UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------- x
   :   11 Civ. 6189 (DLC)
   :
FEDERAL HOUSING FINANCE AGENCY,   :  **PLAINTIFF'S REPLY TO**
etc.,   :  **DEFENDANTS' RESPONSE TO**
   :  **PLAINTIFF'S LOCAL RULE 56.1**
         Plaintiff,   :  **STATEMENT OF UNDISPUTED**
      v.   :  **MATERIAL FACTS, REPLY TO**
   :  **DEFENDANTS'**
HSBC NORTH AMERICA HOLDINGS,   :  **COUNTERSTATEMENT OF**
INC., *et al.*,   :  **MATERIAL FACTS, AND**
         Defendants.   :  **PLAINTIFF'S LOCAL RULE 56.1**
     **STATEMENT OF ADDITIONAL**
     **UNDISPUTED MATERIAL FACTS**
    x
----------------------------------------------------------- :
   :   11 Civ. 6198 (DLC)
   :
FEDERAL HOUSING FINANCE AGENCY,   :
etc.,   :
   :
         Plaintiff,   :
      v.   :
   :
GOLDMAN, SACHS & CO., *et al.*,   :
         Defendants.   :

----------------------------------------------------------- x
   :
   :   11 Civ. 6201 (DLC)
FEDERAL HOUSING FINANCE AGENCY,   :
etc.,   :
   :
         Plaintiff,   :
      v.   :
   :
NOMURA HOLDING AMERICA, INC., *et*   :
*al.*,   :
         Defendants.   :
----------------------------------------------------------- x

```
------------------------------------------------------------ x
                                                            :
                                                            :    11 Civ. 7010 (DLC)
FEDERAL HOUSING FINANCE AGENCY,                             :
etc.,                                                       :
                                                            :
                                                            :
                        Plaintiff,                          :
                    v.                                      :
                                                            :
ALLY FINANCIAL INC., et al.,                                :
                                                            :
                        Defendants.                         :
------------------------------------------------------------ x
```

Pursuant to Civil Rule 56.1 of the Local Rules of Civil Procedure for the Southern District of New York, Plaintiff Federal Housing Finance Agency ("FHFA"), as Conservator for the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac" and, together with Fannie Mae, the "GSEs"), respectfully submits the following Reply to Defendants' Reponse to Plaintiff's Local Rule 56.1 Statement of Undisputed Material Facts and Response to Defendants' Counterstatement of Material Facts and Plaintiff's Local Rule 56.1 Statement of Additional Undisputed Material Facts in support of its Motion for Partial Summary Judgment on the GSEs' Knowledge.

To the extent FHFA states below that a statement of material fact proffered by Defendants is disputed or undisputed, FHFA does so for purposes of this Motion only.  FHFA preserves all potential evidentiary objections and does not acknowledge that any fact proffered by Defendants or evidence offered by them in support of a fact is either admissible or may properly be considered by the Court.  FHFA objects to each and every paragraph in Defendants' Response to FHFA's Statement of Undisputed Material Facts and in Defendants' Counterstatement of Material Facts Facts to the extent each paragraph states multiple facts.

**FHFA'S REPLY TO DEFENDANTS' RESPONSE TO FHFA'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS**

| | **FHFA's Rule 56.1 Statement** | **Defendants' 56.1 Counterstatement** | **FHFA's Reply** |
|---|---|---|---|
| 2 | Each Securitization was issued pursuant to a Shelf Registration Statement and Prospectus Supplement, which contained the following representations regarding the supporting Mortgage | Undisputed that the Securitizations were issued pursuant to shelf registration statements and prospectus supplements, which contained representations and other statements by various entities related to the four categories outlined above, and those representations | Defendants' provision of additional evidence to undermine or provide necessary context to FHFA's SUF does not create a factual dispute that would preclude the Court from granting FHFA's motion, because it does not specifically controvert FHFA's SUF.  *See, e.g., Maersk, Inc. v. Neewra, Inc.*, 687 F.Supp.2d 300, 313 |

| | **FHFA's Rule 56.1 Statement** | **Defendants' 56.1 Counterstatement** | **FHFA's Reply** |
|---|---|---|---|
| | Loans: (1) the Mortgage Loans' adherence to the applicable underwriting guidelines; (2) the loan-to-value ratios ("LTV") and combined loan-to-value ratio ("CLTV") of the Mortgage Loans; (3) the owner-occupancy rates of the properties underlying the Mortgage Loans; and (4) the credit ratings based on information furnished by Defendants to the credit ratings agencies for each tranche of the Securitizations. *Infra,* ¶¶ 9-12, 15-18, 21-24, 33-36, 39- 42. | and statements included cautionary language and other disclosures informing the GSEs of the risks associated with underlying loans. Defendants incorporate into this paragraph their responses to paragraphs 20 and 23, including Tables A-E. | (S.D.N.Y. 2009) (statements not specifically controverted" by a correspondingly numbered paragraph" are deemed admitted under Rule 56.1). |
| 8 | Fact discovery closed across these actions on December 6, 2013. *See FHFA v. Goldman, Sachs & Co et al.,* Order re Revised Pretrial Schedule, Dkt. 494, No 1:11-cv-06198-DLC at 1, ¶ 1 (September 25, 2013). | Disputed. FHFA continued to produce documents and take party discovery after December 6, 2013. *See* Endorsed FHFA Ltr. To Court, Dec. 10, 2013, *FHFA v. Goldman, Sachs & Co., et al.,* 11 Civ. 6198 (DLC), D.E. No. 566, and third party fact discovery is ongoing as of the date of filing of this Statement. *See* Endorsed FHFA Ltr. to Court, May 23, 2014, *FHFA v. Goldman, Sachs & Co., et al.,* 11 Civ. 6198 (DLC), D.E. No. 714. | Defendants' counterstatement fails to create a genuine dispute of material fact.  It is undisputed that December 6, 2013 is the date on which fact discovery closed in these Actions.  *See FHFA v. Goldman, Sachs & Co et al.,* Order re Revised Pretrial Schedule, Dkt. 494, No 1:11-cv-06198-DLC at 1, ¶ 1 (September 25, 2013). |

| | FHFA's Rule 56.1 Statement | Defendants' 56.1 Counterstatement | FHFA's Reply |
|---|---|---|---|
| 11 | In the GSAMP 2005-AHL2 Prospectus Supplement, the Goldman Sachs Defendants represented that "Each mortgage loan originated or acquired by Accredited is underwritten prior to loan closing, or re-underwritten after loan closing but prior to purchase by Accredited, in accordance with Accredited's underwriting guidelines." Ex. 54[1] (GSAMP 2005-AHL2 Prospectus Supplement, GS FHFA 000227426) at 462. | Undisputed that the GSAMP 2005-AHL2 prospectus supplement included the language cited in ¶ 11, as well as other disclosures related to the origination and underwriting of the underlying mortgage loans. *See infra* ¶ 20. In this and all other responses in this Statement, except as explicitly noted otherwise, Defendants dispute that "the Goldman Sachs Defendants" or any other similar collection of defendants took any particular action, either collectively, individually or otherwise. In this particular instance, GSAMP Trust 2005-AHL2 acted as Issuer of that Securitization and only certain of the Goldman Sachs Defendants were involved in the preparation of the Offering Materials for that Securitization. As the Supreme Court noted in *Janus Capital Group, Inc.* v. *First Derivative Traders*, 131 S. | Defendants' provision of additional evidence to undermine or provide necessary context to FHFA's SUF does not create a factual dispute that would preclude the Court from granting FHFA's motion, because it does not specifically controvert FHFA's SUF. *See, e.g., Maersk, Inc. v. Neewra, Inc.*, 687 F.Supp.2d 300, 313 (S.D.N.Y. 2009) (statements not specifically controverted" by a correspondingly numbered paragraph" are deemed admitted under Rule 56.1). |

[1]   Citations to "FHFA Ex. 1" through "FHFA Ex. 204" refer to the exhibits attached to the Declaration of Andrew R. Dunlap in Support of Plaintiff's Motion for Partial Summary Judgment on the GSEs' Knowledge, dated April 21, 2014 and to the Declaration of Kanchana W. Leung in Support of Plaintiff's Motion for Partial Summary Judgment on the GSE's Knowledge, dated April 21, 2014.  Citations to "FHFA Ex. 248" through "FHFA Ex. 296" refer to the exhibits attached to the Declaration of Andrew R. Dunlap in Support of Plaintiff's Motion for Partial Summary Judgment on the GSEs' Knowledge, dated June 24, 2014.  Citations to "Defs. Ex." refer to an exhibit filed jointly by Defendants in support of their opposition to FHFA's Motion for Partial Summary Judgment on the GSEs' Knowledge, dated June 3, 2014.

|  | **FHFA's Rule 56.1 Statement** | **Defendants' 56.1 Counterstatement** | **FHFA's Reply** |
|---|---|---|---|
|  |  | Ct. 2296, 2302 (2011), the "the maker of a statement" is one who has "ultimate authority over the statement, including its content and whether and how to communicate it." Furthermore, in this and all subsequent responses in this Statement, wherever Defendants do not dispute that offering documents include statements or language quoted by FHFA, except as explicitly noted otherwise, Defendants dispute that those statements or language constitute a contractual "representation." The language quoted above appears  following a preamble stating that "[t]he *information* set forth in the following paragraphs has been provided by Accredited." Ex. 1 at S- 37 (emphasis added). |  |
| 12 | In the GSAMP 2005-AHL2 Prospectus Supplement, the Goldman Sachs Defendants also represented that (1) 559 of the 978 Mortgage Loans in Group 1, the Supporting Loan Group, had LTVs at or below 80%, *id.* at 584; (2) none of the 978 Mortgage Loans in the Supporting Loan Group had LTVs | Undisputed that **t**he GSAMP 2005-AHL2 Prospectus Supplement included the language cited in ¶ 12, as well as other disclosures related to owner-occupancy, valuation of the loans and credit ratings, and the calculation of those figures. *See infra* ¶¶ 21-23. | Defendants' provision of additional evidence to undermine or provide necessary context to FHFA's SUF does not create a factual dispute that would preclude the Court from granting FHFA's motion, because it does not specifically controvert FHFA's SUF. *See, e.g.*, *Maersk, Inc. v. Neewra, Inc.*, 687 F.Supp.2d 300, 313 (S.D.N.Y. 2009) (statements not specifically controverted" by a correspondingly numbered paragraph" are deemed admitted under Rule 56.1). |

|  | **FHFA's Rule 56.1 Statement** | **Defendants' 56.1 Counterstatement** | **FHFA's Reply** |
|---|---|---|---|
|  | above 100%, *id.*; (3) 887 of the 978 Mortgage Loans in the Supporting Loan Group were for owner-occupied properties, *id.*; and (4) Certificates from the A-1A tranche would have credit ratings of AAA from Standard & Poor's ("S&P") and Aaa from Moody's Investors Service ("Moody's"), *id.* at 536. |  |  |
| 14 | In the GSR 2007-OA2 Prospectus Supplement, the Goldman Sachs Defendants represented that "[A]ll of the mortgage loans that GSMC may acquire through its conduit program will be acquired generally in accordance with the underwriting criteria described in this section," Ex. 76 (GSR 2007-OA2 Prospectus Supplement, GS FHFA 000093185) at 403, and that loans purchased from the other primary originator, Residential Funding Company LLC, "will have been originated generally in accordance with | Undisputed that the GSR 2007-OA2 Prospectus Supplement included the language cited in ¶ 14, as well as other disclosures related to owner-occupancy, valuation of the loans and credit ratings, and the calculation of those figures. *See infra* ¶¶ 21-23. | Defendants' provision of additional evidence to undermine or provide necessary context to FHFA's SUF does not create a factual dispute that would preclude the Court from granting FHFA's motion, because it does not specifically controvert FHFA's SUF. *See, e.g., Maersk, Inc. v. Neewra, Inc.*, 687 F.Supp.2d 300, 313 (S.D.N.Y. 2009) (statements not specifically controverted" by a correspondingly numbered paragraph" are deemed admitted under Rule 56.1). |

| | **FHFA's Rule 56.1 Statement** | **Defendants' 56.1 Counterstatement** | **FHFA's Reply** |
|---|---|---|---|
| | Residential Funding Company, LLC's underwriting standards or alternative underwriting criteria as described below." *Id.* at 236. | | |
| 15 | In the GSR 2007-OA2 Prospectus Supplement, the Goldman Sachs Defendants represented that (1) 919 of the 1,116 Mortgage Loans in the Supporting Loan Group had LTVs at or below 80%, *id.* at 344; (2) none of the 1,116 Mortgage Loans in the Supporting Loan Group had LTVs above 100%, *id.*; (3) 739 of the 1,116 Mortgage Loans in the Supporting Loan Group were for owner-occupied properties, *id.* at 347; and (4) Certificates from the 1A-1 tranche would have credit ratings of AAA from S&P and Aaa from Moody's, *id.* at 185. The Goldman Sachs Defendants explained that "Due to rounding, percentages may not add up to 100%." *Id.* at 230. | Undisputed that the GSR 2007-OA2 Prospectus Supplement included the language cited in ¶ 15, as well as other disclosures related to owner-occupancy, valuation of the loans and credit ratings, and the calculation of those figures. *See infra* ¶¶ 21-23. | Defendants' provision of additional evidence to undermine or provide necessary context to FHFA's SUF does not create a factual dispute that would preclude the Court from granting FHFA's motion, because it does not specifically controvert FHFA's SUF.  *See, e.g.*, *Maersk, Inc. v. Neewra, Inc.*, 687 F.Supp.2d 300, 313 (S.D.N.Y. 2009) (statements not specifically controverted" by a correspondingly numbered paragraph" are deemed admitted under Rule 56.1). |

|  | **FHFA's Rule 56.1 Statement** | **Defendants' 56.1 Counterstatement** | **FHFA's Reply** |
|---|---|---|---|
| 16 | In the April 18, 2006 GSAA 2006-8 term sheet, for example, the Goldman Sachs Defendants represented that 76.7% of the 1,142 loans in the Supporting Loan Group had an LTV of 80% or lower, that none had an LTV greater than 100%, and that 52.8% of the loans were for owner-occupied properties. Ex. 138 (GSAA 2006-8 Term Sheet, FHFA01031956) at 988-89. | Undisputed that the GSAA 2006-8 term sheet included the language cited in ¶ 16 as well as other disclosures related to the calculation of those figures. *See infra* ¶¶ 21-23. | Defendants' provision of additional evidence to undermine or provide necessary context to FHFA's SUF does not create a factual dispute that would preclude the Court from granting FHFA's motion, because it does not specifically controvert FHFA's SUF. *See, e.g., Maersk, Inc. v. Neewra, Inc.*, 687 F.Supp.2d 300, 313 (S.D.N.Y. 2009) (statements not specifically controverted" by a correspondingly numbered paragraph" are deemed admitted under Rule 56.1). |
| 17 | The Goldman Sachs Defendants made the same representations as in the April 18, 2006 term sheet in the April 25, 2006, Prospectus Supplement governing the GSAA 2006-8 securitization. Ex. 51 (GSAA 2006-8 Prospectus Supplement, GS FHFA 000068496), at 697-98. | Undisputed that the GSAA 2006-8 prospectus supplement included the language cited in ¶ 17, as well as other disclosures related to owner-occupancy, valuation of the loans and credit ratings, and the calculation of those figures. *See infra* ¶¶ 21-23. | Defendants' provision of additional evidence to undermine or provide necessary context to FHFA's SUF does not create a factual dispute that would preclude the Court from granting FHFA's motion, because it does not specifically controvert FHFA's SUF. *See, e.g., Maersk, Inc. v. Neewra, Inc.*, 687 F.Supp.2d 300, 313 (S.D.N.Y. 2009) (statements not specifically controverted" by a correspondingly numbered paragraph" are deemed admitted under Rule 56.1). |
| 18 | Some of the Supporting Loan Groups changed slightly in the weeks before Defendants would issue the Prospectus Supplements. For example, in the | Undisputed that the preliminary prospectus supplement dated October 11, 2017 for GSR 2007-OA2 included the language cited in ¶ 18, as well as other disclosures related to owner-occupancy, valuation of the loans and credit | Defendants' provision of additional evidence to undermine or provide necessary context to FHFA's SUF does not create a factual dispute that would preclude the Court from granting FHFA's motion, because it does not specifically controvert FHFA's SUF. *See,* |

| | **FHFA's Rule 56.1 Statement** | **Defendants' 56.1 Counterstatement** | **FHFA's Reply** |
|---|---|---|---|
| | October 11, 2007, term sheet for the GSR 2007-OA2 Securitization, which contained data on the Supporting Loan Group as of September 1, 2007, the Goldman Sachs Defendants represented that the relevant Supporting Loan Group would contain 1,142 loans, with a weighted original LTV ratio of 78.01% and 762 owner-occupied homes. Ex. 153 (GSR 2007-OA2 Structural and Collateral Term Sheet, FHFA13587357), at 366, 374. | ratings, and the calculation of those figures. *See infra* ¶¶ 21-23. | *e.g., Maersk, Inc. v. Neewra, Inc.*, 687 F.Supp.2d 300, 313 (S.D.N.Y. 2009) (statements not specifically controverted" by a corresponding numbered paragraph" are deemed admitted under Rule 56.1). |
| 19 | In the preliminary GSR 2007-OA2 Prospectus Supplement that the Goldman Sachs Defendants issued on October 17, 2007, the Goldman Sachs Defendants slightly altered the composition of the Supporting Loan Group, which then contained 1,116 loans, with a weighted original LTV ratio of 78.25% and with 739 owner-occupied homes. Ex. 154 (GSR 2007-OA2, | Undisputed that the GSR 2007-OA2 Prospectus Supplement dated before October 17, 2007 included the language cited in ¶ 19, as well as other disclosures related to owner-occupancy, valuation of the loans and credit ratings, and the calculation of those figures. *See infra* ¶¶ 21-23. | Defendants' provision of additional evidence to undermine or provide necessary context to FHFA's SUF does not create a factual dispute that would preclude the Court from granting FHFA's motion, because it does not specifically controvert FHFA's SUF. *See, e.g., Maersk, Inc. v. Neewra, Inc.*, 687 F.Supp.2d 300, 313 (S.D.N.Y. 2009) (statements not specifically controverted" by a corresponding numbered paragraph" are deemed admitted under Rule 56.1). |

|  | **FHFA's Rule 56.1 Statement** | **Defendants' 56.1 Counterstatement** | **FHFA's Reply** |
|---|---|---|---|
|  | Preliminary Prospectus Supplement, FHFA03888630) at 786, 789. |  |  |
| 20 | For each of the 40 Securitizations issued by the Goldman Sachs Defendants, the Goldman Sachs Defendants made representations in the Prospectus Supplements that the Mortgage Loans were generally or substantially underwritten in accordance with an originator's underwriting guidelines, which are indicated in Table 1 below (Exs. 39 – 78)[.] | Except where otherwise noted, undisputed that ¶ 20 and Table 1 cite pages from the identified Prospectus Supplements that include disclosures concerning whether mortgage loans were underwritten generally or substantially in accordance with Originators'underwriting guidelines. The Offering Materials include additional disclosures concerning origination and underwriting guidelines as specified in Table A[.] | Defendants' provision of additional evidence to undermine or provide necessary context to FHFA's SUF does not create a factual dispute that would preclude the Court from granting FHFA's motion, because it does not specifically controvert FHFA's SUF. *See, e.g.*, *Maersk, Inc. v. Neewra, Inc.*, 687 F.Supp.2d 300, 313 (S.D.N.Y. 2009) (statements not specifically controverted" by a correspondingly numbered paragraph" are deemed admitted under Rule 56.1). |
| 21 | The Goldman Sachs Defendants made representations concerning the LTV and CLTV of the Mortgage Loans backing the Securitizations, as indicated in Table 2 below (Exs. 39– 78)[.] | Except where otherwise noted, undisputed that ¶ 21 and Table 2 cite pages from the identified prospectus supplements that include disclosures concerning valuation. The Offering Materials include additional disclosures concerning LTV/CLTV ratios and valuation matters as specified in Table B[.] | Defendants' provision of additional evidence to undermine or provide necessary context to FHFA's SUF does not create a factual dispute that would preclude the Court from granting FHFA's motion, because it does not specifically controvert FHFA's SUF. *See, e.g.*, *Maersk, Inc. v. Neewra, Inc.*, 687 F.Supp.2d 300, 313 (S.D.N.Y. 2009) (statements not specifically controverted" by a correspondingly numbered paragraph" are deemed admitted under Rule 56.1). |

| | **FHFA's Rule 56.1 Statement** | **Defendants' 56.1 Counterstatement** | **FHFA's Reply** |
|---|---|---|---|
| 22 | The Goldman Sachs Defendants made representations in the Prospectus Supplements concerning the occupancy status of the borrowers of the Mortgage Loans backing the Securitizations, as indicated in Table 3 below (Exs. 39 – 78)[.] | Undisputed that ¶ 22 and Table 3 cite pages from the identified Prospectus Supplements that include disclosures concerning owner-occupancy. Disputed that the Goldman Sachs Defendants made representations "concerning the occupancy status of the borrowers of the Mortgage Loans." For example, the Prospectus Supplement for GSAMP 2006-HE7 states that owner-occupancy disclosures are "based on information that we consider reliable, but we do not represent that it is accurate or complete and it should not be relied upon as such." Ex. 30 at A-4, A-12, A-20. The Offering Materials include additional disclosures concerning owner-occupancy as specified in Table C[.] | Defendants' provision of additional evidence to undermine or provide necessary context to FHFA's SUF does not create a factual dispute that would preclude the Court from granting FHFA's motion, because it does not specifically controvert FHFA's SUF. *See, e.g., Maersk, Inc. v. Neewra, Inc.*, 687 F.Supp.2d 300, 313 (S.D.N.Y. 2009) (statements not specifically controverted" by a correspondingly numbered paragraph" are deemed admitted under Rule 56.1). |
| 23 | The Goldman Sachs Defendants made representations in the Prospectus Supplements concerning the credit ratings for each tranche of the Securitizations, as indicated in Table 4 below (Exs. 39 – 78)[.] | Except where otherwise noted, undisputed that that ¶ 22 and Table 4 cite pages from the identified prospectus supplements that include disclosures concerning credit ratings. The Offering Materials include additional disclosures concerning credit ratings as specified in Table D[.] | Defendants' provision of additional evidence to undermine or provide necessary context to FHFA's SUF does not create a factual dispute that would preclude the Court from granting FHFA's motion, because it does not specifically controvert FHFA's SUF. *See, e.g., Maersk, Inc. v. Neewra, Inc.*, 687 F.Supp.2d 300, 313 (S.D.N.Y. 2009) (statements not specifically controverted" by a correspondingly numbered paragraph" are deemed admitted under Rule 56.1). |

| | **FHFA's Rule 56.1 Statement** | **Defendants' 56.1 Counterstatement** | **FHFA's Reply** |
|---|---|---|---|
| 26 | For each of the 10 Securitizations offered and sold by the Non-Settling Ally Defendants, the Non-Settling Ally Defendants made representations in the Prospectus Supplements that the Mortgage Loans were generally underwritten in accordance with RFC's or the originator's underwriting guidelines, as indicated in Table 6 below (Exs. 205-214)[.] | Except where otherwise noted, undisputed that as to RALI 2007-QH5, ¶ 26 and Table 6 cite pages from the identified Prospectus Supplement that include disclosures concerning whether mortgage loans were underwritten generally or substantially in accordance with Originators' underwriting guidelines. The Offering Materials include additional disclosures concerning origination and underwriting guidelines as specified in Table E[.] | Defendants' provision of additional evidence to undermine or provide necessary context to FHFA's SUF does not create a factual dispute that would preclude the Court from granting FHFA's motion, because it does not specifically controvert FHFA's SUF. *See, e.g., Maersk, Inc. v. Neewra, Inc.*, 687 F.Supp.2d 300, 313 (S.D.N.Y. 2009) (statements not specifically controverted" by a correspondingly numbered paragraph" are deemed admitted under Rule 56.1). |
| 27 | The Non-Settling Ally Defendants made representations in the Prospectus Supplements concerning the LTV and CLTV of the Mortgage Loans backing the Securitizations, as indicated in Table 7 below (Exs. 205-214)[.] | Except where otherwise noted, undisputed that as to RALI 2007-QH5 ¶ 27 and Table 7 cite pages from the identified Prospectus Supplement that include disclosures concerning valuation. The Offering Materials include additional disclosures concerning LTV/CLTV ratios and valuation matters as specified in Table F[.] | Defendants' provision of additional evidence to undermine or provide necessary context to FHFA's SUF does not create a factual dispute that would preclude the Court from granting FHFA's motion, because it does not specifically controvert FHFA's SUF. *See, e.g., Maersk, Inc. v. Neewra, Inc.*, 687 F.Supp.2d 300, 313 (S.D.N.Y. 2009) (statements not specifically controverted" by a correspondingly numbered paragraph" are deemed admitted under Rule 56.1). |
| 28 | The Non-Settling Ally Defendants made representations in the Prospectus Supplements concerning the occupancy status of the borrowers of the | Except where otherwise noted, undisputed that as to RALI 2007-QH5 ¶ 28 and Table 8 cite pages from the identified prospectus supplement that include disclosures concerning owner-occupancy. The | Defendants' provision of additional evidence to undermine or provide necessary context to FHFA's SUF does not create a factual dispute that would preclude the Court from granting FHFA's motion, because it does not specifically |

| | **FHFA's Rule 56.1 Statement** | **Defendants' 56.1 Counterstatement** | **FHFA's Reply** |
|---|---|---|---|
| | Mortgage Loans backing the Securitizations, as indicated in Table 8 below (Exs. 205-214)[.] | Offering Materials include additional disclosures concerning owner-occupancy as specified in Table G[.] | controvert FHFA's SUF. *See, e.g., Maersk, Inc. v. Neewra, Inc.*, 687 F.Supp.2d 300, 313 (S.D.N.Y. 2009) (statements not specifically controverted" by a correspondingly numbered paragraph" are deemed admitted under Rule 56.1). |
| 29 | The Non-Settling Ally Defendants made representations in the Prospectus Supplements concerning the credit ratings for each tranche of the Securitizations, as indicated in Table 9 below (Exs. 205-214)[.] | Except where otherwise noted, undisputed that as to RALI 2007-QH5 ¶ 29 and Table 9 cite pages from the identified Prospectus Supplement that include disclosures concerning credit ratings. The Offering Materials include additional disclosures concerning credit ratings as specified in Table H[.] | Defendants' provision of additional evidence to undermine or provide necessary context to FHFA's SUF does not create a factual dispute that would preclude the Court from granting FHFA's motion, because it does not specifically controvert FHFA's SUF. *See, e.g., Maersk, Inc. v. Neewra, Inc.*, 687 F.Supp.2d 300, 313 (S.D.N.Y. 2009) (statements not specifically controverted" by a correspondingly numbered paragraph" are deemed admitted under Rule 56.1). |
| 33 | In the HASC 2006-HE1 Prospectus Supplement, the HSBC Defendants represented that "Approximately 58.74% of the Mortgage Loans to be acquired by the Trust from the Depositor were originated by WMC Mortgage Corp. ('WMC') in accordance with the underwriting criteria described below" and that "Countrywide Home Loans underwrites the related mortgage loan in | The HASC 2006-HE1 Prospectus Supplement included the language cited in ¶ 33, as well as other disclosures related to the origination and underwriting of the underlying mortgage loans. In this and all subsequent responses, unless explicitly undisputed otherwise, Defendants deny that "the HSBC Defendants" or any similar collection of defendants took any particular action, either collectively or as individuals. *See* Ex. 44 at S-2; S-23; S-26; S-33; S-41-6-; S-64; S-97. | Defendants' provision of additional evidence to undermine or provide necessary context to FHFA's SUF does not create a factual dispute that would preclude the Court from granting FHFA's motion, because it does not specifically controvert FHFA's SUF. *See, e.g., Maersk, Inc. v. Neewra, Inc.*, 687 F.Supp.2d 300, 313 (S.D.N.Y. 2009) (statements not specifically controverted" by a correspondingly numbered paragraph" are deemed admitted under Rule 56.1). |

| | **FHFA's Rule 56.1 Statement** | **Defendants' 56.1 Counterstatement** | **FHFA's Reply** |
|---|---|---|---|
| | accordance with the underwriting standards established by Countrywide Home Loans." Ex. 85 (HASC 2006-HE1 Prospectus Supplement, HSBC-FHFA 01301731) at 775, 788. | | |
| 34 | The HSBC Defendants represented that (1) 2,830 of the 4,211 Mortgage Loans in the Supporting Loan Group had LTVs at or below 80%, Ex. 85 at 950; (2) none of the 4,211 Mortgage Loans in the Supporting Loan Group had LTVs above 100%, *id.*; (3) 1,256 of the 4,211 Mortgage Loans in the Supporting Loan Group had CLTVs at or below 80%, *id.* at 951; (4) none of the 4,211 Mortgage Loans in the Supporting Loan Group had CLTVs above 100%, *id.*; (5) 4,022 of the 4,211 Mortgage Loans in the Supporting Loan Group were for owner occupied properties, *id.* at 960; and (4) Certificates from the I-A tranche would have credit ratings of AAA from S&P and Fitch Ratings and Aaa from | The HASC 2006-HE1 Prospectus Supplement included the representations cited in ¶ 34, as well as other disclosures related to owner-occupancy, valuation of the loans and credit ratings, and the calculation of those figures based on statistics subject to variance as disclosed in the prospectus supplement. *See* Ex. 44 at S-2; S-4; S-6; S-16; S-19; S-24; S-28; S-31; S-33; S-37; S-38; S-46; S-48; S-49; S-51-S-60; S-64; A-7-A-8; A-17. | Defendants' provision of additional evidence to undermine or provide necessary context to FHFA's SUF does not create a factual dispute that would preclude the Court from granting FHFA's motion, because it does not specifically controvert FHFA's SUF.  *See, e.g.*, *Maersk, Inc. v. Neewra, Inc.*, 687 F.Supp.2d 300, 313 (S.D.N.Y. 2009) (statements not specifically controverted" by a correspondingly numbered paragraph" are deemed admitted under Rule 56.1). |

|  | **FHFA's Rule 56.1 Statement** | **Defendants' 56.1 Counterstatement** | **FHFA's Reply** |
|---|---|---|---|
|  | Moody's, *id.* at 887. |  |  |
| 35 | For each of the 17 Securitizations issued by the HSBC Defendants, the HSBC Defendants made representations in the Prospectus Supplements that the Mortgage Loans were generally or substantially underwritten in accordance with an originator's underwriting guidelines, as indicated in Table 11 below (Exs. 79 – 95)[.] | Except where otherwise noted, undisputed that ¶ 35 and Table 11 cite pages from the identified prospectus supplements that include disclosures concerning whether mortgage loans were underwritten generally or substantially in accordance with Originators'underwriting guidelines. The Offering Materials include additional representations and disclosures concerning origination and underwriting guidelines as specified in Table I[.] | Defendants' provision of additional evidence to undermine or provide necessary context to FHFA's SUF does not create a factual dispute that would preclude the Court from granting FHFA's motion, because it does not specifically controvert FHFA's SUF. *See, e.g., Maersk, Inc. v. Neewra, Inc.*, 687 F.Supp.2d 300, 313 (S.D.N.Y. 2009) (statements not specifically controverted" by a correspondingly numbered paragraph" are deemed admitted under Rule 56.1). |
| 36 | The HSBC Defendants made representations in the Prospectus Supplements concerning the LTV and combined loan-to-value ratio ("CLTV") of the Mortgage Loans backing the Securitizations, as indicated in Table 12 below (Exs. 79 – 95)[.] | Except where otherwise noted, undisputed that ¶ 36 and Table 12 cite pages from the identified Prospectus Supplements that include disclosures concerning valuation. The Offering Materials include additional disclosures concerning LTV/CLTV ratios and valuation matters as specified in Table J[.] | Defendants' provision of additional evidence to undermine or provide necessary context to FHFA's SUF does not create a factual dispute that would preclude the Court from granting FHFA's motion, because it does not specifically controvert FHFA's SUF. *See, e.g., Maersk, Inc. v. Neewra, Inc.*, 687 F.Supp.2d 300, 313 (S.D.N.Y. 2009) (statements not specifically controverted" by a correspondingly numbered paragraph" are deemed admitted under Rule 56.1). |
| 37 | The HSBC Defendants made representations in the Prospectus Supplements | Except where otherwise noted, undisputed that ¶ 37 and Table 13 cite pages from the identified | Defendants' provision of additional evidence to undermine or provide necessary context to FHFA's SUF does |

| | FHFA's Rule 56.1 Statement | Defendants' 56.1 Counterstatement | FHFA's Reply |
|---|---|---|---|
| | concerning the occupancy status of the borrowers of the Mortgage Loans backing the Securitizations, as indicated in Table 13 below (Exs. 79 – 95)[.] | prospectus supplements that include disclosures concerning owneroccupancy. The Offering Materials include additional disclosures concerning owner-occupancy as specified in Table K[.] | not create a factual dispute that would preclude the Court from granting FHFA's motion, because it does not specifically controvert FHFA's SUF. *See, e.g., Maersk, Inc. v. Neewra, Inc.*, 687 F.Supp.2d 300, 313 (S.D.N.Y. 2009) (statements not specifically controverted" by a correspondingly numbered paragraph" are deemed admitted under Rule 56.1). |
| 38 | The HSBC Defendants made representations in the Prospectus Supplements concerning the credit ratings for each tranche of the Securitizations, as indicated in Table 14 below (Exs. 79 – 95)[.] | Except where otherwise noted, undisputed that ¶ 38 and Table 14 cite pages from the identified prospectus supplements that include disclosures concerning credit ratings. The Offering Materials include additional disclosures concerning credit ratings as specified in Table L[.] | Defendants' provision of additional evidence to undermine or provide necessary context to FHFA's SUF does not create a factual dispute that would preclude the Court from granting FHFA's motion, because it does not specifically controvert FHFA's SUF. *See, e.g., Maersk, Inc. v. Neewra, Inc.*, 687 F.Supp.2d 300, 313 (S.D.N.Y. 2009) (statements not specifically controverted" by a correspondingly numbered paragraph" are deemed admitted under Rule 56.1). |
| 41 | For each of the 7 Securitizations issued by the Nomura Defendants, they made representations in the Prospectus Supplements that the Mortgage Loans were generally or substantially underwritten in accordance with an originator's underwriting guidelines, as indicated in Table 16 | Except where otherwise noted, the Nomura Defendants do not dispute that ¶ 41, Table 16 cites selected pages from the relevant prospectus supplements for NAA 2005-AR6, NHELI 2006-FM1, NHELI 2006-FM2, NHELI 2006-HE3, NHELI 2007-1 and NHELI 2007-2 that include representations concerning whether mortgage loans were underwritten | The Nomura Defendants' dispute regarding the NHELI 2007-3 prospectus supplement's content is unfounded. The NHELI 2007-3 prospectus supplement does disclose that that mortgage loans were underwritten in accordance with ResMae's Underwriting Guidelines. *See* FHFA Ex. 102, NHELI 2007-3 Prospectus Supplement, NOM-FHFA_04732621 at 763 ("The Mortgage Loans were underwritten in accordance with the underwriting standards |

|  | **FHFA's Rule 56.1 Statement** | **Defendants' 56.1 Counterstatement** | **FHFA's Reply** |
|---|---|---|---|
|  | below (Exs. 96 – 102)[.] | generally or substantially in accordance with Originators' underwriting guidelines. The Nomura Defendants aver that the Offering Materials include additional representations concerning the nature of the underwriting guidelines—including differences from guidelines applicable to GSE loans—and exceptions to the guidelines made by originators and the risks attendant to the use of reduced guidelines. The Nomura Defendants dispute that the prospectus supplement for NHELI 2007-3 represents that the mortgage loans were generally or substantially underwritten in accordance with ResMAE's underwriting guidelines and aver that this prospectus supplement specifically discloses that the loans originated by ResMAE—and any other Originator in financial distress—may not be underwritten in substantial compliance with applicable guidelines. | described in this prospectus supplement under 'The Mortgage Pool-The Originator . . .'" |
| 42 | The Nomura Defendants made representations in the Prospectus Supplements concerning the loan-to-value ratios ("LTV") and combined loan-to-value ratio ("CLTV") | The Nomura Defendants do not dispute that ¶ 42, Table 17 cites pages from the relevant prospectus supplement that include representations concerning valuation. The Offering Materials include additional representations and disclosures concerning | To the extent the Nomura Defendants contend that the Prospectus Supplements did not make any representations regarding LTV ratios, this dispute is unfounded.  While there were no representations regarding CLTV ratios, LTV ratios were disclosed as a representation.  *See* FHFA Ex. |

| | **FHFA's Rule 56.1 Statement** | **Defendants' 56.1 Counterstatement** | **FHFA's Reply** |
|---|---|---|---|
| | of the Mortgage Loans backing the Securitizations, as indicated in Table 17 below (Exs. 96 – 102)[.] | LTV/CLTV ratios and valuation— including how the ratios are calculated and the sources used—as specified in Table N[.] The Nomura Defendants dispute that the Prospectus Supplement for NAA 2005-AR6 made representations concerning CLTV ratios. | 96 (NAA-2005-AR6 Prospectus Supplement) at NOM-FHFA_04811802 at 841. |
| 45 | The Nomura Defendants made similar representations in the preliminary offering materials regarding the LTV and CLTV of the Mortgage Loans backing the Securitizations, occupancy status of the borrowers of the Mortgage Loans backing the Securitizations, and the credit ratings for each tranche of the Securitizations, examples of which are indicated in Table 20 below (Exs. 179 – 186)[.] | The Nomura Defendants dispute that Paragraph 45 accurately portrays the representations made in preliminary offering materials related to the 7 Nomura Securitizations, as cited in ¶ 45. In addition, the preliminary offering materials for NAA 2005-AR6 make no representation about the CLTV of the Mortgage Loans. The preliminary offering materials cited in Table 20 for NAA 2005-AR6, NHELI 2006-FM1, NHELI 2006-FM2, NHELI 2007-1, NHELI 2007-3 indicate only expected credit ratings. The preliminary offering materials cited in Table 20 for NHELI 2006-FM1 only provide credit ratings for two tranches of the securitization, not every tranche. The Nomura Defendants do not dispute that ¶ 45, Table 20 cites pages from the relevant preliminary offering documents that include that | The Nomura Defendants' dispute regarding is unfounded. The representations indicated in FHFA's SUF ¶45 and Table 20 are made in the preliminary offering materials related to the 7 Nomura Securitizations at the relevant cites. |

|  | FHFA's Rule 56.1 Statement | Defendants' 56.1 Counterstatement | FHFA's Reply |
|---|---|---|---|
|  |  | include certain representations concerning LTV and valuations, owner-occupancy, and credit ratings. The Preliminary Offering Materials include additional representations and disclosures concerning these disclosures as specified in Table O. |  |
| 64 | As demonstrated herein, every Fannie Mae deponent who was asked about his or her knowledge regarding Defendants' alleged misrepresentations testified that they did not have any actual knowledge as to the falsity of the specific alleged misrepresentations, because they believed that Defendants were communicating accurate information to them. *Infra* ¶¶ 65–72. | Disputed for reasons set forth in below. *Infra* ¶¶ 65-72. | Defendants do not dispute FHFA's SUF ¶¶ 65, 66, 67, 68, 69, 70, 71 or 72, but rather concede that each statement is 'undisputed." Nor does any of the evidence cited by Defendants in ¶¶ 65-72 conflict with or contradict the testimony FHFA cited in ¶¶ 65-72. Moreover, paragraph 64 contains no evidence to dispute; Defendants do not identify contradictory evidence in their responses to paragraph 64. Defendants' provision of additional evidence to undermine or provide necessary context to FHFA's SUF does not create a factual dispute that would preclude the Court from granting FHFA's motion, because it does not specifically controvert FHFA's SUF. *See, e.g.*, *Maersk, Inc. v. Neewra, Inc.*, 687 F.Supp.2d 300, 313 (S.D.N.Y. 2009) (statements not specifically controverted" by a correspondingly numbered paragraph" are deemed admitted under Rule 56.1). |

18

| | **FHFA's Rule 56.1 Statement** | **Defendants' 56.1 Counterstatement** | **FHFA's Reply** |
|---|---|---|---|
| 73 | As demonstrated herein, every Freddie Mac deponent who was asked about his or her knowledge regarding Defendants' alleged misrepresentations testified that they did not have any actual knowledge as to the falsity of the specific alleged misrepresentations, because they believed that Defendants were communicating accurate information to them. *Infra* ¶¶ 74 – 88. | Disputed for reasons set forth below. *Infra* ¶¶ 74-89. | Defendants do not dispute FHFA's SUF ¶¶ 74-76, 78-81, 85-87 but rather concede that each statement is "undisputed." Nor does any of the evidence cited by Defendants in ¶¶ 74-76, 78-81, 85-87 conflict with or contradict the testimony FHFA cited in ¶¶ 74-76, 78-81, 85-87 . Moreover, paragraph 73 contains no evidence to dispute; Defendants do not identify contradictory evidence in their responses to paragraph 73. Defendants' provision of testimony to undermine or provide necessary context to FHFA's SUF does not create a factual dispute that would preclude the Court from granting FHFA's motion, because it does not specifically controvert FHFA's SUF. *See, e.g.*, *Maersk, Inc. v. Neewra, Inc.*, 687 F.Supp.2d 300, 313 (S.D.N.Y. 2009) (statements not specifically controverted" by a correspondingly numbered paragraph" are deemed admitted under Rule 56.1).<br><br>*See* FHFA's reply to Defendants' Counterstatement to FHFA's SUF ¶¶ 77, 82-84, 88-89, *infra*. |
| 77 | Mr. Hackney also testified that he would have stopped doing business with the dealers if he thought they were providing inaccurate information to him regarding potential deals. *Id.* at | Disputed. Mr. Hackney did not testify that he would have stopped doing business with dealers if he thought he was provided with inaccurate information. He was asked whether he believed he had received inaccurate information from | Defendants' counterstatement argument and the cited evidence does not create a genuine issue of material fact. They do not dispute the cited testimony, only whether it applied to all dealers (as it plainly does) or solely to Bear Stearns. The entire exchange reads: "Q. (BY MS. |

| | **FHFA's Rule 56.1 Statement** | **Defendants' 56.1 Counterstatement** | **FHFA's Reply** |
|---|---|---|---|
| | 234:11-22 ("Q. And in the course of your work at Freddie Mac, did you believe at any time that you had been provided with inaccurate information? Not necessarily fraudulent . . . but inaccurate? . . . A. I wouldn't have done business with them . . . . If I had suspected anyone, that would have been the last time we would have spoken."); *see also id.* at 242:5-8 ("Q. Anybody from Goldman Sachs provide you with any inaccurate information while you were at Freddie Mac? A. To my knowledge, no."). | Bear Stearns, and he answered that he would have stopped doing business if anyone at Bear Stearns had provided him with inaccurate information. *See* Ex. 68 at 233:21- 235:4; *see also supra* ¶ 76, which is incorporated into this paragraph. | SHANE) And in the course of your work at Freddie Mac, did you believe at any time that you had been provided with inaccurate information? Not necessarily fraudulent -- A. When I was -- Q. -- but inaccurate? A. When I was at Freddie Mac? Q. Yep. A. I wouldn't have done business with them. Q. All right. And -- A. If I had suspected anyone, that would have been the last time we would have spoken." FHFA Ex. 260 (D. Hackney Dep. Tr.) at 234:11-22.  The fact that the exchange occurred in response to a general question, with Bear Stearns specific questions before and after, does not make the question narrower than it reads. Moreover, this dealer-general testimony is consistent with Mr. Hackney's testimony elsewhere. *Id.* at 252:10-253:13, which reads: "Q. Did you understand that as a general matter in the industry QC and due diligence consisted of techniques like sampling and investigation of certain characteristics on portions of but not the entirety of the pools backing the securities? MR. OBLAK: Objection to form. A. My understanding is that *they* needed to take a statistically relevant sample that got *them, meaning the seller*, comfortable that all the information was true and correct. Q. (BY MS. SHANE) And the sample by definition is less than the whole, |

| | **FHFA's Rule 56.1 Statement** | **Defendants' 56.1 Counterstatement** | **FHFA's Reply** |
|---|---|---|---|
| | | | correct? MR. OBLAK: Objection to form. A. It would need to be a statistically relevant sample so that you could derive confidence intervals that you would -- or I shouldn't say "you" -- but *the dealer* could accept the risk. That's up to *them* to decide what confidence intervals *they're* comfortable accepting, and that will derive their sample size. Q. (BY MS. SHANE) Was it your understanding that as a general matter applying confidence intervals and sampling techniques, dealers tended to actually examine a portion of the pools, not the entire pools? Something less than all? MR. OBLAK: Objection to form. A. My understanding was *they* were comfortable with the risk of not doing a hundred percent review, and that was a risk that *they* undertook when *they* made *their* reps and warrants.") (emphases added).  Whether the Court determines that the specific cited testimony is Bear Stearns-specific or broader does not create material issue of disputed fact with respect to this motion.  Defendants do not present evidence to dispute Mr. Hackney's testimony that he did not believe that Goldman Sachs provided him with "inaccurate information." |

21

|   | **FHFA's Rule 56.1 Statement** | **Defendants' 56.1 Counterstatement** | **FHFA's Reply** |
|---|---|---|---|
| 82 | Bruce Wood, senior director of portfolio management credit policy at Freddie Mac, testified that, in order to avoid securities that had predatory loans, Freddie Mac relied on the representations and warranties from the seller that the collateral did not contain predatory loans. He also noted that Freddie Mac "didn't perform any separate due diligence beyond the due diligence that was being provided by the issuers of the securities." Ex. 12 (B. Wood Dep. Tr.) at 147:21-151:5. | Disputed. Mr. Wood did not testify that Freddie Mac did not conduct separate due diligence to avoid securities that potentially contained predatory loans. He testified that he did not personally conduct any other diligence, and that he did not know whether any separate diligence was also carried out by Freddie Mac. Ex. 72 at 147:22-24 ("Q: Do you know if anyone else at Freddie Mac was separately checking? A: I don't know that.") Mr. Wood also testified that Freddie Mac performed due diligence, including on PLS transactions. Id. at 835:16; 887:10. In 2005, Mr. Wood attended a series of meetings where a "National Lending Customer Issues Comments" report was distributed. That document reported the "National defect rate" had increased from 7.8% in December 2004 to 10.5% in May 2005. See infra ¶¶ 314-317. In June 2006, Mr. Wood received an AMO review of First NLC that rated the originator as "Marginal," and "First NLC's guidelines make it more difficult for an investor working from a standard tape to properly evaluate risk." See infra ¶¶ 193-194, 347. | Defendants do not dispute that Freddie Mac relied on seller representations and warranties that the MABS [PLS] supporting loan pools regarding predatory loans. Mr. Wood testified that Freddie Mac did not perform due diligence to identify predatory loans in MABS [PLS] beyond what was being provided by the issuers. See Defs. Ex. 72 at 148:14-22; 149:18-150:4. After Mr. Wood testified that he did not know if anyone else at Freddie Mac was checking for the representations and warranties (the testimony Defendants cite to created a purported dispute), defense counsel jogged his memory and he testified that Freddie Mac's legal department reviewed the deal documents to ensure that they contained the correct representations and warranties. Id. at 150:5-23. Defendants cannot "dispute" Mr. Wood's testimony that Freddie Mac did not do anti-predatory lending due diligence with testimony (a) that he cannot recall whether and what type of diligence, if any Freddie Mac did on unrelated T-deals (Defs. Ex. 72 at 835:15-20), or (b) his view that Freddie Mac PLS traders and credit analysts did the best pre-purchase diligence that they could with the information the dealers provided, with which they could not conduct "extensive due diligence" Ex. 259 (B. Wood Dep. Tr.) at 887:10-888:14. Freddie Mac |

|  | **FHFA's Rule 56.1 Statement** | **Defendants' 56.1 Counterstatement** | **FHFA's Reply** |
|---|---|---|---|
|  |  |  | does not dispute that Freddie Mac PLS traders and credit analysts examined the data that the dealers provided. Defendants' citation to an AMO reports and a report regarding a national delinquency rate do not contradict Mr. Wood's testimony about either Freddie Mac's reliance on dealer representations and warranties for predatory lending purposes or Freddie Mac's PLS due diligence practices. |
| 83 | Further, Mr. Wood noted that EPDs by themselves were not indicative of poorer underwriting. Ex. 12 (B. Wood Dep. Tr.) at 346:7-19 ("Q. Do you know whether or not EPDs indicate poor underwriting on the part of the originator? [Objection omitted.] A. No, I don't. Not in and of itself I don't."). | Disputed. Mr. Wood testified that he did not know whether EPDs indicated poor underwriting and that EPDs were a sign to examine defaults more closely to confirm that loans were originated to stated guidelines. Ex. 72 at 346:7-347:2. | Defendants do not dispute that Mr. Wood testified as set forth in FHFA Fact No. 83.  Mr. Wood's inadmissible speculation that a high level of EPDs "could be a sign that you would want to look at the defaults more closely," Defs. Ex. 72 at 346:17-19, does not contradict or dispute his testimony.  This speculation is also irrelevant as a matter of law, because under the Securities Act "[a] purchaser has no duty to investigate a seller's possible fraud and need not verify a statement's accuracy."  *Wright v. Nat'l Warranty Co.*, 953 F.2d 256, 262 (6th Cir. 1992).  Moreover, a general assertion that rising EPDs "could" warrant further investigation does not change Mr. Wood's prior testimony, given Defendants' complete failure to identify any rising EPDs in any particular Certificate that, they contend, would establish actual knowledge regarding material |

|  | **FHFA's Rule 56.1 Statement** | **Defendants' 56.1 Counterstatement** | **FHFA's Reply** |
|---|---|---|---|
|  |  |  | defects in later-purchased loan pools, much less actual knowledge that Defendants were misrepresenting the actual collateral characteristics of the defective loans. |
| 84 | Moreover, Mr. Wood testified that it was Freddie Mac's "expectation that the underwriting was conforming to Freddie's standards and failure to do so would have constituted a failure to meet their representations and warranties." Ex. 12 (B. Wood Dep. Tr.) at 883:11-885:23. | Disputed. Plaintiff cites pages and testimony that do not exist in the indicated exhibit or transcript. *See generally* Ex. 72. | FHFA inadvertently included an incorrect citation in its SUF ¶84. Mr. Wood did in fact testify that it was his expectation that the basis for removing collateral from a pool was loans that "wouldn't have met the representations and warranties," and that, in his words, this would occur if the dealers "were, in fact, representing to us that they followed their underwriting guidelines with that collateral." Defs. Ex. 72 at 885:19-23. |
| 88 | Mr. Bisenius testified that the market volatility, by itself, was not clear until at least 2008: "Yeah. I want to just challenge a little bit your statement about the markets going through tremendous volatility. Even by the beginning of 2008, while house prices had stopped appreciating, they actually didn't begin declining until probably late 2007, maybe very early 2008. So they weren't appreciating at 20 percent, but during much of 2006 and even the first part of | Disputed. The cited testimony does not appear in the exhibit or full deposition. *See generally* Ex. 73. | FHFA inadvertently included an incorrect citation in its SUF ¶88. The quoted testimony appears in the transcript of Mr. Bisenius' testimony before the Financial Crisis Inquiry Commission (FCIC). *See* FHFA Ex. 275 (Testimony of D. Bisenius in front of the Financial Crisis Inquiry Commission at 56:17-57:10). |

| | **FHFA's Rule 56.1 Statement** | **Defendants' 56.1 Counterstatement** | **FHFA's Reply** |
|---|---|---|---|
| | 2007 [there was still] positive appreciation, just not at the level we had seen prior. So, putting things into historical context [is] important so the decision that's being made in March is being based on late 2007 information, because it takes a lag to get the information. And at that point, I know we were not anticipating the level of house price decline that ultimate[ly] came about." Ex. 13 (D. Bisenius Dep. Tr.) at 56:17-57:10. | | |
| 89 | Neither Fannie Mae nor Freddie Mac received loan origination files for the Mortgage Loans backing the PLS at issue. None of the Goldman Sachs, HSBC, Nomura, Barclays, or First Horizon deponents, when asked what securitization-specific materials the GSEs were provided with, recalled loan files being among those materials. *See* Exs. 17, 19-21, 26, 29 (E. Phillips Dep. Tr. at 78:14 79:3; S. Hernnson Dep. Tr. at 94:7-95:9; M. Kelly | Disputed. FHFA has refused to produce any loan origination files the GSEs may have received for the certificate mortgage loans before 2008. Ex. 500 at 31. In some instances, deponents were asked about specific documents, but were not questioned about loan files. Elaine Phillips was asked by Plaintiff if she ever received a series of items, such as prospectus materials, term sheets, or loan stratifications, but was never asked by Plaintiff if she received and forwarded loan files. Ex. 106 at 76:21-78:23. Other deponents did not testify with certainty that loan files either were or were not included in | Defendants identify no testimony that contradicts the asserted fact.  Lack of recollection of the possibility of providing the GSEs' loan files or inadmissible speculation that some information provided to the GSEs could have included loan files does not "specifically controvert" FHFA's SUF.  *See* L.R. 56.1(c).  Because Defendants' deponents either could not recall sending loan files to the GSEs or could not testify with certainty on the topic, their testimony is insufficient to support a finding that the witnesses had personal knowledge of whether loan files were provided to the GSEs.  *See* Fed. R. Evid. 602. Accordingly, the witnesses' testimony is objectionable, and cannot create |

| | FHFA's Rule 56.1 Statement | Defendants' 56.1 Counterstatement | FHFA's Reply |
|---|---|---|---|
| | Dep. Tr at 60:21-61:3; R. Lee Dep. Tr. at 113:7-18; D. Clifford Dep. Tr. at 99:5-12; W. Walker Dep. Tr. at 132:16-20). | materials sent to investors. Samuel Hernnson, when asked whether he forwarded loan tapes, responded that he forwarded all information that he received. Ex. 75 at 94:7-95:9. Randall Lee, when asked whether loan files were provided to investors, said "I don't know." Ex. 476 at 113:12-18. Other deponents, though they testified that they did not recall loan files being forwarded, admitted sending large amounts of information, which could have included loan files. Ex. 76 at 60:24-61:3. | an issue of material fact and preclude the Court from granting FHFA's motion. Moreover, Defendants offer no evidence suggesting that the GSEs received loan files for the PLS Mortgage Loans.  They testified that neither Fannie Mae nor Freddie Mac had access to loan-level information or loan files as part of the pre-purchase review process.  For example, Fannie Mae, David Cook, Fannie Mae's Rule 30(b)(6) designee and the PLAT Coordinator during the relevant time period (Defs. Ex. 181), testified that Fannie Mae did not receive loan files for loans that were included in PLS at any time.  FHFA Ex. 251 (D. Cook Dep. Tr.) at 532:15-533:4. David Gussmann, who was responsible for overseeing pre-purchase analytics and post-purchase surveillance of Fannie Mae's PLS portfolio, Defs. Ex. 181, similarly testified that "we didn't have any ability to look at any of the, like the loan files or loan origination stuff or any of that kind of stuff.  What I had available to me was the data tape that a dealer provided, data that LoanPerformance provided...."  FHFA Ex. 252 (D. Gussmann Dep. Tr.) at 367:23-368:5.  For Freddie Mac, PLS trader Michael Aneiro repeatedly testified that, as a AAA investor, Freddie Mac did not have access to loan-level data, and had to rely on issuers' representations and warranties |

26

| | FHFA's Rule 56.1 Statement | Defendants' 56.1 Counterstatement | FHFA's Reply |
|---|---|---|---|
| | | | as to collateral quality. *See* FHFA Ex. 265 (M. Aneiro Dep. Tr.) at 126:9-19 ("[W]e didn't have access to collateral so we didn't review it[.]"); *see also id.* at 128:17-10. |

## FHFA'S RESPONSE TO DEFENDANTS' LOCAL RULE 56.1 COUNTERSTATEMENT OF MATERIAL FACTS

| | Defendants' Statement of Material Facts | FHFA's Response |
|---|---|---|
| 90. | Fannie Mae and Freddie Mac are government-sponsored entities that, during the relevant period, purchased mortgage loans and securities backed by mortgage loans. Ex. 77. The GSEs were chartered by Congress to provide liquidity, stability and affordability to the residential mortgage market. *See* 12 U.S.C. § 1716; 12 U.S.C. § 1451. Because of their size and sophistication, the GSEs were considered "the big gorillas" in the secondary mortgage market. Ex. 99 at 386:8-13; *see also* Ex. 78 at 108:4-7 ("Freddie Mac certainly was a large, sophisticated client in the space and, you know, had parameters around what they were trying to achieve in their investments."); Ex. 106 at 268:2-6 ("Fannie Mae was a sophisticated institutional investor that made its own investment decisions. We presented product or we purchased | Undisputed for purposes of this Motion that Fannie Mae and Freddie Mac are government-sponsored entities that, during the relevant period, purchased mortgage loans and securities backed by mortgage loans and that the GSEs were chartered by Congress to provide liquidity, stability and affordability to the residential mortgage market, *see* 12 U.S.C. §§ 1716, 1451, but immaterial to any issues presented by this Motion. While the GSEs may have been considered "the big gorillas" in the secondary mortgage market, they did not securitize or sell private label securities. *See* FHFA Ex. 277 (Fannie Mae 2006 10K) at 1; FHFA Ex. 278 (Freddie Mac 2006 10K) at 1. James B. Lockhart, III, the former director of the Office of Federal Housing Enterprise Oversight ("OFHEO"), testified that the GSEs were "gorillas" in the marketplace, he did so in reference to marketplace related to standards on writing mortgages; mortgage affordability; and mortgage best practices. FHFA Ex. 269 (J. Lockhart Dep. Tr.) at 386:6-25. |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | product from them.  So they drove what they wanted to buy."). | |
| 91. | The Federal Housing Finance Agency was created in 2008 by an act of Congress and designated the government overseer of the GSEs, successor to the Office of Federal Housing Enterprise Oversight ("OFHEO").  *See generally* 12 U.S.C.A. § 4511.  Shortly after its creation, FHFA exercised its statutorily authorized conservatorship powers over the GSEs, and has brought suit against the Defendants on the GSEs' behalf in its continued capacity as conservator of the GSEs.  Ex. 107 at 1; Ex. 108 at 1; Ex. 109 at 1; Ex. 110 at 1. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion, because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 92. | Defendants in these Actions collectively issued 65 residential mortgage-backed securitizations purchased by one or both of the GSEs.  Those Securitizations are identified in Table P[.] | Undisputed for purposes of this Motion that Table P includes the correct purchased Securitizations, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Disputed that the listed purchase date for GSR 2006-OA1 is accurate.  Table P lists this date as August 24, 2006.  The purchase date for GSR 2006-OA1 is August 25, 2006.  FHFA Ex. 34 (Rsponses to Defs. Sixth Set of Interrogatories (Dec. 20, 2013) at 12. |
| 93. | Between September 2005 and January 2008, the GSEs bought more than a quarter of a trillion dollars in PLS, including 92 certificates from defendants against whom this motion was brought.  Pl.'s Br. at 4. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 94. | In making those purchases, the GSEs adhered to PLS purchase and | Defendants' ¶ 94 cites no evidence that FHFA could dispute or agree is undisputed, and may |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | monitoring processes that incorporated counterparty reviews, collateral characteristics and general originator trends into the GSEs' assessment of specific loan pools underlying the Securitizations.  *See infra* ¶¶ 104-229. | not be credited as such.  *See* L.R. 56.1(d). |
| 95. | ■■■■■■ | Defendants' proposed "fact" is unsupported argument and too vague to be disputed or undisputed.  *See* L.R. 56.1(d).  Specifically, Defendants' proposed fact fails to identify the Action, expert witness, and findings with sufficient specificity. |
| 96. | **Goldman Sachs.**  In *Federal Housing Finance Agency* v. *Goldman, Sachs & Co., et al.*, No. 11-cv-6198 (DLC) (S.D.N.Y.), FHFA's proffered expert, ■■■■■■ Ex. 79. ■■■■■■ *Id.* at 3-4. ■■■■■■ *Id.* at 142-44.  In *Federal Housing Finance Agency* v. *Ally Financial, Inc., et al.*, No. 11-cv-7010 (S.D.N.Y.), FHFA's proffered expert, ■■■■■■ | ■■■■■■ Defs. Ex. 79 at 3-4, 142-44.  Disputed to the extent that ■■■■■■ Defs.' Ex. 80 at 2-3, 84-85.  FHFA objects that the findings of its expert witnesses are not relevant to the GSEs' pre-purchase knowledge of the prospectus supplement representations.  *See Nimely v. City of New York*, 414 F.3d 381, 399 n. 13 (2d Cir. 2005) ("[I]t is worth emphasizing that, because a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to |

|  | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
|  | ██████████████ Ex. 80 at 2-3. ██████████ *Id.* at 84-85. | other fields.").  Otherwise undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 97. | Another of FHFA's proffered experts, ██████████████ Ex. 81 at 4.  In *Federal Housing Finance Agency v. Ally Financial, Inc., et al.*, No. 11-cv-7010 (S.D.N.Y.), ████████ Ex. 82 at 4. | ██████████████ FHFA objects to Defendants' characterization of Mr. Kilpatrick's automated valuation model as "developed for litigation" as argument, not fact, and unsupported by the evidence.  FHFA further objects that the findings of its expert witnesses are not relevant to the GSEs' pre-purchase knowledge of the prospectus supplement representations.  *See Nimely v. City of New York*, 414 F.3d 381, 399 n. 13 (2d Cir. 2005) ("[I]t is worth emphasizing that, because a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields.").  Otherwise undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 98. | ██████████████ Ex. 79 at 120.  As a result, FHFA alleges the offering materials for the Securitizations misrepresented that | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  FHFA objects that the findings of its expert witnesses are not relevant to the GSEs' pre-purchase knowledge of the prospectus supplement representations.  *See Nimely v. City of New* |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | loans were originated "generally in accordance with" the applicable underwriting guidelines and with guideline exceptions "based upon" compensating factors. *Id.* at 29-31; Ex. 19 at S-51, S-59, and S-65. | *York*, 414 F.3d 381, 399 n. 13 (2d Cir. 2005) ("[I]t is worth emphasizing that, because a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields."). |
| 99. | **Nomura.** In *Federal Housing Finance Agency* v. *Nomura Holding America Inc., et al.*, No. 11-cv-6201 (S.D.N.Y.), FHFA's proffered expert, ████████ ████████████████████ ████████████████████ ████████████████████ ████ Ex. 83 at 2. ████████████████ ████████████████████ ████████████████████ ████████████ *Id.* at 3. ████████████████ ████████████████████ ████████████████████ ████████ *Id.* | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  FHFA further objects that the findings of its expert witnesses are not relevant to the GSEs' pre-purchase knowledge of the prospectus supplement representations.  *See Nimely v. City of New York*, 414 F.3d 381, 399 n. 13 (2d Cir. 2005) ("[I]t is worth emphasizing that, because a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields."). |
| 100. | Another of FHFA's proffered experts, ████ ████████████████████ ████████████████████ ████████████████████ ████████████████████ ████████████████████ ████ Ex. 430 at 4. | ████████████████████ ████████████████████ ████  FHFA objects to Nomura's characterization of Mr. Kilpatrick's automated valuation model as "developed for litigation" as argument, not fact, and unsupported by the evidence.  *See* L.R. 56.1(d).  FHFA further objects that the findings of its expert witnesses are not relevant to the GSEs' pre-purchase knowledge of the prospectus supplement representations.  *See Nimely v. City of New York*, 414 F.3d 381, 399 n. 13 (2d Cir. 2005) ("[I]t is worth emphasizing that, because a witness qualifies as an expert with respect to certain matters or |

|  | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
|  |  | areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields."). Otherwise undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 101. | Underwriting defects that FHFA purported to find in the Certificate SLGs include, among other things: (i) missing documents such as HUD-1, or a signed mortgage application, (ii) loans originated without regard to the borrower's ability to pay, (iii) missing appraisals, (iv) missing credit reports, (v) missing or unsigned appraisals , (vi) insufficient assets to close, (vii) insufficient or missing credit history, (viii) insufficient income documentation, (iv) misrepresented owner occupancy claims, and (x) inaccurate and overvalued appraisals. Ex. 182. ██████ ██████████████████ ██████████████████ ██████████████████ ██████████████████ ██████████████████ ██████████ Ex. 79 at 142-44. | ████████████████████████ ████████████████████████ ████████████████████████ Defendants' assertion is argument, not fact, and is unsupported by the evidence. *See* L.R. 56.1(d). Otherwise undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. FHFA further objects that the findings of its expert witnesses are not relevant to the GSEs' pre-purchase knowledge of the prospectus supplement representations. *See Nimely v. City of New York*, 414 F.3d 381, 399 n. 13 (2d Cir. 2005) ("[I]t is worth emphasizing that, because a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields."). |
| 102. | The GSEs regularly reviewed the Originators that originated the loans underlying the Securitizations at issue in these Actions. | Defendants' ¶ 102 cites no evidence that FHFA could dispute or agree is undisputed, and may not be credited as such. *See* L.R. 56.1(d). |
| 103. | Those reviews included, *inter alia*, (i) site visits and meetings with personnel from the Originators; (ii) reviews of the loan origination | Defendants' ¶ 103 cites no evidence that FHFA could dispute or agree is undisputed, and may not be credited as such. *See* L.R. |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | policies, procedures and underwriting practices of the Originators; (iii) reviews of the Originators' valuation and appraisal review policies and procedures; (iv) reviews of the Originators' abilities to detect fraud, and (v) reviews either by GSE personnel or a third party diligence vendor of a sample of loan files for recently originated loans to confirm the Originators' compliance with underwriting guidelines. *See infra* ¶¶ 104-126. | 56.1(d). |
| 104. | Fannie Mae's PLS policies limited Fannie Mae's ability to purchase PLS that included loans not originated by "Fannie Mae approved originators" or those counterparties on the "Fannie Mae approved prime seller/servicer list." *See* Ex. 178 at FHFA02861745. | Undisputed for purposes of this Motion that Fannie Mae had "standards, approvals policies, documents and limitations such as … Fannie Mae approved prime seller/servicer list" and "Fannie Mae approved originators[,]" which is all that is referenced in Defendants' Ex. 178 at FHFA02861745, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  A list of "Fannie Mae approved originators" was not distributed to the PLS traders until after October 12, 2006.  *See* FHFA Ex. 281 ("History of 10% Originator Approval Rule") (FHFA01748972) at FHFA01748974. |
| 105. | PLS personnel were required to request review and approval by Fannie Mae's Single Family Counterparty Risk Management group before any purchases.  Ex. 180 at FHFA11987650.   Shayan Salahuddin, a Fannie Mae PLS trader involved in the purchase of the Certificates, *see* Ex. 181, testified that "when a deal was brought to Fannie Mae's attention, one of the first questions that the traders of Fannie Mae would ask is | Undisputed for purposes of this Motion that Fannie Mae conducted reviews and approvals of PLS counterparties, including "issuers, originators, master servicers, and servicers" during the 2005-2007 purchase period, *see, e.g.*, Defs. Exs. 84 at FHFA00277894 & Ex. 85 at FHFA00000904, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Fannie Mae's July 2005 PLS Policy *did not* require SF CPRM approval of originators backing PLS that PLS personnel |

| | Defendants' Statement of Material Facts | FHFA's Response |
|---|---|---|
| | who are the originators involved with the deal and if . . . an originator on that deal w[as] not [on] the list of originators provided to the trading desk by the counterparty group, then Fannie Mae would not participate in the deal." Ex. 61 at 49:9-20. | committed to purchase.  *See* FHFA Ex. 281 ("History of 10% Originator Approval Rule") (FHFA01748972); *see also* Defs. Ex. 85 at FHFA00000904.  Fannie Mae required only that "issuers and servicers" of PLS "have a desk review of financial and operational performance."  FHFA Ex. 281 at FHFA01748972.  Fannie Mae's August 2006 Policy required SF CPRM approval of originators for the first time.  *Id.* The August 2006 "addition of the originator approval requirement proved to be much larger than anticipated." *Id.* at FHFA01748973.  SF CPRM therefore worked with PLS traders to "prioritize which originators needed to be approved first, but the workload proved to be too large to allow for vast approvals of originators. " *Id.* The requirement that PLS personnel obtain SF CPRM approval of originators of loans backing PLS was not implemented until the end of 2006.  *See id.* at FHFA01748982-83.  SF CPRM never approved all the originators in a given PLS deal, but rather limited its approval to any originator that originated greater than 10% of the loans in a PLS deal.  *See id.* |
| 106. | In 2005 through 2007, the SF CPRM performed operational reviews on originators whose loans backed PLS transactions purchased by Fannie.  In the third quarter 2005 "Private Label Securities Update" provided to Fannie Mae's Risk Policy Committee, SF CPRM head Lesia Bates Moss reported on her group's PLS "Originator/Issuer/Servicer Approval & Monitoring" efforts. Ex. 120 at FHFA02537625, FHFA02537632. SF CPRM's "First Priority" was "Blemished credit seller servicers." *Id.* at FHFA02537632. Countrywide, | Undisputed for purposes of this Motion that Exhibit 120 includes the quoted text, but immaterial because Fannie Mae's PLS traders did not receive SF CPRM's operational reviews, but rather relied on a list of approved counterparties that was circulated by SF CPRM.  FHFA Ex. 255 (J. Norris Dep. Tr.) at 342:17-343:15.  Disputed that SF CPRM performed operational reviews on originators "[i]n 2005 through 2007," but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  As of October 25, 2006, SF CPRM was not regularly reviewing originators of loans backing PLS being purchased by Fannie Mae.  *See* FHFA Ex. 281 ("History of |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | Ameriquest, Wells Fargo, Option One, Fremont, WMC, IndyMac and New Century were listed in that report. *Id.* at FHFA02537632. | 10% Originator Approval Rule") (FHFA01748972) at FHFA01748976-77 (noting that, as of October 25, 2006, "[t]he approval of originators is a gap."). It was not until a meeting on November 13, 2006, that SF CPRM and the PLS personnel reached an agreement that SF CPRM would provide a list to PLS personnel confirming which originators were approved as counterparties for the PLS business as well as a list of which issuers and servicers were approved. *Id.* at FHFA01748978. During that meeting, it was noted that "[o]nly originators with >10% of a deal are even reported in deal documents, so other originators really can't even be approved (and should not require approval)." *Id.* at FHFA01748979. The rule that SF CPRM had to approve any originator that originated greater than 10% of the loans in a PLS deal was not implemented until early-2007. *See id.* at FHFA01748982-83. |
| 107. | By August 2006, Fannie Mae's SF CPRM was required to approve and monitor all originators whose loans backed PLS like the Securitizations. Ex. 84 at FHFA00277894. SF CPRM was responsible for "[r]eview[ing] and approv[ing] issuers, originators . . . and servicers per procedures established by SF CPRM prior to committing to any PLS purchases . . . with the counterparties, and again periodically per procedures and frequency established by SF CPRM." *Id.* at FHFA00277894; *see also* Ex. 85 at FHFA00000904. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Further immaterial because Fannie Mae's PLS traders did not receive SF CPRM's operational reviews, but rather relied on a list of approved counterparties that was circulated by SF CPRM. FHFA Ex. 255 (J. Norris Dep. Tr.) at 342:17-343:15. |
| 108. | Ms. Bates Moss, who was responsible for overseeing the SF CRM group, Ex. 181, testified that the purpose of SF CPRM's reviews was to "assess the overall financial | Undisputed for purposes of this Motion that Ms. Bates Moss's testimony includes the statement quoted by Defendants, but immaterial to any issues presented by this Motion because none of the cited evidence |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | strength of the counterparty and its ability to meet . . . its rep and warrant requirements." Ex. 86 at 36:2-11. SF CPRM's operational reviews were intended to ensure that originators of the PLS and subprime loans Fannie Mae bought "demonstrated appropriate business practices to mitigate operational risk and credit risk of the origination of [s]ubprime collateral." Ex. 88 at FHFA12404991. | relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Further immaterial because Ms. Bates Moss testified that the focus of SF CPRM's reviews was "to ensure that the counterparties had the financial wherewithal and overall creditworthiness to do business with Fannie Mae." Defs. Ex. 86 at 36:2-11. Ms. Bates Moss further testified that "[o]ur focus on the counterparty was around their financial and operational capabilities. As it relates to repurchase activity, repurchase activity, because it requires cash, contributes to further financial erosion. We, at Fannie Mae, would not necessarily be privy to all outstanding repurchases of any counterparty doing business with others outside of Fannie Mae." FHFA Ex. 256 (L. Bates Moss Dep. Tr.) at 315:21-316:7. It is further undisputed for purposes of this Motion that Defendants' Ex. 88 includes the quoted text. However, the document is referring to the credit risk of the counterparty, or its financial health, not the credit risk of the borrower, as is implied by Defendants' ¶ 108. Further immaterial because Fannie Mae's PLS traders did not receive SF CPRM's operational reviews, but rather relied on a list of approved counterparties that was circulated by SF CPRM. FHFA Ex. 255 (J. Norris Dep. Tr.) at 342:17-343:15. |
| 109. | Ms. Bates Moss testified that SF CPRM's reviews of originators examined "the policies, procedures, processes . . . any activity related to the origination, underwriting, selling and servicing" of an originator's loans. Ex. 86 at 36:23-37:24, 62:11-23; Ex. 89 at FHFA04340566; Ex. 90 at FHFA04340583; Ex. 91 at FHFA04340595. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Immaterial because SF CPRM obtained information for its reviews by "*spend[ing] time with management* to understand … the[ lender's] entire … mortgage origination and servicing processes and policies." Defs. Ex. 86 at 36:23-37:10 (emphasis added). Fannie Mae operational reviews of originators |

| | Defendants' Statement of Material Facts | FHFA's Response |
|---|---|---|
| | | conducted for the PLS Business relied on representations by management.  FHFA Ex. 251 (D. Cook Dep. Tr.) at 406:15-19 ("For a PLS counterparty originator review, the management team at the originator would discuss at a very high level the general originating and underwriting practices that that originator engaged in as part of originating loans for inclusion in PLS.").  The Fannie Mae employee conducting the PLS review of an originator "would have an opinion on the quality of the underwriting processes, but Fannie Mae did not verify that the practices were followed or did not otherwise assess, from a objective standpoint, whether it met some criteria that could be considered satisfactory." *Id.* at 406:20 – 407:6.  Further immaterial because Fannie Mae's PLS traders did not receive SF CPRM's operational reviews, but rather relied on a list of approved counterparties that was circulated by SF CPRM.  FHFA Ex. 255 (J. Norris Dep. Tr.) at 342:17-343:15. |
| 110. | At times, SF CPRM reviews involved the review of loan files of a "sample" of the originator's loans, either by Fannie Mae personnel or a third party diligence vendor, such as Clayton.  Ex. 86 at 70-72, 74-75; Ex. 94 at FHFA13213565; Ex. 88 at FHFA12404987; Ex. 95 at FHFA01104664; Ex. 96 at FHFA01439997.  Ms. Bates Moss testified that Fannie Mae personnel accompanied Clayton (or whatever due diligence provider was used) on these reviews, and the results of the vendor's reviews were shared internally with senior SF CPRM personnel.  Ex. 86 at 72:10-73:24. | Undisputed for purposes of this Motion that ¶110 includes the statement quoted by Defendants, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Further immaterial because Fannie Mae's PLS traders did not receive SF CPRM's operational reviews, but rather relied on a list of approved counterparties that was circulated by SF CPRM.  FHFA Ex. 255 (J. Norris Dep. Tr.) at 342:17-343:15.  Defendants misleadingly omit a key portion of Ms. Bates Moss's testimony concerning information sharing between SF CPRM and the PLS business, however.  Ms. Bates Moss further testified that SF CPRM "focused on specific issues related to the financial wherewithal, and … there was a wall, there was a Chinese wall, we did not test loans that went into PLS |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | | portfolios."  FHFA Ex. 256 (L. Bates Moss Tr.) at 366:6-25 ("Q. Are you aware of any person or document that indicated that Fannie Mae review teams' findings of appraisal issues or misrepresentation by borrowers or missing documents at an originator in whole loans that the originator generated, did not apply to loans generated by the originator and placed in PLS?  …. A. Which counterparty teams are you referring to?  Q. First your counterparty teams?  A. Okay. Again, I have no knowledge or recollection of that because we focused on specific issues related to the financial wherewithal, and we did not, there was a wall, there was a Chinese wall, we did not test loans that went into PLS portfolios.").  Additionally, SF CPRM did not begin engaging Clayton to conduct loan file reviews until late 2006.  Defs. Ex. 86 at 71:14-72:9.  During the relevant time period, Clayton conducted fewer than 10 operational reviews of counterparties for SF CPRM.  *Id.* at 72:15-8.  Moreover, the Fannie Mae Rule 30(b)(6) designee, David Cook, testified that operational reviews of originators conducted for the PLS Business were different from those done for Single Family in that the review team relied on representations by management, not loan file reviews.  FHFA Ex. 251 (D. Cook Dep. Tr.) at 405:8-21 ("Generally -- well, actually, I can talk more in general because I actually participated in some of these on-site reviews of originators.  Fannie Mae, as an investor in a PLS, was like any other investor in a PLS.  We could request a visit at an originator's headquarters and sit down with the management team and understand at a very high level their general practices at the originator, similar to any other investor in a private label security."); *id.* at 406:15-19 ("For a PLS counterparty originator review, the management team at the originator would discuss at a very high level the general |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | | originating and underwriting practices that that originator engaged in as part of originating loans for inclusion in PLS."). As Mr. Cook testified, "Fannie Mae did not receive loan files for loans that were included in PLS at any time." *Id.* at 530:7-8; *see also* FHFA Ex. 252 (D. Gussmann Dep. Tr.) at 367:23-368:6 (head of Fannie Mae PLS Credit Analysis and Surveillance testifying that "we didn't have any ability to look at any of the, like the loan files or loan origination stuff or any of that kind of stuff. What I had available to me was the data tape that a dealer provided, data that LoanPerformance provided and then I could create cohorts between those."). Ms. Bates Moss further testified that "[a]ny information that Clayton found or identified as a nonpublic nature had to be first discussed with … management of counterparty risk to determine whether or not that information was material or not." Defs. Ex. 86 at 73:9-18. |
| 111. | SF CPRM was part of Fannie Mae's Single Family operating division, overseeing counterparty reviews conducted both for Fannie Mae's PLS and Single Family business units as well as monitoring overall market trends. Ex. 86 at 23:3-9, 25:15-21, 46:9-48:2. Approximately 25 people worked in the SF CPRM group; all reported to Ms. Bates Moss. Ex. 86 at 30:12-25. The group was organized according to counterparty type, specifically "traditional" and "non-traditional" lenders. Ex. 86 at 31:6-34:8. "Traditional" lenders were lenders that sold loans to Fannie Mae's Single Family businesses, *see infra* ¶ 121, and "non-traditional" lenders were lenders that sold subprime loans. Ex. 86 at 32:12-17. Some | Disputed to the extent Defendants seek to make the inference that, on all reviews of originators who supplied a material quantity of loans to Goldman Sachs, HSBC, and Nomura (which quantity is unidentified) for the Certificates, SF CPRM had employees conducting both traditional and non-traditional reviews. The cited evidence does not so support. *See* Defs. Ex. 86 at 36-37. Ms. Bates Moss testified that "non-traditional" referred not only to subprime, but more broadly to "[p]rivate label securities, subprime, manufactured housing, reverse mortgage, anything that was not traditional." Defs. Ex. 86 at 32:12-17. Ms. Bates Moss clarified that "[g]enerally, the directive was to keep those activities separate. We had a small team. Occasionally there could be overlap, but very infrequent." Defs. Ex. 86 at 33:6-9. When asked whether "the same people [would] be reviewing Option One both for the review of the counterparty in connection with their sale |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | lenders, such as Countrywide, were both traditional and non-traditional lenders.  Ex. 97 at FHFA00777442; Ex. 98 at FHFA18379494.  Ms. Bates Moss testified that, at times, operational reviews of originators "could have involved employees that were doing both traditional and nontraditional" reviews.  Ex. 86 at 33:20-35:8. | of whole loans and in connection with their sale of loans to securitize in PLS[,]" Ms. Bates Moss responded, "[t]hat was not the typical … we were very clear about our approach which was to have separate parties to conduct such reviews."  *Id.* at 33:20-34:8.  She "[could] not recall a situation where that happened" and emphasized that "we generally tried to ensure that there was a separation of those activities."  *Id.* at 34:9-15. |
| 112. | SF CPRM oversaw and/or conducted its "non-traditional" originator reviews as part of its oversight of originators of its PLS and subprime loan purchases.  Ex. 86 at 69, 70:7-10; Ex. 202 at FHFA04340543; Ex. 100 at FHFA04340546.  SF CPRM was responsible for approving and monitoring originators that Fannie Mae transacted with both directly and through the purchase of private label securities PLS.  Ex. 86 at 31:11-19; Ex. 101. | Undisputed for purposes of this Motion that SF CPRM had those responsibilities, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Further immaterial because Fannie Mae's PLS traders did not receive SF CPRM's operational reviews, but rather relied on a list of approved counterparties that was circulated by SF CPRM.  Ex. 255 (J. Norris Dep. Tr.) at 342:17-343:15.  Moreover, Ms. Bates Moss confirmed that SF CPRM "generally tried to ensure that there was a separation of" reviews of counterparties that Fannie Mae transacted with both directly and through the purchase of private label securities.  *See* FHFA's Response to ¶111, *supra*.  Defendants' Ex. 100 is addressed to on-site operational reviews of "issuers and servicers" and does not mention originators.  Defendants' Ex. 101 does not support their contention that "SF CPRM was responsible for approving and monitoring originators that Fannie Mae transacted with both directly and through the purchase of private label securities PLS." |
| 113. | Following a counterparty's approval, SF CPRM was responsible for "[m]aintaining a list of all reviewed and approved issuers [and] originators . . . [m]onitoring the financial and | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | collateral performance of counterparties relative to industry averages . . . [s]har[ing] relevant insights and information with other members of [PLAT] and . . . [m]aintaining the Watch List . . . [and] a list of all existing PLS with counterparties that have been classified as Suspended."  Ex. 180 at FHFA11987659. | |
| 114. | The Fannie Mae Legal Department (the "Legal Department") also was required to approve subprime originators of the loans underlying PLS bought by Fannie Mae.  Ex. 85 at FHFA00000904.  Starting in August 2006, Fannie Mae's policy required that "a comprehensive operational review of the nontraditional lenders" be performed before Fannie Mae "enter[ed] any SFMB Subprime Transaction, PLS Subprime Transaction that is a 'wrap' transaction, or RTF Subprime Transaction . . . ."  Ex. 102 at FHFA11863097. | Undisputed for purposes of this Motion that Defendants' Ex. 85 at FHFA00000904 states that "[t]he Fannie Mae Legal Department (the 'Legal Department') also was required to approve subprime originators of the loans underlying PLS bought by Fannie Mae," but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Disputed that Fannie Mae's policy required that "a comprehensive operational review of the nontraditional lenders" be performed before Fannie Mae "enter[ed] any SFMB Subprime Transaction, PLS Subprime Transaction that is a 'wrap' transaction, or RTF Subprime Transaction . . . ." starting in August 2006, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Also immaterial because the Legal Department did not share the results of its anti-predatory lending review with Fannie Mae's PLS traders and analysts.  *See* FHFA Ex. 290 (GS FHFA 002130300) (Fannie Mae Legal Department employee confirming to Goldman Sachs that anti-predatory reviews are "not shared with our Portfolio and [are] used solely by us here in Legal to validate that there are no loans in breach [of anti-predatory guidelines].").  The date of Defendants' Ex. 102 relied on for this statement is November |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | | 2006. |
| 115. | The Legal Department performed regular reviews of subprime originators to ensure compliance with Fannie Mae's "Anti-Predatory Lending" ("APL") policies.  Ex. 86 at 76:13-21; Ex. 103 at 71:5-9; Ex. 101 at 15.  Until it was revised in late 2006, Fannie Mae's PLS Risk Policy required the Legal Department to conduct "operational reviews" of all subprime PLS originators.  Ex. 104 at FHFA18449730. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Also immaterial because these reviews did not relate to any specific Securitization and the Legal Department did not share the results of its anti-predatory lending reviews with Fannie Mae's PLS traders and analysts.  *See* FHFA Ex. 290 (GS FHFA 002130300) (Fannie Mae Legal Department employee confirming to Goldman Sachs that anti-predatory reviews are "not shared with our Portfolio and [are] used solely by us here in Legal to validate that there are no loans in breach [of anti-predatory guidelines].").  Fannie Mae's Anti-Predatory Lending Guidelines are designed to "help protect consumers from abusive lending practices."  FHFA Ex. 276 (CSR Press Release, Fannie Mae Chairman Announces New Loan Guidelines to Combat Predatory Lending Practices (Apr. 11, 2000), http://www.csrwire.com/press_releases/25741-Fannie-Mae-Chairman-Announces-New-Loan-Guidelines-to-Combat-Predatory-Lending-Practices (last visited June 9, 2014)). |
| 116. | These Legal Department reviews also were required for Fannie Mae's subprime New Business Initiative, which launched by May 2006.  Ex. 105 at FHFA00311035.  One of the purposes of the subprime New Business Initiative was to increase Fannie Mae's penetration of the subprime market by purchasing loans in bulk directly from subprime loan originators, including many of the originators.  *Id.*; *see also* Ex. 103 at 242:10-18. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Defendants' Ex. 103 at 242:10-18 does not discuss any of the purposes for the Subprime New Business Initiative ("NBI").  Additionally, immaterial because Defendants misleadingly omit that the Subprime NBI was an initiative of the Single Family business that did not affect the purchase strategy of the PLS business.  *See* Defs. Ex. 105; FHFA Ex. 255 (J. Norris Dep. Tr.) at 575:21-576:14; FHFA |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | | Ex. 254 (J. Ingram Dep. Tr.) at 126:20-127:3. Also immaterial because the Legal Department did not share the results of its anti-predatory lending reviews with Fannie Mae's PLS traders and analysts.  *See* FHFA Ex. 290 (GS FHFA 002130300) (Fannie Mae Legal Department employee confirming to Goldman Sachs that anti-predatory reviews are "not shared with our Portfolio and [are] used solely by us here in Legal to validate that there are no loans in breach [of anti-predatory guidelines]."). |
| 117. | The Legal Department's operational reviews included loan-level sampling often performed by a third party diligence vendor.  Ex. 104 at FHFA18449730; Ex. 220 at FHFA13481754; Ex. 87 at FHFA11862419; Ex. 85 at FHFA00000904; Ex. 111 at FHFA16971802-03. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  In addition, Defendants' Ex. 220 at FHFA13481754 clearly states that such sampling was expressly done as "non-deal specific due diligence."  Also immaterial because the Legal Department did not share the results of its anti-predatory lending reviews with Fannie Mae's PLS traders and analysts. *See* FHFA Ex. 290 (GS FHFA 002130300) (Fannie Mae Legal Department employee confirming to Goldman Sachs that anti-predatory reviews are "not shared with our Portfolio and [are] used solely by us here in Legal to validate that there are no loans in breach [of anti-predatory guidelines]."). |
| 118. | John Ingram was responsible for Fannie Mae's anti-predatory lending reviews.  Ex. 181.  In August 2005, he told Tom Noto of Ameriquest that "[p]art of [Fannie Mae's] operational review [due diligence] requirements for subprime lenders is to conduct annual loan level due diligence of the lender's recent production (3 | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Also immaterial because the Legal Department did not share the results of its anti-predatory lending reviews with Fannie Mae's PLS traders and analysts.  *See* FHFA Ex. 290 (GS FHFA 002130300) (Fannie Mae Legal |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | months) . . .  We typically look at about 350 loans, running our due diligence scope (which is the same one we use in deals)."  Ex. 220 at FHFA13481754. | Department employee confirming to Goldman Sachs that anti-predatory reviews are "not shared with our Portfolio and [are] used solely by us here in Legal to validate that there are no loans in breach [of anti-predatory guidelines]."). |
| 119. | One of the purposes of the Legal Department's anti-predatory operational reviews of originators was to assess compliance with certain underwriting guidelines.  Specifically, Fannie Mae wanted to ensure that loans were being originated with adequate consideration of borrowers' ability to repay those loans.  Ex. 103 at 25:2-7, 28:10-25; Ex. 112 at FHFA00275687.  John Ingram testified that one goal of Fannie Mae's anti-predatory requirements was "to make sure that the borrower had the ability to repay the loan pursuant to the terms of the loan." Ex. 103 at 28:17-19.  Fannie Mae's anti-predatory policies required review of compliance with state and federal law and prohibited "steering" borrowers to inappropriate loan types for their profile or the imposition of excessive points and fees.  Fannie Mae's required loan file reviews were necessary to confirm certain critical documents, such as HUD-1 settlement statements, rights of rescission, finance charge disclosures, and prepayment penalty disclosures, and to assess— based on the income, asset and liability documentation— whether the lender adequately assessed the borrower's ability to pay.  *See* Ex. 113 at FHFA00016471-72, 483-88; | Disputed, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Defendants' statement is misleading as it suggests that Fannie Mae's Legal Department was assessing as part of its anti-predatory lending reviews compliance with originator underwriting guidelines.  Mr. Ingram's testimony makes clear that he was discussing subprime originators' compliance with Fannie Mae's Anti-Predatory Lending Guidelines, not originator underwriting guidelines.  Defs. Ex. 103 at 28:10-15 (testifying that ability to pay was "one of our guidelines, anti-predatory lending guidelines.").  Defendants' due diligence vendors that conducted anti-predatory lending reviews did so using Fannie Mae's Anti-Predatory Lending Guidelines.  FHFA Ex. 286 (FHFA16864900).  Also immaterial because the Legal Department did not share the results of its anti-predatory lending reviews with Fannie Mae's PLS traders and analysts.  *See* FHFA Ex. 290 (GS FHFA 002130300) (Fannie Mae Legal Department employee confirming to Goldman Sachs that anti-predatory reviews are "not shared with our Portfolio and [are] used solely by us here in Legal to validate that there are no loans in breach [of anti-predatory guidelines]."). |

44

|  | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
|  | Ex. 103 at 65:20-67:8. |  |
| 120. | Parts of Fannie Mae's anti-predatory lending guidelines and requirements were, in many cases, identical or substantially similar to requirements imposed by the lender's underwriting guidelines. As FHFA's expert, ███████ ███████████████████ ███████████████████ ███████████████████ ███████████████████ ███████████████████ ███████████████████ *See* Ex. 79 at 31-35, 43-44; Ex. 114 at LF1UBS_00053232; Ex. 115 at JPMC-UWG-BEAR-000146133; Ex. 116 at JPMC_UWG-BEAR-000002502, 508, 510; Ex. 117 at JPMC-UWG-JPM000036048, 6052; Ex. 118 at WMC-FHFA-Cases-00001784, WMC-FHFA-Cases-00001786, WMC-FHFA-Cases-00001790.  The Prospectus Supplements also generally described these requirements in their discussion of Originators' underwriting guidelines. *See, e.g.*, Ex. 10 at S-37 (First Franklin's "acquisition underwriting standards are primarily intended to assess the ability and willingness of the borrower to repay the debt.") Goldman Sachs' underwriting guidelines for loans purchased through its "conduit" program prohibited "high cost . . . 'predatory' or similarly designated loans as defined under . . . applicable federal state, county or municipal statute, regulation or | ████████████████████████ ████████████████████████ ████████     Additionally, Defendants' assertion is argument, not fact, and is unsupported by the evidence.  Additionally, Defendants' exhibit does not contain the pages referenced.  FHFA further objects that the findings of its expert witnesses are not relevant to the GSEs' pre-purchase knowledge of the prospectus supplement representations. *See Nimely v. City of New York*, 414 F.3d 381, 399 n. 13 (2d Cir. 2005) ("[I]t is worth emphasizing that, because a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields.").  Also immaterial because the Legal Department did not share the results of its anti-predatory lending reviews with Fannie Mae's PLS traders and analysts. *See* Ex. 290 (GS FHFA 002130300) (Fannie Mae Legal Department employee confirming to Goldman Sachs that anti-predatory reviews are "not shared with our Portfolio and [are] used solely by us here in Legal to validate that there are no loans in breach [of anti-predatory guidelines]."). |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | ordinance or mortgage loans that violate any applicable federal, state, county or municipal statute, regulation or ordinance." Ex. 119 at GS FHFA 006283922. Fannie Mae's purchases of PLS from originators were contingent upon anti-predatory reviews, and the results of the reviews were reflected in approved lists or shared with PLS traders informally. Ex. 103 at 60:22-25; Ex. 120 at FHFA02537624. | |
| 121. | In addition to its "non-traditional" reviews, Fannie Mae separately reviewed originators that also were "traditional" lenders. SF CPRM performed these reviews too. Ex. 86 at 32:6-11. Within SF CPRM, there were no restrictions on obtaining or sharing information about originators that were reviewed in connection with Fannie Mae's Single Family business. *Id.* at 32:12-17; 59:7-11. Members of the SF CPRM group used the Single Family "traditional" reviews of originators when considering originators for PLS purchases, and vice versa. *Id.* at 66:25-68:20. | Disputed, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. *See* FHFA's Responses to ¶¶ 110-12, *supra.* Defendants' Ex. 86 at 32:12-17 does not support the alleged fact and is, thus, immaterial. *See* L.R. 56.1(d). Further disputed because Ms. Bates Moss did not testify that "[m]embers of the SF CPRM group used the Single Family 'traditional' reviews of originators when considering originators for PLS purchases, and vice versa." Rather, she testified that "[t]he internal policy or practice was that we would first and foremost conduct separate reviews" and "[i]f the counterparty were dealing with whole loans or flow business through the organization, or PLS securities, and had been an approved counterparty in good standing and such review had not been completing [sic] for a particular purchase, we *may* review prior reviews to the extent that it gives us insight into the financial and operational capacity of that counterparty." Defs. Ex. 86 at 66:15-67:13. |
| 122. | SF CPRM reported its counterparty recommendations to the Single Family division's risk officer Pam Johnson, who would consult with | Undisputed for purposes of this Motion as to the fact that SF CPRM reported its counterparty recommendations to Ms. Johnson, who consulted with Mr. Shaw. |

| **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|
| the Fannie Mae's chief Credit Risk Officer, Mike Shaw.  Ex. 86 at 41:4-42:3; Ex. 129 at FHFA01134035.  Fannie Mae's Chief Risk Officer, Enrico Dellavecchia, convened meetings of personnel from both the Single Family and PLS units to discuss counterparty findings.  Ex. 86 at 82-19-83:6.  Mr. Dallavecchia oversaw approvals of major PLS counterparties and granted exceptions requested by SF CPRM and referred through Fannie Mae's Single Family risk officer.  *Id.* at 104:14-105:6.  He was responsible for reviewing "regular reports on the status of the PLS portfolio," ensuring PLS risk policies were adhered to, and "[e]scalat[ing] issues to the Corporate Risk Management Committee as necessary." Ex. 121 at FHFA13230752. | Disputed as to the remaining assertions, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Defendants' Ex. 86 at 82:19-83:6 does not support the proposition that Fannie Mae's Chief Risk Officer, Enrico Dallavecchia, convened meetings of personnel from both the Single Family and PLS units to discuss counterparty findings.  Defendants' Ex. 86 at 104:14-105:6 does not support the statement that "Mr. Dallavecchia oversaw approvals of major PLS counterparties."  *See* L.R. 56.1(d). |
| 123. | SF CPRM was also responsible for reporting any material concerns it had about counterparties to Fannie Mae's Private Label Advisory Team (the "PLAT").  The PLAT was a group of Fannie Mae employees from both the Single Family and Capital Markets businesses, which oversaw Fannie Mae's PLS transactions.  Ex. 122 at 60:8-16, 195:21-25, 198:7-15.  The PLAT was created based on the premise that information learned about counterparties and similar types of loans could and should inform decisions surrounding the purchase of PLS.  *Id.* at 60:20-61:4, 195:21-25.  David Cook, the PLAT Coordinator, testified that PLAT | Undisputed that the PLAT had discussions about counterparty issues, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Disputed that "[t]he PLAT was created based on the premise that information learned about counterparties and similar types of loans could and should inform decisions surrounding the purchase of PLS[,]" because Defendants' Ex. 122 at 60:20-61:4 and 195:21-25 does not support this statement, but also immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Defendants omit important testimony of David Cook, Fannie Mae's Rule 30(b)(6) designee, concerning information sharing during PLAT |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | "was a venue whereby [PLS traders] could get . . . Single-Family's judgment and opinion on whether certain counterparties were counterparties that the [PLS] traders should be doing business with." *Id.* at 195:21-25.  He testified that the cross-functional PLAT meetings were necessary because "there were specialties throughout the company, people who had a particular specialty that we could draw upon to make sure that the risks of the private label securities were managed." *Id.* at 189:2-5. | meetings.  When asked "[h]ow was PLAT gathering and sharing information from the single-family side," Mr. Cook clearly articulated that there were information barriers in place between the Single Family and PLS businesses that were observed at PLAT meetings, testifying that:  "One thing at PLAT that we made very clear that everybody knew about was that Fannie Mae had an information barrier policy that traders were not allowed to obtain information that was material, nonpublic, and we usually had attorneys -- in fact, I want to say we always had attorneys on the line who made sure that any information that was shared from Single-Family to the traders was material, nonpublic information.  So to say that -- so the PLAT was not a venue for the traders to just get any information they could from Single-Family."  Defs. Ex. 122 at 195:7-25. |
| 124. | Members of the SF CPRM participated in the PLAT.  Ex. 86 at 52:18-25.  SF CPRM "was responsible for distributing the list of all reviewed and approved . . . originators . . . to the PLAT and for reporting material concerns or issues with counterparties to the PLAT." Ex. 101.  PLS traders attended PLAT meetings.  Ex. 122 at 60:8-26. | Undisputed for purposes of this Motion that SF CPRM distributed a list of reviewed and approved originators to the PLAT, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  In addition, SF CPRM did not start distributing the approved list until late 2006.  *See* FHFA's Response to ¶ 106, *supra*. |
| 125. | Ms.  Bates Moss acknowledged that Fannie Mae shared counterparty performance information during PLAT meetings because such general information about originators' practices "could be a factor in assessing securities transactions that the PLS was looking to buy or, alternatively, looking to sell."  Ex. 86 at 785:6- | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  The counterparty "performance" information about which Ms. Bates Moss testified and indicated was shared during PLAT meetings because it "could be a factor in assessing securities transactions that the PLS was looking to buy or, alternatively, looking to sell" pertained |

|  | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| 14. | | solely to the counterparty's "creditworthiness and the financial performance principally to make sure that the entities were financially viable, operationally sound."  FHFA Ex. 256 (L. Bates Moss Dep. Tr.) at 784:7-785:14. |
| 126. | The results of SF CPRM operational reviews were also included on counterparty lists provided to PLAT committee members, including PLS traders, and made available to those committee members.  *See, e.g.*, Ex. 123 at FHFA13230739; Ex. 124 at FHFA00027901; Ex. 125 at FHFA16099904; Ex. 126 at FHFA14308153; Ex. 127 at FHFA13527882; Ex. 128 at FHFA05455909. | Undisputed, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Undisputed to the extent ¶ 126 suggests that Fannie Mae's PLS traders did not receive SF CPRM's operational reviews themselves, but rather relied on a list of approved counterparties that was circulated by SF CPRM and did not include the information included in the narrative counterparty reports.  Ex. 255 (J. Norris Dep. Tr.) at 342:17-343:15.  Defendants' use of the word "results" is ambiguous. |
| 127. | The following Originators were among those reviewed by Fannie Mae: | Defendants' ¶ 127 cites no evidence that FHFA could dispute or agree is undisputed, and may not be credited as such.  *See* L.R. 56.1(d). |
| 128. | **Ameriquest/Argent**.  SF CPRM completed an operational review of Ameriquest Mortgage Company in December 2004.  Ex. 130 at FHFA04340599.  SF CPRM reported that " most underwriting exceptions" made by Ameriquest "result[ed] from competitive pricing issues," and "[m]ost fallout is related to mortgage history or appraisal issues." *Id.* at FHFA04340604.  For Argent, SF CPRM stated that the "most common errors related to missing documents." *Id.* at FHFA04340610.  SF CPRM recommended "that Portfolio | Undisputed for purposes of this Motion that Chris Haspel of Fannie Mae issued a memorandum entitled "Ameriquest Review" addressed to Harold Lewis on January 29, 2005, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  The memorandum indicates that "[t]he Fannie Mae *operational due diligence team* … conducted a *limited operational review* at Ameriquest Mortgage Company (AMC) in Orange, CA from December 14th through 16th, 2004." Defs. Ex. 130 at FHFA04340599 (emphasis added).  The memorandum further states that Fannie Mae's observation in the memorandum that "most |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | continue to be able to purchase ABS backed by collateral originated and serviced by" Ameriquest. *Id.* at FHFA04340599. | underwriting exceptions" made by Ameriquest "result[ed] from competitive pricing issues," and "[m]ost fallout is related to mortgage history or appraisal issues[,]" *id.* at FHFA04340604, were based on the representations of Ameriquest's management, not Fannie Mae's reunderwriting or examination of loan files, *id.* Undisputed for purposes of this Motion that the memorandum contains the statements quoted by Defendants. Further immaterial because Fannie Mae's PLS traders did not receive SF CPRM's operational reviews, but rather relied on a list of approved counterparties that was circulated by SF CPRM. FHFA Ex. 255 (J. Norris Dep. Tr.) at 342:17-343:15. |
| 129. | In November 2005, the Legal Department engaged Clayton, a third party due diligence vendor, to review 407 Ameriquest loan files for compliance with Fannie Mae's anti-predatory and compliance requirements. Ex. 219 at FHFA16972623. Among other things, Clayton reported to Fannie Mae that four loans were missing final HUD-1 statements, five loans had understated finance charges, and eight loans were originated without regard for the borrower's ability to pay. *Id.* at FHFA16972625, FHFA16972626. | Undisputed for purposes of this Motion that Clayton conducted a "Fannie Mae – Regulatory Compliance Review" of Ameriquest for Fannie Mae between November 14 and 18, 2005, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Also immaterial because the Legal Department did not share the results of its anti-predatory lending reviews with Fannie Mae's PLS traders and analysts. *See* FHFA Ex. 290 (GS FHFA 002130300) (Fannie Mae Legal Department employee confirming to Goldman Sachs that anti-predatory reviews are "not shared with our Portfolio and [are] used solely by us here in Legal to validate that there are no loans in breach [of anti-predatory guidelines]."). The Clayton report to Fannie Mae is dated January 12, 2006 and is not related to a specific PLS deal, nor any loans in any deal at issue. Defs. Ex. 219 at FHFA16972623. Indeed, the loans referenced in Defendants' Ex. 219 had not been sold to Fannie Mae. The report states that Clayton's "objective [for] the project was a focused review of legal, regulatory, appraisal, income |

|  | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
|  |  | and credit documentation *to measure each loan for credit and compliance to Fannie Mae guidelines for lending to borrowers with blemished credit records as expressed in Fannie Mae's Anti-Predatory Lending Guidelines*, as well as the Federal Truth in Lending Act, implemented through Regulation Z, and the high-cost and anti-predatory lending regulations of various states and municipalities." *Id.* The report does not reference Ameriquest underwriting guidelines, or whether the reviewed loans were underwriting-guideline compliant. *See generally id.* The report indicates that, "[o]f all [407] loans reviewed, 17 loans (4.17%) were concluded as regulatory compliance even '3', and 13 loans (3.19%) were concluded as Fannie Mae review event '3'." *Id.* at FHFA16972627. |
| 130. | **Countrywide**. SF CPRM completed a one-day, on-site review of Countrywide in November 2005. Ex. 131 at FHFA13249710. The review informed Fannie Mae that "Countrywide has a worse credit profile in terms of average FICO score across recent vintages." *Id.* at FHFA13249713. | Undisputed for purposes of this Motion that the "Fannie Mae operational due diligence team conducted a *limited operational review* of Countrywide Home Loans, Inc. ('Countrywide') on November 7th, 2005 at their specialty lending operations site in Plano, Texas," Defs Ex. 131 at FHFA13249710 (emphasis added), but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  "The purpose of the review was to evaluate Countrywide's nonprime, wholesale lending and servicing operations pursuant to the Private Label Securities Credit Policies, Procedures and Delegated Authorities. *The review did not include the loan level testing necessary to validate the procedures and practices as represented by management.*" *Id.* (emphasis added). Further immaterial because Fannie Mae's PLS traders did not receive SF CPRM's operational reviews, but rather relied on a list of approved counterparties that was circulated by SF CPRM.  FHFA Ex. 255 (J. |

| | Defendants' Statement of Material Facts | FHFA's Response |
|---|---|---|
| | | Norris Dep. Tr.) at 342:17-343:15. |
| 131. | In April 2006, Clayton completed a review of 406 Countrywide loans for a Legal Department review. Ex. 132 at CLAY-FHFADEF-E-2472997.  Clayton reported to Fannie Mae that 260 of the 404 loans it reviewed "contained material [regulatory compliance] violations," including missing credit disclosures, understated finance charges, missing HUD-1 closing statements, missing note, missing right of rescission, missing truth-in-lending disclosure, and violations of various state statutes. *Id.* at CLAY-FHFADEF-E-2473000.  In addition, 17 loans were found to have anti-predatory violations, including loans originated without regard to the borrower's ability to pay.  *Id.* at CLAY-FHFADEF-E-2473001. | Undisputed for purposes of this Motion that Clayton conducted a "Fannie Mae – Regulatory Compliance Review" of Countrywide for Fannie Mae between March 27 through March 31, 2006, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Also immaterial because the Legal Department did not share the results of its anti-predatory lending reviews with Fannie Mae's PLS traders and analysts.  *See* FHFA Ex. 290 (GS FHFA 002130300) (Fannie Mae Legal Department employee confirming to Goldman Sachs that anti-predatory reviews are "not shared with our Portfolio and [are] used solely by us here in Legal to validate that there are no loans in breach [of anti-predatory guidelines].").  The Clayton report to Fannie Mae is dated April 4, 2006 and is not related to a specific PLS deal.  Defs. Ex. 132 at CLAY-FHFADEF-E-2472997.  The report states that Clayton's "objective [for] the project was a focused review of legal, regulatory, appraisal, income and credit documentation *to measure each loan for credit and compliance to Fannie Mae guidelines for lending to borrowers with blemished credit records as expressed in Fannie Mae's Anti-Predatory Lending Guidelines*, as well as to identify violations of the Federal Truth in Lending Act, implemented through Regulation Z, and the high-cost and anti-predatory lending regulations of various states and municipalities."  *Id.* (emphasis added).  The report does not reference Countrywide underwriting guidelines, or whether the reviewed loans were underwriting-guideline compliant.  Further immaterial because there is no evidence the results of this review were shared with PLS traders or analysts. |

|  | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| 132. | In May 2007, the Legal Department again engaged Clayton to review 348 Countrywide loan files for compliance with Fannie Mae's anti-predatory and compliance requirements.  Ex. 133 at FHFA11944268; Ex. 96 at FHFA01439997; Ex. 134 at CLAY-FHFADEF-E-2300415. Interim results of that review indicated a "high percentage (23.41%) of credit violations" compared to a target of "10%," and a "high percentage (18.79%) of predatory [violations]" with a "target" of 5%.  Ex. 96 at FHFA01439997.  Clayton reported credit exceptions for 62 loans, or 18% of the sample, and compliance exceptions for 50 loans, or 14% of the sample.  Ex. 134 at CLAY-FHFADEF-E-2300417-18. Clayton also reported loan tape "discrepancies . . . in debt to income calculation [and] appraised value." *Id.* at FHFADEF-E-2300419.  Exceptions to underwriting guidelines reported to Fannie Mae by Clayton included a missing final HUD-1 statement, loans originated without regard to the borrower's ability to repay, points and fees violations, insufficient credit disclosures, missing note, and missing truth-in-lending disclosure.  Ex. 133 at FHFA11944270. | Undisputed for purposes of this Motion that Clayton conducted a "Countrywide Lender Review" "Fannie Mae – Regulatory Compliance and Anti-Predatory Lending Review" for Fannie Mae between May 10 and 17, 2007 to approve Countrywide as a subprime counterparty for the Single Family subprime business, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  *See* Defs. Ex. 133 at FHFA11944268; *see* Defs. Ex. 96; *see also* FHFA Ex. 255 (J. Norris Dep. Tr.) at 140:8-18 (explaining that Leslie Peeler's team was "working on the single family side of the business as -- in subprime whole loans."); FHFA Ex. 254 (J. Ingram Tr.) at 23:24-25:6, 60:10-61:10 (John Ingram testifying that his principal responsibility was to "manage a compliance process around anti-predatory lending" and that he did not communicate with traders about which PLS to purchase other than to let the traders know if there was an anti-predatory lending "trend" with a particular originator that caused the Legal Department to request that the traders not purchase PLS backed by that originator's loans).  Clayton issued a revised report of this review on June 29, 2007.  The report states that "each loan was reviewed to Fannie Mae guidelines for lending to borrowers with blemished credit records as expressed in Fannie Mae's Anti-Predatory Lending Guidelines, as well as to identify violations of the Federal Truth in Lending Act, implemented through Regulation Z, and the high-cost and anti-predatory lending regulations of various states and municipalities."  Defs. Ex. 133 at FHFA11944268.  The report does not reference Countrywide underwriting guidelines, or whether the reviewed loans were underwriting-guideline compliant.  Also |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | | immaterial because the May 2007 Countrywide review was conducted for the Single Family Subprime business (Defs. Ex. 96) and the Legal Department did not share the results of its anti-predatory lending reviews with Fannie Mae's PLS traders and analysts. *See* FHFA Ex. 290 (GS FHFA 002130300) (Fannie Mae Legal Department employee confirming to Goldman Sachs that anti-predatory reviews are "not shared with our Portfolio and [are] used solely by us here in Legal to validate that there are no loans in breach [of anti-predatory guidelines]."). |
| 133. | SF CPRM again reviewed Countrywide in December 2006, which included an "in-depth evaluation of the mortgage origination, risk management and servicing operations" of Countrywide.  Ex. 136 at FHFA00777405.  SF CPRM identified several weaknesses in Countrywide's underwriting and loan origination controls, including: that Countrywide had no "formal written Fair Lending/Predatory Lending Policy in place to ensure all employees are aware of potential predatory lending practices;" "[u]nsatisfactory controls in place to minimize the potential for duplicate loan sales to multiple investors in Capital Markets;" "[l]ack of systemic tracking of borrower activity across different business channels (*i.e.* retail, broker, correspondent) [that] could lead to funding errors;" and that Countrywide often contests repurchase requests.  Ex. 136 at FHFA00777404, 412. | Undisputed for purposes of this Motion that SF CPRM conducted an "on-site operational review" of Countrywide Home Loans during the week of November 13, 2006 and published a "Non-Traditional Counterparty Review" of Countrywide Home Loans on December 29, 2006, Defs. Ex. 136 at FHFA00777403, FHFA00777405, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Further immaterial because Fannie Mae's PLS traders did not receive SF CPRM's operational reviews, but rather relied on a list of approved counterparties that was circulated by SF CPRM.  FHFA Ex. 255 (J. Norris Dep. Tr.) at 342:17-343:15.  The review states that its purpose was "to evaluate the counterparty approval for Fannie Mae's Sub Prime Housing Initiative and the Risk Transformation Facility" and does not mention PLS.  Defs' Ex. 136 at FHFA00777405.  Fannie Mae's Subprime Initiative and Risk Transformation Facility were run through its Single Family business.  Defs. Ex. 303 at FHFA01222819-20.  The review was based on "walkthroughs of key controls and procedures and interviews with lender management and staff in [] specific functional areas…." *Id.* at FHFA00777418. SF CPRM reviewed a small sample of 10 of |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | | CHL's automated underwriting loan files as part of its underwriting review.  *Id.* |
| 134. | SF CPRM approved Countrywide as a counterparty based on "satisfactory operational procedures and controls in place to mitigate risk exposure for both the origination and servicing platforms."  Ex. 136 at FHFA00777404. | Undisputed for purposes of this Motion that the statement quoted by Defendants appears in Defendants' Exhibit 136, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Further immaterial because Fannie Mae's PLS traders did not receive SF CPRM's operational reviews, but rather relied on a list of approved counterparties that was circulated by SF CPRM.  FHFA Ex. 255 (J. Norris Dep. Tr.) at 342:17-343:15.  SF CPRM's assessment of Countrywide in this review was based on "walkthroughs of key controls and procedures and interviews with lender management and staff in [] specific functional areas…."  Defs. Ex. 136 at FHFA00777418.  This approval was given for Single Family purposes and was unrelated to PLS. |
| 135. | Fannie Mae reviewed Countrywide in November 2006, and reported that Countrywide "[wa]s not ordering independent appraisals for loans where the mortgagor requested the mortgage insurance be cancelled due to increased property value . . . [or] the mortgagor may provide Countrywide with their own appraisal."  Ex. 137 at FHFA11941483. | Undisputed for purposes of this Motion that Fannie Mae conducted an Operational and Compliance Review ("ORC") Countrywide Home Loans for the Single Family business during the week of November 13-17, 2006, Defs. Ex. 137 at FHFA11941480, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Further immaterial because Fannie Mae's PLS traders did not receive Single Family reviews of originators nor was this review circulated to anyone in the PLS business. *See* FHFA Ex. 255 (J. Norris Dep. Tr.) at 342:17-343:15.  Vince Credle sent a memorandum summarizing the review to several members of the Single Family business on November 30, 2006.  No members of the PLS business, of the PLAT, or of SF CPRM were among the recipients of the memo as addressed.  *See id.* |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | | The memorandum confirms that the "scope of [the] review *was limited to walkthroughs of key controls and procedures and interviews with lender management and staff*, and testing of samples in various areas." Defs. Ex. 137 at FHFA11941481 (emphasis added). The observation that Countrywide "[wa]s not ordering independent appraisals for loans where the mortgagor requested the mortgage insurance be cancelled due to increased property value . . . [or] the mortgagor may provide Countrywide with their own appraisal[,]" was made in the context of "General Servicing" operations, not underwriting. *See id.* at FHFA11941483. Further immaterial because Fannie Mae's PLS traders did not receive originator reviews, but rather relied on a list of approved counterparties that was circulated by SF CPRM. FHFA Ex. 255 (J. Norris Dep. Tr.) at 342:17-343:15. |
| 136. | Countrywide was Fannie Mae's "top customer" every year between 2005 and 2007, accounting for approximately 25% of Fannie Mae's total single family business volume in 2005, 26% in 2006, and 28% in 2007. Ex. 138 at 9; Ex. 139 at 4; Ex. 140 at 4. Fannie Mae was also exposed to Countrywide through its PLS portfolio. As of September 2006, Countrywide was the issuer of "$10.1 billion in nonagency securities owned by Fannie Mae . . . consist[ing] primarily of subprime (49% of nonagency issuer balance) and Alt-A collateral (47%)." Ex. 141 at FHFA03318122. At that time, Fannie Mae approved a corporate exposure limit for Countrywide of $6.41 billion. *Id.* at FHFA03318117. Fannie Mae | Statements of fact are undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Defendants' unsupported statement that "Fannie Mae would have developed extensive knowledge of Countrywide through this relationship, which almost certainly could not be contained in these few counterparty reviews" is argument that is unsupported and speculative, and is not a fact. |

|  | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
|  | would have developed extensive knowledge of Countrywide through this relationship, which almost certainly could not be contained in these few counterparty reviews. |  |
| 137. | **First Franklin**.  SF CPRM completed a two-day, onsite operational review of First Franklin in May 2006, and approved it to sell subprime loans and PLS to Fannie Mae.  Ex. 88 at FHFA12404988.  As part of this review, Clayton performed loan level due diligence and reviewed loan files for a sample of 450 loans. *Id.* at FHFA12404988, FHFA12404996.  Ninety-five of the 450 loans were noted as credit exceptions by Clayton.  *Id.* at FHFA12404997.  SF CPRM stated that Clayton's findings for 43 of those loans were "immaterial" because they involved conditions like "outdated" documents, which reduced the "true level 3 findings to 52 loans" out of the 450 loans reviewed (12%).  *Id.* at FHFA12404997. | Undisputed for purposes of this Motion that SF CPRM conducted an onsite operational review of First Franklin Mortgage Corp. on May 24-25, 2006 at their offices in San Jose, California and issued a DRAFT Non-Traditional Counterparty Operational Review about that visit on May 25, 2006,  Defs. Ex. 88 at FHFA12404987-88, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Further immaterial because Fannie Mae's PLS traders did not receive SF CPRM's operational reviews, but rather relied on a list of approved counterparties that was circulated by SF CPRM.  FHFA Ex. 255 (J. Norris Dep. Tr.) at 342:17-343:15.  The review was conducted "to evaluate the counterparty for approval pursuant to Fannie Mae's Subprime [NBI] and Risk Transformation facility[,]" not for the PLS business, and the reviewers from Fannie Mae included members of the Single Family WBC Account Team. Defs. Ex. 88 at FHFA12404988.  Fannie Mae's Subprime Initiative and Risk Transformation Facility were run through its Single Family business.  Defs. Ex. 303 at FHFA01222819-20.  The review states that, as part of the review, "[l]oan level due diligence was performed by the Clayton Group *in conjunction with Fannie Mae's predatory lending review managed by Cindy Workman and John Ingram of Fannie Mae.*"  *Id.*  The review further states that Fannie Mae had not previously performed a review of First Franklin or New Century.  Defs. Ex. 88 at FHFA12404989.  The review indicates that Clayton reviewed "approximately 450 recently |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | | originated loan files, most of the loans closed in the past 60 days" and that, rather than conduct a full credit review, "*Clayton reviewed the loan files against Fannie Mae predatory lending rules as well as an overall borrower's ability to pay.*" *Id.* at FHFA12404996-97 (emphasis added).  The review indicates that "[o]ut of the 450 loans reviewed, only 95 loans or 2.1% were classified as Credit Level 3 findings." *Id.* at FHFA12404997.  The review also states that, with regard to Clayton's anti-predatory lending review, "[o]verall the findings are better than average as compared to other subprime originators….[and] are considered acceptable." *Id.* |
| 138. | Among the exceptions reported to Fannie Mae by Clayton were: insufficient credit history, missing housing verification, insufficient assets, as well as DTI and LTV guideline excessions.  *Id.* at FHFA12404997.  SF CPRM's report stated that Fannie Mae applied " a tolerance level of 5%" for certain types of underwriting defects.  *Id.* at FHFA12404997. | Undisputed for purposes of this Motion that the DRAFT SF CPRM Non-Traditional Counterparty Operational Review of First Franklin dated May 25, 2006 includes the results of Clayton's anti-predatory lending review, which found 2.67% of Credit history insufficient for program/grade; 2.00% VOM or VOR missing/required; 1.11% assets are not sufficient to close; 0.89% debt ratio > 55%; and 0.67% LTV Exception => 10%, Defs. Ex. 88 at FHFA12404997, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Further immaterial because Fannie Mae's PLS traders did not receive SF CPRM's operational reviews, but rather relied on a list of approved counterparties that was circulated by SF CPRM.  FHFA Ex. 255 (J. Norris Dep. Tr.) at 342:17-343:15.  The report references a tolerance level of 5%, but does not specify what types of underwriting defects it applies to.  *See id.* |
| 139. | The May 2006 First Franklin SF CPRM review also informed Fannie Mae that First Franklin, | Undisputed for purposes of this Motion that the DRAFT SF CPRM Non-Traditional Counterparty Operational Review of First |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | through a quality control sampling audit, "sets a 15% annual tolerance level for branch underwriting errors" and that "[b]oth clerical and substantive errors uncovered through sampling procedures are tallied against the 15% benchmark." *Id.* at FHFA12405001. Despite this fact, SF CPRM graded First Franklin's underwriting and quality control processes as "acceptable." *Id.* at FHFA12405001. | Franklin conducted for the Single Family subprime business dated May 25, 2006 includes the language quoted by Defendants and that SF CPRM rated First Franklin's "Underwriting Processes" and "Post-funding and Quality Control Process" "Acceptable," Defs. Ex. 88 at FHFA12404998, FHFA124041000, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Further immaterial because Fannie Mae's PLS traders did not receive SF CPRM's operational reviews, but rather relied on a list of approved counterparties that was circulated by SF CPRM. FHFA Ex. 255 (J. Norris Dep. Tr.) at 342:17-343:15. |
| 140. | The Legal Department completed an operational review of First Franklin in July 2006 that relied on the results of a loan level review by Clayton that was performed in conjunction with SF CPRM. Ex. 142 at FHFA16099859; Ex. 88 at FHFA12404987. Clayton reported to Fannie Mae that 4.5% of the loans had "predatory exceptions," including 2.9% of the sample loans that violated Fannie Mae's cost requirements, 10 loans that violated Fannie Mae's fees requirements, and two loans that had DTIs above 60%. Ex. 142 at FHFA16099859. In addition, 60 loans—13% of the sample—"had various federal, state, or regulatory violations." *Id.* at FHFA16099860. | Undisputed for purposes of this Motion that Fannie Mae's Legal Department "conducted an operational review of First Franklin" in July 2006 "[a]s part of the [Single Family] Subprime NBI," Defs. Ex. 142 at FHFA16099859, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Also immaterial because the Legal Department did not share the results of its anti-predatory lending reviews with Fannie Mae's PLS traders and analysts. *See* FHFA Ex. 290 (GS FHFA 002130300) (Fannie Mae Legal Department employee confirming to Goldman Sachs that anti-predatory reviews are "not shared with our Portfolio and [are] used solely by us here in Legal to validate that there are no loans in breach [of anti-predatory guidelines].")  The Legal Department memorandum summarizing the review indicates that the total predatory lending exceptions based on Clayton's review of 466 loans underwritten at Clayton's facility in Florida were 4.48%, of which 0.45% had ability to pay issues; 1.12% violated Fannie's |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | | points and fees rule; 2.9% had state high cost violations; only 2 loans (0.45%) had ability to pay issues based on DTI's greater than 60%." Defs. Ex. 142 at FHFA16099859-60. |
| 141. | In the fall of 2006, the Legal Department engaged Opus, a third party due diligence vendor like Clayton, to perform a "supplemental review" of First Franklin's "compliance and anti-predatory lending policies and procedures." Ex. 143 at FHFA00774759.  That review, which was completed on September 14, 2006, observed that "[i]t is not clear from the information provided if First Franklin has appropriate controls in place to monitor for predatory lending practices in [third party originator] loans." *Id.* at FHFA00774767. | Undisputed for purposes of this Motion that Defendants' Exhibit 143 is a "First Franklin Mortgage Operations and Compliance Review Summary" attached to which is a report from Opus, Defs. Ex. 143 at FHFA00774759, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Also immaterial because the Legal Department did not share the results of its anti-predatory lending reviews with Fannie Mae's PLS traders and analysts.  *See* FHFA Ex. 290 (GS FHFA 002130300) (Fannie Mae Legal Department employee confirming to Goldman Sachs that anti-predatory reviews are "not shared with our Portfolio and [are] used solely by us here in Legal to validate that there are no loans in breach [of anti-predatory guidelines].").  The Opus "Operations and Compliance Review Summary" of First Franklin dated September 14, 2006 states that the information therein "is based on information provided to Fannie Mae by First Franklin, including internal policies, guidelines, and procedure manuals."  Defs. Ex. 143 at FHFA00774759.  Undisputed for purposes of this Motion that the Opus report states that "[i]t is not clear from the information provided if First Franklin has appropriate controls in place to monitor for predatory lending practices in TPO originated loans." *Id.* at FHFA00774767. |
| 142. | In addition to engaging Opus to review First Franklin's policies and procedures, Fannie Mae's Legal Department also engaged Clayton to perform additional loan-level | Undisputed for purposes of this Motion that Clayton conducted a "loan/lender review project for Fannie Mae" concerning First Franklin at Clayton's Centralized Underwriting Facility in Tampa, Florida |

| **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|
| reviews on 373 loans.  Ex. 144 at FHFA16865159; Ex. 145 at CLAY-FHFADEF-E-2453887.  That review found nine loans with regulatory compliance exceptions such as an understated finance charge, three loans with anti-predatory lending exceptions such as failure to assess the borrower's ability to pay, and 47 loans with other credit exceptions.  *Id.* at CLAY-FHFADEF-E-2453890-91.  Those exceptions included missing or unsigned appraisals, insufficient assets to close, insufficient credit history, insufficient income documentation, and late mortgage or rental payments.  *Id.* at CLAY-FHFADEF-E-2453891. | between September 26 to October 5, 2006, Defs. Ex. 145 at CLAY-FHFADEF-E-2453887, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Also immaterial because the Legal Department did not share the results of its anti-predatory lending reviews with Fannie Mae's PLS traders and analysts.  *See* Ex. 290 (GS FHFA 002130300) (Fannie Mae Legal Department employee confirming to Goldman Sachs that anti-predatory reviews are "not shared with our Portfolio and [are] used solely by us here in Legal to validate that there are no loans in breach [of anti-predatory guidelines].").  Also undisputed for purposes of this Motion that the review consisted of 373 loans, but that 2 loans were missing.  *See id.*  The report states that Clayton's "objective [for] the project was a focused review of legal, regulatory, appraisal, income and credit documentation *to measure each loan for credit and compliance to Fannie Mae guidelines for lending to borrowers with blemished credit records as expressed in Fannie Mae's Anti-Predatory Lending guidelines*, as well as to identify violations of the Federal Truth in Lending Act, implemented through Regulation Z, and the high-cost and anti-predatory lending regulations of various states and municipalities."  *Id.* (emphasis added).  The report states that "[u]pon completion of the anti-predatory lending review on the sample of 373 loans, it was found that 3 of the loans reviewed contained material violations."  *Id.* at CLAY-FHFADEF-E-2453890.  Undisputed for purposes of this Motion that Clayton found nine loans with regulatory compliance exceptions such as an understated finance charge (1 loan).  *Id.*  Disputed that the report states Clayton found "three loans with anti-predatory lending exceptions such as failure to |

|  | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
|  |  | assess the borrower's ability to pay, and 47 loans with other credit exceptions." |
| 143. | **Fremont**. SF CPRM reviewed Fremont in August 2004. Ex. 146 at FHFA04340632. The review warned that "Fannie Mae should cautiously monitor [Fremont] as they rapidly grow their mortgage originations and securitizations." *Id.* at FHFA04340632. The review also informed Fannie Mae that "[u]nderwriting exceptions may be granted based on an underwriters [sic] judgment that compensating factors warrant an exception," and "[a] substantial portion of [Fremont's] originations may be such exceptions." *Id.* at FHFA04340632. | Undisputed for purposes of this Motion that Greg Kuper of Fannie Mae sent a memorandum to Bob Sanborn of Fannie Mae entitled "Desk Review of Fremont Investment & Loan" dated August 2, 2004,  Defs. Ex. 146 at FHFA04340632, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Further immaterial because Fannie Mae's PLS traders did not receive SF CPRM's operational reviews, but rather relied on a list of approved counterparties that was circulated by SF CPRM.  FHFA Ex. 255 (J. Norris Dep. Tr.) at 342:17-343:15.  Disputed whether either Mr. Kuper or Mr. Sanborn worked for SF CPRM.  The memorandum states that Fannie Mae "performed a desk review of the Fremont Investment & Loan" and "the purpose of [the] review was to research public information, including regulatory filings, rating agency reports and press reports, to gain knowledge of FIL as a significant issuer of Fannie Mae acquired private label securities." Defs. Ex. 146 at FHFA04340632.  The review "*did not include the loan level testing necessary to validate the information and practices*" reported in the memorandum, which include predatory lending, originations,  underwriting, quality control and servicing.  *Id.* at FHFA04340632, 35-36 (emphasis added).  The report contains the further caveat that "the information in [the] report may contain material omissions or misstatements due to the inherent limitations f our scope." *Id.* at FHFA04340632. Undisputed for purposes of this Motion that the memorandum states that Fannie Mae should cautiously monitor [Fremont] as they rapidly grow their mortgage originations and securitizations[,]" *id.* at FHFA04340632, and |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | | that "[u]nderwriting exceptions may be granted based on an underwriters [sic] judgment that compensating factors warrant an exception," and "[a] substantial portion of [Fremont's] originations may be such exceptions[,]" *id.* at FHFA04340635. |
| 144. | SF CPRM conducted an onsite review of Fremont in May 2005. Ex. 147 at FHFA01096587.  FHFA has not produced a copy of this review, but it appears Fremont maintained its status as an approved originator.  Ex. 120 at FHFA02537630; Ex. 147 at FHFA01096587. | Undisputed for purposes of this Motion that SF CPRM conducted an onsite operational review of Fremont on May 16-17, 2006 at their offices in Brea and Ontario, California and issued a Non-Traditional Counterparty Operational Review about that visit on June 13, 2006, Defs. Ex. 147 at FHFA01096586, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Further immaterial because Fannie Mae's PLS traders did not receive SF CPRM's operational reviews, but rather relied on a list of approved counterparties that was circulated by SF CPRM.  FHFA Ex. 255 (J. Norris Dep. Tr.) at 342:17-343:15.  The review states that its purpose was "to evaluate the counterparty approval for Fannie Mae's Sub Prime Housing Initiative and the Risk Transformation Facility" and does not mention PLS.  *Id.* at FHFA01096586.  Fannie Mae's Subprime Initiative and Risk Transformation Facility were run through its Single Family business. Defs. Ex. 303 at FHFA01222819-20. Undisputed for purposes of this Motion that the June 2006 SF CPRM review references a May 2005 review.  *Id.* at FHFA01096587. FHFA was not obligated to produce that review, which fell outside the parties' time period for document production.  *See* Nov. 6, 2012 Hr'g Tr. at 68:20-25.  Undisputed for purposes of this Motion that Defendants' Exhibit 147 indicates that, as of June 2006, Fremont was an "approved" originator. |

| | Defendants' Statement of Material Facts | FHFA's Response |
|---|---|---|
| 145. | In May 2006, SF CPRM reviewed Fremont again.  Ex. 147 at FHFA01096586.  This review included a loan file review, in which SF CPRM found that six out of seven "current" loans reviewed presented either "moderate risk" or "significant risk," including "fair credit" or "late [mortgage] payments." *Id.* at FHFA01096598. Twelve percent of the loan files reviewed were given a "risk grade of 4" or "high risk." *Id.* SF CPRM also informed Fannie Mae that "[o]n a case by case basis, Fremont may determine that, based upon compensating factors, a prospective mortgage not strictly qualifying under the underwriting risk category guidelines . . . is nonetheless qualified to receive a loan, *i.e.*, an underwriting exception," and reiterated that "[i]t is expected that a substantial portion of the mortgage loans may represent such underwriting exceptions." *Id.* at FHFA01096596; *see also* Ex. 148 at FHFA01644372 (showing that, as of October 2006, Fremont retained its status as an "approved" originator based on the May 2006 review.) | Undisputed for purposes of this Motion that SF CPRM conducted an onsite operational review of Fremont on May 16-17, 2006 at their offices in Brea and Ontario, California and issued a Non-Traditional Counterparty Operational Review about that visit on June 13, 2006, Defs. Ex. 147 at FHFA01096586, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Further Undisputed for purposes of this Motion that Fremont was an "approved" originator as of October 2006.  Defs. Ex. 148 at FHFA01644372.  Further immaterial because Fannie Mae's PLS traders did not receive SF CPRM's operational reviews, but rather relied on a list of approved counterparties that was circulated by SF CPRM.  FHFA Ex. 255 (J. Norris Dep. Tr.) at 342:17-343:15.  The review states that its purpose was "to evaluate the counterparty approval for Fannie Mae's Sub Prime Housing Initiative and the Risk Transformation Facility" and does not mention PLS.  *Id.* at FHFA01096586.  Fannie Mae's Subprime Initiative and Risk Transformation Facility were run through its Single Family business. Defs. Ex. 303 at FHFA01222819-20.  The evaluation included a "meeting with Fremont executive management as well as a tour of a production branch[.]"  *Id.* at FHFA01096586. The review indicates that SF CPRM reviewed a sample of 17 loan files (7 current loans that closed in previous 30 days, 5 currently delinquent loans, and 5 loans reviewed by Fremont's quality control department).  *Id.* at FHFA01096598.  The review further indicates that "[t]he risk grade of 4 would not be purchased and 'kicked' from the pool of loans."  *Id.*  Undisputed for purposes of this Motion that the review contains the language quoted by Defendants. |

|  | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| 146. | Fannie Mae's reviews of Fremont consistently observed that Fremont's appraisal quality and review processes "allow[] an appraisal variance of 15% for loans with an LTV of 80% or less and 5% for loans up to 95%." *See* Ex. 149 at FHFA03310527; Ex. 150 at UG1FHFA15299; Ex. 147 at FHFA01096598. | Undisputed for purposes of this Motion that the language quoted is in the cited documents , but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Further immaterial because Fannie Mae's PLS traders did not receive SF CPRM's operational reviews, but rather relied on a list of approved counterparties that was circulated by SF CPRM.  FHFA Ex. 255 (J. Norris Dep. Tr.) at 342:17-343:15.  Defendants' statement that "Fannie Mae's reviews of Fremont *consistently observed that* Fremont's appraisal quality and review processes 'allow[] an appraisal variance of 15% for loans with an LTV of 80% or less and 5% for loans up to 95%[,]'" (emphasis added), is argument, not a fact. |
| 147. | In June 2006, the Legal Department engaged Clayton to review 450 Fremont-originated loans against Fannie Mae's anti-predatory and regulatory compliance requirements.  Ex. 151 at FHFA00775003.  Clayton also reviewed the loans to determine whether they complied with Fremont's underwriting guidelines. *Id.*  Clayton found that five files did not have final HUD-1 statements, three loans had DTIs exceeding 60%, 20 loans exceeded Fannie's "points and fees" requirements, four loans had undisclosed finance charges, five loans were missing truth in lending disclosures, and two loans were missing a copy of the promissory note. *Id.* at FHFA00775005, 007, 008.  In total, Clayton found 119 "material [compliance] violations" out of 450 loans reviewed, or more than 26% | Undisputed for purposes of this Motion that Clayton conducted a "Fannie Mae – Regulatory Compliance Review" of Fremont for Fannie Mae between June 22 and July 10, 2007, Defs. Ex. 151 at FHFA00775003, and that the report includes the information referenced by Defendants.  Remaining assertions are disputed to the extent that they mischaracterize or lack evidence supporting them but these are immaterial to any issues presented by this Motion because none of them relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Also immaterial because the Legal Department did not share the results of its anti-predatory lending reviews with Fannie Mae's PLS traders and analysts.  *See* FHFA Ex. 290 (GS FHFA 002130300) (Fannie Mae Legal Department employee confirming to Goldman Sachs that anti-predatory reviews are "not shared with our Portfolio and [are] used solely by us here in Legal to validate that there are no loans in breach [of anti-predatory guidelines].").  Clayton issued a report of this |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | of the sample. *Id.* at FHFA00775006. In addition, Clayton found 37 loans of the 450 loan sample had Fannie Mae predatory lending exceptions. *Id.* at FHFA00775007. | review on July 24, 2006. The report does not relate to a specific PLS deal. *See id.* The report states that Clayton's "objective of the project was a focused review of legal, regulatory, appraisal, income and credit documentation *to measure each loan for credit and compliance to Fannie Mae guidelines for lending to borrowers with blemished credit records as expressed in Fannie Mae's Anti-Predatory Lending Guidelines*, as well as to identify violations of the Federal Truth in Lending Act, implemented through Regulation Z, and the high-cost and anti-predatory lending regulations of various states and municipalities." *Id.* (emphasis added). |
| 148. | Clayton reported credit exceptions for 169 loans (37.5% of the sample). Ex. 152 at FHFA16865655. Those exceptions included 27 loans with DTI exceptions of five percentage points or less, 26 loans with insufficient assets to close, 13 loans missing housing verification documentation, 13 loans missing the promissory note, 13 loans with the application missing, 11 loans missing the appraisal, 11 loans missing a copy of the second lien note, six loans with a credit score below the guideline requirement, four loans with cash reserves below the required minimum, two loans missing the credit report, and one loan with an unexecuted mortgage. *Id.* at FHFA16865655. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Also immaterial because the Legal Department did not share the results of its anti-predatory lending reviews with Fannie Mae's PLS traders and analysts. *See* FHFA Ex. 290 (GS FHFA 002130300) (Fannie Mae Legal Department employee confirming to Goldman Sachs that anti-predatory reviews are "not shared with our Portfolio and [are] used solely by us here in Legal to validate that there are no loans in breach [of anti-predatory guidelines]."). |
| 149. | On January 31, 2007, Fannie Mae's counterparty review team placed subprime originator Fremont on "caution" "based on the fact that they have been put on negative watch by the rating agencies, | Undisputed for purposes of this Motion that Defendants' Ex. 153 at FHFA00775299 indicates that SF CPRM "downgraded Fremont to a Continue with Caution" status based on the fact that they have been put on negative watch by the ratings agencies, |

| | Defendants' Statement of Material Facts | FHFA's Response |
|---|---|---|
| | Fremont has begun terminating lots of brokers, and the government has begun investigating Fremont." Ex. 153 at FHFA00775299. | Fremont has begun terminating lots of brokers, and the government has begun investigating Fremont[,]" but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  The document does not make clear when this downgrade occurred. |
| 150. | On March 2, 2007, Fannie Mae downgraded subprime originator Fremont from "caution" to "suspend" "given recent headline news," which included Fremont's plan to sell its subprime business and a cease-and-desist order issued by the FDIC requiring Fremont to "implement[] revised lending policies . . . and implement[] a third-party mortgage broker monitoring program and plan." Ex. 154 at FHFA00022371.  Fannie PLS trader Shayan Salahuddin wrote that "[f]olks will probably be talking about this on Monday . . . Fremont General Credit Corp. unit agreed to a cease-and-desist order by the [FDIC] requiring the company to stop 'engaging in unsatisfactory lending practices' and 'operating with a large volume of poor quality loans.'" Ex. 155 at FHFA00027906. | Undisputed for purposes of this Motion that Fannie Mae downgraded subprime originator Fremont from "caution" to "suspend" on March 2, 2007 based on headline news and that Defendants' Ex. 154 includes the language referenced by them, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Further undisputed for purposes of this Motion, but immaterial, that on March 2, 2007, PLS trader Shayan Salahuddin emailed a copy of a Bloomberg article about Fremont being in talks to sell its subprime unit and agreement to a cease and desist order to his PLS trader colleagues Paul Norris and Ashley Dyson with the introduction:  "Folks will probably be talking about this on Monday" Because this article does not discuss any Certificate at issue in these Actions.   *See* Defs. Ex. 155 at FHFA00027906. |
| 151. | **Greenpoint.**  SF CPRM conducted an operational review of Greenpoint Mortgage Funding in June 2005, and approved the originator for PLS purchases.  Ex. 126 at FHFA14308154. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Further immaterial because Fannie Mae's PLS traders did not receive SF CPRM's operational reviews, but rather relied on a list of approved counterparties that was circulated by SF CPRM.  FHFA Ex. 255 (J. Norris Dep. Tr.) at |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | | 342:17-343:15. |
| 152. | **IndyMac**.  SF CPRM reviewed IndyMac Bank in October 2005 and approved the originator for PLS purchases.  Ex. 126 at FHFA14308153.  The review reported to Fannie Mae that IndyMac permitted exceptions to its underwriting guidelines "where compensating factors are present or in the context of negotiated bulk purchases," and that "[i]f an exception is approved, an appropriate pricing adjustment is made to cover the particular risks of the loan."  Ex. 156 at FHFA13249696, 697. | Undisputed for purposes of this Motion that the "Fannie Mae operational due diligence team" conducted a *limited operational and servicing review"* of IndyMac Bancorp on October 13, 2005 at their offices in Pasadena, California and issued a Non-Traditional Counterparty Operational Review about that visit on December 3, 2005, Defs. Ex. 156 at FHFA13249692, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Further immaterial because Fannie Mae's PLS traders did not receive SF CPRM's operational reviews, but rather relied on a list of approved counterparties that was circulated by SF CPRM.  FHFA Ex. 255 (J. Norris Dep. Tr.) at 342:17-343:15.  The review states that its purpose was "to evaluate [IndyMac's] subprime and Alt A mortgage operations and servicing operations pursuant to the Private Label Securities Credit Policies, Procedures and Delegated Authorities." *Id.*  The review also states that it "*did not include the loan level testing necessary to validate the procedures and practices as represented by management.*" *Id.* (emphasis added).  The review further indicates that the "relationship recommendation" based on the review is "continue." *Id.*  Undisputed for purposes of this Motion that the review contains the language referenced by Defendants. |
| 153. | **New Century**.  SF CPRM reviewed New Century's loan origination operations in May 2005.  Ex. 157 at FHFA11729932.  The loan file review Fannie Mae conducted found "inconsistencies with the published guidelines and procedures against the actual loan files," and recommended "a larger | Undisputed for purposes of this Motion that Fannie Mae issued a DRAFT Non-Traditional Lending Operational Review of New Century on May 26, 2005, Defs. Ex. 157 at FHFA11729932, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Undisputed for purposes of this |

| Defendants' Statement of Material Facts | FHFA's Response |
|---|---|
| sample be reviewed for consistency and compliance." *Id.* at FHFA11729932. Fannie Mae also found that New Century was doing less quality control than New Century's policies required. *Id.* at FHFA11729932. | Motion that the review contains the language quoted by Defendants, but also immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Further immaterial because Fannie Mae's PLS traders did not receive SF CPRM's operational reviews, but rather relied on a list of approved counterparties that was circulated by SF CPRM. FHFA Ex. 255 (J. Norris Dep. Tr.) at 342:17-343:15. |
| 154. | John Ingram testified that Clayton reviewed 208 New Century loan files as part of a Legal Department operational review in November 2005. Ex. 103 at 232:16-233:19; Ex. 158 at FHFA11944314. That review found 11 of the 208 loans had regulatory compliance exceptions such as a missing HUD-1 closing statement or an insufficient credit disclosure, and two loans violated Fannie Mae's anti-predatory guidelines because they were not originated with regard to the borrower's ability to repay the loan. *Id.* at FHFA11944314. For one loan, Clayton reported that Fannie Mae was "okay with [a] credit and compliance exception" where the loan had a "missing Final HUD1," and that, as a result of Fannie Mae's approval, the loan grade was "changed to 2" from a 3. Ex. 159 at FHFA11944347. | Undisputed for purposes of this Motion that Defendants' Exhibit 158 is a "Fannie Mae – Regulatory Compliance Review" of New Century Mortgage for Fannie Mae dated November 14, 2005, which indicates that Clayton reviewed 208 loans and that the Clayton report contains the information referenced by Defendants, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Also immaterial because the Legal Department did not share the results of its anti-predatory lending reviews with Fannie Mae's PLS traders and analysts. *See* FHFA Ex. 290 (GS FHFA 002130300) (Fannie Mae Legal Department employee confirming to Goldman Sachs that anti-predatory reviews are "not shared with our Portfolio and [are] used solely by us here in Legal to validate that there are no loans in breach [of anti-predatory guidelines]."). |
| 155. | By March 5, 2007, Fannie Mae had suspended New Century as an originator from which it could buy PLS based on "[a] messy earnings restatement, a meeting with the SEC, an internal investigation and a | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | criminal inquiry," "the combined impact of which sent the company's stock declining over 50%."  Ex. 160 at FHFA00775752. | |
| 156. | **Option One**.  SF CPRM reviewed Option One in July 2005.  Ex. 161 at FHFA12805035.  In advance of its operational review, Fannie Mae requested that Option One supply information about its EPD rates in 2002, 2003, and 2004.  Ex. 171 at SCC_FHFA_BOA_003100.  In its July 2005 review, Fannie Mae recommended maintaining a "close watch on [Option One] performance metrics to determine any early warning trends, which may indicate a deterioration of bond quality," noting that "OOMC's credit quality is among the lower tier within the subprime industry."  Ex. 161 at FHFA12805036.  The Fannie Mae review team found that although "OOMC has a set of published underwriting guidelines that are used to help an underwriter make appropriate lending decisions[,] OOMC's basic philosophy of underwriting is to make loans that make sense, even if an approval requires an exception." *Id.* at FHFA12805043.  Fannie Mae's review also found that "OOMC appraisers allow for a variance in loan value based on LTV: <85% allows for a 10% variance, >85% and <95% allows for a 5% variance and LTV's greater than 95% allow for only a 3% variance." *Id.* | Undisputed for purposes of this Motion that Fannie Mae issued a Non-Traditional Lending Operational Review of Option One Mortgage Corporation on July 15, 2005, Defs. Ex. 161 at FHFA12805035, and that the review contains the language quoted by Defendants, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Further immaterial because Fannie Mae's PLS traders did not receive SF CPRM's operational reviews, but rather relied on a list of approved counterparties that was circulated by SF CPRM.  FHFA Ex. 255 (J. Norris Dep. Tr.)  at 342:17-343:15. |
| 157. | Fannie Mae reviewers also found that "[a]pproximately 30% of all | Undisputed for purposes of this Motion that the language quoted by Defendants appears in |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | appraisals result in a reduction of value. The most common reasons for a value being adjusted are the comparable properties are outside the subject property's neighborhood, the condition of the subject property is less than average, or there is deferred maintenance on the subject property." Ex. 161 at FHFA12805035. Fannie Mae reviewers also found that "with respect to mortgage loans where the review valuation has a variance, the following tolerance levels are accepted; (i) 10% less in the case of mortgage loans with LTV's less than or equal to 85% or (ii) 5% less in the case of mortgage loans with LTV's in excess of 85% or (iii) 3% less in the case of mortgage loans with LTVs in excess of 95%, the LTV of the related mortgage loan is based on the valuation obtained in the review of the original appraisal." *Id.* at FHFA12805044. | Defendants' Exhibit 161, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Further immaterial because Fannie Mae's PLS traders did not receive SF CPRM's operational reviews, but rather relied on a list of approved counterparties that was circulated by SF CPRM. FHFA Ex. 255 (J. Norris Dep. Tr.) at 342:17-343:15. |
| 158. | In September 2005, Clayton reviewed a sample of 386 loans for the Legal Department to assess Option One's compliance with Fannie Mae's anti-predatory lending requirements. Ex. 162 at FHFA11862559. Clayton reported to Fannie Mae that 58 of the loans in the Option One sample were classified as having regulatory compliance exceptions, including missing credit score disclosures, under-disclosed finance charges, missing HUD-1 closing statements, missing notes, missing right of rescission disclosures, missing truth-in-lending disclosure, and | Undisputed for purposes of this Motion that Clayton conducted an, "Option One Annual Review" "Fannie Mae – Regulatory Compliance Review" September 26 and 30, 2005, Defs. Ex. 162 at FHFA11862559, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Also immaterial because the Legal Department did not share the results of its anti-predatory lending reviews with Fannie Mae's PLS traders and analysts. *See* FHFA Ex. 290 (GS FHFA 002130300) (Fannie Mae Legal Department employee confirming to Goldman Sachs that anti-predatory reviews are "not shared with our Portfolio and [are] used solely |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | incomplete applications. *Id.* Clayton also found 19 loans with predatory lending exceptions, including loans extended without regard to the borrower's ability to repay the loan. *Id.* | by us here in Legal to validate that there are no loans in breach [of anti-predatory guidelines].") Clayton issued a report of this review on October 25, 2006. The report does not relate to a specific PLS deal. *See* Defs. Ex. 162. The report states that Clayton's "objective of the project was a focused review of legal, regulatory, appraisal, income and credit documentation *to measure each loan for credit and compliance to Fannie Mae guidelines for lending to borrowers with blemished credit records as expressed in Fannie Mae's Lender Letter 03/00*, as well as to identify violations of the Federal Truth in Lending Act, implemented through Regulation Z, and the high-cost and anti-predatory lending regulations of various states and municipalities." *Id.* (emphasis added). Undisputed for purposes of this Motion that the report includes the information referenced by Defendants. |
| 159. | SF CPRM conducted a review of Option One in June 2006 and found the same appraisal issues and value variances. *See* Ex. 163 at FHFA03310974. That review also identified several risks associated with the credit quality of Option One originations, including the "[r]isk of poor underwriting performance and deterioration of credit quality in originations." *Id.* at FHFA03310963. Fannie Mae's reviews further found that Option One allowed for a 3-10% variance between AVM results and reported appraised values. *Id.* | Undisputed for purposes of this Motion that SF CPRM conducted "*a limited operational review of Option One Mortgage Corporation on June 12th -13th, 2006* at their offices in Irvine, California" and issued a Non-Traditional Counterparty Operational Review on June 13th, 2006, Defs. Ex. 163 at FHFA03310962, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Further immaterial because Fannie Mae's PLS traders did not receive SF CPRM's operational reviews, but rather relied on a list of approved counterparties that was circulated by SF CPRM. FHFA Ex. 255 (J. Norris Dep. Tr.) at 342:17-343:15. The review states that its purpose was "to evaluate the counterparty for approval pursuant to Fannie Mae's [Single Family] Subprime Initiative and the Risk Transformation Facility" and does not mention PLS. *Id.* at FHFA03310963. Fannie Mae's |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | | Subprime Initiative and Risk Transformation Facility were run through its Single Family business.  Defs. Ex. 303 at FHFA01222819-20.  The review "focused on assessing the financial condition of the company" and included a "meeting with Option One executive management as well as a tour of a production branch[.]"  *Id.* at FHFA03310963.  Otherwise undisputed. |
| 160. | On February 27, 2007, Fannie Mae's counterparty review team downgraded Option One to a "caution" status.  Ex. 164 at FHFA00022370. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  The downgrade was based on "recent headline news" about Option One.  Defs. Ex. 164 at FHFA00022370. |
| 161. | **Wells Fargo**.  SF CPRM reviewed Wells Fargo in December 2005.  Ex. 165 at FHFA02325937.  The review found that Wells Fargo's quality control unit graded loans by investment quality, and that even loans graded as "[m]oderate" investment quality "may be missing documentation required" or "contain process defects." *Id.* at FHFA02325947. | Undisputed for purposes of this Motion that Fannie Mae's "operational due diligence team conducted *a limited operational review of Wells Fargo Home Mortgage ('WFHM') origination divisions* on December 1st, 2005 at their offices in Minneapolis, Minnesota" as well as of the servicing division and issued a Non-Traditional Lending Operational Review on December 1, 2005, Defs. Ex. 165 at FHFA02325937 (emphasis added), but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Further immaterial because Fannie Mae's PLS traders did not receive SF CPRM's operational reviews, but rather relied on a list of approved counterparties that was circulated by SF CPRM.  FHFA Ex. 255 (J. Norris Dep. Tr.) at 342:17-343:15.  The review states that its purpose was "to evaluate the counterparty for approval pursuant to the Private Label Securities Credit Policies, Procedures and Delegated Authorities" and "*did not include the loan level testing necessary to validate the* |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | | *procedures and practices as represented by management*." *Id.* at FHFA02325938 (emphasis added). Otherwise undisputed. |
| 162. | Freddie Mac regularly reviewed the operations and loan origination practices of the Originators. Ex. 166 at 146. Freddie Mac's pre-purchase PLS review required a counterparty risk assessment before trade commitment. Ex. 167 at FHFA11625649; *see also* Ex. 168 at FHFA11728696. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 163. | At Freddie Mac, counterparty approval was always required to obtain credit approval. Ex. 71 at 265:5-9. Freddie Mac required pre-approval of any originator whose loans constituted more than 1% of the unpaid principal balance of its PLS portfolio. Ex. 172 at FHFA1195454. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. As part of the credit approval process, the credit analyst was required to consult a matrix to determine whether, based on the creditworthiness of the originators, not the loans originated, the credit analyst could approve the deal without additional counterparty assessment. Defs. Ex. 167 at FHFA11625652. If the counterparty was not approved, then the credit analyst had to obtain an exception. *Id.* at FHFA11625653. |
| 164. | This requirement reflected Freddie Mac's understanding that "[u]nderwriting standards can have an [e]ffect on deal performance" and that "[p]oorly managed servicers and originators can expose Freddie Mac to reputational risk . . . including but not limited to fraud." Ex. 169 at FHFA12147595-596. This policy also notes that "this risk cannot be structured away [and we] rely on understanding counterparty practices" to prevent it. *Id.* at | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. The cited text, moreover, is not specific to any originator or aggregator. The cited policy also states: "Where counterparties can play a key role at the AAA level is through their ability to screen out fraudulent and/or predatory loans. Even at the AAA risk position, predatory or fraudulent loans could pose legal and/or reputational risks to Freddie Mac. We look to the aggregator and in some cases the |

|  | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
|  | FHFA12147596. | underlying originator(s) of the deal to provide some level of fair lending due diligence on the underlying collateral." Defs. Ex. 169 at FHFA12147595. |
| 165. | Michael Aneiro, Freddie Mac's Vice President for Non-Agency Portfolio Management and the head of the group that bought Freddie Mac's PLS, Ex. 181, testified that Freddie Mac required counterparty approval for PLS deals because "the deals are dependent upon the performance of originators . . . ." and "[i]f originators don't follow the guidelines and originate things in a poor manner, [then]. . . whatever expectations we had on the performance of the bonds will be affected in a negative way . . . ." Ex. 71 at 255:19-24, 259:11-21. The approval of a counterparty depended on an assigned "matrix" score. Ex. 172 at FHFA11950454-456. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. The cited testimony, moreover, is not specific to any originator or aggregator. |
| 166. | Freddie Mac's Alternative Market Operations ("AMO") group was one of the business units that performed counterparty reviews, including reviews of aggregators, issuers and originators. One of the purposes of these reviews was to approve and monitor the originators whose loans backed PLS. Ex. 101. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 167. | Freddie Mac's AMO unit selected which originators to review in consultation with PLS and Single Family employees and distributed its findings to those divisions to assist in business decisions. Ex. 93 at FHFA13306194. The AMO group also incorporated analyses of | Disputed. Defendants' Ex. 93 at FHFA13306194 does not support the assertion. *See* L.R. 56.1(d). Further disputed because Defendants' Ex. 166 at 213:12-223:14 does not support their statement that the AMO group incorporated analyses of Freddie Mac's Single Family business, including its flow channel, into its originator reviews. Even if it |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | Freddie Mac's Single Family business, including its "flow" channel, into its originator reviews. Ex. 166 at 213:12-223:14. | had, that fact is immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions, as Defendants have provided no evidence that such information provided knowledge of misrepresentations made regarding the Securitizations. |
| 168. | Based on these originator reviews, AMO created a "scorecard" by which it assigned ratings to originators for the following categories: credit, appraisal, management, controls, and fair lending.  Ex. 173 at 52:9-54:11; Ex. 174 at FHFA00126810; Ex. 175 at FHFA03506825.  Those ratings ranged from "superior" to "poor" based on the AMO operational review findings, and reported whether the latest AMO review was "current" or "stale."  Ex. 174 at FHFA00126810.  AMO "scorecards" were distributed monthly to numerous Freddie Mac personnel, including employees with PLS responsibilities.  Ex. 176 at FHFA13621438. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 169. | AMO reviews examined Originators' loan underwriting and overall origination practices.  At times, AMO reviews involved reviewing loan files for a sample of the Originators' loans, to assess compliance with underwriting guidelines and material risks embedded in those originators' loans.  *See, e.g.*, Ex. 166 at 188-90; Ex. 177 at FHFA11971347; Ex. 179 at FHFA13278832.  The purpose of AMO reviews was "to gain insight into the way [Freddie | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  The loan file review was limited to 50 recently originated loans to understand the originator's processes.  Defs. Ex. 475 (Operational Review Procedures, Alternative Markets Operations (May 2005), FHFA11971617) at 619.  Because of the small number of loans, Freddie Mac did not "draw stringent conclusions" about the quality of the collateral originated by that originator.  Defendants' Ex. 166 at |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | Mac's] counterparties do business." Ex. 183 at FHFA02421535. | 190:10-17.  The evidence cited in Defendants' Ex. 177 does not support the inference Defendants seek to draw. |
| 170. | Mr. Feigles testified that AMO personnel "reviewed the [loan] files to get a sense of what [the originator] did," with "[a] goal, certainly, to understand if they adhered to credit guidelines." Ex. 166 at 190:4-17.  These loan file reviews were typically on-site at the originator's location.  *Id.* at 175:23-176:8; 307:6-8.  Freddie Mac also obtained AVM results on the loan file reviews it conducted as part of its AMO reviews "to evaluate the adequacy of [the originator's] controls." *Id.* at 209:12-214:9; Ex. 196 at FHFA11548699; Ex. 177 at FHFA11971349 (detailing AMO's operational review procedures.) | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  The loan file review was limited to 50 recently originated loans to understand the originator's processes.  Defs. Ex. 475 at 619.  Because of the small number of loans, Freddie Mac did not "draw stringent conclusions" about the quality of the collateral originated by that originator.  Defendants' Ex. 166 at 190:10-17. |
| 171. | The AMO group was part of Freddie's External Operational Risk Management ("EORM") unit, which was part of Freddie's Single Family business.  Ex. 166 at 69:10-70:3; Ex. 184 at FHFA00000134. In addition to PLS counterparty reviews, AMO was responsible for Freddie Mac's bulk purchases of subprime loans and securitization of those loans into "T-Deals" for investors.  Ex. 166 at 108:12-109:6. | Undisputed for purposes of this Motion that the AMO group was part of Freddie Mac's External Operational Risk Management unit. Disputed that the AMO group was responsible for Freddie Mac's bulk purchases of subprime loans and securitization of those loans into "T-Deals" for investors. Defendants' Ex. 166 does not support the proposed fact. Defendants' Ex. 166 discusses the AMO group's involvement in due diligence related to T-Deals, not that it was responsible for purchases. This fact is immaterial to any issues presented by this Motion because there are no T-Deals at issue and none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 172. | As shown in more detail below, *infra* ¶¶ 328-362, there were no information sharing restrictions on | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence |

| | Defendants' Statement of Material Facts | FHFA's Response |
|---|---|---|
| | the distribution of AMO reviews. Ex. 173 at 61.  PLS traders had access to these reviews, including the results of loan file reviews.  Ex. 166 at 823:5-23. | relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 173. | In addition to Freddie Mac's AMO unit, the CCRM group and EORM unit conducted reviews of originators from which the GSE directly purchased loans. Ex. 101 at 25; Ex. 173 at 42:6-12; Ex. 166 at 161:15-24; 804:19-25; Ex. 188 at FHFA17619353; Ex. 189 at FHFA17625640; Ex. 176 at FHFA13621434.  CCRM, which inputted AMO's originator rankings into its broader analysis of a counterparty's credit risk, also relied on AMO's operational reviews of originators when approving and monitoring PLS counterparties.  Ex. 185 at FHFA12967104; Ex. 186 at FHFA01485802; Ex. 187 at FHFA09816676; Ex. 172 at FHFA11950450. | Undisputed for purposes of this Motion but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 174. | EORM's reviews examined the underwriting and appraisal quality of originators' loans and rated those originators as "Superior", "Above Average", "Satisfactory", "Marginal" or "Poor." Ex. 189 at FHFA17625640; Ex. 190 at FHFA16966410.  EORM reviews were shared with personnel responsible for PLS transactions and counterparty oversight.  Ex. 176 at FHFA13621438.  EORM and AMO also shared information regarding the results of their reviews, and there were no restrictions on what information | Undisputed for purposes of this Motion that EORM's reviews recorded information provided by the originators' management about the underwriting and appraisal quality of originators' loans and rated those originators as "Superior," "Above Average," "Satisfactory," "Marginal," or "Poor." Disputed that EORM reviews were shared with "personnel responsible for PLS transactions Actions," which is not supported by Defendants' Ex. 176.  As is apparent on the face of the EORM reviews, they were not distributed to any PLS traders or credit analysts. *See, e.g.*, Defs. Ex. 213 at FHFA04850281.  These facts are immaterial to any issues presented by this Motion because |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | should be shared between these units. Ex. 166 at 213-223; 257-58; 847-49. | none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 175. | Because Freddie Mac was allowed to buy PLS only if the collateral loans were originated by an "approved seller servicer" by Freddie Mac's Single Family division, the reviews conducted by CCRM and EORM affected PLS purchases. Ex. 191 at FHFA01391812-13. | Disputed, because Defendants' Ex. 191 does not support the proposed fact. Defendants' Ex. 191 states that "[a]ny F[reddie] [M]ac approved seller servicer is considered an approved *originator* or *servicer* for MABS trades," not that a PLS originator must be an approved seller servicer. Defs. Ex. 191 at FHFA01391812 (emphases in original). These facts are immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 176. | Freddie Mac conducted reviews of the following Originators:<br><br>**Aames**.  In March 2005, Freddie Mac conducted an AMO review of Aames. Ex. 192 at FHFA13146126.  During this review, Freddie Mac found that Aames permitted LTV tolerances of up to 10% depending on risk levels.  *Id.* at FHFA13146128.  The review also listed Aames' "Fraud tools," and noted that "11.8% of all findings are for fraud, with 55% for falsified documentation which are found through re-verification of licenses, income, employment and assets." *Id.* at FHFA13146129.  Moreover, it found that "Aames' largest Broker was just revoked due to fraud." *Id.* | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  The AMO review also noted that Aames did not allow any variance for LTVs greater than 90%. Defendants' Ex. 192 at FHFA13146128. |
| 177. | **Accredited**.  On February 2, 2006, Freddie Mac conducted an AMO review of Accredited Home Lenders, which included loan-level reviews to evaluate the credit | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  The |

| | Defendants' Statement of Material Facts | FHFA's Response |
|---|---|---|
| | quality of its originations.  Ex. 193 at FHFA11548682.  The review reported that exceptions to underwriting guidelines made up 40% of Accredited's loan production.  *Id.* at FHFA11548683. The review also stated that approximately 10% of the appraisal values of the sampled loans were reduced upon review.  *Id.* at FHFA11548684.  As part of the review, Freddie Mac analyzed Accredited's fraud review process and expressed the belief that "[f]raud areas of concern" for loans originated by Accredited included "[e]mployment and income, property value and condition, property flips, undisclosed debts, straw buyer, identity theft, occupancy, assets and cash reserves."  *Id.* at FHFA11548686. | AMO review also noted that "FICO score exceptions are allowed with a variance no greater than 5%" and that "50% of the [requested] exceptions are denied."  Defs. Ex. 193 at FHFA11548683. |
| 178. | **Aegis**.  In January 2007, AMO conducted a review of Aegis.  Ex. 194 at FHFA00129445.  Freddie Mac found that a unit of Aegis, "Aegis Funding Corporation (AFC), was closed at the end of 2006.  This unit included all wholesale subprime originations, and was closed due to significantly higher incidences of fraud and repurchase requests than in both other units combined."  *Id.* at FHFA00129445.  It also noted that "EPD's for subprime originations at Aegis have ranged from a high of 4.9% of production to the current 1.9%.  Management believes that this number will stabilize around 2%, based on the closure of AFC (which accounted for the majority of their subprime EPDs) and the | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |

|  | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
|  | enhanced appraisal standards." *Id.* at FHFA00129447. |  |
| 179. | **Ameriquest/Argent**.  In July 2003, AMO conducted a review of Argent, which included loan-level due diligence of Argent loans.  Ex. 195 at FHFA11597649.  Freddie Mac found that that 9.5% of all Argent loans it reviewed during its visit contained issues relating to "appraisal," and further, that appraisal issues accounted for 25% of all files AMO found inadequate during its review of loans.  *Id.* at FHFA11597649.  AMO also found "appraisal discrepancies on approximately 10% of the Argent loans in the sample [reviewed by Freddie Mac]." *Id.* at FHFA11597651. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Moreover, none of the Certificates purchased by Freddie Mac contained collateral originated by Argent.  *See* Reply SUF ¶ 467. |
| 180. | In October 2004, Freddie Mac's AMO team again visited Argent, and found that "Argent generally allows for a[n appraisal] value variance of 7% to 10% depending on loan amount" and "[a]pproximately 7% of all values and 20% of the values on full reviews are reduced."  Ex. 225 at FHFA11597645. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Moreover, none of the Certificates purchased by Freddie Mac contained collateral originated by Argent.  *See* Reply SUF ¶ 467. |
| 181. | In November and December 2005, AMO visited Argent again and, after that visit, rated Argent's appraisal practices as "marginal."  Ex. 197.  The reviewers found "significant signs of deterioration within [Argent's] appraisal and credit areas" and concluded that Argent's "enormous growth has outpaced the ability to manage critical credit risk properly leading | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Moreover, none of the Certificates purchased by Freddie Mac contained collateral originated by Argent.  *See* Reply SUF ¶ 467. |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | to poor loan quality." *Id.* at FHFA01079050. | |
| 182. | AMO's loan analysis during its 2005 review "resulted in significant issues, (22%) for Ameriquest appraisals and for Argent appraisals; credit (16%) with (11%) for appraisals." *Id.* at FHFA01079050.  Specifically, the review noted that "because LTV parameters are generally higher for Argent[, ] [t]he results are inflated LTV's with already weak appraisals and difficulty knowing if the risk has actually been assessed properly for pricing." *Id.* at FHFA01079051. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Moreover, none of the Certificates purchased by Freddie Mac contained collateral originated by Ameriquest or Argent.  *See* Reply SUF ¶ 467. |
| 183. | AMO also found that Argent "show[ed] weakness in [its] appraisal processes[:] AMO observed appraisal values pushed consistently just to obtain what appears to be a specific value." *Id.* at FHFA01079052.  AMO also observed that Argent "ha[d] realized the downfalls through [its] own discoveries and from several state inquiries notating unacceptable appraisal processes." *Id.* | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Moreover, none of the Certificates purchased by Freddie Mac contained collateral originated by Argent.  *See* Reply SUF ¶ 467. |
| 184. | AMO noted that at Argent, "exceptions appear to be frequent for LTV." Ex. 201 at FHFA11597628. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Moreover, none of the Certificates purchased by Freddie Mac contained collateral originated by Argent.  *See* Reply SUF ¶ 467. |
| 185. | **Countrywide**.  Freddie Mac's AMO team reviewed Countrywide | Undisputed for purposes of this Motion, but immaterial to any issues presented by this |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | in June 2004.  Ex. 226.  The review awarded Countrywide an overall rating of "marginal" and a rating of "marginal" for internal controls. *Id.* at FHFA02419613.  AMO found that "Countrywide's quality control unit targets too small a sample to be fully effective." *Id.* AMO also noted that approximately 20% of appraisals in Countrywide loans "[had] a reduction in value after review." *Id.* | Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Moreover, all the Certificates purchased by Freddie Mac that contained collateral originated by Countrywide were purchased approximately two years after this review.  *See* Reply SUF ¶ 467. |
| 186. | Between August 31 and December 23, 2005, Freddie Mac's EORM reviewed Countrywide.  Ex. 198 at FHFA11984900.  During this review, EORM identified "risks related to [Countrywide]'s ability to manage appraisers utilized in the origination process, which may adversely impact loan quality," specifically finding "during file testing that licenses are not consistently found with each appraisal." *Id.* at FHFA11984909. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  This review is additionally immaterial as the EORM group at Freddie Mac performed reviews for the single-family business, not the PLS side of the business.  FHFA Ex. 267 (S. Kenneweg Dep Tr.) at 420: 12-25 ("[W]ould you consider the EORM review in connection with your work on the PLS Side?  A.  No . . . my focus was PLS.  So I had access - - you know, I was on the distribution list and stuff for the AMO reviews."), and FHFA Ex. 260 (D. Hackney Dep. Tr.) at 667:18-670:2 (testifying he had never seen an EORM review and was not on the distribution list).  As is apparent on the face of the EORM review, it was not distributed to any PLS traders or credit analysts.  Defs. Ex. 198 at FHFA11984900. |
| 187. | Freddie Mac's AMO team again reviewed Countrywide in September 2007.  Ex. 199.  During its on-site visit, Freddie Mac reviewed "independent AVM's for 50 recently funded loans to determine the reasonableness of the collateral valuation" and found that | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Moreover, none of the Certificates purchased by Freddie Mac that contained collateral originated by Countrywide were purchased |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | Countrywide's appraisals varied from Freddie Mac's AVM values by 8.6%.  *Id.* at FHFA00371995. | after this review.  *See* Reply SUF ¶ 467. |
| 188. | **Decision One**.  AMO reviewed Decision One in July 2004.  Ex. 200 at FHFA12992151.  Regarding the accuracy of Decision One's appraisals, Freddie Mac knew that Decision One did "not have an appraiser approval or monitoring process," that there was generally a 15% tolerance between original and reviewed appraisal values, and that "[s]everal files in the sample had poor comparables, and one value was clearly not supported."  *Id.* at FHFA12992152. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Moreover, all the Certificates purchased by Freddie Mac that contained collateral originated by Decision One were purchased more than two years after this review.  *See* Reply SUF ¶ 467. |
| 189. | **Equifirst**.  AMO conducted operational reviews of Equifirst in 2004 and 2007.  Ex. 204; Ex. 205.  Freddie Mac engaged Clayton to perform the September 2004 operational review, and Clayton reported to Freddie Mac that Equifirst's appraisal practices were "marginal" and that a "high percentage" of Equifirst's loans "closed with an LTV over 90%"— and recommended "more involvement of the Appraisal Review Department in reviewing appraisals prior to closing."  Ex. 204 at FHFA13294892. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Moreover, none of the Certificates purchased by Freddie Mac contained collateral originated by Equifirst.  *See* Reply SUF ¶ 467. |
| 190. | **First Franklin**.  AMO reviewed First Franklin in 2004, 2005 and 2007.  Ex. 206; Ex. 207; Ex. 208.  AMO's 2004 review reflected Freddie Mac's belief that "First Franklin's layering of risk consists of high FICO scores, high LTVs, some 100% first liens, first time | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Moreover, none of the Certificates purchased by Freddie Mac that contained collateral originated by First Franklin were purchased |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | homebuyers, payment shock in excess of 75% and no assets verified." Ex. 206 at FHFA12992160.  Freddie Mac also observed that First Franklin made exceptions "for loan amount and DTI total 10%" and "[t]olerance levels for AVMs are currently at 15% for purchase transactions and 10% for refinances." *Id.* at FHFA12992161. | after the 2007 AMO review.  *See* Reply SUF ¶ 467. |
| 191. | In its 2005 review, Freddie Mac's AMO review reflected its <u>belief</u> that First Franklin loans had "[v]alue discrepancies between various types of loan reviews," and that "First Franklin does not have an extensive appraisal department." Ex. 207 at FHFA02418743. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 192. | In August 2007, "AMO observed many loans with values that were pushed or exceeded the AVM's pulled by 10-15% . . .  AMO's review indicated that values were often pushed . . . .  Overall the AVM's pulled by AMO demonstrated an absolute standard deviation of 13.2% from the appraised value." Ex. 228 at FHFA12769700. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Moreover, none of the Certificates purchased by Freddie Mac that contained collateral originated by First Franklin were purchased after this review.  *See* Reply SUF ¶ 467. |
| 193. | **First NLC**.  In January and February 2005, Freddie Mac conducted an AMO review of First NLC Mortgage Corp. Ex. 209 at FHFA04385473.  It gave First NLC the lowest possible rating of "poor," reporting that First NLC had "poor command of its credit, appraisal and quality control units." *Id.* Freddie Mac found that First NLC opted to use the highest credit | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  The AMO review also notes an expectation "that First NLC will probably improve under FBR's ownership."  Ex. 209 at FHFA04385473.  Moreover, none of the Certificates purchased by Freddie Mac that contained collateral originated by First NLC were purchased prior |

|  | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
|  | score available "[w]here more than one score is obtained," a practice FHFA now claims was a violation of proper standards. *Id.* Freddie Mac concluded that First NLC's underwriting process "result[ed] in loans with credit attributes that would be greatly misrepresented on a pricing tape." *Id.* AMO rated First NLC's appraisal quality as "poor" based on three "weaknesses":<br><br>• "First NLC has no formal appraisal department. Consequently, their appraisal process relies entirely on the underwriter's review [and] AMO does not believe that a centrally located underwriting department can understand national markets well enough to control valuation risk";<br><br>• "First NLC allows a 10% variance in value at all LTV levels . . . [which] makes it possible for the true LTV to exceed 100%"; and<br><br>• "[A]ppraised value was reduced less than 2% of the time in 2004, which is well below the 6% to 8% AMO typically sees." | to the April 2005 AMO review of First NLC. *See* Defs. Ex. 210 at FHFA03484206; Reply SUF ¶ 467. |
| 194. | Freddie Mac's April 2005 review of First NLC Financial Services echoes the same concerns. Ex. 210 at FHFA03484206. | Disputed, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. The April 2005 review rated First NLC as "marginal," Defs. Ex. 210 at |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | | FHFA03484206, whereas the February 2005 review rated First NLC as "poor," Defs. Ex. 209 at FHFA04385473.  The April 2005 AMO review further notes that "First NLC has made some improvements since AMO's previousl operational review one year ago with the addition of a quality control unit and improved technology.  AMO believes that First NLC will probably continue to improve under FBR's ownership." *Id.* |
| 195. | **Fremont**.  AMO reviewed Fremont Investment & Loan in 2004, 2005 and 2006.  Ex. 211; Ex. 212 ; Ex. 213.  Its 2004 review reflected its belief that Fremont loans had "[m]ajor underwriting exceptions . . . at 4%, with most for Debt to income ratio." Ex. 211 at FHFA11596541.  AMO also found that Fremont allowed excessive variances between appraisal values and AVM-generated values: "Greater than 80% LTV allows for a 5% variance in value, with less than 80% LTV allowing for 10%." *Id.* | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 196. | In August 2005, Freddie Mac observed that Fremont's LTV "tolerance levels" (the degree to which the LTV could depart from AVM estimates of accurate value) were 5, 10, and 15%, depending on the riskiness of the loan.  Ex. 212 at FHFA00129493.  Freddie Mac found that Fremont was making credit exceptions during loan underwriting, with the following tolerances: "5% for Loan amount, LTV, FICO, DTI and BK [bankruptcy] seasoning." *Id.* at FHFA00129494. | Undisputed for purposes of this Motion that a August 2005 AMO review of Fremont Investment & Loan noted "LTV tolerance levels" of 5% for high risk loans, 10% for medium risk loans, and 15% as the maximum variance.  Defs. Ex. 212 at FHFA00129495. Disputed that Freddie Mac "found that Fremont was making credit exceptions . . . during loan underwriting," which is not supported by Defendants' Ex. 212. Defendants' Ex. 212 at FHFA00129494 records Fremont's explanation of its policies, not anything that Freddie Mac found through underwriting.  These facts are immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | | Certificate purchased by the GSEs and at issue in these Actions.   Additionally, the AMO Review gave Fremont an overall rating of "Above Average," because they "tend to treat all parts of their operations cautiously and on the conservative side."  Defs. Ex. 212 at FHFA00129493.  This review is additionally immaterial as six of the nine Certificates purchased by Freddie Mac that contained collateral originated by Fremont were purchased more than year after this review.  *See* Reply SUF ¶ 467. |
| 197. | In June 2006, EORM conducted a two-day review of Fremont.  Ex. 213.  This review identified underwriting problems including "[d]ata integrity issues" and "risks related to Fremont's ability to assess the risk associated with the origination of loans to self-employed borrowers and/or borrowers utilizing tax returns to substantiate income."  *Id.* at FHFA04850282, FHFA04850286. | Undisputed, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Additionally, the EORM group reviewed Fremont Bank, an entity separate from Fremont Loan & Investment, the originator of some of the loans in the Securitizations at issue.  Fremont Bank did not originate any of the mortgage loans in the Securitizations at issue. |
| 198. | By the end of March 2007, Freddie Mac's CCRM department had downgraded Fremont.  Ex. 214 at FHFA03344375. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Moreover, none of the Certificates purchased by Freddie Mac that contained collateral originated by Countrywide were purchased after March 2007.  *See* Reply SUF ¶ 467. |
| 199. | **Greenpoint**.  AMO reviewed Greenpoint Mortgage Funding in 2004. Ex. 94 at FHFA13213565.  AMO selected a sample of 202 loans from Greenpoint's recent loan production and engaged Clayton to review those loan files, after which Freddie Mac staff also | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Moreover, all the Certificates purchased by Freddie Mac that contained collateral originated by Greenpoint were purchased |

| | Defendants' Statement of Material Facts | FHFA's Response |
|---|---|---|
| | reviewed the loans.  *Id.* at FHFA13213565.  AMO and Clayton found that 19.8% of the loans had material exceptions to underwriting guidelines: 6.9% for appraisal issues, 5% for "credit" issues, 1% for "missing docs," 1.5% for DTI-related issues, 1.5% for LTV-related issues, and 3.5% for borrower misrepresentations or "other" issues.  *Id.* at FHFA13213565.  As a result of this review, Freddie Mac believed that Greenpoint's "valuation process showed more weaknesses than in the last review," *Id.* at FHFA13213566, including the facts that "[p]roperty condition issues in the sample were more prevalent than noted in prior reviews" and "[c]omparable[] properties in the appraisal that were not truly comparable or did not support the value were more frequent than in the prior review." *Id.* at FHFA13213567. | approximately two years after this review.  *See* Reply SUF ¶ 467. |
| 200. | AMO's 2004 review reflected Freddie Mac's <u>belief</u> that "Greenpoint's overall credit standards and their control focus are still marginal," and that Greenpoint's "[c]redit guidelines are softer than their major competitors," "Greenpoint's culture is geared toward production and profit, not towards control," "[e]xceptions to their lending guidelines are frequent," and "Greenpoint's guidelines are very big and very complex, creating a possibility of confusion or misuse." *Id.* at FHFA13213566- 567.  AMO underwriters "deemed 6% of [the] | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Moreover, all the Certificates purchased by Freddie Mac that contained collateral originated by Greenpoint were purchased approximately two years after this review.  *See* Reply SUF ¶ 467. |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | sample to be outside Greenpoint's guidelines with unacceptable risk." *Id.* at FHFA13213567. | |
| 201. | Based on its AMO review, Freddie Mac knew that Greenpoint's "misrep[resentation] findings have recently averaged 31% compared to a consistent 25% AMO noted at previous onsites" and "[m]ost of the misrep findings are for income and employment." *Id.* at FHFA13213567. It also believed that some of the issues it identified were "recurring problems, [but] senior management [did] not seem to have a plan to resolve these issues." *Id.* at FHFA13213567. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Additionally, the AMO review notes that "Most of the misrep findings are for income and employment," and "Occupancy issues appear to have improved since the prior review." Defs' Ex. 94 at FHFA13213567-68. Moreover, all the Certificates purchased by Freddie Mac that contained collateral originated by Greenpoint were purchased approximately two years after this review. *See* Reply SUF ¶ 467. |
| 202. | EORM conducted an operational review of Greenpoint Mortgage Funding in March 2006. Ex. 215. EORM's review reflected Freddie Mac's belief that Greenpoint had an "[i]nadequate process to obtain re-verifications of employment and deposits," and that "data integrity controls need additional strengthening." *Id.* at FHFA11985099. The review also noted that "[a]pproximately 35 percent of closed loans have been approved with exceptions," with "multiple exceptions making up 10 percent overall," and that the "[t]op three credit exceptions [are] DTI, loan amount and credit score." *Id.* at FHFA11985112- 113. EORM observed that "[r]everification of income and source of funds/reserves are not consistently performed," and Greenpoint's "guidelines allow credit | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Additionally, the review noted that "Credit issues have improved and were minimal," "No occupancy issues were found," "All income appeared to be reasonable," and "Assets verified majority of the time." Defs' Ex. 215 at FHFA11985112. This review is additionally immaterial as the EORM group at Freddie Mac performed reviews for the single-family business, not the PLS side of the business. FHFA Ex. 267 (S. Kenneweg Dep Tr.) at 420: 12-25 ("[W]ould you consider the EORM review in connection with your work on the PLS Side? A. No . . . my focus was PLS. So I had access - - you know, I was on the distribution list and stuff for the AMO reviews."), and FHFA Ex. 260 (D. Hackney Dep. Tr.) at 667:18-670:2 (testifying he had never seen an EORM review and was not on the distribution list). As is apparent on the face |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | characteristics to be layered in ways that could create risk." *Id.* at FHFA11985113. | of the EORM review, it was not distributed to any PLS traders or credit analysts.  Defs. Ex. 198 at FHFA11984900.  Moreover, one of the two Certificates purchased by Freddie Mac that contained collateral originated by Greenpoint was purchased prior to this review. *See* Reply SUF ¶ 467. |
| 203. | **IndyMac**.  AMO reviewed IndyMac in 2003, 2004 and 2006. Ex. 216; Ex. 217; Ex. 218.  AMO's 2003 review reflected Freddie Mac's <u>belief</u> that IndyMac suffered from "over-reliance on FICO score, their concentration in California, and their extremely aggressive growth plan." Ex. 216 at FHFA13675213.  The report noted that IndyMac only reviewed "45% of their values with AVM's" and reflected Freddie Mac's <u>belief</u> that this practice "shows in the quality of the appraisals." *Id.* at FHFA13675214. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Defendants' Ex. 216 is a 2003 review of Indymac.  The 2003 AMO review is further immaterial because none of the Certificates purchased by Freddie Mac that contained collateral originated by IndyMac were purchased after this review but before the subsequent reviews of IndyMac.  *See* Defs. Ex. 217; Reply SUF ¶ 467. |
| 204. | Freddie Mac believed that "[i]t was very obvious on several loans that values were being pushed to get to a certain level in order to support a predetermined loan amount.  AMO observed appraisers deliberately crossing into nearby upscale neighborhoods to get the value they needed.  Comparables also consistently had superior style, layout, appeal, design and even square footage.  Even when AVMs were obtained, in many cases where the AVM did not support the value, value adjustments were not made.  It was as if the AVM was just ignored." *Id.* at FHFA13675214-215. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Defendants' Ex. 216 is a 2003 review of Indymac.  The 2003 AMO review is further immaterial because none of the Certificates purchased by Freddie Mac that contained collateral originated by IndyMac were purchased after this review but before the subsequent reviews of IndyMac.  *See* Defs. Ex. 217; Reply SUF ¶ 467. |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| 205. | Freddie Mac believed that 31.6% of the loans that it reviewed during its AMO review contained issues relating to "appraisal." *Id.* at FHFA13675213. Indeed, appraisal issues accounted for 66% of all files AMO rejected during its due diligence. *Id.* at FHFA13675214. To Freddie Mac, these percentages posed "a major concern, since collateral is such a key factor in determining overall lending risk." *Id.* at FHFA13675214. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Defendants' Ex. 216 is a 2003 review of Indymac. The 2003 AMO review is further immaterial because none of the Certificates purchased by Freddie Mac that contained collateral originated by IndyMac were purchased after this review but before the subsequent reviews of IndyMac. *See* Defs. Ex. 217; Reply SUF ¶ 467. |
| 206. | Freddie Mac's 2004 AMO review reflected its belief that "IndyMac's subprime credit quality is still an issue with aggressive credit guidelines that allow them to compete with the lower sector of subprime lenders," and "make exceptions largely unnecessary." Ex. 217 at FHFA12992173. These guidelines "make it more difficult for an investor working from a standard tape format to properly evaluate risk." *Id.* at FHFA12992173. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 207. | In 2006, Freddie Mac's AMO review concluded that "IndyMac's underwriters appear to underwrite to satisfy the [automated underwriting system] conditions and do not typically question risk factors such as occupancy." Ex. 218 at FHFA16955789. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 208. | AMO stated that it "would like to see IndyMac underwriters . . . more closely capture other fundamental lending risks, such as occupancy. For example, if a borrower recently | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by |

| | Defendants' Statement of Material Facts | FHFA's Response |
|---|---|---|
| | acquired three owner <u>occupied properties at 100% LTV within the last 3 months and now requesting [sic] a fourth property as owner-occupied an automated system . . . is unable to  capture these types of lending risks."</u>  Ex. 221 at FHFA03337787 (emphasis added). AMO also observed that IndyMac "did not question income reasonability" for many loans.  *Id.* | the GSEs and at issue in these Actions. |
| 209. | AMO analyzed a sample of IndyMac's most recent available loan production using Corelogic's "cascading AVM technology" and determined that "[t]he mean value variance" on the 43 loans was 11.39%.  Ex. 221 at FHFA03337789, FHFA03337792. It was Freddie Mac's view that this variance exceeded standard industry variances.  *Id.* | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 210. | EORM also performed operational reviews of IndyMac in 2005 and 2007.  Ex. 222; Ex. 223.  In 2005, EORM found that "IndyMac's quality control reviews lacked evidence of a response or resolution to findings," including underwriting issues, and, as part of its production compliance review, EORM found that 14 of 19 broker-originated loan files "contained expired licenses."  Ex. 222 at FHFA11985217, 223-224. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  FHFA Ex. 267 (S. Kenneweg Dep Tr. at 420:12-25 ("[W]ould you consider the EORM review in connection with your work on the PLS Side?  A.  No . . . my focus was PLS.  So I had access - - you know, I was on the distribution list and stuff for the AMO reviews.")), and FHFA Ex. 260 (D. Hackney Dep. Tr.) at 667:18-670:2 (testifying he had never seen an EORM review and was not on the distribution list).  As is apparent on the face of the EORM review, it was not distributed to any PLS traders or credit analysts.  Defs. Ex. 222 at FHFA11985206; Defs. Ex. 223 at FHFA01333129. |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| 211. | By the end of March 2007, Freddie Mac's CCRM department had downgraded Indymac.  Ex. 214 at FHFA03344376. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Moreover, none of the Certificates purchased by Freddie Mac that contained collateral originated by Indymac were purchased after March 2007.  *See* Reply SUF ¶ 467. |
| 212. | **Mandalay Mortgage**.  In November 2004, Clayton performed an operational review of Mandalay Mortgage on behalf of Freddie Mac.  Ex. 227 at FHFA13253473.  The review gave Mandalay Mortgage the worst possible overall rating of "Poor."  *Id.* The report specifically noted that Mandalay's "stated" and "interest only" product categories "are aggressive" and that "[a] tolerance of 15% is allowed between appraised value and AVM value."  *Id.* at FHFA13253474. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Moreover, the only Certificates purchased by Freddie Mac that contained collateral originated by Mandalay Mortgage was purchased approximately two years after this review.  *See* Reply SUF ¶ 467. |
| 213. | **New Century**.  AMO reviewed New Century in January 2005.  Ex. 224 at FHFA11597212.  The review reflected Freddie Mac's understanding that New Century had a "stated goal of offering mortgages to all borrowers," and that "stated income" loans "represent[ed] 45%" of New Century's production.  *Id.* at FHFA11597213.  The Freddie Mac reviewers reported that New Century had an "LTV tolerance level" of 7% for loans with an LTV less than 90%.  *Id.* at FHFA11597215. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  The AMO review also notes that New Century had no LTV tolerance level for loans with an LTV of greater than or equal to 90%.  Defs. Ex. 224 at FHFA11597215. |
| 214. | Freddie Mac reviewed New Century again in February 2007. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this |

| Defendants' Statement of Material Facts | FHFA's Response |
|---|---|
| Ex. 229.  In this review, it concluded that New Century's underwriters "lack[ed] the ability or the direction to detect layering of risk." *Id.* at FHFA13238766. Freddie Mac observed that, for the New Century loans sampled, the "appraisals had a mean value variance (appraisal v. AVM) of 14.25%" and expressed its belief that "[t]his put[] the New Century value variance on par with what we have seen industry wide." *Id.* | Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 215. | By March 8, 2007, New Century had announced that it had stopped accepting loan applications, Ex. 368 at FHFA00178855, and it declared bankruptcy in April 2007, Ex. 515.  By the end of March 2007, Freddie Mac's CCRM department had downgraded New Century.  Ex. 214 at FHFA03344376. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 216. | GSE personnel believed that pools from originators in bankruptcy were more likely to contain fraud. Peter Niculescu of Fannie Mae described that proposition as "almost tautological" and said it "would be hard for anybody to disagree" that loans pools from failing originators were "more likely to contain fraud." Ex. 66 at 290:20-292:9. | The first sentence of Defendants' ¶ 216 is an argument without evidentiary support. Otherwise undisputed for purposes of this Motion that Defendants' Ex. 66 contains the language quoted by Defendants, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 217. | **Option One**.  Freddie Mac reviewed Option One in May 2005. Ex. 230 at FHFA11597859. Freddie Mac's 2005 review reflects its <u>opinion</u> that Option One was "marginal." *Id.* at FHFA11597859. The review also reflects Freddie | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | Mac's belief that "Option One's philosophy is to trust credit scores period," *Id.* at FHFA11597860, and that "Option One's FICO score average of 609 is low when compared to the industry.  When you add the fact that AMO found 10% of the loans with an average FICO score of 627 to be misrepresentative, an Option One loan pool could perform more like an average FICO score of 580-590." *Id.* at FHFA11597859.  The low credit scores, in conjunction with Option One's "[e]xcessive layering of risk" "caused AMO to downgrade Option Ones' [sic] overall credit rating from Satisfactory to Marginal." *Id.* | |
| 218. | During its review, AMO reviewed a sample of loans from a recent Option One production and noted at least one instance in which a home "value [] was stretched excessively." *Id.* at FHFA11597861. | Disputed, as the cited language does not appear in Defs. Ex. 230. |
| 219. | In February 2007, Freddie Mac again rated Option One as "marginal." Ex. 231 at FHFA12656910.  The Freddie Mac reviewers reported that Option One's philosophy was to make loans that "make sense . . . . even when an exception to the guidelines is required." *Id.* | Disputed that the review occurred in February 2007; Defendants' Ex. 231 indicates that the review occurred in March 2007.  Undisputed that the review contained the cited language, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Moreover, none of the Certificates purchased by Freddie Mac that contained collateral originated by Option One were purchased after this March 2007 review.  *See* Reply SUF ¶ 467. |
| 220. | The 2007 Option One review reflected Freddie Mac's observation that "underwriting | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | styles varied from branch to branch with varying levels of consistency in how the guidelines were applied. AMO feels this lack of cohesiveness, coupled with OOMC's liberal interpretation of policy leads to additional process execution risk." *Id.* at FHFA12656911.  During its loan level review, Freddie Mac found several "underwriting decisions [it] disagreed with." *Id.* at FHFA12656913.  For example, the Freddie Mac review found, based on its review of loan files, an approved loan with a 103% CLTV despite the fact that "over 100% CLTV [was] not allowed under any program." *Id.* The approved loan was "most certainly outside of the guidelines of Option One." Ex. 166 at 332:17-20.  It also found that for one of the loans, the "[o]riginal appraised value of [ ] $286k was used to determine LTV" even though "[a] field review of the appraisal cut the value to $255k." Ex. 231 at FHFA12656913. Finally, the review noted that Option One underwrote at least one of the loans using a credit score of 597, "where the credit score supported in the file was 554." *Id.* Freddie Mac was unsure "how the 597 credit score was obtained." *Id.* | relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Moreover, none of the Certificates purchased by Freddie Mac that contained collateral originated by Option One were purchased after this March 2007 review.  *See* Reply SUF ¶ 467. |
| 221. | Freddie Mac again found evidence of appraisal bias during its March 2007 review.  During its review of one loan file, AMO noted that although "[a] field review of the appraisal cut the value to $255k," "[t]he original appraised value of $286k was used to determine LTV | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Disputed that this was a separate review. Defendants' Exs. 231 and 233 are the same March 2007 AMO reviews.  Moreover, none |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | with no exceptions noted or explanation given." Ex. 233 at FHFA00204575.  AMO found another loan that had given "103% CLTV to self-employed first time homebuyer with stated income [even though] Borrower only had a two year history of being self-employed.   Between seller contributions and 103% LTV, borrower contributed less than $1000 to purchase [which violated Freddie Mac standards because] [o]ver 100% CLTV [is] not allowed under any program." *Id.* | of the Certificates purchased by Freddie Mac that contained collateral originated by Option One were purchased after this March 2007 review.  *See* Reply SUF ¶ 467. |
| 222. | Freddie Mac's review also expressed concerns over Option One's new, fully automated "appraisal waiver" program: "[Option One] is seeing approximately 12% of the returned values not supported.  Based on the overall success of this program [Option One] is looking to expand this in the near future.  AMO is unaware of any other subprime lender that offers a program that requires less than a full appraisal." Ex. 233 at FHFA00204576. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Moreover, none of the Certificates purchased by Freddie Mac that contained collateral originated by Option One were purchased after this March 2007 review.  *See* Reply SUF ¶ 467. |
| 223. | **Ownit Mortgage**.  Freddie Mac's August 2004 AMO review of Ownit Mortgage ("Ownit") noted that AMO did "not believe that [Ownit's] operation [was] stable", resulting in "appraisal and controls that are marginal." Ex. 234 at FHFA13293318.  The review noted that "Ownit tape data is currently very inaccurate with respect to doc type and other key areas." *Id.* at FHFA13293320.  The review also acknowledged that Ownit did not | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | have its own appraisal department and "allows a value variance of up to 15% as compared to AVMs or desk reviews, which is large, especially at the higher LTV's." *Id.* at FHFA13293319. | |
| 224. | **ResMAE.**  Freddie Mac's AMO group conducted an operational review of ResMAE in April 2004 that gave ResMAE an overall rating of "Marginal" and recommended that Freddie Mac "Proceed with Caution."  Ex. 300 at FHFA12992187.  The review found that "ResMae does not have an internal quality control program," *Id.* at FHFA12992189, and encourages "story loans" which are "loans that are made based more on the borrower's individual story that [sic] they are on objective criteria." *Id.* at FHFA12992188.  Freddie Mac acknowledged that ResMae "accept[s] a variance of 10% between origination appraisal and the review appraisal." *Id.* at FHFA12992189. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Moreover, the only Certificates purchased by Freddie Mac that contained collateral originated by ResMAE was purchased approximately three years after this review. *See* Reply SUF ¶ 467. |
| 225. | **RFC/GMAC**.  In October 2005, AMO reviewed RFC-GMAC ("RFC").  Ex. 235.  Freddie Mac observed that "[e]xceptions make-up 2% of production," and "[t]op three exceptions are: loan amounts, LTV and DTI." *Id.* at FHFA13238755.  Additionally, AMO found that AVM tolerances at RFC ranged from 5% to 15%. *Id.* at FHFA13238756. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Moreover, none of the Certificate purchased by Freddie Mac contained collateral originated by RFC-GMAC. *See* Reply SUF ¶ 467. |
| 226. | **Wells Fargo**.  AMO reviewed Wells Fargo in November 2006.  Ex. 236.  AMO reviewed 50 loan | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence |

|  | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
|  | files on-site at Wells Fargo, and reported "a high percentage of files that we categorize as having material exceptions, mostly around the decisions regarding collateral." *Id.* at FHFA12684947.  Freddie Mac believed that Wells Fargo's "lack of technology was evident in several areas" and the "number of underwriters working without the benefit of an automated underwriting system and without the support of a separate appraisal department" accounted for what Freddie Mac viewed as "the lack of consistent underwriting decisions found in the file review." *Id.* at FHFA12684948.  Wells Fargo also informed Freddie Mac that "fraud losses are up from last year" in part "due to higher volumes of stated [loan] products and investments [sic] property loans." *Id.* at FHFA12684950. | relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 227. | **WMC**.  In July 2003, Freddie Mac's AMO team reviewed WMC. Ex. 237 at FHFA11597970. During their loan-level review of a recent production of WMC loans, Freddie Mac concluded that 7% of the sample loans contained appraisal issues.  The reviewers observed that appraisal issues accounted for 33.3% of all files AMO rejected during its due diligence.  *Id.* at FHFA11597970. AMO rated WMC's appraisal/valuation process as "marginal," noting instances where appraisers made "excessive adjustments to comp[arable properties]." *Id.* at FHFA11597971.  Freddie Mac "did | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Moreover, the only Certificates purchased by Freddie Mac that contained collateral originated by WMC were purchased more than three years after this review.  *See* Reply SUF ¶ 467. |

|     | **Defendants' Statement of Material Facts** | **FHFA's Response** |
| --- | --- | --- |
|     | not have full confidence in certain of the [appraisal values] values" of WMC loans. *Id.* | |
| 228. | In January 2005, AMO again reviewed WMC. Ex. 238 at FHFA11597964. The review reflected Freddie Mac's <u>belief</u> that WMC was "marginal" overall. In particular, Freddie Mac observed that WMC had a 6% exception rate and that underwriting exceptions for LTV and DTI constituted the top two exception categories. *Id.* Based on its review, Freddie Mac understood that WMC applied appraisal tolerance variances ranging from 3% to 10% for LTVs ranging from 80% to 90% and greater, respectively. *Id.* at FHFA11597965. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 229. | In January 2007, Freddie Mac's AMO team again reviewed WMC. Ex. 239 at FHFA03485131. Freddie Mac noted that not all appraisals were completed by licensed appraisers, who made up only fifty-five percent of WMC's appraisal auditing staff. *Id.* at FHFA03485133. | Disputed that the AMO review noted that "not all appraisals were comleted by licensed appraisers"; Defendants' Ex. 239 notes that not all appraisal auditors are licensed appraisers, but that all second level auditors are licensed appraisers. Defs. Ex. 239 at FHFA03485133. Undisputed for purposes of this motion that Freddie Mac's AMO team reviewed WMC in January 2007. The proposed facts are immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 230. | Joseph Paul Norris, who served as director of portfolio management, mortgage trading, at Fannie Mae during the relevant period, testified that he would expect that loans backing the PLS he purchased would reflect the general underwriting practices of the | Disputed, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Also immaterial because Mr. Norris testified that he did not believe that Originators' general practices affected the loans in the Supporting Loan Groups |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | originators responsible for those loans.  Ex. 63 at 809:21-810:4. | ("SLGs"); he tesstified that Fannie Mae's "process basically relied on the dealers and originators providing [Fannie Mae] with reps and warrants as to the validity of how these loans were underwritten."  FHFA Ex. 255 (J. Norris Dep. Tr.) at 265:17-21; *see also id.* at 321:13-322:14 (general knowledge of origination problems at New Century did not affect purchase decision of PLS containing New Century loans because Fannie Mae relied on representations that the loans were originated pursuant to guidelines); *id.* at 458:13-19 (testifying that "[t]he reps and warrants that, generally speaking, are, you know, charter compliant, that are anti-predatory, and that the loans were underwritten as sort of stated in the offering documentation that was given to us."). |
| 231. | Peter Niculescu, who supervised Fannie's purchases of PLS during the relevant period, testified that he believed the identity of the originator was an important factor in the performance of mortgages.  Ex. 66 at 168:19-24.  Mr. Niculescu explained that he could "see no reason why loan performance would be different" when loans were sold to Fannie Mae through PLS as opposed to directly in whole loan transactionsActions.  *Id.* at 169:6-9. | Disputed, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  With regard to the quality of loans backing PLS purchased by Fannie Mae, Mr. Niculescu testified that "[i]n the case of the subprime loans that backed the private label securities that we purchased we took comfort from the credit enhancement and subordination of the loans and the due diligence process that went on to ensure that the loans were – were correctly originated."  Ex. 66 at 113:13-19.  Mr. Niculescu testified that Fannie Mae had an expectation that Defendants were conducting adequate due diligence to ensure the securities they sold were as represented, testifying that Fannie Mae "had both a very careful level of credit enhancement and subordination on the securities that we purchased and had purchased them through established underwriters who had assuredly good due diligence processes on the underlying loans, I would not have had at the time much reason to be concerned, I think, about the incidence of fraud in the issues of |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | | securities that we had purchased." *Id.* at 191:8-17. |
| 232. | John Ingram also testified that, if he perceived negative general originator trends, that he would tell PLS traders that "we don't want to see any more deals with that originator because of the trend." Ex. 103 at 60:22-61:5. | Undisputed for purposes of this Motion that Mr. Ingram testified that "there was a -- if there was a[n anti-predatory lending] trend that we saw with a particular originator, we might let the -- well, we would let the trading desk know that we don't want to see any more deals with that originator because of the trend. That may have happened," Defs. Ex. 103 at 60:22-61:5, but immaterial to any issues presented by this Motion, because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Mr. Ingram also testified that it was his expectation that the issuers of PLS purchased by Fannie Mae included the Fannie Mae anti-predatory lending guidelines in their due diligence and removed predatory loans from the Securitization pool prior to settlement. FHFA Ex. 254 (J. Ingram Dep. Tr.) at 34:16-35:2; 43:13-24; 44:16-21. Otherwise they were required to or else would be required to repurchase such loans pursuant to the representations and warranties they made to Fannie Mae. *Id.* at 32:14-33:15. |
| 233. | In January 2007, Lesia Bates Moss wrote to Michael Shaw, "Given Ameriquest's past performance it is my opinion that sub prime performance will [] mirror overall market performance." Ex. 240 at FHFA12412767. | Undisputed for purposes of this Motion that Ms. Bates Moss wrote an email to Michael Shaw on January 29, 2007 in which she wrote: "Given Ameriquest's past performance it is my opinion that sub prime performance will be mirror [sic] overall market performance, which is why the reps/warrants *from Citi* are critical for this transaction," Defs. Ex. 240 at FHFA12412767 (emphasis added), but immaterial to any issues presented by this Motion, because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Ms. Bates Moss's email was sent in response to an email thread concerning a specific PLS transaction with Citigroup and concerns the importance to Fannie Mae of having Citigroup |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | | make representations and warranties concerning the quality of the Ameriquest collateral backing the PLS at issue before agreeing to proceed with the transaction. *See id.* The email does not relate to the Securitizations at issue in the Actions. |
| 234. | Fannie Mae's belief that an originators' general practices would be reflected in the PLS is also reflected in contemporaneous communications. Mike Shaw, who analyzed PLS credit risk at Fannie Mae, Ex. 86 at 41:4-42:3, wrote that he wanted to "reject[] [a] deal" (which Fannie Mae ultimately bought) because it contained "New Century origination from that company's weakest time period." Ex. 241 at FHFA01125883. Ben Perlman, another Fannie Mae employee, expressed the view that "[m]ost of the originators [in the deal], especially New Century, are known in the industry to have been underwriting to weak standards. These loans were also believed to contain some degree of fraud." Ex. 241 at FHFA01125885. | Undisputed for purposes of this Motion that Mr. Shaw, Mr. Perlman and others involved in the PLS business at Fannie Mae, including Enrico Dallavecchia (Chief Risk Officer, Defs. Ex. 181 at 1), exchanged email messages beginning on September 21, 2007 about a specific "Morgan Stanley Trade with New Century Collateral" that culminated in Fannie Mae's acquisition of the Morgan Stanley Securitization MSAC 2007-HE7, a securitization that is not at issue in the Actions and thus immaterial to the issues before the Court. *See* Defs. Ex. 241 at FHFA01125883-87. Fannie Mae conducted a credit analysis of the deal, *id.* at FHFA01125886, and, after writing that "[m]ost of the originators [in the deal], especially New Century, are known in the industry to have been underwriting to weak standards. These loans were also believed to contain some degree of fraud[,]" *id.* at FHFA01125885, Mr. Perlman continued: "Morgan Stanley provides the reps, including a fraud rep[,]" *id.* |
| 235. | Michael Aneiro, the head of Freddie Mac's PLS portfolio, testified that Freddie Mac's AMO reviews and originator rankings were provided to the "credit group, which would then provide a credit approval, counterparty approval and other . . . credit approval for purchases of the specific bonds." Ex. 71 at 262:19-63:14. Mr. Aneiro testified that he relied on Freddie Mac's AMO "review of underwriting practices and their | Undisputed for purposes of this Motion that the language quoted by Defendants appears in Defendants' Ex. 71, but immaterial to any issues presented by this Motion, because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. However, Mr. Aneiro did not testify that he "relied" on Freddie Mac's AMO reviews and scoring of underwriters to confirm whether originators' underwriting practices would lead to a reasonable determination of borrowers' income. He testified that he "based" his view on AMO reviews. Defs. Ex. |

|  | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
|  | scoring of specific underwriters" to confirm, for example, whether originators had determined borrowers' income in a reasonable manner. *Id.* at 341:16-42:3. | 71 at 341:25-342:2.  As Mr. Aneiro testified, Freddie Mac did not have access to the loan-level information needed to determine whether Defendants were accurately reporting, for example, whether originators had determined borrowers' income in a reasonable manner. FHFA Ex. 265 (M. Aneiro Dep. Tr. at 125:13-127:20). |
| 236. | Michael Aneiro, head of Freddie Mac's PLS portfolio and the employee with approval authority over all PLS purchases, Ex. 71 at 296:13-18; 297:13-15, agreed that if an "originator was not following its own guidelines and was contributing loans to the collateral for the pool" he would have expected that "loans not underwritten to the originator's guidelines would then end up in the collateral for a pool." *Id.* at 265:16-22.  Aneiro also agreed it "would be [his] general expectation" that an originator's collateral backing a PLS deal would reflect that Originator's general practices. *Id.* at 265:25-266:7. | Undisputed for purposes of this Motion that the language quoted by Defendants appears in Defendants' Ex. 71, but immaterial to any issues presented by this Motion, because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Mr. Aneiro agreed with Defendants' unremarkable proposition that "if an originator was not following its own guidelines and was contributing loans to the collateral for a pool," then a subset of the collateral pool sold by the originator to an aggregator would include defective loans.  Mr. Aneiro did *not* testify that he was aware of any specific Originator that was not following its guidelines, that any Defendant purchased such improperly underwritten loans, or that any Defendant placed such loans into any of the SLGs.  Mr. Aneiro's general testimony, in response to a hypothetical question, cannot reasonably be read to mean that Mr. Aneiro—or anyone else at the GSEs—actually knew that Defendants had misrepresented the characteristics of the specific loans in the SLGs.  *See* Defs. Ex. 71 at 265:16-22.  To the contrary, Mr. Aneiro testified that he was *not* aware of defective loans in the SLGs because he lacked the requisite information or access. *See* FHFA Ex. 265 (M. Aneiro Dep. Tr.) at 126:9-19 ("[W]e didn't have access to collateral so we didn't review it[.]"); *see also id.* at 128:17-129:19 (". . .[W]e didn't get loan tapes. We were a AAA investor. From what I recall, we weren't given loan tapes."). |

|   | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| 237. | Similarly, Perri Henderson, a PLS trader for Freddie Mac, testified that unless she was specifically told otherwise, she would "assume" that an originator's loans backing PLS would reflect that originator's general practices. Ex. 242 at 132:3-10. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion, because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Ms. Henderson was not the PLS trader responsible for any of the Certificates purchased from Defendants. FHFA Ex. 274 (FHFA's Fifth Am. Responses to Defs. First Set of Interrogatories).   Additionally, in response to a question of whether she would expect loans backing a PLS deal to "generally reflect [the] originator's practices," Ms. Henderson testified:  "Unless they stated otherwise I would assume that." Defs. Ex. 242 at 132:3-10.  When asked whether by "stated otherwise" she meant "in stipulations, or something," Ms. Henderson responded, "In anything." *Id.* at 132:11-14. |
| 238. | Because the GSEs knew that Originators' practices significantly affected the risk presented by the Certificates they bought from Defendants, their pre-purchase credit analyses took into account the Originators in the deal. *See infra* ¶¶ 269-80. | Defendants' ¶ 238 cites no evidence that FHFA could dispute or agree is undisputed, and may not be credited as such. *See* L.R. 56.1(d). |
| 239. | Individuals involved in Freddie Mac's purchase of PLS testified that they relied on AMO reviews in deciding whether to buy PLS from Defendants. *See infra* ¶¶ 455-60. | Defendants' ¶ 239 cites no evidence that FHFA could dispute or agree is undisputed, and may not be credited as such. *See* L.R. 56.1(d). |
| 240. | Kevin Palmer, who was responsible for pre-purchase PLS credit reviews at Freddie Mac, testified that he reviewed AMO reports when assessing prospective PLS purchases, and the AMO "score from those credit reviews would feed into the credit worksheet and was part of [Freddie Mac] | Undisputed for purposes of this Motion that Defendants' Ex. 170 includes the quoted text. Undisputed for purposes of this Motion that Defendants' Ex. 67 contains the cited testimony, except disputed that Ex. 67 at 217:23-219:8 indicates that Mr. Palmer reviewed AMO reports to "assess reasonableness of a borrower's income."  In fact, Mr. Palmer testified that he recalled |

|  | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
|  | procedure." Ex. 67 at 217:23-219:8.  For example, in approving one purchase, Kevin Palmer stated that he was approving the deal despite First NLC's rating of "Poor" because it had "over 10% more subordination than required on this deal[.]" Ex. 170 at FHFA00764538.  Palmer also testified that, as part of Freddie's PLS pre-purchase procedures, he reviewed AMO's reports to understand originator practices, such as compliance with underwriting guidelines, the originator's "fraud prevention mechanisms," and the methods the originator employed to assess reasonableness of a borrower's income.  Ex. 67 at 217:23-219:8, 338:15-17; *see also* Ex. 302. | looking for "compliance and [originators'] fraud prevention mechanisms" in AMO reviews, including "the extent to which [originators] complied with their internal procedures" including their underwriting guidelines.  Defs. Ex. 67 at 218:12-219:8.<br><br>Neither undisputed nor disputed facts are material to the issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 241. | Freddie Mac's trade tickets for the PLS it bought noted the AMO grade of the significant underlying originators.  For example, for GSAA 2007-6, the credit approval for the Certificate lists as the Originators for the loans in the SLG as Avelo (63.92%), Countrywide (8.86%), Greenpoint (22.42%), National City (4.71%) and Wachovia (0.10%).  Ex. 248 at FHFA04593165.  The trade packet notes that the Freddie Mac AMO group rated these Originators "Satisfactory," and Goldman Sachs as aggregator "Above Average." *Id.* | The first sentence of ¶ 241 is without evidentiary support, as no trade package is cited.  Undisputed that Defendants' Ex. 248 is the credit approval for the GSAA 2007-6 purchase.  However, it is not a trade package or trade ticket.  Undisputed that Defendants' Ex. 248 otherwise is as described, except to the extent it is described as a "trade packet" or "trade ticket." |
| 242. | The GSEs' PLS traders were aware that appraisals are subjective estimates of value.  Fannie Mae trader Paul Norris testified that | Undisputed for purposes of this Motion that Mr. Norris's transcript contains the language asserted by Defendants, but immaterial to any issues presented by this Motion because none |

107

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | appraisals were inexact and, further, that there is no single "correct" home value. Rather, reasonable minds could differ as to the value of a particular property. *See* Ex. 63 at 640:19-641:21 ("Q. [An appraisal] [i]s inexact, right? A. That's correct . . . Q. An appraisal reflects one appraiser's opinion, right? A. That's correct. Q. And reasonable appraisers could differ significantly about what a given property is worth, right? . . . A. It's possible. Q. And there's no one correct appraisal for a house, right? A. That's correct."). | of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Moreover, when asked "[a]nd reasonable appraisers could differ significantly about what a given property is worth, right?[,]" Defs. Ex. 63 at 641:8-10, Mr. Norris responded, "I can only speculate on that," *id.* at 641:12-13.  The line of general questioning cited by Defendants asks Mr. Norris about his current knowledge and is not tied to any knowledge at the time that he was a PLS trader, and is, therefore, irrelevant to past knowledge. |
| 243. | Fannie Mae PLS trader Shayan Salahuddin concurred that two different appraisers evaluating the same property could generate two entirely different appraisals.  *See* Ex. 61 at 591:5-15 ("Q.  And you understood at the time that you were purchasing residential mortgage-backed securities for Fannie Mae in 2005/2007 that an appraisal was an opinion of the value of a property, right? A. That's correct.  Q. And different appraisers could reach different opinions, right? A.  That's correct."). | Undisputed for purposes of this Motion that Mr. Salahuddin's transcript contains the language asserted by Defendants, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 244. | The GSEs understood that inaccurate or overstated appraisals had a direct impact on LTV ratios.  Freddie Mac's Gary Kain testified that "LTV is a key variable for credit.  If appraisals were . . . inflated, LTVs in reality would be higher than what you anticipated and you modeled[,] which would | The first sentence of ¶ 244 is an assertion without evidentiary support, including to the extent it purports to include Fannie Mae, for which no supporting evidence is cited.  *See* L.R. 56.1(d).  Undisputed that Defendants' Ex. 243 includes the quoted testimony, but it is immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | increase your credit risk over what you otherwise would have thought." Ex. 243 at 234:21-236:2. As a result, Kain "bec[a]me more concerned about whether [Freddie Mac] was getting a complete picture on CLTV." *Id.* at 237:21-238:4. | the GSEs and at issue in these Actions. Moreover, Mr. Kain testified repeatedly that he did not recall when his concerns regarding appraisal bias for PLS formed. *See, e.g.,* FHFA Ex. 263 (G. Kain Dep. Tr. at 234:9-21 ("I mean, I think whether we are talking about the ABS portfolio or we are talking about the single family portfolio, you know, the term appraisal bias. . . what I knew specific to the ABS portfolio versus kind of globally and when is very hard to track. . . "); *id.* at 235:9-15 ("So what I would say is at some point in this process I, you know, became aware that appraisals were problem – there was potentially an issue with appraisal bias and so forth and the appraisal process. Again, I don't have a good feel for when that, you know, when that occurred."). Accordingly, Mr. Kain's testimony is not relevant to Freddie Mac's pre-purchase knowledge. |
| 245. | Traders also were aware that inflated appraisals could skew LTV ratios. For example, in a March 30, 2007 e-mail, Fannie Mae PLS trader Ashley Dyson alluded to the link between inflated appraisals and LTV ratios and the <u>need to take into account appraisal bias when assessing borrower LTV ratios.</u> *See* Ex. 244 at FHFA00286423 ("The dramatic changes to underwriting guides have also created some chatter on what refi options a subprime borrower will have once his [adjustable rate mortgage] resets. . . . [A]fter taking into account appraisal bias, a portion of borrowers with >95% LTVs could have some even more flexible options if refi appraisals push their LTVs lower (which is more common that one might think)."); *see also* Ex. 245 at | Undisputed for purposes of this Motion that the exhibits cited included the language quoted by Defendants, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Moreover, PLS traders relied on Goldman's representations regarding LTV and appraisals. Additionally, Defendants' Ex. 245 is a presentation that was created by the Single Family side of the business and that relies on whole loan data, not PLS. |

| | Defendants' Statement of Material Facts | FHFA's Response |
|---|---|---|
| | FHFA03520248 ("[a]ppraisal [b]ias [m]eans [t]rue LTV is [h]igher.). | |
| 246. | Given its correlation to LTV, appraisal bias had "explanatory power." Ex. 246 at FHFA01656675. Specifically, the GSEs regarded appraisal bias as "a pretty good measure of [originator] underwriting standards." *Id.* | Disputed, but immaterial to any issues presented by this Motion, because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. One Fannie Mae employee who had modeling responsibilities, Yevgeny Yuzefovich, wrote in an email regarding a whole loan deal, "[s]o far it looks like variation of appraisal bias over lenders is more important than its variation over time and geography. This is probably because the appraisal bias is a pretty good measure of underwriting standards." Defs. Ex. 246 at FHFA01656675. In response, another GSE employee, Caijiao ("C.J.") Zhao wrote that regional appraisal bias "did not have a significant effect on default probability . . . ." *Id.* Ms. Zhao also testified that as of April 18, 2007, Fannie Mae's PLS model did not account for appraisal bias "[b]ecause [they] [did]n't know what it [was]. I ha[d] no idea what's -- how much it [wa]s." FHFA Ex. 249 (C. Zhao Dep. Tr.) at 206:17-209:5. Although the single family side of the business was considering appraisal bias, "they [we]re talking about their single-family acquisitions. [Zhao was] talking about non-agency loans. [They] are two different beasts in a way." *Id.*; *see also id.* at 572:11-13 ("As the PLS team and as analytical person in PLS team, I never look at the appraisal bias."). |
| 247. | As some of the largest participants in the mortgage industry, Fannie Mae and Freddie Mac had a sophisticated understanding of appraisal bias in the 2005 to 2007 time period. | Defendants' ¶ 247 cites no evidence that FHFA could dispute or agree is undisputed, and may not be credited as such. *See* L.R. 56.1(d). |
| 248. | Freddie Mac officials expressed concern, as early as 2005, about the | Undisputed for purposes of this Motion that the exhibits cited included the language quoted |

| Defendants' Statement of Material Facts | FHFA's Response |
|---|---|
| "direction that the mortgage credit industry ha[d] taken over the most recent years," Ex. 247 at FHFA08974252, and, in particular, "[t]he general degrading of appraisal quality as well as the proliferation of automated appraisal valuations." *Id.* at FHFA08974252. | by Defendants, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Moreover, the term "Freddie Mac officials" is exceptionally broad, considering Defendants are citing only one document, a memorandum authored by Shelly Poland, who during some of the relevant time period, served as the Vice President of Mortgage Credit Risk Management beneath Don Bisenius in Credit Policy and Portfolio Management.  *See* FHFA Ex. 280 (FHFA01377918 at FHFA01377922 (organization chart)). |
| 249. | Freddie Mac's Executive Vice President of Credit Risk Oversight Ray Romano testified that he expected a deviation of "5 to 10%" between home values generated using AVMs versus the appraisal valuations reflected in originators' loan files. Ex. 69 at 438:10-439:20. | Disputed, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Mr. Romano actually testified that he believed it would be "reasonable" to expect a deviation of 5 to 10% between home values generated using AVMs and those generated by appraisers. Defs. Ex. 69 at 438:10-439:20.  Mr. Romano's testimony does not relate to any PLS deal at issue, or any loans backing a deal at issue. |
| 250. | Mr. Romano's expectation was consistent with the "general degrading of appraisal quality" that Freddie Mac officials understood was occurring in 2005. Ex. 247 at FHFA08974252.  By May 2005, Freddie Mac had "worries" about "[a]ppraisal practices (including AVMs)" and appraisal methods, including selection of the comparable properties that formed the basis for appraisals. Ex. 249 at FHFA17547950. | Disputed that Mr. Romano's held the proposed "expectation," as Mr. Romano testified that he believed it would be "reasonable" to expect a deviation of 5 to 10% between home values generated using AVMs and those generated by appraisers. Defs. Ex. 69 at 438:10-439:20.  Undisputed that Defendants' Ex. 247 and 249 include the quoted language, but immaterial to any issues presented by this Motion because the exhibits do not identify any of the Originators at issue and none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |

| | Defendants' Statement of Material Facts | FHFA's Response |
|---|---|---|
| 251. | A January 2007 Freddie Mac Subprime Strategy Working Paper reveals that by that time, Freddie Mac was finding "[m]ore inflated estimates with fewer controls. More pressure from originators on values – greater bias in the numbers." Ex. 250 at FHFA02344982. | Undisputed for purposes of this Motion that the Defendants' Ex. 250 has an "Appendix C" which states this text as it relates to subprime loans only. However, Defendants' Ex. 250 is only a draft, and it is not apparent whether the statement was included in any final version that was created. |
| 252. | Patti Cook, Freddie Mac's Executive Vice President of Investment and Capital Markets, testified that as "house price volatility" increased, Freddie Mac observed "more uncertainty around the appraisal process." Ex. 70 at 147:13-24. | Disputed, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Ms. Cook actually testified that "house price volatility creates more uncertainty around the appraisal process than *stable home prices*." Defs. Ex. 270 at 147:22-24. |
| 253. | Freddie Mac's September 2006 Strategic Perspective newsletter echoed growing concerns about the effects of increased "regional volatility in house prices." Ex. 251 at FHFA03703559. Senior credit officials opined that although "Freddie Mac policies are designed to prevent us from taking on unacceptable layers of risk (Ex. thresholds on LTV and FICO)" there remained serious concerns about how Freddie Mac could "ensure that a lender's property assessment process is in fact providing us with LTVs we are comfortable with." *Id.* | Disputed, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Defendants' Ex. 251 does not state that Freddie Mac possessed "growing concerns" or "serious concerns" about risk or regional volatility in house prices, and Defendants do not cite any evidentiary support suggesting otherwise. Moreover, the document relates only to Single Family issues, and there is no evidence that this document was provided to PLS traders. |
| 254. | Gary Kain testified that during 2006-2007, Freddie Mac became "aware that appraisals were [a] problem – there was potentially an issue with appraisal bias and so forth and the appraisal process." | Disputed, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Mr. Kain actually testified that he did not "have a good feel for when [it] occurred" |

| **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|
| Ex. 243 at 235:9-15.  Freddie Mac was also aware that there was "a high level of appraisal inflation in affordable housing (AH) product." Ex. 252 at FHFA03703596. Specifically, the subprime loans "needed to meet subgoals and business priorities," suffered from "[m]ore inflated estimates with fewer controls," were susceptible to "pressure from originators on [home] values," and thus contained "greater bias in the numbers." Ex. 250 at FHFA02344967, FHFA02344982. | that he became aware that there was "potentially an issue with appraisal bias and so forth and the appraisal process." Defs. Ex. 243 at 235:9-15.  Defendants' Ex. 252 also does not indicate what Freddie Mac's general view was, and may only reflect the view of the author, who is unidentified.  With respect to Defendants' Ex. 250, which was a draft document, it does not say either that subprime loans were "needed to meet subgoals and business priorities" or that there was  "pressure from originators on [home] values." It says that Freddie Mac should prepare itself "to be competitive in the whole loan space as needed to meet subgoals and business priorities," and that there was "pressure from originators on values."  *Id.* at FHFA02344967, FHFA02344982. |
| 255. | Freddie Mac used its proprietary AVM, Home Value Explorer (or "HVE") to assess the extent of appraisal bias among its primary counterparties.  Ex. 253 at FHFA11594913; *see* Ex. 243 at 241:21-242:4 ("I believe [HVE] was designed or was used to . . . run loans through it and it would . . . spit out its own opinion of what the loan to value or the loan value – what the house price would be."). The results of Freddie Mac's HVE analysis were included in monthly "Calibrator" reports that scored lenders' valuations to determine whether the value of any given property in an originator's production "would be at significant risk of being flawed." Ex. 253 at FHFA11594913. | Disputed, but immaterial to any issue before the Court. Freddie Mac's Home Value Explorer tool was not used as an AVM to "assess the extent of appraisal bias among its primary counterparties," and Defendants' Ex. 253 does not suggest that it does.  Calibrator scores are not a report or study of appraisal bias.  Calibrator scores indicate the likelihood that a reported appraisal value will differ from the appraisal value that would be computed by Freddie Mac's automated valuation model, Home Value Explorer ("HVE").  *See* FHFA Ex. 282 at FHFA03703628 (January-March 2007 Strategic Perspective).  A low Calibrator score does not connote systematic appraiser bias or that an originator is not reliable.  A low Calibrator score provides no indication about the reason for the variance between the HVE value and the reported appraisal value.  Rather, any discrepancy could be caused by a number of possibilities, including the inability of HVE to provide reliable values for certain property types (e.g., multiunit homes) or locations (e.g., rural properties), missing appraisal reports, or a particular underwriting practice not |

113

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | | accounted for by HVE.  By noting trends in variances from Freddie Mac's HVE, the Calibrator scores allow single family personnel who maintain relationships with the sellers to understand when HVE will be unlikely to match the reported appraisal value.  Those single family personnel can then engage with the sellers to identify ways to improve the consistency between HVE and the reported appraisal values.  Although fraud could cause low Calibrator scores, Freddie Mac did not assume—and Defendants err by assuming— that low Calibrator scores indicated appraisal bias.  *Id*. at FHFA03703629 ("While Calibrator is designed as a QC tool and not a fraud tool, Calibrator-identified outliers can help identify fraud.").  Moreover, the document only states that "appraisals with scores of less than 600 would be at significant risk of being flawed."  Defs. Ex. 253 at FHFA11594913. |
| 256. | Fannie Mae also understood that there was appraisal bias in the mortgage market, and the subprime market, during the time period in question.  Fannie Mae evaluated appraisal bias in connection with whole loan purchases at least as early as 2002.  *See, e.g.*, Ex. 254 at 204:23-205:1. | Disputed to the extent that Defendants imply that Fannie Mae's PLS business had any knowledge of appraisal bias related to the specific loans underlying the collateral in the PLS it purchased. The evidence cited supports no such statement.  Undisputed for purposes of this Motion to the extent Defendants' Ex. 254 includes testimony that Fannie Mae's Single Family business looked at appraisal bias in connection with whole loan purchases and the credit guarantee as far back as 2002.  However, PLS Credit Analyst Caijiao ("C.J.") Zhao testified that "[a]s the PLS team and as analytical person in PLS team, I never look at the appraisal bias."  FHFA Ex. 249 (C. Zhao Dep. Tr.) at 572:11-13.  The facts asserted in this paragraph are thus immaterial to any issues presented by this Motion, because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |

| | Defendants' Statement of Material Facts | FHFA's Response |
|---|---|---|
| 257. | In June 12, 2006, Eric Rosenblatt e-mailed Mark Winer, Fannie Mae's Interim Chief Risk Officer and Senior Vice President, Ex. 181, attaching a report entitled: "Housing Markets and Aggressive Appraisals: What Goes Up Must Come Down." Ex. 245 at FHFA03520230. The report reflected the belief that "[e]conomic conditions [were] ripe for higher appraisal bias," and further noted that in "refi[nances] and cash-out [product], appraisals often over-estimate home value." Ex. 245 at FHFA03520245. | Disputed as to Mr. Winer's position. Defendants' Ex. 181 indicates that Mr. Winer was no longer the Interim Chief Risk Officer on June 12, 2006. Undisputed for purposes of this Motion that Mr. Rosenblatt e-mailed Mr. Winer the referenced presentation and that the presentation includes bullet points with the statements Defendants indicate, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 258. | During the time period in question, Fannie Mae employees produced and circulated quarterly "Lender Valuation Bias Reports that "provide[d] detailed information" on "valuation bias" for "approximately 25 large lenders," including some Originators. Ex. 257 at FHFA11941805. Fannie Mae assessed appraisal bias in loans by comparing "the lender-reported property" value to the predicted value from Fannie Mae's "Retrospective Property Valuation System (RPS)," an internal model that Fannie Mae believed was a particularly accurate way to model a property's value. Ex. 262 at 380:20-381:22; Ex. 269 at FHFA00287073. | Undisputed for purposes of this Motion that Defendants' Ex. 257 is a Lender Valuation Bias Report that "provide[d] detailed information" on "valuation bias" for "approximately 25 large lenders," including some Originators. Otherwise disputed except to the extent that Eric Rosenblatt, whose deposition Defendants rely on and who had no PLS responsibilities, FHFA Ex. 253 (E. Rosenblatt Dep. Tr.) at 34:3-6, testified that "[t]he RPS model predicted value and then the difference, an average difference between appraisal value and our prediction is appraisal bias." Defs. Ex. 262. Moreover, the facts asserted in this paragraph are immaterial to any issues presented by this Motion, because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. In particular, immaterial because, in addition to not concerning any SLG loans, Lender Valuation Bias Reports did not provide information at the loan-level, but rather on an aggregated basis "for various refinance loan segments delivered to Fannie Mae['s Single Family Business]." Defs. Ex. 257 at FHFA11941805; see also FHFA Ex. 253 (E. Rosenblatt Dep. Tr.) at 68:6-69:15 ("In |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | | the single-family business Fannie Mae would have taken thousands and thousand of loans; is that right? A.  Oh, yeah, at least. Q.  And to price these loans appropriately and figure out what kind of guarantee fee to issue, you know, is it true that Fannie Mae would -- would treat the loans as a whole, as an aggregate instead of trying to, you know, predict the performance of a single loan? . . . [A:] I think that's right. I mean, that -- statistically you can't predict any -- any single -- to anything.").  Also immaterial because the evidence demonstrates that the PLS Credit Analysts did not consider the reports in connection with their pre-purchase analysis.  Caijiao ("C.J.") Zhao testified that "[a]s the PLS team and as analytical person in PLS team, I never look at the appraisal bias."  FHFA Ex. 249 (C. Zhao Dep. Tr.) at 572:11-13.  Ms. Zhao further testified that she was not in the distribution list for Lender Valuation Bias Reports during the relevant time period.  *Id.* at 202:16-203:4. |
| 259. | On September 2, 2006, Eric Rosenblatt circulated the Lender Valuation Bias Report for Second Quarter 2006, noting in his cover e-mail that "the average 80 LTV TPO cash-out in much of the country has appraisal bias median of 11.4%, and if I do my arithmetic right that means the median one of the so-called LTV loans might be 89." Ex. 258 at FHFA01733177. | Undisputed for purposes of this Motion except that Defendants' Ex. 258 misquotes the document.  The exhibit states, "one of the so-called *80* LTV loans might be 89" (emphasis added).  Moreover, the facts asserted in this paragraph are immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  In particular, immaterial because, in addition to not concerning any SLG loans, Lender Valuation Bias Reports did not provide information at the loan-level, but rather on an aggregated basis "for various refinance loan segments delivered to Fannie Mae['s Single Family Business]."  Defs. Ex. 257 at FHFA11941805; *see also* FHFA Ex. 253 (E. Rosenblatt Dep. Tr.) at 68:6-69:15 ("In the single-family business Fannie Mae would have |

| | Defendants' Statement of Material Facts | FHFA's Response |
|---|---|---|
| | | taken thousands and thousand of loans; is that right? A.   Oh, yeah, at least. Q.   And to price these loans appropriately and figure out what kind of guarantee fee to issue, you know, is it true that Fannie Mae would -- would treat the loans as a whole, as an aggregate instead of trying to, you know, predict the performance of a single loan? . . . [A:] I think that's right. I mean, that -- statistically you can't predict any -- any single -- to anything.").  Also immaterial because the evidence demonstrates that the PLS Credit Analysts did not consider the reports in connection with their pre-purchase analysis.  Caijiao ("C.J.") Zhao testified that "[a]s the PLS team and as analytical person in PLS team, I never look at the appraisal bias."  FHFA Ex. 249 (C. Zhao Dep. Tr.) at 572:11-13.  Ms. Zhao further testified that she was not in the distribution list for Lender Valuation Bias Reports during the relevant time period. *Id.* at 202:16-203:4. |
| 260. | In October 2006, Lesia Bates Moss, the head of Fannie Mae's SF CPRM team received and circulated a June 2006 Moody's Investors Service RMBS Investor Briefing stating that on "average," PLS aggregators accepted between "10%" and "17.5%" "Appraisal tolerance," *i.e.*, "Variance" between AVM-generated appraisal values and "stated [home] value[s]." Ex. 259 at FHFA00333573; Ex. 260 at FHFA00333787. | Undisputed for purposes of this Motion that Ms. Bates Moss circulated the Investor Briefing Document in October 2006, and that Defendants' Ex. 260 includes a chart showing 10%-17.5% in the "average" column next to "Appraisal tolerance."  Otherwise immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 261. | Eric Rosenblatt reiterated his concerns about industry-wide appraisal bias during a December 20, 2006 Fannie Mae Credit Risk Committee Meeting, stating that "significant decreases in home price growth rates" corresponded to an "increase[] [in] appraisal bias." | Undisputed for purposes of this Motion that Derfendants' Ex. 261 is a set of minutes from the December 20, 2006 Fannie Mae Credit Risk Committee Meeting and that the document includes the language quoted by Defendants, but otherwise disputed and also immaterial to any issues presented by this Motion because none of the cited evidence |

| | Defendants' Statement of Material Facts | FHFA's Response |
|---|---|---|
| | Ex. 261 at FHFA1100721. | relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 262. | By 2006, Fannie Mae had developed and implemented AVMs to determine what it considered "more true" appraisal values for whole loan collateral. *See* Ex. 262 at 75:23¬77:11; 78:17-24; 80:18-21 ("Q. And in 2004, 2005, did . . . Fannie Mae have all four of those types of models that you just described? A. I think so. Pretty sure.") Fannie Mae believed its AVM was the "best" AVM in the industry and could "tell if a deal is fairly appraised." Ex. 245 at FHFA03520250. In a February 2006 "national contest on live house value predictions from freshly originated purchase mortgage transactions," Fannie Mae's "AVM scored first place in a combination of accuracy and coverage." Ex. 296 at FHFA00037429. | Undisputed for purposes of this Motion that Defendants' Ex. 245 includes a slide with the heading "We Have the 'Best' AVM….," Defs. Ex. 245 at FHFA03520249, and another claiming "We Can Tell If A Deal is Fairly Appraised," *id.* at FHFA03520250. AVMs were typically run only on loans purchased by Fannie Mae's Single Family business and were not run on PLS purchases, including on any Certificate at issue. |
| 263. | To achieve its quantitative edge, Fannie Mae's AVM, which was calibrated "using data from 1988 to 2005," utilized housing metrics from both "high [appraisal] bias environment[s]" and "low appraisal bias environment[s]" to account for a spectrum of economic environments and biases. Ex. 263 at FHFA00076874. Because its "average [valuation] measure [was] dead on," Fannie Mae could "tell if lenders/brokers/appraisers don't have true average or median" appraisal values. Ex. 249 at FHFA0350245. The Retrospective Property Services AVM was | Undisputed for purposes of this Motion that Defendants' Ex. 263 includes the language quoted by Defendants and is what Defendants represent it to be. Disputed as to Defendants' Ex. 249, a Freddie Mac email from Raymond Romano to Bruce Wood that does not include any information about what Fannie Mae's "valuation measure" or what Fannie Mae could or could not "tell." Moreover, the facts asserted in this paragraph are immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. AVMs were typically run only on loans purchased by Fannie Mae's Single Family business and were not run on PLS purchases, including on any Certificate at |

|  | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
|  | developed by employees in Fannie Mae's Single Family business, and reflected their knowledge and understanding of the performance of originators and extent to which a group of loans were likely to contain appraisal bias.  Ex. 264 at FHFA01284126-27. | issue. |
| 264. | The Lender Valuation Bias and Subprime Monthly Business reports confirmed that LTV ratios reported by lenders for collateral purchased by Fannie Mae were "underestimated."  *See* Ex. 262 at 128:11-17.  For example, a July 2007 Subprime Monthly Business Report noted that between the fourth quarter of 2005 and the second quarter of 2007, the median appraisal bias in cash-out subprime loans across all Fannie Mae lenders rose from 4.9% to 7.8%, and increased from 4.2% to 7.8% in ALT-A mortgages.  Ex. 265 at FHFA00057224.  Rate Term mortgages were similarly affected. Between the first quarter of 2006 and the second quarter of 2007, the median appraisal bias in subprime loans across all Fannie Mae lenders rose from 5.4% to 8.6% and from 4.7% to 8.4% in Alt-A product alone.  *Id.* | Disputed, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  In the cited deposition testimony, Mr. Rosenblatt answered a question about a Lender Valuation Bias Report for Q3 2006, "[a]nd why would the fact that appraisal bias is becoming more prominent be -- or make the report more important than ever?" by testifying that, "[b]ecause it means that our loan to values are underestimated. . .." Defs. Ex. 262 at 128:11-16.  Otherwise undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 265. | Fannie Mae's Lender Valuation Bias reports demonstrated trends in appraisal bias among lenders and originators.  For example, the reports listed Indymac as one of the top five highest originators in terms of appraisal bias during 2005-2007. Ex. 266 at FHFA11594849; Ex. 267 at FHFA11594869; Ex. 268 at | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Defendants' Exs. 266, 267, 268, and 253 are Freddie Mac Calibrator reports and reveal nothing about Fannie Mae.  Undisputed for purposes of this Motion that Defendants' Ex. |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | FHFA11594912; Ex. 253 at FHFA11594916; Ex. 232 at FHFA03522894. | 232 is a Fannie Mae e-mail sending a Lender Valuation Bias Report, a Single Family-side document, which "summarizes valuation bias for various refinance loan segments delivered to Fannie Mae." Defs. Ex. 232 at FHFA03522884. Disputed that Defendants' Ex. 232 at FHFA03522894 lists "Indymac as one of the top five highest originators in terms of appraisal bias during 2005-2007." Defendants' Ex. 232 at FHFA03522894 only includes a comparative analysis of lender valuation bias for "selected lenders," not for all lenders. |
| 266. | Fannie Mae compiled and produced a "Subprime Monthly Business Report" reporting on "Median Bias for Subprime Loans Acquired" by Fannie Mae.  Ex. 269 at FHFA00287073. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 267. | A May 2007 Fannie Mae Subprime Monthly Business Report reported that "Median Bias for Subprime Loans Acquired 2005Q4 – 2006Q4" from Option One was "6.8%." Ex. 269 at FHFA00287066, FHFA00287073. It further found that median bias was "12.2%" for rate term refinance loans with a reported LTV of 80% or higher.  *Id.* By July 2007, "Median Bias for Subprime Loans Acquired 2005 Q4 – 2007 Q2" from Option One had risen to "7.5%" and median bias for rate term loans with a reported LTV of 70 through 80 percent was "13.0%." Ex. 265 at FHFA00057217, FHFA00057224. Fannie Mae later cited to Option One as a "big offender[]" for appraisal bias. Ex. 297 at | Undisputed for purposes of this Motion as to the quoted language in Defendants' Exs. 269 and 265, however Defendants' Ex. 265 refers to H&R Block rather than Option One.  Defs. Ex. 265 at FHFA00057224.  Additionally, contrary to Defendants' suggestion that median bias increased for Option One loans with a certain LTV, the median bias for rate term refinance loans both with a reported LTV of 80% or higher and with a reported LTV of 70 through 80% actually *decreased* from May 2007 to July 2007.  *Compare* Defs. Ex. 269 at FHFA00287073 (14.5% and 12.2%, *with* Defs. Ex. 265 at FHFA00057224 (13% and 8.9%). As to Defendants' Ex. 297, disputed to the extent that Defendants purport to impute the statement of one employee to all of Fannie Mae.  Moreover, the facts asserted in this paragraph are immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions, or even to PLS subprime pool loans, |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | FHFA01821318. | and Fannie Mae did not purchase any deals containing Option One collateral. |
| 268. | OFHEO also was concerned about the risks of increasing appraisal bias.  In a February 2006 working paper entitled "Removing Appraisal Bias from a Repeat-Transactions House Price Index: A Basic Approach," OFHEO "respond[ed] to concerns that house price appraisals are biased measures of true home values" and presented mechanisms of "inoculating [house price] indices from appraisal bias." Ex. 270 at 2. | Undisputed for purposes of this Motion that Defendants' Ex. 270 contains the language quoted by Defendants, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 269. | To mitigate the risks of appraisal associated with their purchases, the GSEs sometimes used AVMs to validate home appraisals before purchasing PLS.  *See infra* ¶¶ 273-80, 302. | Defendants' ¶ 269 cites no evidence that FHFA could dispute or agree is undisputed, and may not be credited as such.  *See* L.R. 56.1(d). |
| 270. | In 2006, for example, Freddie Mac, suspicious of CLTV misrepresentation in a prospective PLS purchase with the "highest CLTVs (95.99%) that [Freddie Mac] ha[d] seen in the past six months," Freddie Mac traders requested "loan level information" to verify the accuracy of the information reported.  Ex. 271 at FHFA13682971 ("Since this deal costed out at a very high level, we were concerned about the accuracy of the matrix.") The results of Freddie Mac's AVMs were "just as expected, lower than the [reported credit] matrix." *Id.* | Undisputed for purposes of this Motion that Defendants' Ex. 271 at FHFA13682971 includes the quoted text, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Disputed that Defendants' Ex. 271 supports Defendants' assertion that Freddie Mac was "suspicious of CLTV misrepresentation."  Defendants' Ex. 271, which does not pertain to a deal at issue, provides no evidence of such suspicion.  Even if this fact were not disputed, the fact is immaterial as suspicions are not sufficient to show actual knowledge. |
| 271. | Fannie Mae likewise used its proprietary RPS AVM to conduct | Undisputed for purposes of this Motion that Defendants' Exs. 272 and 273 are what |

|  | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
|  | pre-purchase analyses on its PLS. *See* Ex. 272 at FHFA11835382 (providing "deal-level information" and "loan-level file is attached" based on SAST 2007-3 loan tape, reflecting "RPS prediction" "for median bias" and "extreme values"); Ex. 273 at FHFA11442052 (loan tape for FFMER 2007-5 containing, *inter alia*, predicted property values based on Fannie Mae's RPS model). | Defendants represent them to be, but disputed that Fannie Mae ran AVMs on all PLS. Nevertheless, immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  The SAST 2007-3 and FFMER 2007-5 securitizations are not at issue in any of the non-settled Actions. |
| 272. | During 2007, Fannie Mae instructed its PLS analytics team that "[t]he PLS Front-end [pre-purchase review] consists of all of the analysis performed before the Trade is settled.  The role of the DMT in this process is to run two requested services (Goalscore and RPS) on the dealer tapes and mask all the [non-public information]. The outputs of these services are then forwarded to the Capital Markets Group."  Ex. 274 at FHFA03364752.  RPS yielded data about each property's "original current value," "original value confidence score," "property current value," and "current value confidence score."  *Id.* | Undisputed for purposes of this Motion that Defendants' Ex. 274 includes the quoted language, however immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Disputed as to Defendants' assertion that "Fannie Mae instructed its PLS analytics team" regarding this document as the evidence cited does not support the statement. Moreover, Defendants provide no support for the assertion that any such instruction occurred in 2007.  Defendants' proffered evidence concering RPS is immaterial, however, because, as the testimony of Fannie Mae's head of PLS analytics, David Gussmann, testified, it never was implemented for PLS. *See* FHFA Ex. 252 (D. Gussmann Dep. Tr.) at 249:3-19 ("Q. Do you recall that in September 2007 your group made a determination that Fannie Mae would run RPS on all PLS deals going forward?  A. I don't remember a specific date for when we would have made that determination. I remember that, again,  it was a technology I was interested in using.  We were investigating it. My recollection is that it never got productionalized or baked in a manner where we could use it because we never got that data we're talking about.  Fifteen deals wouldn't be sufficient, we would need it for |

| | Defendants' Statement of Material Facts | FHFA's Response |
|---|---|---|
| | | everything that they brought and that we ran it sort of on an ad hoc basis on a couple of deals." Defendants offer no evidence that RPS was run on any Certificate at issue sold to Fannie Mae by Goldman Sachs, HSBC or Nomura. |
| 273. | For example, in advance of the September 19, 2007 purchase of BSABS 2007-HE7, Fannie Mae analysts used "the origination and current AVM property values and their confidence scores from deal factory" to "calculate the 'unbiased' OLTV ('original LTV') and CLTV of the [supporting] loans." Ex. 275 at FHFA01642202-203. To aid in its collateral assessment for this purchase, Fannie Mae set its model to "calculate unbiased OLTV, CLTV and MTM LTV automatically for an additional sensitivity run . . . [because] [i]t would also be nice if [ ] the collateral summary could quantify the average appraisal bias ratio for the top states, and report on the confidence score UPB distribution." *Id.* | Disputed to the extent that BSABS 2007-HE7 is not at issue in any of these Actions. Undisputed for purposes of this Motion that Defendants' Ex. 275 contains the quoted language; however, the document does not reflect that Fannie Mae set its model to "calculate unbiased OLTV, CLTV and MTM LTV automatically for an additional sensitivity run," but rather that one Fannie Mae employee suggested to do so. *See* Defs. Ex. 275 at FHFA01642202. Moreover, the facts asserted in this paragraph are immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 274. | Because Fannie Mae was aware of and concerned by appraisal bias, Fannie Mae also ran AVMs retrospectively to identify appraisal bias in its PLS portfolio. | Defendants' ¶ 274 cites no evidence that FHFA could dispute or agree is undisputed, and may not be credited as such. *See* L.R. 56.1(d). |
| 275. | In July 2007, Fannie Mae began work on a research project studying appraisal bias in PLS through the use of its proprietary AVM. Ex. 276. The ensuing back test was designed to detect appraisal bias and concomitant LTV inflation in | Undisputed for purposes of this Motion that Fannie Mae began working on research related to appraisal bias in PLS through the use of its AVM, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | its prior PLS deals to assess the risk of skewed LTV rates in future PLS purchases. *Id.* | Actions.  The testimony of several Fannie Mae witnesses who conducted PLS pre-purchase credit analysis testified that Fannie Mae's PLS business *did not* consider appraisal bias in connection with that analysis. *See* FHFA Ex. 249 (C. Zhao Dep. Tr.) at 208:22-209:13; FHFA Ex. 252 (D. Gussmann Dep. Tr.) at 191:13-19; 219:7-12; 249:10-19.  When asked specifically about the AVM back test, Mr. Gussmann, the Vice President in charge of PLS crdit analytics at Fannie Mae, testified that "this was a technology that some other part of Fannie Mae had. I didn't have any insight to how it was made…. I didn't understand which data it was sampled off of, what it meant, how it would be integrated into our model, whether it meant anything at all. This was like some ideas that, you know, some quants were suggesting to me.  So I, I wasn't convinced that it really meant anything myself personally at this point in time."  FHFA Ex. 252 (D. Gussmann Dep. Tr.) at 231:6-23.  Further immaterial because Fannie Mae did not run AVMs on any of the Certificates it bought from Defendantsat issue in these Actions, and they cite no evidence to the contrary. |
| 276. | To facilitate this back test, Fannie Mae's "PLS Analytics groups" requested "RPS values on every loan tape to be able to quantify appraisal bias as modeled by [the] AVM, and include that bias as an input sensitivity test in our prepurchase analysis." Ex. 263 at FHFA00076875. | Undisputed for purposes of this Motion that Exhibit 263 contains the quoted language, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  The testimony of several Fannie Mae witnesses who conducted PLS pre-purchase credit analysis testified that Fannie Mae's PLS business *did not* consider appraisal bias in connection with that analysis. *See* FHFA Ex. 249 (C. Zhao Dep. Tr.) at 208:22-209:13; FHFA Ex. 252 (D. Gussmann Dep. Tr.) at 191:13-19; 219:7-12; 249:10-19.  Mr. Gussmann also testified that the back test was merely for informational purposes.  *See* FHFA |

|  | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
|  |  | Ex. 252 (D. Gussmann Dep. Tr.) at 231:6-23; FHFA's Response to ¶ 275, *supra*. |
| 277. | The GSEs required issuers to submit loan tapes containing property street addresses for the loans backing each Certificate to retrospectively assess the extent of appraisal inflation in their PLS holdings. *See* Ex. 388 at 56:16-25 (Stephen Pionke testifying that loan tapes provided to Freddie Mac during 2005-2007 included "street address"); Ex. 277 at 313:23¬314:4 ("Q. And that data that you got directly from issuers from May 2006 when you started in capital market strategy included street addresses, did it not? A. Yes, it did."). Because the "[s]treet address of each loan is a key attribute in evaluating appraisal biases," Ex. 278 at FHFA01812752, this information helped Fannie Mae to further "understand appraisal bias." Ex. 277 at 345:19-23 ("[W]e were trying to understand appraisal bias, so that needs the addresses to estimate, to get our o[w]n AVM value, so we need [the] street address, so I wanted to get access to that."). | Disputed to the extent that Defendants purport to impute information and actions of one GSE to the other GSE. Also disputed to the extent that Defendants suggest the GSEs assessed "the extent of appraisal inflation in their PLS holdings" as to "the loans backing each Certificate." Undisputed for purposes of this Motion that the exhibits cited include the quoted language, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Moreover, while Freddie Mac received loan tapes containing street addresses, it used these loan tapes for housing-goal scoring purposes only, not for the purpose of "assess[ing] the extent of appraisal inflation" in its PLS holdings. *See* FHFA Ex. 268 (S. Pionke Rule 30(b)(6) Dep. Tr.) at 37:22-39:8 ("We would receive a loan tape from a dealer who was looking to do a deal with us.... We would then run the tape through some automated processes we had that would identify missing data.... We would generate analytics. . .  Q. What were the analytics that were run; for what purpose? A. It was a – it was a summary – the analytics that were run were to essentially data completeness, exclude nonconforming, noncompliant loans. Identify which were goal-accretive, goal-neutral, and which were, for lack of a better term, goal negative, or were counted against goals. Those were the analytics that were run."). At Fannie Mae, the PLS business was not permitted to use street addresses or other borrower information for its analysis. *See* FHFA Ex. 252 (D. Gussmann Dep. Tr.) at 219:3-24 ("Q. And at least for some PLS deals Fannie Mae received loan level data, including property addresses? .... A. Yeah, my recollection is that the privacy group did not want us to have the |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | | street address along with the loan level data and we were able to get it on a handful -- you know, one, two, three sort of transactions. Q. Did you understand that it was okay for the dealers to provide this information to Fannie Mae as long as they sent it to the bulk data submissions group? …. A. I was aware that there was a process where the dealer sent the information to a group, and I don't remember the name of the group, that then scrubbed the data and gave us the data that we were allowed to see."); *see also* FHFA Ex. 255 (J. Norris Dep. Tr.) at 64:20-65:6 ("Then if we were interested in the deal based on price and credit, then a data tape would be sent to Fannie Mae's data warehouse, which was on the other side of the business, and that would be scrubbed of nonpublic information, because there was a firewall between us and single family. And nonpublic information would be scrubbed from, from this tape and a CDI file would be sent to us containing summarized data."); FHFA Ex. 251 (D. Cook Rule 30(b)(6) Tr.) at195:10-18 ("Fannie Mae had an information barrier policy that traders were not allowed to obtain information that was material, nonpublic…."). The testimony of several Fannie Mae witnesses who conducted PLS pre-purchase credit analysis confirms that Fannie Mae's PLS business *did not* consider appraisal bias in connection with that analysis. *See* FHFA Ex. 249 (C. Zhao Dep. Tr.) at 208:22-209:13; FHFA Ex. 252 (D. Gussmann Dep. Tr.) at 191:13-19; 219:7-12; 249:10-19. In fact, when asked whether he "recall[ed] any discussion of evaluating appraisal bias with respect to the purchase of subprime loan[s]," Mr. Gussmann, the Vice President responsible for PLS pre-purchase analytics at Fannie Mae, testified that he did not. FHFA Ex. 252 (D. Gussmann Tr.) at 184:17-186:6. And, when asked whether he "underst[ood] that there was a linkage between systematically biased |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | | appraisals and mortgage default risk[,]" Mr. Gussmann responded, "No." *Id*. at 187:7-12. |
| 278. | Fannie Mae analysts then transmitted loan level data from its PLS deals with the request that Fannie Mae's Capital Markets Strategy Group "run PLS deal[s] through [the] appraisal bias process." Ex. 278 at FHFA01812747; Ex. 279 at FHFA01450322. | Disputed to the extent that this paragraph generalizes Fannie Mae's PLS practices. Otherwise undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. *See* FHFA's Response to ¶ 277, *supra*. |
| 279. | The street address information gleaned from PLS loan tapes allowed Fannie Mae to recalibrate its models using contemporaneous data and "incorporate appraisal bias analysis in our collateral analysis for subprime securities going forward." Ex. 278 at FHFA01812752. | Undisputed for purposes of this Motion that Defendants' Ex. 278 contains the quoted language, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. *See* FHFA's Response to ¶ 277, *supra*. |
| 280. | Such retrospective analyses revealed the extent of bias in Fannie Mae's PLS purchases. Indeed, the results of similar retrospective analyses on loans originated between 1997 and 2006 led Fannie Mae employees to claim in a March 2007 report that "systemic bias in [] collateral value" was "a broad phenomenon, system-wide." *See* Ex. 262 at 146:7-18; Ex. 280. | The first sentence of Defendants' ¶ 280 cites no evidence that FHFA could dispute or agree is undisputed, and may not be credited as such. *See* L.R. 56.1(d). Disputed as to the second sentence, because the testimony and document quoted refer to Single Family loans, not PLS, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. *See* FHFA's Response to ¶ 277, *supra*. |
| 281. | By June 30, 2008, the GSEs had purchased subprime and Alt-A loans directly from many of the same originators whose loans Defendants purchased and securitized, including Countrywide, First Franklin, New Century, Option One, IndyMac and Wells | Undisputed for purposes of this Motion that the GSEs' Single Family businesses purchased loans from "many of the same originators" whose loans back PLS, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Disputed that "[b]y 2008, the |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | Fargo. Ex. 281 at FHFA00060536-538; Ex. 250 at FHFA02344971; Ex. 282 at FHFA12469142-143, FHFA12469148; Ex. 166 at 432:6-25.; Ex. 284 at FHFA00137841, FHFA00137843; Ex. 283 at 1 n.1, n.4; Ex. 166 at 423:6-25.  By 2008, the unpaid principal balance of the subprime and other high risk-mortgages held by the GSEs' totaled approximately $1.8 trillion. Ex. 285 at 456 Table 1. | unpaid principal balance of the subprime and other high risk-mortgages held by the GSEs' totaled approximately $1.8 trillion," but immaterial to any issues presented by this Motion, because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  In addition, Table 1 of Defendants' Ex. 285 is undated.  Defendants' Ex. 285 was created by the American Enterprise Institute ("AEI"), not by the GSEs or FHFA, nor was it produced in this litigation, and its accuracy has not been verified. |
| 282. | Many of these loans were purchased through the GSEs' "flow" channels, in which the GSEs purchased loans on an ongoing basis from lenders without any pre-purchase review.  *See* Ex. 286 at 60:25–61:3; Ex. 283.  The GSEs purchased Alt-A and subprime loans in bulk that were underwritten in whole or in part to originators' guidelines.  *See supra* ¶¶ 116, 281.  The GSEs conducted loan file reviews on these subprime and Alt-A loans in which they identified many of the same underwriting defects that FIFA claims exist in the SLGs, including missing documents, unreasonable stated income, failures to verify employment, owner-occupancy misrepresentations, and inflated appraisals.  *See supra* ¶¶ 176-22. | Undisputed for purposes of this Motion that the GSEs purchased Alt-A loans on a "flow basis," but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Disputed that the GSEs purchased what fell within their definition of "subprime" loans through their flow channels, but immaterial to any issues presented by this Motion, because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  *See* Defs. Ex. 286 at 60:5-61:3.  Fannie Mae only purchased subprime whole loans in bulk transactions through its Single Family Investor Channel as part of its Subprime New Business Initiative ("NBI") beginning in mid-2006.  *See* Defs. Ex. 303 at FHFA01222817.  FHFA Disputed that"[t]he GSEs purchased Alt-A and subprime loans in bulk that were underwritten in whole or in part to originators' guidelines."  Defendants' ¶¶ 116 and 281 do not discuss underwriting guidelines provide no support for this proposition.  Disputed that "[t]he GSEs conducted loan file reviews on these subprime and Alt-A loans in which they identified many of the same underwriting defects that FHFA claims exist in the SLGs, including missing |

|  | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
|  |  | documents, unreasonable stated income, failures to verify employment, owner-occupancy misrepresentations, and inflated appraisals" for the reasons set forth in FHFA's responses to ¶¶ 176-22, *supra*. |
| 283. | Starting around 2006, Fannie Mae purchased Alt-A loans that were originated to originators' guidelines through its Single Family business. Ex. 283. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 287 at 19:14–23, 21:7–24:2, 27:18–28:13; *see also* Ex. 287 at 117:10–14 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ | Undisputed for purposes of this Motion that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Defs. Ex. 283 at 1 (emphasis added), but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Defs. Ex. 287 at 27:16-28:9. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See id.* at 21:14-22. |
| 284. | Fannie Mae did so, in part, to "combat loss of market share amid rising private label MBS issuance . . . [and] target[] . . . 'Alt-A' product that would otherwise follow a private label execution path." Ex. 288 at FIFA11843884. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 289 at 63:21-24. (emphasis added) As part of its so-called "Alt-A Transformation" project, Fannie | Undisputed for purposes of this Motion that Defendants' Exs. 288 and 289 contains the language quoted by Defendants, but immaterial to any issues presented by this Motion, because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Disputed, but immaterial to any issues presented by this Motion, because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions., that Defendants' Ex. 290 supports the proposition that "[a]s part of its so-called 'Alt-A Transformation' project, Fannie Mae sought to expand its eligibility criteria to 'allow [it] to accept about 90% of what [was] being done in Alt-A PLS deals.'" Defendants' |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | Mae sought to expand its eligibility criteria to "allow [it] to accept about 90% of what [was] being done in Alt-A PLS deals." Ex. 290 at FIFA13202060. | Ex. 290 does not mention the "Alt-A Transformation" project. |
| 285. | By December 2007, Alt-A loans constituted approximately 13% of Fannie Mae's Single Family book of business. Ex. 291. | Undisputed for purposes of this Motion that Defendants' Ex. 291, dated December 1, 2007, states that "about 13% of our book of business," but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 286. | Fannie Mae performed post-purchase reviews of its Alt-A flow loans purchased through its flow channel. Fannie Mae's National Underwriting Center sampled Fannie Mae's total population of loans to perform loan-level, post-purchase reviews of loans that Fannie Mae purchased through its flow network to "ensur[e] loans me[]t approved guidelines for product[s]" and to "[m]onitor[] material misrepresentation." Ex. 292 at FHFA01241163. The National Underwriting Center's "Post-Purchase Random Reviews . . . [were] part of Fannie Mae's loan level data quality control system . . . a statistically valid, simple random sample is drawn for four core business segments: EA/TPR, Alt-A, A-minus and Core . . . Each loan selected for review is examined for deficiencies in any of 11 significant findings categories: [d]ocuments, [e]ligibility, [c]redit, [i]ncome, [p]redatory, [f]unds, [s]ervicing, [p]roperty, [a]ppraisal, [m]isrepresentation [and] [o]ther." | Undisputed for purposes of this Motion that Defendants' Ex. 293 includes the language quoted by Defendants, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | Ex. 293 at FHFA01275179-80. | |
| 287. | The National Underwriting Center performed "double the random sampling" on Fannie Mae's Alt-A flow purchases "as well as additional special discretionary sampling targeting higher risk mortgages." Ex. 294 at FHFA01785970.  This "[i]ncreased special discretionary sampling" was intended to "target[] loans that [were] considered higher risk . . . loans that have characteristics (non existent SSN, appraisal bias, or incorrect property address)."  Ex. 292 at FHFA01241151. | Undisputed for purposes of this Motion that Defendants' Exs. 294 and 292 contain the language quoted by Defendants, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 288. | On January 23, 2007, Fannie Mae's National Underwriting Center ("NUC") issued "Management Reports" that provided "high level statistics about the QC process."  Ex. 492 at FHFA01281076.  The reports covered five review types: "Random and Discretionary Post Purchase Reviews (PPRs), Early Payment Default (EPD) reviews, Loss Mitigation Reviews (LMR) and Post Foreclosure Reviews (PFR)."  The "Review Results" reported that, of the 26,990 loans reviewed by the NUC during 2006 from all lenders, "20.6% had at least one significant finding."  *Id.*  The "top three drivers of significant findings" were misrepresentation, eligibility and property, which accounted for 64.6% of all significant findings.  *Id.* NUC's review of 3,721 Alt-A loans found at least one significant finding in 28.1% of the loans, also driven by misrepresentation, eligibility and | Undisputed for purposes of this Motion that Defendants' Ex. 492 contains the language quoted by Defendants.  Defendants' Ex. 492 is a January 23, 2007 memorandum from Anthony Bui to several employees of the Single Family business concerning "NUC Management Reports January 2006-December 2006" that was not addressed to any of the PLS traders or credit analysts, *see* Defs. Ex. 181, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | property. *Id.* | |
| 289. | Fannie Mae learned of trends in the origination practices of the Originators by buying loans directly from those Originators through its flow channel. Eric Rosenblatt, a Vice President in Fannie Mae's Credit Risk Analytics and Monitoring group, Ex. 262 at 27:10-28:4, testified that Fannie Mae detected owner-occupancy misrepresentations in the Alt-A loans it bought through its Single Family business. Ex. 262 at 244:6-245:15. Likewise, in October 2006, Fannie Mae stated that "Indy Mac has had issues . . . with appraisal bias in [bulk] deals" based on its review of loans bought through its Single Family channels. Ex. 295 at FHFA13029574. | Undisputed for purposes of this Motion that Mr. Rosenblatt testified about owner occupancy misrepresentations in the loans Fannie Mae purchased through its Single Family business, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Mr. Rosenblatt's testimony about owner-occupancy misrepresentations concerned Fannie Mae's *post-purchase* review of Alt-A whole loans purchased by the Single Family business that had *defaulted* and did not concern pre-purchase, or even pre-securitization, due diligence. *See* Defs. Ex. 262 at 244:11-25. In addition, Mr. Rosenblatt's testimony is immaterial because he works for Fannie Mae's Single Family business and testified that he never had a title or a position with respect to that PLS side of the business. FHFA Ex. 253 (E. Rosenblatt Dep. Tr.) at 32:20-24:6. Mr. Rosenblatt further testified that Fannie Mae had an information barrier or "firewall" that prevented him from sharing information about "specific borrowers, specific loans" to which he had access in his work in Single Family with members of the PLS business, including members of the Risk Policy Committee. *Id.* at 46:21-48:6. He also testified, with regard to the information barrier, employees in Capital Markets (including the PLS business) were "only supposed to know what the general market knows and they can't know anything that's special -- special information that arose from your business dealings. I mean, it might be about a loan performance, but I -- I assume it covers anything. *Id.* at 48:14-22. Mr. Rosenblatt testified that he does not recall "freely" sharing his "knowledge or opinions about the influence of house prices on loans or different influence on different factors on how |

| | Defendants' Statement of Material Facts | FHFA's Response |
|---|---|---|
| | | loans performed that [he] gleaned from [his] job in the single-family side" at meetings attended by PLS personnel, including meetings of the Risk Policy Committee. *Id.* at 48:25-49:11. Defendants' Exhibit 295 contains the language quoted by Defendants, but is a memorandum dated October 17, 2006 about the Single Family Alt-A Transformation Strategy. The memorandum was not sent to members of the PLS business. *See* Defs. Ex. 181. |
| 290. | Fannie Mae also purchased subprime loans in bulk. Ex. 286 at 60:25-61:3. As part of Fannie Mae's Subprime Initiative, Fannie Mae purchased subprime mortgage loans in bulk from, among others, New Century, Bank of America, Countrywide, Chase, First Franklin, Lehman Brothers, Nationstar, and Option One, all of which are originators of loans in the samples FHFA is re-underwriting in order to meet its burden to show material misrepresentations in these Actions. | Undisputed for purposes of this Motion that Fannie Mae purchased subprime whole loans in bulk through its Single Family Investor Channel beginning in mid-2006, Defs. Ex. 303 at FHFA01222819-20, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Defendants offer no record support for their statement that "[a]s part of Fannie Mae's Subprime Initiative, Fannie Mae purchased subprime mortgage loans in bulk from, among others, New Century, Bank of America, Countrywide, Chase, First Franklin, Lehman Brothers, Nationstar, and Option One, all of which are originators of loans in the samples FHFA is re-underwriting in order to meet its burden to show material misrepresentations in these Actions." |
| 291. | In particular, Fannie Mae bought Alt-A and subprime loan pools purchased from the following originators at the following times. Ex. 299 at FHFA03469097-101. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 292. | Fannie Mae understood the collateral quality of the subprime whole loans it bought to be similar to loans underlying the PLS it bought. In a March 2007 e-mail concerning a bid on First Franklin | Undisputed for purposes of this Motion that Defendants' Ex. 298 contains the language quoted by Defendants, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | loans, a Fannie Mae employee wrote, "I believe we are the only bid on this pool vs the lender's securitization route." Ex. 298 at FHFA00183643.  A colleague responded that "these loans are already earmarked for a security that we purchased for April." *Id.* at FHFA00183642. | in these Actions.   Defendants' argumentative inference that "Fannie Mae understood the collateral quality of the subprime whole loans it bought to be similar to loans underlying the PLS it bought" is not supported by this Exhibit, which does not discuss "collateral quality."  Moreover, even if Defendants provided such evidence, it would be immaterial because the credit eligibility requirements for whole loans purchased by the Fannie Mae's Single Family businesses are, at best, relevant to materiality and are entirely irrelevant to their knowledge of the misrepresentations made by Goldman Sachs, HSBC and Nomura in the Offering Materials for the Certificates at issue. |
| 293. | The credit quality of the whole loans in Fannie Mae's May 2007 purchase of subprime Option One loans was materially similar to the credit quality of the subprime Option One loans backing the at-issue Certificates.  For example, the Option One whole loans had a weighted average OLTV of 77.5%, a weighted average combined LTV of 77.6% and a weighted average FICO of 609.  Ex. 269 at FHFA00287071.  Similarly, HASC 2007-OPT1, which was backed entirely by Option One subprime loans, had a weighted average OLTV of 79.05%, a weighted average original combined LTV of 82.92% and a weighted average FICO score of 608.  *See* Ex. 59 at A-12. | Disputed, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Further immaterial because the credit eligibility requirements for whole loans purchased by the GSEs' Single Family businesses are, at best, relevant to materiality and are entirely irrelevant to their knowledge of the misrepresentations made by Defendants in the Offering Materials for the Certificates at issue. |
| 294. | The credit quality of Fannie Mae's subprime purchases from Option One was consistent throughout the 2006 to 2007 time period.  Fannie Mae's 2006 purchases of Option | Disputed, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Further immaterial because the credit |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | One whole loans likewise had a weighted average OLV of 77%, a weighted average combined LTV of 79.1%, and a weighted average FICO of 608.  Ex. 269 at FHFA00287070.  Similarly, HASC 2006-OPT1 contained loans with a weighted average OLTV of 78.04%, a weighted average combined LTV of 80.17%, and a weighted average credit score of 621.  *See* Ex. 301 at A-33; *see also* Ex. 56 at A-30-31; A-45.  HASC 2006-OPT4 was composed of loans with a weighted average OLTV of 77.24%, a weighted average original combined LTV of 80.13% and a weighted average credit score of 618. | eligibility requirements for whole loans purchased by the GSEs' Single Family businesses are, at best, relevant to materiality and are entirely irrelevant to their knowledge of the misrepresentations made by Defendants in the Offering Materials for the Certificates at issue. |
| 295. | Lesia Bates Moss testified that she did not believe the origination standards for the subprime whole loans Fannie Mae bought were different from the standards for the loans underlying the Certificates.  Ex. 86 at 45:1-46:9. | Disputed, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  The portion of Ms. Bates Moss's testimony cited by Defendants does not discuss "origination standards" nor reference "the Certificates."  *See* Defs. Ex. 86 at 45:1-46:9. |
| 296. | Beginning in 2001, Fannie Mae performed pre-purchase due diligence on all subprime whole loan purchases to "manage and mitigate" the risks associated with subprime borrowers.  Ex. 303 at FHFA01222830.  Although loan samples were based on "various risk criteria including RPS scores . . . [and] high LTVs," *id.*, "loan characteristics" such as "appraisal bias generally dr[o]ve the [loan] sample." Ex. 304 at FHFA01247207.  Fannie Mae | Disputed, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Defendants' Exhibit 303 at FHFA01222830 does not support their statement that "[b]eginning in 2001, Fannie Mae performed pre-purchase due diligence on all subprime whole loan purchases to "manage and mitigate" the risks associated with subprime borrowers" or that "loan samples were based on 'various risk criteria including RPS scores . . . [and] high LTVs[.]'"  Defendants' Ex. 304 is in no way connected to |

135

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | continued to perform pre-purchase due diligence on its bulk purchases of subprime loans from 2005-2008. *E.g.* Exs. 301; Ex. 305. | their Ex. 303, but rather is an email chain from November 2007, which post-dates Fannie Mae's purchase of the Certificates. *See* FHFA SUF Reply ¶ 467. Defendants' Exs. 301 and 305 do not indicate that "Fannie Mae continued to perform pre-purchase due diligence on its bulk purchases of subprime loans from 2005-2008." Fannie Mae's purchase of subprime whole loans on which it conducted pre-purchase due diligence commenced when it launched the Subprime NBI in mid-2006. *See* Defs. Ex. 303. Further immaterial because the loan-level results of Single Family due diligence were not sent to the PLS business and Defendants cite no evidence to the contrary. |
| 297. | As part of this due diligence, Fannie Mae had third party vendors like Clayton and Opus review a sample of the loans in the pool to determine whether they were originated in accordance with underwriting guidelines. *See* Ex. 306 at FHFA01282611; Ex. 301; Ex. 307. This included assessing whether the underlying properties were accurately valued and/or appraised, whether there were excessive DTIs and LTVs, missing or incomplete HUD-1s or insufficient documentation, whether the loan pool appeared to contain fraud, and other "Guidelines Exception[s]." Ex. 301 at ML-OPUS-00174100-01. | Disputed, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Defendants' Exs. 301 and 306 at FHFA01282611 does not support their statement that "[a]s part of this due diligence, Fannie Mae had third party vendors like Clayton and Opus review a sample of the loans in the pool to determine whether they were originated in accordance with underwriting guidelines." Defendants' Ex. 301, which was produced by third-party Opus, does not on its face indicate that it relates to Fannie Mae subprime bulk purchases. Further immaterial because the loan-level results of Single Family due diligence were not sent to the PLS business and Defendants cite no evidence to the contrary. |
| 298. | For example, in February 2006 Fannie Mae reviewed a sample of a subprime loan pool it bought from New Century to "[c]onfirm that the loans were originated in conformity with the lender's guidelines." Ex. 305 at FHFA00778817. Through | Undisputed for purposes of this Motion that Defendants' Ex. 305 at FHFA00778817 indicates that Fannie Mae conducted pre-purchase due diligence on a pool of New Century loans for a December 2005 Single Family bulk transaction and that Fannie Mae stated in a February 2006 memorandum |

| | Defendants' Statement of Material Facts | FHFA's Response |
|---|---|---|
| | this review, Fannie Mae observed that 23% of the loans represented "[s]ubstantial deviations from the guidelines . . . with no apparent compensating factors," yet it still "pull[ed] through" 85% of the pool, and noted that 90% or higher was typical for a Wall Street pool. *Id.* | summarizing key learnings from the transaction (Defs. Ex. 305) that Clayton used New Century underwriting guidelines "to determine the degree of conformity of the original underwriting," but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Defendants' statement that "[t]hrough this review, Fannie Mae observed that 23% of the loans represented '[s]ubstantial deviations from the guidelines . . . with no apparent compensating factors,' yet it still 'pull[ed] through" 85% of the pool, and noted that 90% or higher was typical for a Wall Street pool[,]'" is not supported by the citation they provide (Defs. Ex. 305 at FHFA00778817).  Further immaterial because the loan-level results of Single Family due diligence were not sent to the PLS business and Defendants cite no evidence to the contrary. |
| 299. | In August 2006, Fannie Mae performed due diligence on a pool of more than 780 First Franklin subprime loans, which had a weighted average OLTV of 82.7% and a weighted average FICO of 646. Ex. 306 at FFHA01282611; Ex. 308; Ex. 309 at FHFA00003133. | Disputed, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Defendants' Exs. 306 at FFHA01282611, 308, and 309 at FHFA00003133 do not support their statement that "[i]n August 2006, Fannie Mae performed due diligence on a pool of more than 780 First Franklin subprime loans, which had a weighted average OLTV of 82.7% and a weighted average FICO of 646."  Further immaterial because the loan-level results of Single Family due diligence were not sent to the PLS business and Defendants cite no evidence to the contrary. |
| 300. | Fannie Mae conducted due diligence on a 25% sample of loans in two additional First Franklin loan pools it purchased in October | Undisputed for purposes of this Motion that Defendants' Ex. 310 (a Single Family business report) contains the language quoted by Defendants, but immaterial to any issues |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | 2006.  Ex. 310 at FHFA0138510. Its "kick-out" rates—the rates at which it declined to purchase loans—were 4.53% and 8.3%, which Fannie Mae regarded as "well within tolerance." *Id.* Through this review, Fannie Mae uncovered problems with loans in the sample including "insufficient assets," "insufficient income documentation," "excessive DTI," and other "credit and compliance deficiencies." *Id.* | presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Further immaterial because the loan-level results of Single Family due diligence were not sent to the PLS business and Defendants cite no evidence to the contrary. |
| 301. | In May 2007, Fannie Mae's pre-purchase due diligence review on a pool of Countrywide subprime loans found a "[h]igh percentage (23.41%) of credit violations" of Countrywide's underwriting guidelines.  Ex. 96 at FHFA01439997. | Undisputed for purposes of this Motion that Defendants' Ex. 96 (a May 21, 2007 email about "CHL Due Diligence – Subprime Lender Approval Request" which was not sent to the PLS Business, *see* Defs. Ex. 181), contains the language quoted by Defendants, but immaterial to any issues presented by this Motion, because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Further immaterial because the loan-level results of Single Family due diligence were not sent to the PLS business and Defendants cite no evidence to the contrary. |
| 302. | Fannie Mae reviewed the subprime loans it bought from originators for appraisal bias using its own AVM. Fannie Mae personnel were responsible for "coordinat[ing] data run[s] through [the RPV AVM) to determine outliers and [the] potential of appraisal bias." *See* Ex. 311 at FHFA11943705.  Once a loan sample was selected for diligence, Fannie Mae's National Underwriting Center would then "identify [an] appropriate sample size based on RPS data." *Id.* at FHFA11943706.  Third party | Defendants' Ex. 311 at FHFA11943705 does not discuss Fannie Mae's "own AVM" nor mention "the RPV AVM."  Otherwise undisputed for purposes of this Motion that Defendants' Ex. 311 at FHFA11943705 contains the additional language quoted by Defendants, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Further immaterial because the loan-level results of Single Family due diligence were not sent to the PLS business and Defendants cite no evidence to the contrary. |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | diligence vendors applied "[a]dditional research tools" on the final loan sample to "eliminate loans with excessive appraisal bias." *Id.* | |
| 303. | In connection with a May 2007 subprime whole loan purchase, for example, Fannie Mae reviewed a pool of Option One loans selected for fraud and credit risk factors, including a subset of loans that had "Appraisal Bias [values that were] . . . 30%" more than the values Fannie Mae deemed appropriate. Ex. 312 at FHFA01303358. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions, and because Fannie Mae did not purchase any deals backed by Option One collateral post-May 2007.  Fannie Mae's Single Family business conducted third party pre-purchase due diligence on a pool of Option One loans in May 2007 and that Defendants' Exhibit 312 at FHFA01303358 states that "[o]ur sample selection also identified that following risk factors: Appraisal Bias – (created using APS predicted value) > 30% and confidence level 1 or 2…."  Further immaterial because the loan-level results of Single Family due diligence were not sent to the PLS business and Defendants cite no evidence to the contrary. |
| 304. | Likewise, in connection with a July 2007 NationStar whole loan purchase, Fannie Mae used its APS valuation tool to create a sample containing loans with, among other things, greater than "30%" appraisal bias.  Ex. 313 at FHFA01440209-210.  Fannie Mae further noted in its pre-diligence summary that the risk eligible loan population consisted of loans with "RPS values" "outside median limits" and a median appraisal variance of 13.91%.  *Id.* | Undisputed for purposes of this Motion that Fannie Mae's Single Family business conducted third party pre-purchase due diligence on a pool of NationStar loans in August 2007 and that Defendants' Ex. 313 at FHFA01440209 states that "[o]ur sample selection also identified that following risk factors: Appraisal Bias – (created using APS predicted value) > 30% and confidence level 1 or 2…", but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Otherwise undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | | Actions, that Defendants' Exhibit 313 contains the language quoted by Defendants.  Further immaterial because the loan-level results of Single Family due diligence were not sent to the PLS business and Defendants cite no evidence to the contrary. |
| 305. | Fannie Mae recognized that its pre-purchase due diligence sample did not capture all of the loans with potential underwriting defects or appraisal bias and, as such, Fannie Mae implicitly accepted that such loans could be included in its whole loan purchase.  *See* Ex. 314 at FHFA13029558 (analyzing the subset of appraisal bias loans selected for due diligence review). | Disputed, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Defendants' Ex. 314 at FHFA13029558, which consists of 2 bar charts, does not support Defendants' argumentative statement that "Fannie Mae recognized that its pre-purchase due diligence sample did not capture all of the loans with potential underwriting defects or appraisal bias and, as such, Fannie Mae implicitly accepted that such loans could be included in its whole loan purchase."  Further immaterial because the loan-level results of Single Family due diligence were not sent to the PLS business and Defendants cite no evidence to the contrary. |
| 306. | Freddie Mac also bought Alt-A loans through its "flow" channel.  Ex. 283 at 1 n.1. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 307. | Freddie Mac performed post-purchase reviews on the Alt-A loans it bought through its flow channel.  Freddie Mac's Quality Control group obtained loan files for defaulted loans in order "to understand whether or not those loans were originated in compliance with the contractual requirements of the company," to seller servicer guidelines, or to any variances that applied to the lender, | Undisputed for purposes of this Motion that the quoted language appears in Defendants' Exhibit 69, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  The statement, "which would include those variances that allowed lenders to sell Alt-A loans originated to their own guidelines," is not supported by Defendants cite.  Further immaterial because the results of Single Family post-purchase reviews were not |

140

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | which would include those variances that allowed lenders to sell Alt-A loans originated to their own guidelines. Ex. 69 at 733:4–16. | sent to the PLS business and Defendants cite no evidence to the contrary. |
| 308. | For loans that did not default, Freddie Mac reviewed a stratified random sample of roughly 1,500 loans. Ex. 315 at 55:1–13. While this process did not involve checking loan files against underwriting guidelines, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ *Id.* at 56:11–19. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. As clarification, the 1,500 loan sample was a monthly sample at a specific point in time. Defs. Ex. 315 at 55:1-13. Further immaterial because the results of Single Family post-purchase reviews were not sent to the PLS business and Defendants cite no evidence to the contrary. |
| 309. | Freddie Mac observed increasing defect rates for originators across its flow portfolio during the relevant time period and found, for example, that the defect rate for loans originated by Countrywide increased from 9% to 24% between mid-2005 and mid-2007, Ex. 316 at FHFA01664783, compared with an increase from 8% to 20% across the flow portfolio. Ex. 317 at FHFA14282630. | Disputed that Defendants' Ex. 316 shows increasing defect rates for Countrywide; Defendants' Ex. 316 is a draft chart regarding Single Family flow purchase from Chase; it does not discuss Countrywide. Also immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Undisputed for purposes of this Motion that Defendants' Ex. 317 shows increasing defect rates in Freddie Mac's Single Family flow portfolio, but immaterial to any issues presented by this Motion, because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Further immaterial because the results of Single Family post-purchase reviews were not sent to the PLS business and Defendants cite no evidence to the contrary. |
| 310. | Between June 2004 and October 2007, Freddie Mac also bought 18 subprime and Alt-A pools in bulk that were securitized into T- | Disputed, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these |

| | Defendants' Statement of Material Facts | FHFA's Response |
|---|---|---|
| | Deals—securities that Freddie Mac offered to the public after performing securitization due diligence—totaling more than $300 billion.  Ex. 282 at FHFA12469142–143; Ex. 166 at 432:6–18.  As part of the T-Deal program, Freddie Mac purchased subprime or Alt-A mortgage loans in bulk from Originators including Washington Mutual, Wells Fargo, and Countrywide.  Exs. 318–320.  In particular, Fannie Mae bought Alt-A and subprime loan pools purchased from the following originators at the following times: | Actions.  Freddie Mac securitized 4 subprime T-Deals between July 2007 and January 2008, and 14 Alt-A T-Deals between June 2004 and October 2007.  Defendants' Exhibit 282 at FHFA12469142–143.  The total original balance of those T-Deals was $30 billion, not $300 billion.  *Id.*  Undisputed for purposes of this Motion that Freddie Mac securitized T-Deals containing subprime collateral originated by Wells Fargo, but also immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Defs. Ex. 320; Defs. Ex. 282 at FHFA12469142–143.  Disputed that Freddie Mac securitized T-Deals containing subprime collateral by Washington Mutual or Countrywide, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  The collateral supporting those T-Deals were Alt-A/Option ARM loans.  Defendants' Exhibit 318, 319, and 282 at FHFA12469142–143.  Disputed that Fannie Mae purchased the Alt-A and subprime loan pools set forth in Table R, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Undisputed for purposes of this Motion that Table R sets forth the underlying originators for collateral in the Freddie Mac T-Deals, except that Washington Mutual, not Wells Fargo, originated the collateral in T-70,  Defs. Ex. 324, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 311. | Ronald Feigles, a member of Freddie Mac's AMO unit responsible for the pre-purchase | Undisputed for purposes of this Motion that the quoted language appears in Defendants' Exhibit 166, but immaterial to any issues |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | due diligence Freddie Mac performed on Alt-A and subprime pools of loans, testified that "[p]robably most of" the subprime and Alt-A loans Freddie Mac purchased as part of its bulk purchase program were "underwritten to the lenders' guidelines with specific carve-outs" and some of the exceptions in Freddie Mac's due diligence exception reports would be exceptions to originators' guidelines.  Ex. 166 at 436:19–437:13, 593:15–594:19. | presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Further immaterial because the results of Single Family due diligence were not sent to the PLS business and Defendants cite no evidence to the contrary. |
| 312. | Freddie Mac T-Deal offering materials disclose it purchased loans underwritten to originator guidelines:<br><br>• "All of the Mortgage Loans to be acquired by the Issuing Entity from the Depositor were originated generally in accordance with First Franklin Financial's Underwriting Guidelines."  Ex. 321 at 28.<br><br>• "As set forth in the Pooling and Servicing Agreement, all of the Mortgage Loans were originated in accordance with certain Wells Fargo Bank Underwriting Guidelines (as defined in the Pooling and Servicing Agreement) in effect at the time of the related origination . . . ."  Ex. 322 at 30.<br><br>• "As set forth in the Pooling | Undisputed for purposes of this Motion that the quoted language appears in Defendants' cited exhibits, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | and Servicing Agreement, all of the Mortgage Loans were originated in accordance with certain Wells Fargo Bank Underwriting Guidelines (as defined in the Pooling and Servicing Agreement) in effect at the time of the related origination . . . ." Ex. 320 at 29.<br><br>• "All of the Mortgage Loans in the trust fund will have been originated or acquired by Countrywide Home Loans in accordance with its credit, appraisal and underwriting standards." Ex. 323 at 52.<br><br>• "All of the mortgage loans were originated by Countrywide Home Loans, Inc. ("Countrywide" or the "originator"). The mortgage loans were originated in accordance with the underwriting guidelines described under 'Mortgage Loan Origination—Underwriting Standards' herein." Ex. 318 at 104.<br><br>• "As set forth in the Pooling Agreement, all of the Mortgage Loans were originated in accordance with certain Seller Underwriting Guidelines (as defined in the Pooling Agreement) in effect at the time of the related | |

144

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | origination." Ex. 324 at 21.<br><br>• "As set forth in the Pooling Agreement, all of the Mortgage Loans were originated in accordance with certain Seller Underwriting Guidelines (as defined in the Pooling Agreement) in effect at the time of the related origination." Ex. 325 at 21.<br><br>• "All of the Mortgage Loans acquired by the Seller were originated in accordance with guidelines (the 'Underwriting Guidelines') established by the Originator as described below." Ex. 326 at S-29.<br><br>• "As set forth in the related Pooling Agreement, all of the Mortgage Loans were originated in accordance with certain Seller Underwriting Guidelines (as defined in the related Pooling Agreement) in effect at the time of the related origination." Ex. 319 at 24.<br><br>• "Each Underlying Mortgage Loan was originated with credit, appraisal and underwriting guidelines applied by the related originator to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the | |

|  | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
|  | mortgaged property as collateral in accordance with applicable federal and state laws and regulations." Ex. 327 at 25. |  |
| 313. | Through these transactions, Freddie Mac purchased in bulk the same kind of collateral that they bought through PLS transactions:<br><br>• Kevin Palmer, a Freddie Mac employee involved pricing whole loan purchases, testified that when Freddie Mac acquired a block of loans it would divide the block into a portion to be bought through traditional PLS and another through T-Deals. Ex. 67 at 632:9–19.<br><br>• Donna Corley testified that "the same collateral [could] be bought . . . either in the form of AAA PLS or bulk loans on the single-family side of Freddie Mac's business." Ex. 328 at 162:14-163:9.<br><br>• A January 2007 Freddie Mac purchase approval for a pool of Alt-A loans from Countrywide stated that the loans would be "s[old]/deliver[ed] . . . to Freddie Mac in two parts. A whole loan/asset bid will cover 50% of the eligible universe, and the portfolio will purchase the other 50% in the form of AAA bonds." | Disputed, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  The testimony Defendants cite shows that Freddie Mac purchased whole loans originated by some of the originators that originated the loans underlying its PLS purchases.  It does not provide evidence that the collateral was the "same kind."  Defendants have also taken Mr. Palmer's testimony out of context.  He did not testify that Freddie Mac "acquired a block of loans" and then "divide[d] the block into a portion to be bought through traditional PLS and another through T-Deals."  Rather, when presented with an email written by Bruce Wood, Mr. Palmer guessed "that a block of loans came to Freddie Mac, and a portion of those went through a traditional private label securitizations . . . and a portion of the loans went through our T Securitization where we took the first loss risk."  FHFA Ex. 264 (Palmer Dep. Tr. at 625:19-633:12).  When asked to explain that process, Mr. Palmer said "I can't" because he "was not involved in that process."  *Id.* |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | Ex. 329 at FHFA01219050. | |
| 314. | In July 2007, Freddie Mac performed a pre-purchase review of a pool of subprime loans originated by Wells Fargo.  The loan review included a review of both random and targeted samples of loans and analyzed, among other things, the extent to which the loans complied with Wells Fargo's credit guidelines.  Ex. 330 at FHFA02438970.  The review concluded that "[s]ome of the loans rejected due to collateral [valuation] issues appeared to have been closely scrutinized by Wells Fargo during origination, and then approved to close with the collateral issues remaining unresolved." *Id.* at FHFA02438970-971. | Undisputed for purposes of this Motion, except that Defendants' Exhibit 330 does not support Defendants' assertion that the loan review included an analysis of "the extent to which the loans complied with Wells Fargo's credit guidelines."  Regardless, immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Further immaterial because the results of Single Family due diligence were not sent to the PLS business and Defendants cite no evidence to the contrary. |
| 315. | On March 9, 2005, Freddie Mac held a "Credit Risk Oversight Phase 1 Meeting." Ex. 331 at FHFA17549363.  The meeting covered topics including "Mortgage ABS," that is, PLS, and "Single-family." *Id.* The presenters on the Mortgage ABS topic included Bruce Wood and Kevin Palmer. *Id.* Materials discussed at the meeting included a document entitled "National Lending Customer Issues Comments January 2005." *Id.* at FHFA17549486.  That document reported that the "National defect rate" had increased from 7.8% in December 2004 to 8.8% in January 2005. *Id.* | Undisputed for purposes of this Motion, except that the meeting included separated "Mortgage ABS" and "Single Family" presentations.  Defs. Ex. 331 at FHFA17549363.  Immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 316. | On May 11, 2005, Freddie Mac held a "Credit Risk Oversight | Undisputed for purposes of this Motion, except that the meeting included separated "Mortgage |

|  | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
|  | Phase 1 Meeting." Ex. 332. The meeting covered topics including "Mortgage ABS," that is, PLS, and "Single-family." *Id.* The presenters on the Mortgage ABS topic included Bruce Wood and Kevin Palmer. *Id.* Materials discussed at the meeting included a document entitled "National Lending Customer Issues Comments March 2005." *Id.* at FHFA16963575. That document reported that the "defect rate" had increased from 8.3% in February 2005 to 8.8% in March 2005. *Id.* | ABS" and "Single Family" presentations. Defs. Ex. 332 at FHFA16963385. Immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 317. | On June 15, 2005, Freddie Mac held a "Credit Risk Oversight Phase 1 Meeting." Ex. 333. The meeting covered topics including "Mortgage ABS," that is, PLS, and "Single-family." *Id.* The presenters on the Mortgage ABS topic included Bruce Wood and Kevin Palmer. *Id.* Materials discussed at the meeting included a document entitled "National Lending Customer Issues Comments April 2005." *Id.* at FHFA17527442. That document reported that the "national segment defect rate" was 9.3% YTD in April 2005. *Id.* | Undisputed for purposes of this Motion, except that the meeting included separated "Mortgage ABS" and "Single Family" presentations. Defs. Ex. 333 at FHFA17527302. Immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 318. | On August 17, 2005, Freddie Mac held a "Credit Risk Oversight Phase 1 Meeting." Ex. 334. The meeting covered topics including "Mortgage ABS," that is, PLS, and "Single-family." *Id.* The presenters on the Mortgage ABS topic were Bruce Wood, Kevin Palmer and David Hackney. *Id.* Materials discussed at the meeting included a document entitled "National | Undisputed for purposes of this Motion, except that the meeting included separated "Mortgage ABS" and "Single Family" presentations. Defs. Ex. 334 at FHFA16966208. Immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | Lending Customer Issues Comments June 2005." *Id.* at FHFA16966372. That document reported that the "national segment defect rate" was 10.4% YTD in May 2005 and 9.4% YTD in June 2005. *Id.* | |
| 319. | During at least 2006 and 2007, Freddie Mac received "Individual Asset Summary" reports from Clayton summarizing the pre-purchase due diligence performed on pools of loans purchased through the T-Deals program. *E.g.* Ex. 335; Ex. 336. In these reports, Clayton identified loans that, upon initial review, have material defects and explained the reasons for its findings. Freddie Mac employees then reviewed Clayton's findings and noted their own determinations regarding whether loans should be rejected or "waived in" to the pool with a score of "2W." Ex. 166 at 485:24-487:6. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion, because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 320. | In July 2007, Freddie Mac received an Individual Asset Summary report for pre-purchase due diligence on the T-074 deal. Ex. 336 at FHFA02465380. The report indicates that Clayton found material defects in the loan pool including failure to verify employment, noting for one loan that "[p]hone reverification indicates borrower is no longer employed at company listed on application." *Id.* at FHFA02465470–73. The grade given to the loan was changed to a "2W" with the note, "[i]ssue waived by client." *Id.* at | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion, because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Further immaterial because the results of Single Family due diligence were not sent to the PLS business and Defendants cite no evidence to the contrary. |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | FHFA02465473. | |
| 321. | In November 2007, Freddie Mac received an Individual Asset Summary report for T-076 that noted material defects with the loans including, among other things, unreasonable stated income, Ex. 336 at FHFA02475300–03, failure to verify income, *Id.* at FHFA02475616–18, and excessive DTI, *Id.* at FHFA02475428–431. Freddie Mac evaluated and waived in loans with each of these defects. *Id.* at FHFA02475303, FHFA02475616–18, FHFA02475428–31. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion, because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Further immaterial because the results of Single Family due diligence were not sent to the PLS business and Defendants cite no evidence to the contrary. |
| 322. | Beginning in 2006, Freddie Mac identified the risk of appraisal bias in the subprime loans it bought in its T-Deals, and began to run AVMs internally on those loans.  It ran "all of [its] T-deals through HVE and Calibrator to identify loans that might be riskier due to appraisal bias." Ex. 252 at FHFA03703596. | Disputed for purposes of this Motion, but immaterial to any issues presented by this Motion, because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Defendants' Ex. 252 does not note that "[b]eginning in 2006, Freddie Mac identified the risk of appraisal bias in the subprime loans it bought in its T-Deals." Defendants' Ex. 252 notes that Freddie Mac was "running all of [its] T-deals through HVE and Calibrator to identify loans that might be riskier due to appraisal bias." *Id.* at FHFA03703596.  Moreover, Freddie Mac's first subprime T-Deal during the relevant period was not until July 2007.  The proposed fact is further immaterial because the results of Single Family due diligence were not sent to the PLS business and Defendants cite no evidence to the contrary. |
| 323. | The results of the AVMs run on its T-deals revealed that the whole loans Freddie Mac purchased and securitized were, like the PLS certificates at issue, not immune to | Disputed.  Defendants' ¶ 323 cites no evidence that FHFA could dispute or agree is undisputed, and may not be credited as such. *See* L.R. 56.1(d).  Notwithstanding the lack of evidence, this statement is immaterial to any |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | appraisal bias. | issues presented by this Motion, because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Further immaterial because the results of Single Family due diligence were not sent to the PLS business and Defendants cite no evidence to the contrary. |
| 324. | Freddie Mac's AVMs evidenced appraisal bias in a sample of loans reviewed for its T-076 T-Deal, including several instances in which the appraisal "value used by the lender [was] not supported," and the difference between Freddie Mac's HVE calculation and the lender's reported appraisal "exceed[ed] [the] 15% [variation] threshold." Ex. 336 at FHFA02475455-58. | Undisputed for purposes of this Motion, except that Defendants' Exhibit 336 at FHFA02475455-58 does not include any discussion of appraisal bias. Immaterial to any issues presented by this Motion, because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Further immaterial because the results of Single Family due diligence were not sent to the PLS business and Defendants cite no evidence to the contrary. |
| 325. | Freddie Mac's due diligence results also reflected discrepancies between the AVM home value and the loan tape. In one loan, the reviewer commented that the "subject is larger than all neighboring comps" and thus, "[a]ppraisal not great in that [appraiser] extended the distance to find comps of a similar size." Ex. 336 at FHFA02475479. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion, because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Further immaterial because the results of Single Family due diligence were not sent to the PLS business and Defendants cite no evidence to the contrary. |
| 326. | Freddie Mac was aware of these discrepancies and "waived" such loans into the pool notwithstanding their adverse effect on borrower LTV rates. Ex. 336 at FHFA02475458. For example, during its review of one particular loan, Clayton noted that the appraised value of $375,000 exceeded the audited value of $325,000 and was thus | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Further immaterial because the results of Single Family due diligence were not sent to the PLS business and Defendants cite no evidence to the contrary. |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | "overstated." *Id.* at 457-58.  As a consequence the reported LTV of 64% was "closer to 80%," well outside of originator guidelines. *Id.* at 457; *see* Ex. 166 at 559:15-560:10. | |
| 327. | A January 27, 2006 Countrywide pre-funding due diligence review of deal Freddie Mac T-Deal T-067, likewise revealed that 17.5% of the 497 loans reviewed warranted "appraisal" exceptions for deviations from Countrywide's guidelines.  Ex. 338 at FHFA04399946.  Approximately 10.6% of the loans reviewed had "unsupported" appraisal values, *Id.* at FHFA04399947, and an additional 4.2% of the loan sample population revealed "valuation issues" such as "poor comparables, incomplete analysis, and values geared to a specific LTV." *Id.* at FHFA04399943. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Further immaterial because the results of Single Family due diligence were not sent to the PLS business and Defendants cite no evidence to the contrary. |
| 328. | As described above, between 2005 and 2007, the GSEs' businesses operated both Single Family and "Capital Markets" (or "PLS") business units.  Because "the same collateral can be bought from either [the Single Family Bulk or PLS] execution path," the GSEs "need[ed] to promote a consistent view" between their Single Family and PLS businesses.  *See* Ex. 339 at FHFA00515699. | Disputed, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Further immaterial because the results of Single Family due diligence were not sent to the PLS business and Defendants cite no evidence to the contrary.  Defendants state that the "GSEs 'need[ed] to promote a consistent view  between their Single Family and PLS businesses."  Defendants only cite to one Freddie Mac document, however, and no Fannie Mae documents.  Accordingly, it is inappropriate to generalize.  Undisputed for purposes of this Motion that the Freddie Mac document, authored by Frank Vetrano and directed to Don Bisenius, states that "we need to promote a consistent view" between |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | | mortgage asset-backed securities and bulk credit analysis processes, but immaterial as it does not relate to any specific Certificate purchased by the GSEs and at issue in these Actions. |
| 329. | To facilitate a "cross-functional approach to risk management," both GSEs' Single Family and PLS businesses' credit risks functions operated on an "integrated" basis "as one business segment." *See, e.g.*, Ex. 340 at 46, 117; Ex. 341 at 3. | Disputed, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Defendants' Ex. 340 states that Fannie Mae had three business segments that worked together to "provide services, products, and solutions to our lender customers and a broad range of housing partners." Fannie Mae's corporate risk framework as stated on page 117 of Ex. 340 does not mention or indicate operating the Single Family and PLS credit risk functions on an "integrated" basis. Defendants' Ex. 341, a Freddie Mac document, is clearly intended to discuss the sources of Freddie Mac's capital generation, not to discuss the practical operations of Freddie Mac's Single Family and PLS businesses. |
| 330. | Fannie Mae instituted "corporate-wide policies for risk management" and controls to "monitor[] aggregate risks and compliance with risk policies at a corporate level." Ex. 340 at 117.  Several executives with Fannie Mae had dual responsibilities for both PLS and Single Family.  For example, Robert Levin, Fannie Mae's Chief Business Officer, oversaw aspects of both the Single Family and PLS business.  *See* Ex. 66 at 108:20-25. Similarly, Enrico Dallavecchia, the Chief Risk Officer at Fannie Mae, had "overall responsibility for credit, market, counterparty and operational risk oversight for all business units within Fannie Mae." | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |

|   | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
|   | Ex. 342 at 1. |   |
| 331. | Fannie Mae's corporate infrastructure reflected this unified approach to risk management. Fannie Mae established a Corporate Risk Management Committee ("CRMC") comprising executives from "corporate counterparty, corporate credit risk . . . [and] single family." Ex. 86 at 440:19-25.  Like the PLAT, the CRMC facilitated the exchange of information between the Single Family and PLS groups to reduce institutional risk.  As a result of a June 2006 CRMC meeting, for example, Fannie Mae personnel from both the Single Family and PLS units established "triggers" to "stop acquiring securities" or to "induce sale" of risky PLS purchases.  Ex. 343 at FHFA03334904; Ex. 86 at 44:25-45:24 ("The triggers this is referring to in terms of acquiring securities or selling them . . . . were actually put in place.") | Disputed, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Ms. Bates Moss actually testified, "[CRMC] would have been comprised of individuals at the corporate level for risk management and it includes, based on this [document], members of corporate counterparty, corporate credit risk, capital markets, multi-family, single family representation."  Defs. Ex. 86 at 440:19-25.  Disputed that the PLAT "facilitated the exchange of information between the Single Family and PLS groups to reduce institutional risk" or otherwise, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Defendants' Ex. 343 does not include a page number ending in Bates –4904.  Defendants' Ex. 86 at 44:25-45:24 does not include testimony to the effect quoted. |
| 332. | Fannie Mae's Risk Policy Committee, which also comprised personnel from both Fannie Mae's PLS and Single Family businesses, met periodically to discuss activities and concerns relating to both businesses. *See, e.g.*, Ex. 344.  As with the CRMC, there were no prohibitions on attendees' communications about general market trends affecting both businesses.  *See* Ex. 262 at 49.  Indeed, Eric Rosenblatt, the Vice President of Single Family's Credit Risk Analytics and Monitoring, | Undisputed for purposes of this Motion that Fannie Mae's Risk Policy Committee, which also comprised personnel from both Fannie Mae's PLS and Single Family businesses, met periodically to discuss activities and concerns relating to both businesses.  Disputed that Mr. Rosenblatt's testimony at 49 in Defendants' Ex. 262 indicates that "[a]s with the CRMC, there were no prohibitions on attendees' communications about general market trends affecting both businesses."  These facts are immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |

154

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | used such Committee Meetings to "talk about loan performance . . . and home prices" in the "context of single-family purchases." *See Id.* at 46:2-14. | |
| 333. | Fannie Mae's cross-functional risk management structure was not unique to its executive committees. Like its high-ranking committees, Fannie Mae's counterparty risk divisions used information gleaned from Single Family assessments to inform its PLS purchase decisions. For example, Fannie Mae's Single Family Counterparty Credit Risk Management Group, which performed reviews of originators that originated both whole loans purchased by Fannie Mae's Single Family group and loans securitized and sold as PLS, could use information from its prior Single Family reviews to rate PLS counterparties for upcoming transactionsActions. Ex. 91 at 67:23-68:4. | Disputed that Defendants' Ex. 91 supports any of the foregoing statements, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Defendants' Ex. 91 is a one-page document (titled "Non-Traditional Lending Group Checklist of Lender Requested Items") not setting forth any testimony or pertaining to the topics discussed.  Otherwise undisputed for purposes of this Motion that Fannie Mae had various high-level, executive committees that had access to both Single Family and PLS information. |
| 334. | The results of SF CPRM's operational reviews were transmitted to both Single Family and PLS personnel. *See* Ex. 66 at 227:25 - 228 ("Well, there was a group that reviewed originators including both for the purchase of whole loans from the originators, and for the purchase of loans within PLS.  A: Yes.  I remember the existence of such an effort."). | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Further immaterial because Fannie Mae's PLS traders did not receive SF CPRM's operational reviews, but rather relied on a list of approved counterparties that was circulated by SF CPRM.  FHFA Ex. 255 (J. Norris Dep. Tr.) at 342:17-343:15. |
| 335. | Fannie Mae's Senior Vice President of Capital Markets Mortgage Assets, Ramon de Castro, was responsible for | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by |

155

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | "[e]nsur[ing] that no transactions are committed to with entities not designated on the list of all approved issuers, originators, master servicers, and servicers maintained by SF Counterparty Risk Management group." *See* Ex. 181; Ex. 345 at FHFA11851052. To ensure compliance, under Fannie Mae's corporate policy Mr. de Castro was to "[c]reate a summary report of each transaction and share it with the SVP – Capital Markets Mortgage Assets, the SVP – Capital Markets Strategy, and the VP – SF Counterparty Risk Management, or designees." *Id.* | the GSEs and at issue in these Actions. |
| 336. | Fannie Mae's Single Family Risk Officer, Pam Johnson, informed the PLS business units of material changes to counterparty approval status by "[p]rovid[ing] an approval memo to Capital Markets Structured Transactions that details any changes or additions to be negotiated with the issuers and required for Fannie Mae to provide its guaranty." Ex. 345 at FHFA11851054. Lesia Bates Moss testified that her role within Single Family was, in part, to "raise, or to report on the current financial and operational state of that particular counterparty" to the PLS business units. Ex. 86 at 738:7-14. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 337. | Fannie Mae's legal department received loan level anti-predatory lending reports on both Single Family purchases and on PLS bonds backed by subprime collateral. John Ingram, associate general counsel at Fannie Mae, | The first sentence of Defendants' ¶ 94 cites no evidence that FHFA could dispute or agree is undisputed, and may not be credited as such. *See* L.R. 56.1(d). Undisputed for purposes of this Motion, but immaterial to the issues before the Court, that Mr. Ingram testified as quoted by Defendants (notwithstanding their |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | testified that "if [the reviews revealed] a trend . . . with a particular originator . . . we would let the trading desk know that we don't want to see any more deals with that originator because of the trend." Ex. 103 at 60:24-61:5. | alteration), but the testimony in context demonstrates that Mr. Ingram was referring to predatory lending trends, not credit trends: 16 "Q. Did you ever render any business advice to the traders on private label securities? …. I don't know what that means. I mean, I viewed our function as a legal function that we were performing.  If there was a -- if there was a trend that we saw with a particular originator, we might let … the trading desk know that we don't want to see any more deals with that originator because of the trend.  That may have happened."  Defs. Ex. 103 at 60:16-61:5. Finally, Mr. Ingram's cited testimony is not specific as to time period, and thus is not relevant to Fannie Mae's pre-purchase knowledge.  Further immaterial because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 338. | As shown *supra* ¶ 123, to oversee enterprise risk, Fannie Mae created the PLAT from a cross-section of Single Family and PLS personnel "to manage and govern the risks associated with private label securities." Ex. 346 at FHFA05345278. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 339. | As Ms.  Bates Moss, Fannie Mae's Vice President of Single Family Counterparty Risk Management, testified: "There was representation [on PLAT] from single family counterparty credit risk . . . capital markets counterparty credit risk, capital markets strategy, [and] mortgage assets." Ex. 86 at 52:21-25.  PLAT was "a forum for parties that were involved in the purchase or the monitoring and review of PLS to come together and discuss trends [and] issues" in the RMBS | Undisputed for purposes of this Motion that Ms. Bates Moss' testimony includes the quoted text, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |

|  | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
|  | marketplace. *Id.* at 52:13-17. |  |
| 340. | Ms.  Bates Moss conveyed to the PLAT "financial" and "credit" concerns surrounding counterparties with which both Single Family and PLS transacted business. Ex. 86 at 54:23-55:1.  As "high and increasing defaults and delinquencies" began to plague the mortgage market in the fall of 2006, Fannie Mae instituted, at the direction of PLAT members, a "weekly call between single family and the [PLS] surveillance team" to "track action items jointly." *See* Ex. 347 at FHFA13870376; Ex. 86 at 522:13-17 (Q: And were these weekly calls instituted? A: I recall there being ongoing communications between our [Single Family] group and PLS, yes."). | Disputed that as to the first assertion, that Ms. Bates Moss so testified or that Ex. 347 reads as asserted, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Ms. Bates Moss actually testified that "financial and credit concerns" would be recorded on Fannie Mae's "watch lists," and that "material concerns or issues with counterparties" would be reported to the PLAT. She was not asked, and accordingly did not, define what "material concerns or issues" would consist of.  *See* Defs. Ex. 86 at 54:23-55:9.  In addition, Defendants' Ex. 347 states that "Lesia" (not general PLAT members) "wants to start having a weekly call…." |
| 341. | Counterparty trends discussed at PLAT were, in turn, shared with PLS traders.  David Cook, the Director of Financial Engineering at Fannie Mae, testified that the PLAT was designed to give PLS traders, some of whom attended PLAT meetings, "certain information, such as the Single-Family's judgment and opinion on whether certain counterparties were counterparties that the [PLS] traders should be doing business with." Ex. 122 at 195:21¬25. Indeed, PLS traders were "always represent[ed]" on the PLAT, attended team meetings, and were copied on the minutes circulated after every PLAT meeting. Ex. 122 at 60:20-61:10 ("We always took | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Further immaterial because Fannie Mae's PLS traders did not receive SF CPRM's operational reviews, but rather relied on a list of approved counterparties that was circulated by SF CPRM.  FHFA Ex. 255 (J. Norris Dep. Tr.) at 342:17-343:15. |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | minutes at the PLAT, so to the extent that somebody in the PLAT meeting wanted to note guidance, it would have been written down. . . . Q: Were the PLAT minutes communicated to the traders? A: Yes.  They were copied on the minutes."). | |
| 342. | Counterparty concerns communicated during PLAT meetings informed traders' PLS purchase decisions.  For example, during a February 8, 2007 PLAT meeting, Single Family participants advised the PLAT that it had "downgraded Fremont to continue with caution status based on the fact that they have been put on negative watch by the rating agencies." Ex. 348 at FHFA00775246.  Ms.  Bates Moss testified that downgrades by the Single Family business could affect the PLS unit's decision to purchase bonds containing Fremont's loans. Ex. 86 at 592:25-593:6. | Undisputed that the quoted text corresponds to minutes from a February 8, 2007 PLAT meeting and that Ms. Bates Moss testified as represented, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  However, the evidence cited does not support the purported fact.  At the cited portion of Ms. Bates Moss' testimony in Defendants' Ex. 86, she actually testified that "an originator being placed on negative watch by a rating agency" could "have an impact" on whether "Fannie Mae would purchase PLS containing that originator's loans."  Defs. Ex. 86 at 592:25-593:6. |
| 343. | Fannie Mae's counterparty review personnel also shared reporting lines with employees such as Karen Pallotta and Laurel Davis, who worked on Fannie's "flow" purchases of Alt-A loans from the originators.  Ex. 360; Ex. 287 at 115:13-119:17; Ex. 361 at 55:12-56:18; 59:19, 83:7-84:24. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 344. | Like Fannie Mae, Freddie Mac recognized the benefit of a centralized credit risk structure that accounted for both PLS and Single Family risks.  As a result, Freddie Mac vested certain of its executives | The first sentence of Defendants' ¶ 344 cites no evidence that FHFA could dispute or agree is undisputed, and may not be credited as such. *See* L.R. 56.1(d).  The second sentence misstates Mr. Syron's deposition testimony. He actually testified: "Q. Was there some way |

| **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|
| with oversight responsibilities for both groups. *See* Ex. 74 at 213:2-8 (citing the "benefit[] from [PLS officials] reporting to the same person that the single family business reported to"). Raymond Romano, Freddie Mac's Credit Risk Officer, testified that there was no prohibition on information sharing between Freddie Mac's Single Family and PLS risk groups. *See* Ex. 69 at 406:5-409:3. | in which the retained portfolio benefited from reporting to the same person that the single family business reported to? MR. COREY: Objection, form. A. To the extent that person was a strong leader, yes. Q. Were the retained portfolio and single family businesses able to share information about market trends and things like that? MR. COREY: Objection, form. A. They could share, they could share general opinions. Q. General opinions about what? A. The housing market." Ex. 74 at 213:2-17. Undisputed for purposes of this Motion that Mr. Romano generally testified as indicated, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 345. | Mr. Romano, for example, oversaw Freddie Mac's Single Family and PLS businesses. Ex. 69 at 71:22-72:5 ("There were multiple business lines for [Freddie Mac], single-family business, multi-family business, investments and capital markets activities for the company. Q: And you – in your position you had oversight responsibility for all three of those? A: Yes."). Similarly, Melissa Crabtree oversaw both the Single Family and PLS facets of the Counterparty Credit Risk Management Group. *See* Ex. 173 at 37:23-38:4. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 346. | Freddie Mac held "[p]eriodic" "counterparty forum" meetings between "all critical parties involved in the MABS counterparty management process" including representatives from "CCRM, portfolio management, Structured Credit, AMO and Single Family | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | Credit Management." Ex. 172 at FHFA11950453. The forums were regarded as "extremely useful in terms of sharing information, such as operational review findings and current events, and also for conveying business area priorities in terms of counterparty activities and review requests." *Id.* Significantly, information gleaned from these meetings could "aid CCRM in reviewing a rating of a counterparty." *Id.* | |
| 347. | In 2007, Freddie Mac created a Subprime Business Steering Committee to manage the risks associated with untested mortgage products. The committee comprised executives from, among others, Freddie Mac's Single Family Sourcing and PLS groups, Ex. 349; Ex. 73 at 695:15-22; 696:8-15 ("[Y]ou had the single-family sourcing group with Paul Mullings, Tricia McClung. You had the investment portfolio with Gary Kain and Peter Federico. You had . . . the risk oversight group with Ray Romano, the operational reviews with Michael Wade."). Donald Bisenius testified that this cross-functional team "added value" to Freddie Mac's initiative and further, that he was unaware of any information walls limiting the scope of information shared with, or discussed by, the committee." Ex. 73 at 696:17-697:7. Freddie Mac required PLS and Single Family employees to meet periodically and "share[] information, such as operational review findings and current events" | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |

| | Defendants' Statement of Material Facts | FHFA's Response |
|---|---|---|
| | that could affect Freddie's PLS credit risk.  Ex. 172 at FHFA11950453. | |
| 348. | Freddie Mac's counterparty review teams also could exchange information regarding Originators' underwriting, quality control, and origination procedures.  Stacey Kenneweg, a director in Freddie Mac's Counterparty Credit Risk Management Department, testified that she was not "aware of any policy that prevented sharing the[] results of [Single Family-created originator] operational reviews with [employees involved in purchasing PLS]."  Ex. 173 at 61:4-16 (Ms. Kenneweg "[did not] believe [information sharing] violated any [Freddie Mac policy]"). | Disputed that Ms. Kenneweg testified as described.  In fact, Ms. Kenneweg testified that it did not violate a practice or procedure at Freddie Mac to share Alternative Market Operations reviews with PLS traders.  Defendants' Ex. 173 at 60:15-61:16.  Reviews conducted by Alternative Market operations were not "Single Family-created originator operational reviews."  This testimony is, however, immaterial to any issues presented by this Motion because it does not relate to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 349. | Freddie Mac's Alternative Market's Operations Department, which conducted operational reviews of PLS counterparties, could combine its annual operational reviews with the EORM department, which reviewed Single Family originators.  Ex. 93 at FHFA13306198.  Indeed, Ronald Feigles testified that "there [were] occasions on which [AMO] coordinated [its] review with EORM."  *See* Ex. 166 at 257:2-258:16.  Mr. Feigles was not aware of any policy preventing AMO and EORM from sharing the results of their operational reviews.  *See Id.* at 257:2-258:16.  The AMO team's reviews of PLS originators were sent to, among others, Donald Bisenius, who "oversaw . . . counterparty credit and single-family credit risk management." | Undisputed that Defendants' Ex. 93 is as described, that Mr. Feigles' testimony includes the text quoted in Defendants' Ex. 166, and that Exs. 351 and 352 include examples of AMO distribution lists for AMO reviews, but are immaterial to the issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Defendants' Ex. 350 is FHFA's Third Amended Initial Disclosures Pursuant to Federal Rule of Civil Procedure Rule 26(a)(1), and it is not apparent what relevance this document has to the issues presented by this Motion.  At the cited pages, Defendants' Ex. 350 lists individuals likely to have discoverable information in these Actions, which has no bearing on any issues presented by this Motion. |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | *See* Ex. 350 at 5, 6; Ex. 351 (e-mail sent to Bisenius, Crabtree, and others attaching the June 2006 AMO review of First NLC and listing the AMO assessment as "Marginal"); Ex. 352. | |
| 350. | AMO employees reported to Donald Bisenius, who also oversaw Freddie Mac's post-purchase loan level reviews of originator's "flow" channel loans.  Ex. 362; Ex. 73 at 47:13-53:19, 119:15-20. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 351. | Freddie Mac's Mortgage Investments and Structuring Group which was responsible for "[m]anag[ing] all outright purchases and sales of mortgages and mortgage-backed securities," oversaw transactions related to both "single-family whole loans" and "non-agency mortgage-backed securities."  Ex. 354 at FHFA1482084.  Gary Kain, the Vice President of Freddie Mac's Mortgage Investments and Strategy group testified about the existence of a forward agreement between Freddie Mac and Ameriquest permitting Freddie Mac to purchase Ameriquest loans either directly as whole loans, or as part of subsequent PLS Securitizations. *See* Ex. 243 at 322:9-324:8. | Undisputed for purposes of this Motion that the cited language appears in Defs. Ex. 354, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Disputed that Mr. Kain testified as described. In fact, he testified, when asked what he "generally recalled about Ameriquest," that Ameriquest was a "large subprime originator, but I do remember them having some non-subprime originations. It may have come from them or someone else, but I remember them doing some, you know, stuff that was bought by Freddie Mac somewhere else in the single-family area[,]" Defs. Ex. 243 at 323:10-23, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 352. | Although both GSEs had purported "Chinese wall[s]" restricting the transmission of loan-level information to PLS traders, those information sharing barriers applied very narrowly.  *See, e.g.*, Ex. 74 at 212:22-25. | Defendants' use of the term "very narrowly" is ambiguous, is argumentative and lacks evidentiary support.  Defendants' Ex. 74, which references Mr. Syron's deposition testimony, does not contain this term or any opinion on the narrowness or broadness of the applicability of the information barriers. Otherwise, undisputed for purposes of this |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | | Motion that the GSEs both had information walls restricting the transmission of loan-level information to certain individuals, including PLS traders. |
| 353. | Freddie Mac's Investments & Capital Markets Compliance Assessment stated that the "Information Wall Policy (7-115)" was "applicable to information affecting any of Freddie Mac's guaranteed mortgage securities," *i.e.* the Single Family business, but "[a]ll traders of the non-agency portfolio [*i.e.* the PLS business] are not designated as 'Restricted Persons' because they do not have authority to trade agency issues." *See* Ex. 355 at FHFA02350925, 926. The wall instead existed only "between the traders who actually executed the trade in the PLS organization and the traders who executed the trade in the single-family business." *See* Ex. 243 at 116:14-19. | Undisputed for purposes of this Motion that Defendants' Ex. 355 includes the cited text, or that Mr. Gary Kain testified that "to the best of [his] recollection," there was a "Chinese wall between the traders who actually executed the trade in the PLS organization and the traders who executed the trade in the single-family business." Mr. Kain did not testify, however, that this was the "only" information wall. To the contrary, Ex. 355 states that "Freddie Mac obtains affordable housing data on ABS deals from dealer/issuers with whom Freddie Mac has confidentiality agreements. These agreements and the Information Wall policy require that ABS traders do not access the affordable housing data." Defs. Ex. 355 at FHFA02350926. Freddie Mac deponents, including Michael Aneiro and David Hackney, also made clear that they were subject to information wall restrictions. *See* FHFA Ex. 265 (M. Aneiro Dep. Tr.) at 84:2-5 ("There was an information wall where there was a specific mailbox where the dealers were to send the loan tapes."); FHFA Ex. 260 (D. Hackney Dep. Tr.) at 64:25-65:1 ("I did not get loan tapes. I was not allowed to get loan tapes."). |
| 354. | Certain non-trader executives were "above" the wall. *See* Ex. 243 at 118:11-119:3. Freddie Mac's organizational charts shows that credit analysts had access to information from the Single Family business through the established reporting structure. For example, in his role as a Director of Structured Credit, Frank Vetrano reported to Don Bisenius. *See, e.g.*, Ex. 356 at FHFA0137765; Ex. 357 | Undisputed for purposes of this Motion, but immaterial to any issue presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions, that certain Freddie Mac executives were "above" Freddie Mac's information wall, that Mr. Bisenius was superior to Mr. Vetrano within the Credit Policy and Portfolio Management division of Freddie Mac's Investments and Capital Markets division, or that Mr. Bisenius had both PLS and Single Family |

|  | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
|  | FHFA01347829; Ex. 358 FHFA01377735.  Bisenius had responsibilities for both the PLS and Single Family sides of Freddie Mac's business.  *See, e.g.*, Ex. 73 at 68:24-69:17.  In fact, Mr. Vetrano testified that his work for Mr. Bisenius included evaluating credit risk for both PLS and bulk deals.  Ex. 359 at 98:5-13. | responsibilities.  Disputed that these facts demonstrate that "credit analysts" had access to information from the Single Family Business through the Freddie Mac organizational structure, an argument for which no evidentiary support is supplied.  Nevertheless, this is immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 355. | At Freddie Mac, Stacey Kenneweg testified that it was "regular practice" for the counterparty review group to send operational reviews, which often contained the results of loan-level due diligence, to PLS traders, "to ensure that [traders] were aware of any heightened risks that might be present" when making decisions as to whether or not to buy certain PLS.  Ex. 173 at 60:15-18; 61:17-62:2.  Gary Kain recalled "instances . . . where there was cooperation between . . . the single family . . . and the securities side to coordinate a bid for a pool of loans."  Ex. 243 at 112:1-13.  Specifically, Mr. Kain recalled that Freddie Mac's PLS and Single Family businesses "kind of bid together" on "option ARMs, the T-deals where the portfolio had a bid for the cash flows and . . . the guarantee."  Ex. 243 at 112:15-19.  Mr. Kain added that "there [were] points of contact within the single-family flow business with whom . . . [the PLS] group worked on those kinds of . . . cooperative agreements."  *See Id.* at 112:20-25. | Undisputed for purposes of this Motion that Ms. Kenneweg and Mr. Kain testified as described, but immaterial to any issue presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |

|  | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| 356. | In December 2006, Freddie Mac committed to purchase PLS backed by loans from the very same loan pool that the Single Family unit purchased contemporaneously as whole loans.  During the bidding process, Freddie Mac bifurcated its purchase such that "50%" of the "hybrid transaction" would be "take[n] as whole loans" and the "other 50%" Freddie Mac "would simply buy [as PLS]." *See* Ex. 369 at FHFA04594416.  With respect to the deal structure, Donna Corley stated that Freddie Mac would then "have the ability to go through the loans once they are closed and select which loans will go into which groups." *Id.* | Undisputed for purposes of this Motion that Defendants' Ex. 369 includes the quoted text. However, Ms. Corley, testifying about this precise document at her deposition on March 12, 2013, stated that "they [the PLS traders] would not have had access to any [] loan-level information" that would have allowed them to "make decisions about what loans were included in PLS securities' collateral pools." FHFA Ex. 261 (D. Corley Rule 30(b)(6) Dep. Tr.) at 277:6-25.  Regardless, the cited evidence is immaterial to any issues presented by this Motion because none relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 357. | In November 2007, Freddie Mac PLS and Single Family personnel looked into purchasing a $900 million subprime loan pool from Nationstar—which was looking to sell the pool "on a whole loan basis rather than [PLS]." *See* Ex. 363 at FHFA00534169.  Michael Aneiro wrote to Single Family team members, including Ron Feigles, that "[both Freddie Mac teams] can certainly look at the production, buy the loans we are comfortable with at the right price, and then buy the [PLS] bonds of the remaining production." *Id.* | Undisputed for purposes of this Motion that Defendants' Ex. 363 includes the quoted text, but immaterial to any issues presented by this Motion, because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Disputed that Mr. Ronald Feigles or Ms. Lauren Biehler were "Single Family personnel" or "Single Family team members," an assertion for which there is no evidentiary support, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 358. | For much of the relevant period, Fannie Mae traders also had access to loan tapes.  Fannie Mae's February 2007 "new process for the submission of pre-purchase, loan-level data tapes for Private Label Security transactions" required that | Disputed that "for much of the relevant period, Fannie Mae traders also had access to loan tapes."  This is argument without evidentiary support.  Undisputed for purposes of this Motion that Defendants' Ex. 364 includes the quoted text, with the exception of "Fannie Mae['s PLS] trading desk."  In fact, the |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | the loan tapes be sent to Fannie Mae's data warehouse but then "[a] Data Analyst will process the tape and provide results directly to Fannie Mae['s PLS] trading desk." *See* Ex. 364 at FHFA01152279-280. Fannie Mae's "subprime weekly" reports were also shared with PLS traders and contain information about subprime and Alt-A whole loan market trends. Ex. 61 at 54:19-56:14 ("Q: And did you intend [Subprime Weekly Updates] to convey information concerning whole loans, subprime and Alt-A whole loans? A: I believe we did include some commentary from time to time on the whole loan side of the market."); *see also* Ex. 365. | document states, "Fannie Mae trading desk." Defs. Ex. 364 at FHFA0115280. Nevertheless, immaterial to the issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 359. | Fannie Mae credit analysts also had access to information from the Single Family business. For example, C.J. Zhao, a Director of PLS Analytics, had previously worked on developing pricing models for the Single Family Credit guarantee business. Ex. 254 at 21:17¬24. She was also involved in assessing Single Family counterparty risk. *Id.* at 54:19-22. Lin Cao, who reported to C.J. Zhao, Ex. 277 at 38:10-17, also testified that she provided analytical support to the Single Family business. *Id.* at 41:22-25. | Undisputed for purposes of this Motion that Ms. Zhao and Ms. Cao testified as described, but immaterial to the issues presented by this Motion because "access to information," without more, cannot show Fannie Mae's pre-purchase knowledge of any misrepresentations for any deals at issue in these Actions. |
| 360. | On September 8, 2006, Fannie Mae Financial Analyst Stephen Shen sent an e-mail to members of Fannie Mae's PLS and Single Family trading teams—including Sal Mirran and Paul Norris— | Undisputed for purposes of this Motion that Ex. 366 includes the quoted text, but immaterial to any issues presented by this Motion, because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | describing a fixed rate whole loan pool to which Fannie Mae was committing.  Ex. 366.  Mr. Shen stated that "The [pool's] pricing was based on a reference pool that Merrill Lynch supplied, and we will substitute a portion of the reference pool with loans that Single Family has already chosen to maximize housing goals."  *Id.* at 303.  Regarding a future securitization, Mr. Shen stated that Fannie Mae "will be receiving . . . the final tape . . . that contained the ARM loan population, and Single Family will help Capital Markets select the loans that will go into the securization [sic]."  *Id.* | |
| 361. | In a March 2007 e-mail concerning a bid on First Franklin loans, Alvaro Ocasio in Fannie Mae's Single Family unit wrote to Milan Hickman and others that Fannie Mae was bidding on a pool of First Franklin whole loans.  Ex. 298 at FHFA00183643 ("I believe we are the only bid on this pool vs the lender's securitization route.").  After speaking with PLS trader Paul Norris, George Ashton III responded that the Single Family unit would not be purchasing the First Franklin whole loans because they were "already earmarked for a security that [Fannie Mae] purchased for April."  Ex. 292. | Undisputed for purposes of this Motion that Defendants' Ex. 298 includes the quoted text.  Disputed that "[a]fter speaking with PLS trader Paul Norris, George Ashton III responded that the Single Family unit would not be purchasing the First Franklin whole loans because they were "already earmarked for a security that [Fannie Mae] purchased for April."  Defs. Ex. 292 includes no such text, and no other evidentiary support is supplied.  Accordingly, both undisputed and disputed facts are immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 362. | In a February 2007 e-mail chain among Lesia Bates Moss, Paul Norris, Michael Shaw, and others, Ms.  Bates Moss stated that Fannie Mae's Single Family Counterparty Risk group supported purchasing | Undisputed for purposes of this Motion that Defendants' Ex. 367 includes the quoted text, but immaterial to any issues presented by this Motion because none of the cited evidence apparently relates to a specific Certificate purchased by the GSEs and at issue in these |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | PLS securities backed by Ameriquest-originated bonds "[b]ased on . . . updated information provided by Capital Markets." *See* Ex. 367 at FHFA00018742.  Mr. Shaw, Fannie Mae's Credit Risk Officer, replied to Ms. Bates Moss' e-mail, stating that he "would like to see the tape and review it with someone from single family." *Id.* at FHFA00018741. | Actions. |
| 363. | During 2005-2007, Fannie Mae required pre-purchase review and analyses of the PLS.  Fannie Mae's pre-purchase PLS policies were intended to "evaluate credit risk, counterparty risk, and operational risk on the securities that are committed to be purchased." Ex. 178 at FHFA02861745.  Fannie Mae's Private Label Securities Risk Policy (the "PLS Risk Policy") (previously known as "PLS Credit Policies, Procedures and Delegates Authorities"), governed its purchase of PLS during 2005 through 2007.  Ex. 122 at 42:9-23, 45:4-46:13; Ex. 370; Ex. 371; Ex. 372; Ex. 373.  Fannie Mae factored into its analysis the type of loan, including the level of documentation.  Through their pre-purchase analysis processes, the GSEs even selected at least some of the loans included in their SLGs. Ex. 71 at 82:19-83:10; Ex. 61 at 442-443. | Undisputed for purposes of this Motion as to all except the assertion that "[t]hrough their pre-purchase analysis processes, the GSEs even selected at least some of the loans included in their SLGs."  With regard to Fannie Mae, Defendants provide no evidence for their assertion that "[d]uring 2005-2007, Fannie Mae required pre-purchase review and analyses of the PLS" and Defendants' Exhibit 178 is dated September 30, 2006.  Fannie Mae had other pre-purchase policies during the relevant time period than those cited by Defendants, including a Non-Agency (Private Label) Desk Procedure Manual for the PLS traders.  FHFA Ex. 273 (FHFA04382865) at FHFA04382865-866.  This Manual lists as the "critical inputs for the traders' pre-purchase analysis "Bloomberg messages related to the deal[;] Deal termsheet[;] Free writing prospectus[;] TAC runs[; and] Computational materials-marketing materials[.]"  *Id.* at FHFA04382869.  In terms of "selet[ing] at least some of the loans included in their SLGs[,]" Defs. ¶ 363, Fannie Mae's traders were required to "verif[y] that each security is not an owners trust or debt interest, that the pool is conforming, that the conforming cash flows are not crossed with the non confirming group at the senior level, by referred to the prospectus and deal documentation."  *Id.* at FHFA04382870.  Undisputed for purposes of |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | | this Motion that Fannie Mae's "Private Label Securities Risk Policy (the "PLS Risk Policy") (previously known as "PLS Credit Policies, Procedures and Delegates Authorities"), governed its purchase of PLS during 2005 through 2007."  With regard to Freddie Mac, Mr. Aneiro's excerpted testimony in Ex. 71 should be read in conjunction with Rule 30(b)(6) testimony provided by Ms. Donna Corley, who clarified the process for Freddie Mac's "selection" of loans to be included in its SLGs.  *See generally* FHFA Ex. 261 (D. Corley Rule 30(b)(6) Dep. Tr.) at 324:22-327:23 (explaining there were sometimes "best efforts stips" were made on trades, under which dealers would try to include as many housing goal-qualifying loans as possible, and that Freddie Mac's Mission group would provide lists of accretive loans to dealers to facilitate these efforts). |
| 364. | For example, Fannie Mae's Deal Analysis Sheet of GSAMP 2006-HE7 assigned a "default frequency" of 1 to full documentation loans, but a default frequency of 1.7 and 1.5, respectively, to stated documentation and limited documentation loans.  Ex. 374.  According to Fannie Mae PLS trader Shayan Salahuddin, this was because "a stated documentation loan is a loan that has less information attached to it and therefore, more variability in the type of information that could conceivably be true about a particular loan."  Ex. 61 at 643:24-644:5. | Undisputed for purposes of this Motion that Defendants' Ex. 374 indicates as described.  Disputed that Mr. Salahuddin testified that these, or these types, of default frequencies would be assigned to stated and limited documentation loans "because" a "stated documentation loan is a loan that has less information attached to it and therefore, more variability in the type of information that could conceivably be true about a particular loan[,]" Defs. Ex. 61, 643:24-644:5, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 365. | During 2005-2008, Freddie Mac policy required credit analysis on PLS purchases that included an analysis of loan-level information | Undisputed for purposes of this Motion, except that it is disputed that the exhibit supports the statement that Freddie Mac policy "required credit analysis on PLS purchases that included |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | and counterparty information. Credit analysis of PLS was conducted by Freddie Mac's Portfolio Management and Pricing ("PM&P") group, meant to provide "independent review of collateral and structure risk. Ex. 375 at FHFA11984596. The credit analysis procedures recognized the riskiness of certain types of loans, differentiating between PLS backed by subprime and Alt-A loans. Ex. 376 at FHFA00519468. The credit analysis "worksheet," required to be completed for every PLS purchased by Freddie Mac, required as inputs both the type of underlying loan and the identity of the counterparties involved. *Id.* at FHFA00519510. | an analysis of loan-level information." Freddie Mac's credit analysis process made use only of aggregated collateral characteristics, not individual loan-level information. *See, e..g.*, FHFA Ex. 284 (PM&P 101 at FHFA11625650) (stating that "AAA bond investors can access only aggregated loan disclosure. Our solution was to make aggregate data look more like loan level, emphasizing key risk overlays; we require dealers to modify their disclosure to reveal risk layering along 5 major dimensions.") Finally, Defendants' Ex. 375 does not relate to the "2005-2008" time period, having only become effective in April 2006. |
| 366. | The GSEs learned from their pre-purchase credit reviews numerous characteristics about the loan pools in which they were purchasing an interest, including underlying originators, the type of loans (particularly low- or no-documentation loans), the geographic distribution of the loans, and the LTV distribution. These reviews therefore informed the GSEs that they were purchasing certificates backed by stated income/stated asset, or no income/no asset, loans, which the GSEs knew contained certain risks. Ex. 65 at 150:24-151:17; Ex. 377 at 332:5-10; Ex. 63 at 281:23-282:2. | Undisputed for purposes of this Motion that, prior to purchase, the dealers disclosed in the offering manuals various pool characteristics, including the originators of the collateral, type of loan product, geographic distribution of the loans, and the LTV distribution of the loans. |
| 367. | Freddie Mac pre-purchase reviews focused on the presence of no or low-documentation loans. For example, the credit approval for | Undisputed for purposes of this Motion that Freddie Mac pre-purchase credit analysis reviews considered whether loans were no or low-documentation. Disputed that the Freddie |

| | Defendants' Statement of Material Facts | FHFA's Response |
|---|---|---|
| | GSAA 2007-6 notes that only 17.04% of the loans are full documentation loans. Ex. 248 at FHFA04593165; *see also* Ex. 378 FHFA00764461; Ex. 379; Ex. 380; Ex. 381; Ex. 382. | Mac credit analysis process "focused" on this characteristic, an argumentative assertion for which Defendants have provided no evidentiary support. |
| 368. | The Freddie Mac's credit approval package for the AHMA 2006-1 Certificate includes a May 18, 2006 e-mail from Steve Keleher to Kevin Palmer and David Kirk, noting that the AHMA 2006-1 Certificate "contains only 17.69% full documentation and 0.00% NINA" and "[a]bout 3.71% of the collateral has FICO's less than 640. These attributes are slightly better relative to other Option Arm deals we have seen recently." Ex. 383 at FHFA13683838. Keleher also wrote: "To mitigate some of the model risk of MTA we assumed LTV's were higher than reported to account for the potential for negative amortization" and noted the "high concentration of the deal in 79-80% CLTV range (~32%)." *Id.* The trade ticket lists AHMA 2006-1's Originator as American Home. *Id.* at FHFA13683829. Keleher's e-mail to Palmer states: "Regarding American Home as the originator and servicer, they are an approved Freddie Mac seller/servicer so we feel comfortable with the counterparty exposure." *Id.* at FHFA13683839. | Undisputed for purposes of this Motion that Defendants' Ex. 383 includes the stated text. |
| 369. | Likewise, for Fannie Mae, the deal analysis for GSAMP 2006-HE8 Certificate lists the SLG loans' Originators as NovaStar and Aames (Accredited Home Lenders). Ex | Undisputed for purposes of this Motion that Defendants' Ex. 385 contains the described text. |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | 385.  The deal analysis further indicates that 38% of the SLG loans were stated documentation loans and 5% were limited documentation loans.  *Id.* | |
| 370. | Similarly, the Fannie Mae trade ticket for the GSAMP 2006-NC2 Certificate lists the trade date as June 21, 2006 and the Fannie Mae trader for the purchase as Shayan Salahuddin.  Ex. 386 at FHFA04379054.  The included Originators for the SLG loans are American Home (AHM), Countrywide, Greenpoint, and National City (NatCity).  *Id.* at FHFA04379057.  The Certificate is listed as containing 5.07% NINA loan and 8.58% SISA loans.  *Id.* at FHFA04379058. | Undisputed for purposes of this Motion that Defendants' Ex. 386 contains the described text. |
| 371. | In a March 2007 e-mail, Fannie Mae PLS trader Paul Norris wrote to colleagues regarding a prospective purchase of New Century whole loan pools requesting that the analytics group "make some liberal assumptions with regard to CLTV, income, DTI, etc." Ex. 387 at FHFA01653384. Fannie Mae Vice President David Gussman, who received the e-mail, understood Mr. Norris was asking him to change the CLTV, income, and DTI data that had been provided by the dealer in order to see its effect on bond performance. *See* Ex. 64 at 320:7¬320:19) ("Q: And did you understand [Mr. Norris] to be asking you to vary it from the data that had been – that had been provided by the dealer? | Undisputed for purposes of this Motion that Defendants' Exs. 387 and 64 include the described text, but immaterial to the issues presented by this Motion because the cited evidence relates neither to PLS nor to a specific Certificate purchased by the GSEs and at issue in these Actions. |

|   | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
|   | A: Yes."). |   |
| 372. | One month later, Fannie Mae's Director of PLS surveillance, Kin Chung, requested that credit risk analysts develop a model to account for "'liar loans' and biased appraisals . . . to see what severity increment is needed to break a bond.  This could then be translated into an appraisal bias factor that tells us how much appraisals need to have been inflated for our bond to break."  Ex. 389 at FHFA01819578.  In a follow-up e-mail, Mr. Chung indicated that "appraisal bias in [reported risk] parameters" should be captured in the existing Fannie Mae "model" and that the Capital Markets Strategy team "would need to know how much bias is modeled in and how much more we want to include."  Ex. 390 at FHFA01643078. | Undisputed for purposes of this Motion that Defendants' Exs. 389 and 390 contain the quoted text. |
| 373. | The January 2006 PLAT meeting minutes show that one consultant suggested that Fannie "should not outsource collateral reviews; we should get the data tape and do the review ourselves.  There may be some nonconforming loans that make it through to the pools that we buy."  Ex. 284 at FHFA00137819. | Undisputed for purposes of this Motion that Defendants' Ex. 284 includes the quoted text. The word "conforming" refers to annual conforming loan limits published annually by FHFA (and its predecessor OFHEO) that apply to all conventional mortgages delivered to Fannie Mae, including general loan limits and the high-cost area loan limits, which vary by geographic location.  *See* FHFA Ex. 279 (Fannie Mae Loan Limits for Conventional Mortgages). |
| 374. | On May 17, 2006, Lesia Bates Moss and others wrote a memo to three senior Fannie Mae executives, sending a copy to Pamela Johnson, Senior Vice President and Single Family Credit Officer, Ex. 493; Ex. 288 at FHFA11843896.  The memo | Undisputed for purposes of this Motion that Ex. 288 includes the quoted text.  Defendants' Exhibit 288, which concerned "potential counterparty implications regarding the ALT-A Expansion, and specifically as Alt-A relates to *Lender Channel flow business*[,]" has nothing to do with PLS and acknowledges |

| Defendants' Statement of Material Facts | FHFA's Response |
|---|---|
| reported that "[e]fforts to mitigate the risk exposures" of "No Ratio" loans coupled with "reduced (or No Doc) type product" had "not been very effective. The 'reduced or no documentation' requirement to obtain an executed IRS 4506 form in order to process through the IRS and receive the reported income of the borrower(s) was done originally to determine which borrowers were overstating their income (misrepresentation). This has become a 'paper tiger' basically, and the inevitability of the results usually does not provide a form of evidence that would allow Fannie Mae to obtain repurchase from the lender. The 'Mortgage Industry' has virtually accepted the fact that these loan products are not a true representation of the borrower's income. The income is overstated, when stated, and difficult at best to determine the reasonableness test based on industry, job title, etc." *Id.* at FHFA11843896-897. | generally the unremarkable proposition that the "mortgage industry" viewed certain, non-Securitization specific Alt-A loans as "risky" because they might not accurately capture the borrower's income. Defs. Ex. 288 at FHFA11843896 (emphasis added). The document does not demonstrate that Fannie Mae actually knew the LTV ratios, owner-occupancy or underwriting guidelines compliance of the SLG loans were misrepresented by Defendants and is, therefore, immaterial to the issues presented by this Motion. Further immaterial because the cited evidence does not relate to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 375. Freddie Mac likewise altered dealer-provided information to compensate for appraisal bias and underestimated LTV ratios in the loans backing its PLS purchases. In an April 12, 2006 credit approval for INDX 2006-AR6, PLS trader Kevin Palmer stated that "[t]o mitigate some of this risk we assumed LTVs were higher than reported to account for the potential for negative amortization. In the FICO/LTV matrices we shifted CLTV to the right." Ex. 391 at FHFA13679879. | Undisputed for purposes of this Motion that Defendants' Ex. 391 includes the quoted text. Disputed that Freddie Mac's credit analysis processes "altered" dealer-provided information to "compensate for appraisal bias and underestimated LTV ratios in the loans backing its PLS purchases." Not only do Defendants lack any evidentiary support for this assertion, but the assertion is contrary to the unambiguous testimony of two Freddie Mac deponents who worked as credit analysts. Mr. Palmer testified, "[w]e weren't making an assumption of what the actual LTVs were. We were illustrating what the performance would be if the CLTVs were different. . . . our assumption of the LTVs is that the information |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | | provided to us was accurate.  This was a process to see how the structure would perform under different LTVs."  FHFA Ex. 264 (K. Palmer Dep. Tr.) at 554:12-555:6).  Mr. Palmer classified this type of analysis as "prudent risk management."  *Id.* at 556:24-25.  Though Freddie Mac "reli[ed] on the issuers and the data that was provided," the credit analysis team "on occasion ran additional scenarios to see the strength of the structure under those scenarios."  *Id.* at 557:2-17.  Mr. Frank Vetrano, who chaired Freddie Mac's PLS credit analysis department during much of the relevant time period and oversaw Mr. Palmer, testified consistently with Mr. Palmer with regard to the significance of Freddie Mac's scenario analyses on particular deals.  When asked whether Freddie Mac assumed that disclosed LTVs were lower than actual LTVs, Mr. Vetrano replied, "Freddie Mac was pricing conservatively. . . . We didn't know.  We didn't assume.  But it was our job to be conservative in our views of the risk of an inherently, where we have not all of the data that you want to have.  So you build conservatism into your evaluation of the risks. . . ."  FHFA Ex. 262 (F. Vetrano Dep. Tr.) at 189:15-190:4.   Both undisputed and disputed facts are immaterial to the issues presented in this Motion, because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 376. | Thereafter, in advance of a May 2007 purchase of AHMAT 2006-1 1A1, a PLS bond backed by American Home collateral, Freddie Mac's modeling group "assumed LTV's were higher than reported to account for the potential of negative amortization.  In the FICO/LTV matrices, we shifted CLTV to the right.  Because of the | Undisputed for purposes of this Motion that Defendants' Ex. 383 includes the quoted text.  Mr. Palmer testified about Defendants' Ex. 383 at his deposition as follows:  "We weren't making an assumption of what the actual LTVs were.  We were illustrating what the performance would be if the CLTVs were different. . . . our assumption of the LTVs is that the information provided to us is accurate.  This was a process to see how the |

| **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|
| high concentration of the deal in the 79-80% CLTV range (~32%), we shifted this bucket two columns to the right to account for the possibility of silent seconds that are not disclosed." Ex. 383 at FHFA13683838. By "shift[ing] this bucket . . . to the right," Freddie Mac's analysts indicated that they were assuming that the actual LTV values were higher than reported and taking these assumptions into account in their credit analysis. | structure would perform under different LTVs." Ex. 264 (K. Palmer Dep. Tr.) at 554:12-555:6. Mr. Palmer classified this type of analysis as "prudent risk management." *Id.* at 556:24-25. Though Freddie Mac "reli[ed] on the issuers and the data that was provided," the credit analysis team "on occasion ran additional scenarios to see the strength of the structure under those scenarios." *Id.* at 557:2-17. Mr. Frank Vetrano, who chaired Freddie Mac's PLS credit analysis department during much of the relevant time period and oversaw Mr. Palmer, testified consistently with Mr. Palmer with regard to the significance of Freddie Mac's scenario analyses on particular deals. When asked whether Freddie Mac assumed that disclosed LTVs were lower than actual LTVs, Mr. Vetrano replied, "Freddie Mac was pricing conservatively. . . . We didn't know. We didn't assume. But it was our job to be conservative in our views of the risk of an inherently, where we have not all of the data that you want to have. So you build conservatism into your evaluation of the risks. . . ." FHFA Ex. 262 (F. Vetrano Dep. Tr.) at 189:15-190:4. None of Defendants' cited evidence tends to show that the Freddie Mac actually knew any SLGs would contain a material number of defective loans, including loans with misrepresented LTVs, or misrepresented occupancy statuses. |
| 377. | By 2004, Freddie Mac believed that "a pure reliance on external originators to police [reduced documentation loans] would likely result in future losses with a higher than average incidence of fraudulent mortgage practices." Ex. 392 at FHFA08389110. Freddie Mac also believed that "NINA mortgages . . . can be vulnerable to predatory and/or fraudulent practices," Ex. 393 at | Undisputed for purposes of this Motion that Defendants' Exs. 392, 393, 252 and 250 include the quoted text. Disputed, but immaterial to any issue of fact before the Court, that Defendants' Exs. 392, 393 and 252 demonstrate that "Freddie Mac" "believed," "recognized" or "knew" the quoted text, as Defendants' Ex. 392 was authored by Cherie Bartos and Bruce Wood for "discussion purposes only, " Defs. Ex. 392 at FHFA08389105, and Defendants' Ex. 393 was authored by Mr. Romano and directed to |

|  | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
|  | FHFA01487617-618, and recognized that NINA loans were particularly susceptible to valuation fraud, and that they "appeared to have stretched appraisal values," Ex. 394 at FMAC0013703. Freddie Mac knew that there was "a high level of appraisal inflation in affordable housing (AH) product." Ex. 252 at FHFA03703596. Specifically, the subprime loans "needed to meet subgoals and business priorities," suffered from "[m]ore inflated estimates with fewer controls," were susceptible to "pressure from originators on [home] values," and thus contained "greater bias in the numbers." Ex. 250 at FHFA02344967, FHFA02344982. | Freddie Mac's Credit Risk Sub-Committee, Defs. Ex. 393 at FHFA01487617, and Defendants' Ex. 252 was authored in part by Ms. Patti Cook. None of these documents state or indicate that they are meant to be considered as Freddie Mac's official position on any matters discussed therein, particularly Defendants' Ex. 250, which states on its face that it is a draft document. |
| 378. | As early as October 2004, Freddie Mac was aware that the subprime reduced documentation loans being originated were susceptible to appraisal fraud or bias. During a review of 100 mortgage files of reduced documentation loans purchased from Chase and Countrywide, Freddie Mac noted that "33 of the 100 loans appeared to have stretched appraisal values." *See* Ex. 394 at FMAC0013703 ("Operational Risk Management reviewed 100 mortgage files on NINA mortgages purchased from Chase and Countrywide. They selected a random sample of 50 NINA mortgages from each organization. Several observations from their review and analysis are consistent with information received from the Mortgage Insurers interviewed by Operational | Undisputed for purposes of this Motion that Defendants' Ex. 394 includes the quoted text, but immaterial to the issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | Risk Management.  Noted in their findings are several concerns that indicate that NINA mortgages may be more susceptible to questionable lending practices . . . 33 of the 100 loans appeared to have stretched appraisal values."). | |
| 379. | Donald Bisenius testified that "the valuation area was an area that I recall being a place where in the earlier programs they found some difficulties.  So that would be consistent with this idea that NINA [sic] stretched appraisals."  Ex. 73 at 273:14-24. | Undisputed for purposes of this Motion that Mr. Bisenius' testimony includes the quoted text, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 380. | Likewise, Freddie Mac knew that there was "a high level of appraisal inflation in affordable housing (AH) product."  Ex. 252 at FHFA03703596.  Specifically, the subprime loans "needed to meet subgoals and business priorities," suffered from "[m]ore inflated estimates with fewer controls," "were susceptible to pressure from originators on [home] values," and thus contained "greater bias in the numbers."  Ex. 250 at FHFA02344967. | Undisputed for purposes of this Motion that Defendants' Exs. 252 and 250 include the quoted text; disputed that these documents demonstrate Freddie Mac's knowledge. Defendants' Ex. 250 states on its face that it is a draft document, and neither exhibit purports to discuss the knowledge of Freddie Mac. Both undisputed and disputed facts are immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 381. | During the 2005 to 2007 time period, the GSEs actively sought to purchase loans that met their HUD-mandated housing goals.  The GSEs knew that their quest to purchase housing goals rich bonds came with a "tradeoff of credit risk."  Ex. 395.  Freddie Mac knew that "Higher credit risk mortgages disproportionately tend to be goal-qualifying" and further that "[t]argeted affordable lending | Undisputed for purposes of this Motion that Defendants' Exs. 395 and 396 include the quoted text.  However, Defendants' Ex. 395 is a Fannie Mae document, and is not probative of Freddie Mac's knowledge.  Defendants' Ex. 396 is dated June 4, 2009, after the relevant time period, and does not purport to relate the quoted text to the 2005 to 2007 time period. Neither Defendants' Ex. 395 nor Ex. 396 relate to a specific Certificate purchased by the GSEs and at issue in these Actions and are, therefore, immaterial.  Moreover, whether or not |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | generally requires 'accepting' substantially higher credit risk." Ex. 396 at FHFA06123086. | "Freddie Mac knew that 'higher credit risk mortgages disproportionately tend to be goal-qualifying'" or that Fannie Mae had similar knowledge is irrelevant to the issues presented in this Motion.  The GSEs purchased AAA tranches of securitizations in order to protect themselves from the potential that some collateral was defective.  *See, e.g.*, FHFA Ex. 265 (M. Aneiro Dep. Tr.) at 486:15-487:13; FHFA Ex. 248 (A. Dyson Dep. Tr.) at 245:3-13. |
| 382. | The GSEs received loan tapes from dealers like Goldman Sachs pursuant to confidentiality agreements and designated loans as accepted or rejected based on whether they met housing goals, among other reasons.  In the case of GSAA 2005-14, for example, on November 2, 2005, Goldman Sachs employee Bill Moliski e-mailed Thomas Flynn, a director at Freddie Mac responsible for HUD housing goal assessments, to provide a confidentiality agreement in anticipation of providing a loan tape for that transaction. Ex. 501 at GS FHFA 003713971.  After Freddie Mac executed the agreement ("[m]odified to last one year for any deal"), Goldman Sachs provided the tape, and Mr. Flynn responded to say "[a]ttached below are the pre-bid analysis results . . . . The first (poolloans.zip) contains the loans that meet the pooling requirements, and the second (rejects.zip) contains the loans that do not meet the pooling requirements."  *Id.*; *see also* Ex. 502 at GS FHFA 003663176; Ex. 68 at 58:16 – 59:16.  Fannie Mae similarly adjusted pools to select | Undisputed for purposes of this Motion that both GSEs received loan tapes from dealers and that these were sometimes subject to confidentiality agreements.  Both GSEs had information walls preventing PLS traders from accessing loan tapes, and required other individuals with goals-scoring responsibilities to assess loan tapes.  *See* FHFA Ex. 265 (M. Aneiro Dep. Tr.) at 84:2-5 ("There was an information wall where there was a specific mailbox where the dealers were to send the loan tapes."); FHFA Ex. 260 (D. Hackney Dep. Tr.) at 64:25-65:1 ("I did not get loan tapes.  I was not allowed to get loan tapes."); FHFA Ex. 268 (S. Pionke Rule 30(b)(6) Dep. Tr.) at 37:4-39:8 (describing his role in Business Engineering as a support function, part of which included receiving and processing loan tapes for the PLS desk); FHFA Ex. 255 (J. Norris Dep. Tr.) at 64:20-65:6 ("Then if we were interested in the deal based on price and credit, then a data tape would be sent to Fannie Mae's data warehouse, which was on the other side of the business, and that would be scrubbed of nonpublic information, because there was a firewall between us and single family. And nonpublic information would be scrubbed from, from this tape and a CDI file would be sent to us containing summarized data."); FHFA Ex. 251 (D. Cook Rule 30(b)(6) Tr.) at 195:10-18 ("Fannie Mae had an information barrier policy that traders |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | for loans that were "housing goals accretive." Fannie Mae trader Shayan Salahuddin testified that "[w]e would cut the loans that were not goal accretive and we would select loans that met our other stips." Ex. 61 at 442:11-443:14. | were not allowed to obtain information that was material, nonpublic…."); Undisputed for purposes of this Motion that Defendants' Exs. 501 and 502 are as described, and that Mr. Salahuddin's testimony includes the quoted excerpt. |
| 383. | Both GSEs monitored the performance of their PLS purchases and discovered indications that loans had not been originated to underwriting guidelines. *See infra* ¶¶ 384-411. | Defendants' ¶ 383 cites no evidence that FHFA could dispute or agree is undisputed, and may not be credited as such. *See* L.R. 56.1(d). |
| 384. | The GSEs reviewed monthly "trustee reports" (a type of "remittance report") containing loan performance information, including information reflecting delinquencies and early payment defaults ("EPDs"), which they believed were "red flags" that the loan was improperly originated. Ex. 62 at 228:1-10, 229:1-8; Ex. 68 at 378:17-379:13; Ex. 63 at 740:4-740:20; Ex. 243 at 631:18-632:10; Ex. 66 at 225:6-225:16. | Undisputed for purposes of this Motion except that none of the cited testimony discusses "red flags." This fact is immaterial to the issues presented by this Motion, however, because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 385. | For example, Freddie Mac received remittance reports in August 2006 for GSAMP 2005-HE6, which contained Fremont-originated loans. This report showed that the loan pool in that securitization had a delinquency rate of 10.64% less than a year after Freddie's December 29, 2005 purchase. Ex. 397 at 11. | Undisputed for purposes of this Motion that the report is as described, but whether Freddie Mac received this particular report is an assertion without evidentiary support. *See* L.R. 56.1(d). |
| 386. | Freddie Mac received remittance reports in August and September 2006 for other Fremont originated deals it purchased showing | Undisputed for purposes of this Motion that Defendants' Exs. 398-400 are remittance reports, but whether Freddie Mac received these particular reports is an assertion without |

|   | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
|   | similarly high delinquency rates. Exs. 398¬400. | evidentiary support.  *See* L.R. 56.1(d). |
| 387. | In addition to analyzing securitization-specific remittance reports from the deal trustees, Freddie Mac's monitoring included the following:<br><br>• **I&CM Credit Committee Packages (Non-Agency).** The January 2007 credit committee package noted that one recently purchased First Franklin securitization, FFML 2007-FF1, had "higher than average FICO for subprime and our internal model does not value the higher FICO as much as the credit agencies have done."  Ex. 401 at FHFA03502380.  Also included was Freddie's "Weakest Deals Report" which listed "any bond that based on current performance could potentially take either a principal writedown or interest shortfall," *Id.* at FHFA03502385, and a "Mortgage ABS Portfolio Report" tracking deal delinquency rates by loan type.  Ex. 402 at FHFA03502382.<br><br>• **Enterprise Risk Management Committee Reports.**  The February 2007 "Enterprise Risk Dashboard" noted that the "excesses of the subprime | Undisputed for purposes of this Motion that Defendants' Exs. 401, 402, 403, and 404 include the quoted text, but immaterial to the issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |

|  | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
|  | market are beginning to affect the financial capacity of some customers," and "[r]ecent market events resulted in our termination of Mortgage Lender's Network (MLN)." Ex. 403 at FHFA083937762.<br><br>• **Counterparty Scorecards (the "MABS scorecard and watchlist").** The August 2007 Counterparty Scorecard showed Accredited, Aegis, Ameriquest, Fremont and New Century as on watch with "[n]o reps and warrants going to these originators." Ex. 404 at FHFA02315256. |  |
| 388. | Through its monitoring of deal performance, Freddie Mac factored its post-purchase analysis into its PLS purchase decisions. Ex. 405 at FHFA04391249.  The Counterparty Credit Risk Management Group regularly assessed Freddie Mac's exposure to a particular originator and established limits on that exposure. Ex. 406 at FHFA13293081-082.  One aspect of that exposure was the "3 month average Remittance" faced by Freddie Mac for that Originator. *See, e.g.*, Ex. 407 at FHFA02132774. | Disputed, as Defendants' Ex. 405 does not support the proposed fact that "[t]hrough its monitoring of deal performance, Freddie Mac factored post-purchase analysis into its PLS purchase decisions."  Rather, it discusses how Freddie Mac projects performance for a deal it has already purchased.  Defs. Ex. 405 at FHFA04391249.  Disputed that Counterparty Credit Risk Management ("CCRM") "regularly" assessed Freddie Mac's exposure to a particular originator, as that fact is not supported by Defendants' Ex. 406.  Rather, it notes that CCRM "monitors the credit risk of all exposures."  Defs. Ex. 406 at FHFA13293081.  "For originators and servicers, CCRM [ ] monitor[ed] exposure through [a] quarterly reporting process."  Defs. Ex. 407 at FHFA02132767.  Undisputed that the sample "High Profile Counterparty Review" of New Century attached as an exhibit to the cited CCRM policy includes a box titled "3 month average Remittance." |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | | New Century's recorded "3 month average Remittance" was $0.  Defs. Ex. 407 at FHFA02132774.  These facts are immaterial to the issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 389. | In addition to receiving securitization-specific remittance reports from the deal trustees, Fannie Mae's monitoring included the following:<br><br>• **PLS Transaction "Watch Lists" Memoranda.**  The PLAT received monthly PLS "Watch List analysis" discussing the projected performance of poorly performing PLS deals.  Fannie Mae's September 2006 "Watch List analysis memo" noted that Nomura 2005-WF1 "was added to the yellow watch list because the credit support fell short to cover the assumed stressed losses," and that Fannie was "performing the stochastic cashflow analysis on this bond."  Ex. 408 at FHFA00009362.<br><br>• **PLS Transaction "Trends Analysis" Reports.**  The PLAT also received monthly transaction "trends analysis" describing Fannie Mae's recent purchases and its counterparty exposure.  The "PLS Transaction Trends Analysis report" | Undisputed for purposes of this Motion that the testimony quoted by Defendants appears in the transcripts they cite, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  To the extent it is implied by ¶ 389, FHFA disputes that Fannie Mae actually received all such reports. |

|  | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
|  | compiled for the PLAT and dated November 20, 2006 observed that "Fannie Mae did not purchase any bonds issued by Ameriquest in this quarter" and "continue[d] reducing our Ameriquest holdings with [the] sale of $0.2 billion in this quarter." Ex. 409 at FHFA00011487.<br><br>• **PLS "Credit Trends" Reports.** The PLAT was informed of PLS deal performance in a monthly "Credit Trends" report. The February 2007 "PLS Credit Trend Report" noted "deterioration of credit performance of 2005 Subprime purchases has continued," and overall "performance of . . . Fannie Mae's investments is still consistent with industry trends." Ex. 410 at FHFA00775811.<br><br>• **PLS Counterparty Approved Lists.** SF CPRM was responsible for providing the PLAT with lists of PLS counterparties reflecting each counterparty's status, recent operational reviews and other information. "PLS Counterparty Approval Report" showed: Fremont was "suspended" as the Originator "plans to sell subprime business. Entered into cease and desist order with FDIC"; New Century |  |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | was "terminated" after "a messy earnings restatement, a meeting with the SEC, an internal investigation and a criminal inquiry" were initiated; and WMC was rated "Caution" after the Originator "laid off 50% of its work force." Ex. 203 at FHFA00089409, FHFA000894411-13. | |
| | • **Quarterly Private Label Securities Updates for the Firmwide Risk Committee.** Fannie Mae's Corporate Risk Management Committee received quarterly updates on PLS, including market trends and counterparty status reports. The "market trends" section of Third Quarter 2006 "Private Label Securities Update" noted that Moody's had placed several Fremont deals on "watch" due to "the weak early performance of [the Originator's] 2005 and 2006 vintages." Ex. 411 at FHFA19050124. The same update's "counterparty trends" discussion noted "Investor Repurchases and Fraud on the Rise (based on 2Q06 company earnings," and referred to recent news about H&R Block (parent company of Option One), New Century and IndyMac. *Id.* at 136. These updates also included lists of counterparties with each | |

|  | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
|  | counterparty's current status. | |
| 390. | Fannie Mae's post-purchase reviews of other PLS transactions informed its PLS purchase decisions. Fannie Mae prepared "quarterly transaction trends" reports, "review[ed] all documents (prospectus and supporting issuance documentation) . . . and create[]d a summary report" regarding the transaction. Ex. 85 at FHFA00000905. Fannie Mae also performed "[c]omprehensive monitoring and reporting of all purchased or wrapped private label securities" on a quarterly basis. *Id.* at FHFA00000906. That monitoring was then factored into counterparty reviews that tracked the performance of deals purchased by Fannie, including outstanding repurchases and the rate of serious delinquencies. *See, e.g.*, Ex. 412 at FHFA11728579-80. | Undisputed for purposes of this Motion that Defendants' Exhibit 85, which is a copy of Fannie Mae's Private Label Securities Credit Policies, Procedures and Delegated Authorities dated July 13, 2005, contains the language quoted by Defendants, but immaterial to any issues presented by this Motion, because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. This policy was superseded by subsequent versions of the Private Label Securities Risk Policy (*see, e.g.*, Defs. Ex. 84 (PLS Risk Policy v. 1.00 (Aug. 16, 2006)) that do not contain the same description of post-purchase reviews. Defendants' Exhibit 412 at FHFA11728579-80, which is a May 2007 Fannie Mae counterparty credit review of Option One, is not connected to Exhibit 85 and does not support their statement that "[t]hat monitoring was then factored into counterparty reviews that tracked the performance of deals purchased by Fannie, including outstanding repurchases and the rate of serious delinquencies." Defendants' Exhibit 412 does discuss "the performance of deals purchased by Fannie, including outstanding repurchases and the rate of serious delinquencies." |
| 391. | EPDs are delinquencies early in the life of a loan. Ex. 122 at 316:11¬316:16; Ex. 71 at 527:18-528:9; Ex. 68 at 388:1-388:11; Ex. 413 at 193:15-195:16; Ex. 66 at 360:8-16; Ex. 166 at 195:4-196:3; Ex. 414 at 57:7-16. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 392. | Fannie Mae and Freddie Mac personnel believed EPDs were an indicator that there might be misrepresentations in the underlying loan application or in | Undisputed for purposes of this Motion that the testimony quoted by Defendants appears in the transcripts they cite, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific |

| **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|
| data provided to the investor.  Ex. 66 at 219:9–220:4; 223-24 ("[T]here may be a problem with the overall pool of mortgages that's been assembled," including that "[p]erhaps errors were made, or perhaps it goes beyond that and information was actually misstated at some point in the process" such that "the information the investor got was not an accurate reflection of the actual credit of the underlying borrowers themselves."); Ex. 69 at 565:9-566:14 (Agreeing that, "[i]n general, the earlier the serious delinquency occurs the more likely it is linked to a significant misrepresentation on the original loan application."); Ex. 99 at 188:16-188:21; Ex. 359 at 65:17-68:20 (EPDs "can be" "an indicator of manufacturing defects"; EPDs suggested that "the rules surrounding the credit box" might not have been "followed" by the originator); Ex. 414 at 55:17 ("They had an interest in identifying early indicators if there was a problem."); Ex. 414 at 57:2-6 (noting Pentalpha "suggested" to Fannie Mae's SVP of Capital Markets Strategy that Fannie Mae "monitor the amount of early payment default as a mathematical tool to see if something was not performing as expected.").  EPDs were of concern because "if a lender gave somebody money on Monday and he couldn't pay his bills on Tuesday, it would lead me to believe that the guy on Monday didn't do his job right." Ex. 414 at | Certificate purchased by the GSEs and at issue in these Actions.  Some of this testimony is not that of GSE personnel, however.  And Defendants omit relevant EPD testimony from GSE witnesses demonstrating they understood a delinquency (even if early in the life of the loan), by itself, was not conclusively indicative of underwriting defects.  *See* FHFA Ex. 260 (D. Hackney Dep. Tr.) at 391:12-19 ("An EPD is a delinquency.  So as you go to look at loans that potentially have issues that *may* have violated the guidelines, you would review loans that are delinquent.  You cannot make a statement that says you have a EPD; therefore, I know there is a violation.") (emphasis added); FHFA Ex. 259 (B. Wood Dep. Tr.) at 346: 7-12 ("Q.  Do you know whether or not EPDs indicate poor underwriting on the part of the originator?  A.  No I don't.  Not in and of itself I don't."); FHFA Ex. 257 (P. Niculescu Dep. Tr.) at 219:14-16 (testifying that EPDs could be caused, in part, because "bad things might happen to people – unemployment, death, divorce, other issues – and there may be some number of delinquencies that arise as a result of that at any point in time . . .").  The testimony of James Callahan, a Rule 30(b)(6) and fact witness from Pentalpha Surveillance (which provided surveillance consulting services to Fannie Mae during the relevant time period) whose testimony Defendants cite extensively (*see* Defs. ¶¶ 391-92l, 403), further confirms that the remittance reports the GSEs received did not provide sufficient information from which Fannie Mae could deduce the cause of EPDs or even confirm that there were EPDs.  *See* FHFA Ex. 270 (J. Callahan Dep. Tr.) at 69:21-71:20 (testifying that the remittance report for a Securitization purchased by Fannie "tells you what delinquencies are" "but it doesn't tell you any composition of those buckets as to what it means," and, consequently, means the reader is |

| | Defendants' Statement of Material Facts | FHFA's Response |
|---|---|---|
| | 138:12-17. | unable to "identify if there are EPDs."). And Defendants present no testimony as to the EPD rates for the specific securitizations at issue in this case, and whether they were rising as the GSEs purchased successive securitizations from 2005 to 2007. |
| 393. | When they observed elevated rates of EPDs for loans backing PLS that they had purchased, the GSEs "would want to understand why those borrowers were defaulting so quickly." Ex. 70 at 316:23-317:6; *see also* Ex. 68 at 393:5–394:5 (where there were EPDs, Freddie Mac would "need to do a review of those loans to determine why they defaulted."); Ex. 66 at 222:16–223:15 ("Early delinquencies should not occur at a rapid level unless something very bad happens to the mortgages or the people who have the mortgages. It's unlikely that there will be a sudden outbreak of scarlet fever or something that will cause a significant portion of the population to be unable to make their mortgage payments and become delinquent. You have to look for other causes. And there aren't very many other potential causes."). | Undisputed for purposes of this Motion that the testimony quoted by Defendants appears in the transcripts they cite, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Defendants mis-cite their Exhibit 70, an excerpt of the deposition of Patti Cook at 316:23-317:13, deploying vague speculation and surmise as fact. The testimony read in full states, "Q: Would Freddie Mac take steps to figure that out? …. THE WITNESS: I don't know what we did specifically when we observed early payment defaults." Defendants' Exhibit 68 at 393:5-394:5 also needs to be placed in proper context, as follows: "Q. (BY MR. BENNETT) And one of the reasons -- one of the possibilities that you'd be looking for is if there had been a departure from underwriting guidelines, correct? ….A. Well, an event happened. Whether it is fraud, whether it's nature, whether it's a calamity, all -- all these need to be taken under consideration. Q. (BY MR. BENNETT) Right. And so when you see a -- what they call here a steady increase in EPDs, you'd want to find out whether it had been fraud, calamity, some other factor? …. A. You would want -- you would want to do review." |
| 394. | In August 2006, Goldman Sachs warned Freddie Mac of the risk of defaults: it noted in a presentation received by Freddie Mac that "[c]ompanies [were] citing weaker underwriting and performance in the 2005 and 2006 vintages," and that there had been an "increase in | Undisputed for purposes of this Motion that the language quoted by Defendants appears in the document they cite, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Disputed insofar as the presentation was "received by Freddie Mac." |

|  | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
|  | early defaults." Ex. 415 at FHFA01009758. | Nowhere in the document or the document family is it indicated that Freddie Mac personnel received or reviewed this presentation.  Even if this had been shown, observations in the market, unrelated to any particular Certificates that Goldman Sachs or the other Defendants sold to Freddie Mac, do not warn of the risks of the specific misrepresentations alleged in these Actions, and are immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 395. | GSE personnel observed increased delinquencies and EPDs by the end of 2006, including:<br><br>• On August 25, 2006, the Fannie Mae Subprime Weekly reported that "shares in H&R Block (parent company of Option One Mortgage) dropped more than 8% today on news that they will take a $102 MM provision in Q1 for possible losses on mortgages.  Losses are due to an increase in early payment defaults on Option One originations. Investors should carefully consider how this affects their view of origination standards and quality control in the subprime sector, as Option One has long been considered one of the better originators." Ex. 416 at FHFA00031680.  The author, Fannie Mae PLS trader Shayan Salahuddin, meant that "we should look | • Undisputed for purposes of this Motion that on August 25, 2006 Fannie Mae Subprime weekly contained the quoted language, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Undisputed for purposes of this Motion that Mr. Salahuddin did in fact make the excerpted statement about Option One.  However, Mr. Salahuddin went on to say: "As I said earlier, this is just market commentary.  I would say this is not advice to anybody."  FHFA Ex. 258 (S. Salahuddin Dep. Tr.) at 76:6-14. Additionally, this statement is immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.<br><br>• Undisputed for purposes of this Motion that the "Summary of Freddie Non-Agency Portfolio and the Subprime Market" noted the relevant delinquencies, but immaterial to any |

|  | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
|  | at underwriting standards and perhaps the degree to which Option One and others might be adhering to them.  So make sure that their loans looked the way that they say they look." Ex. 61 at 75:21-76:5.<br><br>• In November 2006, a "Summary of Freddie Non-Agency Portfolio and the Subprime Market" noted "2006 60+ delinquencies ("DQ") are greater than all other vintages at comparable seasoning, including 2000 which was the worst vintage of this decade."  Further, "[e]arly payment defaults are up significantly, especially for loans with piggyback seconds."  Ex. 417 at FHFA11759111, 112.<br><br>• Fannie Mae PLS personnel observed in December 2006 that "our 2006 vintage [of PLS] is showing much faster ramping in delinquencies than previous vintages (this is not as clear from the calendar month series).  Moreover, the 2006Q2 vintage is performing significantly worse than the 2006Q1 vintage." Ex. 418 at FHFA01276393.<br><br>• A December 6, 2006 Fannie Mae PLS Update reported that "weak early | issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Undisputed for purposes of this Motion that Fannie Mae PLS personnel observed the 2006 vintage ramping in delinquencies, although importantly, this data came with a disclaimer: "Please note that we have yet to validate all the data used."  Defs. Ex. 418.  Additionally, this is immaterial to any issues presented by this Motion, because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.<br><br>• Undisputed for purposes of this Motion that a December 6, 2006 Fannie Mae PLS Update reported Fremont's performance in 2005 and 2006 as being on a watchlist for possible downgrade. The same update, though, goes on to note: "As of Q3, we had about $1.28 billion in Fremont bonds, with net exposure (after haircuts for insurance and excess subordination) of about $640 million."  Moreover, this is immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Undisputed for purposes of this Motion that a December 8, 2006 Freddie Mac memorandum reported Ownit was closing its doors.  However, the memo importantly pointed out that: "Freddie Mac has only engaged in business with Ownit through the Mortgage ABS portfolio.  They do not service any of the securities in our portfolio; therefore, we have $0 in current exposure to this counterparty." |

191

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | performance of Fremont's 2005 and 2006 vintages has caused Moody's to place on watch for possible downgrade several deals with collateral backed by Fremont originated collateral . . .  As of Q3, we had about $1.28 billion in Fremont bonds."  Ex. 419 at FHFA00011636.<br><br>• A December 8, 2006 Freddie Mac memorandum reported that Ownit had announced it was "closing their doors and ceasing operations, after warehouse lenders pulled financing on the high level of EPDs the originator has experienced."  Ex. 420 at FHFA09607176.<br><br>• The Fannie Mae PLSWI for December 15, 2006 warned that "[e]arly trends on 2006 vintage bonds raise serious concerns, with skyrocketing 60 plus delinquency rates,"  Ex. 421 at FHFA00031684.  The accompanying e-mail referred to the "changing landscape of the subprime mortgage market" and the fact that the "originator community continues to be concerned with early payment defaults," *id.*; according to the author, the changes in the subprime market were "pretty stark" as of this time, including because "[d]elinquency rates were higher."  Ex. 61 | Additionally, this is immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.<br><br>• Undisputed for purposes of this Motion that the Fannie Mae PLSWI for December 15, 2006 warned of the relevant delinquency rates, but this is immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Undisputed for purposes of this Motion that the author of the accompanying email did in fact refer to concern with early payment defaults.  However, Mr. Salahuddin could not recall specifically the basis for this statement.  Ex. 258 (S. Salahuddin Dep. Tr.) at 131:18-25.  Additionally, this is immaterial to any issues presented by this Motion, because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Undisputed for purposes of this Motion that in a December 2006 "MABS [Mortgage Asset Backed Securities] Industry Review, Freddie Mac discussed the relevant EPDs and delinquencies, although this is immaterial to any issues presented by this Motion, because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.<br><br>• Disputed that a February 2007 Fannie Mae Private Label Securities Update contains the excerpted evidence insofar as the proposition does not exist in the cited exhibit and transcripts. |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | at 127:21¬131:10.<br><br>• In a December 2006 "MABS [Mortgage Asset Backed Securities] Industry Review," Freddie Mac warned that "the combination of lower HPA and aggressive underwriting practices have begun to show up in delinquency and EPD figures.  Fitch projects 2006 vintage subprime mortgages will perform substantially worse in 2007, with cumulative lifetime losses ultimately reaching 7%, the worst collateral losses of any vintage to date.  Serious subprime delinquencies have increased almost 50% year-over-year, and the rate of bond downgrades is escalating.  Previous vintages do not appear to be performing as badly as 2006, with pre-06 vintages showing average or above average credit performance." Ex. 422 at FHFA11556724.<br><br>• A February 2007 Fannie Mae Private Label Securities Update cautioned that "60+ [EPD] delinquencies are running notably higher than those of sector 2005 and 2006 vintages" and warned readers of Fannie Mae's exposure to Fremont loans. | Additionally, the cited proposition is immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.<br><br>• Undisputed for purposes of this Motion that Timothy Judge did forward the excerpted information regarding New Century's performance to Mike Shaw. Mr. Shaw, however, responded in turn: "The loans perform worse than comparables.  However, the PLS transactions perform well and are in structured securities or credit enhanced by a AAA guarantor ($26 million out of $35 million)." Defs. Ex. 424. Additionally, this information is immaterial to any issues before this Court because the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.<br><br>• Undisputed for purposes of this Motion that a July 25, 2007 e-mail chain between Caijiao ("C.J.") Zhao, David Gussman, Francisco Gonzalez-Rey, and Lin Cao (Fannie Mae) discussed analyses for an SAST deal and the accompanying issues, but immaterial to any issues before this Court because the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Disputed that Ms. Cao's accompanying testimony reflected acknowledgment of appraisal bias with New Century insofar as the proposition does not exist in the cited exhibit.  Additionally, the testimony of several Fannie Mae witnesses who conducted PLS pre-purchase credit analysis testified that Fannie Mae's PLS business *did not* consider appraisal |

| Defendants' Statement of Material Facts | FHFA's Response |
|---|---|
| Ex. 423 at FHFA00015037.<br><br>• Timothy Judge, the Director of Fannie Mae's Credit Risk Oversight group, forwarded Mike Shaw information regarding the PLS exposure to New Century and New Century's performance on February 9, 2007, stating that that "New Century performs worse than comparables." Ex. 424 at FHFA01129754.<br><br>• A July 25, 2007 e-mail chain between CJ Zhao, David Gussman, Francisco Gonzalez-Rey, and Lin Cao (Fannie) discussed analyses for an SAST deal, and Zhao said that "the properties are on average about 10% overvalued in this deal" and that "appraisal bias is a big deal in terms of impact on our bond analysis." Zhao noted that Andre Gao's team's recent conclusion was that "New Century loans have very significant appraisal bias." Ex. 425 at FHFA00076738-739. Lin Cao later testified that the recipients of that e-mail were "very definitely" informed that New Century loans had very significant appraisal bias. Ex. 277 at 752:11-16. | bias in connection with that analysis. *See* FHFA Ex. 249 (C. Zhao Dep. Tr.) at 208:22-209:13; FHFA Ex. 252 (D. Gussmann Dep. Tr.) at 191:13-19; 219:7-12; 249:10-19. Ms. Zhao testified that she was not in the distribution list for Lender Valuation Bias Reports during the relevant time period. *Id.* at 202:16-203:4. |
| 396. | Shayan Salahuddin, a Fannie Mae PLS trader, testified that, by the end of 2006, there was an "increase | Disputed that Mr. Salahuddin testified regarding an "increase in defaults in deals in general" that was of "serious concern" insofar |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | in defaults in deals in general" that was "of serious concern" to GSE personnel.  Ex. 421 at FHFA00031684; Ex. 61 at 128:6-129:11.  Daniel Mudd, Fannie Mae CEO, described early defaults as a "broad concern in the market."  Ex. 65 at 148:17-149:8; *see also* Ex. 426 at FHFA001867752 ("Early default has been a concern weighing on Moody's as well as investors, issuers, and originators alike."). | as the proposition does not exist in the cited exhibit, but immaterial to any issues presented by this Motion because the evidence relates only to general market information, not to a specific Certificate purchased by the GSEs and at issue in these Actions.  Undisputed for purposes of this Motion that Mr. Mudd described early defaults in the excerpted manner, although immaterial to any issues presented by this Motion. |
| 397. | Remittance reports reviewed by the GSEs showed increasing numbers of EPDs in the loans underlying the Certificates.  For example, according to the Certificates' remittance reports, by mid-2007 several of the Certificates contained more than 4% of loans that were 60 or more days delinquent on payment.  *See generally e.g.*, Ex. 427; Ex. 490; Ex. 491. | Disputed for the following reasons: (1) the cited materials, which are three remittance reports received by the GSEs in 2007, do not demonstrate that there were "increasing number of EPDs," as Defendants do not cite to any remittance reports prior to 2007 to actually demonstrate an increase, and the dates of all three remittance reports are July 25, 2007.  *See generally, e.g.*, Defs. Ex. 427; Defs. Ex. 490; Defs. Ex. 491; (2) The Supporting Loan Group ("SLG") for the GSAMP 2007-NC1 securitization was Group 1, *see* FHFA Ex. 34 (*FHFA v. Goldman, Sachs & Co., et al.*, Responses to Defendant's Sixth Set of Interrogatories) at 10, and the corresponding remittance report for the GSAMP 2007-NC1 Securitization shows that for Group 1, 2.05 % of the loans in the SLG were 60 or more days delinquent, which is less than "4 of the loans." *See* Ex. 491 at 10; (3) Defendants do not make a showing that all of the loans which were 60 or more days delinquent subsequently did in fact default, to constitute an early payment default.  This is also immaterial before the issues before the court because: (1) the GSEs purchased just one securitization at issue in this case **after** receiving the remittance reports, the GSR 2007-OA2 securitization, *see* FHFA Ex. 34 (*FHFA v. Goldman, Sachs & Co., et al.*, Responses to Defendant's Sixth Set of |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | | Interrogatories) at 12; and (2) Defendants have not made a showing that the makeup of this securitization was sufficiently similar to the securitizations for the remittance reports cited. The originators for the GSR 2007-OA2 securitization were Residential Funding and Quicken, *see* Joint Defs' 56. 1 Counterstatement at 7, and neither of these originators originated collateral in the three securitizations Defendants cite. *Id.* at 5-6; Defs. Ex. 427; Defs. Ex. 490; Defs. Ex. 491 (containing remittance reports for the GSAMP 2005-HE5, GSAMP 2006-FM1, and GSAMP 2007-NC1 securitizations, respectively). |
| 398. | In 2006 and continuing into early 2007, GSE personnel were informed of and personally observed the correlation between EPDs, fraud, and weaknesses in origination practices.  A November 2006 Fannie Mae guide to "Quality Assurance and Fraud Prevention" observed that EPDs "may highlight weaknesses in the origination process" and "may also uncover fraud schemes that are often seen with cases of early payment default." Ex. 428 at FHFA01784532. | Undisputed for purposes of this Motion that Fannie Mae did have a 2006 guide to "Quality Assurance and Fraud Prevention."  Disputed that the existence of the guide explicitly meant that "GSE personnel were informed of and personally observed the correlation between EPDs, fraud, and weaknesses in origination practices."  Additionally, this information is immaterial to any issues presented by this Motion because it is speculative and does not relate to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 399. | A January 2007 memorandum written by Freddie Mac counterparty credit risk director Melissa Crabtree reported that in 2006 "many originators expanded nonconforming product underwriting guidelines to compete." As a result, Ms. Crabtree wrote, "a significant increase in delinquencies and misrepresentation/fraud began to emerge during the first half of 2006.  As delinquencies increased, | Undisputed for purposes of this Motion that the February 2007 memorandum did report the excerpted findings, but this information is immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |

|  | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
|  | aggregators were quick to enforce [repurchase rights] even though the definition of early payment default was reportedly inconsistent. Ameriquest management disclosed credit losses of $150 million in 2006 associated with early payment default repurchases alone." Ex. 429 at FHFA01334243; *see also* Ex. 377 at 328:14-329:10 (confirming that while the memo was technically dated January 2006, it was likely mis-dated). |  |
| 400. | During the first few months of 2007, GSE personnel observed increased rates of delinquencies and EPDs in subprime and Alt-A mortgage-backed securities. For example:<br><br>• In a February 2007 earnings call, Fannie Mae's Chief Risk Officer informed investors that for subprime RMBS "[c]redit quality and performance has deteriorated rapidly and dramatically, in particular for certain segments originated in 2006. <u>Delinquencies have spiked upward to over 7% of loans backing subprime MBS and show no sign of moderating. Early []payment defaults have risen significantly over the past four years, reaching over 5.5% of loans backing the subprime MBSs for the 2006</u> vintage." Ex. 431 at 4.<br><br>• Freddie Mac's Senior Vice- | Undisputed for purposes of this Motion that in a February 2007 earnings call, Fannie Mae's Chief Risk Officer did inform investors regarding RMBS credit quality deteriorating rapidly and dramatically, and undisputed for purposes of this Motion that Gary Kain did observe in a February 2007 memorandum the performance of more recent originations as being a point of concern. However, this is immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | President for Mortgage Investments and Structuring, Gary Kain, observed in a February 2007 memorandum that the "immediate problem" with the subprime market was "the performance of more recent originations." "More specifically," he reported, "early-payment defaults or EPDs (when loans become delinquent within the first three months) have picked up materially to around 4 – 5% of total originations. Some lenders have had EPDs approaching 10%." Ex. 432 at BLK01534, BLK01535. | |
| 401. | In Spring 2007, the GSEs observed further deterioration in the performance of their PLS holdings:<br><br>• A March 5, 2007 Fannie Mae PLS Weekly Intelligence newsletter reported on the "overwhelming tide of negative subprime market news." "Delinquency rates for '06 vintage loans are creeping higher, and are being reported at 3-4 times above their 2005 counterparts. Combined with waning home price appreciation, delinquency and foreclosure rates for this vintage are expected to be the worst ever recorded for both Alt-A and subprime originations." Ex. | • Undisputed for purposes of this Motion that a March 5, 2007 Fannie Mae PLS Weekly Intelligence newsletter did report the relevant delinquency rates. The newsletter, however, also noted that: "However, tightening of underwriting guidelines should lend stability to both sectors in 2007." Defs. Ex. 433 at FHFA00007457. Additionally, this information is immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.<br><br>• Undisputed for purposes of this Motion that a March 9, 2007 Fannie Mae PLS Credit Trend Report reported that collateral performance being weaker than the market average in 2004 and 2005. The report also noted, though, that "Fannie Mae 2003 Subprime |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | 433 at FHFA00007457-458. | continuously outperforms the market." Defs. Ex. 434 at FHFA01320652. Additionally, this information is immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| | • A March 9, 2007 Fannie Mae PLS Credit Trend Report reported that "Fannie Mae 2004 and 2005 Subprime investments show weaker collateral performance compared to the Subprime market average." Ex. 434 at FHFA01320652. | |
| | • In April 2007, Peter Niculescu and Tom Lund presented a "Subprime Market Update" to a committee of Fannie Mae's Board of Directors. Ex. 435 at FHFA01253169, FHFA01253179. The presentation indicated that "investor appetite and aggressive underwriting guidelines in 2006 fueled subprime loan growth," and that a "[s]low down in home price appreciation and interest rate resets exposed poor underwriting," leading to a "market dislocation [] in the subprime segment." *Id.* at 180. | • Undisputed for purposes of this Motion that Mr. Niculescu did present a "Subprime Market Update" in April 2007 to a committee of Fannie Mae's Board of Directors, but the accompanying information is immaterial to any issues presented by this Motion.

• Undisputed for purposes of this Motion that a April 9, 2007 Fannie Mae PLS Credit Trend Report did in fact report as noted on the cumulative loss rate. The report did also note, however, that "Fannie Mae 2003 Subprime deals still demonstrate the best credit performance, and they continuously outperform the market in term of the 60 + day delinquency rate and cumulative loss rate." Defs. Ex. 436 at FHFA00775839. Additionally, this information is immaterial to any issues presented by this Motion. |
| | • An April 9, 2007 Fannie Mae PLS Credit Trend Report reported that "the cumulative loss rates are higher than the Subprime market average for both Fannie Mae 2004 and 2005 investments. The deterioration of credit performance of 2005 | • Undisputed for purposes of this Motion that a May 8, 2007 Fannie Mae PLS Credit Trend Report did make the relevant findings regarding Fannie Mae's subprime portfolio. The report went on to note, though: "Fannie Mae 2003 Subprime deals continue to outperform the market in terms of the 60 + day delinquency rate and cumulative loss rate." Defs. Ex. 436 at FHFA00775839. Additionally, this |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | Subprime purchase continues. Fannie Mae 2006 Subprime investments show weaker collateral performance compared to the market average." Ex. 436 at FHFA00775839. Appended to this report were graphs highlighting, among other things, the "60+ Delinquency Rate by Seasoning" of Fannie Mae's PLS portfolio. *Id.* at 844-847.<br><br>• A May 8, 2007 Fannie Mae PLS Credit Trend Report reiterated that "Fannie Mae 2005 and 2006 Subprime investments show weaker collateral performance compared to the market average." Ex. 437 at FHFA01150181. The report added that "[t]he trends diverge further as deals get seasoned for 2006 vintage." *Id.* at FHFA01150181. | information is immaterial to any issues presented by this Motion. |
| 402. | A June 9, 2007 Fannie Mae PLS Credit Trend Report circulated within the company indicated that "Fannie Mae 2007 subprime investments are tracking the 2006 vintage in 60+ delinquency rate. Fannie Mae 2007 Alt-A acquisitions perform worse than the 2006 vintage at the same age." Ex. 438 at FHFA01203744. The report further noted: "Both Fannie Mae 2006 and 2007 investments have significantly higher Foreclosure rate and REO percentage compared | Undisputed for purposes of this Motion that a June 9, 2007 Fannie Mae PLS Credit Trend Report circulated within the company did report on Fannie Mae 2007 subprime investments as indicated, but this information is immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |

|   | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
|   | to other vintages at the same age." Further, "[t]he foreclosure trends in Fannie Mae 2007 vintage needs to be watched as well." *Id.* at FHFA01203745. |   |
| 403. | A Fannie Mae consultant warned as early as January 2006 that "a growing percentage of early payment defaults in some subprime deals" was "concerning and possibly a leading indicator that existing dealer diligence procedures regarding proper due diligence and compliance testing are insufficient." Ex. 439 at PENT-0000102; *see also* Ex. 414 at 139:14-22 ("Q. The description that you just provided of why early payment defaults were concerning, did you have such discussions with your clients about such concerns? A. Yes, I did. Q. Okay. And that would have included Fannie Mae? A. Correct."). "[T]he growing percentage of early payment defaults" was "a topic of discussion" between Pentalpha and its clients, including "Fannie Mae" "during the '05 to '07 period." Ex. 414 at 137:16-24. | Undisputed for purposes of this Motion that the testimony quoted by Defendants appears in the transcripts and documents they cite, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 404. | Pentalpha "w[as] on a monthly retainer [with Fannie Mae] to provide what effectively was research on general market trends," and informed Fannie Mae that "[t]here's a problem brewing, monitor it and understand your risk." Ex. 414 at 148:9-10, 267:25 – 268:6. In an October 26, 2006 memorandum to senior management, Fannie Mae personnel reported that EPDs were | Undisputed for purposes of this Motion that the testimony quoted by Defendants appears in the transcripts and documents they cite, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions, and is speculative at best. |

|  | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
|  | "highly correlated with mortgage fraud" and warned that EPDs may "drift higher due to sloppy underwriting and/or servicing practices." Ex. 440 at FHFA01231661.  They flagged that, according to Fannie Mae consultant Pentalpha, first payment defaults had risen more than fourfold since 2003.  *Id.* at FHFA01231661. |  |
| 405. | Pentalpha's principal, James Callahan, testified that his firm discussed with Fannie Mae the "connection drawn between EPDs and mortgage fraud" and likely also the "connection between EPDs and sloppy underwriting practices." Ex. 414 at 148:11-25; 149:2-17.  Callahan testified that "EPDs became a very frequently discussed statistic as a possible early indicator of fraud" and were "the talk of the town.  People started writing research on it and all that kind of stuff, but it was just a metric that somebody started focusing on." Ex. 414 at 236:14¬16, 237:6-11.  A January 2007 e-mail from Pentalpha's James Callahan informed Fannie Mae SVP of Capital Markets Strategy, William Quinn, that "[s]ome lenders have control problems and they are making many loans based on fraudulent rep[resentation]s by the borrower.  This is contributing to the thousands of EPDs we are seeing on some select originators.  Thousands! This is a CONTROL issue, not an underwriting issue." Ex. 441 at FHFA04380982. | Undisputed for purposes of this Motion that the testimony quoted by Defendants appears in the transcripts and documents they cite, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Defendants ignore testimony from Mr. Callahan demonstrating that Fannie Mae was unable to conclusively detect EPDs or to deduce the *cause* of EPDs based on the materials available to them. In response to Defendants' request that he confirm whether Pentalpha "recommended that Fannie Mae review the remittance reports with an eye toward identifying so-called early payment defaults[,]" Mr. Callahan testified that the remittance report at issue would *not* permit Fannie Mae to identify EPDs for that securitization.  FHFA Ex. 270 (J. Callahan Dep. Tr.) at 69:21-70:17.  Mr. Callahan further testified that Fannie Mae's ability to detect EPDs or their cause was due to "the limitation of the data that's available." *Id.* at 71:21-72:3; *see also id.* at 142:18-19 (testifying that Fannie Mae was limited in its analysis of EPDs to "publicly available information).  Accordingly, the inference Defendants attempt to draw from Mr. Callahan's testimony is speculative and necessarily fails. |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| 406. | Pentalpha informed Fannie Mae in the "late '06, early '07 time frame" that "to the extent the performance was deteriorating on PLS deals," "such deterioration" could "result at least in part from the presence of fraud loans that were contained with those PLS deals." Ex. 414 at 188:22-189:12. | Undisputed for purposes of this Motion that the testimony quoted by Defendants appears in the transcripts and documents they cite, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Defendants ignore testimony from Mr. Callahan demonstrating that Fannie Mae *did* not think there was fraud in the loans backing the Certificates they owned because they did not have the data to detect such fraud.  When asked whether he was "ever aware of any reason that Fannie Mae had to believe that, that its PLS bonds were free from unreliable statistics or credit data[,]" Mr. Callahan responded, "[t]hey couldn't get any data in which to test if there was fraud.  Public bonds had a very limited set of data that investors could get.  And that was just a market convention.  So fraud detection means that you can go out and get the data to say something doesn't smell right. You couldn't actually tie it out.  We could, Pentalpha, because we would have ability to get data that the average guy wouldn't.  So we could identify these trends and make suggestions, but if you looked actually at the data tape that an invest -- AAA investor could get five years into the deal's life, it really wasn't a whole lot of data." Ex. 270 (J. Callahan Dep. Tr.) at 222:18-223:20. Accordingly, the inference Defendants attempt to draw from the cited evidence is speculative and necessarily fails. |
| 407. | Mr. Callahan testified that "control problems" included "originators making exceptions to stated guidelines" that were designed to "analyz[e] the borrower's ability to repay." Ex. 414 at 168:7-14, 167:10-11.  In particular, "[p]eople at trading desks at originators" were using an "exemption" or | Undisputed for purposes of this Motion that the testimony quoted by Defendants appears in the transcripts and documents they cite, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Mr. Callahan testified that the GSEs did not deduce that the loans backing the Certificates were |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | "override" feature.  Ex. 414 at 168:17-19, 167:17-19.  Mr. Callahan further testified that the fact that "exceptions were growing and growing in use" "was a red flag" and "when we tied it to the EPD statistics in the following months, we started to say: is the EPD a correlation from the exceptions. . . .  The EPDs suggested that we look under the hood and we suspected that the fault under the hood was the exception control issue."  Ex. 414 at 170:3-13, 171:15-18. | defective.  *See* FHFA's Responses to ¶¶ 405-06, *supra*.  Accordingly, the inference Defendants attempt to draw from the cited evidence is speculative and necessarily fails. |
| 408. | Mr. Callahan testified that Fannie Mae "embraced what information I could provide so that they could consider what changes they may want to make internally" and said he couldn't "recall any discussion where [Fannie] effectively pushed back saying, 'Callahan, I don't know what you're talking about 'cause we're not seeing it on ours.'" Ex. 414 at 174:25-175:5, 195:9-15. | Undisputed for purposes of this Motion that the testimony quoted by Defendants appears in the transcripts and documents they cite, but immaterial to any issues presented by this Motion, because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Mr. Callahan testified that the GSEs did not deduce that the loans backing the Certificates were defective.  *See* FHFA's Responses to ¶¶ 405-06, *supra*.  Accordingly, the inference Defendants attempt to draw from the cited evidence is speculative and necessarily fails. |
| 409. | In an April 3, 2007 e-mail, Pentalpha informed Fannie Mae executives responsible for the PLS portfolio that Pentalpha's research indicated that "many of these existing pools have loans that have serious misrepresentations about the borrower's income, the value of the house and whether they own the house for investment or residency." Ex. 442 at FHFA01443222; Ex. 414 at 226:17-21 ("[T]here was fraud in many existing pools of loans that back PLS.") Fannie | Undisputed for purposes of this Motion that the testimony quoted by Defendants appears in the transcripts and documents they cite, but immaterial to any issues presented by this Motion, because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Defendants mislead the Court by neglecting to clarify that Pentalpha did not examine or provide post-purchase surveillance consulting services to Fannie Mae concerning *any* of the Securitizations at issue in these Actions.  *See* FHFA Ex. 287 (J. Callahan Dep. Ex. 44502) at FHFA00011674 (listing seven securitizations |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | Mae's consultant further advised it that "[s]ome people would call it lender fraud, others would call it borrower fraud, the result is the same. Stressed borrowers and unreliable statistics about key credit metrics." Ex. 442 at FHFA01443222; *see also* Ex. 414 at 213:19-214:12 ( "[I]n early 2007 . . . Pentalpha's research indicate[d] that at least some investors were declining to buy PLS because of fraud in the generation of the loans back[ing] those PLS," including "lender fraud," *i.e.*, "[a] representation that the loan is originated to a certain set of rules and it turns out that it's not been originated as to those rules."). | within the scope of Pentalpha's engagement with Fannie Mae, none of which is at issue in this Action); *see also* FHFA Ex. 270 (J. Callahan Dep. Tr.) at 263:16-264:20 (testifying about Exhibit 44502 and confirming that Pentalpha's securitization-specific work for Fannie Mae was limited to "seven particular securitizations"). Accordingly, the inference Defendants attempt to draw from the cited evidence is speculative and necessarily fails. |
| 410. | Pentalpha also informed Fannie Mae that "[f]or some but not all originators, 2005 and 2006 will be known as the 'stupid' vintages." Ex. 422 at FHFA01443223; *see also* Ex. 414 at 233:4-8 (identifying "originators with high EPD rates" as being "part of the stupid vintages"). With respect to the 2007 vintage of loans being placed into PLS, Callahan reported "we are not impressed," including with data provided by borrowers. Ex. 422 at FHFA01443223. "[I]nvestors are waking up to realize they cannot trust certain credit and underwriting related numbers that are available from traditional sources." Ex. 422 at FHFA01443223; *see also* Ex. 414 at 252:7-253:10. | Undisputed for purposes of this Motion that the testimony quoted by Defendants appears in the transcripts and documents they cite, but immaterial to any issues presented by this Motion, because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Mr. Callahan testified that the GSEs did not deduce that the loans backing the Certificates were defective. *See* FHFA's ¶¶ 405-06. Accordingly, the inference Defendants attempt to draw from the cited evidence is speculative and necessarily fails. |
| 411. | By early 2007, fraud "was becoming such a heightened focus" | Undisputed for purposes of this Motion that the testimony quoted by Defendants appears in |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | "that a lot of people [were] looking for the exit." Ex. 414 at 222:8-12. As Mr. Callahan testified, "[a] little bit of fraud is bad.  More fraud is like a problem.  You get a lot of fraud you just run away." Ex. 414 at 221:25-222:4.  Mr. Callahan further testified that he discussed with his clients, of which Fannie Mae was one, that "fraud is like a virus that you don't know where it's crept to.  And so as you lose confidence in the numbers, performance numbers of an existing pool, that impacts your confidence in predicting the future.  So fraud is the root of blowing confidence.  And nobody knows what it means.  In the bond – many people in the investment community don't know what it means, but they just hear the word fraud and they just run for the hills because there's been so many instances in the corporate markets that when fraud comes out, you just can't control [] you just can't make [] confident predictions of the future." Ex. 414 at 221:2-24.  By April 2007, Mr. Callahan testified, the "virus" of fraud and unreliable key credit statistics was being seen "in many different parts of the business," and "looking at that virus," an investor could "have reason to conduct further inquiries." Ex. 414 at 226:24-227:20. | the transcripts and documents they cite, but immaterial to any issues presented by this Motion, because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Mr. Callahan testified that the GSEs did not deduce that the loans backing the Certificates were defective.  *See* FHFA's ¶¶ 405-06.  Accordingly, the inference Defendants attempt to draw from the cited evidence is speculative and necessarily fails. |
| 412. | As part of their counterparty and general market monitoring, the GSEs gathered and analyzed public information about originators and mortgage industry trends during the | Undisputed for purposes of this Motion,  but immaterial to any issues presented by this Motion, because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | relevant period. | Defendants offer no support for this "fact." *See* L.R. 56.1(d). |
| 413. | Fannie Mae traders wrote "subprime weekly updates" summarizing significant news reports and developments in the subprime PLS markets, which they sent to a broad distribution list.  For example, PLS trader Ashley Dyson wrote in the November 3, 2006 edition of Fannie Mae's "Subprime Weekly," analysis, "[T]here was a sharp spike in New York sushi chefs applying for Wall Street Trader positions - listing 'previous experience putting slimy things in pretty packages.'" Ex. 365 at FHFA02953755. | Undisputed for purposes of this Motion that the testimony quoted by Defendants appears in the document they cite, but immaterial to any issues presented by this Motion, because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions, or even to specific securitizations or originators. This testimony needs to be placed in context, however.  When she was asked about this e-mail during her deposition, Ms. Dyson testified that she was "being funny" when she wrote it and that she was "making a joke, nothing more."  FHFA Ex. 248 (A. Dyson Dep. Tr.)  at 191:8-19. Moreover, Ms. Dyson's colleague and fellow PLS trader Shayan Salahuddin who also wrote Subprime Weekly emails, testified that the Subprime Weekly "was a weekly email that went out to several people at Fannie Mae *that contained some market color, commentary*[.]" FHFA Ex. 258 (S. Salahuddin Dep. Tr.) at 52:4-8.  Mr. Salahuddin further explained that information in the Subprime Weekly emails "would have come from one of a number of different sources, dealer research, conversations with our Wall Street contacts and other contact that were involved in the business, other traders, the news, Google." *Id.* at 56:6-14.  In addition, when asked whether an internal memorandum suggesting a rise in income misstatements in the market affected her decision-making, Ms. Dyson explained that, "in regard to loans that I purchased, I relied on the data that was sent to me by the Wall Street firms, which I engaged in with trades, and I assumed that the information that I received was accurate and correct."  FHFA Ex. 248 (A. Dyson Dep. Tr.) at 120:18-23. |
| 414. | A December 2005 report widely circulated within Fannie Mae | The first statement in Defendants' ¶ 414 that any such report was "widely circulated" is not |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | warned that "[m]ortgage fraud in the United States has surged," and noted that "[m]any analysts blame the loose underwriting standards of mortgage aggregators who package loans into asset-backed securities." Ex. 443 at FHFA00179831. | supported by the evidence cited. *See* L.R. 56.1(d). Undisputed that Defendants' Ex. 443 is a "Morning Commentary" document dated December 15, 2005, but there is no distribution list for the document nor do Defendants point to any evidence of who received, reviewed or created the document. Regardless, this evidence is immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 415. | An August 30, 2006 *Wall Street Journal* article titled "Mortgage Market Begins to See Cracks as Subprime-Loan Problems Emerge," identified Fremont as "among the mortgage lenders reporting declines in timely payments by subprime borrowers." Ex. 444 at FHFA00516422-23. The article went on to discuss indicators of "widespread" problems in the subprime market, including vulnerabilities to underwriting defects. *Id.* | Undisputed for purposes of this Motion that the language quoted by Defendants appears in the document they cite, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 416. | A Barclay's Sub-Prime Intelligence Report dated March 7, 2007, circulated within Fannie Mae, reported: "[T]he recent woes in sub-prime can be traced to other factors such as poor underwriting in the 2006 vintage, coupled with mortgage fraud. A study recently published by BasePoint Analytics claims that as much as 70% of EPD may be "linked to a significant misrepresentation on the original loan application. While it is very difficult to quantify the actual linkage to fraud, we agree with this assessment." Ex. 445 at | Undisputed for purposes of this Motion that a Barclays' Sub-Prime Intelligence Report dated March 7, 2007 did report on the market as excerpted. Undisputed for purposes of this Motion that early payment default information was in a February 2007 excerpt from Inside Mortgage Finance as noted, but disputed to the extent that this presentation was "circulated to Freddie Mac," which there is no evidence of on the face of the exhibit. Undisputed for purposes of this Motion that similar information was widely circulated within the GSEs regarding the subprime market in Defendants' Exhibits 447 and 448, respectively. This information is all immaterial to any issues presented by this |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | FHFA01642741.  The same information was circulated to Freddie Mac in a February 2007 excerpt from Inside Mortgage Finance, which noted that BasePoint stated that it had "'rigorously studied the issue and found a direct correlation between early payment defaults and mortgage fraud.'" Ex. 446 at FHFA18411402.  Similar information concerning problems in the subprime market were widely circulated within the GSEs.  *E.g.* Ex. 447 at FHFA12500557-58; Ex. 448 at FHFA00305248. | Motion, however, because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 417. | By February 2007, Fannie Mae's CEO, Daniel Mudd, had concluded that certain originators, including Certificate-Originators, had "abandoned" their underwriting guidelines.  Ex. 65 at 129:17-130:15.  These originators included New Century, Ameriquest, and "that whole crowd." Ex. 65 at 129:17-130:15; *see also Id.* at 166:23-168:1 (letter from the state of Minnesota noting it had uncovered fraud at Ameriquest "refreshes me that my concerns with respect to fraud—were generally in the type of operators—Ameriquest, New Century and others—that I had described to you before"); Ex. 414 at 88:3-14, 108:25-110:17 (identifying Ameriquest, Fremont, Option One, ResMae, and WMC as "subprime players" that were "vulnerable to lawsuits based on allegations similar to those made against Ameriquest"); Ex. 449 at FHFA0001112 (January 5, 2007 | Undisputed for purposes of this Motion that by February 2007, Mr. Mudd concluded that certain originators had "abandoned" their underwriting guidelines.  Notably, however, Mr. Mudd testified that he couldn't "recall the timing" regarding this particular concern.  FHFA Ex. 250 (D. Mudd Dep. Tr.) at 168: 6-11.  Undisputed for purposes of this Motion that Defendants' Exhibit 414 identified Ameriquest, Fremont, Option One, ResMae, and WMC as indicated.  Undisputed for purposes of this Motion that a January 5, 2007 Fannie Mae PLSWI reported on the subprime industry's "questionable lending practices."  Undisputed for purposes of this Motion that an October 2006 Fannie Mae email discussed that originators were pushing to increase loan volume by offering special deals.  However, all of the cited evidence is immaterial to any issues presented by this Motion because none relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Additionally, Mr. Mudd testified that he believed New Century and Ameriquest had abandoned their guidelines as of February 2007, Defs. Ex. 65 at 129:17-130:15, but Fannie Mae bought no Certificates backed by |

|  | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
|  | Fannie Mae PLSWI reported on the subprime industry's "questionable lending practices" in the form of a parody of "Twas the night before Christmas"); Ex. 450 at FHFA00072642 (October 2006 e-mail in which Fannie Mae personnel discussed the fact that originators were pushing to increase loan volume by offering special deals, noting Certificate-Originator New Century was generally reducing interest rates on two- and three-year ARMs by 50 basis points and that Fannie Mae expected that the special loans being issued by New Century and other originators would "likely perform worse from a credit perspective as these shops stretch to find borrowers."). | those Originators' loans after that time.  Also, Defendants' Ex. 450 mentions three originators:  Ownit, Sebring, and Ameriquest in January 2007, but Fannie Mae bought no Certificates backed by those originators' loans afer that time. |
| 418. | During the first three months of 2007, multiple originators of subprime and Alt-A loans announced significant losses or declared bankruptcy, in part due to their inability to meet increasing repurchase demands triggered by EPDs.  Ex. 451 at FHFA00051390; Ex. 452 at FHFA00775458; Ex. 453 at FHFA18277688; Ex. 414 at 160:16-161:5 (identifying "EPDs" as the "probabl[e]" "cause[] of the ongoing shakeout" "in the subprime mortgage industry").  In early February, Fannie Mae learned that New Century was restating its earnings, and that "[r]epurchases, which contributed to [New Century's] likely fourth-quarter loss, stem from borrowers missing initial payments, fraud or other issues[.]" Ex. 92 at | Undisputed for purposes of this Motion that Defendants' Exhibit 451 did detail originators announcing significant losses or bankruptcy in part due to their inability to meet increasing repurchase demands triggered by EPDs.  Defendants' Exhibit 451, however, but also notes that "[t]he weakness, however, has yet to affect the top portion of the capital structure as AA's and AAA's remain well bid."  Defs. Ex. 451 at FHFA00051390.  Additionally, this information is immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Undisputed for purposes of this Motion that Defendants' Exhibit 452 also detailed originators announcing losses or bankruptcy due in part to repurchase demands, but this information is immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | FHFA00857909. | Actions.  Undisputed for purposes of this Motion that Defendants' Exhibit 453 also detailed similar content, but this information is immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Undisputed for purposes of this Motion that per Defendants' Exhibit 414, Fannie Mae learned in early February that New Century was restating its earnings, but this information is immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Undisputed for purposes of this Motion that Defendants' Exhibit 92 also discusses repurchase demands based on originator losses, but this information is immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 419. | In June 2007, Fitch Ratings published a report indicating that mortgage loans that experienced delinquencies within the first 12 months of a PLS's life had an "expected lifetime liquidation rate" above 40%.  Ex. 454 at ML_FHFA16758729.  Fitch specifically associated early delinquencies with borrower misrepresentation, observing that delinquencies early in the life of a deal are correlated with higher lifetime default because "if you have early payment defaults in a transaction," "it would be a fraudulent issue," such as "the borrower had identified that they were living in the property, but they were in fact not living in the | Undisputed for purposes of this Motion that in June 2007 Fitch Ratings published a report with the relevant findings on delinquencies. Undisputed for purposes of this Motion that the accompanying testimony is as cited. However, this information is immaterial to the issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions, and Defendants' Ex. 454 was produced by Merrill Lynch, a settling Defendant, not by FHFA. |

|  | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
|  | property."  Ex. 455 at 234:5-235:1. |  |
| 420. | On July 10, 2007, Moody's downgraded 399 PLS certificates from the 2005 and 2006 vintages of PLS backed by subprime and Alt-A loans and placed an additional 32 PLS certificates on review for possible downgrade.  Ex. 456 at FHFA00118033.  The Moody's press release announcing these hundreds of PLS downgrades stated:<br><br>• Moody's "rating actions reflect rigorous review of all 2006 subprime RMBS deals," undertaken after a survey of market participants "to get their perspective on the drivers of the 2006 vintage performance and their expectations about future losses."<br><br>• "Recent data shows that the first lien subprime mortgage loans securitized in 2006 have delinquency rates that are higher than original expectations," and "were originated in an environment of aggressive underwriting."<br><br>• "Moody's has noted a persistent negative trend in severe delinquencies for first lien subprime mortgage loans securitized in 2006. For example, the 90+ day delinquency rate for loans securitized in 2006 has | Undisputed for purposes of this Motion that on July 10, 2007, Moody's downgraded 399 PLS certificates with the accompanying press release containing the excerpted content.  The report also notes: "However, losses have remained relatively low, with the May cumulative loss rate reaching only 0.30 %."  Defs. Ex. 456 at FHFA00118034.  Additionally, this evidence is immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | increased from 7.9% in March 2007 to 10.8% in May 2007." <br><br> • "Moody's analysis shows that the transactions backed by collateral originated by Fremont Investment & Loan, Long Beach Mortgage Corporation, New Century Mortgage Corporation and WMC Mortgage Corp. have been performing below the average of the 2006 vintage and represent about 60% of the rating actions taken today." | |
| 421. | Moody's held a press conference on July 12, 2007, at which it stated that "[t]hrough these months of dialogue with the market, we have also understood the trends in the collateral showing three types of weaknesses[,]" including "misrepresentations called by the industry soft fraud like occupancy or stated income and appraisal inflation."  Ex. 457 at 4. | Undisputed for purposes of this Motion that Moody's held a press conference on July 12, 2007, commenting on the market conditions as excerpted, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 422. | The July 10, 2007 S&P press release announcing the negative watch actions stated: <br><br> • "New data reveals that delinquencies and foreclosures continue to accumulate at an increasing rate for the 2006 vintage. We see poor performance of loans, early payment defaults, and increasing levels of delinquencies and | Undisputed for purposes of this Motion that the July 10, 2007 S&P Press Release did report the negative watch actions with the accompanying excerpts, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | loss." Ex. 458 at FHFA00118058. | |
| | • Poor collateral performance was "evidence of lower underwriting standards and misrepresentations in the mortgage market" and "current [reported] findings of fraud were in excess of previous industry highs." Id. at FHFA00118058. | |
| | • "Data quality concerning some of the borrower and loan characteristics provided during the rating process has also come under question." Id. at FHFA00118059. | |
| | • The unreliable data borrowers and loan originators had provided included "key risk variables that have historically influenced default patterns, such as FICO, LTV, and ownership status." Id. at FHFA00118059. | |
| | • "The loan performance associated with the data to date has been anomalous in a way that calls into question the accuracy of some of the initial data provided to us regarding the loan and borrower characteristics." Id. at FHFA00118059. | |
| | • "Reports of alleged underwriting fraud tend to | |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | grow over time, as suspected fraud incidents are detected upon investigation following a loan default." Id. at FHFA00118059.<br><br>• The downgrades resulted in part from "loosened underwriting at the time of loan origination, misrepresentation and speculative borrower behavior," and "given the level of" these phenomena "reported for the 2006 vintage, we will be increasing our review of the capabilities of lenders to minimize the potential and incidence of misrepresentation in their loan production." Id. at FHFA00118062. | |
| 423. | On August 2, 2007, less than a month after the July 10, 2007 downgrades, Moody's stated that it had increased its loss expectations for PLS because "[t]he incidence of first and early payment defaults rose markedly for 2006 vintage loans" and that "[p]art of this phenomenon may be related to borrower and appraiser misrepresentations in the origination process." Ex. 459 at JPMC_DBNTC_0005413666. | Undisputed for purposes of this Motion that on August 2, 2007, Moody's did increase its loss expectations for PLS with the excerpted justification, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 424. | Fannie Mae policy required that the loans backing PLS certificates it purchased complied with its anti-predatory lending requirements. Ex. 103 at 35:16-36:9; Ex. 460 at | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | FHFA11942305. | the GSEs and at issue in these Actions. |
| 425. | To confirm the loan pools supporting its PLS certificates complied with Fannie's anti-predatory requirements, the Legal Department required that a sample of at least 100 loans underlying each pool of subprime PLS "must receive a full credit and regulatory compliance review, and the Fannie Mae [[anti-predatory compliance] Scope." Ex. 461 at FHFA11948353. | Undisputed for purposes of this Motion that Defendants' Exhibit 461, which is a Fannie Mae Legal Department memorandum to "All Fannie Mae Approved Issuers/Underwriters" dated May 18, 2005, contains the language quoted by Defendants, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 426. | Fannie Mae also mandated that "[a]ny loans that are found [by the diligence provider] to be in breach of the Fannie Mae Reps (as evidenced by such due diligence review) must be removed from the Fannie Mae pool pre-settlement." Ex. 461 at FHFA11948353; Ex. 103 at 113:15-114:11.  The Legal Department further required that a "Fannie Mae Exception Report must be sent by the due diligence provider to the Fannie Mae Legal Department . . . 90 days after settlement so that it can validate that the loans in the Fannie Mae Pool comply with the Fannie Mae Reps," and that "[a]ny loan exceptions that remain in the Fannie Mae Pool . . . are subject to immediate repurchase." Ex. 461 at FHFA11948354; Ex. 103 at 41:17-42:9; Ex. 460 at FHFA11942305; Ex. 462 at FHFA01147838. | Undisputed for purposes of this Motion that Defendants' Exhibit 461, which is a Fannie Mae Legal Department memorandum to "All Fannie Mae Approved Issuers/Underwriters" dated May 18, 2005, contains the language quoted by Defendants, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.   The memorandum states that "[i]t is the *responsibility of the Issuer/Underwriter [of PLS]* to request the due diligence provider to perform the Fannie Mae Scope 'at the time of the initial loan level due diligence review[,]'" (emphasis added), but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Additionally immaterial because, far from demonstrating knowledge, the anti-predatory lending reviews were conducted by Defendants' third party due diligence vendors for the express purpose of ensuring loans that violated Fannie Mae's Anti-Predatory Lending Guidelines were *removed* from the pool that could ultimtalety be securitized and sold to Fannie Mae *prior to settlement*.  FHFA Ex. 254 (J. Ingram Dep. Tr.) at 43:25-44:5, 43:13- |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | | 24. |
| 427. | Between 2005 and 2007, Fannie Mae's policy required the Legal Department to obtain these exception reports for loans with predatory and compliance exceptions for all subprime PLS transactions that Fannie purchased. Ex. 461 at FHFA11948354; Ex. 103 at 50:21-24. | Undisputed for purposes of this Motion that Defendants' Exhibit 461 at FHFA11948354 states that "[t]he Fannie Mae exception report *must be sent by the due diligence provider to the Fannie Mae Legal Department…90 days after settlement* so it can validate that the loans in the Fannie Mae Pool comply with the Fannie Mae Reps" (emphasis added), but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Mr. Ingram's testimony confirms that Fannie Mae did not receive a third-party anti-predatory lending exception report for every Securitization. When asked whether it did, Mr. Ingram testified that, while that was the intent, Fannie Mae had "a hard time getting the documentation[]"; started to experience a "real delay" in obtaining the reports after settlement and often did not receive the reports, if at all, until 120 or 150 days after settlement; and "stopped chasing the documentation" in late-2006 or early-2007.  FHFA Ex. 254 (J. Ingram Dep. Tr.) at 50:14-52:19.  Also immaterial because the evidence demonstrates that Fannie Mae's PLS traders and analysts did not receive anti-predatory lending reports or the results of the Legal Department's review of them. FHFA Ex. 290 (GS FHFA 002130300) (Fannie Mae Legal Department employee confirming to Goldman Sachs that anti-predatory reviews are "not shared with our Portfolio and [are] used solely by us here in Legal to validate that there are no loans in breach [of anti-predatory guidelines]."). |
| 428. | The Legal Department relied on these exception reports—and the due diligence providers' work they reflected—to "validate" that any loans found during the diligence | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | process to violate its APL requirements had been removed from the pool. Ex. 103 at 113:3-9. For the years 2005 and 2006, Fannie Mae certified to one of its regulators, HUD, that it performed this "validation" on all of the subprime PLS transactions that it purchased. Ex. 111 at FHFA16971801-03; Ex. 463 at FHFA01148011-14. | Further immaterial because the Lergal Department's post-purchase anti-predatory lending "validation" process was limited to reviewing the exception reports generated by Defendants' due diligence vendors alone and did not compare those results to the actual loan files as the Legal Department did not have access to loan files.  As David Cook, Fannie Mae's Rule 30(b)(6) designee testified, "I want to be very clear that, to my knowledge, Fannie Mae never actually looked at loan files. Fannie Mae received due diligence reports from the vendors that talked about their looking at loan files. But Fannie Mae did not receive loan files, and that's what – that's what this bullet is talking about, is that Fannie Mae received the due diligence results from the due diligence firms and that the due diligence firms had been -- had looked at loan files and had run the screens."  FHFA Ex. 251 (D. Cook Rule 30(b)(6) Dep. Tr.) at 510:9-21; *see also id.* at 532:21-533:4 (John Ingram "told me that loan files were never provided to Fannie Mae, only due diligence reports.").  Also immaterial because the evidence demonstrates that Fannie Mae's PLS traders and analysts did not receive anti-predatory lending reports or the results of the Legal Department's review of them. FHFA Ex. 290 (GS FHFA 002130300) (Fannie Mae Legal Department employee confirming to Goldman Sachs that anti-predatory reviews are "not shared with our Portfolio and [are] used solely by us here in Legal to validate that there are no loans in breach [of anti-predatory guidelines]."). |
| 429. | Mr. Ingram testified that, to assess that borrower's ability to repay the loan, due diligence firms would "look at the loan file and . . . the documentation in the loan file," such as "the income, assets, liability data" and "calculat[e] a debt to income ratio." Ex. 103 at | Undisputed for purposes of this Motion that Mr. Ingram gave the testimony quoted by Defendants, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Fannie Mae-mandated predatory lending due diligence was not credit due |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | 65:20-67:8.  Mr. Ingram also testified that due diligence vendors assessed the "reasonableness of [a borrower's] income" to confirm the borrower's ability to pay.  Ex. 103 at 105:9-20.  Fannie Mae received detailed exception reports with the results of these reviews.  Ex. 465 at FHFA11863360. | diligence, did not involve re-underwriting the loan files, and did not verify compliance with originator underwriting guidelines.  *See* FHFA Ex. 254 (J. Ingram Dep. Tr) at 268:15-23 (John Ingram testifying that Defendants' due diligence providers "may have" looked at "certain credit characteristics of the originators or of the underlying loans as part of their diligence review…. *for the issuer when they were buying the loans*, but it wasn't part of … our [anti-predatory lending] review.") (emphasis added); *id.* at 268:24-269:9 (testifying that the Legal Department "didn't monitor[]" due diligence firms' "report[ing] out on some of th[]e credit characteristics."); *id.* at 174:7-20 (testifying that, as part of its anti-predatory lending review, Fannie Mae did "not require" that Defendants' due diligence vendor recalculate the borrower's income based on documentation in the loan file because "[i]t wasn't a Fannie Mae anti-predatory lending requirement to -- to do all these things."); FHFA Ex. 286 (FHFA16864900) (Clayton APL Review of SVHE 2006-OPT4 indicating Clayton did not check for underwriting guidelines compliance as part of anti-predatory lending review); Fannie Mae's Anti-Predatory Lending Guidelines are designed to "help protect consumers from abusive lending practices[,]"; FHFA Ex. 276 (CSR Press Release, Fannie Mae Chairman Announces New Loan Guidelines to Combat Predatory Lending Practices (Apr. 11, 2000), http://www.csrwire.com/press_releases/25741-Fannie-Mae-Chairman-Announces-New-Loan-Guidelines-to-Combat-Predatory-Lending-Practices (last visited June 9, 2014)).  Also immaterial because the Legal Department did not share the results of its anti-predatory lending reviews with Fannie Mae's PLS traders and analysts.  *See* FHFA Ex. 290  (GS FHFA 002130300) (Fannie Mae Legal |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | | Department employee confirming to Goldman Sachs that anti-predatory reviews are "not shared with our Portfolio and [are] used solely by us here in Legal to validate that there are no loans in breach [of anti-predatory guidelines]."). |
| 430. | A Fannie Mae Anti-Predatory Lending Exception Report was also generated for GSAMP 2006-FM1. Ex. 464 at GS FHFA 002666587. That report, titled by the loan pool "14631 Fremont Investment and Loan FMT-MAR302006," shows that the finance charges of 126 loans exceeded Fannie Mae's limits, 10 loans were flagged as exceptions based on the borrower's ability to pay, 10 loans were flagged as having a "material disclosure violation," four loans were missing the promissory note, three loans were flagged as having a non-compliant right of rescission notice and two loans were missing HUD-1 statements. *Id.* | Undisputed for purposes of this Motion that Defendants' Exhibit 464 contains the information cited by Defendants, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Fannie Mae purchased GSAMP 2006-FM1 on April 27, 2006, and received Ex. 464 on or about April 11, 2006. Also immaterial because the Legal Department did not share the results of its anti-predatory lending reviews with Fannie Mae's PLS traders and analysts. *See* FHFA Ex. 290 (GS FHFA 002130300) (Fannie Mae Legal Department employee confirming to Goldman Sachs that anti-predatory reviews are "not shared with our Portfolio and [are] used solely by us here in Legal to validate that there are no loans in breach [of anti-predatory guidelines]."). |
| 431. | The Fannie Mae Anti-Predatory Lending Exception Report generated for SVHE 2005-1, a deal underwritten by RBS Greenwich Capital, found 21 loans exceeded Fannie's points and fees requirements, three loans were funded before the rescission period, two loans had understated finance charges, and two loans were extended without regard to the borrower's ability to repay, among other compliance exceptions that warranted "Event Level 3" grades. Ex. 465 at FHFA11863360. | Undisputed for purposes of this Motion that Defendants' Exhibit 464 contains the information cited by Defendants, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Also immaterial because the Legal Department did not share the results of its anti-predatory lending reviews with Fannie Mae's PLS traders and analysts. *See* FHFA Ex. 290 (GS FHFA 002130300) (Fannie Mae Legal Department employee confirming to Goldman Sachs that anti-predatory reviews are "not shared with our Portfolio and [are] used solely by us here in Legal to validate that there are no |

| | Defendants' Statement of Material Facts | FHFA's Response |
|---|---|---|
| | | loans in breach [of anti-predatory guidelines].""). |
| 432. | The GSEs understood that a security's credit rating might not indicate its actual risk.  For example, Kevin Palmer, a Freddie Mac Director in the Investment and Capital Markets division who performed pre-purchase credit analyses on PLS, testified that he believed Credit Rating Agency models were "more aggressive than our risk view internally." Ex. 67 at 741:20-742:2.  Peter Niculescu testified that Fannie Mae "didn't rely upon the ratings agencies to form their views of losses, defaults and credit risk," because it had concerns about "the adequacy of the rating agency approach to rating [PLS], and . . . preferred to do [its] own analysis." Ex. 66 at 238:17-240:3; 257:13-25. | Disputed, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Mr. Palmer testified that "the rating agencies were sometimes more aggressive than our risk view internally."  Defs. Ex. 67 at 741:20-742:2.  Mr. Niculescu testified that Fannie Mae personnel "have always preferred to do their own analysis as well as looking at what the ratings agencies have done."  Defs. Ex. 66 at 238:17-240:3; 257:13-25.  The GSEs' internal policies limited their purchases of PLS to those rated AAA (or its equivalent), and in very limited instances, AA or A bonds (or their equivalent).  FHFA Ex. 283 (Fannie Mae PLS Risk Policy (June 27, 2007) at FHFA05345725, 158; FHFA Ex. 285 (Freddie Mac PM&P 100 (Mar. 23, 2006) at FHFA11984574). |
| 433. | Fannie Mae conducted its own independent analysis of credit, rather than relying exclusively on the credit ratings agencies.  Ex. 66 at 257:13-25.  For sophisticated participants in the mortgage market like the GSEs, actions by credit rating agencies were a "lagging indicator" of performance-related information already available to the market participants.  Ex. 61 at 301:13-302:6.  As Fannie Mae's Executive Vice President, Peter Niculescu, testified, "[p]rofessional investors and analysts are likely to have reached the conclusions that S&P or Moody's reached before the S&P and Moody's Actions." | Undisputed for purposes of this Motion that the language quoted by Defendants appears in Defendants' Exhibits 66 and 61, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | Ex. 66 at 382:20-382:23. | |
| 434. | Freddie Mac's Senior Vice President for Mortgage Investments & Structuring, Gary Kain, echoed this testimony: "People are more worried about something and finally four months later, the rating agency gets to it"; "delinquency trends" are the "best indicator in addition to characteristics of the loans or pools".  Ex. 243 at 623:16-627:4. As Fannie Mae's consultant described it, "[m]ost of these were activities by the rating agencies based on old news.  They were slow to [] deal with this. . . .  Q.  Is it fair to say that you believe that during that relevant time period that the rating agencies had reacted late? A.  That was my opinion at the time. Q.  Okay.  And in or around the summer of '07, was that an opinion that was frequent in the marketplace? A.  Yes." Ex. 414 at 261:23-262:2, 262:13-24.  A Freddie Mac credit analyst noted that "[t]hese announcements had been anticipated." Ex. 466 at FHFA16052257.  David Gussman of Fannie Mae wrote at the time that S&P "finally acquiesced today and put over 600 subprime bonds on negative watch." Ex. 467 at FHFA12030298.  Other Fannie Mae personnel similarly testified that this news was expected.  Ex. 254 at 448:23-449:11; Ex. 86 at 659:11-659:19. | Undisputed for purposes of this Motion that the language quoted by Defendants appears in Defendants' Exhibits 243, 414, 466, 467, 254, and 86, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  The credit agency downgrades discussed in the cited testimony did not include downgrades of the Certificates at issue. |
| 435. | Prior to and after the July 10, 2007 downgrades and placements on negative watch of hundreds of PLS certificates, GSE personnel | This assertion is argumentative and not a statement of fact.  *See* L.R. 56.1(d). |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | believed that the data provided by issuers of PLS might not be wholly accurate. | |
| 436. | A July 2006 Freddie Mac credit approval analysis authored by Mr. Palmer stated: "This deal [FHLT 2006-B, Class 1-A Certificate] has about 47% of the collateral concentrated right at 80% CLTV. We believe that the dealer is not reporting true CLTV accurately and therefore we have shifted all of this collateral into the 95+ CLTV bucket for costing purposes. When doing this, the 100th percentile moves from 19.08% to 24.83%, still within the provided CE amount." Ex. 255 at FHFA00001846. Michael Aneiro testified that this reflected a belief by several Freddie Mac employees that CLTV levels at 80% were not accurate, and contained a number of "silent seconds." Ex. 71 at 613:5-620:14. | Undisputed for purposes of this Motion that in the credit approval for the FHLT 2006-B 1-A Certificate, Kevin Palmer wrote: "This deal has about 47% of the collateral concentrated right at 80% CLTV. We believe that the dealer is not reporting true CLTV accurately and therefore we have shifted all of this collateral into the 95+ CLTV bucket for costing purposes. When doing this, the 100th percentile moves from 19.08% to 24.83%, still within the provided CE amount." Ex. 255 at FHFA00001846. Freddie Mac purchased the FHLT 2006-B 1-A from dismissed Defendant UBS. Therefore, this statement is immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Additionally, regarding this document, Mr. Palmer testified that "[t]he framework that the credit process was built on assumed accurate information provided to us." FHFA Ex. 264 (K. Palmer Dep. Tr.) at 591:3-5. An assumption is not a belief, nor is there any evidence that this assumption was rooted in fact. Disputed that Michael Aneiro testified that Mr. Palmer's credit approval for the FHLT 2006-B 1-A reflected a belief by several Freddie Mac employees that CLTV levels at 80% were not accurate and contained "silent seconds." Moreover, Mr. Aneiro confirmed that he did not "remember anything at all from [his] time at Freddie Mac about LTVs being listed right exactly at 80 percent on the nose having anything to do with the risk profile of loans." FHFA Ex. 265 (M. Aneiro Dep. Tr.) at 585:12-17. |
| 437. | Freddie Mac's personnel ultimately approved the GSEs' acquisition of | Undisputed for purposes of this Motion that Freddie Mac purchased the FHLT 2006-B 1-A from dismissed Defendant UBS. This |

| | Defendants' Statement of Material Facts | FHFA's Response |
|---|---|---|
| | this security. *Id.* | statement is immaterial to any issues presented by this Motion, however, because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 438. | One month later, in an August 21, 2006 e-mail approving Freddie Mac's purchase of PLS certificate MABS 2006-NC2 A1, Kevin Palmer wrote: "This deal contained a higher percentage of collateral right at 80% LTV, this was an indicator to us that the reported CLTV number could have been low.  We also costed this deal assuming that 100% of the collateral with LTV's between 75-80 had silent seconds to take the CLTV up to 95-100 . . . Notwithstanding the deal has CE just under 29% and is very well protected."  Ex. 468 at FHFA0002405. | Undisputed for purposes of this Motion that in the credit approval for the MABS 2006-NC2 A1 Certificate, Kevin Palmer wrote: "This deal contained a higher percentage of collateral right at 80% LTV, this was an indicator to us that the reported CLTV number could have been low.  We also costed this deal assuming that 100% of the collateral with LTV's between 75-80 had silent seconds to take the CLTV up to 95-100. . . Notwithstanding the deal has CE just under 29% and is very well protected."  Freddie Mac purchased the MABS 2006-NC2 Certificate from dismissed Defendant UBS.  Therefore, this statement is immaterial to any issues presented by this Motion, because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Additionally, Mr. Palmer testified that "[t]he framework that the credit process was built on assumed accurate information provided to us."  FHFA  Ex. 264 (K. Palmer Dep. Tr.) at 591:3-5. |
| 439. | In a March 26, 2007 e-mail, Fannie Mae PLS trader Paul Norris wrote to colleagues regarding an expected pool of loans with New Century collateral, stating: "Given these are likely the last loans made by New Century, we ask that you make some liberal assumptions with regard to CLTV, income, DTI, etc."  Ex. 387 at FHFA01653384 (emphasis added).  Fannie Mae Vice President David Gussmann received the e-mail and understood that he was being asked to change | Undisputed for purposes of this Motion that in a March 26, 2007 email, Paul Norris wrote: "Given these are likely the last loans made by New Century we ask that you make some liberal  assumptions with regard to CLTV, income, etc."  Norris wrote the email in reference to "offerings from [dismissed Defendants] UBS and Morgan Stanley."  Defs. Ex. 387 at FHFA01653384.  An assumption is not a belief, nor is there any evidence that this assumption was rooted in fact.  Undisputed for purposes of this Motion that David Gussmann agreed to the proposition that Norris asked him "to be asking you to vary it from the data that |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | the CLTV, income, and DTI data that had been provided by the dealer in order to see its effect on bond performance.  Ex. 64 at 320:7-320:19. | had been — that had been provided by the dealer."  FHFA Ex. 252 (D. Gussmann Dep. Tr.) at 320:14-320:19.  This statement is immaterial to any issues presented by this Motion, because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Mr. Gussmann further testified that he did not undertake the analysis Norris requested because "[t]he deal got killed by some other party at Fannie Mae before I had the chance to perform the analysis.  Or the traders lost interest in it."  *Id.* at 321:6-9. |
| 440. | In April 2007, Fannie Mae's Director of PLS Surveillance, Kin Chung, requested that credit risk analysts develop a model to account for "'liar loans' and biased appraisals . . . to see what severity increment is needed to break a bond.  This could then be translated into an appraisal bias factor that tells us how much appraisals need to have been inflated for our bond to break."  Ex. 390 at FHFA01643081-82.  In a follow-up e-mail, Mr. Chung indicated that "appraisal bias in [reported risk] parameters should be captured in the" existing Fannie Mae "model" and that the Capital Markets Strategy team "would need to know how much bias is modeled in and how much more we want to include."  *Id.* | Undisputed for purposes of this Motion that in a series of April 2007 emails and with respect to a non-Securitization-specific draft pre-trade performance model, Fannie Mae's Director of PLS Surveillance Kin Chung wrote: "Because of the 'liar loans' and biased appraisals, it would be interesting to see what severity increment is needed to break a bond.  This could then be translated into an appraisal bias factor that tells us how much appraisals need to have been inflated for our bond to break," and "we look at historical default rates given reported risk parameters, thus any (historical) appraisal bias in those parameters should be captured in the model.  To make the correct adjustment, we would need to know how much bias is modeled in and how much more we want to include, these are very difficult determinations."  Therefore, this statement is immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Additionally, when Ms. Zhao, the Director of PLS Analytics, was asked in relation to Mr. Chung's email whether "there were discussions about the possibility that appraisal bias was infecting the reported LTVs in PLS deals[,]" Ms. Zhao testified: "[T]here's always wanting to know what if and the |

225

| | Defendants' Statement of Material Facts | FHFA's Response |
|---|---|---|
| | | impact. So I don't know if they truly think there is or it's just a . . . potential risk factor you want to run some analysis on." FHFA Ex. 249 (C. Zhao Dep Tr.) at 210:19-211:2. |
| 441. | In April 2007, Fannie Mae's "Sub Prime Project Plan" asked PLS personnel to "determine [a] process for . . . Income Verification." Specifically, Fannie Mae personnel considered using "Core Logic (Income Reasonableness) . . . in future deals" and indicated that Fannie "[w]ill keep in mind perhaps using an income verification service." Ex. 469 at FHFA16870864. | Disputed that the document identified as Defendants' Exhibit 469 is an authentic Fannie Mae memorandum entitled "Sub Prime Project Plan." To the extent there exists an authentic Fannie Mae memorandum entitled "Sub Prime Project Plan," the document does not pertain to Fannie Mae's PLS purchases. Therefore, this evidence is immaterial to any issues presented by this Motion because it does not relate to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 442. | By the summer of 2007, and even "for a long time" before that, Freddie Mac Risk Officer Ray Romano expected a deviation of "5 to 10%" between the AVMs and the appraisal valuations in originators' loan files. Ex. 69 at 438:10-439:20. | Disputed that Mr. Romano "expected a deviation of '5 to 10%' between the AVMs and the appraisal valuations in orginators' loan files." Mr. Romano testified that he believed it would be "reasonable" to expect a deviation of 5 to 10% between home values generated using AVMs and those generated by appraisers. Defs. Ex. 69 at 438:10-439:20. The proposed facts are immaterial to any issues presented by this Motion because Mr. Romano's testimony is not connected to any of the Originators at issue and none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 443. | The offering documents for the Securitizations described the process through which loans in the SLG were originated and securitized. For example, the prospectus supplement for the FFMLT Trust 2006-FF13 stated that First Franklin Financial Corporation originated the underlying loans and sold those | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | loans to the securitization's sponsor, Goldman Sachs Mortgage Company.  Ex. 10 at S-5, S-36-37.  Similarly, the prospectus supplement for GSR 2007-OA2 states that Residential Funding Company, LLC, Quicken Loans Inc.  and other originators originated and sold the mortgage loans in the SLGs to the securitization sponsor, Goldman Sachs Mortgage Company.  Ex. 2 at S-10, S-12. | |
| 444. | Goldman Sachs disclosed in its offering documents that while it "may elect to-reunderwrite *some* of the mortgage loans based upon our own criteria," it would "not undertake any independent investigations of the creditworthiness of particular obligators." Ex. 10 at 29.  In addition, Goldman Sachs' base prospectuses disclosed that Goldman Sachs utilized sampling in conducting credit and compliance due diligence on the mortgage loans. *See, e.g.,* Ex. 15 at 27. | Undisputed for purposes of this Motion that the quoted language appears in Defendants' Exhibit 10 at 29.  Disputed that Defendants' Exhibit 15 at 27 discloses sampling methodologies.  Even if it did, it would be immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  The GSEs' PLS employees believed that the information Defendants provided was materially true and accurate.  *See* FHFA's Response to ¶¶ 64-88, *supra*. |
| 445. | The offering materials also disclosed that exceptions to origination guidelines were made "based upon compensating factors," Ex. 10 at S-38, and that "[i]t is expected that a substantial portion of the mortgage loans may represent such underwriting exceptions." *Id.* The offering materials for FFML 2005-FF11 also have identical language.  Ex. 9 at S-35.  Not only did the GSEs understand the exception process, | Undisputed for purposes of this Motion that the GSEs understood that exceptions to guidelines could be made based upon compensating factors, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  The cited evidence does not show that the GSEs used the same processes with their own Single Family purchases as that used by Defendants. |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | but they also used the process in their own securitizations and loan pool purchases. *See* Ex. 486 at FHFA11843926; Ex. 487 at FHFA02465059; Ex. 166 at 436:19-437:13, 494:8-495:25. | |
| 446. | In addition, as the offering documents disclosed, Originators typically provided representations and warranties—contractual commitments about the characteristics of the underlying loan pool—to investors as part of the loan sale agreements, including terms that the loans complied with the underwriting guidelines and did not contain fraud. *See, e.g.*, Ex. 9 at S-46; Ex. 39 at S-90; *see also infra* ¶ 461. A Freddie Mac Offering Circular dated October 14, 2005 disclosed that "[w]hen [Freddie Mac] purchase[s] a Mortgage, we rely on representations and warranties of the seller with respect to certain matter, as is customary in the secondary mortgage market. These representations and warranties cover such matters as: [t]he accuracy of the information provided by the borrower;" and "[t]he accuracy and completeness of any third party reports prepared by qualified professionals, such as property appraisals and credit reports." Ex. 337 at 20. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |
| 447. | The GSE also generally required PLS "aggregators" with whom they transacted to be reviewed and approved. Ex. 169 at FHFA12147596; Ex. 86 at 278:21-24. The GSEs understood that | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Regardless of sampling practices, the GSEs' |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | Defendants' due diligence practices were generally to confirm that a sample of loans in the Securitizations conformed to underwriting guidelines, as well as to review indicia of fraud and valuation.  *See generally* Ex. 353 at FHFA04828840; Ex. 489 at FHFA00371462; Ex. 470 at FHFA01283579; Ex. 471 at FHFA03484191; Ex. 473 at FHFA01280944; Ex. 474 at FHFA13253477.  Defendants were approved to sell PLS to both GSEs.  Ex. 203 at FHFA00089410; Ex. 477 at FHFA00019774; Ex. 478 at FHFA01316847; Ex. 353 at FHFA04828840; Ex. 474 at FHFA13253477; Ex. 471 at FHFA03484191. | PLS employees believed that the information Defendants provided was materially true and accurate.  *See* FHFA's Response to ¶¶ 64-88, *supra*. |
| 448. | Fannie Mae's SF CPRM unit performed reviews of PLS issuers, examining their due diligence practices among other factors.  Fannie Mae knew, as a result of these reviews, that PLS issuers generally performed due diligence on a sample of loans before securitizing a larger pool—and Fannie Mae endorsed that practice for the PLS it purchased.  For example, Fannie Mae's Peter Niculescu acknowledged that it "was . . . not uncommon practice to sample loans rather than look at every loan" in a PLS.  Ex. 66 at 184. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Regardless of sampling practices, the GSEs' PLS employees believed that the information Defendants provided was materially true and accurate.  *See* FHFA's Responses to ¶¶ 64-88, *supra*.  Further immaterial because Fannie Mae's PLS traders did not receive SF CPRM's operational reviews, but rather relied on a list of approved counterparties that was circulated by SF CPRM.  FHFA Ex. 255 (J. Norris Dep. Tr.) at 342:17-343:15. |
| 449. | Paul Norris, also of Fannie Mae, understood that "between 10 percent to 50 percent" of loans in a PLS were sampled and that "by definition that meant [Defendants] | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion, because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  Mr. |

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | were not looking at every loan." Ex. 63 at 565:6-566:10. | Norris also testified that he relied on "the reps and warrants that were given to [Fannie Mae] and the due diligence done by the dealers." FHFA's Response to ¶ 68, *supra*. |
| 450. | The Second Quarter 2006 "Private Label Securities Update" presented to Fannie Mae's Risk Management Committee shows Fannie Mae evaluated issuers' due diligence by "% Sampling Selection for Compliance," "% Sampling Selection for Underwriting," and "% of Loans Removed from a Deal as a result of Due Diligence." Ex. 480 at FHFA1908 2008.  Fannie Mae also understood through these reviews that issuers performed similar counterparty reviews and monitoring to that which the GSE conducted on originators. *See, e.g.*, Ex. 481 at FHFA00205320-21; Ex. 488 at FHFA00205444. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Regardless of sampling practices, Fannie Mae's PLS employees believed that the information Defendants provided was materially true and accurate.  *See* FHFA's Responses to ¶¶ 64-72, *supra*. |
| 451. | **Goldman Sachs**.  Although FHFA has failed to produce Fannie Mae's operational reviews of Goldman Sachs, the record shows that Fannie conducted such reviews in 2005, 2006 and 2007. Ex. 126 at FHFA14308154; Ex. 125 at FHFA16099906; Ex. 482 at FHFA12597671.  Through these reviews, Fannie Mae would have become familiar with Goldman Sachs' securitization processes, including its due diligence practices. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Defendants provide no evidence that Fannie Mae knew that Goldman Sachs' due diligence practices did not prevent it from making material representations in the Offering Materials. |
| 452. | **Nomura**.  Although FHFA has failed to produce Fannie Mae's operational reviews of Nomura, the record shows that Fannie conducted such a review in 2005.  Ex. 126 at | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |

|   | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
|   | FHFA14308154. Through that review, Fannie Mae became familiar with Nomura's securitization processes, including its due diligence practices. | Defendants provide no evidence that Fannie Mae knew that Nomura's due diligence practices did not prevent it from making material representations in the Offering Materials. |
| 453. | **RBS**. Clayton performed an operational review of RBS for Fannie Mae in November 2006. Clayton reported that RBS performed credit due diligence on 25 percent of its non-prime loan purchases. Ex. 472 at FHFA01283569. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Defendants provide no evidence that Fannie Mae knew that RBS's due diligence practices did not prevent it from making material representations in the Offering Materials. |
| 454. | **HSBC**. Fannie Mae conducted a counterparty review of HSBC in May 2007 that found HSBC similarly sampled 25% of purchased loans for credit compliance diligence. Ex. 477 at FHFA00019778. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion, because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Defendants provide no evidence that Fannie Mae knew that HSBC's due diligence practices did not prevent it from making material representations in the Offering Materials. |
| 455. | Ronald Feigles, the Freddie Mac employee responsible for its counterparty reviews and the due diligence Freddie Mac performed on its subprime and Alt-A securitizations, Ex. 166 at 139:3-9, 423:6-11, testified that, when samples were used in subprime loan due diligence, "one could reasonably assume there were other loans [outside the sample] that had defects." Ex. 166 at 466:12-14. Feigles understood that the "pull through rate" during Freddie Mac's Alt-A due diligence typically was 70%-85%—meaning the majority of most pools were deemed suitable | Undisputed for purposes of this Motion that the language quoted by Defendants appears in Defendants' Exhibit 166, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Mr. Feigles' testimony is about Freddie Mac's Single Family business's practices when purchasing whole loans. |

| | Defendants' Statement of Material Facts | FHFA's Response |
|---|---|---|
| | for purchase.  Ex. 166 at 457:4-9. | |
| 456. | Freddie Mac's AMO and CCRM units reviewed PLS issuers and studied their due diligence practices.  Freddie Mac knew, as a result of these reviews, that PLS issuers generally performed due diligence on a sample of loans before securitizing a larger pool. Ex. 166 at 466:7-14. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Regardless of sampling practices, Freddie Mac's PLS employees believed that the information Defendants provided was materially true and accurate.  *See* FHFA's Responses at ¶¶ 77, 82-84, 88-89, *supra.* |
| 457. | Unlike AMO's originator reviews, AMO's reviews of PLS issuers and "loan aggregators" like Defendants were not required to include a review of a sample of loans securitized by that issuer, because "the lenders and products in aggregated pools change rapidly, and ***the origination controls are the lenders***, [making] file testing . . . of very limited benefit."  Ex. 475 at FHFA11971617 (emphasis added). | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions.  The language cited by Defendants appears in Defendants' Exhibit 475 at FHFA11971619, not FHFA11971617.  That same page reflects that during AMO reviews of aggregators, management provided an overview of its "[d]ue diligence, appraisal, control, fair lending, and corporate governance functions." *Id.* at FHFA11971619. |
| 458. | **Goldman Sachs**.  AMO reviewed Goldman Sachs' conduit PLS operations in May 2005 and its overall PLS practices in June 2006. Ex. 483 at FHFA12495701; Ex. 484 at FHFA12495695.  The June 2006 review found Goldman Sachs' sample size "[went] down to 20¬25% for more seasoned sellers." *Id.* at 696.  It also reflected Freddie Mac's knowledge that Goldman Sachs performed AVMs on all the loans it securitized, with a "15% tolerance on all loans up to 95% LTV" and a "10% tolerance on all loans with | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Defendants provide no evidence that Freddie Mac knew that Goldman Sachs' due diligence practices did not prevent it from making material representations in the Offering Materials. |

232

| | **Defendants' Statement of Material Facts** | **FHFA's Response** |
|---|---|---|
| | LTV's > 100%." *Id.* at 698. | |
| 459. | **Nomura**. A March 14, 2006 AMO review of Nomura disclosed that Nomura had a practice of sampling 20% of a loan package for credit diligence. Ex. 474 at FHFA13253478. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. The AMO review notes that Nomura sampled 20% for bulk purchases greater than $25 million, 100% of loans for bulk purchases between $5 million and $25 million, and all loans purchased on a loan-by-loan basis. Defs. Ex. 474 at FHFA13253478. Defendants provide no evidence that Freddie Mac knew that Nomura's due diligence practices did not prevent it from making material representations in the Offering Materials. |
| 460. | **RBS**. AMO March 2004 review of RBS similarly revealed that RBS reviewed a sample of loans in advance of securitization. Ex. 485 at FHFA11594620. That sample could be as low as 10%. | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. Defendants provide no evidence that Freddie Mac knew that RBS's due diligence practices did not prevent it from making material representations in the Offering Materials. |
| 461. | The prospectus supplements for the Securitizations typically disclosed that Originators would be obligated to repurchase Mortgage Loans under certain conditions, including if the loans breached the Originators' representations and warranties. As shown in Table S, representations and warranties typically stated that Mortgage Loans would be repurchased if they included borrower fraud. They also typically disclosed that Originators may be unable to repurchase "defective loans." | Undisputed for purposes of this Motion, but immaterial to any issues presented by this Motion because none of the cited evidence relates to a specific Certificate purchased by the GSEs and at issue in these Actions. |

**FHFA'S LOCAL RULE 56.1 COUNTERSTATEMENT OF ADDITIONAL
UNDISPUTED MATERIAL FACTS**

462.     Defendants acknowledge the differences between the loans purchased by the

GSEs' Single Family businesses and those in the SLGs in their Prospectus Supplements.  *See,*

*e.g.*, FHFA Ex. 41 at S-10 (FFML 2005-FF8 Pro Supp (Goldman) stating, "The underwriting

standards used in the origination of the mortgage loans held by the trust are generally less

stringent than those of Fannie Mae or Freddie Mac with respect to a borrower's credit history

and in certain other respects."); FHFA Ex. 90 at S-23 (HASC 2006-OPT3 Pro Supp (HSBC)

stating "The underwriting standards used in the origination of the mortgage loans held by the

trust are generally less stringent than those of Fannie Mae or Freddie Mac in certain respects.");

FHFA Ex. 99 at S-38 (NHELI 2006-HE3 (Nomura) Pro Supp stating "The underwriting

standards applicable to the Mortgage Loans typically differ from, and are, with respect to a

substantial number of Mortgage Loans, generally less stringent than, the underwriting standards

established by Fannie Mae or Freddie Mac").

463.     In connection with 18 of the Goldman Sachs Securitizations, Goldman Sachs

represented that the loans were acquired through Goldman Sachs's conduit program and pursuant

to Goldman Sachs's own guidelines.  (1) GSAA 2005-11 (33.33%), *see* FHFA Ex. 45; (2) GSAA

2005-14 (47.71%), *see* FHFA Ex. 46; (3) GSAMP 2005-HE5 (20.88%), *see* FHFA Ex. 55; (4)

GSAA 2006-4 (25.73%), *see* FHFA Ex. 49; (5) GSAA 2006-5 (36.28%), *see* FHFA Ex. 50; (6)

GSAA 2006-8 (33.29%), *see* FHFA Ex. 51; (7) GSAMP 2006-HE3 (12.73%), *see* FHFA Ex. 62;

(8) GSAMP 2006-HE4 (3.92%), *see* FHFA Ex. 63; (9) GSAA 2006-11 (12.32%), *see* FHFA Ex.

52; (10) GSR 2006-OA1 (1.41%), *see* FHFA Ex. 291 (GS FHFA 004761859) at GS FHFA

004761865), FHFA Ex. 73; (11) GSAMP 2006-HE5 (0.56%), *see* FHFA Ex. 64; (12) GSAMP

2006-HE7 (25.31%), *see* FHFA Ex. 65; (13) GSAMP 2006-HE8 (10.18%), *see* FHFA Ex. 66;

(14) GSAMP 2007-HE1 (0.16%), *see* FHFA Ex. 70; (15) GSAMP 2007-HE2 (1.71%), *see*

FHFA Ex. 71; (16) GSR 2007-OA1 (24.13%), *see* FHFA Ex. 292 (GS FHFA 000080150) at GS

FHFA 000080150, FHFA Ex. 75 ; (17) GSAA 2007-6 (22.42%), *see* FHFA Ex. 53; and (18)

GSR 2007-OA2 (100%), *see* FHFA Ex. 76.

464.    GSE witnesses consistently testified that they relied on Defendants' diligence to

screen out defective loans, and Defendants do not genuinely contest that evidence. *See, e.g.*,

FHFA Ex. 260 (D. Hackney Dep. Tr.) at 254:7-21 (Freddie Mac PLS trader David Hackney

testifying that "whether they did a hundred percent sampling, they did a 25 percent sampling,

that was actually their risk to undertake.  It wasn't my –my duty or my risk that I took on.  I was

looking to the counterparty, and the counterparty was that dealer.").

465.    The uncontradicted testimony of the GSEs' PLS traders is that they relied on the

information about the Mortgage Loans provided to them by Defendants, not general market

trends.  *See* FHFA Ex. 258 (S. Salahuddin Dep. Tr.) at 194:6-20 (testifying that he

"remember[ed] quite a bit of documentation that would indicate that the PLS that Fannie Mae

bought would have withstood a very large deterioration in [] performance over what was

expected at the time" when asked about whether he was "aware of anyone at Fannie Mae who

indicated their belief that the PLS that Fannie Mae purchased would suffer zero loss if a once-in-

a-lifetime economic tsunami occurred in the U.S. residential real estate market"); *id.* at 242:4-

243:3 (testifying that to the extent subprime market trends "would affect subprime securitizations

as not at this point clear because, again, the ability for a subprime loan to perform has very little

to do with the ability of that subprime originator to remain in business"); FHFA Ex. 265 (M.

Aneiro Dep. Tr.) at 742:10-743:4 (testifying that in connection with PLS purchases he considered "various reps within – within the deal, fraud reps, repurchase agreements, collateral descriptions that were provided to us"); FHFA Ex. 260 (D. Hackney Dep. Tr.) at 140:19-25 (testifying that the dealer has "perfect information" and that he "relied upon them to roll up that information and provide [him] subsets of it"). *See also* FHFA Ex. 67 (Prospectus Supp. for GSAMP 2006-NC2) at GS FHFA 001013968.

466.     Multiple GSE witnesses testified that they relied on the credit ratings in making PLS purchase decisions.  FHFA Ex. 257 (P. Niculescu Dep. Tr.) at 41:19-25 (testifying that when Fanne Mae purchased PLS, they "believed at the time that th[e] credit risk was very substantially mitigated by the subordination and credit enhancement of those securities"); *id.* at 46:5-15 (testifying that "given the structure" the securities were "viewed as very low-risk securities"); FHFA Ex. 264 (K. Palmer Dep. Tr.) at 733:5-17 (testifying that Freddie Mac "believed that the rating agencies were, generally speaking, more conservative than [Freddie Mac] w[as], and [Freddie Mac] had better, more comfort in relying on the rating agencies in terms of the amount of credit protection provided."); FHFA Ex. 258 (S. Salahuddin Dep. Tr.) at 588:8-20 (testifying that he "understood at the time that the bonds created off of the collateral and subprime deals were engineered to offer the highest quality credit risk at the AAA level that was available at the time, which was the risk that [he] was concerned about").

467.     The below chart sets forth the Originators that originated 5% or more of of the Mortgage Loans underlying the Supporting Loan Groups supporting the GSE Certificates:

| Table I:  Originators Supporting Loan Groups at Issue[2] |
|---|

---

[2]   Pursuant to Federal Rule of Evidence 1006, this chart details the Originators who originated 5% or more of the Mortgage Loans underlying the Supporting Loan Groups supporting the GSE Certificates.  This content of this chart was drawn from the loan tapes

| Case | Securitization | Trade Date | GSE | Originator(s) (%) |
|---|---|---|---|---|
| Ally | RALI 2007-QH5 | 5/18/2007 | FRE | Homecomings Financial, LLC (40%)<br>First Magnus Financial Corporation (18%)<br>SCME Mortgage Bankers (11%)<br>First National Bank of Nevada (10%) |
| Goldman Sachs | INDX 2005-AR18 | 8/15/2005 | FRE | IndyMac Bank,  F.S.B. (100%) |
| Goldman Sachs | GSAA 2005-11 | 9/12/2005 | FNM | GreenPoint Mortgage Funding, Inc., (65%)<br>National City Mortgage Co. (19%)<br>SunTrust Mortgage, Inc. (15%) |
| Goldman Sachs | FFML 2005-FF8 | 9/12/2005 | FRE | First Franklin Financial Corporation (100%) |
| Goldman Sachs | INDX 2005-AR27 | 10/14/2005 | FNM | IndyMac Bank,  F.S.B. (100%) |
| Goldman Sachs | GSAMP 2005-WMC2 | 10/25/2005 | FNM | WMC Mortgage Company (100%) |
| Goldman Sachs | FFML 2005-FF11 | 10/31/2005 | FRE | First Franklin Financial Corporation (100%) |
| Goldman Sachs | GSAMP 2005-HE5 | 11/3/2005 | FRE | SouthStar Funding, LLC (54.35%)<br>Oak Street Mortgage, LLC (13.69)<br>GMFS, LLC (11.66%) |
| Goldman Sachs | GSAA 2005-14 | 11/9/2005 | FRE | SouthStar Funding, LLC (10.45%)<br>SunTrust Mortgage, Inc. (33.14%)<br>CTX (7.4%)<br>Aegis (6.88%)<br>Greenpoint (5.7%) |
| Goldman Sachs | ACCR 2005-4 | 11/10/2005 | FRE | Accredited Home Lenders, Inc. (100%) |

produced by the Ally, Goldman Sachs, HSBC, and Nomura Defendants, which identified the Originator of each Mortgage Loan underlying the Securitization.

| Table I:  Originators Supporting Loan Groups at Issue[2] | | | | |
|---|---|---|---|---|
| **Case** | **Securitization** | **Trade Date** | **GSE** | **Originator(s) (%)** |
| Goldman Sachs | GSAMP 2005-AHL2 | 12/5/2005 | FNM | Accredited Home Lenders, Inc. (100%) |
| Goldman Sachs | GSAA 2005-15 | 12/8/2005 | FNM | Countrywide Home Loans, Inc. (64%)<br>GreenPoint Mortgage Funding, Inc. (26%)<br>National City Mortgage Co. (10%) |
| Goldman Sachs | GSAMP 2005-HE6 | 12/9/2005 | FRE | Meritage Mortgage Corporation (31.23%)<br>First NLC Financial Services LLC (19.76%)<br>Fremont Investment & Loan (14.78%)<br>Acoustic Home Loans, LLC.  (14.16%)<br>Maribella Mortgage LLC (7%) |
| Goldman Sachs | GSAMP 2005-WMC3 | 12/15/2005 | FNM | WMC Mortgage Company (100%) |
| Goldman Sachs | GSAA 2006-2 | 1/25/2006 | FNM | Argent Mortgage Company, L.L.C. (100%) |
| Goldman Sachs | GSAA 2006-4 | 2/24/2006 | FNM | Countrywide Home Loans, Inc. (94.16%) |
| Goldman Sachs | GSAA 2006-5 | 3/23/2006 | FNM | Countrywide Home Loans, Inc. (31.62%)<br>SunTrust Mortgage, Inc. (23.33%)<br>GreenPoint Mortgage Funding, Inc. (22.68%)<br>First National Bank of Nevada (8.72%)<br>PHH Mortgage Corporation (8.62%)<br>National City Bank (5.02%) |
| Goldman Sachs | GSAMP 2006-FM1 | 4/13/2006 | FNM | Fremont Investment & Loan (100%) |
| Goldman Sachs | GSAA 2006-8 | 4/20/2006 | FRE | Countrywide Home Loans, Inc. (33.34%)<br>Wells Fargo Bank, N.A. (27.55%)<br>First National Bank of Nevada (13.21%)<br>Aegis Mortgage Corporation (10.06%) |
| Goldman Sachs | GSAMP 2006-HE3 | 5/12/2006 | FRE | Southstar Funding, LLC (53.04%)<br>Mortgage Investment Lending Associates (16.97%)<br>Meritage Mortgage Corp (9.16%)<br>Fremont Investment & Loan (6.42%) |

| Table I: Originators Supporting Loan Groups at Issue[2] | | | | |
|---|---|---|---|---|
| **Case** | **Securitization** | **Trade Date** | **GSE** | **Originator(s) (%)** |
| Goldman Sachs | AHMA 2006-1 | 5/18/2006 | BOTH | American Home Mortgage Investment Corp. (100%) |
| Goldman Sachs | GSAMP 2006-NC2 | 6/21/2006 | FNM | New Century Mortgage Corporation.(100%) |
| Goldman Sachs | GSAA 2006-11 | 6/23/2006 | FNM | Countrywide Home Loans, Inc. (60.93%) American Home  Mortgage Investment Corp. (15.53%) GreenPoint Mortgage Funding, Inc., (12.59%) National City Mortgage Co. (10.93%) |
| Goldman Sachs | GSAMP 2006-HE4 | 6/27/2006 | FRE | Aames Capital Corporation (25.07%) CIT Group (20.24%) NovaStar Financial Inc (10.29%) First Horizon Home Loan Corporation (10.62%) Southstar Funding, LLC (15.17%) MILA, Inc. (8.80%) |
| Goldman Sachs | GSAMP 2006-HE5 | 8/16/2006 | FRE | Aames Capital Corporation (53.96%) SouthStar Funding, LLC (13.96%) Decision One Mortgage Company, LLC (11.35%) Equibanc (7.51%) Encore (6.51%) |
| Goldman Sachs | GSR 2006-OA1 | 8/16/2006 | FRE | IndyMac Bank, F.S.B (66.22%) Countrywide Home Loans, Inc. (14.79%) American Home Mortgage Corp. (12.31%) SunTrust (6.19%) |
| Goldman Sachs | FFML 2006-FF13 | 9/21/2006 | FNM | First Franklin Financial Corporation (100%) |
| Goldman Sachs | GSAMP 2006-FM2 | 9/27/2006 | FRE | Fremont Investment & Loan (100%) |
| Goldman Sachs | GSAMP 2006-HE7 | 10/24/2006 | FNM | Aames Capital Corporation (34.50%) Novastar Financial Inc. (18.65%) SouthStar Funding, LLC (12.31%) First Horizon Home Loan Corporation (11.60%) |
| Goldman Sachs | FHLT 2006-E | 11/16/2006 | FRE | Fremont Investment & Loan (100%) |

| Table I:  Originators Supporting Loan Groups at Issue[2] | | | | |
|---|---|---|---|---|
| Case | Securitization | Trade Date | GSE | Originator(s) (%) |
| Goldman Sachs | GSAMP 2006-FM3 | 12/15/2006 | FRE | Fremont Investment & Loan (100%) |
| Goldman Sachs | GSAMP 2006-HE8 | 12/20/2006 | FNM | Aames Capital Corporation (30.05%)<br>Novastar Financial Inc. (25.26%)<br>First Horizon Home Loan Corporation (12.90%)<br>Southstar Funding, LLC (8.14%)<br>Sebring Capital Partners, LP (5.92%) |
| Goldman Sachs | GSAMP 2007-FM1 | 1/12/2007 | FRE | Fremont Investment & Loan (100%) |
| Goldman Sachs | GSAMP 2007-NC1 | 1/26/2007 | FNM | New Century Mortgage Corporation. (100%) |
| Goldman Sachs | GSAMP 2007-FM2 | 2/14/2007 | FRE | Fremont Investment & Loan (100%) |
| Goldman Sachs | GSAMP 2007-HE1 | 2/20/2007 | FRE | SouthStar Funding, LLC (16.76%)<br>Senderra Funding LLC (13.32%)<br>Wilmington National Finance (10.21%)<br>First Horizon (9.14%)<br>Lownhome Financial (9.69%)<br>Home Loan Corp (8.41%)<br>Equibanc (8.13%) |
| Goldman Sachs | GSAMP 2007-HE2 | 3/30/2007 | FRE | New Century Mortgage Corporation. (73.24%)<br>Aegis Mortgage Corp. (12.32%)<br>Southstar Funding, LLC (7.45%) |
| Goldman Sachs | GSR 2007-OA1 | 4/27/2007 | FRE | Quicken Loans Inc. (38.50%)<br>Countrywide Home Loans, Inc.(25.34%)<br>Residential Funding Company, LLC (22.81%) |
| Goldman Sachs | GSR 2007-AR2 | 5/9/2007 | FNM | Wells Fargo Bank, N.A. (100%) |

| Table I:  Originators Supporting Loan Groups at Issue[2] | | | | |
|---|---|---|---|---|
| Case | Securitization | Trade Date | GSE | Originator(s) (%) |
| Goldman Sachs | GSAA 2007-6 | 5/23/2007 | FRE | Aegis Mortgage Corp. (25.89%)<br>Freedom Mortgage Corp (9%)<br>Greenpoint Mortgage Funding Inc (9%)<br>First Banc (8%)<br>Decision One Mortgage Co LLC (7%)<br>Lownhome Financial (6%)<br>Plaza Home Mortgage Inc (6%)<br>National City Mortgage Co (6%) |
| Goldman Sachs | GSR 2007-OA2 | 10/19/2007 | FRE | Residential Funding Company, LLC  (79.75%)<br>Quicken Loans Inc. (13.71%) |
| HSBC | HASC 2005-I1 | 12/15/2005 | FRE | New Century Mortgage Corporation (48.47%)<br>Option One Mortgage Corporation (31.73%)<br>First Franklin Financial Corporation (20.00%) |
| HSBC | FFML 2006-FF1 | 1/20/2006 | FRE | First Franklin Financial Corporation (100%) |
| HSBC | HASC 2006-OPT1 | 1/31/2006 | FRE | Option One Mortgage Corporation (100%) |
| HSBC | HASC 2006-OPT2 | 2/23/2006 | FRE | Option One Mortgage Corporation (100%) |
| HSBC | HASC 2006-NC1 | 3/6/2006 | FRE | New Century Mortgage Corporation (100%) |
| HSBC | HASC 2006-OPT3 | 3/23/2006 | Both | Option One Mortgage Corporation (100%) |
| HSBC | HASC 2006-OPT4 | 4/19/2006 | FNM | Option One Mortgage Corporation (100%) |

| Table I:  Originators Supporting Loan Groups at Issue[2] | | | | |
|---|---|---|---|---|
| **Case** | **Securitization** | **Trade Date** | **GSE** | **Originator(s) (%)** |
| HSBC | FFML 2006-FF5 | 4/28/2006 | FRE | First Franklin Financial Corporation (100%) |
| HSBC | FFML 2006-FF7 | 5/19/2006 | FNM | First Franklin Financial Corporation (100%) |
| HSBC | FFML 2006-FF9 | 6/27/2006 | FRE | First Franklin Financial Corporation (100%) |
| HSBC | FFML 2006-FF11 | 8/17/2006 | FNM | First Franklin Financial Corporation (100%) |
| HSBC | HASC 2006-HE1 | 10/18/2006 | FRE | WMC Mortgage Corp. (68.13%) Countrywide Home Loans, Inc. (31.68%) |
| HSBC | HASC 2006-HE2 | 11/29/2006 | FNM | WMC Mortgage Corp. (60.33%) Countrywide Home Loans, Inc. (29.77%) Decision One Mortgage Company, LLC (10.00%) |
| HSBC | HASC 2007-OPT1 | 1/18/2007 | FRE | Option One Mortgage Corporation (100%) |
| HSBC | HASC 2007-HE1 | 2/28/2007 | FRE | Accredited Home Lenders, Inc. (76.86%) Wells Fargo (8.35%) Option One (8.16%) Decision One (6.18%) |
| HSBC | HASC 2007-HE2 | 4/26/2007 | FRE | Decision One Mortgage Company, LLC (79.08%) WMC Mortgage Corp. (19.51%) |
| HSBC | HASC 2007-WF1 | 6/21/2007 | FRE | Wells Fargo Bank, N.A. (100%) |

| Table I:  Originators Supporting Loan Groups at Issue[2] | | | | |
|---|---|---|---|---|
| **Case** | **Securitization** | **Trade Date** | **GSE** | **Originator(s) (%)** |
| Nomura | NAAC 2005-AR6 | 11/16/2005 | FNM | Aegis Mortgage (21.01%)<br>Alliance Bancorp (2.210%)<br>Silver State Mortgage (15.43%)<br>Gateway Funding (6.91%)<br>Steward Financial (6.65%) |
| Nomura | NHELI 2006-FM1 | 12/19/2005 | FRE | Fremont Investment & Loan (100%) |
| Nomura | NHELI 2006-HE3 | 8/15/2006 | FRE | People's Choice Home Loan, Inc. (46.21%)<br>First NLC Financial Services, LLC (19.35%)<br>Funding America 6.74%)<br>Mandalay Financial (5.50%) |
| Nomura | NHELI 2006-FM2 | 10/18/2006 | FRE | Fremont Investment & Loan (100%) |
| Nomura | NHELI 2007-2 | 12/27/2006 | FRE | Ownit Mortgage Solutions, Inc. (47.92%)<br>First NLC Financial Services, LLC (10.40%)<br>Millennium Bank, N.A. (7.73%) |
| Nomura | NHELI 2007-1 | 1/23/2007 | FRE | Silver State Financial Services, LLC (32.49%)<br>Pinnacle Financial Corp. (19.62%)<br>Alliance Bancorp (6.12%) |
| Nomura | NHELI 2007-3 | 4/26/2007 | FRE | ResMAE Mortgage Corporation (77.48%)<br>WMC (7.73%) |

Respectfully submitted,

DATED:   New York, New York
               June 24, 2014

By: /s/ Philippe Z. Selendy

Philippe Z. Selendy
Manisha M. Sheth
Andrew R. Dunlap
David B. Schwartz
QUINN EMANUEL URQUHART &
   SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

By: /s/ Kanchana Wangkeo Leung

Marc E. Kasowitz
Christopher P. Johnson
Michael A. Hanin
Kanchana Wangkeo Leung
KASOWITZ, BENSON, TORRES &
   FRIEDMAN LLP
1633 Broadway
New York, New York 10019
(212) 506-1700


*Attorneys for Plaintiff Federal Housing Finance Agency,*
*as Conservator for Fannie Mae and Freddie Mac*

244