**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FEDERAL HOUSING FINANCE AGENCY, etc.,<br><br>Plaintiff,<br>v.<br><br>HSBC NORTH AMERICA HOLDINGS, INC., et al.,<br><br>Defendants. | 11 Civ. 6189 (DLC)<br><br>**DEFENDANTS' LOCAL RULE 56.1 COUNTERSTATEMENT OF MATERIAL FACTS AND REPLY TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS** |
| FEDERAL HOUSING FINANCE AGENCY, etc.,<br><br>Plaintiff,<br>v.<br><br>GOLDMAN, SACHS & CO., et al.,<br><br>Defendants. | 11 Civ. 6198 (DLC) |
| FEDERAL HOUSING FINANCE AGENCY, etc.,<br><br>Plaintiff,<br>v.<br><br>NOMURA HOLDING AMERICA, INC., et al.,<br><br>Defendants. | 11 Civ. 6201 (DLC) |
| FEDERAL HOUSING FINANCE AGENCY, etc.,<br><br>Plaintiff,<br>v.<br><br>ALLY FINANCIAL INC., et al.,<br><br>Defendants. | 11 Civ. 7010 (DLC) |

# TABLE OF CONTENTS

**Page**

I.      DEFENDANTS' JOINT RESPONSE TO FHFA'S STATEMENT OF FACTS ..............1

II.     GENERAL BACKGROUND.........................................................................38

III.    THE ALLEGED MISSTATEMENTS ...........................................................41

IV.     THROUGH ON-SITE VISITS AND LOAN FILE REVIEWS, THE GSES
        FULLY UNDERSTOOD ORIGINATORS' UNDERWRITING, APPRAISAL
        AND FRAUD DETECTION PRACTICES ....................................................44

        A.      Fannie Mae ...................................................................................44
        B.      Freddie Mac..................................................................................62

V.      THE GSES BELIEVED ORIGINATORS' GENERAL PRACTICES AFFECTED
        THE MORTGAGE LOANS...........................................................................80

        A.      GSE Employees Believed SLG Loans Would Reflect Originators'
                Underwriting Practices...............................................................80
                1.      Fannie Mae ......................................................................80
                2.      Freddie Mac.....................................................................81
        B.      Credit Reviews Reflected the Importance of Originators' General
                Practices .......................................................................................82

VI.     THE GSES BELIEVED THE CERTIFICATE SLGS CONTAINED
        APPRAISAL BIAS......................................................................................83

        A.      The GSEs Understood Appraisals Were Subjective Estimates of Home
                Value, and LTVs Could Be Understated As a Result of Inflated
                Appraisals. ...................................................................................83
        B.      The GSEs Believed That Appraisal Bias Affected the Residential
                Mortgage Market.........................................................................85
                1.      Freddie Mac.....................................................................85
                2.      Fannie Mae ......................................................................87
                3.      OFHEO ............................................................................90
        C.      The GSEs understood that appraisal bias applied to subprime loans,
                and used AVMs in connection with PLS purchases to detect it. ...................90

VII.    THE GSES' PURCHASES OF ALT-A AND SUBPRIME LOANS DIRECTLY
        FROM ORIGINATORS PROVIDED UNPARALLELED INSIGHT INTO
        ORIGINATOR PRACTICES ......................................................................93

        A.      Fannie Mae ...................................................................................94
                1.      Detection of underwriting "defects"...................................99
                2.      Detection of appraisal bias ...............................................101

# TABLE OF CONTENTS
*(continued)*

Page

    **B.**    **Freddie Mac**...........................................................................................101
        **1.**    **Detection of underwriting "defects"**.......................................105
        **2.**    **Detection of appraisal bias** .....................................................108

VIII.    THE GSES' BUSINESS UNITS READILY SHARED INFORMATION WITH
        VIRTUALLY NO BARRIERS. ..................................................................109

    **A.**    **Fannie Mae** ......................................................................................109
    **B.**    **Freddie Mac** ....................................................................................114
    **C.**    **"Chinese Walls" Did Not Preclude Information Sharing within the**
        **GSEs** .................................................................................................116
        **1.**    **Freddie Mac**...........................................................................117
        **2.**    **Fannie Mae** ............................................................................118

IX.    THE GSES' KNEW ABOUT FRAUD AND VALUATION RISKS IN NON-
        TRADITIONAL LOAN PRODUCTS AND FACTORED THEM INTO THEIR
        PRE-PURCHASE ANALYSIS OF PLS. ......................................................120

    **A.**    **The GSES Were Aware of Risks in No- and Low-Document Lending**.........120
    **B.**    **The GSEs Accounted for the Risks of No- and Low-Doc Loans in**
        **Their Purchases of PLS** ...................................................................121

X.    THE GSES' POST-PURCHASE MONITORING INFORMED THEM OF
        DEPARTURES FROM UNDERWRITING GUIDELINES AND FRAUD. .................127

        **1.**    **Freddie Mac**...........................................................................128
        **2.**    **Fannie Mae** ............................................................................129
    **B.**    **Both GSEs Believed that EPDs May Reflect Loan Defects**........................130
        **1.**    **Both GSEs observed increased EPDs through 2006-2007**.................132
    **C.**    **Fannie Mae's Consultant Warned of Rising EPDs**.........................................137

XI.    THE GSES MONITORED PUBLIC INFORMATION ABOUT ORIGINATORS
        AND PROBLEMS IN THE SUBPRIME MARKET TO INFORM THEM
        ABOUT THEIR PLS HOLDINGS AND FUTURE PURCHASES. .............................140

XII.    FANNIE MAE KNEW OF LOANS WITH DTI EXCEPTIONS,
        UNREASONABLE INCOME, AND OTHER PURPORTED DEFECTS
        THROUGH ANTI-PREDATORY LENDING REVIEWS OF PLS PURCHASES ......145

XIII.    THE GSES DID NOT BELIEVE PLS RATINGS WERE ACCURATE
        INDICATORS OF CREDIT RISK.................................................................147

XIV.    THE GSES DOUBTED STATEMENTS IN THE OFFERING MATERIALS. ............148

XV.    THE GSES KNEW DEFENDANTS' SAMPLING PRACTICES WOULD NOT
        ELIMINATE ALL DEFECTS IN THE SLGS.................................................150

## TABLE OF CONTENTS
*(continued)*

**Page**

**A.**     **Fannie Mae** ............................................................................................... 152

**B.**     **Freddie Mac** .............................................................................................. 153

XVI.   THE OFFERING MATERIALS INFORMED INVESTORS THAT THE
SECURITIZATIONS WOULD INCLUDE DEFECTIVE LOANS. ............................ 155

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| **Actions** | *FHFA* v. *Goldman, Sachs & Co. et al.*, No. 11 Civ. 6198 (DLC); *FHFA* v. *Ally Financial Inc.*, *et al.*, No. 11 Civ. 7010 (DLC); *FHFA* v. *HSBC North America Holdings, Inc. et al.*, No. Civ. 6189 (DLC); *FHFA* v. *Nomura Holding America Inc.*, *et al*, No. 6201 (DLC) |
| **AMO** | Freddie Mac Alternative Markets Operations group |
| **APL** | Anti-predatory lending |
| **AVM** | Automated valuation model |
| **Certificates** | The specific RMBS that Fannie and Freddie allegedly purchased from the Securitizations at issue in the Actions |
| **Clayton** | Clayton Holdings LLC |
| **CLTV** | Combined loan-to-value ratio |
| **CCRM** | Freddie Mac Counterparty Credit Risk Management |
| **Credit Rating Agencies** | Moody's Corporation, Standard & Poor's Ratings Services, and Fitch Group |
| **Defendants** | Defendants Goldman Sachs, HSBC, Nomura and RBS |
| **DTI** | Debt-to-income ratio |
| **EPDs** | Early payment defaults |
| **EORM** | Freddie Mac's External Operational Risk Management |
| **Fannie Mae** | Federal National Mortgage Association |
| **Freddie Mac** | Federal Home Loan Mortgage Corporation |
| **FHFA** | Federal Housing Finance Agency, the regulator of Fannie Mae and Freddie Mac, which brings these Actions in its capacity as their conservator |
| **Goldman Sachs** | Defendants Goldman, Sachs & Co., GS Mortgage Securities Corp., Goldman Sachs Mortgage Company, The Goldman Sachs Group, Inc., Goldman Sachs Real Estate Funding Corp., Howard S. Altarescu, Kevin Gasvoda, Michelle Gill, David J. Rosenblum, |

|  | Jonathan S. Sobel, Daniel L. Sparks and Mark Weiss |
|---|---|
| **GSE** | Government-Sponsored Entity (here, Fannie Mae and/or Freddie Mac) |
| **HVE** | Freddie Mac's Home Value Explorer AVM |
| **HUD** | U.S. Department of Housing and Urban Development |
| **HSBC** | HSBC North America Holdings Inc., HSBC USA Inc., HSBC Markets (USA) Inc., HSBC Bank USA, N.A., HSI Asset Securitization Corporation, HSBC Securities (USA) Inc., Neal Leonard, Gerard Mattia, Todd White,  and Jon Voigtman |
| **Harsch Declaration or Harsch Decl.** | Declaration of Bradley A. Harsch, Pursuant to Fed. R. Civ. P. 56(D) in Opposition to FHFA's Motion for Partial Summary Judgment |
| **LTV** | Loan-to-value ratio |
| **Nomura** | Nomura Holding America Inc., Nomura Asset Acceptance Corporation, Nomura Home Equity Loan, Inc., Nomura Credit & Capital, Inc., Nomura Securities International, Inc., David Findlay, John McCarthy, John P. Graham, Nathan Gorin, and N. Dante LaRocca |
| **OFHEO** | Office of Federal Housing Enterprise Oversight, the former regulator of Fannie Mae and Freddie Mac |
| **Offering Materials** | The offering materials for the Securitizations in the Actions |
| **Opus** | Opus Capital Markets Consultants LLC |
| **Originator(s)** | Any originator that originated loans underlying the Securitizations |
| **PLAT** | Fannie Mae Private Label Advisory Team |
| **PLS** | Private label securities |
| **PM&P** | Freddie Mac's Portfolio Management & Pricing Group |
| **Prospectus Supplements** | The prospectus supplements filed with the SEC pertaining to the Securitizations |
| **RMBS** | Residential mortgage-backed securities |
| **RPS** | Fannie Mae's Retrospective Property Valuation System |

| | |
|---|---|
| **SEC** | U.S. Securities and Exchange Commission |
| **SF CPRM** | Fannie Mae's  Single Family Counterparty Risk Management group |
| **Securitization** | The PLS from which the GSEs purchased the Certificates at issue in these Actions. |
| **SLG** | The supporting loan groups for the Certificates |

Pursuant to Civil Rule 56.1 of the Local Rules of Civil Procedure for the Southern District of New York, Defendants respectfully submit this response to Plaintiff's Statement of Undisputed Material Facts and Counterstatement of Material Facts regarding Plaintiff FHFA's Motion for Partial Summary Judgment on the GSEs' Knowledge.  In addition, as set forth in the accompanying Harsch Declaration, Defendants believe that the evidence summarized in this Counterstatement demonstrates that there are material issues of fact concerning whether the GSEs were aware of the alleged misstatements, but that they have been deprived of additional discovery that also is essential to their defense against FHFA's claims.

## I.   DEFENDANTS' JOINT RESPONSE TO FHFA'S STATEMENT OF FACTS

1.   Undisputed that certain Defendants issued certain of the Securitizations.

2.   Undisputed that the Securitizations were issued pursuant to shelf registration statements and prospectus supplements, which contained representations and other statements by various entities related to the four categories outlined above, and those representations and statements included cautionary language and other disclosures informing the GSEs of the risks associated with underlying loans.  Defendants incorporate into this paragraph their responses to paragraphs 20 and 23, including Tables A-E.

3.   Undisputed that the Offering Materials included representations from various persons, and disclosures concerning the four categories described in ¶ 3.

4.   Undisputed that the Offering Materials for the Defendants were distributed and made available to potential purchasers.

5.   Undisputed that, for each offering, the GSEs were provided with one or more of: a term sheet, a preliminary prospectus supplement and a free writing prospectus.

6.     Undisputed that FHFA filed amended complaints in the Actions on either June 12, 13, or 28, 2012, asserting claims against Defendants for, among other things, violations of Sections 11 and 12 of the Securities Act and related provisions of the Virginia and D.C. Blue Sky Acts, and that FHFA currently seeks damages from the remaining Defendants.

7.     Undisputed that FHFA has produced over 19 million pages, defendants in the 16 coordinated actions have produced approximately 200 million pages, and third parties have produced at least 14 million pages of non-loan file documents alone.  As set out in the Harsch Decl. (which is incorporated into this paragraph) Defendants believe that they have been deprived of additional discovery that also is essential to their defense against FHFA's claims. *See generally* Harsch Decl.

8.     Disputed.  FHFA continued to produce documents and take party discovery after December 6, 2013.  *See* Endorsed FHFA Ltr. To Court, Dec. 10, 2013, *FHFA* v. *Goldman, Sachs & Co., et al.*, 11 Civ. 6198 (DLC), D.E. No. 566, and third party fact discovery is ongoing as of the date of filing of this Statement.  *See* Endorsed FHFA Ltr. to Court, May 23, 2014, *FHFA* v. *Goldman, Sachs & Co., et al.*, 11 Civ. 6198 (DLC), D.E. No. 714.

9.     Undisputed.

10.    Undisputed that Fannie Mae purchased a Certificate from the A-1A tranche of the GSAMP 2005-AHL2 Securitization on December 28, 2005.

11.    Undisputed that the GSAMP 2005-AHL2 prospectus supplement included the language cited in ¶ 11, as well as other disclosures related to the origination and underwriting of the underlying mortgage loans.  *See infra* ¶ 20.  In this and all other responses in this Statement, except as explicitly noted otherwise, Defendants dispute that "the Goldman Sachs Defendants" or any other similar collection of defendants took any particular action, either

collectively, individually or otherwise.  In this particular instance, GSAMP Trust 2005-AHL2

acted as Issuer of that Securitization and only certain of the Goldman Sachs Defendants were

involved in the preparation of the Offering Materials for that Securitization.  As the Supreme

Court noted in *Janus Capital Group, Inc.* v. *First Derivative Traders*, 131 S. Ct. 2296, 2302

(2011), the "the maker of a statement" is one who has "ultimate authority over the statement,

including its content and whether and how to communicate it."  Furthermore, in this and all

subsequent responses in this Statement, wherever Defendants do not dispute that offering

documents include statements or language quoted by FHFA, except as explicitly noted otherwise,

Defendants dispute that those statements or language constitute a contractual

"representation."  The language quoted above appears following a preamble stating that "[t]he

*information* set forth in the following paragraphs has been provided by Accredited." Ex. 1 at S-

37 (emphasis added).[1]

      12.    Undisputed that **t**he GSAMP 2005-AHL2 Prospectus Supplement included

the language cited in ¶ 12, as well as other disclosures related to owner-occupancy, valuation of

the loans and credit ratings, and the calculation of those figures.  *See infra* ¶¶ 21-23.

      13.    Undisputed that Freddie Mac purchased a Certificate from the 1A-1 tranche

of the GSR 2007-OA2 Securitization on October 29, 2007.

      14.    Undisputed that the GSR 2007-OA2 Prospectus Supplement included the

language cited in ¶ 14, as well as other disclosures related to owner-occupancy, valuation of the

loans and credit ratings, and the calculation of those figures.  *See infra* ¶¶ 21-23.

---

[1]    All exhibits cited herein are attached to the June 3, 2014 Declaration of Megan Bradley in Support of Defendants' Local Rule 56.1 Counterstatement of Material Facts and Reply to Plaintiff's Statement of Undisputed Material Facts.

15.     Undisputed that the GSR 2007-OA2 Prospectus Supplement included the language cited in ¶ 15, as well as other disclosures related to owner-occupancy, valuation of the loans and credit ratings, and the calculation of those figures.  *See infra* ¶¶ 21-23.

16.     Undisputed that the GSAA 2006-8 term sheet included the language cited in ¶ 16 as well as other disclosures related to the calculation of those figures.  *See infra* ¶¶ 21-23.

17.     Undisputed that the GSAA 2006-8 prospectus supplement included the language cited in ¶ 17, as well as other disclosures related to owner-occupancy, valuation of the loans and credit ratings, and the calculation of those figures.  *See infra* ¶¶ 21-23.

18.     Undisputed that the preliminary prospectus supplement dated October 11, 2017 for GSR 2007-OA2 included the language cited in ¶ 18, as well as other disclosures related to owner-occupancy, valuation of the loans and credit ratings, and the calculation of those figures. *See infra* ¶¶ 21-23.

19.     Undisputed that the GSR 2007-OA2 Prospectus Supplement dated before October 17, 2007 included the language cited in ¶ 19, as well as other disclosures related to owner-occupancy, valuation of the loans and credit ratings, and the calculation of those figures. *See infra* ¶¶ 21-23.

20.     Except where otherwise noted, undisputed that ¶ 20 and Table 1 cite pages from the identified Prospectus Supplements that include disclosures concerning whether mortgage loans were underwritten generally or substantially in accordance with Originators' underwriting guidelines.  The Offering Materials include additional disclosures concerning origination and underwriting guidelines as specified in Table A:

4

| Table A: Goldman Sachs' Additional Disclosures Regarding Compliance with Underwriting Guidelines | | |
|---|---|---|
| Securitization | Prospectus Supplement Page Number | Originators |
| ACCR 2005-4 | Ex. 6 at S-44; S-62; S-84; S-86 | Accredited Home Lenders |
| AHMA 2006-1 | Ex. 7 at S-20; S-21; S-34; S-34-S-36 | American Home |
| FFML 2005-FF8 | Ex. 8 at S-10; S-28; S-33-S-35; S-78; 26-27 | First Franklin |
| FFML 2005-FF11 | Ex. 9 at S-11; S-29; S-34; S-35-S-36; S-78 | First Franklin |
| FFML 2006-FF13 | Ex. 10 at S-13; S-31; S-37; S-38; S-100; 10-11; 29; 30 | First Franklin |
| FHLT 2006-E | Ex. 11 at 32; 40; 41; 77; 78 | Fremont |
| GSAA 2005-11 | Ex. 12 at S-12; S-35; S-42; S-43; S-44-S-48; S-103; 22-23 | GreenPoint National City SunTrust GSMC |
| GSAA 2005-14 | Ex. 13 at S-13; S-34-S-35; S-41-S-45; 10 | GreenPoint, National City and SunTrust Mortgage |
| GSAA 2005-15 | Ex. 14 at S-13; S-34; S-40-S-49; 10; 27 | Countrywide, GreenPoint, National City |
| GSAA 2006-2 | Ex. 15 at S-20; S-43; S-50; S-51; 10; 27 | Argent Mortgage |
| GSAA 2006-4 | Ex. 16 at S-23; S-41; S-48; S-49; S-52-S-54-S-57; 10; 27 | Countrywide, GSMC |
| GSAA 2006-5 | Ex. 17 at S-16; S-21; S-43; S-49; S-50; S-53; S-54; 9-10; 27 | Countrywide GreenPoint, GSMC |
| GSAA 2006-8 | Ex. 3 at S-8; S-22; S-44; S-49; S-50; S-52; S-54; S-55; S-57; S-58; 10-11; 29-30 | Countrywide Wells Fargo First National Bank of Nevada, GSMC |
| GSAA 2006-11 | Ex. 18 at S-8; S-22; S-45; S-50, S-51-S-55; S-57-S-59; 10-11; 29-30 | Countrywide, National City, GSMC, GreenPoint |
| GSAA 2007-6 | Ex. 19 at S-24; S-51; S-58 - S-63; S-65-S-66; 10-11; 29-30 | Countrywide, GreenPoint, GSMC, National City, Wells Fargo |
| GSAMP 2005-AHL2 | Ex. 1 at S-13; S-32;  S-37-39; 10; 27 | Accredited Home Lenders, |
| GSAMP 2005-HE5 | Ex. 20 at S-12; S-23; S-32; S-38- -42; 10; 27 | SouthStar, GSMC |
| GSAMP 2005-HE6 | Ex. 21 at S-12; S-33; S-40-S-43; S-47-S-48; S-98; 10; 27 | Meritage Mortgage Corporation, First NLC, Acoustic Home Loans, Fremont |
| GSAMP 2005-WMC2 | Ex. 22 at S-11; S-21; S-28; S-34-S-36 ; 9-10; 27 | WMC |

| Table A: Goldman Sachs' Additional Disclosures Regarding Compliance with Underwriting Guidelines | | |
|---|---|---|
| Securitization | Prospectus Supplement Page Number | Originators |
| GSAMP 2005-WMC3 | Ex. 23 at S-10; S21-S-22; S-27; S-33-S-35; 10; 27 | WMC |
| GSAMP-2006 FM1 | Ex. 24 at S-14, S-17; S-33; S-41; S-98, 11, 29, 30 | Fremont |
| GSAMP 2006-FM2 | Ex. 25 at S-15, S-33, S-40-S-41, 11, 29-30 | Fremont |
| GSAMP 2006-FM3 | Ex. 26 at S-16; S-27-S-29; S-41-S-43, 11, 29-30 | Fremont |
| GSAMP 2006-HE3 | Ex. 27 at S-17; S-38; S-47–S-48; S-118; 11; 30 | SouthStar Funding, MILA, Aames Capital, Fremont, Impac, GSMC, Meritage |
| GSAMP 2006-HE4 | Ex. 28 at S-17; S-38; S-44-S-48; S-116; 10-11; 29-30 | Aames, SouthStar Funding, First Horizon, CIT, MILA, United Pacific Mortgage, GSMC, NovaStar |
| GSAMP 2006-HE5 | Ex. 29 at S-17, S-37, S-44-S-47; S-115; 10-11; 29-30 | Aames, CIT Group, GSMC, Mortgage Lenders Network USA, SouthStar |
| GSAMP 2006-HE7 | Ex. 30 at S-17; S-36; S-45; S-47-S-51; S-112; 10-11; 29-30 | SouthStar, Aames, GSMC, NovaStar |
| GSAMP 2006-HE8 | Ex. 31 at S-17; S-36; S-45-S-51; S-112; 11; 29; 30 | Aames, NovaStar, GSMC, SouthStar |
| GSAMP 2006-NC2 | Ex. 32 at S-15; S-33; S-40-S-41; S-44; S-104; 11; 30 | New Century |
| GSAMP 2007-FM1 | Ex. 33 at S-17; S-; S-36; S-42-S-44; S-102; 11; 29-30 | Fremont |
| GSAMP 2007-FM2 | Ex. 34 at S-17-; S-38; S-47-S-50 S-111; 11; 29-30 | Fremont |
| GSAMP 2007-HE1 | Ex. 35 at S-17; S-36; S-44-S-45; S-47-49; S-107; 10-11; 29-30 | SouthStar, Wilmington Finance, Senderra Funding, First Horizon, LownHome, GSMC |
| GSAMP 2007-HE2 | Ex. 36 at S-17; S-38; S-46; S-54-S-55; S-58; S-117; 10-11; 29-30 | New Century, Aegis SouthStar, GSMC |
| GSAMP 2007-NC1 | Ex. 37 at S-17; S-36; S-44-S-47; S-50; S-110; 11; 29-30 | New Century |
| GSR 2006-OA1 | Ex. 38 at S-51-S-52; S-54; S-57; S-59; S-60; 10-11; 29-30 | American Home, Countrywide, IndyMac, GSMC |
| GSR 2007-AR2 | Ex. 39 at S-46-S-49; S-51-S-55; S-58; S-61-S-62; S-67=S-69; S-71-S-72; S- | Countrywide, IndyMac, PHH, Wells Fargo |

| Table A: Goldman Sachs' Additional Disclosures Regarding Compliance with Underwriting Guidelines | | |
|---|---|---|
| Securitization | Prospectus Supplement Page Number | Originators |
| | 76-S-77; S-80; S-82; S-83; S-85-S-87; S-94; 10-11; 29-30 | |
| GSR 2007-OA1 | Ex. 40 at S-43-S-44; S-49-S-50; S-60-S-63; S-67-S-69; S-71; S-75-S-76; 10-11; 28-30 | Countrywide, Residential Funding, GSMC, Quicken |
| GSR 2007-OA2 | Ex. 2 at S-37-38; S-45-S-46; S-54-S-56; S-60; S-70 10-11; 29-30 | Residential Funding, Quicken |
| INDX 2005-AR18 | Ex. 41 at S-30-S-31; 25 | IndyMac |
| INDX 2005-AR27 | Ex. 42 at S-35 – S-37; 25 | IndyMac |

21.     Except where otherwise noted, undisputed that ¶ 21 and Table 2 cite pages from the identified prospectus supplements that include disclosures concerning valuation. The Offering Materials include additional disclosures concerning LTV/CLTV ratios and valuation matters as specified in Table B:

| Table B: Goldman Sachs' Additional Disclosures Regarding Compliance with LTV/CLTV Ratios and Other Valuation Matters | | |
|---|---|---|
| Securitization | SLG | Prospectus Supplement Page Number |
| ACCR 2005-4 | Group 1 | Ex. 6 at S-24; S-28; S-83-S-84 |
| AHMA 2006-1 | Group 1 | Ex. 7 at S-16; S-35; S-37; S-38; 9 |
| FFML 2005-FF8 | Group 1 | Ex. 8 at S-19; S-27; S-28; S-35-S-36; A-25; A-29; 4; 8 |
| FFML 2005-FF11 | Group 1 | Ex. 9 at S-20; S-28; S-29; S-36-S-37; A-24; A-25; A-30; A-31 |
| FFML 2006-FF13 | Group 1 | Ex. 10 at S-23; S-31; S-39-S-40; A-3; A-10; 4; 9; 32-33 |
| FHLT 2006-E | Group 1 | Ex. 11 at S-14, S-26; S-32-S-33; S-42; 10; 75 |
| GSAA 2005-11 | Group 1 | Ex. 12 at S-23-S-24; S-34; S-36; S-44-S-45; A-30; A-38; 11 |
| GSAA 2005-14 | Group 1 | Ex. 13 at S-24; S-34; S-36; S-43; S-45; A-27; A-35; 4; 8; 16 |
| GSAA 2005-15 | Group 1 | Ex. 14 at S-24; S-34; S-36; S-44-S-45; S-50; A-27; A-34; 4; 7-8; 16 |

| Table B: Goldman Sachs' Additional Disclosures Regarding Compliance with LTV/CLTV Ratios and Other Valuation Matters | | |
|---|---|---|
| **Securitization** | **SLG** | **Prospectus Supplement Page Number** |
| GSAA 2006-2 | Group 1 | Ex. 15 at S-31; S-42; S-43; S-51; A-27; A-34; 4; 8; 16 |
| GSAA 2006-4 | Group 1 | Ex. 16 at S-28-S-29; S-40; S-42; S-51-S-52; S-54-56; S-B-13; S-B-20; 4; 8; 16 |
| GSAA 2006-5 | Group 1 | Ex. 17 at S-31; S-42; S-44; S-55; A-28; A-35; 4; 8; 16 |
| GSAA 2006-8 | Group 1 | Ex. 3 at S-33; S-43; S-45; S-49-S-50; S-52-55; S-60; A-26; A-33; 4; 9; 17 |
| GSAA 2006-11 | Group 1 | Ex. 18 at S-33; S-44; S-46; S-51; S-54-S-57; S-61; A-26; A-33; 4; 9; 17 |
| GSAA 2007-6 | Group 3 | Ex. 19 at S-38; S-50; S-52; S-58; S-61-S-64; S-67-S-68; A-28; A-35; 4; 9; 17 |
| GSAMP 2005-AHL2 | Group 1 | Ex. 1 at S-23; S-32; S-38-S-39; A-24; A-31; 4; 8; 16 |
| GSAMP 2005-HE5 | Group 1 | Ex. 20 at S-22-S-23; S-32-S-33; S-40; S-43; A-27; A-34; A-39; A-45; 4; 8; 16 |
| GSAMP 2005-HE6 | Group 1 | Ex. 21 at S-23-S-24; S-33; S-34; S-41-S-43; A-3; A-10; 4; 7; 16 |
| GSAMP 2005-WMC2 | Group 1 | Ex. 22 at S-20-S-21; S-27; S-28; S-35; S-37-S-45; A-24; A-30; 4; 8; 16 |
| GSAMP 2005-WMC3 | Group 1 | Ex. 23 at S-19; S-26; S-27; S-33-S-34; S-36; S-38-S-43; A-8; A-10; 4; 8; 16 |
| GSAMP-2006 FM1 | Group 1 | Ex. 24 at S-24-S-26; S-33; S-41-43; A-3; A-10; 4; 9; 17 |
| GSAMP 2006-FM2 | Group 1 | Ex. 25 at S-25-S-27; S-33-S-34; S-41-S-43; A-3; A-10; 4; 9; 17 |
| GSAMP 2006-FM3 | Group 1 | Ex. 26 at S-27-S-28; S-35-S-36; S-43-S-45; A-3; A-10; 4; 9; 17 |
| GSAMP 2006-HE3 | Group 1 | Ex. 27 at S-29-S-30; S-38; S-39; S-49; A-3; A-10; A-11; 4; 9; 17 |

| Table B: Goldman Sachs' Additional Disclosures Regarding Compliance with LTV/CLTV Ratios and Other Valuation Matters | | |
|---|---|---|
| **Securitization** | **SLG** | **Prospectus Supplement Page Number** |
| GSAMP 2006-HE4 | Group 1 | Ex. 28 at S-29-S-30; S-38; S-39; S-46; A-3; A-10; 4; 9; 17 |
| GSAMP 2006-HE5 | Group 1 | Ex. 29 at S-28-S-29; S-37; S-38; S-45; A-3; A-10; A-15; 4; 9; 17 |
| GSAMP 2006-HE7 | Group 1 | Ex. 30 at S-28-S-29; S-36; S-37; S-47; S-49; A-3; A-11; 4; 9; 17 |
| GSAMP 2006-HE8 | Group 1 | Ex. 31 at S-28; S-36; S-37; S-45; S-49; A-3; A-11; 4; 9; 17 |
| GSAMP 2006-NC2 | Group 1 | Ex. 32 at S-25-S-27; S-33-S-34; S-40-S-44; A-3; A-9; 4; 9; 17 |
| GSAMP 2007-FM1 | Group 1 | Ex. 33 at S-28-S-30; S-36-S-37; S-44-S-46; A-3; A-8; A-9; 4; 9; 17 |
| GSAMP 2007-FM2 | Group 1 | Ex. 34 at S-29-S-31; S-38-S-39; S-49-S-51; A-3; A-10; 4; 9; 17 |
| GSAMP 2007-HE1 | Group 1 | Ex. 35 at S-28-S-29; S-36; S-37; S-46; S-48-S-49; A-3; A-9; A-10; 4; 9; 17 |
| GSAMP 2007-HE2 | Group 1 | Ex. 36 at S-29-S-31; S-38; S-39; S-54-S-58; A-3; A-10; 4; 9; 17 |
| GSAMP 2007-NC1 | Group 1 | Ex. 37 at S-27-S-29; S-36-S-37; S-46-S-50; A-3; A-8; A-9; 4; 9; 17 |
| GSR 2006-OA1 | Group 1 | Ex. 38 at S-38; S-45; S-50; S-52-S-56; S-59; 4; 9; 17 |
| GSR 2007-AR2 | Group 6 | Ex. 39 at S-32; S-39; S-44-S-45; S-47-S-50; S-54; S-59; S-69-S-70; S-78; 4; 9; 17 |
| GSR 2007-OA1 | Group 1 | Ex. 40 at S-46; S-53; S-59; S-61-S-65; S-68; S-71-S-73; 4; 9; 17 |
| GSR 2007-OA2 | Group 1 | Ex. 2 at S-41; S-48; S-56-S-58; 4; 9; 17 |
| INDX 2005-AR18 | Group 1 | Ex. 41 at S-15; S-18; S-20; 16; 25 |
| INDX 2005-AR27 | Group 2 | Ex. 42 at S-10-S-11; S-15; S- |

| Table B: Goldman Sachs' Additional Disclosures Regarding Compliance with LTV/CLTV Ratios and Other Valuation Matters | | |
|---|---|---|
| Securitization | SLG | Prospectus Supplement Page Number |
| | | 18; 16; 25 |

22.    Undisputed that ¶ 22 and Table 3 cite pages from the identified Prospectus Supplements that include disclosures concerning owner-occupancy.  Disputed that the Goldman Sachs Defendants made representations "concerning the occupancy status of the borrowers of the Mortgage Loans."  For example, the Prospectus Supplement for GSAMP 2006-HE7 states that owner-occupancy disclosures are "based on information that we consider reliable, but we do not represent that it is accurate or complete and it should not be relied upon as such."  Ex. 30 at A-4, A-12, A-20.  The Offering Materials include additional disclosures concerning owner-occupancy as specified in Table C:

| Table C: Goldman Sachs' Additional Disclosures Regarding Owner Occupancy | | |
|---|---|---|
| Securitization | SLG | Prospectus Supplement Page Number |
| ACCR 2005-4 | Group 1 | Ex. 6 at 20 |
| AHMA 2006-1 | Group 1 | Ex. 7 at S-24; S-37; S-38 |
| FFML 2005-FF8 | Group 1 | Ex. 8 at S-27; S-36; A-26; A-30; A-35; A-39; A-44 |
| FFML 2005-FF11 | Group 1 | Ex. 9 at S-28; A-25; A-31; A-37; A-41; A-47; A-53 |
| FFML 2006-FF13 | Group 1 | Ex. 10 at S-31; A-11 |
| FHLT 2006-E | Group 1 | Ex. 11 at S-32 |
| GSAA 2005-11 | Group 1 | Ex. 12 at S-34; S-44; S-47; A-31; A-39; A-46; A-53 |
| GSAA 2005-14 | Group 1 | Ex. 13 at S-34; S-66; A-28; A-36 |
| GSAA 2005-15 | Group 1 | Ex. 14 at S-34; S-70; A-28; A-35 |
| GSAA 2006-2 | Group 1 | Ex. 15 at S-42; S-79; A-28; A-35 |
| GSAA 2006-4 | Group 1 | Ex. 16 at S-40; S-48; S-60; S-64; S-B-14; S-B-21 |
| GSAA 2006-5 | Group 1 | Ex. 17 at S-42; S-49; S-84; A- |

10

| Table C: Goldman Sachs' Additional Disclosures Regarding Owner Occupancy | | |
|---|---|---|
| Securitization | SLG | Prospectus Supplement Page Number |
| | | 29; A-36 |
| GSAA 2006-8 | Group 1 | Ex. 3 at S-43; S-89; A-27; A-34 |
| GSAA 2006-11 | Group 1 | Ex. 18 at S-44; S-89; A-27; A-34 |
| GSAA 2007-6 | Group 3 | Ex. 19 at S-50; S-99; A-29; A-36 |
| GSAMP 2005-AHL2 | Group 1 | Ex. 1 at S-32; S-57; A-25; A-31 |
| GSAMP 2005-HE5 | Group 1 | Ex. 20 at S-32; S-41; A-28; A-35; A-40; A-46; A-53; A-58 |
| GSAMP 2005-HE6 | Group 1 | Ex. 21 at S-33; A-4; A-11 |
| GSAMP 2005-WMC2 | Group 1 | Ex. 22 at S-27-S-28; S-56; A-25; A-31; A-37; A-42; A-49; A-55; A-60; A-67; A-73 |
| GSAMP 2005-WMC3 | Group 1 | Ex. 23 at S-26- S-27; S-55; A-3; A-11; A-18 |
| GSAMP-2006 FM1 | Group 1 | Ex. 24 at S-33; S-62; A-4; A-11 |
| GSAMP 2006-FM2 | Group 1 | Ex. 25 at S-33; S-60; A-4; A-11 |
| GSAMP 2006-FM3 | Group 1 | Ex. 26 at S-35; S-62; A-4; A-11 |
| GSAMP 2006-HE3 | Group 1 | Ex. 27 at S-38; A-4; A-11 |
| GSAMP 2006-HE4 | Group 1 | Ex. 28 at S-38; A-4; A-11 |
| GSAMP 2006-HE5 | Group 1 | Ex. 29 at S-37; A-4; A-11; A-16 |
| GSAMP 2006-HE7 | Group 1 | Ex. 30 at S-36; A-4; A-12; A-20 |
| GSAMP 2006-HE8 | Group 1 | Ex. 31 at S-36; A-4; A-12 |
| GSAMP 2006-NC2 | Group 1 | Ex. 32 at S-33; S-64-S-65; A-4; A-10 |
| GSAMP 2007-FM1 | Group 1 | Ex. 33 at S-36; S-62; A-3; A-9 |
| GSAMP 2007-FM2 | Group 1 | Ex. 34 at S-38; S-68; A-4; A-11 |
| GSAMP 2007-HE1 | Group 1 | Ex. 35 at S-36; A-3; A-10 |
| GSAMP 2007-HE2 | Group 1 | Ex. 36 at S-38; A-4; A-11 |
| GSAMP 2007-NC1 | Group 1 | Ex. 37 at S-17-S-20; S-36; S-67; A-3; A-9 |
| GSR 2006-OA1 | Group 1 | Ex. 38 at S-45; S-62 |
| GSR 2007-AR2 | Group 6 | Ex. 39 at S-39; S-63; S-89 |

| Table C: Goldman Sachs' Additional Disclosures Regarding Owner Occupancy | | |
|---|---|---|
| **Securitization** | **SLG** | **Prospectus Supplement Page Number** |
| GSR 2007-OA1 | Group 1 | Ex. 40 at S-42; S-53; S-78; S-82 |
| GSR 2007-OA2 | Group 1 | Ex. 2 at S-48; S-65; S-69 |
| INDX 2005-AR18 | Group 1 | Ex. 41 at S-18; S-29; 23; 26 |
| INDX 2005-AR27 | Group 2 | Ex. 42 at S-15; S-20; S-24; S-28; S-32; S-35 |

23.     Except where otherwise noted, undisputed that that ¶ 22 and Table 4 cite pages from the identified prospectus supplements that include disclosures concerning credit ratings.  The Offering Materials include additional disclosures concerning credit ratings as specified in Table D:

| Table D: Goldman Sachs' Additional Disclosures Regarding Credit Ratings | |
|---|---|
| **Securitization** | **Prospectus Supplement Page Number** |
| ACCR 2005-4 | Ex. 6 at S-15; S-149; 11 |
| AHMA 2006-1 | Ex. 7 at S-13; S-20; S-21; S-91; 132 |
| FFML 2005-FF8 | Ex. 8 at S-9; S-14; 116 |
| FFML 2005-FF11 | Ex. 9 at S-10; S-15; S-25; S-99; S-101 |
| FFML 2006-FF13 | Ex. 10 at S-12; S-18; S-28; S-119; S-121; 13; 127 |
| FHLT 2006-E | Ex. 11 at S-12; S-13; S-18; S-29; 21 |
| GSAA 2005-11 | Ex. 12 at S-11; S-16; S-30; S-128-S-129; 112 |
| GSAA 2005-14 | Ex. 13 at S-12; S-124-S-125 |
| GSAA 2005-15 | Ex. 14 at S-12; S-17; S-30; S-127; 11; 121 |
| GSAA 2006-2 | Ex. 15 at S-19; S-24; S-37; S-139; S-141-S-142; 11; 121 |
| GSAA 2006-4 | Ex. 16 at S-22; S-34; S-138; S-140-S-141; 11; 121 |
| GSAA 2006-5 | Ex. 17 at S-20; S-25; S-38; S-144; S-146-S-147; 11; 121 |
| GSAA 2006-8 | Ex. 3 at S-21; S-26; S-38; S-150-S-151; 13; 127 |
| GSAA 2006-11 | Ex. 18 at S-21; S-26; 13; 127 |
| GSAA 2007-6 | Ex. 19 at S-23; S-29; S-46; S-169; 13; 126 |
| GSAMP 2005-AHL2 | Ex. 1 at S-12; S-28; S-111; 11; 121 |
| GSAMP 2005-HE5 | Ex. 20 at S-11; S-26-S-27; 11; 121 |
| GSAMP 2005-HE6 | Ex. 21 at S-11; S-17; S-27-S-28; S-119; 11; |

| Table D: Goldman Sachs' Additional Disclosures Regarding Credit Ratings | |
|---|---|
| Securitization | Prospectus Supplement Page Number |
|  | 121 |
| GSAMP 2005-WMC2 | Ex. 22 at S-9-S-10; S-25; 6; 121 |
| GSAMP 2005-WMC3 | Ex. 23 at S-9; S-24; S-104-S-105; 11; 121 |
| GSAMP-2006 FM1 | Ex. 24 at S-13; S-19; S-29; S-117; S-119 |
| GSAMP 2006-FM2 | Ex. 25 at S-14; S-20; S-28; S-30; S-122; 13; 127 |
| GSAMP 2006-FM3 | Ex. 26 at S-15; S-21; S-32; S-122; S-124 |
| GSAMP 2006-HE3 | Ex. 27 at S-22-S-23; S-33; S-136; S-139 |
| GSAMP 2006-HE4 | Ex. 28 at S-16; S-22-S-23; S-34; S-134-S-135; S-137; 7 |
| GSAMP 2006-HE5 | Ex. 29 at S-16; S-22; S-30; S-33; S-133; 13; 119 |
| GSAMP 2006-HE7 | Ex. 30 at S-16; S-22; S-33; S-129; S-132; 127 |
| GSAMP 2006-HE8 | Ex. 31 at S-15; S-21; S-32; S-130; S-132; 12; 126 |
| GSAMP 2006-NC2 | Ex. 32 at S-14; S-20; S-30; S-123; S-125; 13 |
| GSAMP 2007-FM1 | Ex. 33 at S-16; S-22; S-30-S-31; S-33; S-123; 13 |
| GSAMP 2007-FM2 | Ex, 34 at S-16; S-23; S-32; S-34; S-133 |
| GSAMP 2007-HE1 | Ex, 35 at S-16; S-22; S-30; S-33; S-128; 126 |
| GSAMP 2007-HE2 | Ex. 36 at S-16; S-23; S-35; S-135; S-138; 13; 126 |
| GSAMP 2007-NC1 | Ex. 37 at S-16; S-22; S-29-S-30; S-33; S-128; 28-32 |
| GSR 2006-OA1 | Ex. 38 at S-22; S-28; S-38-S-39; S-102; S-142-S-143; 13; 127 |
| GSR 2007-AR2 | Ex. 39 at S-20; S-33; S-162-S-163; 13; 126 |
| GSR 2007-OA1 | Ex. 40 at S-25; S-32; S-41; S-46; S-171; 27-33 |
| GSR 2007-OA2 | Ex. 2 at S-24; S-29; S-41; S-135-S-136; 126-127 |
| INDX 2005-AR18 | Ex. 41 at S-4; S-81; S-83; 91 |
| INDX 2005-AR27 | Ex. 42 at S-3; S-73; S-75; 9-10; 93 |

24.    Except where otherwise noted, undisputed that ¶ 24 and Table 5 cite pages from the identified Prospectus Supplements that include disclosures related to LTV and valuations, owner-occupancy, and credit ratings.

25.     Undisputed, except that the assertion as to Barclays is no longer relevant because the claims against the Barclays Defendants have been dismissed voluntarily and with prejudice (11 Civ. 6190 (DLC), D.E. No. 630), and therefore does not require response.

26.     Except where otherwise noted, undisputed that as to RALI 2007-QH5, ¶ 26 and Table 6 cite pages from the identified Prospectus Supplement that include disclosures concerning whether mortgage loans were underwritten generally or substantially in accordance with Originators' underwriting guidelines.  The Offering Materials include additional disclosures concerning origination and underwriting guidelines as specified in Table E:

| Table E: Goldman Sachs' Additional Disclosures Regarding Compliance with Underwriting Guidelines | | |
|---|---|---|
| Securitization | Prospectus Supplement Page Number | Originators |
| RALI 2007-QH5 | Ex. 43 at S-11; S-20; S-53; S-54; S-88; 8; 17; 18; 20; 22; 23 | Residential Funding |

27.     Except where otherwise noted, undisputed that as to RALI 2007-QH5 ¶ 27 and Table 7 cite pages from the identified Prospectus Supplement that include disclosures concerning valuation.  The Offering Materials include additional disclosures concerning LTV/CLTV ratios and valuation matters as specified in Table F:

| Table F: Goldman Sachs' Additional Disclosures Regarding Compliance with LTV/CLTV Ratios and Other Valuation Disclosures | | |
|---|---|---|
| Securitization | SLG | Prospectus Supplement Page Number |
| RALI 2007-QH5 | Group 2 | Ex. 43 at S-21; S-54; S-55; 16-19 |

28.     Except where otherwise noted, undisputed that as to RALI 2007-QH5  ¶ 28 and Table 8 cite pages from the identified prospectus supplement that include disclosures concerning owner-occupancy.  The Offering Materials include additional disclosures concerning owner-occupancy as specified in Table G:

| Table G: Goldman Sachs' Additional Disclosures Regarding Owner Occupancy | | |
|---|---|---|
| **Securitization** | **SLG** | **Prospectus Supplement Page Number** |
| RALI 2007-QH5 | Group II | Ex. 43 at S-20; S-53; S-55; S-88; 15; 16 |

29.     Except where otherwise noted, undisputed that as to RALI 2007-QH5 ¶ 29 and Table 9 cite pages from the identified Prospectus Supplement that include disclosures concerning credit ratings.  The Offering Materials include additional disclosures concerning credit ratings as specified in Table H:

| Table H: Goldman Sachs' Additional Representations Regarding Credit Ratings | |
|---|---|
| **Securitization** | **Prospectus Supplement Page Number** |
| RALI 2007-QH5 | Ex. 43 at S-6; S-17; S-24; S-41; S-120-S-121; 152 |

30.     Except where otherwise noted, undisputed that as to RALI 2007-QH5 ¶ 30 and Table 10 cite pages from the identified term sheet that include disclosures related to LTV and valuations, owner-occupancy, and credit ratings.

31.     Undisputed.

32.     Undisputed that Freddie Mac purchased a Certificate from the I-A tranche of the HASC 2006-HE1 Securitization on November 3, 2006.

33.     The HASC 2006-HE1 Prospectus Supplement included the language cited in ¶ 33, as well as other disclosures related to the origination and underwriting of the underlying mortgage loans.  In this and all subsequent responses, unless explicitly undisputed otherwise, defendants deny that "the HSBC Defendants" or any similar collection of defendants took any particular action, either collectively or as individuals.  *See* Ex. 44 at S-2; S-23; S-26; S-33; S-41-6-; S-64; S-97.

34.     The HASC 2006-HE1 Prospectus Supplement included the representations cited in ¶ 34, as well as other disclosures related to owner-occupancy, valuation of the loans and credit ratings, and the calculation of those figures based on statistics subject to variance as disclosed in the prospectus supplement.  *See* Ex. 44 at S-2; S-4; S-6; S-16; S-19; S-24; S-28; S-31; S-33; S-37; S-38; S-46; S-48; S-49; S-51-S-60; S-64; A-7-A-8; A-17.

35.     Except where otherwise noted, undisputed that ¶ 35 and Table 11 cite pages from the identified prospectus supplements that include disclosures concerning whether mortgage loans were underwritten generally or substantially in accordance with Originators' underwriting guidelines.  The Offering Materials include additional representations and disclosures concerning origination and underwriting guidelines as specified in Table I:

| Table I: HSBC's Additional Disclosures Regarding Compliance with Underwriting Guidelines | | |
|---|---|---|
| Securitization | Prospectus Supplement Page Number | Originators |
| FFML 2006-FF1 | Ex. 45 at S-2; S-22-S-24; S-28; S-35-S-39; S-43; S-71 | First Franklin |
| FFML 2006-FF5 | Ex. 46 at S-2; S-3; S-25; S-31; S-39-S-43; S-47; S-79; S-89 | First Franklin |
| FFML 2006-FF7 | Ex. 47 at S-2; S-3; S-24; S-30; S-37-S-42; S-46; S-78; S-88 | First Franklin |
| FFML 2006-FF9 | Ex. 48 at S-2; S-3; S-24; S-30; S-38-42; S-46; S-77; S-86 | First Franklin |
| FFML 2006-FF11 | Ex. 49 at S-2; S-3; S-23; S-29; S-37-42; S-45; S-47; S-77 | First Franklin |
| HASC 2005-I1 | Ex. 50 at S-1; S-16; S-23; S-28-S-40; S-43; S-60 | First Franklin; New Century |
| HASC 2006-HE1 | Ex. 44 at S-2; S-23; S-26; S-33; S-41-S-60; S-64; S-97 | WMC; Countrywide; General |
| HASC 2006-HE2 | Ex. 51 at S-2; S-24; S-27; S-33; S-42-61; S-64; S-100 | Countrywide; General |
| HASC 2006-NC1 | Ex. 52 at S-2; S-22; S-28; S-35-41; S-44; S-74 | New Century |
| HASC 2006-OPT1 | Ex. 53 at S-2; S-23; S-29; S-36-S-41; S-44; S-73 | Option One |
| HASC 2006-OPT2 | Ex. 54 at S-2; S-23; S-28; S-36-S-40; S-44; S-73 | Option One |

| Table I: HSBC's Additional Disclosures Regarding Compliance with Underwriting Guidelines | | |
|---|---|---|
| Securitization | Prospectus Supplement Page Number | Originators |
| HASC 2006-OPT3 | Ex. 55 at S-2; S-23; S-29; S-37-S-41; S-45; S-46; S-76; | Option One |
| HASC 2006-OPT4 | Ex. 56 at S-2; S-24; S-30; S-38-S-42; S-46; S-78 | Option One |
| HASC 2007-HE1 | Ex. 57 at S-2; S-23; S-26; S-32; S-40-S-43; S-49; S-82 | Accredited; General |
| HASC 2007-HE2 | Ex. 58 at S-2; S-18; S-24; S-27; S-32; S-41-S-58; S-63; | Decision One; WMC; General |
| HASC 2007-OPT1 | Ex. 59 at S-2; S-21; S-24; S-30; S-38-S-42; S-45; S-78 | Option One |
| HASC 2007-WF1 | Ex. 60 at S-2; S-17; S-23; S-26; S-32; S-40-S-65; S-69 | Wells Fargo |

36.     Except where otherwise noted, undisputed that ¶ 36 and Table 12 cite

pages from the identified Prospectus Supplements that include disclosures concerning valuation.

The Offering Materials include additional disclosures concerning LTV/CLTV ratios and

valuation matters as specified in Table J:

| Table J: HSBC's Additional Disclosures Regarding Compliance with LTV/CLTV Ratios and Other Valuation Disclosures | | |
|---|---|---|
| Securitization | SLG | Prospectus Supplement Page Number |
| FFML 2006-FF1 | 1 | S-4; S-24; S-29; S-32-33; S-35; S-37-39; A-7-A-8 |
| FFML 2006-FF5 | 1 | S-4; S-27; S-32; S-35-36; S-38; A-7-A-8 |
| FFML 2006-FF7 | 1 | S-4; S-26; S-30; S-33-35; S-36; A-7-A-8 |
| FFML 2006-FF9 | 1 | S-4; S-26; S-30; S-33-35; A-7-A-A-8 |
| FFML 2006-FF11 | 1 | S-4; S-25; S-30; S-33-34; A-7-A-8 |
| HASC 2005-I1 | 1 | S-4; S-18; S-23-24; S-33; S-47; S-48; A-7-A-8 |
| HASC 2006-HE1 | 1 | S-4; S-28; S-33; S-37; S-38; S-46; S-48; S-49; S-51-S-60; A-7-A-8 |
| HASC 2006-HE2 | 1 | S-4; S-28; S-33; S-44; S-46-48; S-50-S-54; S-57-60; A-7-A-8 |
| HASC 2006-NC1 | 1 | S-3; S-24; S-29; S-31-32; S-36-S-37; A-7-A-8 |
| HASC 2006-OPT1 | 1 | S-3; S-24; S-30; S-33-34; S-38-S-41; A-7-A-8 |
| HASC 2006-OPT2 | 1 | S-4; S-24; S-29; S-32-33; S-37-S-40; A-7- |

| Table J: HSBC's Additional Disclosures Regarding Compliance with LTV/CLTV Ratios and Other Valuation Disclosures | | |
|---|---|---|
| **Securitization** | **SLG** | **Prospectus Supplement Page Number** |
| | | A-8 |
| HASC 2006-OPT3 | 1 | S-4; S-24-25; S-29; S-32-33; S-39-S-41; A-7-A-8 |
| | 2 | S-4; S-24-25; S-29; S-32-33; S-39-S-41; A-7-A-8 |
| HASC 2006-OPT4 | 1 | S-4; S-26; S-31; S-34-35; S-39-S-42; A-7-A-8 |
| HASC 2007-HE1 | 1 | S-4; S-27; S-32; S-35-37; S-41-S-43; A-7-A-8 |
| HASC 2007-HE2 | 1 | S-4; S-28; S-33; S-36-38; S-41-S-43; A-7-A-8 |
| HASC 2007-OPT1 | 1 | S-4; S-25; S-30; S-33-34; S-39-S-42; A-7-A-8 |
| HASC 2007-WF1 | 1 | S-4; S-27; S-32; S-36; S-45-S-65; A-7-A-8 |

37.     Except where otherwise noted, undisputed that ¶ 37 and Table 13 cite pages from the identified prospectus supplements that include disclosures concerning owner-occupancy.  The Offering Materials include additional disclosures concerning owner-occupancy as specified in Table K:

| Table K: HSBC's Additional Disclosures Regarding Owner Occupancy | | |
|---|---|---|
| **Securitization** | **SLG** | **Prospectus Supplement Page Number** |
| FFML 2006-FF1 | 1 | S-44; A-17 |
| FFML 2006-FF5 | 1 | S-48; A-17 |
| FFML 2006-FF7 | 1 | S-46; A-17 |
| FFML 2006-FF9 | 1 | S-46; A-17 |
| FFML 2006-FF11 | 1 | S-46; A-17 |
| HASC 2005-I1 | 1 | S-44; A-17 |
| HASC 2006-HE1 | 1 | S-64; A-17 |
| HASC 2006-HE2 | 1 | S-64; A-17 |
| HASC 2006-NC1 | 1 | S-45; A-17 |
| HASC 2006-OPT1 | 1 | S-45; A-17 |
| HASC 2006-OPT2 | 1 | S-44; A-18 |
| HASC 2006-OPT3 | 1 | S-45; A-17 |
| | 2 | S-45; A-17 |
| HASC 2006-OPT4 | 1 | S-46; A-17 |

18

| Table K: HSBC's Additional Disclosures Regarding Owner Occupancy | | |
|---|---|---|
| Securitization | SLG | Prospectus Supplement Page Number |
| HASC 2007-HE1 | 1 | S-49; A-17 |
| HASC 2007-HE2 | 1 | S-62; A-17 |
| HASC 2007-OPT1 | 1 | S-46; A-17 |
| HASC 2007-WF1 | 1 | S-69; A-18 |

38.     Except where otherwise noted, undisputed that ¶ 38 and Table 14 cite pages from the identified prospectus supplements that include disclosures concerning credit ratings.  The Offering Materials include additional disclosures concerning credit ratings as specified in Table L:

| Table L: HSBC's Additional Disclosures Regarding Credit Ratings | |
|---|---|
| Securitization | Prospectus Supplement Page Number |
| FFML 2006-FF1 | S-2; S-6; S-14; S-17; S-20; S-27; |
| FFML 2006-FF5 | S-2; S-6; S-16; S-23; S-30 |
| FFML 2006-FF7 | S-2; S-6; S-15; S-18; S-22; S-29 |
| FFML 2006-FF9 | S-2; S-6; S-15; S-18; S-22; S-29; |
| FFML 2006-FF11 | S-2; S-6; S-15; S-18; S-22; S-28 |
| HASC 2005-I1 | S-2; S-5; S-9; S-12; S-14; S-15; S-21 |
| HASC 2006-HE1 | S-2; S-6; S-16; S-19; S-24; S-31 |
| HASC 2006-HE2 | S-2; S-6; S-16; S-19; S-24; S-32 |
| HASC 2006-NC1 | S-2; S-6; S-14; S-17; S-21; S-27; |
| HASC 2006-OPT1 | S-2; S-5; S-14; S-17; S-21; S-27; |
| HASC 2006-OPT2 | S-2; S-5; S-14; S-17; S-21; S-27 |
| HASC 2006-OPT3 | S-2; S-5; S-14; S-17; S-21; S-28 |
| HASC 2006-OPT4 | S-2; S-5; S-15; S-18; S-23; S-29; |
| HASC 2007-HE1 | S-2; S-6; S-15; S-19; S-24; S-31; |
| HASC 2007-HE2 | S-2; S-6; S-15-16; S-20; S-25; S-31; |
| HASC 2007-OPT1 | S-2; S-5; S-14; S-17; S-22; S-28; |
| HASC 2007-WF1 | S-2; S-5; S-14-15; S-19; S-24; S-31 |

39.     Except where otherwise noted, undisputed that ¶ 39, Table 15 cites pages from the identified preliminary offering materials that include disclosures related to LTV and valuations, owner-occupancy, and credit ratings.

40.     The Nomura Defendants do not dispute that certain of them issued 7 Securitizations pursuant to Shelf Registration Statements and Prospectus Supplements and that the GSEs purchased 7 Certificates from these 7 Securitizations.

41.     Except where otherwise noted, the Nomura Defendants do not dispute that ¶ 41, Table 16 cites selected pages from the relevant prospectus supplements for NAA 2005-AR6, NHELI 2006-FM1, NHELI 2006-FM2, NHELI 2006-HE3, NHELI 2007-1 and NHELI 2007-2 that include representations concerning whether mortgage loans were underwritten generally or substantially in accordance with Originators' underwriting guidelines.  The Nomura Defendants aver that the Offering Materials include additional representations concerning the nature of the underwriting guidelines—including differences from guidelines applicable to GSE loans—and exceptions to the guidelines made by originators and the risks attendant to the use of reduced guidelines.  The Nomura Defendants dispute that the prospectus supplement for NHELI 2007-3 represents that the mortgage loans were generally or substantially underwritten in accordance with ResMAE's underwriting guidelines and aver that this prospectus supplement specifically discloses that the loans originated by ResMAE—and any other Originator in financial distress—may not be underwritten in substantial compliance with applicable guidelines.

| Table M : Nomura's Additional Disclosures Regarding Compliance with Underwriting Guidelines | | |
|---|---|---|
| **Securitization** | **Prospectus Supplement Page Number** | **Originators** |
| NAA 2005-AR6 | Ex. 493 at NOM-FHFA_04811894 | General |
| NHELI 2006-FM1 | Ex. 494 at NOM-FHFA_04729544 | Fremont |
| NHELI 2006-FM2 | Ex. 495 at NOM-FHFA_04638396-98 | Fremont |

| | | |
|---|---|---|
| NHELI 2006-HE3 | Ex. 496 at NOM-FHFA_04620972-73 | General |
| NHELI 2007-1 | Ex. 497 at NOM-FHFA_05142021-24 | FNB Nevada |
| | Ex. 497 at NOM-FHFA_05142024-25 | Silver State |
| | Ex. 497 at NOM-FHFA_05142026-27 | General |
| NHELI 2007-2 | Ex. 498 at NOM-FHFA_05591413-15 | OwnIt |
| | Ex. 498 at NOM-FHFA_05591415-16 | General |
| NHELI 2007-3 | Ex. 499 at NOM-FHFA_04732664 | ResMAE |
| | Ex. 499 at NOM-FHFA_04732712-13 | General |

42.     The Nomura Defendants do not dispute that ¶ 42, Table 17 cites pages from the relevant prospectus supplement that include representations concerning valuation.  The Offering Materials include additional representations and disclosures concerning LTV/CLTV ratios and valuation—including how the ratios are calculated and the sources used—as specified in Table N:

| Table N: Nomura's Additional Disclosures Regarding Compliance with LTV/CLTV Ratios and Other Valuation Disclosures | | |
|---|---|---|
| Securitization | SLG | Prospectus Supplement Page Number |
| NAA 2005-AR6 | Group III | Ex. 493 at NOM-FHFA_04811976 |
| NHELI 2006-FM1 | Group I | Ex. 494 at NOM-FHFA_04729664-65 |
| NHELI 2006-FM2 | Group I | Ex. 495 at NOM-FHFA_04638543 |
| NHELI 2006-HE3 | Group I | Ex. 496 at NOM-FHFA_04621112 |
| NHELI 2007-1 | Group II-1 | Ex. 497 at NOM-FHFA_05142213 |
| NHELI 2007-2 | Group I | Ex. 498 at NOM-FHFA_05591416-17, NOM-FHFA_05591579 |
| NHELI 2007-3 | Group II | Ex. 499 at NOM-FHFA_04732713-14, NOM-FHFA_04732866 |

The Nomura Defendants dispute that the Prospectus Supplement for NAA 2005-AR6 made representations concerning CLTV ratios.

43.     The Nomura Defendants do not dispute that the Prospectus Supplements reported the occupancy status of borrowers.  The Prospectus Supplements contain information supplied by borrowers to originators concerning their intentions to occupy the properties securing the Mortgage Loans at the pages cited in  ¶ 43, Table 18.

44.     The Nomura Defendants do not dispute that the Prospectus Supplements reported the then-current credit ratings for each tranche of the Securitizations provided to the Nomura Defendants by the Credit Rating Agencies.

45.     The Nomura Defendants dispute that Paragraph 45 accurately portrays the representations made in preliminary offering materials related to the 7 Nomura Securitizations, as cited in ¶ 45.  In addition, the preliminary offering materials for NAA 2005-AR6 make no representation about the CLTV of the Mortgage Loans.  The preliminary offering materials cited in Table 20 for NAA 2005-AR6, NHELI 2006-FM1, NHELI 2006-FM2, NHELI 2007-1, NHELI 2007-3 indicate only expected credit ratings.  The preliminary offering materials cited in Table 20 for NHELI 2006-FM1 only provide credit ratings for two tranches of the securitization, not every tranche.

The Nomura Defendants do not dispute that ¶ 45, Table 20 cites pages from the relevant preliminary offering documents that include that include certain representations concerning LTV and valuations, owner-occupancy, and credit ratings.  The Preliminary Offering Materials include additional representations and disclosures concerning these disclosures as specified in Table O.

| Table O: Nomura's Additional Disclosures in Preliminary Offering Materials | | |
|---|---|---|
| Securitization | SLG | Prospectus Supplement Page Number |
| NAA 2005-AR6 | Group III | Ex. 493 at FHFA00200771 |

| NHELI 2006-FM1 | Group I | Ex. 494 at FHFA01041472 |
|---|---|---|
| NHELI 2006-FM2 | Group I | Ex. 495 at FHFA01041897 |
| NHELI 2006-HE3 | Group I | Ex. 496 at FHFA01041504-505 |
| NHELI 2007-1 | Group II-1 | Ex. 497 at FHFA013746810-811 |
| NHELI 2007-2 | Group I | Ex. 498 at FHFA04227300 |
| NHELI 2007-3 | Group II | Ex. 499 at FHFA01055475 |

46.     The assertion is no longer relevant because the claims against the Barclays Defendants have been dismissed voluntarily and with prejudice (11 Civ. 6190 (DLC), D.E. No. 630) and therefore does not require response.

47.     The assertion is no longer relevant because the claims against the Barclays Defendants have been dismissed voluntarily and with prejudice (11 Civ. 6190 (DLC), D.E. No. 630), and therefore does not require response.

48.     The assertion is no longer relevant because the claims against the Barclays Defendants have been dismissed voluntarily and with prejudice (11 Civ. 6190 (DLC), D.E. No. 630), and therefore does not require response.

49.     The assertion is no longer relevant because the claims against the Barclays Defendants have been dismissed voluntarily and with prejudice (11 Civ. 6190 (DLC), D.E. No. 630), and therefore does not require response.

50.     The assertion is no longer relevant because the claims against the Barclays Defendants have been dismissed voluntarily and with prejudice (11 Civ. 6190 (DLC), D.E. No. 630), and therefore does not require response.

51.     The assertion is no longer relevant because the claims against the Barclays Defendants have been dismissed voluntarily and with prejudice (11 Civ. 6190 (DLC), D.E. No. 630), and therefore does not require response.

52.     The assertion is no longer relevant because the claims against the First Horizon Defendants have been dismissed voluntarily and with prejudice (11 Civ. 6193 (DLC), D.E. No. 686), and therefore does not require response.

53.     The assertion is no longer relevant because the claims against the First Horizon Defendants have been dismissed voluntarily and with prejudice (11 Civ. 6193 (DLC), D.E. No. 686), and therefore does not require response.

54.     The assertion is no longer relevant because the claims against the First Horizon Defendants have been dismissed voluntarily and with prejudice (11 Civ. 6193 (DLC), D.E. No. 686), and therefore does not require response.

55.     The assertion is no longer relevant because the claims against the First Horizon Defendants have been dismissed voluntarily and with prejudice (11 Civ. 6193 (DLC), D.E. No. 686), and therefore does not require response.

56.     The assertion is no longer relevant because the claims against the First Horizon Defendants have been dismissed voluntarily and with prejudice (11 Civ. 6193 (DLC), D.E. No. 686), and therefore does not require response.

57.     The assertion is no longer relevant because the claims against the First Horizon Defendants have been dismissed voluntarily and with prejudice (11 Civ. 6193 (DLC), D.E. No. 686), and therefore does not require response.

58.     Undisputed.

59. Undisputed, except that the assertion as to Barclays is no longer relevant because the claims against the Barclays Defendants have been dismissed voluntarily and with prejudice (11 Civ. 6190 (DLC), D.E. No. 630), and therefore does not require response.

60. Undisputed.

61. The assertion is no longer relevant because the claims against the Barclays Defendants have been dismissed voluntarily and with prejudice (11 Civ. 6190 (DLC), D.E. No. 630), and therefore does not require response.

62. Undisputed.

63. The assertion is no longer relevant because the claims against the First Horizon Defendants have been dismissed voluntarily and with prejudice (11 Civ. 6193 (DLC), D.E. No. 686), and therefore does not require response.

64. Disputed for reasons set forth in below. *Infra* ¶¶ 65-72.

65. Undisputed that Mr. Salahuddin's testimony included the language cited by FHFA, except Mr. Salahuddin provided testimony on various subjects, some of which undermines, or provides necessary context for, FHFA's characterization of his quote. For example, Mr. Salahuddin testified that he was aware of rising EDPs as early as August 2006, including at Option One, and believed that trend could affect investors' view of "origination standards and quality control in the subprime sector." *See* Ex. 61 at 67:4-20; 168:19. He testified that he knew that loans backing Certificates Fannie purchased could be affected by that trend, which was "concerning," and that he encouraged Fannie Mae at that time to "look at underwriting standards and perhaps the degree to which Option One and others might be adhering to them." Ex 61 at 75:24-76:3; 78:8-12; 128:6-129:11. Mr. Salahuddin also testified that he was suspicious of certain dealers he purchased securities from, causing "a little bit of

spidey sense, sort of tingling," and that he considered Credit Rating Agencies a "lagging

indicator." Ex. 61 at 541:5-12; 301:13-18.  In December 2006, Salahuddin wrote that "[e]arly

trends on 2006 vintage bonds raise serious concerns, with skyrocketing 60 plus delinquency

rates," and in early 2007, he wrote "Fremont . . . agreed to a cease –and-desist order . . . requiring

the company to stop 'engaging in unsatisfactory lending practices' and 'operating with a large

volume of poor quality loans."  *See infra* ¶¶ 150, 393.  Mr. Salahuddin attended a January 2006

PLAT meeting at which Jim Callahan, a Fannie Mae consultant, warned "[t]here may be some

nonconforming loans that make it through to the pools that we buy."  *See infra* ¶ 371.  In

November 2006, Mr. Salahuddin received an e-mail from Ms. Dyson describing "a sharp spike

in New York sushi chefs applying for Wall Street Trader positions – listing 'previous experience

putting slimy things in pretty packages.'"  *See infra* ¶ 411.  As a member of PLAT, Mr.

Salahuddin received regular reports discussing market events and Fannie Mae's PLS

performance.  *See infra* ¶ 386.

66.     Undisputed that Mr. Salahuddin's testimony included the language cited by

FHFA, except Mr. Salahuddin provided testimony on various subjects, some of which

undermines, or provides necessary context for, FHFA's characterization of his quote.  *See supra*

¶ 65, which is incorporated into this paragraph.

67.     Undisputed that Ms. Dyson's testimony included the language cited by

FHFA, except Ms. Dyson provided testimony on various subjects, some of which undermines, or

provides necessary context for, FHFA's characterization of her quote.  For example, Ms. Dyson

testified that she knew "some small changes" might be made to the loan pool before closing that

were not reflected in the preliminary information provided in the prospectus supplement. *See* Ex.

62 at 526:22-527:10.  Ms. Dyson testified that she believed that EPDs of 4% could indicate fraud,

and wrote in November 2006 of a "sharp spike in New York sushi chefs applying for Wall Street

trader positions – listing 'previous experience putting slimy things in pretty pages." Ex. 62 at

191:8-15; 212:16-19.  She also testified that she was aware "that there were some shady

subprime mortgage brokers that utilized bad practices to sell loans to people," and did not

believe "there was no fraud or misrepresentation in the market," just as "S&P . . . report[ed] that

they believed that there was misrepresentation in the market."  Ex. 62 at 244:23-245:2; 348:22-

349:2, 380:16-20.  Ms. Dyson wrote in a March 2007 e-mail that "appraisal bias" should be

"tak[en] into account."  *See infra* ¶ 244.  In late 2006 and early 2007, respectively, Ms. Dyson

received e-mails from Mr. Salahuddin that "serious concerns [were raised by] skyrocketing 60+

delinquency rates" and "Fremont . . . agreed to a cease –and-desist order . . . requiring the

company to stop 'engaging in unsatisfactory lending practices' and 'operating with a large

volume of poor quality loans."  *See also infra* ¶¶ 150, 393.  As a member of PLAT, Ms. Dyson

received regular reports discussing market events and Fannie Mae's PLS performance.  *See infra*

¶ 386.  Moreover, when questioned about particular PLS trades, Ms. Dyson was unable to recall

specifics about her role, including PLS deals on which the trade tickets identified her as the

trader on PLS transactions and even the meaning of notes she had written.  Ex. 62 at 661:7-663:9,

670:3-670:24.

      68.     Undisputed that Mr. Norris' testimony included the language cited by

FHFA, except Mr. Norris provided testimony on various subjects, some of which undermines, or

provides necessary context for, FHFA's characterization of his quote.  For example, Mr. Norris

testified that Fannie Mae "understood" that as New Century and Fremont "were slowing down

their business," those originators had also "expanded their credit box tremendously," and that he

expected loans backing PLS to reflect the general underwriting practices of the originators

responsible for those loans.  *See* Ex. 63 at 431:14-25.  Mr. Norris was aware that no-

documentation loans like those backing the PLS Fannie Mae purchased were sometimes referred

to as "liar loans."  Ex. 63 at 281:20-284:4.  Mr. Norris also testified that he understood "between

10 percent and 50 percent" of loans in a PLS were sampled and that "by definition that meant

[Defendants] were not looking at every loan."  Ex. 63 at 565:6-566:10.  Mr. Norris wrote in

January 2007 that "[g]iven Ameriquest's past performance it is my opinion that subprime

performance will mirror overall market performance."  *See infra* ¶ 232.  In March 2007, Norris

wrote that "[w]e are starting to see pools from dealers we suspected were long some of this bad

collateral from New Century and Fremont" and the analysis of a pool of New Century loans

should "make some liberal assumptions with regard to CLTV, income, DTI, etc."  *See infra* ¶

436.  In late 2006 and early 2007, respectively, Mr. Norris received e-mails from Mr. Salahuddin

stating that "serious concerns [were raised by] skyrocketing 60+ delinquency rates" and

"Fremont . . . agreed to a cease –and-desist order . . . requiring the company to stop 'engaging in

unsatisfactory lending practices' and 'operating with a large volume of poor quality loans."  *See*

*infra* ¶¶ 150, 393.  In October 2006, Mr. Norris wrote to Mr. Salahuddin and Ms. Dyson

regarding a New Century loan offering that "[w]ould be extra careful with this type of special

product.  These loans will likely perform worse from a credit perspective as these shops stretch

to find borrowers."  *See infra* ¶ 415.  In November 2006, Mr. Norris received an e-mail from Ms.

Dyson describing "a sharp spike in New York sushi chefs applying for Wall Street Trader

positions – listing 'previous experience putting slimy things in pretty packages.'"  *See infra* ¶

411.  As a member of PLAT, Mr. Norris received regular reports discussing market events and

Fannie Mae's PLS performance.  *See infra* ¶ 386.  Moreover, at his deposition, Mr. Norris was

questioned about 33 PLS deals over two days, but could not recall any individual

Certificates.  Ex. 63 at 817:16-820:18.

69.     Undisputed that Mr. Gussman's testimony included the language cited by

FHFA, except Mr. Gussman provided testimony on various subjects, some of which undermines,

or provides necessary context for, FHFA's characterization of his quote.  For example, Mr.

Gussman testified that, in March 2007, he was asked to change the reported CLTV, income and

DTI information for a loan pool reported by New Century to assess as part of Fannie Mae's pre-

purchase analysis of the loans the difference in bond performance.  Ex. 64 at 317:18-320:13.  Mr.

Gussman testified that in March 2007 he read a report describing "recent woes in subprime . . .

traced to . . . poor underwriting in the 2006 vintage, coupled with mortgage fraud," and a

BasePoint Analytics study claiming "as much as 70 percent of EPD may be linked to a

significant misrepresentation on the original loan application."  Ex. 64 at 148:7-152:15.  In April

2007, Mr. Gussmann received an e-mail from a Fannie employee describing the "way [to] . . .

capture the appraisal bias effect" in PLS modeling and, in July 2007, Mr. Gussmann received an

e-mail from another Fannie Mae employee noting "appraisal bias is a big deal in terms of impact

on our bond analysis."  Ex. 389 at FHFA01819576; Ex. 276 at FHFA01660952. As a member of

PLAT, Mr. Gussman received regular reports discussing market events and Fannie Mae's PLS

performance.  *See infra* ¶ 386.

70.     Undisputed that Mr. Mudd's testimony included the language cited by

FHFA, except Mr. Mudd provided testimony on various subjects, some of which undermines, or

provides necessary context for, FHFA's characterization of his quote.  For example, Mr. Mudd

testified that Fannie Mae had "concerns" about the accuracy of reported occupancy statistics and

income misrepresentations connected to stated income loans, and as of 2005 he was aware that

risks in the "alternative mortgage products area . . . seemed to be increasing." *See* Ex. 65 at 31:10-15; 42:17-43:6.  Mr. Mudd testified that rising early payment defaults in 2006 were of "broad concern in the market," and that by February 2007, he had concluded that certain originators had "abandoned" their underwriting guidelines, including Ameriquest, New Century and "that whole crowd."  Ex. 65 at 148:17-149:8; 129:17-130:15.

71.    Undisputed that Mr. Niculescu's testimony included the language cited by FHFA, except Mr. Niculescu provided testimony on various subjects, some of which undermines, or provides necessary context for, FHFA's characterization of his quote.  For example, Mr. Niculescu testified that he could "see no reason why loan performance would be different" when loans were sold to Fannie Mae through PLS rather than directly, and that the identity of the originator was an important consideration in mortgage performance.  *See* Ex. 66 at 168:19-169:9. Mr. Niculescu testified that he was aware that PLS dealers performed diligence on only a sample of the loans they securitized.  Ex. 66 at 184:11-21, 187:6-9.  Mr. Niculescu also testified that EPDs indicate that "there may be a problem with the overall pool of mortgages that's been assembled," such as "[p]erhaps errors were made, or perhaps it goes beyond that and information was actually misstated at some point in the process . . . [and] the information the investor got was not an accurate reflection of the actual credit of the underlying borrowers themselves."  Ex. 66 at 219:23-220:4; 222:12-224:4.  In April 2007, Mr. Niculescu's presentation to a committee of Fannie Mae's Board of Directors stated "investor appetite and aggressive underwriting guidelines fueled subprime loan growth" and a "[s]low down in home price appreciation and interest rate resets exposed poor underwriting."  *See infra* ¶ 399.  As a member of PLAT, Mr. Niculescu received regular reports discussing market events and Fannie Mae's PLS performance. *See infra* ¶ 386.

72.     Undisputed that Mr. Niculescu's testimony included the language cited by
FHFA, except Niculescu provided testimony on various subjects, some of which undermines, or
provides necessary context for, FHFA's characterization of his quote.  *See supra* ¶ 71, which is
incorporated into this paragraph.

73.     Disputed for reasons set forth below.  *Infra* ¶¶ 74-89.

74.     Undisputed that Mr. Palmer's testimony included the language cited by
FHFA, except Mr. Palmer provided testimony on various subjects, some of which undermines,
or provides necessary context for, FHFA's characterization of his quote.  For example, Mr.
Palmer testified that he reviewed AMO reports, *infra* ¶¶ 240, to understand the nature of
originators' "fraud prevention mechanisms" as well as the ways originators assessed a
borrower's income.  *See* Ex. 67 at 217:23-218:26; 338:10-342:25.  In 2005, Mr. Palmer attended
a series of meetings where a "National Lending Customer Issues Comments" report was
distributed.  That document reported the "National defect rate" had increased from 7.8% in
December 2004 to 10.4% in May 2005.  *See infra* ¶¶ 314-317.  Mr. Palmer received an e-mail in
May 2006 suggesting that, for the AHMA 2006-1 transaction, "we assumed LTV's were higher
than reported."  *See infra* ¶ 366.  A month earlier, Mr. Palmer wrote similarly that for the INDX
2006-AR6 transaction, "we assumed LTVs were higher than reported . . . [and i]n the FICO/LTV
matrices we shifted CLTV to the right."  *See infra* ¶ 373.  In July 2006, Mr. Palmer wrote, in
connection with a Fremont transaction, "[w]e believe that the dealer is not reporting the true
CLTV accurately."  *See infra* ¶ 434.  A month later, Mr. Palmer noted one "deal contained a
higher percentage of collateral right at 80% [which] was an indicator to us that the reported
CLTV number could have been low."  *See infra* ¶ 435.  Moreover, when questioned about

specific PLS deals, Mr. Palmer testified that he did not recall his involvement with PLS deals he approved.  Ex. 67 at 724:24-726:22.

75.     Undisputed that Mr. Palmer's testimony included the language cited by FHFA, except Mr. Palmer provided testimony on various subjects, some of which undermines, or provides necessary context for, FHFA's characterization of his quote.  *See supra* ¶ 74, which is incorporated into this paragraph.

76.     Undisputed that Mr. Hackney's testimony included the language cited by FHFA, except Mr. Hackney provided testimony on various subjects, some of which undermines, or provides necessary context for, FHFA's characterization of his quote.  For example, Mr. Hackney testified that EPDs may signal a problem with the origination of a loan, and Freddie Mac would "need to do a review of those loans to determine why they defaulted." *See* Ex. 68 at 378:17-379:13; 393:5-394:5.  Mr. Hackey also testified that Freddie Mac understood that PLS dealers performed due diligence on a sample of loans, rather the entire pool and, in at least one instance, Freddie Mac was comfortable buying a PLS Certificate with LTVs higher than what was represented by the dealer, because "[w]e . . . believed that the credit support that was offered in this deal was sufficient."  Ex. 68 at 252:10- 253:3; 562:23-563:5.  Mr. Hackney received an e-mail in May 2006 suggesting that, for the AHMA 2006-1 transaction, "we assumed LTV's were higher than reported." *See infra* ¶ 366.  In June 2006, Mr. Hackney received an AMO review of First NLC that rated the originators as "Marginal," and "First NLC's guidelines make it more difficult for an investor working from a standard tape to properly evaluate risk." *See infra* ¶¶ 193-194, 347.  When questioned about specific PLS trades, Mr. Hackney testified that he had no recollection of those deals.  Ex. 68 at 568:9-569:7; 571:7-571:25; at 629:3-630:24.

77.    Disputed.  Mr. Hackney did not testify that he would have stopped doing business with dealers if he thought he was provided with inaccurate information.  He was asked whether he believed he had received inaccurate information from Bear Stearns, and he answered that he would have stopped doing business if anyone at Bear Stearns had provided him with inaccurate information.  *See* Ex. 68 at 233:21- 235:4; *see also supra* ¶ 76, which is incorporated into this paragraph.

78.    Undisputed that Mr. Romano's testimony included the language cited by FHFA, except Mr. Romano provided testimony on various subjects, some of which undermines, or provides necessary context for, FHFA's characterization of his quote.  For example, Mr. Romano testified that "[i]n general, the earlier the serious delinquency occurs the more likely it is linked to a signficant misrepresentation on the original loan application," that he received and forwarded reports about unprecedented loan default rates in 2006, and that "In 2005 and '6, I was concerned about how risk layering activities were taking place across the industry." Ex. 69 at 307:17-21; 531:22-537:17; 565:9-566:14.  Mr. Romano testified that he had concerns about fraudulent owner occupancy representations and appraisal practices generally in 2005 through 2007.  *Id.* at 217:13; 225-34; 263:17-20; , 431:24-432:13.  Mr. Romano also testified that he communicated his concerns to Freddie Mac's CEO, Richard Syron, in February 2007, and that "we were concerned that without the required verification, there were opportunities to not disclose correct information." *Id.* at 601:5-8; 636:20-637:5.

79.    Undisputed that Mr. Romano's testimony included the language cited by FHFA, except Mr. Romano provided testimony on various subjects, some of which undermines, or provides necessary context for, FHFA's characterization of his quote.  *See supra* ¶ 78, which is incorporated into this paragraph.  Disputed that the GSEs did not believe there was a

correlation between EPDs and departures from underwriting guidelines or potential fraud in the SLGs.  See *infra* ¶¶ 391-394, which are incorporated into this paragraph.

80.     Undisputed that Ms. Cook's testimony included the language cited by FHFA, except Ms. Cook provided testimony on various subjects, some of which undermines, or provides necessary context for, FHFA's characterization of her quote.  For example, Ms. Cook testified that, in addition to PLS dealer diligence, Freddie Mac also performed diligence into originators' underwriting practices.  Ex. 70 at 113:4-16 (P. Cook Tr.).  Ms. Cook also testified that "house prices volatility creates more uncertainty around the appraisal process[.]" Ex. 70 at 147:13-24.

81.     Undisputed that Mr. Aneiro's testimony included the language cited by FHFA, except Mr. Aneiro provided testimony on various subjects, some of which undermines, or provides necessary context for, FHFA's characterization of his quote.  For example, Mr. Aneiro testified that Freddie Mac required originators reviews for PLS deals because "the deals are dependent upon the performance of originators . . . [and if] originators don't follow the guidelines and originate things in a poor manner, then . . . whatever expectations we had on the performance of the bonds will be affected in a negative way." *See* Ex. 71 at 255:19-260:11.  Mr. Aneiro testified that he relied on Freddie Mac's AMO group to assess originators' practices.  *Id.* at 341:16-342:11.  Mr. Aneiro also testified that if an "originator was not following its own guidelines and was contributing loans to the collateral for a pool" then he would expect that "loans not underwritten to the originator's guidelines would then end up in the collateral for a pool." *Id.* at 265:16-266:7.  Mr. Aneiro also testified that an August 2005 e-mail showed that Freddie Mac PLS employees, including Mr. Palmer, assumed the CLTV was "under-reported" by originators.  Ex. 71 at 610:14-620:14.  In August 2006, Mr. Aneiro received an e-mail from

Mr. Palmer noting that a "deal contained a higher percentage of collateral right at 80% [which] was an indicator to us that the reported CLTV number could have been low." *See infra* ¶ 435.  In June 2006, Mr. Aneiro received an AMO review of First NLC that rated the originator as "Marginal," and "First NLC's guidelines make it more difficult for an investor working from a standard tape to properly evaluate risk." *See infra* ¶¶ 193-194, 347.  When questioned about specific PLS trades, Mr. Aneiro testified that could not "remember specifics" of any PLS deal, making "it impossible for [him] to . . . have a relative opinion from one specific deal to another," including deals which he approved.  Ex. 71 at 713: 7-12; 717:18-718:3; 777:10-778:25.

       82.    Disputed.  Mr. Wood did not testify that Freddie Mac did not conduct separate due diligence to avoid securities that potentially contained predatory loans.  He testified that he did not personally conduct any other diligence, and that he did not know whether any separate diligence was also carried out by Freddie Mac.  Ex. 72 at127:22-24 ("Q: Do you know if anyone else at Freddie Mac was separately checking? A: I don't know that.")  Mr. Wood also testified that Freddie Mac performed due diligence, including on PLS transactions.  *Id.* at 835:16; 887:10.  In 2005, Mr. Wood attended a series of meetings where a "National Lending Customer Issues Comments" report was distributed.  That document reported the "National defect rate" had increased from 7.8% in December 2004 to 10.5% in May 2005.  *See infra* ¶¶ 314-317.  In June 2006, Mr. Wood received an AMO review of First NLC that rated the originator as "Marginal," and "First NLC's guidelines make it more difficult for an investor working from a standard tape to properly evaluate risk." *See infra* ¶¶ 193-194, 347.

       83.    Disputed.  Mr. Wood testified that he did not know whether EPDs indicated poor underwriting and that EPDs were a sign to examine defaults more closely to confirm that loans were originated to stated guidelines.  Ex. 72 at 346:7-347:2.

84. Disputed.  Plaintiff cites pages and testimony that do not exist in the indicated exhibit or transcript.  *See generally* Ex. 72.

85. Undisputed that Mr. Bisenius' testimony included the language cited by FHFA, except Mr. Bisenius provided testimony on various subjects, some of which undermines, or provides necessary context for, FHFA's characterization of his quote.  For example, Mr.Bisenius testified that, at the beginning of 2007, he disagreed with some colleagues over the "direction" of Freddie Mac, because he "thought that the firm should not be taking on as much credit risk."  Ex. 73 at 133:22-135:19.  Mr. Bisenius testified that credit risk was reflected in the "expected default rates on new production [and] the quality control results."  *Id.* at 135:14-15. He testified that another Freddie Mac employee, Dave Andrukonis, left because he believed the firm was taking on too much credit risk, and that both he and Mr. Andrukonis believed Freddie Mac should not purchase NINA loans.  *Id.* at 141:9-24; 146:20-25; 149:15-24, *see also infra* ¶¶ 363-382.  Mr. Bisenius also testified that Freddie Mac applied a "risk multiplier" for low documentation loans when assessing their credit risk.  *Id.* at 269:19-271:10.  In June 2006, Mr. Bisenius received an AMO reviews, including a June 2006 renew of First NLC that rated the originator as "Marginal," and "First NLC's guidelines make it more difficult for an investor working from a standard tape to properly evaluate risk."  *See infra* ¶¶ 193-194, 347.  In August 2005, Mr. Bisenius received a memorandum warning that the "mortgage industry has become much more accepting to the layering of risk [and] . . . we see many levels of risk layering with little or no real offsets or compensating factors."  *See infra* ¶¶ 247, 249.  The memo also observed the "proliferation of Alt-A programs that allow for little to no income and asset documentation and verification, combined with low FICO scores, and high loan-to-value ratios," as well as a "general degrading of appraisal quality."  *Id.*; *See infra* ¶¶ 242-280.

86.     Undisputed that Mr. Syron's testimony included the language cited by
FHFA, except Mr. Syron provided testimony on various subjects, some of which undermines, or
provides necessary context for, FHFA's characterization of his quote.  For example, Mr. Syron
testified that in 2006 and 2007, he was "aware that there was a concern in the marketplace as a
whole that there'd been some loosening [of credit standards]," and that "subprime originators
were not as effective in enforcing their underwriting standards."  *See* Ex. 74 at 148:8-18; 173:14-
24.  Mr. Syron testified that a "high degree of fraud in the subprime mortgage marketplace"
would "show up in some tranches of the subprime securities."  *Id.* at 373:5-15.

87.     Undisputed that the language cited by FHFA is included in  Deposition
Exhibit 3739, which is a memorandum that identifies Ms. Kenneweg as the author.

88.     Disputed.  The cited testimony does not appear in the exhibit or full
deposition. *See generally* Ex. 73.

89.     Disputed.  FHFA has refused to produce any loan origination files the
GSEs may have received for the certificate mortgage loans before 2008.  Ex. 500 at 31.  In some
instances, deponents were asked about specific documents, but were not questioned about loan
files.  Elaine Phillips was asked by Plaintiff if she ever received a series of items, such as
prospectus materials, term sheets, or loan stratifications, but was never asked by Plaintiff if she
received and forwarded loan files.   Ex. 106 at 76:21-78:23.  Other deponents did not testify with
certainty that loan files either were or were not included in materials sent to investors.  Samuel
Hernnson, when asked whether he forwarded loan tapes, responded that he forwarded all
information that he received.  Ex. 75 at 94:7-95:9.  Randall Lee, when asked whether loan files
were provided to investors, said "I don't know."  Ex. 476 at 113:12-18.  Other deponents, though

they testified that they did not recall loan files being forwarded, admitted sending large amounts

of information, which could have included loan files.  Ex. 76 at 60:24-61:3.

## DEFENDANTS' JOINT COUNTERSTATEMENT OF MATERIAL FACTS

**II.     GENERAL BACKGROUND**

90.     Fannie Mae and Freddie Mac are government-sponsored entities that,

during the relevant period, purchased mortgage loans and securities backed by mortgage loans.

Ex. 77.  The GSEs were chartered by Congress to provide liquidity, stability and affordability to

the residential mortgage market.  *See* 12 U.S.C. § 1716; 12 U.S.C. § 1451.  Because of their size

and sophistication, the GSEs were considered "the big gorillas" in the secondary mortgage

market.  Ex. 99 at 386:8-13; *see also* Ex. 78 at 108:4-7 ("Freddie Mac certainly was a large,

sophisticated client in the space and, you know, had parameters around what they were trying to

achieve in their investments."); Ex. 106 at 268:2-6 ("Fannie Mae was a sophisticated institutional

investor that made its own investment decisions.  We presented product or we purchased product

from them.  So they drove what they wanted to buy.").

91.     The Federal Housing Finance Agency was created in 2008 by an act of

Congress and designated the government overseer of the GSEs, successor to the Office of

Federal Housing Enterprise Oversight ("OFHEO").  *See generally* 12 U.S.C.A. § 4511.  Shortly

after its creation, FHFA exercised its statutorily authorized conservatorship powers over the

GSEs, and has brought suit against the Defendants on the GSEs' behalf in its continued capacity

as conservator of the GSEs.  Ex. 107 at 1; Ex. 108 at 1; Ex. 109 at 1; Ex. 110 at 1.

92.     Defendants in these Actions collectively issued 65 residential mortgage-

backed securitizations purchased by one or both of the GSEs.  Those Securitizations are

identified in Table P:

| Table P: Securitizations Issued or Underwritten by Defendants in these Actions | | | | |
|---|---|---|---|---|
| Defendant | Securitization | Purchaser | Purchase Date | Major Originators |
| FHFA v. Goldman Sachs & Co. et al. | | | | |
| Goldman Sachs | ACCR 2005-4 | Freddie | November 23, 2005 | Accredited |
| Goldman Sachs | AHMA 2006-1 | Fannie, Freddie | May 25, 2006 | American Home |
| Goldman Sachs | FFML 2005-FF8 | Freddie | September 29, 2005 | First Franklin |
| Goldman Sachs | FFML 2005-FF11 | Freddie | November 22, 2005 | First Franklin |
| Goldman Sachs | FFML 2006-FF13 | Fannie | September 28, 2006 | First Franklin |
| Goldman Sachs | FHLT 2006-E | Freddie | December 6, 2006 | Fremont |
| Goldman Sachs | GSAA 2005-11 | Fannie | September 29, 2005 | GreenPoint, GSMC, Nat City, SunTrust |
| Goldman Sachs | GSAA 2005-14 | Freddie | November 22, 2005 | GreenPoint, SunTrust, GSMC |
| Goldman Sachs | GSAA 2005-15 | Fannie | December 29, 2005 | Countrywide, GreenPoint, Nat City |
| Goldman Sachs | GSAA 2006-2 | Fannie | February 6, 2006 | Argent |
| Goldman Sachs | GSAA 2006-4 | Fannie | March 2, 2006 | Countrywide, GSMC |
| Goldman Sachs | GSAA 2006-5 | Fannie | March 30, 2006 | Countrywide, GreenPoint, GSMC |
| Goldman Sachs | GSAA 2006-8 | Freddie | April 28, 2006 | Countrywide, Wells Fargo, First National, GSMC |
| Goldman Sachs | GSAA 2006-11 | Fannie | June 30, 2006 | Countrywide, GreenPoint, Nat City, GSMC |
| Goldman Sachs | GSAA 2007-6 | Freddie | May 30, 2007 | Countrywide, GreenPoint, GSMC, National City, Wells Fargo |
| Goldman Sachs | GSAMP 2005-AHL2 | Fannie | December 28, 2005 | Accredited |
| Goldman Sachs | GSAMP 2005-HE5 | Freddie | November 22, 2005 | SouthStar, GSMC |
| Goldman Sachs | GSAMP 2005-HE6 | Freddie | December 29, 2005 | Meritage, Acoustic, Fremont, First NLC |
| Goldman Sachs | GSAMP 2005-WMC2 | Fannie | November 23, 2005 | WMC |
| Goldman Sachs | GSAMP 2005-WMC3 | Fannie | December 28, 2005 | WMC |
| Goldman Sachs | GSAMP-2006 FM1 | Fannie | April 27, 2006 | Fremont |
| Goldman Sachs | GSAMP 2006-FM2 | Freddie | September 29, 2006 | Fremont |
| Goldman Sachs | GSAMP 2006-FM3 | Freddie | December 21, 2006 | Fremont |
| Goldman Sachs | GSAMP 2006-HE3 | Freddie | May 26, 2006 | SouthStar, MILA, Aames, Meritage, Fremont, Impac, GSMC |
| Goldman Sachs | GSAMP 2006-HE4 | Freddie | June 29, 2006 | Aames, CIT, Mandalay, SouthStar, First Horizon, NovaStar, MILA, |

| | | | | GSMC |
|---|---|---|---|---|
| Goldman Sachs | GSAMP 2006-HE5 | Freddie | August 25, 2006 | Aames, CIT, SouthStar, MLN, GSMC |
| Goldman Sachs | GSAMP 2006-HE7 | Fannie | November 22, 2006 | SouthStar, Aames, NovaStar, GSMC |
| Goldman Sachs | GSAMP 2006-HE8 | Fannie | December 27, 2006 | NovaStar, Aames, SouthStar, GSMC |
| Goldman Sachs | GSAMP 2006-NC2 | Fannie | June 29, 2006 | New Century |
| Goldman Sachs | GSAMP 2007-FM1 | Freddie | January 30, 2007 | Fremont |
| Goldman Sachs | GSAMP 2007-FM2 | Freddie | February 21, 2007 | Fremont |
| Goldman Sachs | GSAMP 2007-HE1 | Freddie | February 23, 2007 | SouthStar, Wilmington, Senderra, First Horizon, LownHome, Home Loan, GSMC |
| Goldman Sachs | GSAMP 2007-HE2 | Freddie | April 20, 2007 | Aegis, New Century, SouthStar, GSMC |
| Goldman Sachs | GSAMP 2007-NC1 | Fannie | February 20, 2007 | New Century |
| Goldman Sachs | GSR 2006-OA1 | Freddie | August 24, 2006 | American Home, IndyMac, SunTrust, GSMC |
| Goldman Sachs | GSR 2007-AR2 | Fannie | May 24, 2007 | Countrywide, IndyMac, PHH, Wells Fargo |
| Goldman Sachs | GSR 2007-OA1 | Freddie | May 8, 2007 | Countrywide, Residential Funding, Quicken Loans, GSMC |
| Goldman Sachs | GSR 2007-OA2 | Freddie | October 29, 2007 | Residential Funding, Quicken Loans |
| Goldman Sachs | INDX 2005-AR18 | Freddie | September 7, 2005 | IndyMac |
| Goldman Sachs | INDX 2005-AR27 | Fannie | October 28, 2005 | IndyMac |
| ***FHFA v. Ally Financial Inc., et al.*** | | | | |
| Goldman Sachs | RALI 2007-QH5 | Freddie | May 30, 2007 | Residential Funding |
| ***FHFA v. Nomura Holding America Inc., et al.*** | | | | |
| Nomura | NAA 2005-AR6 | Fannie | November 30, 2005 | Alliance Bancorp, Aegis, Silver State |
| Nomura | NHELI 2006-FM1 | Freddie | January 31, 2006 | Fremont |
| Nomura | NHELI 2006-HE3 | Freddie | August 31, 2006 | People's Choice, First NLC, Equifirst, Mandalay |
| Nomura | NHELI 2006-FM2 | Freddie | October 31, 2006 | Fremont |
| Nomura | NHELI 2007-1 | Freddie | January 31, 2007 | Silver State |
| Nomura | NHELI 2007-2 | Freddie | January 31, 2007 | OwnIt, First NLC |
| Nomura | NHELI 2007-3 | Freddie | April 30, 2007 | ResMae, WMC |
| ***FHFA v. HSBC N. Am. Holdings Inc., et. al.*** | | | | |
| HSBC | FFML 2006-FF1 | Freddie | January 27, 2006 | First Franklin |

| HSBC | FFML 2006-FF5 | Freddie | May 5, 2006 | First Franklin |
|---|---|---|---|---|
| HSBC | FFML 2006-FF7 | Fannie | May 31, 2006 | First Franklin |
| HSBC | FFML 2006-FF9 | Freddie | July 7, 2006 | First Franklin |
| HSBC | FFML 2006-FF11 | Fannie | September 6, 2006 | First Franklin |
| HSBC | HASC 2005-I1 | Freddie | December 20, 2005 | First Franklin, New Century, Option One |
| HSBC | HASC 2006-HE1 | Freddie | November 3, 2006 | WMC, Countrywide, New Century, Option One |
| HSBC | HASC 2006-HE2 | Fannie | December 5, 2006 | WMC, Countrywide, Decision One |
| HSBC | HASC 2006-NC1 | Freddie | March 7, 2006 | New Century |
| HSBC | HASC 2006-OPT1 | Freddie | February 3, 2006 | Option One |
| HSBC | HASC 2006-OPT2 | Freddie | February 28, 2006 | Option One |
| HSBC | HASC 2006-OPT3 | Fannie, Freddie | April 5, 2006 | Option One |
| HSBC | HASC 2006-OPT4 | Fannie | April 28, 2006 | Option One |
| HSBC | HASC 2007-HE1 | Freddie | March 8, 2007 | Accredited, Decision One, WMC, Option One, Wells Fargo |
| HSBC | HASC 2007-HE2 | Freddie | May 4, 2007 | Decision One, WMC, Countrywide, First Franklin, Accredited, New Century |
| HSBC | HASC 2007-OPT1 | Freddie | January 30, 2007 | Option One |
| HSBC | HASC 2007-WF1 | Freddie | July 3, 2007 | Wells Fargo |

93.    Between September 2005 and January 2008, the GSEs bought more than a quarter of a trillion dollars in PLS, including 92 certificates from defendants against whom this motion was brought.  Pl.'s Br. at 4.

94.    In making those purchases, the GSEs adhered to PLS purchase and monitoring processes that incorporated counterparty reviews, collateral characteristics and general originator trends into the GSEs' assessment of specific loan pools underlying the Securitizations.  *See infra* ¶¶ 104-229.

## III.    THE ALLEGED MISSTATEMENTS

95.    FHFA, through its experts, has alleged that █████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

96.    **Goldman Sachs.**  In *Federal Housing Finance Agency* v. *Goldman, Sachs & Co., et al.*, No. 11-cv-6198 (DLC) (S.D.N.Y.), FHFA's proffered expert, Richard Payne,



Ex. 79.

*Id.* at 3-4.

*Id.* at 142-44.  In *Federal Housing Finance Agency* v. *Ally Financial, Inc., et al.*, No. 11-cv-7010 (S.D.N.Y.), FHFA's proffered expert, Robert W. Hunter,

Ex. 80 at 2-3.

*Id.* at 84-85.

97.    Another of FHFA's proffered experts, Dr. John Kilpatrick, claims

Ex. 81 at 4.  In *Federal Housing Finance Agency* v. *Ally Financial, Inc., et al.*, No. 11-cv-7010 (S.D.N.Y.),

Ex. 82 at 4.

98.

Ex. 79 at 120.  As a result, FHFA alleges the offering materials for the Securitizations misrepresented that loans were originated "generally in accordance with" the applicable

underwriting guidelines and with guideline exceptions "based upon" compensating factors. *Id.* at 29-31; Ex. 19 at S-51, S-59, and S-65.

99.    **Nomura.**   In *Federal Housing Finance Agency* v. *Nomura Holding America Inc., et al.*, No. 11-cv-6201 (S.D.N.Y.), FHFA's proffered expert, Robert Hunter,



Ex. 83 at 2.  Based on this review, Mr. Hunter claims that

*Id.* at 3.  Mr. Hunter also claims claimed that

*Id.*

100.   Another of FHFA's proffered experts, Dr. John Kilpatrick, claims that

in *Federal Housing Finance Agency* v. *Nomura Holding America Inc., et al.*, No. 11-cv-6201 (S.D.N.Y.),

Ex. 430 at 4.

101.   Underwriting defects that FHFA purported to find in the Certificate SLGs include, among other things:  (i) missing documents such as HUD-1, or a signed mortgage application, (ii) loans originated without regard to the borrower's ability to pay, (iii) missing appraisals, (iv) missing credit reports, (v) missing or unsigned appraisals , (vi) insufficient assets to close, (vii) insufficient or missing credit history, (viii) insufficient income documentation, (iv) misrepresented owner occupancy claims, and (x) inaccurate and overvalued appraisals. Ex. 182.

███████████████████████████████████████████

████████████████████████   Ex. 79 at 142-44.

## IV. THROUGH ON-SITE VISITS AND LOAN FILE REVIEWS, THE GSES FULLY UNDERSTOOD ORIGINATORS' UNDERWRITING, APPRAISAL AND FRAUD DETECTION PRACTICES

102.    The GSEs regularly reviewed the Originators that originated the loans

underlying the Securitizations at issue in these Actions.

103.    Those reviews included, *inter alia*, (i) site visits and meetings with

personnel from the Originators; (ii) reviews of the loan origination policies, procedures and

underwriting practices of the Originators; (iii) reviews of the Originators' valuation and appraisal

review policies and procedures; (iv) reviews of the Originators' abilities to detect fraud, and

(v) reviews either by GSE personnel or a third party diligence vendor of a sample of loan files

for recently originated loans to confirm the Originators' compliance with underwriting

guidelines. *See infra* ¶¶ 104-126.

### A. Fannie Mae

104.    Fannie Mae's PLS policies limited Fannie Mae's ability to purchase PLS

that included loans not originated by "Fannie Mae approved originators" or those counterparties

on the "Fannie Mae approved prime seller/servicer list." *See* Ex. 178 at FHFA02861745.

105.    PLS personnel were required to request review and approval by Fannie

Mae's Single Family Counterparty Risk Management group before any purchases.  Ex. 180 at

FHFA11987650.  Shayan Salahuddin, a Fannie Mae PLS trader involved in the purchase of the

Certificates, *see* Ex. 181, testified that "when a deal was brought to Fannie Mae's attention, one

of the first questions that the traders of Fannie Mae would ask is who are the originators involved

with the deal and if . . . an originator on that deal w[as] not [on] the list of originators provided to

the trading desk by the counterparty group, then Fannie Mae would not participate in the deal." Ex. 61 at 49:9-20.

106.   In 2005 through 2007, the SF CPRM performed operational reviews on originators whose loans backed PLS transactions purchased by Fannie.  In the third quarter 2005 "Private Label Securities Update" provided to Fannie Mae's Risk Policy Committee, SF CPRM head Lesia Bates Moss reported on her group's PLS "Originator/Issuer/Servicer Approval & Monitoring" efforts.  Ex. 120 at FHFA02537625, FHFA02537632.  SF CPRM's "First Priority" was "Blemished credit seller servicers."  *Id.* at FHFA02537632.  Countrywide, Ameriquest, Wells Fargo, Option One, Fremont, WMC, IndyMac and New Century were listed in that report. *Id.* at FHFA02537632.

107.   By August 2006, Fannie Mae's SF CPRM was required to approve and monitor all originators whose loans backed PLS like the Securitizations.  Ex. 84 at FHFA00277894.  SF CPRM was responsible for "[r]eview[ing] and approv[ing] issuers, originators . . . and servicers per procedures established by SF CPRM prior to committing to any PLS purchases . . . with the counterparties, and again periodically per procedures and frequency established by SF CPRM."  *Id.* at FHFA00277894; *see also* Ex. 85 at FHFA00000904.

108.   Ms. Bates Moss, who was responsible for overseeing the SF CRM group, Ex. 181, testified that the purpose of SF CPRM's reviews was to "assess the overall financial strength of the counterparty and its ability to meet . . . its rep and warrant requirements."  Ex. 86 at 36:2-11.  SF CPRM's operational reviews were intended to ensure that originators of the PLS and subprime loans Fannie Mae bought "demonstrated appropriate business practices to mitigate operational risk and credit risk of the origination of [s]ubprime collateral."  Ex. 88 at FHFA12404991.

109.   Ms. Bates Moss testified that SF CPRM's reviews of originators examined "the policies, procedures, processes . . . any activity related to the origination, underwriting, selling and servicing" of an originator's loans.  Ex. 86 at 36:23-37:24, 62:11-23; Ex. 89 at FHFA04340566; Ex. 90 at FHFA04340583; Ex. 91 at FHFA04340595.

110.   At times, SF CPRM reviews involved the review of loan files of a "sample" of the originator's loans, either by Fannie Mae personnel or a third party diligence vendor, such as Clayton.  Ex. 86 at 70-72, 74-75; Ex. 94  at FHFA13213565; Ex. 88  at FHFA12404987; Ex. 95 at FHFA01104664; Ex. 96  at FHFA01439997.  Ms. Bates Moss testified that Fannie Mae personnel accompanied Clayton (or whatever due diligence provider was used) on these reviews, and the results of the vendor's reviews were shared internally with senior SF CPRM personnel.  Ex. 86 at 72:10-73:24.

111.   SF CPRM was part of Fannie Mae's Single Family operating division, overseeing counterparty reviews conducted both for Fannie Mae's PLS and Single Family business units as well as monitoring overall market trends.  Ex. 86 at 23:3-9, 25:15-21, 46:9-48:2. Approximately 25 people worked in the SF CPRM group; all reported to Ms. Bates Moss.  Ex. 86 at 30:12-25.  The group was organized according to counterparty type, specifically "traditional" and "non-traditional" lenders.  Ex. 86 at 31:6-34:8.  "Traditional" lenders were lenders that sold loans to Fannie Mae's Single Family businesses, *see infra* ¶ 121, and "non-traditional" lenders were lenders that sold subprime loans.  Ex. 86 at 32:12-17.  Some lenders, such as Countrywide, were both traditional and non-traditional lenders.  Ex. 97 at FHFA00777442; Ex. 98 at FHFA18379494.  Ms. Bates Moss testified that, at times, operational reviews of originators "could have involved employees that were doing both traditional and nontraditional" reviews.  Ex. 86 at 33:20-35:8.

112.    SF CPRM oversaw and/or conducted its "non-traditional" originator reviews as part of its oversight of originators of its PLS and subprime loan purchases.  Ex. 86 at 69, 70:7-10; Ex. 202 at FHFA04340543; Ex. 100 at FHFA04340546.  SF CPRM was responsible for approving and monitoring originators that Fannie Mae transacted with both directly and through the purchase of private label securities PLS.  Ex. 86 at 31:11-19; Ex. 101.

113.    Following a counterparty's approval, SF CPRM was responsible for "[m]aintaining a list of all reviewed and approved issuers [and] originators . . . [m]onitoring the financial and collateral performance of counterparties relative to industry averages . . . [s]har[ing] relevant insights and information with other members of [PLAT] and . . . [m]aintaining the Watch List . . . [and] a list of all existing PLS with counterparties that have been classified as Suspended." Ex. 180 at FHFA11987659.

114.    The Fannie Mae Legal Department (the "Legal Department") also was required to approve subprime originators of the loans underlying PLS bought by Fannie Mae.  Ex. 85 at FHFA00000904.  Starting in August 2006, Fannie Mae's policy required that "a comprehensive operational review of the nontraditional lenders" be performed before Fannie Mae  "enter[ed] any SFMB Subprime Transaction, PLS Subprime Transaction that is a 'wrap' transaction, or RTF Subprime Transaction . . . . "  Ex. 102 at FHFA11863097.

115.    The Legal Department performed regular reviews of subprime originators to ensure compliance with Fannie Mae's "Anti-Predatory Lending" ("APL") policies.  Ex. 86  at 76:13-21; Ex. 103 at 71:5-9; Ex. 101 at 15.  Until it was revised in late 2006, Fannie Mae's PLS Risk Policy required the Legal Department to conduct "operational reviews" of all subprime PLS originators.  Ex. 104 at FHFA18449730.

116.   These Legal Department reviews also were required for Fannie Mae's subprime New Business Initiative, which launched by May 2006.  Ex. 105  at FHFA00311035. One of the purposes of the subprime New Business Initiative was to increase Fannie Mae's penetration of the subprime market by purchasing loans in bulk directly from subprime loan originators, including many of the originators.  *Id.*; *see also* Ex. 103 at 242:10-18.

117.   The Legal Department's operational reviews included loan-level sampling often performed by a third party diligence vendor.  Ex. 104 at FHFA18449730; Ex. 220 at FHFA13481754; Ex. 87 at FHFA11862419; Ex. 85 at FHFA00000904; Ex. 111 at FHFA16971802-03.

118.   John Ingram was responsible for Fannie Mae's anti-predatory lending reviews.  Ex. 181.  In August 2005, he told Tom Noto of Ameriquest that "[p]art of [Fannie Mae's] operational review [due diligence] requirements for subprime lenders is to conduct annual loan level due diligence of the lender's recent production (3 months) . . . We typically look at about 350 loans, running our due diligence scope (which is the same one we use in deals)." Ex. 220 at FHFA13481754.

119.   One of the purposes of the Legal Department's anti-predatory operational reviews of originators was to assess compliance with certain underwriting guidelines. Specifically, Fannie Mae wanted to ensure that loans were being originated with adequate consideration of borrowers' ability to repay those loans.  Ex. 103 at 25:2-7, 28:10-25; Ex. 112 at FHFA00275687.  John Ingram testified that one goal of Fannie Mae's anti-predatory requirements was "to make sure that the borrower had the ability to repay the loan pursuant to the terms of the loan."  Ex. 103 at 28:17-19.  Fannie Mae's anti-predatory policies required review of compliance with state and federal law and prohibited "steering" borrowers to

inappropriate loan types for their profile or the imposition of excessive points and fees.  Fannie

Mae's required loan file reviews were necessary to confirm certain critical documents, such as

HUD-1 settlement statements, rights of rescission, finance charge disclosures, and prepayment

penalty disclosures, and to assess—based on the income, asset and liability documentation—

whether the lender adequately assessed the borrower's ability to pay.  *See* Ex. 113 at

FHFA00016471-72, 483-88; Ex. 103 at 65:20-67:8.

         120.   Parts of Fannie Mae's anti-predatory lending guidelines and requirements

were, in many cases, identical or substantially similar to requirements imposed by the lender's

underwriting guidelines.  As FHFA's expert, Mr. Payne, has claimed that ██████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████   *See* Ex. 79 at 31-35, 43-44; Ex. 114 at LF1UBS_00053232; Ex.

115 at JPMC-UWG-BEAR-000146133; Ex. 116 at JPMC_UWG-BEAR-000002502, 508, 510;

Ex. 117 at JPMC-UWG-JPM000036048, 6052; Ex. 118 at WMC-FHFA-Cases-00001784,

WMC-FHFA-Cases-00001786, WMC-FHFA-Cases-00001790.  The Prospectus Supplements

also generally described these requirements in their discussion of Originators' underwriting

guidelines.  *See, e.g.*, Ex. 10 at S-37 (First Franklin's "acquisition underwriting standards are

primarily intended to assess the ability and willingness of the borrower to repay the debt.")

Goldman Sachs' underwriting guidelines for loans purchased through its "conduit" program

prohibited "high cost . . . 'predatory' or similarly designated loans as defined under . . .

applicable federal state, county or municipal statute, regulation or ordinance or mortgage loans

that violate any applicable federal, state, county or municipal statute, regulation or ordinance."

Ex. 119 at GS FHFA 006283922.  Fannie Mae's purchases of PLS from originators were

contingent upon anti-predatory reviews, and the results of the reviews were reflected in approved lists or shared with PLS traders informally.  Ex. 103 at 60:22-25; Ex. 120 at FHFA02537624.

121.    In addition to its "non-traditional" reviews, Fannie Mae separately reviewed originators that also were "traditional" lenders.  SF CPRM performed these reviews too.  Ex. 86 at 32:6-11.  Within SF CPRM, there were no restrictions on obtaining or sharing information about originators that were reviewed in connection with Fannie Mae's Single Family business.  *Id.* at 32:12-17; 59:7-11.  Members of the SF CPRM group used the Single Family "traditional" reviews of originators when considering originators for PLS purchases, and vice versa.  *Id.* at 66:25-68:20.

122.    SF CPRM reported its counterparty recommendations to the Single Family division's risk officer Pam Johnson, who would consult with the Fannie Mae's chief Credit Risk Officer, Mike Shaw.  Ex. 86 at 41:4-42:3; Ex. 129 at FHFA01134035.  Fannie Mae's Chief Risk Officer, Enrico Dellavecchia, convened meetings of personnel from both the Single Family and PLS units to discuss counterparty findings.  Ex. 86 at 82-19-83:6.  Mr. Dallavecchia oversaw approvals of major PLS counterparties and granted exceptions requested by SF CPRM and referred through Fannie Mae's Single Family risk officer.  *Id.* at 104:14-105:6.  He was responsible for reviewing "regular reports on the status of the PLS portfolio," ensuring PLS risk policies were adhered to, and "[e]scalat[ing] issues to the Corporate Risk Management Committee as necessary."  Ex. 121 at FHFA13230752.

123.    SF CPRM was also responsible for reporting any material concerns it had about counterparties to Fannie Mae's Private Label Advisory Team (the "PLAT").  The PLAT was a group of Fannie Mae employees from both the Single Family and Capital Markets

50

businesses, which oversaw Fannie Mae's PLS transactions.  Ex. 122 at 60:8-16, 195:21-25,

198:7-15.  The PLAT was created based on the premise that information learned about

counterparties and similar types of loans could and should inform decisions surrounding the

purchase of PLS.  *Id*. at 60:20-61:4, 195:21-25.  David Cook, the PLAT Coordinator, testified

that PLAT "was a venue whereby [PLS traders] could get . . . Single-Family's judgment and

opinion on whether certain counterparties were counterparties that the [PLS] traders should be

doing business with."  *Id.* at 195:21-25.  He testified that the cross-functional PLAT meetings

were necessary because "there were specialties throughout the company, people who had a

particular specialty that we could draw upon to make sure that the risks of the private label

securities were managed."  *Id.* at 189:2-5.

   124. Members of the SF CPRM participated in the PLAT.  Ex. 86 at 52:18-25.

SF CPRM "was responsible for distributing the list of all reviewed and approved . . .

originators . . . to the PLAT and for reporting material concerns or issues with counterparties to

the PLAT."  Ex. 101.  PLS traders attended PLAT meetings.  Ex. 122 at 60:8-26.

   125. Ms. Bates Moss acknowledged that Fannie Mae shared counterparty

performance information during PLAT meetings because such general information about

originators' practices "could be a factor in assessing securities transactions that the PLS was

looking to buy or, alternatively, looking to sell."  Ex. 86 at 785:6-14.

   126. The results of SF CPRM operational reviews were also included on

counterparty lists provided to PLAT committee members, including PLS traders, and made

available to those committee members.  *See, e.g.*, Ex. 123 at FHFA13230739; Ex. 124 at

FHFA00027901; Ex. 125 at FHFA16099904; Ex. 126 at FHFA14308153; Ex. 127 at

FHFA13527882; Ex. 128 at FHFA05455909.

127.    The following Originators were among those reviewed by Fannie Mae:

128.    **Ameriquest/Argent**. SF CPRM completed an operational review of Ameriquest Mortgage Company in December 2004.  Ex. 130 at FHFA04340599.  SF CPRM reported that " most underwriting exceptions" made by Ameriquest "result[ed] from competitive pricing issues," and "[m]ost fallout is related to mortgage history or appraisal issues."  *Id.* at FHFA04340604.  For Argent, SF CPRM stated that the "most common errors related to missing documents."  *Id.* at FHFA04340610.  SF CPRM recommended "that Portfolio continue to be able to purchase ABS backed by collateral originated and serviced by" Ameriquest.  *Id.* at FHFA04340599.

129.    In November 2005, the Legal Department engaged Clayton, a third party due diligence vendor, to review 407 Ameriquest loan files for compliance with Fannie Mae's anti-predatory and compliance requirements.  Ex. 219 at FHFA16972623.  Among other things, Clayton reported to Fannie Mae that four loans were missing final HUD-1 statements, five loans had understated finance charges, and  eight loans were originated without regard for the borrower's ability to pay.  *Id.* at FHFA16972625, FHFA16972626.

130.    **Countrywide**. SF CPRM completed a one-day, on-site review of Countrywide in November 2005.  Ex. 131 at FHFA13249710.  The review informed Fannie Mae that "Countrywide has a worse credit profile in terms of average FICO score across recent vintages."  *Id.* at FHFA13249713.

131.    In April 2006, Clayton completed a review of 406 Countrywide loans for a Legal Department review.  Ex. 132 at CLAY-FHFADEF-E-2472997.  Clayton reported to Fannie Mae that 260 of the 404 loans it reviewed "contained material [regulatory compliance] violations," including missing credit disclosures, understated finance charges, missing HUD-1

closing statements, missing note, missing right of rescission, missing truth-in-lending disclosure, and violations of various state statutes. *Id.* at CLAY-FHFADEF-E-2473000. In addition, 17 loans were found to have anti-predatory violations, including loans originated without regard to the borrower's ability to pay. *Id.* at CLAY-FHFADEF-E-2473001.

132. In May 2007, the Legal Department again engaged Clayton to review 348 Countrywide loan files for compliance with Fannie Mae's anti-predatory and compliance requirements. Ex. 133 at FHFA11944268; Ex. 96 at FHFA01439997; Ex. 134 at CLAY-FHFADEF-E-2300415. Interim results of that review indicated a "high percentage (23.41%) of credit violations" compared to a target of "10%," and a "high percentage (18.79%) of predatory [violations]" with a "target" of 5%. Ex. 96 at FHFA01439997. Clayton reported credit exceptions for 62 loans, or 18% of the sample, and compliance exceptions for 50 loans, or 14% of the sample. Ex. 134 at CLAY-FHFADEF-E-2300417-18. Clayton also reported loan tape "discrepancies . . . in debt to income calculation [and] appraised value." *Id.* at FHFADEF-E-2300419. Exceptions to underwriting guidelines reported to Fannie Mae by Clayton included a missing final HUD-1 statement, loans originated without regard to the borrower's ability to repay, points and fees violations, insufficient credit disclosures, missing note, and missing truth-in-lending disclosure. Ex. 133 at FHFA11944270.

133. SF CPRM again reviewed Countrywide in December 2006, which included an "in-depth evaluation of the mortgage origination, risk management and servicing operations" of Countrywide. Ex. 136 at FHFA00777405. SF CPRM identified several weaknesses in Countrywide's underwriting and loan origination controls, including: that Countrywide had no "formal written Fair Lending/Predatory Lending Policy in place to ensure all employees are aware of potential predatory lending practices;" "[u]nsatisfactory controls in place to minimize

the potential for duplicate loan sales to multiple investors in Capital Markets;" "[l]ack of systemic tracking of borrower activity across different business channels (*i.e.* retail, broker, correspondent) [that] could lead to funding errors;" and that Countrywide often contests repurchase requests.  Ex. 136 at FHFA00777404, 412.

134.   SF CPRM approved Countrywide as a counterparty based on "satisfactory operational procedures and controls in place to mitigate risk exposure for both the origination and servicing platforms."  Ex. 136 at FHFA00777404.

135.   Fannie Mae reviewed Countrywide in November 2006, and reported that Countrywide "[wa]s not ordering independent appraisals for loans where the mortgagor requested the mortgage insurance be cancelled due to increased property value . . . [or] the mortgagor may provide Countrywide with their own appraisal."  Ex. 137 at FHFA11941483.

136.   Countrywide was Fannie Mae's "top customer" every year between 2005 and 2007, accounting for approximately 25% of Fannie Mae's total single family business volume in 2005, 26% in 2006, and 28% in 2007.  Ex. 138 at 9; Ex. 139 at 4; Ex. 140 at 4.  Fannie Mae was also exposed to Countrywide through its PLS portfolio.  As of September 2006, Countrywide was the issuer of "$10.1 billion in nonagency securities owned by Fannie Mae . . . consist[ing] primarily of subprime (49% of nonagency issuer balance) and Alt-A collateral (47%)." Ex. 141 at FHFA03318122.  At that time, Fannie Mae approved a corporate exposure limit for Countrywide of $6.41 billion.  *Id.* at FHFA03318117.  Fannie Mae would have developed extensive knowledge of Countrywide through this relationship, which almost certainly could not be contained in these few counterparty reviews.

137.   **First Franklin**.  SF CPRM completed a two-day, onsite operational review of First Franklin in May 2006, and approved it to sell subprime loans and PLS to Fannie

Mae. Ex. 88 at FHFA12404988. As part of this review, Clayton performed loan level due diligence and reviewed loan files for a sample of 450 loans. *Id.* at FHFA12404988, FHFA12404996. Ninety-five of the 450 loans were noted as credit exceptions by Clayton. *Id.* at FHFA12404997. SF CPRM stated that Clayton's findings for 43 of those loans were "immaterial" because they involved conditions like "outdated" documents, which reduced the "true level 3 findings to 52 loans" out of the 450 loans reviewed (12%). *Id.* at FHFA12404997.

138.    Among the exceptions reported to Fannie Mae by Clayton were: insufficient credit history, missing housing verification, insufficient assets, as well as DTI and LTV guideline excessions. *Id.* at FHFA12404997. SF CPRM's report stated that Fannie Mae applied " a tolerance level of 5%" for certain types of underwriting defects. *Id.* at FHFA12404997.

139.    The May 2006 First Franklin SF CPRM review also informed Fannie Mae that First Franklin, through a quality control sampling audit, "sets a 15% annual tolerance level for branch underwriting errors" and that "[b]oth clerical and substantive errors uncovered through sampling procedures are tallied against the 15% benchmark." *Id.* at FHFA12405001. Despite this fact, SF CPRM graded First Franklin's underwriting and quality control processes as "acceptable." *Id.* at FHFA12405001.

140.    The Legal Department completed an operational review of First Franklin in July 2006 that relied on the results of a loan level review by Clayton that was performed in conjunction with SF CPRM. Ex. 142 at FHFA16099859; Ex. 88 at FHFA12404987. Clayton reported to Fannie Mae that 4.5% of the loans had "predatory exceptions," including 2.9% of the sample loans that violated Fannie Mae's cost requirements, 10 loans that violated Fannie Mae's fees requirements, and two loans that had DTIs above 60%. Ex. 142 at FHFA16099859.

In addition, 60 loans—13% of the sample—"had various federal, state, or regulatory violations." *Id.* at FHFA16099860.

141. In the fall of 2006, the Legal Department engaged Opus, a third party due diligence vendor like Clayton, to perform a "supplemental review" of First Franklin's "compliance and anti-predatory lending policies and procedures." Ex. 143 at FHFA00774759. That review, which was completed on September 14, 2006, observed that "[i]t is not clear from the information provided if First Franklin has appropriate controls in place to monitor for predatory lending practices in [third party originator] loans." *Id.* at FHFA00774767.

142. In addition to engaging Opus to review First Franklin's policies and procedures, Fannie Mae's Legal Department also engaged Clayton to perform additional loan-level reviews on 373 loans. Ex. 144 at FHFA16865159; Ex. 145 at CLAY-FHFADEF-E-2453887. That review found nine loans with regulatory compliance exceptions such as an understated finance charge, three loans with anti-predatory lending exceptions such as failure to assess the borrower's ability to pay, and 47 loans with other credit exceptions. *Id.* at CLAY-FHFADEF-E-2453890-91. Those exceptions included missing or unsigned appraisals, insufficient assets to close, insufficient credit history, insufficient income documentation, and late mortgage or rental payments. *Id.* at CLAY-FHFADEF-E-2453891.

143. **Fremont**. SF CPRM reviewed Fremont in August 2004. Ex. 146 at FHFA04340632. The review warned that "Fannie Mae should cautiously monitor [Fremont] as they rapidly grow their mortgage originations and securitizations." *Id.* at FHFA04340632. The review also informed Fannie Mae that "[u]nderwriting exceptions may be granted based on an underwriters [sic] judgment that compensating factors warrant an exception," and "[a] substantial portion of [Fremont's] originations may be such exceptions." *Id.* at FHFA04340632.

144.    SF CPRM conducted an onsite review of Fremont in May 2005.  Ex. 147 at
FHFA01096587.  FHFA has not produced a copy of this review, but it appears Fremont
maintained its status as an approved originator.  Ex. 120 at FHFA02537630; Ex. 147 at
FHFA01096587.

145.    In May 2006, SF CPRM reviewed Fremont again.  Ex. 147 at
FHFA01096586.  This review included a loan file review, in which SF CPRM found that six out
of seven "current" loans reviewed presented either "moderate risk" or "significant risk,"
including "fair credit" or "late [mortgage] payments."  *Id.* at FHFA01096598.  Twelve percent
of the loan files reviewed were given a "risk grade of 4" or "high risk."  *Id.*  SF CPRM also
informed Fannie Mae that "[o]n a case by case basis, Fremont may determine that, based upon
compensating factors, a prospective mortgage not strictly qualifying under the underwriting risk
category guidelines . . . is nonetheless qualified to receive a loan, *i.e.*, an underwriting
exception," and reiterated that "[i]t is expected that a substantial portion of the mortgage loans
may represent such underwriting exceptions."  *Id.* at FHFA01096596; *see also* Ex. 148 at
FHFA01644372 (showing that, as of October 2006, Fremont retained its status as an
"approved" originator based on the May 2006 review.)

146.    Fannie Mae's reviews of Fremont consistently observed that Fremont's
appraisal quality and review processes "allow[] an appraisal variance of 15% for loans with an
LTV of 80% or less and 5% for loans up to 95%."  *See* Ex. 149 at FHFA03310527; Ex. 150 at
UG1FHFA15299; Ex. 147 at FHFA01096598.

147.    In June 2006, the Legal Department engaged Clayton to review 450
Fremont-originated loans against Fannie Mae's anti-predatory and regulatory compliance
requirements.  Ex. 151 at FHFA00775003.  Clayton also reviewed the loans to determine

whether they complied with Fremont's underwriting guidelines.  *Id.*  Clayton found that five

files did not have final HUD-1 statements, three loans had DTIs exceeding 60%, 20 loans

exceeded Fannie's "points and fees" requirements, four loans had undisclosed finance charges,

five loans were missing truth in lending disclosures, and two loans were missing a copy of the

promissory note.  *Id.* at FHFA00775005, 007, 008.  In total, Clayton found 119 "material

[compliance] violations" out of 450 loans reviewed, or more than 26% of the sample.  *Id.* at

FHFA00775006.  In addition, Clayton found 37 loans of the 450 loan sample had Fannie Mae

predatory lending exceptions. *Id.* at FHFA00775007.

148.    Clayton reported credit exceptions for 169 loans (37.5% of the sample). Ex.

152 at FHFA16865655.  Those exceptions included 27 loans with DTI exceptions of five

percentage points or less, 26 loans with insufficient assets to close, 13 loans missing housing

verification documentation, 13 loans missing the promissory note, 13 loans with the application

missing, 11 loans missing the appraisal, 11 loans missing a copy of the second lien note, six

loans with a credit score below the guideline requirement, four loans with cash reserves below

the required minimum, two loans missing the credit report, and one loan with an unexecuted

mortgage. *Id.* at FHFA16865655.

149.    On January 31, 2007, Fannie Mae's counterparty review team placed

subprime originator Fremont on "caution" "based on the fact that they have been put on

negative watch by the rating agencies, Fremont has begun terminating lots of brokers, and the

government has begun investigating Fremont."  Ex. 153 at FHFA00775299.

150.    On March 2, 2007, Fannie Mae downgraded subprime originator Fremont

from "caution" to "suspend" "given recent headline news," which included Fremont's plan to

sell its subprime business and a cease-and-desist order issued by the FDIC requiring Fremont to

"implement[] revised lending policies . . . and implement[] a third-party mortgage broker

monitoring program and plan." Ex. 154 at FHFA00022371.  Fannie PLS trader Shayan

Salahuddin wrote that "[f]olks will probably be talking about this on Monday . . . Fremont

General Credit Corp. unit agreed to a cease-and-desist order by the [FDIC] requiring the

company to stop 'engaging in unsatisfactory lending practices' and 'operating with a large

volume of poor quality loans.'"  Ex. 155 at FHFA00027906.

      151.  **Greenpoint.**  SF CPRM conducted an operational review of Greenpoint

Mortgage Funding in June 2005, and approved the originator for PLS purchases.  Ex. 126  at

FHFA14308154.

      152.  **IndyMac**.  SF CPRM reviewed IndyMac Bank in October 2005 and

approved the originator for PLS purchases.  Ex. 126 at FHFA14308153.  The review reported to

Fannie Mae that IndyMac permitted exceptions to its underwriting guidelines "where

compensating factors are present or in the context of negotiated bulk purchases," and that "[i]f

an exception is approved, an appropriate pricing adjustment is made to cover the particular risks

of the loan." Ex. 156 at FHFA13249696, 697.

      153.  **New Century**.  SF CPRM reviewed New Century's loan origination

operations in May 2005.  Ex. 157 at FHFA11729932.  The loan file review Fannie Mae

conducted found "inconsistencies with the published guidelines and procedures against the

actual loan files," and recommended "a larger sample be reviewed for consistency and

compliance."  *Id.* at FHFA11729932.  Fannie Mae also found that New Century was doing less

quality control than New Century's policies required.  *Id.* at FHFA11729932.

      154.  John Ingram testified that Clayton reviewed 208 New Century loan files as

part of a Legal Department operational review in November 2005.  Ex. 103 at 232:16-233:19;

Ex. 158 at FHFA11944314.  That review found 11 of the 208 loans had regulatory compliance exceptions such as a missing HUD-1 closing statement or an insufficient credit disclosure, and two loans violated Fannie Mae's anti-predatory guidelines because they were not originated with regard to the borrower's ability to repay the loan.  *Id.* at FHFA11944314.  For one loan, Clayton reported that Fannie Mae was "okay with [a] credit and compliance exception" where the loan had a "missing Final HUD1," and that, as a result of Fannie Mae's approval, the loan grade was "changed to 2" from a 3.  Ex. 159 at FHFA11944347.

155.   By March 5, 2007, Fannie Mae had suspended New Century as an originator from which it could buy PLS based on "[a] messy earnings restatement, a meeting with the SEC, an internal investigation and a criminal inquiry," "the combined impact of which sent the company's stock declining over 50%."  Ex. 160 at FHFA00775752.

156.   **Option One**.  SF CPRM reviewed Option One in July 2005.  Ex. 161 at FHFA12805035.  In advance of its operational review, Fannie Mae requested that Option One supply information about its EPD rates in 2002, 2003, and 2004.  Ex. 171 at SCC_FHFA_BOA_003100.  In its July 2005 review, Fannie Mae recommended maintaining a "close watch on [Option One] performance metrics to determine any early warning trends, which may indicate a deterioration of bond quality," noting that "OOMC's credit quality is among the lower tier within the subprime industry."  Ex. 161 at FHFA12805036.  The Fannie Mae review team found that although "OOMC has a set of published underwriting guidelines that are used to help an underwriter make appropriate lending decisions[,] OOMC's basic philosophy of underwriting is to make loans that make sense, even if an approval requires an exception."  *Id.* at FHFA12805043.  Fannie Mae's review also found that "OOMC appraisers

allow for a variance in loan value based on LTV:  <85% allows for a 10% variance, >85% and

<95% allows for a 5% variance and LTV's greater than 95% allow for only a 3% variance."  *Id.*

157.    Fannie Mae reviewers also found that "[a]pproximately 30% of all

appraisals result in a reduction of value.  The most common reasons for a value being adjusted

are the comparable properties are outside the subject property's neighborhood, the condition of

the subject property is less than average, or there is deferred maintenance on the subject

property."  Ex. 161 at FHFA12805035.  Fannie Mae reviewers also found that "with respect to

mortgage loans where the review valuation has a variance, the following tolerance levels are

accepted; (i) 10% less in the case of mortgage loans with LTV's less than or equal to 85% or (ii)

5% less in the case of mortgage loans with LTV's in excess of 85% or (iii) 3% less in the case

of mortgage loans with LTVs in excess of 95%, the LTV of the related mortgage loan is based

on the valuation obtained in the review of the original appraisal."  *Id.* at FHFA12805044.

158.    In September 2005, Clayton reviewed a sample of 386 loans for the Legal

Department to assess Option One's compliance with Fannie Mae's anti-predatory lending

requirements.  Ex. 162 at FHFA11862559.  Clayton reported to Fannie Mae that 58 of the loans

in the Option One sample were classified as having regulatory compliance exceptions, including

missing credit score disclosures, under-disclosed finance charges, missing HUD-1 closing

statements, missing notes, missing right of rescission disclosures, missing truth-in-lending

disclosure, and incomplete applications.  *Id*  Clayton also found 19 loans with predatory lending

exceptions, including loans extended without regard to the borrower's ability to repay the loan.

*Id.*

159.    SF CPRM conducted a review of Option One in June 2006 and found the

same appraisal issues and value variances.  *See* Ex. 163 at FHFA03310974.  That review also

identified several risks associated with the credit quality of Option One originations, including

the "[r]isk of poor underwriting performance and deterioration of credit quality in originations."

*Id.* at FHFA03310963.  Fannie Mae's reviews further found that Option One allowed for a 3-

10% variance between AVM results and reported appraised values.  *Id.*

160.   On February 27, 2007, Fannie Mae's counterparty review team

downgraded Option One to a "caution" status.  Ex. 164 at FHFA00022370.

161.   **Wells Fargo**.  SF CPRM reviewed Wells Fargo in December 2005.  Ex.

165 at FHFA02325937.  The review found that Wells Fargo's quality control unit graded loans

by investment quality, and that even loans graded as "[m]oderate" investment quality "may be

missing documentation required" or "contain process defects."  *Id.* at FHFA02325947.

## B.     Freddie Mac

162.   Freddie Mac regularly reviewed the operations and loan origination

practices of the Originators.  Ex. 166 at 146.  Freddie Mac's pre-purchase PLS review required a

counterparty risk assessment before trade commitment.  Ex. 167 at FHFA11625649; *see also* Ex.

168 at FHFA11728696.

163.   At Freddie Mac, counterparty approval was always required to obtain credit

approval.  Ex. 71 at 265:5-9.  Freddie Mac required pre-approval of any originator whose loans

constituted more than 1% of the unpaid principal balance of its PLS portfolio.  Ex. 172 at

FHFA1195454.

164.   This requirement reflected Freddie Mac's understanding that

"[u]nderwriting standards can have an [e]ffect on deal performance" and that "[p]oorly managed

servicers and originators can expose Freddie Mac to reputational risk . . . including but not

limited to fraud."  Ex. 169 at FHFA12147595-596.  This policy also notes that "this risk cannot

be structured away [and we] rely on understanding counterparty practices" to prevent it.  *Id.* at FHFA12147596.

165.   Michael Aneiro, Freddie Mac's Vice President for Non-Agency Portfolio Management and the head of the group that bought Freddie Mac's PLS, Ex. 181, testified that Freddie Mac required counterparty approval for PLS deals because "the deals are dependent upon the performance of originators . . . ." and "[i]f originators don't follow the guidelines and originate things in a poor manner, [then]. . . whatever expectations we had on the performance of the bonds will be affected in a negative way . . . ."  Ex. 71 at 255:19-24, 259:11-21.  The approval of a counterparty depended on an assigned "matrix" score.  Ex. 172 at FHFA11950454-456.

166.   Freddie Mac's Alternative Market Operations ("AMO") group was one of the business units that performed counterparty reviews, including reviews of aggregators, issuers and originators.  One of the purposes of these reviews was to approve and monitor the originators whose loans backed PLS.  Ex. 101.

167.   Freddie Mac's AMO unit selected which originators to review in consultation with PLS and Single Family employees and distributed its findings to those divisions to assist in business decisions.  Ex. 93 at FHFA13306194.  The AMO group also incorporated analyses of Freddie Mac's Single Family business, including its "flow" channel, into its originator reviews.  Ex. 166 at 213:12-223:14.

168.   Based on these originator reviews, AMO created a "scorecard" by which it assigned ratings to originators for the following categories: credit, appraisal, management, controls, and fair lending.  Ex. 173 at 52:9-54:11; Ex. 174 at FHFA00126810; Ex. 175 at FHFA03506825.  Those ratings ranged from "superior" to "poor" based on the AMO operational

review findings, and reported whether the latest AMO review was "current" or "stale."  Ex. 174 at FHFA00126810.  AMO "scorecards" were distributed monthly to numerous Freddie Mac personnel, including employees with PLS responsibilities.  Ex. 176 at FHFA13621438.

169.   AMO reviews examined Originators' loan underwriting and overall origination practices.  At times, AMO reviews involved reviewing loan files for a sample of the Originators' loans, to assess compliance with underwriting guidelines and material risks embedded in those originators' loans. *See, e.g.*, Ex. 166 at 188-90; Ex. 177 at FHFA11971347; Ex. 179 at FHFA13278832.  The purpose of AMO reviews was "to gain insight into the way [Freddie Mac's] counterparties do business."  Ex. 183 at FHFA02421535.

170.   Mr. Feigles testified that AMO personnel "reviewed the [loan] files to get a sense of what [the originator] did," with "[a] goal, certainly, to understand if they adhered to credit guidelines."  Ex. 166 at 190:4-17.  These loan file reviews were typically on-site at the originator's location.  *Id.* at 175:23-176:8; 307:6-8.  Freddie Mac also obtained AVM results on the loan file reviews it conducted as part of its AMO reviews "to evaluate the adequacy of [the originator's] controls."  *Id.* at 209:12-214:9; Ex. 196 at FHFA11548699; Ex. 177 at FHFA11971349 (detailing AMO's operational review procedures.)

171.   The AMO group was part of Freddie's External Operational Risk Management ("EORM") unit, which was part of Freddie's Single Family business.  Ex. 166 at 69:10-70:3; Ex. 184 at FHFA00000134.  In addition to PLS counterparty reviews, AMO was responsible for Freddie Mac's bulk purchases of subprime loans and securitization of those loans into "T-Deals" for investors.  Ex. 166 at 108:12-109:6.

64

172.   As shown in more detail below, *infra* ¶¶ 328-362, there were no information sharing restrictions on the distribution of AMO reviews.  Ex. 173 at 61.  PLS traders had access to these reviews, including the results of loan file reviews.  Ex. 166 at 823:5-23.

173.   In addition to Freddie Mac's AMO unit, the CCRM group and EORM unit conducted reviews of originators from which the GSE directly purchased loans.  Ex. 101 at 25; Ex. 173 at 42:6-12; Ex. 166 at 161:15-24; 804:19-25; Ex. 188 at FHFA17619353; Ex. 189 at FHFA17625640; Ex. 176 at FHFA13621434.  CCRM, which inputted AMO's originator rankings into its broader analysis of a counterparty's credit risk, also relied on AMO's operational reviews of originators when approving and monitoring PLS counterparties.  Ex. 185 at FHFA12967104; Ex. 186 at FHFA01485802; Ex. 187 at FHFA09816676; Ex. 172 at FHFA11950450.

174.   EORM's reviews examined the underwriting and appraisal quality of originators' loans and rated those originators as "Superior", "Above Average", "Satisfactory", "Marginal" or "Poor."  Ex. 189 at FHFA17625640; Ex. 190 at FHFA16966410.  EORM reviews were shared with personnel responsible for PLS transactions and counterparty oversight.  Ex. 176 at FHFA13621438.  EORM and AMO also shared information regarding the results of their reviews, and there were no restrictions on what information should be shared between these units.  Ex. 166 at 213-223; 257-58; 847-49.

175.   Because Freddie Mac was allowed to buy PLS only if the collateral loans were originated by an "approved seller servicer" by Freddie Mac's Single Family division, the reviews conducted by CCRM and EORM affected PLS purchases.  Ex. 191 at FHFA01391812-13.

176.   Freddie Mac conducted reviews of the following Originators:

**Aames**.  In March 2005, Freddie Mac conducted an AMO review of Aames.  Ex. 192 at FHFA13146126.  During this review, Freddie Mac found that Aames permitted LTV tolerances of up to 10% depending on risk levels.  *Id.* at FHFA13146128.  The review also listed Aames' "Fraud tools," and noted that "11.8% of all findings are for fraud, with 55% for falsified documentation which are found through re-verification of licenses, income, employment and assets."  *Id.* at FHFA13146129.  Moreover, it found that "Aames' largest Broker was just revoked due to fraud."  *Id.*

177.  **Accredited**.  On February 2, 2006, Freddie Mac conducted an AMO review of Accredited Home Lenders, which included loan-level reviews to evaluate the credit quality of its originations.  Ex. 193 at FHFA11548682.  The review reported that exceptions to underwriting guidelines made up 40% of Accredited's loan production.  *Id.* at FHFA11548683. The review also stated that approximately 10% of the appraisal values of the sampled loans were reduced upon review.  *Id.* at FHFA11548684.  As part of the review, Freddie Mac analyzed Accredited's fraud review process and expressed the belief that "[f]raud areas of concern" for loans originated by Accredited included "[e]mployment and income, property value and condition, property flips, undisclosed debts, straw buyer, identity theft, occupancy, assets and cash reserves."  *Id.* at FHFA11548686.

178.  **Aegis**.  In January 2007, AMO conducted a review of Aegis.  Ex. 194 at FHFA00129445.  Freddie Mac found that a unit of Aegis, "Aegis Funding Corporation (AFC), was closed at the end of 2006.  This unit included all wholesale subprime originations, and was closed due to significantly higher incidences of fraud and repurchase requests than in both other units combined."  *Id.* at FHFA00129445.  It also noted that "EPD's for subprime originations at Aegis have ranged from a high of 4.9% of production to the current 1.9%.  Management believes

that this number will stabilize around 2%, based on the closure of AFC (which accounted for the majority of their subprime EPDs) and the enhanced appraisal standards." *Id.* at FHFA00129447.

179.   **Ameriquest/Argent**. In July 2003, AMO conducted a review of Argent, which included loan-level due diligence of Argent loans. Ex. 195 at FHFA11597649. Freddie Mac found that that 9.5% of all Argent loans it reviewed during its visit contained issues relating to "appraisal," and further, that appraisal issues accounted for 25% of all files AMO found inadequate during its review of loans. *Id.* at FHFA11597649. AMO also found "appraisal discrepancies on approximately 10% of the Argent loans in the sample [reviewed by Freddie Mac]." *Id.* at FHFA11597651.

180.   In October 2004, Freddie Mac's AMO team again visited Argent, and found that "Argent generally allows for a[n appraisal] value variance of 7% to 10% depending on loan amount" and "[a]pproximately 7% of all values and 20% of the values on full reviews are reduced." Ex. 225 at FHFA11597645.

181.   In November and December 2005, AMO visited Argent again and, after that visit, rated Argent's appraisal practices as "marginal." Ex. 197. The reviewers found "significant signs of deterioration within [Argent's] appraisal and credit areas" and concluded that Argent's "enormous growth has outpaced the ability to manage critical credit risk properly leading to poor loan quality." *Id.* at FHFA01079050.

182.   AMO's loan analysis during its 2005 review "resulted in significant issues, (22%) for Ameriquest appraisals and for Argent appraisals; credit (16%) with (11%) for appraisals." *Id.* at FHFA01079050. Specifically, the review noted that "because LTV parameters are generally higher for Argent[, ] [t]he results are inflated LTV's with already weak

appraisals and difficulty knowing if the risk has actually been assessed properly for pricing." *Id.*
at FHFA01079051.

183.   AMO also found that Argent "show[ed] weakness in [its] appraisal
processes[:] AMO observed appraisal values pushed consistently just to obtain what appears to
be a specific value." *Id.* at FHFA01079052.  AMO also observed that Argent "ha[d] realized the
downfalls through [its] own discoveries and from several state inquiries notating unacceptable
appraisal processes." *Id.*

184.   AMO noted that at Argent, "exceptions appear to be frequent for LTV."
Ex. 201 at FHFA11597628.

185.   **Countrywide**. Freddie Mac's AMO team reviewed Countrywide in June
2004.  Ex. 226.  The review awarded Countrywide an overall rating of "marginal" and a rating of
"marginal" for internal controls.  *Id*. at FHFA02419613.  AMO found that "Countrywide's
quality control unit targets too small a sample to be fully effective."  *Id*.  AMO also noted that
approximately 20% of appraisals in Countrywide loans "[had] a reduction in value after review."
*Id.*

186.   Between August 31 and December 23, 2005, Freddie Mac's EORM
reviewed Countrywide.  Ex. 198 at FHFA11984900.  During this review, EORM identified
"risks related to [Countrywide]'s ability to manage appraisers utilized in the origination process,
which may adversely impact loan quality," specifically finding "during file testing that licenses
are not consistently found with each appraisal."  *Id.* at FHFA11984909.

187.   Freddie Mac's AMO team again reviewed Countrywide in September 2007.
Ex. 199.  During its on-site visit, Freddie Mac reviewed "independent AVM's for 50 recently
funded loans to determine the reasonableness of the collateral valuation" and found that

Countrywide's appraisals varied from Freddie Mac's AVM values by 8.6%.  *Id.* at

FHFA00371995.

188.  **Decision One**.  AMO reviewed Decision One in July 2004.  Ex. 200 at

FHFA12992151.  Regarding the accuracy of Decision One's appraisals, Freddie Mac knew that

Decision One did "not have an appraiser approval or monitoring process," that there was

generally a 15% tolerance between original and reviewed appraisal values, and that "[s]everal

files in the sample had poor comparables, and one value was clearly not supported."  *Id.* at

FHFA12992152.

189.  **Equifirst**.  AMO conducted operational reviews of Equifirst in 2004 and

2007.  Ex. 204; Ex. 205.  Freddie Mac engaged Clayton to perform the September 2004

operational review, and Clayton reported to Freddie Mac that Equifirst's appraisal practices were

"marginal" and that a "high percentage" of Equifirst's loans "closed with an LTV over 90%"—

and recommended "more involvement of the Appraisal Review Department in reviewing

appraisals prior to closing." Ex. 204 at FHFA13294892.

190.  **First Franklin**.  AMO reviewed First Franklin in 2004, 2005 and 2007.  Ex.

206; Ex. 207; Ex. 208.  AMO's 2004 review reflected Freddie Mac's belief that "First Franklin's

layering of risk consists of high FICO scores, high LTVs, some 100% first liens, first time

homebuyers, payment shock in excess of 75% and no assets verified."  Ex. 206 at

FHFA12992160.  Freddie Mac also observed that First Franklin made exceptions "for loan

amount and DTI total 10%" and "[t]olerance levels for AVMs are currently at 15% for purchase

transactions and 10% for refinances."  *Id.* at FHFA12992161.

191.   In its 2005 review, Freddie Mac's AMO review reflected its belief that First Franklin loans had "[v]alue discrepancies between various types of loan reviews," and that "First Franklin does not have an extensive appraisal department."  Ex. 207 at FHFA02418743.

192.   In August 2007, "AMO observed many loans with values that were pushed or exceeded the AVM's pulled by 10-15% . . . AMO's review indicated that values were often pushed . . . .  Overall the AVM's pulled by AMO demonstrated an absolute standard deviation of 13.2% from the appraised value."  Ex. 228 at FHFA12769700.

193.   **First NLC**.  In January and February 2005, Freddie Mac conducted an AMO review of First NLC Mortgage Corp.  Ex. 209 at FHFA04385473.  It gave First NLC the lowest possible rating of "poor," reporting that First NLC had "poor command of its credit, appraisal and quality control units."  *Id*.  Freddie Mac found that First NLC opted to use the highest credit score available "[w]here more than one score is obtained," a practice FHFA now claims was a violation of proper standards.  *Id*.  Freddie Mac concluded that First NLC's underwriting process "result[ed] in loans with credit attributes that would be greatly misrepresented on a pricing tape."  *Id*.  AMO rated First NLC's appraisal quality as "poor" based on three "weaknesses":

- "First NLC has no formal appraisal department.  Consequently, their appraisal process relies entirely on the underwriter's review [and] AMO does not believe that a centrally located underwriting department can understand national markets well enough to control valuation risk";
- "First NLC allows a 10% variance in value at all LTV levels . . . [which] makes it possible for the true LTV to exceed 100%"; and

- "[A]ppraised value was reduced less than 2% of the time in 2004, which is well below the 6% to 8% AMO typically sees."

194.   Freddie Mac's April 2005 review of First NLC Financial Services echoes the same concerns.  Ex. 210 at FHFA03484206.

195.   **Fremont**. AMO reviewed Fremont Investment & Loan in 2004, 2005 and 2006.  Ex. 211; Ex. 212 ; Ex. 213.  Its 2004 review reflected its belief that Fremont loans had "[m]ajor underwriting exceptions . . . at 4%, with most for Debt to income ratio."  Ex. 211 at FHFA11596541.  AMO also found that Fremont allowed excessive variances between appraisal values and AVM-generated values: "Greater than 80% LTV allows for a 5% variance in value, with less than 80% LTV allowing for 10%."  *Id.*

196.   In August 2005, Freddie Mac observed that Fremont's LTV "tolerance levels" (the degree to which the LTV could depart from AVM estimates of accurate value) were 5, 10, and 15%, depending on the riskiness of the loan.  Ex. 212 at FHFA00129493.  Freddie Mac found that Fremont was making credit exceptions during loan underwriting, with the following tolerances:  "5% for Loan amount, LTV, FICO, DTI and BK [bankruptcy] seasoning." *Id.* at FHFA00129494.

197.   In June 2006, EORM conducted a two-day review of Fremont.  Ex. 213. This review identified underwriting problems including "[d]ata integrity issues" and "risks related to Fremont's ability to assess the risk associated with the origination of loans to self-employed borrowers and/or borrowers utilizing tax returns to substantiate income." *Id.* at FHFA04850282, FHFA04850286.

198.   By the end of March 2007, Freddie Mac's CCRM department had downgraded Fremont.  Ex. 214 at FHFA03344375.

199.   **Greenpoint**.  AMO reviewed Greenpoint Mortgage Funding in 2004.  Ex. 94 at FHFA13213565.  AMO selected a sample of 202 loans from Greenpoint's recent loan production and engaged Clayton to review those loan files, after which Freddie Mac staff also reviewed the loans.  *Id.* at FHFA13213565.  AMO and Clayton found that 19.8% of the loans

had material exceptions to underwriting guidelines: 6.9% for appraisal issues, 5% for "credit" issues, 1% for "missing docs," 1.5% for DTI-related issues, 1.5% for LTV-related issues, and 3.5% for borrower misrepresentations or "other" issues. *Id.* at FHFA13213565. As a result of this review, Freddie Mac believed that Greenpoint's "valuation process showed more weaknesses than in the last review," *id.* at FHFA13213566, including the facts that "[p]roperty condition issues in the sample were more prevalent than noted in prior reviews" and "[c]omparable[] properties in the appraisal that were not truly comparable or did not support the value were more frequent than in the prior review." *Id.* at FHFA13213567.

200.   AMO's 2004 review reflected Freddie Mac's belief that "Greenpoint's overall credit standards and their control focus are still marginal," and that Greenpoint's "[c]redit guidelines are softer than their major competitors," "Greenpoint's culture is geared toward production and profit, not towards control," "[e]xceptions to their lending guidelines are frequent," and "Greenpoint's guidelines are very big and very complex, creating a possibility of confusion or misuse." *Id.* at FHFA13213566- 567. AMO underwriters "deemed 6% of [the] sample to be outside Greenpoint's guidelines with unacceptable risk." *Id.* at FHFA13213567.

201.   Based on its AMO review, Freddie Mac knew that Greenpoint's "misrep[resentation] findings have recently averaged 31% compared to a consistent 25% AMO noted at previous onsites" and "[m]ost of the misrep findings are for income and employment." *Id.* at FHFA13213567. It also believed that some of the issues it identified were "recurring problems, [but] senior management [did] not seem to have a plan to resolve these issues." *Id.* at FHFA13213567.

202.   EORM conducted an operational review of Greenpoint Mortgage Funding in March 2006. Ex. 215. EORM's review reflected Freddie Mac's belief that Greenpoint had an

"[i]nadequate process to obtain re-verifications of employment and deposits," and that "data integrity controls need additional strengthening." *Id.* at FHFA11985099.  The review also noted that "[a]pproximately 35 percent of closed loans have been approved with exceptions," with "multiple exceptions making up 10 percent overall," and that the "[t]op three credit exceptions [are] DTI, loan amount and credit score." *Id.* at FHFA11985112- 113.  EORM observed that "[r]everification of income and source of funds/reserves are not consistently performed," and Greenpoint's "guidelines allow credit characteristics to be layered in ways that could create risk." *Id.* at FHFA11985113.

203.  **IndyMac**.  AMO reviewed IndyMac in 2003, 2004 and 2006.  Ex. 216; Ex. 217; Ex. 218.  AMO's 2003 review reflected Freddie Mac's belief that IndyMac suffered from "over-reliance on FICO score, their concentration in California, and their extremely aggressive growth plan."  Ex. 216 at FHFA13675213.  The report noted that IndyMac only reviewed "45% of their values with AVM's" and reflected Freddie Mac's belief that this practice "shows in the quality of the appraisals." *Id.* at FHFA13675214.

204.  Freddie Mac believed that "[i]t was very obvious on several loans that values were being pushed to get to a certain level in order to support a predetermined loan amount.  AMO observed appraisers deliberately crossing into nearby upscale neighborhoods to get the value they needed.  Comparables also consistently had superior style, layout, appeal, design and even square footage.  Even when AVMs were obtained, in many cases where the AVM did not support the value, value adjustments were not made. It was as if the AVM was just ignored." *Id.* at FHFA13675214-215.

205.  Freddie Mac believed that 31.6% of the loans that it reviewed during its AMO review contained issues relating to "appraisal." *Id.* at FHFA13675213.  Indeed, appraisal

issues accounted for 66% of all files AMO rejected during its due diligence.  *Id.* at

FHFA13675214.  To Freddie Mac, these percentages posed "a major concern, since collateral is

such a key factor in determining overall lending risk."  *Id.* at FHFA13675214.

206.   Freddie Mac's 2004 AMO review reflected its belief that "IndyMac's

subprime credit quality is still an issue with aggressive credit guidelines that allow them to

compete with the lower sector of subprime lenders," and "make exceptions largely unnecessary."

Ex. 217 at FHFA12992173.  These guidelines "make it more difficult for an investor working

from a standard tape format to properly evaluate risk."  *Id.* at FHFA12992173.

207.   In 2006, Freddie Mac's AMO review concluded that "IndyMac's

underwriters appear to underwrite to satisfy the [automated underwriting system] conditions and

do not typically question risk factors such as occupancy."  Ex. 218 at FHFA16955789.

208.   AMO stated that it "would like to see IndyMac underwriters . . . more

closely capture other fundamental lending risks, such as occupancy.  For example, if a borrower

recently acquired three owner <u>occupied properties at 100% LTV within the last 3 months and</u>

<u>now requesting [sic] a fourth property as owner-occupied an automated system . . . is unable to</u>

<u>capture these types of lending risks.</u>"  Ex. 221 at FHFA03337787 (emphasis added).  AMO also

observed that IndyMac "did not question income reasonability" for many loans.  *Id.*

209.   AMO analyzed a sample of IndyMac's most recent available loan

production using Corelogic's "cascading AVM technology" and determined that "[t]he mean

value variance" on the 43 loans was 11.39%. Ex. 221 at FHFA03337789, FHFA03337792.  It

was Freddie Mac's view that this variance exceeded standard industry variances.  *Id.*

210.   EORM also performed operational reviews of IndyMac in 2005 and 2007.

Ex. 222; Ex. 223.  In 2005, EORM found that "IndyMac's quality control reviews lacked

evidence of a response or resolution to findings," including underwriting issues, and, as part of

its production compliance review, EORM found that 14 of 19 broker-originated loan files

"contained expired licenses."  Ex. 222 at FHFA11985217, 223-224.

211.   By the end of March 2007, Freddie Mac's CCRM department had

downgraded Indymac.  Ex. 214 at FHFA03344376.

212.   **Mandalay Mortgage**.  In November 2004, Clayton performed an

operational review of Mandalay Mortgage on behalf of Freddie Mac.  Ex. 227 at FHFA13253473.

The review gave Mandalay Mortgage the worst possible overall rating of "Poor." *Id.*  The report

specifically noted that Mandalay's "stated" and "interest only" product categories "are

aggressive" and that "[a] tolerance of 15% is allowed between appraised value and AVM value."

*Id*. at FHFA13253474.

213.   **New Century**.  AMO reviewed New Century in January 2005.  Ex. 224 at

FHFA11597212.  The review reflected Freddie Mac's understanding that New Century had a

"stated goal of offering mortgages to all borrowers," and that "stated income" loans

"represent[ed] 45%" of New Century's production.  *Id.* at FHFA11597213.  The Freddie Mac

reviewers reported that New Century had an "LTV tolerance level" of 7% for loans with an LTV

less than 90%.  *Id.* at FHFA11597215.

214.   Freddie Mac reviewed New Century again in February 2007.  Ex. 229.  In

this review, it concluded that New Century's underwriters "lack[ed] the ability or the direction to

detect layering of risk."  *Id.* at FHFA13238766.  Freddie Mac observed that, for the New Century

loans sampled, the "appraisals had a mean value variance (appraisal v. AVM) of 14.25%" and

expressed its belief that "[t]his put[] the New Century value variance on par with what we have

seen industry wide."  *Id*.

215.   By March 8, 2007, New Century had announced that it had stopped accepting loan applications, Ex. 368 at FHFA00178855, and it declared bankruptcy in April 2007, Ex. 515.  By the end of March 2007, Freddie Mac's CCRM department had downgraded New Century.  Ex. 214 at FHFA03344376.

216.   GSE personnel believed that pools from originators in bankruptcy were more likely to contain fraud.  Peter Niculescu of Fannie Mae described that proposition as "almost tautological" and said it "would be hard for anybody to disagree" that loans pools from failing originators were "more likely to contain fraud." Ex. 66 at 290:20-292:9.

217.   **Option One**.  Freddie Mac reviewed Option One in May 2005.  Ex. 230 at FHFA11597859.  Freddie Mac's 2005 review reflects its opinion that Option One was "marginal."  *Id.* at FHFA11597859.  The review also reflects Freddie Mac's belief that "Option One's philosophy is to trust credit scores period," *id.* at FHFA11597860,  and that "Option One's FICO score average of 609 is low when compared to the industry.  When you add the fact that AMO found 10% of the loans with an average FICO score of 627 to be misrepresentative, an Option One loan pool could perform more like an average FICO score of 580-590."  *Id.* at FHFA11597859.  The low credit scores, in conjunction with Option One's "[e]xcessive layering of risk" "caused AMO to downgrade Option Ones' [sic] overall credit rating from Satisfactory to Marginal."  *Id*.

218.   During its review, AMO reviewed a sample of loans from a recent Option One production and noted at least one instance in which a home "value [] was stretched excessively."  *Id.* at FHFA11597861.

219.   In February 2007,  Freddie Mac again rated Option One as "marginal."  Ex. 231 at FHFA12656910.  The Freddie Mac reviewers reported that Option One's philosophy was to make loans that "make sense . . . . even when an exception to the guidelines is required."  *Id.*

220.   The 2007 Option One review reflected Freddie Mac's observation that "underwriting styles varied from branch to branch with varying levels of consistency in how the guidelines were applied.  AMO feels this lack of cohesiveness, coupled with OOMC's liberal interpretation of policy leads to additional process execution risk."  *Id.* at FHFA12656911.  During its loan level review, Freddie Mac found several "underwriting decisions [it] disagreed with."  *Id.* at FHFA12656913.  For example, the Freddie Mac review found, based on its review of loan files, an approved loan with a 103% CLTV despite the fact that "over 100% CLTV [was] not allowed under any program."  *Id.*  The approved loan was "most certainly outside of the guidelines of Option One."  Ex. 166 at 332:17-20.  It also found that for one of the loans, the "[o]riginal appraised value of [ ] $286k was used to determine LTV" even though "[a] field review of the appraisal cut the value to $255k."  Ex. 231 at FHFA12656913.  Finally, the review noted that Option One underwrote at least one of the loans using a credit score of 597, "where the credit score supported in the file was 554."  *Id.*  Freddie Mac was unsure "how the 597 credit score was obtained."  *Id.*

221.   Freddie Mac again found evidence of appraisal bias during its March 2007 review.  During its review of one loan file, AMO noted that although "[a] field review of the appraisal cut the value to $255k,"  "[t]he original appraised value of $286k was used to determine LTV with no exceptions noted or explanation given."  Ex. 233 at FHFA00204575.  AMO found another loan that had given "103% CLTV to self-employed first time homebuyer with stated income [even though] Borrower only had a two year history of being self-employed.

77

Between seller contributions and 103% LTV, borrower contributed less than $1000 to purchase [which violated Freddie Mac standards because] [o]ver 100% CLTV [is] not allowed under any program." *Id.*

222.    Freddie Mac's review also expressed concerns over Option One's new, fully automated "appraisal waiver" program: "[Option One] is seeing approximately 12% of the returned values not supported.  Based on the overall success of this program [Option One] is looking to expand this in the near future. AMO is unaware of any other subprime lender that offers a program that requires less than a full appraisal."  Ex. 233 at FHFA00204576.

223.    **Ownit Mortgage**. Freddie Mac's August 2004 AMO review of Ownit Mortgage ("Ownit") noted that AMO did "not believe that [Ownit's] operation [was] stable", resulting in "appraisal and controls that are marginal."  Ex. 234 at FHFA13293318.  The review noted that "Ownit tape data is currently very inaccurate with respect to doc type and other key areas."  *Id*. at FHFA13293320.  The review also acknowledged that Ownit did not have its own appraisal department and "allows a value variance of up to 15% as compared to AVMs or desk reviews, which is large, especially at the higher LTV's."  *Id*. at FHFA13293319.

224.    **ResMAE.**  Freddie Mac's AMO group conducted an operational review of ResMAE in April 2004 that gave ResMAE an overall rating of "Marginal" and recommended that Freddie Mac "Proceed with Caution."  Ex. 300 at FHFA12992187.  The review found that "ResMae does not have an internal quality control program," *id.* at FHFA12992189, and encourages "story loans" which are "loans that are made based more on the borrower's individual story that [sic] they are on objective criteria."  *Id.* at FHFA12992188.  Freddie Mac acknowledged that ResMae "accept[s] a variance of 10% between origination appraisal and the review appraisal."  *Id.* at FHFA12992189.

225.   **RFC/GMAC**.  In October 2005, AMO reviewed RFC-GMAC ("RFC").  Ex. 235.  Freddie Mac observed  that "[e]xceptions make-up 2% of production," and "[t]op three exceptions are: loan amounts, LTV and DTI."  *Id.* at FHFA13238755.  Additionally, AMO found that AVM tolerances at RFC ranged from 5% to 15%.  *Id.* at FHFA13238756.

226.   **Wells Fargo**.  AMO reviewed Wells Fargo in November 2006.  Ex. 236.  AMO reviewed 50 loan files on-site at Wells Fargo, and reported "a high percentage of files that we categorize as having material exceptions, mostly around the decisions regarding collateral."  *Id.* at FHFA12684947.  Freddie Mac believed that Wells Fargo's "lack of technology was evident in several areas" and the "number of underwriters working without the benefit of an automated underwriting system and without the support of a separate appraisal department" accounted for what Freddie Mac viewed as "the lack of consistent underwriting decisions found in the file review."  *Id.* at FHFA12684948.  Wells Fargo also informed Freddie Mac that "fraud losses are up from last year" in part "due to higher volumes of stated [loan] products and investments [sic] property loans."  *Id.* at FHFA12684950.

227.   **WMC**.  In July 2003, Freddie Mac's AMO team reviewed WMC.  Ex. 237 at FHFA11597970.  During their loan-level review of a recent production of WMC loans, Freddie Mac concluded that 7% of the sample loans contained appraisal issues.  The reviewers observed that appraisal issues accounted for 33.3% of all files AMO rejected during its due diligence.  *Id.* at FHFA11597970.  AMO rated WMC's appraisal/valuation process as "marginal," noting instances where appraisers made "excessive adjustments to comp[arable properties]."  *Id.* at FHFA11597971.  Freddie Mac "did not have full confidence in certain of the [appraisal values] values" of WMC loans.  *Id.*

228.   In January 2005, AMO again reviewed WMC.  Ex. 238 at FHFA11597964. The review reflected Freddie Mac's belief that WMC was "marginal" overall.  In particular, Freddie Mac observed that WMC had a 6% exception rate and that underwriting exceptions for LTV and DTI constituted the top two exception categories.  *Id*.  Based on its review, Freddie Mac understood that WMC applied appraisal tolerance variances ranging from 3% to 10% for LTVs ranging from 80% to 90% and greater, respectively.  *Id*. at FHFA11597965.

229.   In January 2007, Freddie Mac's AMO team again reviewed WMC.  Ex. 239 at FHFA03485131.  Freddie Mac noted that not all appraisals were completed by licensed appraisers, who made up only fifty-five percent of WMC's appraisal auditing staff.  *Id*. at FHFA03485133.

## V.   THE GSES BELIEVED ORIGINATORS' GENERAL PRACTICES AFFECTED THE MORTGAGE LOANS

### A.   GSE Employees Believed SLG Loans Would Reflect Originators' Underwriting Practices

#### 1.   Fannie Mae

230.   Joseph Paul Norris, who served as director of portfolio management, mortgage trading, at Fannie Mae during the relevant period, testified that he would expect that loans backing the PLS he purchased would reflect the general underwriting practices of the originators responsible for those loans.  Ex. 63 at 809:21-810:4.

231.   Peter Niculescu, who supervised Fannie's purchases of PLS during the relevant period, testified that he believed the identity of the originator was an important factor in the performance of mortgages.  Ex. 66 at 168:19-24.  Mr. Niculescu explained that he could "see no reason why loan performance would be different" when loans were sold to Fannie Mae through PLS as opposed to directly in whole loan transactions.  *Id*. at 169:6-9.

232.    John Ingram also testified that, if he perceived negative general originator trends, that he would tell PLS traders that "we don't want to see any more deals with that originator because of the trend."  Ex. 103 at 60:22-61:5.

233.    In January 2007, Lesia Bates Moss wrote to Michael Shaw, "Given Ameriquest's past performance it is my opinion that sub prime performance will [] mirror overall market performance."  Ex. 240 at FHFA12412767.

234.    Fannie Mae's belief that an originators' general practices would be reflected in the PLS is also reflected in contemporaneous communications.  Mike Shaw, who analyzed PLS credit risk at Fannie Mae, Ex. 86 at 41:4-42:3, wrote that he wanted to "reject[] [a] deal" (which Fannie Mae ultimately bought) because it contained "New Century origination from that company's weakest time period."  Ex. 241 at FHFA01125883.  Ben Perlman, another Fannie Mae employee,  expressed the view that "[m]ost of the originators [in the deal], especially New Century, are known in the industry to have been underwriting to weak standards. These loans were also believed to contain some degree of fraud."  Ex. 241 at FHFA01125885.

## 2.    Freddie Mac

235.    Michael Aneiro, the head of Freddie Mac's PLS portfolio, testified that Freddie Mac's AMO reviews and originator rankings were provided to the "credit group, which would then provide a credit approval, counterparty approval and other . . . credit approval for purchases of the specific bonds."  Ex. 71 at 262:19-63:14.  Mr. Aneiro testified that he relied on Freddie Mac's AMO "review of underwriting practices and their scoring of specific underwriters" to confirm, for example, whether originators had determined borrowers' income in a reasonable manner.  *Id.* at 341:16-42:3.

236.    Michael Aneiro, head of Freddie Mac's PLS portfolio and the employee

with approval authority over all PLS purchases, Ex. 71 at 296:13-18; 297:13-15, agreed that if an

"originator was not following its own guidelines and was contributing loans to the collateral for

the pool" he would have expected that "loans not underwritten to the originator's guidelines

would then end up in the collateral for a pool." *Id.* at 265:16-22.  Aneiro also agreed it "would

be [his] general expectation" that an originator's collateral backing a PLS deal would reflect that

Originator's general practices. *Id.* at 265:25-266:7.

237.    Similarly, Perri Henderson, a PLS trader for Freddie Mac, testified that

unless she was specifically told otherwise, she would "assume" that an originator's loans backing

PLS would reflect that originator's general practices.  Ex. 242 at 132:3-10.

**B.      Credit Reviews Reflected the Importance of Originators' General Practices**

238.    Because the GSEs knew that Originators' practices significantly affected

the risk presented by the Certificates they bought from Defendants, their pre-purchase credit

analyses took into account the Originators in the deal.  *See infra* ¶¶ 269-80.

239.    Individuals involved in Freddie Mac's purchase of PLS testified that they

relied on AMO reviews in deciding whether to buy PLS from Defendants. *See infra* ¶¶ 455-60.

240.    Kevin Palmer, who was responsible for pre-purchase PLS credit reviews at

Freddie Mac, testified that he reviewed AMO reports when assessing prospective PLS purchases,

and the AMO "score from those credit reviews would feed into the credit worksheet and was part

of [Freddie Mac] procedure." Ex. 67 at 217:23-219:8.  For example, in approving one purchase,

Kevin Palmer stated that he was approving the deal despite First NLC's rating of "Poor" because

it had "over 10% more subordination than required on this deal[.]"  Ex. 170 at

FHFA00764538.  Palmer also testified that, as part of Freddie's PLS pre-purchase procedures, he

reviewed AMO's reports to understand originator practices, such as compliance with underwriting guidelines, the originator's "fraud prevention mechanisms," and the methods the originator employed to assess reasonableness of a borrower's income.  Ex. 67 at 217:23-219:8, 338:15-17; *see also* Ex. 302.

241.    Freddie Mac's trade tickets for the PLS it bought noted the AMO grade of the significant underlying originators.  For example, for GSAA 2007-6, the credit approval for the Certificate lists as the Originators for the loans in the SLG as Avelo (63.92%), Countrywide (8.86%), Greenpoint (22.42%), National City (4.71%) and Wachovia (0.10%).  Ex. 248 at FHFA04593165.  The trade packet notes that the Freddie Mac AMO group rated these Originators "Satisfactory," and Goldman Sachs as aggregator "Above Average."  *Id.*

## VI.    THE GSES BELIEVED THE CERTIFICATE SLGS CONTAINED APPRAISAL BIAS

### A.    The GSEs Understood Appraisals Were Subjective Estimates of Home Value, and LTVs Could Be Understated As a Result of Inflated Appraisals

242.    The GSEs' PLS traders were aware that appraisals are subjective estimates of value.  Fannie Mae trader Paul Norris testified that appraisals were inexact and, further, that there is no single "correct" home value.  Rather, reasonable minds could differ as to the value of a particular property.  *See* Ex. 63 at 640:19-641:21 ("Q.  [An appraisal] [i]s inexact, right?  A. That's correct . . . Q.  An appraisal reflects one appraiser's opinion, right?  A.  That's correct.  Q. And reasonable appraisers could differ significantly about what a given property is worth, right? . . .  A.  It's possible.  Q.  And there's no one correct appraisal for a house, right?  A. That's correct.").

243.    Fannie Mae PLS trader Shayan Salahuddin concurred that two different appraisers evaluating the same property could generate two entirely different appraisals.  *See* Ex.

61 at 591:5-15 ("Q.  And you understood at the time that you were purchasing residential mortgage-backed securities for Fannie Mae in 2005/2007 that an appraisal was an opinion of the value of a property, right?  A.  That's correct.  Q.  And different appraisers could reach different opinions, right?  A.  That's correct.").

244.    The GSEs understood that inaccurate or overstated appraisals had a direct impact on LTV ratios.  Freddie Mac's Gary Kain testified that "LTV is a key variable for credit. If appraisals were . . . inflated, LTVs in reality would be higher than what you anticipated and you modeled[,] which would increase your credit risk over what you otherwise would have thought."  Ex. 243 at 234:21-236:2.  As a result, Kain "bec[a]me more concerned about whether [Freddie Mac] was getting a complete picture on CLTV."  *Id*. at 237:21-238:4.

245.    Traders also were aware that inflated appraisals could skew LTV ratios. For example, in a March 30, 2007 e-mail, Fannie Mae PLS trader Ashley Dyson alluded to the link between inflated appraisals and LTV ratios and the need to take into account appraisal bias when assessing borrower LTV ratios.  *See* Ex. 244 at FHFA00286423 ("The dramatic changes to underwriting guides have also created some chatter on what refi options a subprime borrower will have once his [adjustable rate mortgage] resets. . . .  [A]fter taking into account appraisal bias, a portion of borrowers with >95% LTVs could have some even more flexible options if refi appraisals push their LTVs lower (which is more common that one might think).");  *see also* Ex. 245 at FHFA03520248 ("[a]ppraisal [b]ias [m]eans [t]rue LTV is [h]igher.).

246.    Given its correlation to LTV, appraisal bias had "explanatory power."  Ex. 246 at FHFA01656675.  Specifically, the GSEs regarded appraisal bias as "a pretty good measure of [originator] underwriting standards."  *Id*.

**B.     The GSEs Believed That Appraisal Bias Affected the Residential Mortgage Market**

247.   As some of the largest participants in the mortgage industry, Fannie Mae and Freddie Mac had a sophisticated understanding of appraisal bias in the 2005 to 2007 time period.

**1.     Freddie Mac**

248.   Freddie Mac officials expressed concern, as early as 2005, about the "direction that the mortgage credit industry ha[d] taken over the most recent years," Ex. 247 at FHFA08974252, and, in particular, "[t]he general degrading of appraisal quality as well as the proliferation of automated appraisal valuations." *Id.* at FHFA08974252.

249.   Freddie Mac's Executive Vice President of Credit Risk Oversight Ray Romano testified that he expected a deviation of "5 to 10%" between home values generated using AVMs versus the appraisal valuations reflected in originators' loan files.  Ex. 69 at 438:10-439:20.

250.   Mr. Romano's expectation was consistent with the "general degrading of appraisal quality" that Freddie Mac officials understood was occurring in 2005.  Ex. 247 at FHFA08974252.  By May 2005, Freddie Mac had "worries" about "[a]ppraisal practices (including AVMs)" and appraisal methods, including selection of the comparable properties that formed the basis for appraisals.  Ex. 249 at FHFA17547950.

251.   A January 2007 Freddie Mac Subprime Strategy Working Paper reveals that by that time, Freddie Mac was finding "[m]ore inflated estimates with fewer controls.  More pressure from originators on values – greater bias in the numbers."  Ex. 250 at FHFA02344982.

252.   Patti Cook, Freddie Mac's Executive Vice President of Investment and Capital Markets, testified that as "house price volatility" increased, Freddie Mac observed "more uncertainty around the appraisal process."  Ex. 70 at 147:13-24.

253.   Freddie Mac's September 2006 Strategic Perspective newsletter echoed growing concerns about the effects of increased "regional volatility in house prices."  Ex. 251 at FHFA03703559.  Senior credit officials opined that although "Freddie Mac policies are designed to prevent us from taking on unacceptable layers of risk (ex. thresholds on LTV and FICO)" there remained serious concerns about how Freddie Mac could "ensure that a lender's property assessment process is in fact providing us with LTVs we are comfortable with."  *Id.*

254.   Gary Kain testified that during 2006-2007, Freddie Mac became "aware that appraisals were [a] problem – there was potentially an issue with appraisal bias and so forth and the appraisal process."  Ex. 243 at 235:9-15.  Freddie Mac was also aware that there was "a high level of appraisal inflation in affordable housing (AH) product."  Ex. 252 at FHFA03703596.  Specifically, the subprime loans "needed to meet subgoals and business priorities," suffered from "[m]ore inflated estimates with fewer controls," were susceptible to "pressure from originators on [home] values," and thus contained "greater bias in the numbers."  Ex. 250 at FHFA02344967, FHFA02344982.

255.   Freddie Mac used its proprietary AVM, Home Value Explorer (or "HVE") to assess the extent of appraisal bias among its primary counterparties.  Ex. 253 at FHFA11594913; *see* Ex. 243 at 241:21-242:4 ("I believe [HVE] was designed or was used to . . . run loans through it and it would . . . spit out its own opinion of what the loan to value or the loan value – what the house price would be.").  The results of Freddie Mac's HVE analysis were included in monthly "Calibrator" reports that scored lenders' valuations to determine whether the

value of any given property in an originator's production "would be at significant risk of being flawed." Ex. 253 at FHFA11594913.

### 2.  Fannie Mae

256.  Fannie Mae also understood that there was appraisal bias in the mortgage market, and the subprime market, during the time period in question.  Fannie Mae evaluated appraisal bias in connection with whole loan purchases at least as early as 2002.  *See, e.g.*, Ex. 254 at 204:23-205:1.

257.  In June 12, 2006, Eric Rosenblatt e-mailed Mark Winer, Fannie Mae's Interim Chief Risk Officer and Senior Vice President, Ex. 181, attaching a report entitled: "Housing Markets and Aggressive Appraisals: What Goes Up Must Come Down."  Ex. 245 at FHFA03520230.  The report reflected the belief that "[e]conomic conditions [were] ripe for higher appraisal bias," and further noted that in "refi[nances] and cash-out [product], appraisals often over-estimate home value."  Ex. 245 at FHFA03520245.

258.  During the time period in question, Fannie Mae employees produced and circulated quarterly "Lender Valuation Bias Reports that "provide[d] detailed information" on "valuation bias" for "approximately 25 large lenders," including some Originators.  Ex. 257 at FHFA11941805.  Fannie Mae assessed appraisal bias in loans by comparing "the lender-reported property" value  to the predicted value from Fannie Mae's "Retrospective Property Valuation System (RPS)," an internal model that Fannie Mae believed was a particularly accurate way to model a property's value.  Ex. 262 at 380:20-381:22; Ex. 269 at FHFA00287073.

259.  On September 2, 2006, Eric Rosenblatt circulated the Lender Valuation Bias Report for Second Quarter 2006, noting in his cover e-mail that "the average 80 LTV TPO cash-out in much of the country has appraisal bias median of 11.4%, and if I do my arithmetic

right that means the median one of the so-called LTV loans might be 89."  Ex. 258 at

FHFA01733177.

260.   In October 2006, Lesia Bates Moss, the head of Fannie Mae's SF CPRM

team received and circulated a June 2006 Moody's Investors Service RMBS Investor Briefing

stating that on "average," PLS aggregators accepted between "10%" and "17.5%" "Appraisal

tolerance," *i.e.*, "Variance" between AVM-generated appraisal values and "stated [home]

value[s]."  Ex. 259 at FHFA00333573; Ex. 260 at FHFA00333787.

261.   Eric Rosenblatt reiterated his concerns about industry-wide appraisal bias

during a December 20, 2006 Fannie Mae Credit Risk Committee Meeting, stating that

"significant decreases in home price growth rates" corresponded to an "increase[] [in] appraisal

bias."  Ex. 261 at FHFA1100721.

262.   By 2006, Fannie Mae had developed and implemented AVMs to determine

what it considered "more true" appraisal values for whole loan collateral.  *See* Ex. 262 at 75:23-

77:11; 78:17-24; 80:18-21 ("Q.  And in 2004, 2005, did . . . Fannie Mae have all four of those

types of models that you just described?  A.  I think so.  Pretty sure.")  Fannie Mae believed its

AVM was the "best" AVM in the industry and could "tell if a deal is fairly appraised."  Ex. 245

at FHFA03520250.  In a February 2006 "national contest on live house value predictions from

freshly originated purchase mortgage transactions," Fannie Mae's "AVM scored first place in a

combination of accuracy and coverage."  Ex. 296 at FHFA00037429.

263.   To achieve its quantitative edge, Fannie Mae's AVM, which was calibrated

"using data from 1988 to 2005," utilized housing metrics from both "high [appraisal] bias

environment[s]" and "low appraisal bias environment[s]" to account for a spectrum of economic

environments and biases.  Ex. 263 at FHFA00076874.  Because its "average [valuation] measure

[was] dead on," Fannie Mae could "tell if lenders/brokers/appraisers don't have true average or median" appraisal values. Ex. 249 at FHFA0350245. The Retrospective Property Services AVM was developed by employees in Fannie Mae's Single Family business, and reflected their knowledge and understanding of the performance of originators and extent to which a group of loans were likely to contain appraisal bias. Ex. 264 at FHFA01284126-27.

264. The Lender Valuation Bias and Subprime Monthly Business reports confirmed that LTV ratios reported by lenders for collateral purchased by Fannie Mae were "underestimated." *See* Ex. 262 at 128:11-17. For example, a July 2007 Subprime Monthly Business Report noted that between the fourth quarter of 2005 and the second quarter of 2007, the median appraisal bias in cash-out subprime loans across all Fannie Mae lenders rose from 4.9% to 7.8%, and increased from 4.2% to 7.8% in ALT-A mortgages. Ex. 265 at FHFA00057224. Rate Term mortgages were similarly affected. Between the first quarter of 2006 and the second quarter of 2007, the median appraisal bias in subprime loans across all Fannie Mae lenders rose from 5.4% to 8.6% and from 4.7% to 8.4% in Alt-A product alone. *Id.*

265. Fannie Mae's Lender Valuation Bias reports demonstrated trends in appraisal bias among lenders and originators. For example, the reports listed Indymac as one of the top five highest originators in terms of appraisal bias during 2005-2007. Ex. 266 at FHFA11594849; Ex. 267 at FHFA11594869; Ex. 268 at FHFA11594912; Ex. 253 at FHFA11594916; Ex. 232 at FHFA03522894.

266. Fannie Mae compiled and produced a "Subprime Monthly Business Report" reporting on "Median Bias for Subprime Loans Acquired" by Fannie Mae. Ex. 269 at FHFA00287073.

267.   A May 2007 Fannie Mae Subprime Monthly Business Report reported that "Median Bias for Subprime Loans Acquired 2005Q4 – 2006Q4" from Option One was "6.8%." Ex. 269 at FHFA00287066, FHFA00287073.  It further found that median bias was "12.2%" for rate term refinance loans with a reported LTV of 80% or higher.  *Id*.  By July 2007, "Median Bias for Subprime Loans Acquired 2005 Q4 – 2007 Q2" from Option One had risen to "7.5%" and median bias for rate term loans with a reported LTV of 70 through 80 percent was "13.0%." Ex. 265 at FHFA00057217, FHFA00057224.  Fannie Mae later cited to Option One as a "big offender[]" for appraisal bias.  Ex. 297 at FHFA01821318.

### 3.   OFHEO

268.   OFHEO also was concerned about the risks of increasing appraisal bias.  In a February 2006 working paper entitled "Removing Appraisal Bias from a Repeat-Transactions House Price Index: A Basic Approach," OFHEO "respond[ed] to concerns that house price appraisals are biased measures of true home values" and presented mechanisms of "inoculating [house price] indices from appraisal bias."  Ex. 270 at 2.

### C.   The GSEs understood that appraisal bias applied to subprime loans, and used AVMs in connection with PLS purchases to detect it

269.   To mitigate the risks of appraisal associated with their purchases, the GSEs sometimes used AVMs to validate home appraisals before purchasing PLS.  *See infra* ¶¶ 273-80, 302.

270.   In 2006, for example, Freddie Mac, suspicious of CLTV misrepresentation in a prospective PLS purchase with the "highest CLTVs (95.99%) that [Freddie Mac] ha[d] seen in the past six months," Freddie Mac traders requested "loan level information" to verify the accuracy of the information reported.  Ex. 271 at FHFA13682971 ("Since this deal costed out at

a very high level, we were concerned about the accuracy of the matrix.")  The results of Freddie Mac's AVMs were "just as expected, lower than the [reported credit] matrix."  *Id.*

271.    Fannie Mae likewise used its proprietary RPS AVM to conduct pre-purchase analyses on its PLS.  *See* Ex. 272 at FHFA11835382 (providing "deal-level information" and "loan-level file is attached" based on SAST 2007-3 loan tape, reflecting "RPS prediction" "for median bias" and "extreme values"); Ex. 273 at FHFA11442052 (loan tape for FFMER 2007-5 containing, *inter alia*, predicted property values based on Fannie Mae's RPS model).

272.    During 2007, Fannie Mae instructed its PLS analytics team that "[t]he PLS Front-end [pre-purchase review] consists of all of the analysis performed before the Trade is settled.  The role of the DMT in this process is to run two requested services (Goalscore and RPS) on the dealer tapes and mask all the [non-public information].  The outputs of these services are then forwarded to the Capital Markets Group."  Ex. 274 at FHFA03364752.  RPS yielded data about each property's "original current value," "original value confidence score," "property current value," and "current value confidence score."  *Id.*

273.    For example, in advance of the September 19, 2007 purchase of BSABS 2007-HE7, Fannie Mae analysts used "the origination and current AVM property values and their confidence scores from deal factory" to "calculate the 'unbiased' OLTV ('original LTV') and CLTV of the [supporting] loans."  Ex. 275 at FHFA01642202-203.  To aid in its collateral assessment for this purchase, Fannie Mae set its model to "calculate unbiased OLTV, CLTV and MTM LTV automatically for an additional sensitivity run . . . [because] [i]t would also be nice if [ ] the collateral summary could quantify the average appraisal bias ratio for the top states, and report on the confidence score UPB distribution."  *Id.*

91

274.    Because Fannie Mae was aware of and concerned by appraisal bias, Fannie Mae also ran AVMs retrospectively to identify appraisal bias in its PLS portfolio.

275.    In July 2007, Fannie Mae began work on a research project studying appraisal bias in PLS through the use of its proprietary AVM.  Ex. 276.  The ensuing back test was designed to detect appraisal bias and concomitant LTV inflation in its prior PLS deals to assess the risk of skewed LTV rates in future PLS purchases.  *Id.*

276.    To facilitate this back test, Fannie Mae's "PLS Analytics groups" requested "RPS values on every loan tape to be able to quantify appraisal bias as modeled by [the] AVM, and include that bias as an input sensitivity test in our prepurchase analysis."  Ex. 263 at FHFA00076875.

277.    The GSEs required issuers to submit loan tapes containing property street addresses for the loans backing each Certificate to retrospectively assess the extent of appraisal inflation in their PLS holdings.  *See* Ex. 388 at 56:16-25 (Stephen Pionke testifying that loan tapes provided to Freddie Mac during 2005-2007 included "street address"); Ex. 277 at 313:23-314:4 ("Q.  And that data that you got directly from issuers from May 2006 when you started in capital market strategy included street addresses, did it not?  A.  Yes, it did.").  Because the "[s]treet address of each loan is a key attribute in evaluating appraisal biases," Ex. 278 at FHFA01812752, this information helped Fannie Mae to further "understand appraisal bias."  Ex. 277 at 345:19-23 ("[W]e were trying to understand appraisal bias, so that needs the addresses to estimate, to get our o[w]n AVM value, so we need [the] street address, so I wanted to get access to that.").

278.    Fannie Mae analysts then transmitted loan level data from its PLS deals with the request that Fannie Mae's Capital Markets Strategy Group "run PLS deal[s] through [the] appraisal bias process."  Ex. 278 at FHFA01812747; Ex. 279 at FHFA01450322.

279.    The street address information gleaned from PLS loan tapes allowed Fannie Mae to recalibrate its models using contemporaneous data and "incorporate appraisal bias analysis in our collateral analysis for subprime securities going forward."  Ex. 278 at FHFA01812752.

280.    Such retrospective analyses revealed the extent of bias in Fannie Mae's PLS purchases.  Indeed, the results of similar retrospective analyses on loans originated between 1997 and 2006 led Fannie Mae employees to claim in a March 2007 report that "systemic bias in [] collateral value" was "a broad phenomenon, system-wide."  *See* Ex. 262 at 146:7-18; Ex. 280.

## VII.    THE GSES' PURCHASES OF ALT-A AND SUBPRIME LOANS DIRECTLY FROM ORIGINATORS PROVIDED UNPARALLELED INSIGHT INTO ORIGINATOR PRACTICES

281.    By June 30, 2008, the GSEs had purchased subprime and Alt-A loans directly from many of the same originators whose loans Defendants purchased and securitized, including Countrywide, First Franklin, New Century, Option One, IndyMac and Wells Fargo.  Ex. 281 at FHFA00060536-538; Ex. 250 at FHFA02344971; Ex. 282 at FHFA12469142-143, FHFA12469148; Ex. 166 at 432:6-25.; Ex. 284 at FHFA00137841, FHFA00137843; Ex. 283 at 1 n.1, n.4; Ex. 166 at 423:6-25.  By 2008, the unpaid principal balance of the subprime and other high risk-mortgages held by the GSEs' totaled approximately $1.8 trillion.  Ex. 285 at 456 Table 1.

282.    Many of these loans were purchased through the GSEs' "flow" channels, in which the GSEs purchased loans on an ongoing basis from lenders without any pre-purchase

review.  *See* Ex. 286 at 60:25–61:3; Ex. 283.  The GSEs purchased Alt-A and subprime loans in

bulk that were underwritten in whole or in part to originators' guidelines.  *See supra* ¶¶ 116, 281.

The GSEs conducted loan file reviews on these subprime and Alt-A loans in which they

identified many of the same underwriting defects that FHFA claims exist in the SLGs, including

missing documents, unreasonable stated income, failures to verify employment, owner-

occupancy misrepresentations, and inflated appraisals.  *See supra* ¶¶ 176-22.

A.     **Fannie Mae**

283.    Starting around 2006, Fannie Mae purchased Alt-A loans that were

originated to originators' guidelines through its Single Family business.  Ex. 283.  Karen R.

Pallotta, Fannie Mae's Executive Vice President of Single Family, testified before the SEC that

██████████████████████████████████████████████████████  Ex. 287 at

19:14–23, 21:7–24:2, 27:18–28:13; *see also* Ex. 287 at 117:10–14 ██████████████

████████████████████████████████████████████████████

████████████████████████████████

284.    Fannie Mae did so, in part, to "combat loss of market share amid rising

private label MBS issuance . . . [and] target[] . . . 'Alt-A' product that would otherwise follow a

private label execution path."  Ex. 288 at FHFA11843884.  As Fannie Mae's Vice President of

Product Development, Charles Rumfola, testified to the SEC, ██████████████████████

████████████████████████████████████████████████████████████  Ex.

289 at 63:21-24. (emphasis added)  As part of its so-called "Alt-A Transformation" project,

Fannie Mae sought to expand its eligibility criteria to "allow [it] to accept about 90% of what

[was] being done in Alt-A PLS deals."  Ex. 290 at FHFA13202060.

285.    By December 2007, Alt-A loans constituted approximately 13% of Fannie

Mae's Single Family book of business.  Ex. 291.

286.    Fannie Mae performed post-purchase reviews of its Alt-A flow loans

purchased through its flow channel.  Fannie Mae's National Underwriting Center sampled

Fannie Mae's total population of loans to perform loan-level, post-purchase reviews of loans that

Fannie Mae purchased through its flow network to "ensur[e] loans me[]t approved guidelines for

product[s]" and to "[m]onitor[] material misrepresentation."  Ex. 292 at FHFA01241163.  The

National Underwriting Center's "Post-Purchase Random Reviews . . . [were] part of Fannie

Mae's loan level data quality control system . . . a statistically valid, simple random sample is

drawn for four core business segments: EA/TPR, Alt-A, A-minus and Core . . . Each loan

selected for review is examined for deficiencies in any of 11 significant findings categories:

[d]ocuments, [e]ligibility, [c]redit, [i]ncome, [p]redatory, [f]unds, [s]ervicing, [p]roperty,

[a]ppraisal, [m]isrepresentation [and] [o]ther."  Ex. 293 at FHFA01275179-80.

287.    The National Underwriting Center performed "double the random

sampling" on Fannie Mae's Alt-A flow purchases "as well as additional special discretionary

sampling targeting higher risk mortgages."  Ex. 294 at FHFA01785970.  This "[i]ncreased

special discretionary sampling" was intended to "target[] loans that [were] considered higher

risk . . . loans that have characteristics (non existent SSN, appraisal bias, or incorrect property

address)."  Ex. 292 at FHFA01241151.

288.    On January 23, 2007, Fannie Mae's National Underwriting Center

("NUC") issued "Management Reports" that provided "high level statistics about the QC

process."  Ex. 492 at FHFA01281076.  The reports covered five review types: "Random and

Discretionary Post Purchase Reviews (PPRs), Early Payment Default (EPD) reviews, Loss

Mitigation Reviews (LMR) and Post Foreclosure Reviews (PFR)."  The "Review Results"

reported that, of the 26,990 loans reviewed by the NUC during 2006 from all lenders, "20.6%

had at least one significant finding."  *Id*.  The "top three drivers of significant findings" were

misrepresentation, eligibility and property, which accounted for 64.6% of all significant findings.

*Id*.  NUC's review of 3,721 Alt-A loans found at least one significant finding in 28.1% of the

loans, also driven by misrepresentation, eligibility and property.  *Id*.

       289.   Fannie Mae learned of trends in the origination practices of the Originators

by buying loans directly from those Originators through its flow channel.  Eric Rosenblatt, a

Vice President in Fannie Mae's Credit Risk Analytics and Monitoring group, Ex. 262 at 27:10-

28:4, testified that Fannie Mae detected owner-occupancy misrepresentations in the Alt-A loans

it bought through its Single Family business.  Ex. 262 at 244:6-245:15.  Likewise, in October

2006, Fannie Mae stated that "Indy Mac has had issues . . . with appraisal bias in [bulk] deals"

based on its review of loans bought through its Single Family channels.  Ex. 295 at

FHFA13029574.

       290.   Fannie Mae also purchased subprime loans in bulk.  Ex. 286 at 60:25-61:3.

As part of Fannie Mae's Subprime Initiative, Fannie Mae purchased subprime mortgage loans in

bulk from, among others, New Century, Bank of America, Countrywide, Chase, First Franklin,

Lehman Brothers, Nationstar, and Option One, all of which are originators of loans in the

samples FHFA is re-underwriting in order to meet its burden to show material misrepresentations

in these Actions.

       291.   In particular, Fannie Mae bought Alt-A and subprime loan pools purchased

from the following originators at the following times.

| Table Q: Fannie Mae Bulk Deals | | |
|---|---|---|
| Chase | August 2006 | Bulk Deal 16076 |
| | November 2006 | Bulk Deal 16374 |
| | April 2007 | Bulk Deal 17225 |
| | May 2007 | Bulk Deal 17382 |
| | June 2007 | Bulk Deals 17611, 17768 |
| | July 2007 | Bulk Deal 17993 |
| | August 2007 | Bulk Deal 18223 |
| | October 2007 | Bulk Deal 18319 |
| Countrywide | September 2007 | Bulk Deal 18414 |
| | October 2007 | Bulk Deal 18540 |
| | December 2007 | Bulk Deals 18792, 18934 |
| | January 2008 | Bulk Deal 18991 |
| Wells Fargo | August 2007 | Bulk Deals 18176, 18234 |
| | September 2007 | Bulk Deal 18403 |
| | December 2007 | Bulk Deal 18901 |
| | February 2008 | Bulk Deal 19085 |
| | April 2008 | Bulk Deals 19326, 19357 |
| First Franklin | September 2006 | Bulk Deal 16143 |
| | October 2006 | Bulk Deals 16333, 16502 |
| | November 2006 | Bulk Deal 16558 |
| | August 2007 | Bulk Deals 18093, 18192 |
| | September 2007 | Bulk Deal 18292, 18394 |
| | October 2007 | Bulk Deal 18535 |
| | November 2007 | Bulk Deal 18699 |
| | December 2007 | Bulk Deal 18797 |
| Lehman Brothers | October 2007 | Bulk Deal 18607 |
| Nationstar | August 2007 | Bulk Deal 18110 |
| Bank of America | October 2007 | Bulk Deal 18396 |

| | December 2005 | Bulk Deal 148971 |
| --- | --- | --- |
| New Century | May 2006 | Bulk Deal 15611 |
| | August 2006 | Bulk Deal 16013 |
| | September 2006 | Bulk Deal 16094 |
| Option One | May 2007 | Bulk Deal 17382 |
| | September 2007 | Bulk Deal 18188 |

Ex. 299 at FHFA03469097-101.

292.    Fannie Mae understood the collateral quality of the subprime whole loans it

bought to be similar to loans underlying the PLS it bought.  In a March 2007 e-mail concerning a

bid on First Franklin loans, a Fannie Mae employee wrote, "I believe we are the only bid on this

pool vs the lender's securitization route."  Ex. 298 at FHFA00183643.  A colleague responded

that "these loans are already earmarked for a security that we purchased for April."  *Id*. at

FHFA00183642.

293.    The credit quality of the whole loans in Fannie Mae's May 2007 purchase

of subprime Option One loans was materially similar to the credit quality of the subprime Option

One loans backing the at-issue Certificates.  For example, the Option One whole loans had a

weighted average OLTV of 77.5%, a weighted average combined LTV of 77.6% and a weighted

average FICO of 609.  Ex. 269 at FHFA00287071.  Similarly, HASC 2007-OPT1, which was

backed entirely by Option One subprime loans, had a weighted average OLTV of 79.05%, a

weighted average original combined LTV of 82.92% and a weighted average FICO score of 608.

*See* Ex. 59 at A-12.

294.    The credit quality of Fannie Mae's subprime purchases from Option One

was consistent throughout the 2006 to 2007 time period.  Fannie Mae's 2006 purchases of

Option One whole loans likewise had a weighted average OLV of 77%, a weighted average

98

combined LTV of 79.1%, and a weighted average FICO of 608.  Ex. 269 at FHFA00287070.

Similarly, HASC 2006-OPT1 contained loans with a weighted average OLTV of 78.04%, a

weighted average combined LTV of 80.17%, and a weighted average credit score of 621.  *See* Ex.

301 at A-33; *see also* Ex. 56 at A-30-31; A-45.  HASC 2006-OPT4 was composed of loans with

a weighted average OLTV of 77.24%, a weighted average original combined LTV of 80.13%

and a weighted average credit score of 618.

> 295.   Lesia Bates Moss testified that she did not believe the origination standards

for the subprime whole loans Fannie Mae bought were different from the standards for the loans

underlying the Certificates.  Ex. 86 at 45:1-46:9.

### 1.      Detection of underwriting "defects"

> 296.   Beginning in 2001, Fannie Mae performed pre-purchase due diligence on

all subprime whole loan purchases to "manage and mitigate" the risks associated with subprime

borrowers.  Ex. 303 at FHFA01222830.  Although loan samples were based on "various risk

criteria including RPS scores . . . [and] high LTVs," *id*., "loan characteristics" such as "appraisal

bias generally dr[o]ve the [loan] sample."  Ex. 304 at FHFA01247207.  Fannie Mae continued to

perform pre-purchase due diligence on its bulk purchases of subprime loans from 2005-2008.

*E.g.* Exs. 301; Ex. 305.

> 297.   As part of this due diligence, Fannie Mae had third party vendors like

Clayton and Opus review a sample of the loans in the pool to determine whether they were

originated in accordance with underwriting guidelines.  *See* Ex. 306 at FHFA01282611; Ex. 301;

Ex. 307.  This included assessing whether the underlying properties were accurately valued

and/or appraised, whether there were excessive DTIs and LTVs, missing or incomplete HUD-1s

or insufficient documentation, whether the loan pool appeared to contain fraud, and other "Guidelines Exception[s]."  Ex. 301 at ML-OPUS-00174100-01.

298.   For example, in February 2006 Fannie Mae reviewed a sample of a subprime loan pool it bought from New Century to "[c]onfirm that the loans were originated in conformity with the lender's guidelines."  Ex. 305 at FHFA00778817.  Through this review, Fannie Mae observed that 23% of the loans represented "[s]ubstantial deviations from the guidelines . . . with no apparent compensating factors,"  yet it still "pull[ed] through" 85% of the pool, and noted that 90% or higher was typical for a Wall Street pool.  *Id.*

299.   In August 2006, Fannie Mae performed due diligence on a pool of more than 780 First Franklin subprime loans, which had a weighted average OLTV of 82.7% and a weighted average FICO of 646.  Ex. 306 at FFHA01282611; Ex. 308; Ex. 309 at FHFA00003133.

300.   Fannie Mae conducted due diligence on a 25% sample of loans in two additional First Franklin loan pools it purchased in October 2006.  Ex. 310 at FHFA0138510.  Its "kick-out" rates—the rates at which it declined to purchase loans—were 4.53% and 8.3%, which Fannie Mae regarded as "well within tolerance."  *Id.*  Through this review, Fannie Mae uncovered problems with loans in the sample including "insufficient assets," "insufficient income documentation," "excessive DTI," and other "credit and compliance deficiencies." *Id*.

301.   In May 2007, Fannie Mae's pre-purchase due diligence review on a pool of Countrywide subprime loans found a "[h]igh percentage (23.41%) of credit violations" of Countrywide's underwriting guidelines.  Ex. 96 at FHFA01439997.

2.        **Detection of appraisal bias**

302.    Fannie Mae reviewed the subprime loans it bought from originators for appraisal bias using its own AVM.  Fannie Mae personnel were responsible for "coordinat[ing] data run[s] through [the RPV AVM] to determine outliers and [the] potential of appraisal bias." *See* Ex. 311 at FHFA11943705.  Once a loan sample was selected for diligence, Fannie Mae's National Underwriting Center would then "identify [an] appropriate sample size based on RPS data." *Id.* at FHFA11943706.  Third party diligence vendors applied "[a]dditional research tools" on the final loan sample to "eliminate loans with excessive appraisal bias." *Id.*

303.    In connection with a May 2007 subprime whole loan purchase, for example, Fannie Mae reviewed a pool of Option One loans selected for fraud and credit risk factors, including a subset of loans that had "Appraisal Bias [values that were] . . . 30%" more than the values Fannie Mae deemed appropriate.  Ex. 312 at FHFA01303358.

304.    Likewise, in connection with a July 2007 NationStar whole loan purchase, Fannie Mae used its APS valuation tool to create a sample containing loans with, among other things, greater than "30%" appraisal bias.  Ex. 313 at FHFA01440209-210.  Fannie Mae further noted in its pre-diligence summary that the risk eligible loan population consisted of loans with "RPS values" "outside median limits" and a median appraisal variance of 13.91%. *Id.*

305.    Fannie Mae recognized that its pre-purchase due diligence sample did not capture all of the loans with potential underwriting defects or appraisal bias and, as such, Fannie Mae implicitly accepted that such loans could be included in its whole loan purchase. *See* Ex. 314 at FHFA13029558 (analyzing the subset of appraisal bias loans selected for due diligence review).

B.      **Freddie Mac**

101

306.    Freddie Mac also bought Alt-A loans through its "flow" channel.  Ex. 283 at 1 n.1.

307.    Freddie Mac performed post-purchase reviews on the Alt-A loans it bought through its flow channel.  Freddie Mac's Quality Control group obtained loan files for defaulted loans in order "to understand whether or not those loans were originated in compliance with the contractual requirements of the company," to seller servicer guidelines, or to any variances that applied to the lender, which would include those variances that allowed lenders to sell Alt-A loans originated to their own guidelines.  Ex. 69 at 733:4–16.

308.    For loans that did not default, Freddie Mac reviewed a stratified random sample of roughly 1,500 loans.  Ex. 315 at 55:1–13.  While this process did not involve checking loan files against underwriting guidelines, it was ███████████████████████████ ████████████████████████████    *Id.* at 56:11–19.

309.    Freddie Mac observed increasing defect rates for originators across its flow portfolio during the relevant time period and found, for example, that the defect rate for loans originated by Countrywide increased from 9% to 24% between mid-2005 and mid-2007, Ex. 316 at FHFA01664783, compared with an increase from 8% to 20% across the flow portfolio.  Ex. 317 at FHFA14282630.

310.    Between June 2004 and October 2007, Freddie Mac also bought 18 subprime and Alt-A pools in bulk that were securitized into T-Deals—securities that Freddie Mac offered to the public after performing securitization due diligence—totaling more than $300 billion.  Ex. 282 at FHFA12469142–143; Ex. 166 at 432:6–18.  As part of the T-Deal program, Freddie Mac purchased subprime or Alt-A mortgage loans in bulk from Originators including Washington Mutual, Wells Fargo, and Countrywide.  Exs. 318–320.  In particular, Fannie Mae

bought Alt-A and subprime loan pools purchased from the following originators at the following times:

| Table R: Freddie Mac T-Deals | | |
|---|---|---|
| Washington Mutual | February 16, 2005 | Offering Circular Supplement for Series T-63 |
| | May 18, 2005 | Offering Circular Supplement for Series T-64 |
| | December 15, 2005 | Offering Circular Supplement for Series T-65 |
| | February 22, 2006 | Offering Circular Supplement for Series T-68 |
| | March 23, 2006 | Offering Circular Supplement for Series T-69 |
| | May 19, 2006 | Offering Circular Supplement for Series T-70 |
| | June 20, 2006 | Offering Circular Supplement for Series T-71 |
| | October 26, 2006 | Offering Circular Supplement for Series T-73 |
| Countrywide | December 14, 2005 | Offering Circular Supplement for Series T-66 |
| | February 24, 2006 | Offering Circular Supplement for Series T-67 |
| Wells Fargo | July 30, 2007 | Offering Circular Supplement for Series T-74 |
| | October 26, 2007 | Offering Circular Supplement for Series T-77 |
| | May 19, 2006 | Offering Circular Supplement for Series T-70 |
| Bank of America | June 19, 2008 | Offering Circular Supplement for Series T-80 |
| | April 29, 2008 | Offering Circular Supplement for Series T-82 |
| Ameriquest | September 27, 2006 | Offering Circular Supplement for Series T-72 |
| MortgageIT, Inc. | October 23, 2007 | Offering Circular Supplement for Series T-76 |
| Equifirst | January 23, 2008 | Offering Circular Supplement for Series T-78 |

311.   Ronald Feigles, a member of Freddie Mac's AMO unit responsible for the pre-purchase due diligence Freddie Mac performed on Alt-A and subprime pools of loans, testified that "[p]robably most of" the subprime and Alt-A loans Freddie Mac purchased as part of its bulk purchase program were "underwritten to the lenders' guidelines with specific carve-outs" and some of the exceptions in Freddie Mac's due diligence exception reports would be exceptions to originators' guidelines.  Ex. 166 at 436:19–437:13, 593:15–594:19.

312.   Freddie Mac T-Deal offering materials disclose it purchased loans underwritten to originator guidelines:

- "All of the Mortgage Loans to be acquired by the Issuing Entity from the Depositor were originated generally in accordance with First Franklin Financial's Underwriting Guidelines."  Ex. 321 at 28.

- "As set forth in the Pooling and Servicing Agreement, all of the Mortgage Loans were originated in accordance with certain Wells Fargo Bank Underwriting Guidelines (as defined in the Pooling and Servicing Agreement) in effect at the time of the related origination . . . ."  Ex. 322 at 30.

- "As set forth in the Pooling and Servicing Agreement, all of the Mortgage Loans were originated in accordance with certain Wells Fargo Bank Underwriting Guidelines (as defined in the Pooling and Servicing Agreement) in effect at the time of the related origination . . . ."  Ex. 320 at 29.

- "All of the Mortgage Loans in the trust fund will have been originated or acquired by Countrywide Home Loans in accordance with its credit, appraisal and underwriting standards." Ex. 323 at 52.

- "All of the mortgage loans were originated by Countrywide Home Loans, Inc. ("Countrywide" or the "originator"). The mortgage loans were originated in accordance with the underwriting guidelines described under 'Mortgage Loan Origination—Underwriting Standards' herein." Ex. 318 at 104.

- "As set forth in the Pooling Agreement, all of the Mortgage Loans were originated in accordance with certain Seller Underwriting Guidelines (as defined in the Pooling Agreement) in effect at the time of the related origination." Ex. 324 at 21.

- "As set forth in the Pooling Agreement, all of the Mortgage Loans were originated in accordance with certain Seller Underwriting Guidelines (as defined in the Pooling Agreement) in effect at the time of the related origination." Ex. 325 at 21.

- "All of the Mortgage Loans acquired by the Seller were originated in accordance with guidelines (the 'Underwriting Guidelines') established by the Originator as described below." Ex. 326 at S-29.

- "As set forth in the related Pooling Agreement, all of the Mortgage Loans were originated in accordance with certain Seller Underwriting Guidelines (as defined in the related Pooling Agreement) in effect at the time of the related origination." Ex. 319 at 24.

- "Each Underlying Mortgage Loan was originated with credit, appraisal and underwriting guidelines applied by the related originator to evaluate the prospective borrower's credit standing and repayment ability and the value and adequacy of the mortgaged property as collateral in accordance with applicable federal and state laws and regulations." Ex. 327 at 25.

313.  Through these transactions, Freddie Mac purchased in bulk the same kind

of collateral that they bought through PLS transactions:

- Kevin Palmer, a Freddie Mac employee involved pricing whole loan purchases, testified that when Freddie Mac acquired a block of loans it would divide the block into a portion to be bought through traditional PLS and another through T-Deals.  Ex. 67 at 632:9–19.

- Donna Corley testified that "the same collateral [could] be bought . . . either in the form of AAA PLS or bulk loans on the single-family side of Freddie Mac's business." Ex. 328 at 162:14-163:9.

- A January 2007 Freddie Mac purchase approval for a pool of Alt-A loans from Countrywide stated that the loans would be "s[old]/deliver[ed] . . . to Freddie Mac in two parts.  A whole loan/asset bid will cover 50% of the eligible universe, and the portfolio will purchase the other 50% in the form of AAA bonds." Ex. 329 at FHFA01219050.

## 1.     Detection of underwriting "defects"

314.  In July 2007, Freddie Mac performed a pre-purchase review of a pool of

subprime loans originated by Wells Fargo.  The loan review included a review of both random

and targeted samples of loans and analyzed, among other things, the extent to which the loans

complied with Wells Fargo's credit guidelines.  Ex. 330 at FHFA02438970.  The review

concluded that "[s]ome of the loans rejected due to collateral [valuation] issues appeared to have

been closely scrutinized by Wells Fargo during origination, and then approved to close with the

collateral issues remaining unresolved."  *Id.* at FHFA02438970-971.

315.  On March 9, 2005, Freddie Mac held a "Credit Risk Oversight Phase 1

Meeting."  Ex. 331 at FHFA17549363.  The meeting covered topics including "Mortgage ABS,"

that is, PLS, and "Single-family."  *Id.*  The presenters on the Mortgage ABS topic included

Bruce Wood and Kevin Palmer.  *Id*.  Materials discussed at the meeting included a document

entitled "National Lending Customer Issues Comments January 2005."  *Id*. at

FHFA17549486.  That document reported that the "National defect rate" had increased from

7.8% in December 2004 to 8.8% in January 2005.  *Id*.

      316.    On May 11, 2005, Freddie Mac held a "Credit Risk Oversight Phase 1

Meeting."  Ex. 332.  The meeting covered topics including "Mortgage ABS," that is, PLS, and

"Single-family."  *Id*.  The presenters on the Mortgage ABS topic included Bruce Wood and

Kevin Palmer.  *Id*.  Materials discussed at the meeting included a document entitled "National

Lending Customer Issues Comments March 2005."  *Id*. at FHFA16963575.  That document

reported that the "defect rate" had increased from 8.3% in February 2005 to 8.8% in March

2005.  *Id*.

      317.    On June 15, 2005, Freddie Mac held a "Credit Risk Oversight Phase 1

Meeting."  Ex. 333.  The meeting covered topics including "Mortgage ABS," that is, PLS, and

"Single-family."  *Id*.  The presenters on the Mortgage ABS topic included Bruce Wood and

Kevin Palmer.  *Id*.  Materials discussed at the meeting included a document entitled "National

Lending Customer Issues Comments April 2005."  *Id*. at FHFA17527442.  That document

reported that the "national segment defect rate" was 9.3% YTD in April 2005.  *Id*.

      318.    On August 17, 2005, Freddie Mac held a "Credit Risk Oversight Phase 1

Meeting."  Ex. 334.  The meeting covered topics including "Mortgage ABS," that is, PLS, and

"Single-family."  *Id*.  The presenters on the Mortgage ABS topic were Bruce Wood, Kevin

Palmer and David Hackney.  *Id*.  Materials discussed at the meeting included a document entitled

"National Lending Customer Issues Comments June 2005."  *Id*. at  FHFA16966372.  That

document reported that the "national segment defect rate" was 10.4% YTD in May 2005 and

9.4% YTD in June 2005.  *Id.*

319.    During at least 2006 and 2007, Freddie Mac received "Individual Asset

Summary" reports from Clayton summarizing the pre-purchase due diligence performed on

pools of loans purchased through the T-Deals program. *E.g.* Ex. 335; Ex. 336.  In these reports,

Clayton identified loans that, upon initial review, have material defects and explained the reasons

for its findings.  Freddie Mac employees then reviewed Clayton's findings and noted their own

determinations regarding whether loans should be rejected or "waived in" to the pool with a

score of "2W."  Ex. 166 at 485:24-487:6.

320.    In July 2007, Freddie Mac received an Individual Asset Summary report

for pre-purchase due diligence on the T-074 deal.  Ex. 336 at FHFA02465380.  The report

indicates that Clayton found material defects in the loan pool including failure to verify

employment, noting for one loan that "[p]hone reverification indicates borrower is no longer

employed at company listed on application."  *Id.* at FHFA02465470–73.  The grade given to the

loan was changed to a "2W" with the note, "[i]ssue waived by client." *Id.* at FHFA02465473.

321.    In November 2007, Freddie Mac received an Individual Asset Summary

report for T-076 that noted material defects with the loans including, among other things,

unreasonable stated income, Ex. 336 at FHFA02475300–03, failure to verify income, *id.* at

FHFA02475616–18, and excessive DTI, *id.* at FHFA02475428–431.  Freddie Mac evaluated and

waived in loans with each of these defects.  *Id.* at FHFA02475303, FHFA02475616–18,

FHFA02475428–31.

### 2.      Detection of appraisal bias

322.    Beginning in 2006, Freddie Mac identified the risk of appraisal bias in the subprime loans it bought in its T-Deals, and began to run AVMs internally on those loans.  It ran "all of [its] T-deals through HVE and Calibrator to identify loans that might be riskier due to appraisal bias."  Ex. 252 at FHFA03703596.

323.    The results of the AVMs run on its T-deals revealed that the whole loans Freddie Mac purchased and securitized were, like the PLS certificates at issue, not immune to appraisal bias.

324.     Freddie Mac's AVMs evidenced appraisal bias in a sample of loans reviewed for its T-076 T-Deal, including several instances in which the appraisal "value used by the lender [was] not supported," and the difference between Freddie Mac's HVE calculation and the lender's reported appraisal "exceed[ed] [the] 15% [variation] threshold."  Ex. 336 at FHFA02475455-58.

325.    Freddie Mac's due diligence results also reflected discrepancies between the AVM home value and the loan tape.  In one loan, the reviewer commented that the "subject is larger than all neighboring comps" and thus, "[a]ppraisal not great in that [appraiser] extended the distance to find comps of a similar size."  Ex. 336 at FHFA02475479.

326.    Freddie Mac was aware of these discrepancies and "waived" such loans into the pool notwithstanding their adverse effect on borrower LTV rates.  Ex. 336 at FHFA02475458.  For example, during its review of one particular loan, Clayton noted that the appraised value of $375,000 exceeded the audited value of $325,000 and was thus "overstated." *Id.* at 457-58.  As a consequence the reported LTV of 64% was "closer to 80%," well outside of originator guidelines.  *Id.* at 457; *see* Ex. 166 at 559:15-560:10.

327.   A January 27, 2006 Countrywide pre-funding due diligence review of deal Freddie Mac T-Deal T-067, likewise revealed that 17.5% of the 497 loans reviewed warranted "appraisal" exceptions for deviations from Countrywide's guidelines.  Ex. 338 at FHFA04399946.  Approximately 10.6% of the loans reviewed had "unsupported" appraisal values, *id.* at FHFA04399947, and an additional 4.2% of the loan sample population revealed "valuation issues" such as "poor comparables, incomplete analysis, and values geared to a specific LTV."  *Id.* at FHFA04399943.

## VIII.   THE GSES' BUSINESS UNITS READILY SHARED INFORMATION WITH VIRTUALLY NO BARRIERS

328.   As described above, between 2005 and 2007, the GSEs' businesses operated both Single Family and "Capital Markets" (or "PLS") business units.  Because "the same collateral can be bought from either [the Single Family Bulk or PLS] execution path," the GSEs "need[ed] to promote a consistent view" between their Single Family and PLS businesses. *See* Ex. 339 at FHFA00515699.

329.   To facilitate a "cross-functional approach to risk management," both GSEs' Single Family and PLS businesses' credit risks functions operated on an "integrated" basis "as one business segment."  *See, e.g.*, Ex. 340 at 46, 117; Ex. 341 at 3.

### A.   Fannie Mae

330.   Fannie Mae instituted "corporate-wide policies for risk management" and controls to "monitor[] aggregate risks and compliance with risk policies at a corporate level."  Ex. 340 at 117.  Several executives with Fannie Mae had dual responsibilities for both PLS and Single Family.  For example, Robert Levin, Fannie Mae's Chief Business Officer, oversaw aspects of both the Single Family and PLS business.  *See* Ex. 66 at 108:20-25.  Similarly, Enrico Dallavecchia, the Chief Risk Officer at Fannie Mae, had "overall responsibility for credit, market,

counterparty and operational risk oversight for all business units within Fannie Mae."  Ex. 342 at

1.

331.    Fannie Mae's corporate infrastructure reflected this unified approach to risk

management.  Fannie Mae established a Corporate Risk Management Committee ("CRMC")

comprising executives from "corporate counterparty, corporate credit risk . . . [and] single

family."  Ex. 86 at 440:19-25.  Like the PLAT, the CRMC facilitated the exchange of

information between the Single Family and PLS groups to reduce institutional risk.   As a result

of a June 2006 CRMC meeting, for example, Fannie Mae personnel from both the Single Family

and PLS units established "triggers" to "stop acquiring securities" or  to "induce sale" of risky

PLS purchases.  Ex. 343 at FHFA03334904; Ex. 86 at 44:25-45:24 ("The triggers this is

referring to in terms of acquiring securities or selling them . . . . were actually put in place.")

332.    Fannie Mae's Risk Policy Committee, which also comprised personnel

from both Fannie Mae's PLS and Single Family businesses, met periodically to discuss activities

and concerns relating to both businesses.  *See, e.g.*, Ex. 344.  As with the CRMC, there were no

prohibitions on attendees' communications about general market trends affecting both businesses.

*See* Ex. 262 at 49.  Indeed, Eric Rosenblatt, the Vice President of Single Family's Credit Risk

Analytics and Monitoring, used such Committee Meetings to "talk about loan performance . . .

and home prices" in the "context of single-family purchases."  *See id.* at 46:2-14.

333.    Fannie Mae's cross-functional risk management structure was not unique to

its executive committees.  Like its high-ranking committees, Fannie Mae's counterparty risk

divisions used information gleaned from Single Family assessments to inform its PLS purchase

decisions.  For example, Fannie Mae's Single Family Counterparty Credit Risk Management

Group, which performed reviews of originators that originated both whole loans purchased by

Fannie Mae's Single Family group and loans securitized and sold as PLS, could use information from its prior Single Family reviews to rate PLS counterparties for upcoming transactions.  Ex. 91 at 67:23-68:4.

334.    The results of SF CPRM's operational reviews were transmitted to both Single Family and PLS personnel.  *See* Ex. 66 at 227:25 - 228 ("Well, there was a group that reviewed originators including both for the purchase of whole loans from the originators, and for the purchase of loans within PLS.  A: Yes.  I remember the existence of such an effort.").

335.    Fannie Mae's Senior Vice President of Capital Markets Mortgage Assets, Ramon de Castro, was responsible for "[e]nsur[ing] that no transactions are committed to with entities not designated on the list of all approved issuers, originators, master servicers, and servicers maintained by SF Counterparty Risk Management group."  *See* Ex. 181; Ex. 345 at FHFA11851052.  To ensure compliance, under Fannie Mae's corporate policy Mr. de Castro was to "[c]reate a summary report of each transaction and share it with the SVP – Capital Markets Mortgage Assets, the SVP – Capital Markets Strategy, and the VP – SF Counterparty Risk Management, or designees."  *Id.*

336.    Fannie Mae's Single Family Risk Officer, Pam Johnson, informed the PLS business units of material changes to counterparty approval status by "[p]rovid[ing] an approval memo to Capital Markets Structured Transactions that details any changes or additions to be negotiated with the issuers and required for Fannie Mae to provide its guaranty."  Ex. 345 at FHFA11851054.  Lesia Bates Moss testified that her role within Single Family was, in part, to "raise, or to report on the current financial and operational state of that particular counterparty" to the PLS business units.  Ex. 86 at 738:7-14.

337.   Fannie Mae's legal department received loan level anti-predatory lending reports on both Single Family purchases and on PLS bonds backed by subprime collateral.  John Ingram, associate general counsel at Fannie Mae, testified that "if [the reviews revealed] a trend . . . with a particular originator . . . we would let the trading desk know that we don't want to see any more deals with that originator because of the trend."  Ex. 103 at 60:24-61:5.

338.   As shown *supra* ¶ 123, to oversee enterprise risk, Fannie Mae created the PLAT from a cross-section of Single Family and PLS personnel "to manage and govern the risks associated with private label securities."  Ex. 346 at FHFA05345278.

339.   As Ms. Bates Moss, Fannie Mae's Vice President of Single Family Counterparty Risk Management, testified:  "There was representation [on PLAT] from single family counterparty credit risk . . . capital markets counterparty credit risk, capital markets strategy, [and] mortgage assets."  Ex. 86 at 52:21-25.  PLAT was "a forum for parties that were involved in the purchase or the monitoring and review of PLS to come together and discuss trends [and] issues" in the RMBS marketplace.  *Id.* at 52:13-17.

340.   Ms. Bates Moss conveyed to the PLAT "financial" and "credit" concerns surrounding counterparties with which both Single Family and PLS transacted business.  Ex. 86 at 54:23-55:1.  As "high and increasing defaults and delinquencies" began to plague the mortgage market in the fall of 2006, Fannie Mae instituted, at the direction of PLAT members, a "weekly call between single family and the [PLS] surveillance team" to "track action items jointly."  *See* Ex. 347 at FHFA13870376; Ex. 86 at 522:13-17 (Q: And were these weekly calls instituted?  A: I recall there being ongoing communications between our [Single Family] group and PLS, yes.").

341.   Counterparty trends discussed at PLAT were, in turn, shared with PLS traders.  David Cook, the Director of Financial Engineering at Fannie Mae, testified that the PLAT was designed to give PLS traders, some of whom attended PLAT meetings, "certain information, such as the Single-Family's judgment and opinion on whether certain counterparties were counterparties that the [PLS] traders should be doing business with."  Ex. 122 at 195:21-25.  Indeed, PLS traders were "always represent[ed]" on the PLAT, attended team meetings, and were copied on the minutes circulated after every PLAT meeting.  Ex. 122 at 60:20-61:10 ("We always took minutes at the PLAT, so to the extent that somebody in the PLAT meeting wanted to note guidance, it would have been written down. . . . Q: Were the PLAT minutes communicated to the traders?  A: Yes.  They were copied on the minutes.").

342.   Counterparty concerns communicated during PLAT meetings informed traders' PLS purchase decisions.  For example, during a February 8, 2007 PLAT meeting, Single Family participants advised the PLAT that it had "downgraded Fremont to continue with caution status based on the fact that they have been put on negative watch by the rating agencies."  Ex. 348 at FHFA00775246.  Ms. Bates Moss testified that downgrades by the Single Family business could affect the PLS unit's decision to purchase bonds containing Fremont's loans.  Ex. 86 at 592:25-593:6.

343.   Fannie Mae's counterparty review personnel also shared reporting lines with employees such as Karen Pallotta and Laurel Davis, who worked on Fannie's "flow" purchases of Alt-A loans from the originators.  Ex. 360; Ex. 287 at 115:13-119:17;  Ex. 361 at 55:12-56:18; 59:19, 83:7-84:24.

B.    Freddie Mac

344.    Like Fannie Mae, Freddie Mac recognized the benefit of a centralized

credit risk structure that accounted for both PLS and Single Family risks.  As a result, Freddie

Mac vested certain of its executives with oversight responsibilities for both groups.  *See* Ex. 74 at

213:2-8 (citing the "benefit[] from [PLS officials] reporting to the same person that the single

family business reported to").  Raymond Romano, Freddie Mac's Credit Risk Officer, testified

that there was no prohibition on information sharing between Freddie Mac's Single Family and

PLS risk groups.  *See* Ex. 69 at 406:5-409:3.

345.    Mr. Romano, for example, oversaw Freddie Mac's Single Family and PLS

businesses.  Ex. 69 at 71:22-72:5 ("There were multiple business lines for [Freddie Mac], single-

family business, multi-family business, investments and capital markets activities for the

company.  Q: And you – in your position you had oversight responsibility for all three of those?

A: Yes.").  Similarly, Melissa Crabtree oversaw both the Single Family and PLS facets of the

Counterparty Credit Risk Management Group.  *See* Ex. 173 at 37:23-38:4.

346.    Freddie Mac held "[p]eriodic" "counterparty forum"  meetings between

"all critical parties involved in the MABS counterparty management process" including

representatives from "CCRM, portfolio management, Structured Credit, AMO and Single Family

Credit Management."  Ex. 172 at FHFA11950453.  The forums were regarded as "extremely

useful in terms of sharing information, such as operational review findings and current events,

and also for conveying business area priorities in terms of counterparty activities and review

requests."  *Id.*  Significantly, information gleaned from these meetings could "aid CCRM in

reviewing a rating of a counterparty."  *Id.*

347.    In 2007, Freddie Mac created a Subprime Business Steering Committee to manage the risks associated with untested mortgage products.  The committee comprised executives from, among others, Freddie Mac's Single Family Sourcing and PLS groups, Ex. 349; Ex. 73 at 695:15-22; 696:8-15 ("[Y]ou had the single-family sourcing group with Paul Mullings, Tricia McClung.  You had the investment portfolio with Gary Kain and Peter Federico.  You had . . . the risk oversight group with Ray Romano, the operational reviews with Michael Wade.").  Donald Bisenius testified that this cross-functional team "added value" to Freddie Mac's initiative and further, that he was unaware of any information walls limiting the scope of information shared with, or discussed by, the committee."  Ex. 73 at 696:17-697:7.  Freddie Mac required PLS and Single Family employees to meet periodically and "share[] information, such as operational review findings and current events" that could affect Freddie's PLS credit risk.  Ex. 172 at FHFA11950453.

348.    Freddie Mac's counterparty review teams also could exchange information regarding Originators' underwriting, quality control, and origination procedures.  Stacey Kenneweg, a director in Freddie Mac's Counterparty Credit Risk Management Department, testified that she was not "aware of any policy that prevented sharing the[] results of [Single Family-created originator] operational reviews with [employees involved in purchasing PLS]." Ex. 173 at 61:4-16 (Ms. Kenneweg "[did not] believe [information sharing] violated any [Freddie Mac policy]").

349.    Freddie Mac's Alternative Market's Operations Department, which conducted operational reviews of PLS counterparties, could combine its annual operational reviews with the EORM department, which reviewed Single Family originators.   Ex. 93 at FHFA13306198.  Indeed, Ronald Feigles testified that "there [were] occasions on which [AMO]

coordinated [its] review with EORM." *See* Ex. 166 at 257:2-258:16.  Mr. Feigles was not aware

of any policy preventing AMO and EORM from sharing the results of their operational reviews.

*See Id.* at 257:2-258:16.  The AMO team's reviews of PLS originators were sent to, among

others, Donald Bisenius, who "oversaw . . . counterparty credit and single-family credit risk

management." *See* Ex. 350 at 5, 6; Ex. 351 (e-mail sent to Bisenius, Crabtree, and others

attaching the June 2006 AMO review of First NLC and listing the AMO assessment as

"Marginal"); Ex. 352.

       350.   AMO employees reported to Donald Bisenius, who also oversaw Freddie

Mac's post-purchase loan level reviews of originator's "flow" channel loans. Ex. 362; Ex. 73 at

47:13-53:19, 119:15-20.

       351.   Freddie Mac's Mortgage Investments and Structuring Group which was

responsible for "[m]anag[ing] all outright purchases and sales of mortgages and mortgage-

backed securities," oversaw transactions related to both "single-family whole loans" and "non-

agency mortgage-backed securities."  Ex. 354 at FHFA1482084.  Gary Kain, the Vice President

of Freddie Mac's Mortgage Investments and Strategy group testified about the existence of a

forward agreement between Freddie Mac and Ameriquest permitting Freddie Mac to purchase

Ameriquest loans either directly as whole loans, or as part of subsequent PLS Securitizations.

*See* Ex. 243 at 322:9-324:8.

      **C.**    **"Chinese Walls" Did Not Preclude Information Sharing within the GSEs**

       352.   Although both GSEs had purported "Chinese wall[s]" restricting the

transmission of loan-level information to PLS traders, those information sharing barriers applied

very narrowly.  *See, e.g.*, Ex. 74 at 212:22-25.

### 1.   Freddie Mac

353.   Freddie Mac's Investments & Capital Markets Compliance Assessment stated that the "Information Wall Policy (7-115)" was "applicable to information affecting any of Freddie Mac's guaranteed mortgage securities," *i.e.* the Single Family business, but "[a]ll traders of the non-agency portfolio [*i.e.* the PLS business] are not designated as 'Restricted Persons' because they do not have authority to trade agency issues."  *See* Ex. 355 at FHFA02350925, 926. The wall instead existed only "between the traders who actually executed the trade in the PLS organization and the traders who executed the trade in the single-family business."  *See* Ex. 243 at 116:14-19.

354.   Certain non-trader executives were "above" the wall.  *See* Ex. 243 at 118:11-119:3.  Freddie Mac's organizational charts shows that credit analysts had access to information from the Single Family business through the established reporting structure.  For example, in his role as a Director of Structured Credit, Frank Vetrano reported to Don Bisenius. *See, e.g.*, Ex. 356 at FHFA0137765; Ex. 357 FHFA01347829; Ex. 358 FHFA01377735. Bisenius had responsibilities for both the PLS and Single Family sides of Freddie Mac's business. *See, e.g.*, Ex. 73 at 68:24-69:17.  In fact, Mr. Vetrano testified that his work for Mr. Bisenius included evaluating credit risk for both PLS and bulk deals.  Ex. 359 at 98:5-13.

355.   At Freddie Mac, Stacey Kenneweg testified that it was "regular practice" for the counterparty review group to send operational reviews, which often contained the results of loan-level due diligence, to PLS traders, "to ensure that [traders] were aware of any heightened risks that might be present" when making decisions as to whether or not to buy certain PLS.  Ex. 173 at 60:15-18; 61:17-62:2.  Gary Kain recalled "instances . . . where there was cooperation between . . . the single family . . . and the securities side to coordinate a bid for a

pool of loans." Ex. 243 at 112:1-13.  Specifically, Mr. Kain recalled that Freddie Mac's PLS and

Single Family businesses "kind of bid together" on "option ARMs, the T-deals where the

portfolio had a bid for the cash flows and . . . the guarantee." Ex. 243 at 112:15-19.  Mr. Kain

added that "there [were] points of contact within the single-family flow business with whom . . .

[the PLS] group worked on those kinds of . . . cooperative agreements." *See id.* at 112:20-25.

356.   In December 2006, Freddie Mac committed to purchase PLS backed by

loans from the very same loan pool that the Single Family unit purchased contemporaneously as

whole loans.  During the bidding process, Freddie Mac bifurcated its purchase such that "50%"

of the "hybrid transaction" would be "take[n] as whole loans" and the "other 50%" Freddie Mac

"would simply buy [as PLS]." *See* Ex. 369 at FHFA04594416.  With respect to the deal

structure, Donna Corley stated that Freddie Mac would then "have the ability to go through the

loans once they are closed and select which loans will go into which groups." *Id.*

357.   In November 2007, Freddie Mac PLS and Single Family personnel looked

into purchasing a $900 million subprime loan pool from Nationstar—which was looking to sell

the pool "on a whole loan basis rather than [PLS]." *See* Ex. 363 at FHFA00534169.  Michael

Aneiro wrote to Single Family team members, including Ron Feigles, that "[both Freddie Mac

teams] can certainly look at the production, buy the loans we are comfortable with at the right

price, and then buy the [PLS] bonds of the remaining production." *Id.*

## 2.    Fannie Mae

358.   For much of the relevant period, Fannie Mae traders also had access to loan

tapes.  Fannie Mae's February 2007 "new process for the submission of pre-purchase, loan-level

data tapes for Private Label Security transactions" required that the loan tapes be sent to Fannie

Mae's data warehouse but then "[a] Data Analyst will process the tape and provide results

directly to Fannie Mae['s PLS] trading desk."  *See* Ex. 364 at FHFA01152279-280.  Fannie

Mae's "subprime weekly" reports were also shared with PLS traders and contain information

about subprime and Alt-A whole loan market trends.  Ex. 61 at 54:19-56:14 ("Q: And did you

intend [Subprime Weekly Updates] to convey information concerning whole loans, subprime and

Alt-A whole loans?  A: I believe we did include some commentary from time to time on the

whole loan side of the market."); *see also* Ex. 365.

       359.  Fannie Mae credit analysts also had access to information from the Single

Family business.  For example, C.J. Zhao, a Director of PLS Analytics, had previously worked

on developing pricing models for the Single Family Credit guarantee business.  Ex. 254 at 21:17-

24.  She was also involved in assessing Single Family counterparty risk.  *Id.* at 54:19-22.  Lin

Cao, who reported to C.J. Zhao, Ex. 277 at 38:10-17, also testified that she provided analytical

support to the Single Family business.  *Id.* at 41:22-25.

       360.  On September 8, 2006, Fannie Mae Financial Analyst Stephen Shen sent an

e-mail to members of Fannie Mae's PLS and Single Family trading teams—including Sal Mirran

and Paul Norris—describing a fixed rate whole loan pool to which Fannie Mae was committing.

Ex. 366.  Mr. Shen stated that "The [pool's] pricing was based on a reference pool that Merrill

Lynch supplied, and we will substitute a portion of the reference pool with loans that Single

Family has already chosen to maximize housing goals."  *Id.* at 303.  Regarding a future

securitization, Mr. Shen stated that Fannie Mae "will be receiving . . . the final tape . . . that

contained the ARM loan population, and Single Family will help Capital Markets select the

loans that will go into the securization [sic]."  *Id.*

       361.  In a March 2007 e-mail concerning a bid on First Franklin loans, Alvaro

Ocasio in Fannie Mae's Single Family unit wrote to Milan Hickman and others that Fannie Mae

was bidding on a pool of First Franklin whole loans.  Ex. 298 at FHFA00183643 ("I believe we are the only bid on this pool vs the lender's securitization route.").  After speaking with PLS trader Paul Norris, George Ashton III responded that the Single Family unit would not be purchasing the First Franklin whole loans because they were "already earmarked for a security that [Fannie Mae] purchased for April."  Ex. 292.

362.   In a February 2007 e-mail chain among Lesia Bates Moss, Paul Norris, Michael Shaw, and others, Ms. Bates Moss stated that Fannie Mae's Single Family Counterparty Risk group supported purchasing PLS securities backed by Ameriquest-originated bonds "[b]ased on . . . updated information provided by Capital Markets."  *See* Ex. 367 at FHFA00018742.  Mr. Shaw, Fannie Mae's Credit Risk Officer, replied to Ms. Bates Moss' e-mail, stating that he "would like to see the tape and review it with someone from single family."  *Id.* at FHFA00018741.

## IX.   THE GSES' KNEW ABOUT FRAUD AND VALUATION RISKS IN NON-TRADITIONAL LOAN PRODUCTS AND FACTORED THEM INTO THEIR PRE-PURCHASE ANALYSIS OF PLS

### A.   The GSES Were Aware of Risks in No- and Low-Document Lending

363.   During 2005-2007, Fannie Mae required pre-purchase review and analyses of the PLS.  Fannie Mae's pre-purchase PLS policies were intended to "evaluate credit risk, counterparty risk, and operational risk on the securities that are committed to be purchased."  Ex. 178 at FHFA02861745.  Fannie Mae's Private Label Securities Risk Policy (the "PLS Risk Policy") (previously known as "PLS Credit Policies, Procedures and Delegates Authorities"), governed its purchase of PLS during 2005 through 2007.  Ex. 122 at 42:9-23, 45:4-46:13; Ex. 370; Ex. 371; Ex. 372; Ex. 373.  Fannie Mae factored into its analysis the type of loan, including the level of documentation.  Through their pre-purchase analysis processes, the GSEs even

selected at least some of the loans included in their SLGs.  Ex. 71 at 82:19-83:10; Ex. 61 at 442-

443.

364.   For example, Fannie Mae's Deal Analysis Sheet of GSAMP 2006-HE7

assigned a "default frequency" of 1 to full documentation loans, but a default frequency of 1.7

and 1.5, respectively, to stated documentation and limited documentation loans.  Ex. 374.

According to Fannie Mae PLS trader Shayan Salahuddin, this was because "a stated

documentation loan is a loan that has less information attached to it and therefore, more

variability in the type of information that could conceivably be true about a particular loan."  Ex.

61 at 643:24-644:5.

365.   During 2005-2008, Freddie Mac policy required credit analysis on PLS

purchases that included an analysis of loan-level information and counterparty information.

Credit analysis of PLS was conducted by Freddie Mac's Portfolio Management and Pricing

("PM&P") group, meant to provide "independent review of collateral and structure risk.  Ex. 375

at FHFA11984596.  The credit analysis procedures recognized the riskiness of certain types of

loans, differentiating between PLS backed by subprime and Alt-A loans.  Ex. 376 at

FHFA00519468.  The credit analysis "worksheet," required to be completed for every PLS

purchased by Freddie Mac, required as inputs both the type of underlying loan and the identity of

the counterparties involved.  *Id.* at FHFA00519510.

**B.     The GSEs Accounted for the Risks of No- and Low-Doc Loans in Their
         Purchases of PLS**

366.   The GSEs learned from their pre-purchase credit reviews numerous

characteristics about the loan pools in which they were purchasing an interest, including

underlying originators, the type of loans (particularly low- or no-documentation loans), the

geographic distribution of the loans, and the LTV distribution.  These reviews therefore informed

121

the GSEs that they were purchasing certificates backed by stated income/stated asset, or no income/no asset, loans, which the GSEs knew contained certain risks.  Ex. 65 at 150:24-151:17; Ex. 377 at 332:5-10; Ex. 63 at 281:23-282:2.

367.   Freddie Mac pre-purchase reviews focused on the presence of no or low-documentation loans.  For example, the credit approval for GSAA 2007-6 notes that only 17.04% of the loans are full documentation loans.  Ex. 248 at FHFA04593165; *see also* Ex. 378 FHFA00764461; Ex. 379; Ex. 380; Ex. 381; Ex. 382.

368.   The Freddie Mac's credit approval package for the AHMA 2006-1 Certificate includes a May 18, 2006 e-mail from Steve Keleher to Kevin Palmer and David Kirk, noting that the AHMA 2006-1 Certificate "contains only 17.69% full documentation and 0.00% NINA" and "[a]bout 3.71% of the collateral has FICO's less than 640.  These attributes are slightly better relative to other Option Arm deals we have seen recently."  Ex. 383 at FHFA13683838.  Keleher also wrote: "To mitigate some of the model risk of MTA we assumed LTV's were higher than reported to account for the potential for negative amortization" and noted the "high concentration of the deal in 79-80% CLTV range (~32%)."  *Id.*  The trade ticket lists AHMA 2006-1's Originator as American Home. *Id.* at FHFA13683829.   Keleher's e-mail to Palmer states: "Regarding American Home as the originator and servicer, they are an approved Freddie Mac seller/servicer so we feel comfortable with the counterparty exposure."  *Id.* at FHFA13683839.

369.   Likewise, for Fannie Mae, the deal analysis for GSAMP 2006-HE8 Certificate lists the SLG loans' Originators as NovaStar and Aames (Accredited Home Lenders). Ex 385.  The deal analysis further indicates that 38% of the SLG loans were stated documentation loans and 5% were limited documentation loans.  *Id.*

370.     Similarly, the Fannie Mae trade ticket for the GSAMP 2006-NC2 Certificate lists the trade date as June 21, 2006 and the Fannie Mae trader for the purchase as Shayan Salahuddin.  Ex. 386 at FHFA04379054.  The included Originators for the SLG loans are American Home (AHM), Countrywide, Greenpoint, and National City (NatCity).  *Id.* at FHFA04379057.  The Certificate is listed as containing 5.07% NINA loan and 8.58% SISA loans.  *Id.* at FHFA04379058.

371.     In a March 2007 e-mail, Fannie Mae PLS trader Paul Norris wrote to colleagues regarding a prospective purchase of New Century whole loan pools requesting that the analytics group "make some liberal assumptions with regard to CLTV, income, DTI, etc." Ex. 387 at FHFA01653384.  Fannie Mae Vice President David Gussman, who received the e-mail, understood Mr. Norris was asking him to change the CLTV, income, and DTI data that had been provided by the dealer in order to see its effect on bond performance.  *See* Ex. 64 at 320:7-320:19) ("Q: And did you understand [Mr. Norris] to be asking you to vary it from the data that had been – that had been provided by the dealer?  A: Yes.").

372.     One month later, Fannie Mae's Director of PLS surveillance, Kin Chung, requested that credit risk analysts develop a model to account for "'liar loans' and biased appraisals . . . to see what severity increment is needed to break a bond.  This could then be translated into an appraisal bias factor that tells us how much appraisals need to have been inflated for our bond to break."  Ex. 389 at FHFA01819578.  In a follow-up e-mail, Mr. Chung indicated that "appraisal bias in [reported risk] parameters" should be captured in the existing Fannie Mae "model" and that the Capital Markets Strategy team "would need to know how much bias is modeled in and how much more we want to include."  Ex. 390 at FHFA01643078.

373.    The January 2006 PLAT meeting minutes show that one consultant suggested that Fannie "should not outsource collateral reviews; we should get the data tape and do the review ourselves.  There may be some nonconforming loans that make it through to the pools that we buy."  Ex. 284 at FHFA00137819.

374.    On May 17, 2006, Lesia Bates Moss and others wrote a memo to three senior Fannie Mae executives, sending a copy to Pamela Johnson, Senior Vice President and Single Family Credit Officer, Ex. 493; Ex. 288 at FHFA11843896.  The memo reported that "[e]fforts to mitigate the risk exposures" of "No Ratio" loans coupled with "reduced (or No Doc) type product" had "not been very effective.  The 'reduced  or no documentation' requirement to obtain  an executed  IRS 4506 form in order  to process  through the IRS and receive  the reported  income of the borrower(s) was done originally  to determine  which borrowers were overstating their income (misrepresentation).  This has become  a 'paper  tiger'  basically,   and the  inevitability of the  results  usually   does  not  provide  a form of evidence  that would allow  Fannie  Mae  to  obtain  repurchase from  the  lender. The  'Mortgage Industry'  has virtually  accepted  the fact that these  loan  products  are not a true representation of the borrower's income.  The income is overstated, when stated, and difficult at best to determine the reasonableness test based on industry, job title, etc."  *Id*. at FHFA11843896-897.

375.    Freddie Mac likewise altered dealer-provided information to compensate for appraisal bias and underestimated LTV ratios in the loans backing its PLS purchases.  In an April 12, 2006 credit approval for INDX 2006-AR6, PLS trader Kevin Palmer stated that "[t]o mitigate some of this risk we assumed LTVs were higher than reported to account for the potential for negative amortization.  In the FICO/LTV matrices we shifted CLTV to the right."  Ex. 391 at FHFA13679879.

376.    Thereafter, in advance of a May 2007 purchase of AHMAT 2006-1 1A1, a PLS bond backed by American Home collateral, Freddie Mac's modeling group "assumed LTV's were higher than reported to account for the potential of negative amortization.  In the FICO/LTV matrices, we shifted CLTV to the right.  Because of the high concentration of the deal in the 79-80% CLTV range (~32%), we shifted this bucket two columns to the right to account for the possibility of silent seconds that are not disclosed."  Ex. 383 at FHFA13683838.  By "shift[ing] this bucket . . . to the right," Freddie Mac's analysts indicated that they were assuming that the actual LTV values were higher than reported and taking these assumptions into account in their credit analysis.

377.    By 2004, Freddie Mac believed that "a pure reliance on external originators to police [reduced documentation loans] would likely result in future losses with a higher than average incidence of fraudulent mortgage practices."  Ex. 392 at FHFA08389110.  Freddie Mac also believed that "NINA mortgages . . . can be vulnerable to predatory and/or fraudulent practices," Ex. 393 at FHFA01487617-618, and recognized that NINA loans were particularly susceptible to valuation fraud, and that they "appeared to have stretched appraisal values," Ex. 394  at FMAC0013703.  Freddie Mac knew that there was "a high level of appraisal inflation in affordable housing (AH) product."  Ex. 252 at FHFA03703596.  Specifically, the subprime loans "needed to meet subgoals and business priorities," suffered from "[m]ore inflated estimates with fewer controls," were susceptible to "pressure from originators on [home] values," and thus contained "greater bias in the numbers."  Ex. 250 at FHFA02344967, FHFA02344982.

378.    As early as October 2004, Freddie Mac was aware that the subprime reduced documentation loans being originated were susceptible to appraisal fraud or bias. During a review of 100 mortgage files of reduced documentation loans purchased from Chase

and Countrywide, Freddie Mac noted that "33 of the 100 loans appeared to have stretched appraisal values." *See* Ex. 394 at FMAC0013703 ("Operational Risk Management reviewed 100 mortgage files on NINA mortgages purchased from Chase and Countrywide.  They selected a random sample of 50 NINA mortgages from each organization.  Several observations from their review and analysis are consistent with information received from the Mortgage Insurers interviewed by Operational Risk Management.  Noted in their findings are several concerns that indicate that NINA mortgages may be more susceptible to questionable lending practices . . . 33 of the 100 loans appeared to have stretched appraisal values.").

379.   Donald Bisenius testified that "the valuation area was an area that I recall being a place where in the earlier programs they found some difficulties.  So that would be consistent with this idea that NINA loans was [sic] stretched appraisals."  Ex. 73 at 273:14-24.

380.   Likewise, Freddie Mac knew that there was "a high level of appraisal inflation in affordable housing (AH) product."  Ex. 252 at FHFA03703596.  Specifically, the subprime loans "needed to meet subgoals and business priorities," suffered from "[m]ore inflated estimates with fewer controls," "were susceptible to pressure from originators on [home] values," and thus contained "greater bias in the numbers."  Ex. 250 at FHFA02344967.

381.   During the 2005 to 2007 time period, the GSEs actively sought to purchase loans that met their HUD-mandated housing goals.  The GSEs knew that their quest to purchase housing goals rich bonds came with a "tradeoff of credit risk."  Ex. 395.  Freddie Mac knew that "Higher credit risk mortgages disproportionately tend to be goal-qualifying" and further that "[t]argeted affordable lending generally requires 'accepting' substantially higher credit risk."  Ex. 396 at FHFA06123086.

382.   The GSEs received loan tapes from dealers like Goldman Sachs pursuant to confidentiality agreements and designated loans as accepted or rejected based on whether they met housing goals, among other reasons.  In the case of GSAA 2005-14, for example, on November 2, 2005, Goldman Sachs employee Bill Moliski e-mailed Thomas Flynn, a director at Freddie Mac responsible for HUD housing goal assessments, to provide a confidentiality agreement in anticipation of providing a loan tape for that transaction.  Ex. 501 at GS FHFA 003713971.  After Freddie Mac executed the agreement ("[m]odified to last one year for any deal"), Goldman Sachs provided the tape, and Mr. Flynn responded to say "[a]ttached below are the pre-bid analysis results . . . .  The first (poolloans.zip) contains the loans that meet the pooling requirements, and the second (rejects.zip) contains the loans that do not meet the pooling requirements."  *Id*.; *see also* Ex. 502 at GS FHFA 003663176; Ex. 68 at 58:16 – 59:16.  Fannie Mae similarly adjusted pools to select for loans that were "housing goals accretive."  Fannie Mae trader Shayan Salahuddin testified that "[w]e would cut the loans that were not goal accretive and we would select loans that met our other stips." Ex. 61 at 442:11-443:14.

## X.     THE GSES' POST-PURCHASE MONITORING INFORMED THEM OF DEPARTURES FROM UNDERWRITING GUIDELINES AND FRAUD

383.   Both GSEs monitored the performance of their PLS purchases and discovered indications that loans had not been originated to underwriting guidelines.  *See infra* ¶¶ 384-411.

384.   The GSEs reviewed monthly "trustee reports" (a type of "remittance report") containing loan performance information, including information reflecting delinquencies and early payment defaults ("EPDs"), which they believed were "red flags" that the loan was improperly originated.  Ex. 62 at 228:1-10, 229:1-8; Ex. 68 at 378:17-379:13; Ex. 63 at 740:4-740:20; Ex. 243 at 631:18-632:10; Ex. 66 at 225:6-225:16.

1.      **Freddie Mac**

385.    For example, Freddie Mac received remittance reports in August 2006 for

GSAMP 2005-HE6, which contained Fremont-originated loans.  This report showed that the loan

pool in that securitization had a delinquency rate of 10.64% less than a year after Freddie's

December 29, 2005 purchase.  Ex. 397 at 11.

386.    Freddie Mac received remittance reports in August and September 2006 for

other Fremont originated deals it purchased showing similarly high delinquency rates.  Exs. 398-

400.

387.    In addition to analyzing securitization-specific remittance reports from the

deal trustees, Freddie Mac's monitoring included the following:

- **I&CM Credit Committee Packages (Non-Agency).**  The January 2007 credit committee package noted that one recently purchased First Franklin securitization, FFML 2007-FF1, had "higher than average FICO for subprime and our internal model does not value the higher FICO as much as the credit agencies have done."  Ex. 401 at FHFA03502380.  Also included was Freddie's "Weakest Deals Report" which listed "any bond that based on current performance could potentially take either a principal writedown or interest shortfall," *Id.* at FHFA03502385, and a "Mortgage ABS Portfolio Report" tracking deal delinquency rates by loan type.  Ex. 402 at FHFA03502382.

- **Enterprise Risk Management Committee Reports.**  The February 2007 "Enterprise Risk Dashboard" noted that the "excesses of the subprime market are beginning to affect the financial capacity of some customers," and "[r]ecent market events resulted in our termination of Mortgage Lender's Network (MLN)." Ex. 403 at FHFA083937762.

- **Counterparty Scorecards (the "MABS scorecard and watchlist").**  The August 2007 Counterparty Scorecard showed  Accredited, Aegis, Ameriquest, Fremont and New Century as on watch with "[n]o reps and warrants going to these originators."  Ex. 404 at FHFA02315256.

388.    Through its monitoring of deal performance, Freddie Mac factored its post-

purchase analysis into its PLS purchase decisions.  Ex. 405 at FHFA04391249.  The

Counterparty Credit Risk Management Group regularly assessed Freddie Mac's exposure to a particular originator and established limits on that exposure.  Ex. 406 at FHFA13293081-082. One aspect of that exposure was the "3 month average Remittance" faced by Freddie Mac for that Originator.  *See, e.g.*, Ex. 407 at FHFA02132774.

 2.  **Fannie Mae**

 389.   In addition to receiving securitization-specific remittance reports from the deal trustees, Fannie Mae's monitoring included the following:

- **PLS Transaction "Watch Lists" Memoranda.**  The PLAT received monthly PLS "Watch List analysis" discussing the projected performance of poorly performing PLS deals.  Fannie Mae's September 2006 "Watch List analysis memo" noted that Nomura 2005-WF1 "was added to the yellow watch list because the credit support fell short to cover the assumed stressed losses," and that Fannie was "performing the stochastic cashflow analysis on this bond."  Ex. 408 at FHFA00009362.

- **PLS Transaction "Trends Analysis" Reports.**  The PLAT also received monthly transaction "trends analysis" describing Fannie Mae's recent purchases and its counterparty exposure.  The "PLS Transaction Trends Analysis report" compiled for the PLAT and dated November 20, 2006 observed that "Fannie Mae did not purchase any bonds issued by Ameriquest in this quarter" and "continue[d] reducing our Ameriquest holdings with [the] sale of $0.2 billion in this quarter."  Ex. 409 at FHFA00011487.

- **PLS "Credit Trends" Reports.**  The PLAT was informed of PLS deal performance in a monthly "Credit Trends" report.  The February 2007 "PLS Credit Trend Report" noted "deterioration of credit performance of 2005 Subprime purchases has continued," and overall "performance of . . . Fannie Mae's investments is still consistent with industry trends."  Ex. 410 at FHFA00775811.

- **PLS Counterparty Approved Lists.**  SF CPRM was responsible for providing the PLAT with lists of PLS counterparties reflecting each counterparty's status, recent operational reviews and other information.  "PLS Counterparty Approval Report" showed:  Fremont was "suspended" as the Originator "plans to sell subprime business.  Entered into cease and desist order with FDIC"; New Century was "terminated" after "a messy earnings restatement, a meeting with the SEC, an internal investigation and a criminal inquiry" were initiated; and WMC was rated "Caution"

129

after the Originator "laid off 50% of its work force."  Ex. 203 at
FHFA00089409, FHFA000894411-13.

- **Quarterly Private Label Securities Updates for the Firmwide Risk
  Committee.**  Fannie Mae's Corporate Risk Management Committee
  received quarterly updates on PLS, including market trends and
  counterparty status reports.  The "market trends" section of Third Quarter
  2006 "Private Label Securities Update" noted that Moody's had placed
  several Fremont deals on "watch" due to "the weak early performance of
  [the Originator's] 2005 and 2006 vintages."  Ex. 411 at FHFA19050124.
  The same update's "counterparty trends" discussion noted "Investor
  Repurchases and Fraud on the Rise (based on 2Q06 company earnings,"
  and referred to recent news about H&R Block (parent company of Option
  One), New Century and IndyMac. *Id.* at 136.  These updates also included
  lists of counterparties with each counterparty's current status.

390.    Fannie Mae's post-purchase reviews of other PLS transactions informed its

PLS purchase decisions.  Fannie Mae prepared "quarterly transaction trends" reports,

"review[ed] all documents (prospectus and supporting issuance documentation) . . . and create[]d

a summary report" regarding the transaction.  Ex. 85 at FHFA00000905.  Fannie Mae also

performed "[c]omprehensive monitoring and reporting of all purchased or wrapped private label

securities" on a quarterly basis. *Id.* at FHFA00000906.  That monitoring was then factored into

counterparty reviews that tracked the performance of deals purchased by Fannie, including

outstanding repurchases and the rate of serious delinquencies. *See, e.g.*, Ex. 412 at

FHFA11728579-80.

**B.    Both GSEs Believed that EPDs May Reflect Loan Defects**

391.    EPDs are delinquencies early in the life of a loan.  Ex. 122 at 316:11-

316:16; Ex. 71 at 527:18-528:9; Ex. 68 at 388:1-388:11; Ex. 413 at 193:15-195:16; Ex. 66 at

360:8-16; Ex. 166 at 195:4-196:3; Ex. 414 at 57:7-16.

392.    Fannie Mae and Freddie Mac personnel believed EPDs were an indicator

that there might be misrepresentations in the underlying loan application or in data provided to

the investor.  Ex. 66 at 219:9–220:4; 223-24 ("[T]here may be a problem with the overall pool of

mortgages that's been assembled," including that "[p]erhaps errors were made, or perhaps it goes

beyond that and information was actually misstated at some point in the process" such that "the

information the investor got was not an accurate reflection of the actual credit of the underlying

borrowers themselves."); Ex. 69 at 565:9-566:14 (Agreeing that, "[i]n general, the earlier the

serious delinquency occurs the more likely it is linked to a significant misrepresentation on the

original loan application."); Ex. 99 at 188:16-188:21; Ex. 359 at 65:17-68:20 (EPDs "can be"

"an indicator of manufacturing defects"; EPDs suggested that "the rules surrounding the credit

box" might not have been "followed" by the originator); Ex. 414 at 55:17 ("They had an interest

in identifying early indicators if there was a problem."); Ex. 414 at 57:2-6 (noting Pentalpha

"suggested"  to Fannie Mae's SVP of Capital Markets Strategy that Fannie Mae "monitor the

amount of early payment default as a mathematical tool to see if something was not performing

as expected.").  EPDs were of concern because "if a lender gave somebody money on Monday

and he couldn't pay his bills on Tuesday, it would lead me to believe that the guy on Monday

didn't do his job right."  Ex. 414 at 138:12-17.

393.   When they observed elevated rates of EPDs for loans backing PLS that

they had purchased, the GSEs "would want to understand why those borrowers were defaulting

so quickly."  Ex. 70 at 316:23-317:6; *see also* Ex. 68 at 393:5–394:5 (where there were EPDs,

Freddie Mac would "need to do a review of those loans to determine why they defaulted."); Ex.

66 at 222:16–223:15 ("Early delinquencies should not occur at a rapid level unless something

very bad happens to the mortgages or the people who have the mortgages.  It's unlikely that there

will be a sudden outbreak of scarlet fever or something that will cause a significant portion of the

population to be unable to make their mortgage payments and become delinquent.  You have to

look for other causes.  And there aren't very many other potential causes.").

394.   In August 2006, Goldman Sachs warned Freddie Mac of the risk of

defaults:  it noted in a presentation received by Freddie Mac that "[c]ompanies [were] citing

weaker underwriting and performance in the 2005 and 2006 vintages," and that there had been an

"increase in early defaults."  Ex. 415 at FHFA01009758.

**1.      Both GSEs observed increased EPDs through 2006-2007**

395.   GSE personnel observed increased delinquencies and EPDs by the end of

2006, including:

- On August 25, 2006, the Fannie Mae Subprime Weekly reported that "shares in H&R Block (parent company of Option One Mortgage) dropped more than 8% today on news that they will take a $102 MM provision in Q1 for possible losses on mortgages.  Losses are due to an increase in early payment defaults on Option One originations.  Investors should carefully consider how this affects their view of origination standards and quality control in the subprime sector, as Option One has long been considered one of the better originators."  Ex. 416 at FHFA00031680.  The author, Fannie Mae PLS trader Shayan Salahuddin, meant that "we should look at underwriting standards and perhaps the degree to which Option One and others might be adhering to them.  So make sure that their loans looked the way that they say they look."  Ex. 61 at 75:21-76:5.

- In November 2006, a "Summary of Freddie Non-Agency Portfolio and the Subprime Market" noted "2006 60+ delinquencies ("DQ") are greater than all other vintages at comparable seasoning, including 2000 which was the worst vintage of this decade."  Further, "[e]arly payment defaults are up significantly, especially for loans with piggyback seconds."  Ex. 417 at FHFA11759111, 112.

- Fannie Mae PLS personnel observed in December 2006 that "our 2006 vintage [of PLS] is showing much faster ramping in delinquencies than previous vintages (this is not as clear from the calendar month series).  Moreover, the 2006Q2 vintage is performing significantly worse than the 2006Q1 vintage."  Ex. 418 at FHFA01276393.

- A December 6, 2006 Fannie Mae PLS Update reported that "weak early performance of Fremont's 2005 and 2006 vintages has caused Moody's to place on watch for possible downgrade several deals with collateral backed by Fremont originated collateral . . . As of Q3, we had about $1.28 billion in Fremont bonds." Ex. 419 at FHFA00011636.

- A December 8, 2006 Freddie Mac memorandum reported that Ownit had announced it was "closing their doors and ceasing operations, after warehouse lenders pulled financing on the high level of EPDs the originator has experienced." Ex. 420 at FHFA09607176.

- The Fannie Mae PLSWI for December 15, 2006 warned that "[e]arly trends on 2006 vintage bonds raise serious concerns, with skyrocketing 60 plus delinquency rates," Ex. 421 at FHFA00031684. The accompanying e-mail referred to the "changing landscape of the subprime mortgage market" and the fact that the "originator community continues to be concerned with early payment defaults," *id.*; according to the author, the changes in the subprime market were "pretty stark" as of this time, including because "[d]elinquency rates were higher." Ex. 61 at 127:21-131:10.

- In a December 2006 "MABS [Mortgage Asset Backed Securities] Industry Review," Freddie Mac warned that "the combination of lower HPA and aggressive underwriting practices have begun to show up in delinquency and EPD figures. Fitch projects 2006 vintage subprime mortgages will perform substantially worse in 2007, with cumulative lifetime losses ultimately reaching 7%, the worst collateral losses of any vintage to date. Serious subprime delinquencies have increased almost 50% year-over-year, and the rate of bond downgrades is escalating. Previous vintages do not appear to be performing as badly as 2006, with pre-06 vintages showing average or above average credit performance." Ex. 422 at FHFA11556724.

- A February 2007 Fannie Mae Private Label Securities Update cautioned that "60+ [EPD] delinquencies are running notably higher than those of sector 2005 and 2006 vintages" and warned readers of Fannie Mae's exposure to Fremont loans. Ex. 423 at FHFA00015037.

- Timothy Judge, the Director of Fannie Mae's Credit Risk Oversight group, forwarded Mike Shaw information regarding the PLS exposure to New Century and New Century's performance on February 9, 2007, stating that that "New Century performs worse than comparables." Ex. 424 at FHFA01129754.

- A July 25, 2007 e-mail chain between CJ Zhao, David Gussman, Francisco Gonzalez-Rey, and Lin Cao (Fannie) discussed analyses for an SAST deal, and Zhao said that "the properties are on average about 10%

133

overvalued in this deal" and that "appraisal bias is a big deal in terms of impact on our bond analysis."  Zhao noted that Andre Gao's team's recent conclusion was that "New Century loans have very significant appraisal bias." Ex. 425 at FHFA00076738-739.  Lin Cao later testified that the recipients of that e-mail were "very definitely" informed that New Century loans had very significant appraisal bias.  Ex. 277 at 752:11-16.

396.    Shayan Salahuddin, a Fannie Mae PLS trader, testified that, by the end of 2006, there was an "increase in defaults in deals in general" that was "of serious concern" to GSE personnel.  Ex. 421 at FHFA00031684; Ex. 61 at 128:6-129:11.  Daniel Mudd, Fannie Mae CEO, described early defaults as a "broad concern in the market."  Ex. 65 at 148:17-149:8; *see also* Ex. 426 at FHFA001867752 ("Early default has been a concern weighing on Moody's as well as investors, issuers, and originators alike.").

397.    Remittance reports reviewed by the GSEs showed increasing numbers of EPDs in the loans underlying the Certificates.  For example, according to the Certificates' remittance reports, by mid-2007 several of the Certificates contained more than 4% of loans that were 60 or more days delinquent on payment.  *See generally e.g.*, Ex. 427; Ex. 490; Ex. 491.

398.    In 2006 and continuing into early 2007, GSE personnel were informed of and personally observed the correlation between EPDs, fraud, and weaknesses in origination practices.  A November 2006 Fannie Mae guide to "Quality Assurance and Fraud Prevention" observed that EPDs "may highlight weaknesses in the origination process" and "may also uncover fraud schemes that are often seen with cases of early payment default."  Ex. 428 at FHFA01784532.

399.    A January 2007 memorandum written by Freddie Mac counterparty credit risk director Melissa Crabtree reported that in 2006 "many originators expanded nonconforming product underwriting guidelines to compete."  As a result, Ms. Crabtree wrote, "a significant increase in delinquencies and misrepresentation/fraud began to emerge during the first half of

2006.  As delinquencies increased, aggregators were quick to enforce [repurchase rights] even

though the definition of early payment default was reportedly inconsistent.  Ameriquest

management disclosed credit losses of $150 million in 2006 associated with early payment

default repurchases alone."  Ex. 429 at FHFA01334243; *see also* Ex. 377 at 328:14-329:10

(confirming that while the memo was technically dated January 2006, it was likely mis-dated).

   400. During the first few months of 2007, GSE personnel observed increased

rates of delinquencies and EPDs in subprime and Alt-A mortgage-backed securities.  For

example:

- In a February 2007 earnings call, Fannie Mae's Chief Risk Officer informed investors that for subprime RMBS "[c]redit quality and performance has deteriorated rapidly and dramatically, in particular for certain segments originated in 2006.  Delinquencies have spiked upward to over 7% of loans backing subprime MBS and show no sign of moderating.  Early []payment defaults have risen significantly over the past four years, reaching over 5.5% of loans backing the subprime MBSs for the 2006 vintage."  Ex. 431 at 4.

- Freddie Mac's Senior Vice-President for Mortgage Investments and Structuring, Gary Kain, observed in a February 2007 memorandum that the "immediate problem" with the subprime market was "the performance of more recent originations."  "More specifically," he reported, "early-payment defaults or EPDs (when loans become delinquent within the first three months) have picked up materially to around 4 – 5% of total originations.  Some lenders have had EPDs approaching 10%."  Ex. 432 at BLK01534, BLK01535.

   401. In Spring 2007, the GSEs observed further deterioration in the performance

of their PLS holdings:

- A March 5, 2007 Fannie Mae PLS Weekly Intelligence newsletter reported on the "overwhelming tide of negative subprime market news." "Delinquency rates for '06 vintage loans are creeping higher, and are being reported at 3-4 times above their 2005 counterparts.  Combined with waning home price appreciation, delinquency and foreclosure rates for this vintage are expected to be the worst ever recorded for both Alt-A and subprime originations."  Ex. 433 at FHFA00007457-458.

- A March 9, 2007 Fannie Mae PLS Credit Trend Report reported that "Fannie Mae 2004 and 2005 Subprime investments show weaker collateral performance compared to the Subprime market average."  Ex. 434 at FHFA01320652.

- In April 2007, Peter Niculescu and Tom Lund presented a "Subprime Market Update" to a committee of Fannie Mae's Board of Directors.  Ex. 435 at FHFA01253169,  FHFA01253179.  The presentation indicated that "investor appetite and aggressive underwriting guidelines in 2006 fueled subprime loan growth," and that a "[s]low down in home price appreciation and interest rate resets exposed poor underwriting," leading to a "market dislocation [] in the subprime segment."  *Id.* at 180.

- An April 9, 2007 Fannie Mae PLS Credit Trend Report reported that "the cumulative loss rates are higher than the Subprime market average for both Fannie Mae 2004 and 2005 investments.  The deterioration of credit performance of 2005 Subprime purchase continues.  Fannie Mae 2006 Subprime investments show weaker collateral performance compared to the market average."  Ex. 436 at FHFA00775839.  Appended to this report were graphs highlighting, among other things, the "60+ Delinquency Rate by Seasoning" of Fannie Mae's PLS portfolio.  *Id.* at 844-847.

- A May 8, 2007 Fannie Mae PLS Credit Trend Report reiterated that "Fannie Mae 2005 and 2006 Subprime investments show weaker collateral performance compared to the market average."  Ex. 437 at FHFA01150181.  The report added that "[t]he trends diverge further as deals get seasoned for 2006 vintage."  *Id.* at FHFA01150181.

402.   A June 9, 2007 Fannie Mae PLS Credit Trend Report circulated within the company indicated that "Fannie Mae 2007 subprime investments are tracking the 2006 vintage in 60+ delinquency rate.  Fannie Mae 2007 Alt-A acquisitions perform worse than the 2006 vintage at the same age."  Ex. 438 at FHFA01203744.  The report further noted:  "Both Fannie Mae 2006 and 2007 investments have significantly higher Foreclosure rate and REO percentage compared to other vintages at the same age."   Further, "[t]he foreclosure trends in Fannie Mae 2007 vintage needs to be watched as well."  *Id.* at FHFA01203745.

C.     **Fannie Mae's Consultant Warned of Rising EPDs**

403.    A Fannie Mae consultant warned as early as January 2006 that "a growing

percentage of early payment defaults in some subprime deals" was "concerning and possibly a

leading indicator that existing dealer diligence procedures regarding proper due diligence and

compliance testing are insufficient."  Ex. 439 at PENT-0000102; *see also* Ex. 414 at 139:14-22

("Q.  The description that you just provided of why early payment defaults were concerning, did

you have such discussions with your clients about such concerns?  A. Yes, I did.  Q.  Okay. And

that would have included Fannie Mae?  A. Correct.").  "[T]he growing percentage of early

payment defaults" was "a topic of discussion" between Pentalpha and its clients, including

"Fannie Mae" "during the '05 to '07 period."  Ex. 414 at 137:16-24.

404.    Pentalpha "w[as] on a monthly retainer [with Fannie Mae] to provide what

effectively was research on general market trends," and informed Fannie Mae that "[t]here's a

problem brewing, monitor it and understand your risk."  Ex. 414 at 148:9-10, 267:25 – 268:6.  In

an October 26, 2006 memorandum to senior management, Fannie Mae personnel reported that

EPDs were "highly correlated with mortgage fraud" and warned that EPDs may "drift higher due

to sloppy underwriting and/or servicing practices."  Ex. 440 at FHFA01231661.  They flagged

that, according to Fannie Mae consultant Pentalpha, first payment defaults had risen more than

fourfold since 2003.  *Id.* at FHFA01231661.

405.    Pentalpha's principal, James Callahan, testified that his firm discussed with

Fannie Mae the "connection drawn between EPDs and mortgage fraud" and likely also the

"connection between EPDs and sloppy underwriting practices."  Ex. 414 at 148:11-25; 149:2-17.

Callahan testified that "EPDs became a very frequently discussed statistic as a possible early

indicator of fraud" and were "the talk of the town.  People started writing research on it and all

that kind of stuff, but it was just a metric that somebody started focusing on." Ex. 414 at 236:14-16, 237:6-11.  A January 2007 e-mail from Pentalpha's James Callahan informed Fannie Mae SVP of Capital Markets Strategy, William Quinn, that "[s]ome lenders have control problems and they are making many loans based on fraudulent rep[resentation]s by the borrower.  This is contributing to the thousands of EPDs we are seeing on some select originators.  Thousands! This is a CONTROL issue, not an underwriting issue."  Ex. 441 at FHFA04380982.

      406.   Pentalpha informed Fannie Mae in the "late '06, early '07 time frame" that "to the extent the performance was deteriorating on PLS deals," "such deterioration" could "result at least in part from the presence of fraud loans that were contained with those PLS deals."  Ex. 414 at 188:22-189:12.

      407.   Mr. Callahan testified that "control problems" included "originators making exceptions to stated guidelines" that were designed to "analyz[e] the borrower's ability to repay."  Ex. 414 at 168:7-14, 167:10-11.  In particular, "[p]eople at trading desks at originators" were using an "exemption" or "override" feature.  Ex. 414 at 168:17-19, 167:17-19. Mr. Callahan further testified that the fact that "exceptions were growing and growing in use" "was a red flag" and "when we tied it to the EPD statistics in the following months, we started to say: is the EPD a correlation from the exceptions. . . .  The EPDs suggested that we look under the hood and we suspected that the fault under the hood was the exception control issue."  Ex. 414 at 170:3-13, 171:15-18.

      408.   Mr. Callahan testified that Fannie Mae "embraced what information I could provide so that they could consider what changes they may want to make internally" and said he couldn't "recall any discussion where [Fannie] effectively pushed back saying, 'Callahan, I don't

know what you're talking about 'cause we're not seeing it on ours.'" Ex. 414 at 174:25-175:5, 195:9-15.

409.   In an April 3, 2007 e-mail, Pentalpha informed Fannie Mae executives responsible for the PLS portfolio that Pentalpha's research indicated that "many of these existing pools have loans that have serious misrepresentations about the borrower's income, the value of the house and whether they own the house for investment or residency."  Ex. 442 at FHFA01443222; Ex. 414 at 226:17-21 ("[T]here was fraud in many existing pools of loans that back PLS.")  Fannie Mae's consultant further advised it that "[s]ome people would call it lender fraud, others would call it borrower fraud, the result is the same.  Stressed borrowers and unreliable statistics about key credit metrics."  Ex. 442 at FHFA01443222; *see also* Ex. 414 at 213:19-214:12 ( "[I]n early 2007 . . . Pentalpha's research indicate[d] that at least some investors were declining to buy PLS because of fraud in the generation of the loans back[ing] those PLS," including "lender fraud," *i.e.*, "[a] representation that the loan is originated to a certain set of rules and it turns out that it's not been originated as to those rules.").

410.   Pentalpha also informed Fannie Mae that "[f]or some but not all originators, 2005 and 2006 will be known as the 'stupid' vintages."  Ex. 422 at FHFA01443223; *see also* Ex. 414 at 233:4-8 (identifying "originators with high EPD rates" as being "part of the stupid vintages").  With respect to the 2007 vintage of loans being placed into PLS, Callahan reported "we are not impressed," including with data provided by borrowers.  Ex. 422 at FHFA01443223. "[I]nvestors are waking up to realize they cannot trust certain credit and underwriting related numbers that are available from traditional sources."  Ex. 422 at FHFA01443223; *see also* Ex. 414 at 252:7-253:10.

411.   By early 2007, fraud "was becoming such a heightened focus" "that a lot of people [were] looking for the exit."  Ex. 414 at 222:8-12.  As Mr. Callahan testified, "[a] little bit of fraud is bad.  More fraud is like a problem.  You get a lot of fraud you just run away."  Ex. 414 at 221:25-222:4.  Mr. Callahan further testified that he discussed with his clients, of which Fannie Mae was one, that "fraud is like a virus that you don't know where it's crept to.  And so as you lose confidence in the numbers, performance numbers of an existing pool, that impacts your confidence in predicting the future.  So fraud is the root of blowing confidence.  And nobody knows what it means.  In the bond – many people in the investment community don't know what it means, but they just hear the word fraud and they just run for the hills because there's been so many instances in the corporate markets that when fraud comes out, you just can't control [] you just can't make [] confident predictions of the future."  Ex. 414 at 221:2-24.  By April 2007, Mr. Callahan testified, the "virus" of fraud and unreliable key credit statistics was being seen "in many different parts of the business," and "looking at that virus," an investor could "have reason to conduct further inquiries."  Ex. 414 at 226:24-227:20.

## XI.   THE GSES MONITORED PUBLIC INFORMATION ABOUT ORIGINATORS AND PROBLEMS IN THE SUBPRIME MARKET TO INFORM THEM ABOUT THEIR PLS HOLDINGS AND FUTURE PURCHASES

412.   As part of their counterparty and general market monitoring, the GSEs gathered and analyzed public information about originators and mortgage industry trends during the relevant period.

413.   Fannie Mae traders wrote "subprime weekly updates" summarizing significant news reports and developments in the subprime PLS markets, which they sent to a broad distribution list.  For example, PLS trader Ashley Dyson wrote in the November 3, 2006 edition of Fannie Mae's "Subprime Weekly," analysis, "[T]here was a sharp spike in New York

sushi chefs applying for Wall Street Trader positions - listing 'previous experience putting slimy things in pretty packages.'" Ex. 365 at FHFA02953755.

414.    A December 2005 report widely circulated within Fannie Mae warned that "[m]ortgage fraud in the United States has surged," and noted that "[m]any analysts blame the loose underwriting standards of mortgage aggregators who package loans into asset-backed securities." Ex. 443 at FHFA00179831.

415.    An August 30, 2006 *Wall Street Journal* article titled "Mortgage Market Begins to See Cracks as Subprime-Loan Problems Emerge," identified Fremont as "among the mortgage lenders reporting declines in timely payments by subprime borrowers." Ex. 444 at FHFA00516422-23.   The article went on to discuss indicators of "widespread" problems in the subprime market, including vulnerabilities to underwriting defects. *Id.*

416.    A Barclay's Sub-Prime Intelligence Report dated March 7, 2007, circulated within Fannie Mae, reported:  "[T]he recent woes in sub-prime can be traced to other factors such as poor underwriting in the 2006 vintage, coupled with mortgage fraud.  A study recently published by BasePoint Analytics claims that as much as 70% of EPD may be "linked to a significant misrepresentation on the original loan application.  While it is very difficult to quantify the actual linkage to fraud, we agree with this assessment."  Ex. 445 at FHFA01642741. The same information was circulated to Freddie Mac in a February 2007 excerpt from Inside Mortgage Finance, which noted that BasePoint stated that it had "'rigorously studied the issue and found a direct correlation between early payment defaults and mortgage fraud.'" Ex. 446 at FHFA18411402.  Similar information concerning problems in the subprime market were widely circulated within the GSEs.  *E.g.* Ex. 447 at FHFA12500557-58; Ex. 448 at FHFA00305248.

417.   By February 2007, Fannie Mae's CEO, Daniel Mudd, had concluded that certain originators, including Certificate-Originators, had "abandoned" their underwriting guidelines.  Ex. 65 at 129:17-130:15.  These originators included New Century, Ameriquest, and "that whole crowd."  Ex. 65 at 129:17-130:15; *see also id.* at 166:23-168:1 (letter from the state of Minnesota noting it had uncovered fraud at Ameriquest "refreshes me that my concerns with respect to fraud—were generally in the type of operators—Ameriquest, New Century and others—that I had described to you before"); Ex. 414 at 88:3-14, 108:25-110:17 (identifying Ameriquest, Fremont, Option One, ResMae, and WMC as "subprime players" that were "vulnerable to lawsuits based on allegations similar to those made against Ameriquest"); Ex. 449 at FHFA0001112 (January 5, 2007 Fannie Mae PLSWI reported on the subprime industry's "questionable lending practices" in the form of a parody of "Twas the night before Christmas"); Ex. 450 at FHFA00072642 (October 2006 e-mail in which Fannie Mae personnel discussed the fact that originators were pushing to increase loan volume by offering special deals, noting Certificate-Originator New Century was generally reducing interest rates on two- and three-year ARMs by 50 basis points and that Fannie Mae expected that the special loans being issued by New Century and other originators would "likely perform worse from a credit perspective as these shops stretch to find borrowers.").

418.   During the first three months of 2007, multiple originators of subprime and Alt-A loans announced significant losses or declared bankruptcy, in part due to their inability to meet increasing repurchase demands triggered by EPDs.  Ex. 451 at FHFA00051390; Ex. 452 at FHFA00775458; Ex. 453 at FHFA18277688; Ex. 414 at 160:16-161:5 (identifying "EPDs" as the "probabl[e]" "cause[] of the ongoing shakeout" "in the subprime mortgage industry").  In early February, Fannie Mae learned that New Century was restating its earnings, and that

"[r]epurchases, which contributed to [New Century's] likely fourth-quarter loss, stem from
borrowers missing initial payments, fraud or other issues[.]"  Ex. 92 at FHFA00857909.

419.   In June 2007, Fitch Ratings published a report indicating that mortgage
loans that experienced delinquencies within the first 12 months of a PLS's life had an "expected
lifetime liquidation rate" above 40%.  Ex. 454 at ML_FHFA16758729.  Fitch specifically
associated early delinquencies with borrower misrepresentation, observing that delinquencies
early in the life of a deal are correlated with higher lifetime default because "if you have early
payment defaults in a transaction," "it would be a fraudulent issue," such as "the borrower had
identified that they were living in the property, but they were in fact not living in the property."
Ex. 455 at 234:5-235:1.

420.   On July 10, 2007, Moody's downgraded 399 PLS certificates from the
2005 and 2006 vintages of PLS backed by subprime and Alt-A loans and placed an additional 32
PLS certificates on review for possible downgrade.  Ex. 456 at FHFA00118033.  The Moody's
press release announcing these hundreds of PLS downgrades stated:

- Moody's "rating actions reflect rigorous review of all 2006 subprime
  RMBS deals," undertaken after a survey of market participants "to get
  their perspective on the drivers of the 2006 vintage performance and their
  expectations about future losses."

- "Recent data shows that the first lien subprime mortgage loans securitized
  in 2006 have delinquency rates that are higher than original expectations,"
  and "were originated in an environment of aggressive underwriting."

- "Moody's has noted a persistent negative trend in severe delinquencies for
  first lien subprime mortgage loans securitized in 2006.  For example, the
  90+ day delinquency rate for loans securitized in 2006 has increased from
  7.9% in March 2007 to 10.8% in May 2007."

- "Moody's analysis shows that the transactions backed by collateral
  originated by Fremont Investment & Loan, Long Beach Mortgage
  Corporation, New Century Mortgage Corporation and WMC Mortgage

Corp. have been performing below the average of the 2006 vintage and represent about 60% of the rating actions taken today."

421.   Moody's held a press conference on July 12, 2007, at which it stated that "[t]hrough these months of dialogue with the market, we have also understood the trends in the collateral showing three types of weaknesses[,]" including "misrepresentations called by the industry soft fraud like occupancy or stated income and appraisal inflation." Ex. 457 at 4.

422.   The July 10, 2007 S&P press release announcing the negative watch actions stated:

- "New data reveals that delinquencies and foreclosures continue to accumulate at an increasing rate for the 2006 vintage. We see poor performance of loans, early payment defaults, and increasing levels of delinquencies and loss." Ex. 458 at FHFA00118058.

- Poor collateral performance was "evidence of lower underwriting standards and misrepresentations in the mortgage market" and "current [reported] findings of fraud were in excess of previous industry highs." *Id.* at FHFA00118058.

- "Data quality concerning some of the borrower and loan characteristics provided during the rating process has also come under question." *Id.* at FHFA00118059.

- The unreliable data borrowers and loan originators had provided included "key risk variables that have historically influenced default patterns, such as FICO, LTV, and ownership status." *Id.* at FHFA00118059.

- "The loan performance associated with the data to date has been anomalous in a way that calls into question the accuracy of some of the initial data provided to us regarding the loan and borrower characteristics." *Id.* at FHFA00118059.

- "Reports of alleged underwriting fraud tend to grow over time, as suspected fraud incidents are detected upon investigation following a loan default." *Id.* at FHFA00118059.

- The downgrades resulted in part from "loosened underwriting at the time of loan origination, misrepresentation and speculative borrower behavior," and "given the level of" these phenomena "reported for the 2006 vintage, we will be increasing our review of the capabilities of lenders to minimize

144

the potential and incidence of misrepresentation in their loan production."
*Id.* at FHFA00118062.

423.    On August 2, 2007, less than a month after the July 10, 2007 downgrades,

Moody's stated that it had increased its loss expectations for PLS because "[t]he incidence of

first and early payment defaults rose markedly for 2006 vintage loans" and that "[p]art of this

phenomenon may be related to borrower and appraiser misrepresentations in the origination

process."  Ex. 459 at JPMC_DBNTC_0005413666.

**XII.    FANNIE MAE KNEW OF LOANS WITH DTI EXCEPTIONS, UNREASONABLE
          INCOME, AND OTHER PURPORTED DEFECTS THROUGH ANTI-
          PREDATORY LENDING REVIEWS OF PLS PURCHASES**

424.    Fannie Mae policy required that the loans backing PLS certificates it

purchased complied with its anti-predatory lending requirements.  Ex. 103 at 35:16-36:9; Ex. 460

at FHFA11942305.

425.    To confirm the loan pools supporting its PLS certificates complied with

Fannie's anti-predatory requirements, the Legal Department required that a sample of at least

100 loans underlying each pool of subprime PLS "must receive a full credit and regulatory

compliance review, and the Fannie Mae [[anti-predatory compliance] Scope."  Ex. 461 at

FHFA11948353.

426.    Fannie Mae also mandated that "[a]ny loans that are found [by the

diligence provider] to be in breach of the Fannie Mae Reps (as evidenced by such due diligence

review) must be removed from the Fannie Mae pool pre-settlement."  Ex. 461 at

FHFA11948353; Ex. 103 at 113:15-114:11.  The Legal Department further required that a

"Fannie Mae Exception Report must be sent by the due diligence provider to the Fannie Mae

Legal Department . . . 90 days after settlement so that it can validate that the loans in the Fannie

Mae Pool comply with the Fannie Mae Reps," and that "[a]ny loan exceptions that remain in the

Fannie Mae Pool . . . are subject to immediate repurchase." Ex. 461 at FHFA11948354; Ex. 103 at 41:17-42:9; Ex. 460 at FHFA11942305; Ex. 462 at FHFA01147838.

427.   Between 2005 and 2007, Fannie Mae's policy required the Legal Department to obtain these exception reports for loans with predatory and compliance exceptions for all subprime PLS transactions that Fannie purchased.  Ex. 461 at FHFA11948354; Ex. 103 at 50:21-24.

428.   The Legal Department relied on these exception reports—and the due diligence providers' work they reflected—to "validate" that any loans found during the diligence process to violate its APL requirements had been removed from the pool.  Ex. 103 at 113:3-9. For the years 2005 and 2006, Fannie Mae certified to one of its regulators, HUD, that it performed this "validation" on all of the subprime PLS transactions that it purchased.  Ex. 111 at FHFA16971801-03; Ex. 463 at FHFA01148011-14.

429.   Mr. Ingram testified that, to assess that borrower's ability to repay the loan, due diligence firms would "look at the loan file and . . . the documentation in the loan file," such as "the income, assets, liability data" and "calculat[e] a debt to income ratio."  Ex. 103 at 65:20-67:8.  Mr. Ingram also testified that due diligence vendors assessed the "reasonableness of [a borrower's] income" to confirm the borrower's ability to pay.  Ex. 103 at 105:9-20.  Fannie Mae received detailed exception reports with the results of these reviews.  Ex. 465 at FHFA11863360.

430.   A Fannie Mae Anti-Predatory Lending Exception Report was also generated for GSAMP 2006-FM1.  Ex. 464 at GS FHFA 002666587.  That report, titled by the loan pool "14631 Fremont Investment and Loan FMT-MAR302006," shows that the finance charges of 126 loans exceeded Fannie Mae's limits, 10 loans were flagged as exceptions based on the borrower's ability to pay, 10 loans were flagged as having a "material disclosure

violation," four loans were missing the promissory note, three loans were flagged as having a

non-compliant right of rescission notice and two loans were missing HUD-1 statements. *Id*.

431.     The Fannie Mae Anti-Predatory Lending Exception Report generated for

SVHE 2005-1, a deal underwritten by RBS Greenwich Capital, found 21 loans exceeded

Fannie's points and fees requirements, three loans were funded before the rescission period, two

loans had understated finance charges, and two loans were extended without regard to the

borrower's ability to repay, among other compliance exceptions that warranted "Event Level 3"

grades.  Ex. 465 at FHFA11863360.

## XIII.   THE GSES DID NOT BELIEVE PLS RATINGS WERE ACCURATE INDICATORS OF CREDIT RISK

432.     The GSEs understood that a security's credit rating might not indicate its

actual risk.  For example,  Kevin Palmer, a Freddie Mac Director in the Investment and Capital

Markets division who performed pre-purchase credit analyses on PLS, testified that he believed

Credit Rating Agency models were "more aggressive than our risk view internally."  Ex. 67 at

741:20-742:2.  Peter Niculescu testified that Fannie Mae "didn't rely upon the ratings agencies to

form their views of losses, defaults and credit risk," because it had concerns about "the adequacy

of the rating agency approach to rating [PLS], and . . . preferred to do [its] own analysis."  Ex. 66

at 238:17-240:3; 257:13-25.

433.     Fannie Mae conducted its own independent analysis of credit, rather than

relying exclusively on the credit ratings agencies.  Ex. 66 at 257:13-25.  For sophisticated

participants in the mortgage market like the GSEs, actions by credit rating agencies were a

"lagging indicator" of performance-related information already available to the market

participants.  Ex. 61 at 301:13-302:6.  As Fannie Mae's Executive Vice President, Peter

Niculescu, testified, "[p]rofessional investors and analysts are likely to have reached the

conclusions that S&P or Moody's reached before the S&P and Moody's actions."  Ex. 66 at 382:20-382:23.

434.    Freddie Mac's Senior Vice President for Mortgage Investments & Structuring, Gary Kain, echoed this testimony:  "People are more worried about something and finally four months later, the rating agency gets to it"; "delinquency trends" are the "best indicator in addition to characteristics of the loans or pools".  Ex. 243 at 623:16-627:4.  As Fannie Mae's consultant described it,  "[m]ost of these were activities by the rating agencies based on old news.  They were slow to [] deal with this. . . . Q. Is it fair to say that you believe that during that relevant time period that the rating agencies had reacted late? A. That was my opinion at the time.  Q. Okay.  And in or around the summer of '07, was that an opinion that was frequent in the marketplace? *A.* Yes." Ex. 414 at 261:23-262:2, 262:13-24.  A Freddie Mac credit analyst noted that "[t]hese announcements had been anticipated."  Ex. 466 at FHFA16052257.  David Gussman of Fannie Mae wrote at the time that S&P "finally acquiesced today and put over 600 subprime bonds on negative watch."  Ex. 467 at FHFA12030298.  Other Fannie Mae personnel similarly testified that this news was expected. Ex. 254 at 448:23-449:11; Ex. 86 at 659:11-659:19.

## XIV.   THE GSES DOUBTED STATEMENTS IN THE OFFERING MATERIALS

435.    Prior to and after the July 10, 2007 downgrades and placements on negative watch of hundreds of PLS certificates, GSE personnel believed that the data provided by issuers of PLS might not be wholly accurate.

436.    A July 2006 Freddie Mac credit approval analysis authored by Mr. Palmer stated: "This deal [FHLT 2006-B, Class 1-A Certificate] has about 47% of the collateral concentrated right at 80% CLTV.  We believe that the dealer is not reporting true CLTV

148

accurately and therefore we have shifted all of this collateral into the 95+ CLTV bucket for

costing purposes.  When doing this, the 100th percentile moves from 19.08% to 24.83%, still

within the provided CE amount."  Ex. 255 at FHFA00001846.  Michael Aneiro testified that this

reflected a belief by several Freddie Mac employees that CLTV levels at 80% were not accurate,

and contained a number of "silent seconds."  Ex. 71 at 613:5-620:14.

   437. Freddie Mac's personnel ultimately approved the GSEs' acquisition of this

security.  *Id*.

   438. One month later, in an August 21, 2006 e-mail approving Freddie Mac's

purchase of PLS certificate MABS 2006-NC2 A1, Kevin Palmer wrote: "This deal contained a

higher percentage of collateral right at 80% LTV, this was an indicator to us that the reported

CLTV number could have been low.  We also costed this deal assuming that 100% of the

collateral with LTV's between 75-80 had silent seconds to take the CLTV up to 95-100  . . .

Notwithstanding the deal has CE just under 29% and is very well protected."  Ex. 468 at

FHFA0002405.

   439. In a March 26, 2007 e-mail, Fannie Mae PLS trader Paul Norris wrote to

colleagues regarding an expected pool of loans with New Century collateral, stating:  "Given

these are likely the last loans made by New Century, we ask that you make some liberal

assumptions with regard to CLTV, income, DTI, etc."  Ex. 387 at FHFA01653384 (emphasis

added).  Fannie Mae Vice President David Gussmann received the e-mail and understood that he

was being asked to change the CLTV, income, and DTI data that had been provided by the

dealer in order to see its effect on bond performance.  Ex. 64 at 320:7-320:19.

   440. In April 2007, Fannie Mae's Director of PLS Surveillance, Kin Chung,

requested that credit risk analysts develop a model to account for "'liar loans' and biased

appraisals . . . to see what severity increment is needed to break a bond. This could then be translated into an appraisal bias factor that tells us how much appraisals need to have been inflated for our bond to break." Ex. 390 at FHFA01643081-82. In a follow-up e-mail, Mr. Chung indicated that "appraisal bias in [reported risk] parameters should be captured in the" existing Fannie Mae "model" and that the Capital Markets Strategy team "would need to know how much bias is modeled in and how much more we want to include." *Id.*

441.    In April 2007, Fannie Mae's "Sub Prime Project Plan" asked PLS personnel to "determine [a] process for . . . Income Verification." Specifically, Fannie Mae personnel considered using "Core Logic (Income Reasonableness) . . . in future deals" and indicated that Fannie "[w]ill keep in mind perhaps using an income verification service." Ex. 469 at FHFA16870864.

442.    By the summer of 2007, and even "for a long time" before that, Freddie Mac Risk Officer Ray Romano expected a deviation of "5 to 10%" between the AVMs and the appraisal valuations in originators' loan files. Ex. 69 at 438:10-439:20.

## XV.    THE GSES KNEW DEFENDANTS' SAMPLING PRACTICES WOULD NOT ELIMINATE ALL DEFECTS IN THE SLGS

443.    The offering documents for the Securitizations described the process through which loans in the SLG were originated and securitized. For example, the prospectus supplement for the FFMLT Trust 2006-FF13 stated that First Franklin Financial Corporation originated the underlying loans and sold those loans to the securitization's sponsor, Goldman Sachs Mortgage Company. Ex. 10 at S-5, S-36-37. Similarly, the prospectus supplement for GSR 2007-OA2 states that Residential Funding Company, LLC, Quicken Loans Inc. and other originators originated and sold the mortgage loans in the SLGs to the securitization sponsor, Goldman Sachs Mortgage Company. Ex. 2 at S-10, S-12.

444.   Goldman Sachs disclosed in its offering documents that while it "may elect to-reunderwrite *some* of the mortgage loans based upon our own criteria," it would "not undertake any independent investigations of the creditworthiness of particular obligators."  Ex. 10 at 29.  In addition, Goldman Sachs' base prospectuses disclosed that Goldman Sachs utilized sampling in conducting credit and compliance due diligence on the mortgage loans.  *See, e.g.,* Ex. 15 at 27.

445.   The offering materials also disclosed that exceptions to origination guidelines were made "based upon compensating factors," Ex. 10 at S-38, and that "[i]t is expected that a substantial portion of the mortgage loans may represent such underwriting exceptions."  *Id*.  The offering materials for FFML 2005-FF11 also have identical language.  Ex. 9 at S-35.  Not only did the GSEs understand the exception process, but they also used the process in their own securitizations and loan pool purchases.  *See* Ex. 486 at FHFA11843926; Ex. 487 at FHFA02465059; Ex. 166 at 436:19-437:13, 494:8-495:25.

446.   In addition, as the offering documents disclosed, Originators typically provided representations and warranties—contractual commitments about the characteristics of the underlying loan pool—to investors as part of the loan sale agreements, including terms that the loans complied with the underwriting guidelines and did not contain fraud.  *See, e.g.*, Ex. 9 at S-46; Ex. 39 at S-90; *see also infra* ¶ 461.  A Freddie Mac Offering Circular dated October 14, 2005 disclosed that "[w]hen [Freddie Mac] purchase[s] a Mortgage, we rely on representations and warranties of the seller with respect to certain matter, as is customary in the secondary mortgage market.  These representations and warranties cover such matters as: [t]he accuracy of the information provided by the borrower;" and "[t]he accuracy and completeness of any third

party reports prepared by qualified professionals, such as property appraisals and credit

reports." Ex. 337 at 20.

447.   The GSE also generally required PLS "aggregators" with whom they

transacted to be reviewed and approved. Ex. 169 at FHFA12147596; Ex. 86 at 278:21-24. The

GSEs understood that Defendants' due diligence practices were generally to confirm that a

sample of loans in the Securitizations conformed to underwriting guidelines, as well as to review

indicia of fraud and valuation. *See generally* Ex. 353 at FHFA04828840; Ex. 489 at

FHFA00371462; Ex. 470 at FHFA01283579; Ex. 471 at FHFA03484191; Ex. 473 at

FHFA01280944; Ex. 474 at FHFA13253477. Defendants were approved to sell PLS to both

GSEs. Ex. 203 at FHFA00089410; Ex. 477 at FHFA00019774; Ex. 478 at FHFA01316847; Ex.

353 at FHFA04828840; Ex. 474 at FHFA13253477; Ex. 471 at FHFA03484191.

### A.     Fannie Mae

448.   Fannie Mae's SF CPRM unit performed reviews of PLS issuers, examining

their due diligence practices among other factors. Fannie Mae knew, as a result of these reviews,

that PLS issuers generally performed due diligence on a sample of loans before securitizing a

larger pool—and Fannie Mae endorsed that practice for the PLS it purchased. For example,

Fannie Mae's Peter Niculescu acknowledged that it "was . . . not uncommon practice to sample

loans rather than look at every loan" in a PLS. Ex. 66 at 184.

449.   Paul Norris, also of Fannie Mae, understood that "between 10 percent to 50

percent" of loans in a PLS were sampled and that "by definition that meant [Defendants] were

not looking at every loan." Ex. 63 at 565:6-566:10.

450.   The Second Quarter 2006 "Private Label Securities Update" presented to

Fannie Mae's Risk Management Committee shows Fannie Mae evaluated issuers' due diligence

by "% Sampling Selection for Compliance," "% Sampling Selection for Underwriting," and "%

of Loans Removed from a Deal as a result of Due Diligence."  Ex. 480 at FHFA1908 2008.

Fannie Mae also understood through these reviews that issuers performed similar counterparty

reviews and monitoring to that which the GSE conducted on originators.  *See, e.g.*, Ex. 481 at

FHFA00205320-21; Ex. 488 at FHFA00205444.

451.   **Goldman Sachs**.  Although FHFA has failed to produce Fannie Mae's

operational reviews of Goldman Sachs, the record shows that Fannie conducted such reviews in

2005, 2006 and 2007.  Ex. 126 at FHFA14308154; Ex. 125 at FHFA16099906; Ex. 482 at

FHFA12597671.  Through these reviews, Fannie Mae would have become familiar with

Goldman Sachs' securitization processes, including its due diligence practices.

452.   **Nomura**.  Although FHFA has failed to produce Fannie Mae's operational

reviews of Nomura, the record shows that Fannie conducted such a review in 2005.  Ex. 126 at

FHFA14308154.  Through that review, Fannie Mae became familiar with Nomura's

securitization processes, including its due diligence practices.

453.   **RBS**.  Clayton performed an operational review of RBS for Fannie Mae in

November 2006.  Clayton reported that RBS performed credit due diligence on 25 percent of its

non-prime loan purchases.  Ex. 472 at FHFA01283569.

454.   **HSBC**.  Fannie Mae conducted a counterparty review of HSBC in May

2007 that found HSBC similarly sampled 25% of purchased loans for credit compliance

diligence.  Ex. 477 at FHFA00019778.

B.     **Freddie Mac**

455.   Ronald Feigles, the Freddie Mac employee responsible for its counterparty

reviews and the due diligence Freddie Mac performed on its subprime and Alt-A securitizations,

Ex. 166 at 139:3-9, 423:6-11, testified that, when samples were used in subprime loan due diligence, "one could reasonably assume there were other loans [outside the sample] that had defects."  Ex. 166 at 466:12-14.  Feigles understood that the "pull through rate" during Freddie Mac's Alt-A due diligence typically was 70%-85%—meaning the majority of most pools were deemed suitable for purchase.  Ex. 166 at 457:4-9.

456.    Freddie Mac's AMO and CCRM units reviewed PLS issuers and studied their due diligence practices.  Freddie Mac knew, as a result of these reviews, that PLS issuers generally performed due diligence on a sample of loans before securitizing a larger pool.  Ex. 166 at 466:7-14.

457.    Unlike AMO's originator reviews, AMO's reviews of PLS issuers and "loan aggregators" like Defendants were not required to include a review of a sample of loans securitized by that issuer, because "the lenders and products in aggregated pools change rapidly, and *the origination controls are the lenders*, [making] file testing . . . of very limited benefit." Ex. 475 at FHFA11971617 (emphasis added).

458.    **Goldman Sachs**.  AMO reviewed Goldman Sachs' conduit PLS operations in May 2005 and its overall PLS practices in June 2006. Ex. 483 at FHFA12495701; Ex. 484 at FHFA12495695.  The June 2006 review found Goldman Sachs' sample size "[went] down to 20-25% for more seasoned sellers."  *Id.* at 696.  It also reflected Freddie Mac's knowledge that Goldman Sachs performed AVMs on all the loans it securitized, with a "15% tolerance on all loans up to 95% LTV" and a "10% tolerance on all loans with LTV's > 100%."  *Id.* at 698.

459.    **Nomura**.  A March 14, 2006 AMO review of Nomura disclosed that Nomura had a practice of sampling 20% of a loan package for credit diligence.  Ex. 474 at FHFA13253478.

154

460.   **RBS**.  AMO March 2004 review of RBS similarly revealed that RBS reviewed a sample of loans in advance of securitization.  Ex. 485 at FHFA11594620.  That sample could be as low as 10%.

## XVI.   THE OFFERING MATERIALS INFORMED INVESTORS THAT THE SECURITIZATIONS WOULD INCLUDE DEFECTIVE LOANS

461.   The prospectus supplements for the Securitizations typically disclosed that Originators would be obligated to repurchase Mortgage Loans under certain conditions, including if the loans breached the Originators' representations and warranties.  As shown in Table S, representations and warranties typically stated that Mortgage Loans would be repurchased if they included borrower fraud.  They also typically disclosed that Originators may be unable to repurchase "defective loans."

| Table S: Repurchase Representations & Warranties Concerning Fraudulent and Defective Loans | |
|---|---|
| **Securitization** | **Prospectus and/or Prospectus Supplement Pages** |
| ACCR 2005-4 | S-12 to S-13; S-86; S-96; S-98 |
| AHMA 2006-1 | S-10 |
| FFML 2005-FF8 | S-11 to S-12; S-21; S-22; S-45; S-49; S-50 |
| FFML 2005-FF11 | S-12; S-22; S-46; S-50; S-51 |
| FFML 2006-FF13 | S-11; S-14; S-16 to S-17; S-25; S-57; S-61; S-62 |
| FHLT 2006-E | 11; 17; 25; 66 |
| GSAA 2005-11 | S-15; S-26; S-28; S-68; S-71 |
| GSAA 2005-14 | S-16; S-26 to S-27; S-27; S-29; S-64; S-67; S-68 |
| GSAA 2005-15 | S-16; S-26 to S-27; S-27; S-29; S-68; S-71 |
| GSAA 2006-2 | S-17; S-23; S-33; S-76; S-81 |
| GSAA 2006-4 | S-21; S-30; S-32 to S-33; S-62; S-64 to S-65 |
| GSAA 2006-5 | S-19; S-24; S-33; S-34; S-36; S-82; S-85; S-86 |
| GSAA 2006-8 | S-19; S-25; S-35; S-87; S-90 |
| GSAA 2006-11 | S-20; S-25; S-36; S-87; S-90; S-91 |
| GSAA 2007-6 | S-22; S-27; S-41; S-97; S-100; S-128 |
| GSAMP 2005-AHL2 | S-14; S-16; S-26; S-54; S-58 to S-59 |
| GSAMP 2005-HE5 | S-13; S-15; S-25; S-53; S-55 to S-56 |
| GSAMP 2005-HE6 | S-13; S-15 to S-16; S-26; S-63; S-66 to S-67 |

| Table S: Repurchase Representations & Warranties Concerning Fraudulent and Defective Loans | |
|---|---|
| **Securitization** | **Prospectus and/or**<br>**Prospectus Supplement Pages** |
| GSAMP 2005-WMC2 | S-12; S-14; S-23 to S-24; S-53 to S-54; S-57 to S-58 |
| GSAMP 2005-WMC3 | S-11; S-13; S-22; S-52; S-56; S-57 |
| GSAMP-2006 FM1 | S-12; S-15 to S-16; S-18; S-27; S-59; S-64 to S-65 |
| GSAMP 2006-FM2 | S-13; S-16; S-19; S-28; S-57 to S-58; S-62 to S-63 |
| GSAMP 2006-FM3 | S-13 to S-14; S-18; S-20; S-29; S-60; S-64; S-65 |
| GSAMP 2006-HE3 | S-14 to S-15; S-19; S-21; S-72; S-75 to S-76 |
| GSAMP 2006-HE4 | S-15; S-19; S-21; S-69; S-72 to S-73 |
| GSAMP 2006-HE5 | S-15; S-18; S-20 to S-21; S-67; S-70; S-71 |
| GSAMP 2006-HE7 | S-15; S-18; S-20 to S-21; S-65; S-68; S-69 |
| GSAMP 2006-HE8 | S-15; S-18; S-20 to S-21; S-66; S-69 |
| GSAMP 2006-NC2 | S-13; S-16; S-19; S-28; S-62; S-66; S-67 |
| GSAMP 2007-FM1 | S-15; S-19; S-21; S-31; S-60; S-64; S-65 |
| GSAMP 2007-FM2 | S-14 to S-15; S-19; S-21 to S-22; S-32; S-66; S-70; S-71 |
| GSAMP 2007-HE1 | S-15; S-19; S-21; S-30 to S-31; S-61; S-63 to S-64 |
| GSAMP 2007-HE2 | S-14 to S-15; S-20; S-22; S-32; S-71; S-73 to S-74 |
| GSAMP 2007-NC1 | S-14 to S-15; S-18; S-20; S-30; S-64; S-69; S-70 |
| GSR 2006-OA1 | S-20; S-26; S-29; S-37; S-63 to S-64; S-68 to S-69 |
| GSR 2007-AR2 | S-18; S-30 to S-31; S-90; S-94 to S-95 |
| GSR 2007-OA1 | S-23; S-30; S-33; S-45; S-79; S-84 |
| GSR 2007-OA2 | S-22; S-28; S-30; S-40; S-66; S-71 |
| INDX 2005-AR18 | S-18; S-29; S-32; S-70 |
| INDX 2005-AR27 | S-13; S-15; S-34; S-37; S-62 |
| RALI 2007-QH5 | S-12; S-41 |
| FFML 2006-FF1 | S-3; S-10; S-25; S-41; S-46; S-71; S-81 |
| FFML 2006-FF5 | S-3; S-11; S-28; S-46; S-50; S-79; S-81 |
| FFML 2006-FF7 | S-3; S-11; S-27; S-44; S-49; S-78; S-80 |
| FFML 2006-FF9 | S-3; S-11; S-27; S-44; S-48; S-49; S-78; S-79 |
| FFML 2006-FF11 | S-3; S-10; S-26; S-44; S-48; S-49; S-77; S-79 |
| HASC 2005-I1 | S-19; S-20; S-41-42; S-46 |
| HASC 2006-HE1 | S-3; S-10; S-29; S-62; S-65-66; S-97; S-99 |
| HASC 2006-HE2 | S-3-4; S-11; S-29-30; S-62; S-66-67; 100; S-102 |

| Table S: Repurchase Representations & Warranties Concerning Fraudulent and Defective Loans | |
|---|---|
| Securitization | Prospectus and/or Prospectus Supplement Pages |
| HASC 2006-NC1 | S-3; S-9; S-25; S-43; S-46-47; S-74; S-75 |
| HASC 2006-OPT1 | S-3; S-9; S-25-26; S-43; S-46-47; S-73; S-74; S-101 |
| HASC 2006-OPT2 | S-3; S-9; S-25-26; S-42; S-46-47; S-73; S-75; |
| HASC 2006-OPT3 | S-3; S-9; S-26; S-43; S-48; S-76; S-78; |
| HASC 2006-OPT4 | S-3; S-10; S-27; S-44; S-48-49; S-78; S-80 |
| HASC 2007-HE1 | S-3; S-10; S-16; S-28-29; S-47; S-51-52; S-82-83 |
| HASC 2007-HE2 | S-3; S-11; S-17; S-29; S-60; S-64 |
| HASC 2007-OPT1 | S-3; S-9; S-26; S-44; S-48; S-78; S-80 |
| HASC 2007-WF1 | S-3; S-9; S-16; S-29; S-67; S-71-72; |
| NAA 2005-AR6 | 44-47 |
| NHELI 2007-FM1 | 6; 73-75; |
| NHELI 2007-HE3 | S-143-44 |
| NHELI 2007-FM2 | 5; 75-76;S-166; |
| NHELI 2007-1 | 5; 75-76; S-3; S-4 |
| NHELI 2007-2 | 5-6; 75-76; S-3 |
| NHELI 2007-3 | 5-6; 75-76; S-3 |

Dated: June 3, 2014                                  Respectfully Submitted,
      New York, New York

MAYER BROWN LLP                       SULLIVAN & CROMWELL LLP

By: /s/ Mark G. Hanchet_____         By: /s/ Richard H. Klapper_____
     Mark G. Hanchet                         Richard H. Klapper
     (mhanchet@mayerbrown.com)           (klapperr@sullcrom.com)
     John M. Conlon                           Theodore Edelman
     (jconlon@mayerbrown.com)              (edelmant@sullcrom.com)
     Michael O. Ware                        Michael T. Tomaino
     (mware@mayerbrown.com)               (tomainom@sullcrom.com)
     MAYER BROWN LLP                   Tracy Richelle High
     1675 Broadway                          (hight@sullcrom.com)
     New York, New York 10019           SULLIVAN & CROMWELL LLP
                                   125 Broad Street
     *Attorneys for Defendants HSBC North*     New York, New York 10004
     *America Holdings Inc., HSBC USA Inc.,*    Telephone: 212-558-4000
     *HSBC Markets (USA) Inc., HSBC Bank*    Facsimile: 212 558-3588
     *USA, N.A., HSI Asset Securitization*
     *Corporation, HSBC Securities (USA) Inc.,*
     *Neal Leonard, Gerard Mattia, Todd*      *Attorneys for Defendants Goldman, Sachs*
     *White, and Jon Voigtman*            *& Co., GS Mortgage Securities Corp.,*
                                 *Goldman Sachs Mortgage Company, The*
                                 *Goldman Sachs Group, Inc., Goldman*
                                 *Sachs Real Estate Funding Corp., Howard*
                                 *S. Altarescu, Kevin Gasvoda, Michelle*
                                 *Gill, David J. Rosenblum, Jonathan S.*
                                 *Sobel, Daniel L. Sparks and Mark Weiss*

SULLIVAN & CROMWELL LLP

By: /s/ Amanda F. Davidoff_____
     Bruce E. Clark (clarkb@sullcrom.com)
     Katherine J. Stoller
     (stollerk@sullcrom.com)
     SULLIVAN & CROMWELL LLP
     125 Broad Street
     New York, NY 10004
     Telephone: 212-558-4000
     Facsimile: 212-558-3588

     Amanda F. Davidoff
     (davidoffa@sullcrom.com)
     Elizabeth Cassady
     (cassadye@sullcrom.com)
     SULLIVAN & CROMWELL LLP

1700 New York Avenue, NW
Suite 700
Washington, D.C.  20006
Telephone:  202-956-7500
Facsimile:  202-293-6330

*Attorneys for Defendants Nomura
Holding America Inc., Nomura Asset
Acceptance Corporation, Nomura Home
Equity Loan, Inc., Nomura Credit &
Capital, Inc., Nomura Securities
International, Inc., David Findlay, John
McCarthy, John P. Graham, Nathan
Gorin, and N. Dante LaRocca*