UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
FEDERAL HOUSING FINANCE AGENCY,          :
                                         :    11cv6189 (DLC)
                      Plaintiff,         :    11cv6198 (DLC)
                                         :    11cv6201 (DLC)
         -v-                             :    11cv7010 (DLC)
                                         :
                                         :    OPINION & ORDER
HSBC NORTH AMERICA HOLDINGS INC., et     :
al.,                                     :
                                         :
                      Defendants,        :
                                         :
And other FHFA cases.                    :
----------------------------------------X

APPEARANCES:

For plaintiff Federal Housing Finance Agency:

Philippe Z. Selendy
Manisha M. Sheth
Andrew R. Dunlap
David B. Schwartz
QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Ave., 22nd Fl.
New York, NY 10010

Marc E. Kasowitz
Christopher P. Johnson
Michael A. Hanin
Kanchana Wangkeo Leung
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, NY 10019

For defendants HSBC North America Holdings Inc., HSBC USA Inc.,
HSBC Markets (USA) Inc., HSBC Bank USA, N.A., HIS Asset
Securitization Corp., HSBC Securities (USA) Inc., Neal Leonard,
Gerard Mattia, Todd White, and Jon Voigtman:

Mark G. Hanchet
John M. Conlon
Michael O. Ware
MAYER BROWN LLP
1675 Broadway

New York, NY 10019

For defendants Goldman, Sachs & Co., GS Mortgage Securities
Corp., Goldman Sachs Mortgage Co., The Goldman Sachs Group,
Inc., Goldman Sachs Real Estate Funding Corp., Howard S.
Altarescu, Kevin Gasvoda, Michelle Gill, David J. Rosenblum,
Jonathan S. Sobel, Daniel L. Sparks, and Mark Weiss:

Richard H. Klapper
Theodore Edelman
Michael T. Tomaino
Tracy Richelle High
SULLIVAN & CROMWELL LLP
125 Broad St.
New York, NY 10004

For defendants Nomura Holding America Inc., Nomura Asset
Aceptance Corp., Nomura Home Equity Loan, Inc., Nomura Credit &
Capital, Inc., Nomura Securities International, Inc., David
Findlay, John McCarthy, John P. Graham, Nathan Gorin, and N.
Dante LaRocca:

Bruce E. Clark
Katherine J. Stoller
SULLIVAN & CROMWELL LLP
125 Broad St.
New York, NY 10004

Amanda F. Davidoff
Elizabeth Cassady
SULLIVAN & CROMWELL LLP
1700 New York Ave., NW, Ste. 700
Washington, DC 20006

For defendant RBS Securities Inc.:

Thomas C. Rice
David J. Woll
Andrew T. Frankel
Alan Turner
SIMPSON THACHER & BARTLETT LLP
425 Lexington Ave.
New York, NY 10017

## Table of Contents

BACKGROUND..................................................... 2

I. Fannie and Freddie ......................................... 5

II. The Life of a Mortgage Loan ............................... 6

   A. Underwriting............................................. 6

   B. Sampling................................................ 8

   C. Defendants' Representations to Purchasers............... 10

   D. Repurchase Obligations.................................. 11

   E. GSEs' Pre-Purchase Access to Security-Specific
      Information............................................ 12

     1. GSEs Did Not Trade on Material Non-Public Information,
        Including Loan Files. ............................... 12

     2. The GSEs' Access to Loan-Level Information ........... 12

   F. GSEs' Post-Purchase Analyses............................ 15

     1. Anti-Predatory Lending Reviews ...................... 15

     2. Performance Monitoring .............................. 17

III. Originator Reviews ....................................... 20

IV. Aggregator Reviews ........................................ 24

   A. Goldman Sachs........................................... 25

   B. HSBC.................................................... 26

   C. Nomura.................................................. 27

   D. RBS.................................................... 28

V. The GSEs Were Aware of the Risk of Defective Loans. ....... 28

   A. GSEs Had Extensive Experience With Subprime Loans Through
      Single Family Purchases................................ 28

   B. Knowledge of the Risks of Low- and No-Documentation Loans 29

   C. General Knowledge of the Subprime Marketplace............ 30

   D. Risk that Originator Defects Might Reach Supporting Loan
      Groups................................................ 30

   E. Risk of Inaccuracies in Defendants' Representations...... 33

     1. The GSEs' Pre-Purchase Credit Risk Analyses .......... 34

     2. Appraisal Bias ...................................... 35

VI. Single Family Discovery Rulings .......................... 37

**VII. FHFA's Allegations and the Instant Motion** ................ 40

**DISCUSSION** ....................................................... 43

**I.  Relevant Standards** ........................................ 47

   A.  Summary Judgment Standard ............................... 47

   B.  Elements of Sections 11 and 12(a)(2) Claims ............. 48

   C.  Actual Knowledge ........................................ 51

**II. FHFA's Burden** ............................................. 53

**III. The GSEs Did Not Have Actual Knowledge of Falsity** ........ 54

   A.  The GSEs' General Knowledge ............................. 60

   B.  The GSEs Actually Believed Certain Representations Were
      Inaccurate .............................................. 66

   C.  GSEs Believed Some Defective Loans Might Reach SLGs ..... 69

     1.  Mortgage Loans May Reflect Origination Practices ...... 69

     2.  Expectation "Inherent" in GSEs' Business Practices .... 71

     3.  Defendants' Use of Sampling ........................... 73

     4.  Repurchase Obligations ................................ 77

   D.  Limits on Discovery ..................................... 78

**CONCLUSION** ..................................................... 85

DENISE COTE, District Judge:

Plaintiff Federal Housing Finance Agency ("FHFA"), as conservator for the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") (together, the Government-Sponsored Enterprises or "GSEs"), brought these actions against financial institutions involved in the packaging, marketing, and sale of residential mortgage-backed securities ("RMBS") purchased by the GSEs between 2005 and 2007, alleging among other things that Defendants[1] made materially false statements in offering documents for the RMBS (the "Offering Documents"). FHFA has moved for partial summary judgment on several grounds. At issue in this Opinion is FHFA's motion concerning the GSEs' knowledge of the falsity of these statements.

FHFA urges that no reasonable jury could find that the GSEs knew these statements were false; accordingly, FHFA requests partial summary judgment on Defendants' knowledge defense under 15 U.S.C. § 77k(a) ("Section 11") and the absence-of-knowledge

---

[1] The remaining defendants are Goldman, Sachs & Co. and related entities ("Goldman Sachs"), HSBC North America Holdings Inc. and related entities ("HSBC"), Nomura Holding America Inc. and related entities ("Nomura"), and RBS Securities Inc. ("RBS") (collectively, "Defendants"). The GSEs purchased the securities at issue between the following dates: with respect to Goldman Sachs, from September 7, 2005 to October 29, 2007; with respect to HSBC, from December 20, 2005 to July 3, 2007; with respect to Nomura, from November 30, 2005 to April 30, 2007; and with respect to RBS, from August 31, 2006 to January 31, 2007.

element of FHFA's claims under 15 U.S.C. § 77<u>l</u>(a)(2) ("Section

12(a)(2)") and similar provisions of D.C.'s and Virginia's Blue

Sky laws.  <u>See</u> D.C. Code § 31-5606.05(a)(1)(B) ("D.C. Blue Sky

law"); Va. Code Ann. § 13.1-522(A)(ii) ("Virginia Blue Sky law,"

and together with the D.C. Blue Sky law, the "Blue Sky Laws").

For the reasons set forth below, FHFA's motion is granted.

## BACKGROUND

FHFA brought sixteen related actions in this district

alleging misstatements in the Offering Documents for certain

RMBS certificates purchased by the GSEs between 2005 and 2007

(the "Certificates").  All but four actions have settled.  The

remaining actions concern 65 residential mortgage-backed

securities issued or underwritten by Defendants (the

"Securities"), which the GSEs purchased for more than $19

billion.

RMBS are securities entitling the holder to income payments

from pools of residential mortgage loans ("Supporting Loan

Groups" or "SLGs") held by a trust.  Each of the mortgage loans

underlying the Securities at issue (the "Mortgage Loans") began

as a loan application approved by a financial institution, known

as the loan's originator (the "Originator").[2]  Goldman Sachs,

---

[2] The Originators in these cases, none of which are parties to
the actions, include Ameriquest Mortgage Co.; Countrywide Home
Loans, Inc.; First Franklin Financial Corp.; Fremont Investment
& Loan; Greenpoint Mortgage Funding, Inc.; IndyMac Bank, F.S.B.;

HSBC, and Nomura acted as "aggregators" here,[3] purchasing Alt-A and subprime[4] mortgage loans and then pooling them together, on the basis of credit or other characteristics.  The loans selected for a given securitization were transferred to a trust created specifically for that private-label securitization ("PLS").

Within a given securitization, the loans were placed into one or more Supporting Loan Groups.  For example, Goldman Sachs's INDX 2005-AR18 securitization, offered through a Prospectus Supplement of September 2, 2005, was comprised of twenty-three classes of Certificates and two Supporting Loan Groups with an aggregated stated principal balance of over $2.4 billion.  Goldman Sachs represented that the original principal balances of the loans in one group "conform[ed] to Fannie Mae and Freddie Mac guidelines" that set maximum initial loan balances, and made no such guarantee about the loans in the second group.

---

New Century Mortgage Corp.; Option One Mortgage Corp.; Wells Fargo Bank, N.A.; and WMC Mortgage Corp.

[3] Goldman Sachs served as an underwriter but not an aggregator of the sole remaining security in the Ally Action.  RBS served as an underwriter for four of the Securitizations at issue in the Nomura Action.

[4] Mortgage loans are often divided, by credit risk, into three classes.  In order of ascending risk, they are "prime" loans, "Alt-A" loans, and "subprime" loans.

The trust then issued certificates to Defendants, who in turn sold them to the GSEs, which entitled the holder to a stream of income from borrowers' payments on the loans in a particular Supporting Loan Group. Thus, a certificate's value depended on the ability of mortgagors to repay the loan principal and interest and the adequacy of the collateral in the event of default.

The certificates linked to each SLG were further subdivided into tranches of varying seniority. Holders of the most senior certificates for a given SLG were paid first, after which holders of the next-most-senior certificates received payment, and so on. Thus, should some borrowers in an SLG default on their loans, certificates in the junior-most tranche would absorb all or most of the shortfall before payments to more senior certificates were affected. Accordingly, the most senior certificates were subject to less risk than were more junior certificates. By apportioning risk in this way, Defendants were able to create AAA-rated securities from Alt-A and subprime loans. The GSEs purchased senior Certificates -- often only the most senior -- with the highest credit ratings.

The Defendants raise arguments about the GSEs' knowledge concerning many facets of the origination and securitization process. Below are the principal facts linked to Defendants' major arguments, as well as needed context for those facts. All

reasonable inferences are drawn in favor of Defendants, as non-movants.  Where Defendants offered a litany of similar examples, the Court has attempted to select the strongest or most illustrative.  For reasons given in the Discussion section, the Court finds that many of these facts have little bearing on the question at issue here: whether the GSEs actually knew that the Defendants' specific representations in the Offering Documents at issue here were false.

## I.   Fannie and Freddie

Fannie Mae and Freddie Mac are government-sponsored enterprises created to ensure liquidity in the mortgage market. Fannie Mae was established in 1938, Freddie Mac in 1970.  Their primary business is to purchase mortgage loans from originators that conform to the GSEs' standards ("conforming loans") and then either hold those loans on their own books or securitize them for offer to the public.  This side of their business is known as the "Single Family" side.  In 2000, the GSEs began to purchase quantities of Alt-A and subprime loans as well and securitizing some of those purchases.  Office of Policy Development and Research, U.S. Department of Housing and Urban Development, Fannie Mae and Freddie Mac: Past, Present and Future (2009), in 11 Cityscape: J. Pol'y Dev. & Res. 231, 236-37 (2009).

Each GSE also conducts a second business.  The GSEs
purchase and hold private-label mortgage-backed securities
(PLS), although this is a substantially smaller portion of their
activities.  It is the PLS that the GSEs purchased from the
Defendants that prompt the claims in these lawsuits.  The GSEs
held approximately $100 billion in PLS in 2002, with roughly $35
billion in subprime and $3 billion in Alt-A PLS; at their peak,
in 2005, the GSEs' PLS holdings had grown to approximately $350
billion, with roughly $145 billion in subprime and $40 billion
in Alt-A PLS.  Cong. Budget Office, Fannie Mae, Freddie Mac, and
the Federal Role in the Secondary Mortgage Market 10 (Dec.
2010);[5] Nat'l Comm'n on the Causes of the Fin. & Econ. Crisis in
the U.S., The Financial Crisis Inquiry Report 124 fig. 7.3
(2011).[6]

## II.  The Life of a Mortgage Loan

The process that created a private-label security, whether
followed faithfully or not, generally worked as follows.

### A.  Underwriting

A loan file that contained the documents assembled by an
originator for a given Mortgage Loan was reviewed in a process

---

[5] Available at http://www.cbo.gov/sites/default/files/cbofiles/
ftpdocs/120xx/doc12032/12-23-fanniefreddie.pdf (last visited
July 25, 2014).

[6] Available at http://www.gpo.gov/fdsys/pkg/GPO-FCIC/pdf/GPO-
FCIC.pdf (last visited July 25, 2014).

called "underwriting" at one or more times before the Loan was placed in a securitization.  In the first instance, the originator underwrote each Loan it approved, confirming that it met applicable underwriting guidelines, was valued reasonably and accurately, and was not fraudulent.  Originators sometimes made case-by-case exceptions to their underwriting guidelines when a loan application failed to meet a certain guideline but appeared to nonetheless qualify for a mortgage program based on compensating factors.

Defendants, who functioned as "aggregators" of the Mortgage Loans, acquired loans from Originators in order to pool them into Supporting Loan Groups that would be tied to securities. Before purchasing these loans and issuing securities backed by them, the GSEs understood that Defendants -- or third-party vendors on Defendants' behalf -- conducted due diligence review of the loan pools to confirm that the loans met the relevant underwriting guidelines as well as to confirm other characteristics of the loans that were described in the prospectus supplements that accompanied each securitization, such as the loans' loan-to-value ("LTV") ratios[7] and combined

---

[7] The loan-to-value ratio is the ratio of the loan amount to the appraised value of the property securing the loan.  80% was a common benchmark used to divide lower- and higher-risk loans.

loan-to-value ("CLTV") ratios[8] and the owner-occupancy rates for the properties underlying the loans.  Based on these reviews, Defendants might refuse to purchase some loans.

**B. Sampling**

As the Defendants described their due diligence practices to one or both GSEs, when Defendants conducted due diligence review of a pool of loans, they often reunderwrote a sample of the loans.  HSBC, for example, disclosed to PLS investors that it reunderwrote the loan file against not only the originator's underwriting guidelines but also HSBC's own eligibility standards.  It employed a "10% minimum adverse and random sample" for prime and Alt-A loans, and "25% minimum adverse and random sample" (20% adverse and 5% random) for subprime loans. "An adverse sample . . . [wa]s selected based on the layered risks inherent in the loans (i.e., those posing the greatest default and loss [risk] in the pool)."  This adverse sample was created by a "proprietary model, which w[ould] risk-rank the mortgage loans in the pool" based on a dozen indicia of credit risk.  The selection of the sample depended as well on HSBC's evaluation of the "[o]verall risk level of the mortgage pool,"

---

[8] The combined loan-to-value ratio applies to properties securing more than one loan.  It is the ratio of the sum of all loans secured by the property to the appraised value of the property.

"[p]rior transaction due diligence results," and the "[f]inancial standing of the seller."

A 2006 Freddie Mac review of Goldman Sachs reported that Goldman Sachs's "due diligence sampling model . . . relies primarily on adverse selection to ensure they see the loans with the highest probabilities of default."  The review found that Goldman Sachs's "Alt A and Subprime sample levels depend on seller"; the sample size was "[t]ypically 50%" but could be "20-25% for more seasoned sellers."  These samples were "typically 85-90% adversely selected."

Similarly, Fannie Mae reported in a 2006 review that RBS's "typical sample size" for non-prime loans was 25%, "predominantly adversely selected."  For prime and Alt-A loans, "sampling size [wa]s determined by a statistical calculation intended to obtain a 95 percent confidence interval, a less than 10 percent error rate, and precision of five percent or greater."  RBS "require[d] additional adverse selection for compliance [red flags], high loan balance, low FICO [credit] score, seasoning, or other abnormal loan characteristics."[9]

A Freddie Mac report on Nomura's diligence practices in March 2006 found that Nomura conducted property and compliance

---

[9] "Compliance" generally refers to a loan's compliance with statutory and regulatory requirements, including the Securities and Exchange Commission's Regulation AB, which governs asset-backed securities.   See 17 C.F.R. § 229.1100-1123.

due diligence on 100% of loans.  Nomura conducted credit due diligence on 100% of loans in pools with amounts less than $25 million, and on 20% of loans in pools with greater amounts.

### C.   Defendants' Representations to Purchasers

In the offering documents for each security, Defendants made representations to purchasers, like the GSEs, concerning the mortgage loans' adherence to applicable guidelines and the loans' characteristics.  The offering documents included a Shelf Registration Statement filed with the Securities and Exchange Commission ("SEC"), as well as the relevant Prospectus and Prospectus Supplements.[10]

For instance, with respect to Supporting Loan Group I in Goldman Sachs's Securitization FFML 2006-FF13,[11] an SLG that backed a senior Certificate purchased by Fannie Mae, Goldman Sachs represented that:

> (1)   "[t]he mortgage loans were originated or acquired generally in accordance with the underwriting guidelines described in th[e] prospectus supplement";

---

[10] The representations at issue in these actions appear in the Securities' Prospectus Supplements.  Goldman Sachs issued and underwrote forty Securitizations pursuant to Shelf Registration Statements and Prospectus Supplements and underwrote one Securitization issued by a subsidiary of Ally Financial Inc. HSBC issued seventeen Securitizations pursuant to Shelf Registration Statements and Prospectus Supplements.  And Nomura issued seven Securitizations pursuant to Shelf Registration Statements and Prospectus Supplements.

[11] In its supplemental opposition brief, Goldman Sachs leads with a discussion of FFML 2006-FF13.

> (2)   67% of the loans (or 68.94% of the pool by
>        principal balance) had an LTV ratio of 80% or
>        lower, and the same percentage had a CLTV ratio
>        of 80% or lower;
>
> (3)   100% of the underlying properties were owner
>        occupied; and
>
> (4)   the Certificate would be "rated . . . in the one
>        of the four highest [credit] rating categories."[12]

### D.    Repurchase Obligations

Many of the Offering Documents for the Securities at issue included a repurchase provision requiring Originators or Defendant sponsors to buy back a "defective" loan in certain circumstances.  In many cases, the Originator or sponsor was obligated to repurchase a loan if it was originated as a result of fraud, negligence, or a misrepresentation or omission.  For example, with respect to FFML 2006-FF13, First Franklin Financial Corp. ("First Franklin"), as Originator, or Goldman Sachs, as sponsor, was "obligated to repurchase, or substitute for, [any] mortgage loan" should it happen that, "with respect to [that] mortgage loan[,] any of [First Franklin's or Goldman Sachs's] representations and warranties . . . are breached in any material respect as of the date made."

---

[12] More specifically, the Term Sheet for FFML 2006-FF13 stated that Fannie Mae's Certificate -- in the most senior class for its Supporting Loan Group -- was expected to receive a "AAA" credit rating from Standard & Poor's and a "Aaa" rating from Moody's.

### E.   GSEs' Pre-Purchase Access to Security-Specific Information

#### 1.   GSEs Did Not Trade on Material Non-Public Information, Including Loan Files.

Given federal securities laws prohibiting insider trading, the GSEs understood that their PLS traders and any others involved in purchase decisions could not be privy to material nonpublic information about the Securities.  In addition to purchasing PLS, the GSEs purchased mortgage loans directly through the Single Family side of their businesses.  But, because of the securities laws, "there was a firewall between [each GSE's PLS business] and [its] single family" business. For example, Fannie Mae's Single Family Counterparty Risk Management Group ("SFCPRM") recognized that it "must exercise extreme caution when disseminating information relating to PLS Counterparties," since it was barred from "sharing non-public information with the Mortgage Portfolio Traders" at PLS. Likewise, Freddie Mac required that non-public information be scrubbed from data about a given PLS deal before PLS traders could review it.  In particular, the GSEs understood that federal securities laws barred them from "pre-settlement access to the loan files."

#### 2.   The GSEs' Access to Loan-Level Information

The GSEs' PLS traders were often given access only to aggregated information concerning a securitization or supporting

loan group as a whole.  This information typically included the distributions of LTV and CLTV ratios, owner-occupancy rates, FICO credit scores, no- and low-documentation loans, mortgage type (e.g., fixed-rate or amortizing adjustable rate), and Alt-A and subprime loans.

There is no evidence that the GSEs were ever given pre-purchase access to the loan files for the Mortgage Loans.  But, in at least one PLS deal in March 2006, HSBC sent Paul Norris ("Norris"), who was responsible for Fannie Mae's PLS portfolio, loan-level information including each loan's originator, LTV ratio, and property street address.[13]  In July and September 2007, Fannie Mae used a proprietary automated valuation model ("AVM"), called the Retrospective Property Service ("RPS"), to test the appraised property values in three prospective PLS deals, none of which is at issue in these actions.  To run an RPS test, Fannie Mae needed to have, among other data, the street addresses for the mortgage properties.  An AVM can offer insight into the risk of appraisal bias in a given loan.[14]  David

---

[13] The loan-level information provided to Fannie Mae on that occasion also included note origination date, loan product, original term, maturity date, loan purpose, original and current loan amount, interest rate, property type, borrower's income and debt-to-income ("DTI") ratio, monthly P&I, and occupancy type.

[14] Freddie Mac Risk Officer Ray Romano ("Romano") testified that he believed a deviation of "5 to 10 percent" between AVMs and appraisers would be "reasonable . . . to expect"; a greater difference could signal a greater risk of bias.

Gussman ("Gussman"), a Fannie Mae Vice President in the Capital Markets Strategy division, testified that Fannie Mae "ran [RPS] sort of on an ad hoc basis on a couple of deals" in or around September 2007 and was "investigating" whether to use it "on all PLS deals going forward" but never did so "because we never got that data we're talking about" for enough deals.  In a September 2007 email discussing the use of RPS in connection with another PLS deal, a Fannie Mae employee noted that "[f]or seasoned [i.e., older] deals I don't think we have address data."

The only evidence with respect to Freddie Mac indicates that loan-level information, including property street addresses, was not provided to PLS traders, although others at both GSEs had access to loan-level information to review the extent to which loans would meet affordable housing goals set for the GSEs by the U.S. Department of Housing and Urban Development and to request that loans that did not meet housing goals be removed from a prospective Supporting Loan Group.[15] There is no evidence that the GSEs ever used property street addresses to conduct a pre-purchase test of the Mortgage Loans at issue in these actions for appraisal bias.

---

[15] These housing goals included, for example, the purchase of "loans to lower income borrowers that are owner occupied and in metro areas."

F.   **GSEs' Post-Purchase Analyses**

1.   **Anti-Predatory Lending Reviews**

The GSEs made efforts to discourage predatory lending practices such as prepayment penalties and excessive fees and points, or lending without regard to a borrower's ability to repay the loan.  But, "because of SEC related restrictions related to public securities, the [pre-purchase] loan level due diligence [for anti-predatory lending compliance] [wa]s managed by the seller of securities, not Fannie Mae Legal."  These sellers were required to make representations and extend warranties about compliance with these anti-predatory policies.  The GSEs had the right to "put back" any loans that violated the "reps and warranties."  Consequently, Fannie Mae's Legal Department took steps after the purchase of a PLS certificate to confirm that the PLS sellers had complied with Fannie Mae's anti-predatory lending policy.  The Legal Department undertook operational reviews of Originators after the settlement date of PLS purchases and required transaction-specific due diligence 90 days after the settlement date.  These reviews were not shared with Fannie Mae's PLS traders.

As of May 2005, Fannie Mae's anti-predatory lending review was conducted as follows.  Once Fannie Mae's Supporting Loan Group was finalized, and prior to settlement, Fannie Mae required that the issuer or underwriter have its due diligence

provider "generate a Fannie Mae compliance exception report"
("Fannie Mae Exception Report").  Loans identified as exceptions
had to be cleared with the diligence provider or removed from
the SLG prior to settlement.  Ninety days after settlement, the
Fannie Mae Exception Report was sent to Fannie Mae's Legal
Department.  The Legal Department would review the Report and
require immediate repurchase of any loan exceptions that
remained in the SLG.[16]

Defendants have submitted two such Fannie Mae Exception
Reports.  The first, issued in April 2006 concerning Goldman
Sachs Securitization GSAMP 2006-FM1, noted that the "borrower
does not have sufficient ability to pay" in 10 loans (1% of the
sample reviewed), as well as several other compliance
violations, including excessive finance charges or certain
documents missing from the loan file.  The second, issued in
July 2005 concerning a securitization not at issue in these
actions underwritten by RBS, did not find that any borrowers had
insufficient ability to repay the loan.

---

[16] Defendants misleadingly characterize Fannie Mae's Legal
Department's anti-predatory lending reviews, arguing that
"Fannie Mae also reviewed a sample of SLG loans after purchase
to confirm that they complied with its anti-predatory lending
policies."  The evidence cited by Defendants does not suggest
that the Legal Department ever conducted its own review of a
sample of loan files; it merely reviewed the Exception Report
generated by the issuer or underwriter's due diligence vendor.

### 2.   Performance Monitoring

After purchasing RMBS, the GSEs monitored the performance of their Securities.  They received monthly "remittance reports" that reflected delinquencies and early payment defaults ("EPDs") in the underlying Mortgage Loans.  Freddie Mac created a "Weakest Deals Report" listing struggling securities and a "Mortgage ABS Portfolio Report" that tracked delinquency rates by loan type.  Similarly, Fannie Mae created a monthly "Watch List" identifying poorly performing PLS deals.  Several of the GSEs' former employees testified that EPDs may suggest misrepresentations in the underlying loan applications.

In the late summer and fall of 2006, the GSEs saw an increase in EPDs, including in the PLS they held.  On August 25, 2006, a Fannie Mae weekly email sent by PLS trader Shayan Salahuddin ("Salahuddin") concerning news in the subprime market noted that H&R Block, the parent of Option One Mortgage ("Option One"), took losses "due to an increase in early payment defaults on Option One originations."  Salahuddin continued:

> Investors should carefully consider how this affects
> their view of origination standards and quality
> control in the subprime sector, as Option One has long
> been considered on[e] of the better originators.
> However, from a purely economic perspective, this
> issue is more poignant to originators than to
> investors as originators are required to repurchase
> loans that default within the first couple of payment
> cycles.

Salahuddin testified that "in late 2006 . . . the increase in defaults in deals in general was . . . concerning."  A December 15, 2006 email from Kin Chung ("Chung"), Fannie Mae's Director of PLS Surveillance, noted, based on preliminary data, that "our 2006 vintage [of PLS] is showing much faster ramping in delinquencies than previous vintages" and that "the 2006Q2 [second-quarter 2006] vintage is performing significantly worse than the 2006Q1 vintage."

In November 2006, an internal Freddie Mac document titled "Summary of Freddie Non-Agency Portfolio and the Subprime Market" reported, with respect to the "2006 Vintage" of loans, that "2006 60+ day delinquencies ('DQ') [i.e., loans where monthly payments are more than 60 days past due] are greater than all other vintages at comparable seasoning, including 2000 which was the worst vintage of this decade."  In particular, the summary notes that the 60+ day DQ rate was equivalent to 90 basis points ("bps") for the 2003 vintage, 160 bps for the 2005 vintage, and 240 bps for the 2006 vintage.  It also reports that "more leveraged 2nd liens and high LTV loans have performed worse in 2006 relative to any other vintage," that there is a "significant incidence of foreclosure in the 2006 vintage at such an early stage," and that "there has been a noticeable decline in underwriting standards (higher CLTVs, lower FICOs)."  The summary states that "[u]nderwriting is a major concern as

originators are stretching for volume."  With respect to EPDs in particular, the summary reported that "[e]arly payment defaults are up significantly, especially for loans with piggyback seconds [second mortgages]," with "Option One, Accredited and WAMU hav[ing] reported significantly higher levels of EPD."

Freddie Mac's December 2006 "MABS [Mortgage Asset Backed Securities] Industry Review" reported "a pervasive loosening of credit standards in originators' underwriting guidelines."  It determined that "the combination of lower HPA [home price appreciation] and aggressive underwriting practices ha[d] begun to show up in delinquency and EPD figures."  The review noted that Fitch projected that "2006 vintage subprime mortgages will perform substantially worse in 2007, with cumulative lifetime losses ultimately reaching 7%, the worst collateral losses of any vintage to date," and that "[s]erious subprime delinquencies ha[d] increased almost 50% year-over-year."

These trends continued in 2007.  For example, a June 8, 2007 Fannie Mae "PLS Credit Trend Report" for the month of May noted that "Fannie Mae 2006 investments continue to demonstrate the higher delinquency rate as well as cumulative losses than other vintages at the same age," that "Fannie Mae 2007 subprime investments are tracking the 2006 vintage in 60+ days delinquency rate," and that "Fannie Mae 2007 Alt-A acquisitions perform worse than the 2006 vintage at the same age."  The

report also found that "Fannie Mae 2006 and 2005 investments
have significantly higher Foreclosure rate and REO[17] percentage
compared to other vintages at the same age.  This is consistent
with the looser underwriting standards during that period."

### III. Originator Reviews

The GSEs' Single Family businesses investigated and
approved originators before purchasing mortgage loans from them.
The PLS operations at the GSEs relied on those reviews, or the
results of those reviews, from the Single Family operations in
making their trading decisions.

As of August 2006, Fannie Mae required PLS to confirm,
among other things, that any originator of more than 10% of the
underlying mortgage loans was on a list of Fannie Mae approved
originators.  Its SFCPRM was tasked with approving originators.
SFCPRM reviews, some of which included on-site visits, primarily
assessed "[c]ounterparty risk," which was "the risk of financial
loss to Fannie Mae resulting from [the counterparty]'s failure
to meet its contractual obligation[s]," including inability to
meet repurchase obligations.  SFCPRM also examined originators'
underwriting protocols, appraisal practices, and fraud
detection.  In some instances SFCPRM, itself or through a third-

---

[17] "REO," or "Real Estate Owned," refers to properties that have
been foreclosed upon and are owned by the mortgage holder.

party vendor, conducted loan-level reviews of a sample of the originators' loans.

Pre-approval from Freddie Mac's Alternative Market Operations Group ("AMO") was required for any originator that originated loans constituting more than 1% of the unpaid principal balance of Freddie's PLS portfolio.  AMO was part of Freddie's Single Family business.  AMO's counterparty reviews of originators examined, among other things, the originator's adherence to its underwriting guidelines and its appraisal protocols.  AMO originator reviews typically included on-site visits and reunderwriting of fifty loan files.  While PLS traders at Freddie Mac had access to AMO's originator reviews, it appears that Fannie Mae's traders were only given a list of approved originators.

SFCPRM conducted an on-site operational review of Originator First Franklin on May 24 and 25, 2006.[18]  Defendants list First Franklin as the sole "major originator" in eight of the 65 Securities at issue and as one of several "major originators" in two of the Securities.  Among the counterparty risks SFCPRM evaluated were the "[r]isk of poor underwriting performance and deterioration of credit quality in originations"

---

[18] Defendants also highlight a second originator review of First Franklin from August 2007, but this postdates the GSEs' last purchase of a Certificate in which Defendants identify First Franklin as a "major originator."

and the "[r]isk of poor due diligence around property valuation
and collateral support."  SFCPRM's summary findings concerning
First Franklin's origination practices were as follows:

> First Franklin has acceptable operational
> practices and procedures to mitigate the risk
> associated with the origination of Subprime
> collateral.  FF utilizes quality control and quality
> assurance findings to enhance their processes and
> procedures.  Sales and branch office compensation is
> based heavily on loan performance and QC [quality
> control] findings, rather than simply on loan volume.
> This creates companywide awareness around quality, not
> quantity.

> The appraisal review process utilizes CoreLogic's
> LoanSafe to mitigate the risk associated with
> fraudulent and inflated appraised values.  The use of
> CoreLogic and other vendors is considered a best
> practice within the industry.  FF's automated
> underwriting system, Easy Writer, is rules based and
> allows for loan scenarios to be placed in the best
> available loan program.  FF's [sic] is very conscious
> of predatory lending and has hard stops built into
> their LOS [loan origination system] to prevent the
> origination of loans which violate state and federal
> predatory guidelines.  FF also tracks all loan
> exceptions and reviews the exceptions in a targeted
> quality control sample each quarter to determine any
> unfavorable risk trends associated with specific
> exceptions.

Reviewing the performance of older First Franklin loans, SFCPRM
found that First Franklin

> ARM [adjustable-rate mortgage] vintages are performing
> consistently at the top tier against Subprime peers.
> Although the 2001, 2002, and 2003 vintages are
> trending downward, the ranking indicates a well
> performing pool of loans. . . .  Trending analysis
> should be reviewed periodically to predict any
> downward trends.

On SFCPRM's behalf, diligence vendor Clayton reviewed 450[19] recently originated loan files and found 95 credit exceptions. Forty-three of these exceptions were "immaterial," resulting from issues like "outdated" documents, reducing the number of "true level 3 findings" (i.e., loans that fail to meet guidelines and "would result in an outright denial for purchase") to 52.  These 52 credit exceptions included insufficient credit history, missing housing verification, insufficient assets, and exceeded DTI and LTV ratios.  SFCPRM characterized these findings as "better than average as compared to other Subprime originators" and as "acceptable."  SFCPRM also noted that First Franklin "sets a 15% annual tolerance level for branch underwriting errors," including "[b]oth clerical and substantive errors."

Other Originator reviews were less positive.  For example, Freddie Mac's AMO reviewed Residential Mortgage Assurance Enterprise, LLC ("ResMae") in April 2004 and gave it an overall rating of "Marginal" and recommended that Freddie Mac "Proceed With Caution."  Defendants list ResMae as a "major originator" in one of the 65 Securities at issue, which Freddie Mac purchased on April 30, 2007.  AMO found that ResMae's "credit

---

[19] Notably, although SFCPRM reports that Clayton reviewed 450 loan files, the percentages for exceptions suggest Clayton reviewed 4,500 loan files.

philosophy is marginal, and closely resembles the traditional 'story loan' approach formerly used in subprime," which approves loans based "more on the borrower's individual story than . . . on objective lending criteria."  AMO also found that "[q]uality control is inadequate, as it relies entirely on investor due diligence."

One of the most extreme examples is AMO's review of First NLC Mortgage Corporation ("First NLC"), which Defendants name as a "major originator" in three of the 65 Securities at issue, purchased by Freddie Mac December 29, 2005, August 31, 2006, and January 31, 2007.  AMO's review, conducted on January 31 and February 1, 2005, awarded First NLC an overall rating of "Poor." AMO found that First NLC "allow[ed] almost any borrower with a FICO [credit score] of 500 or greater to obtain a mortgage" and determined that "weaknesses in First NLC's processes and controls lead to high levels of risk layering," which was "particularly evident in their treatment of credit scores, which combines a bad business practice with poor execution."  AMO warned that "[t]his results in loans with credit attributes that would be greatly misrepresented on a pricing tape."

IV.  **Aggregator Reviews**

The GSEs reviewed and approved aggregators as well as originators.  Their reviews of the four aggregators whose Securities are at issue reflect the following assessments.

### A.   Goldman Sachs

AMO reviewed Goldman Sachs's conduit program[20] on May 18, 2005 and rated it "Satisfactory" across the board.  AMO noted that Goldman Sachs conducted "[d]ue diligence on 100% of loan files using Goldman Sachs guidelines," which included "[r]e-underwrit[ing] 100% of all loan files, re-calculat[ing] all loan data, review[ing] for benefit to borrower and capacity to repay."  With respect to appraisals, AMO found that Goldman "[p]erform[ed] extensive property-by-property valuations using Automated Valuation Models (AVM), Broker Price Opinions (BPO) and field reviews," and "[e]value[d] 60% of the appraisals."

AMO issued a review of Goldman Sachs as an aggregator generally on June 15, 2006, rating its due diligence "Satisfactory" and rating it "Above Average" overall.  As noted above, Goldman Sachs's "due diligence sampling model . . . relie[d] primarily on adverse selection to ensure they see the loans with the highest probabilities of default," with sample sizes "[t]ypically 50%."  With respect to appraisal review in particular, AMO noted that "Goldman Sachs takes a proactive and unique approach to the appraisal review process that starts in

---

[20] Under its conduit program, Goldman Sachs acquired, for securitization, mortgage loans from originators and others pursuant to a given set of Goldman Sachs underwriting guidelines that would be set out in the securitization's registration statement.

their adverse sample selection."  AMO explained that "GS closely
monitors national trends and looks for pockets of weakness in
the national real estate markets, these areas are identified by
zip codes and become a part of their adverse selection sample."
Goldman "runs an AVM on the entire sample selection," which it
selected "based on . . . the 'robustness' of data provided by
the AVM vendor."  Moreover, AMO reported that "GS views vacant
and listed properties as major risks" and thus uses "zip code
tables and other internal adverse indicators" to identify
properties on which to "order occupancy checks and run MLS
listings to verify the status.  A credit approval processed in
May 2007 shows that AMO rated Goldman Sachs as an aggregator as
"Above Average."

## B.   HSBC

Fannie Mae issued a counterparty credit review of HSBC
(HASCO) on May 3, 2007.  The review found that HSBC's "subprime
shelf is acceptable based upon (1) the quality and quantity of
loan file due diligence and (2) strong pool performance of the
bonds over a period of two years and 17 deals."  Concerning
HSBC's diligence processes, Fannie Mae found that HSBC:

- Has a well defined and comprehensive loan
  acquisition due diligence process that includes

  - in depth originator and servicer review and
    validation process which incorporates the
    experience of the HSBC organization[; and]

> o  an above average sampling size and the active
>    participation of HSBCs' [sic] personnel in the
>    entire loan review process including loan level
>    review of exceptions in valuations, credit, and
>    compliance.

- Established its own sub-prime loan underwriting
  guidelines, which has allowed the aggregator to
  minimize the inclusion of exceptionally risky loan
  types.

Fannie Mae did note, however, that "[a]lthough [HSBC] claim[s] to conduct intensive and rigorous counterparty due diligence, they have a track record of buying collateral from some poorly capitalized companies including New Century."  The report recommended approving HSBC as a PLS aggregator.

### C.  Nomura

Freddie Mac's AMO issued an aggregator operational review of Nomura on March 14, 2006.  "Based upon the combination of good due diligence methodologies, reasonable valuation processes and sound controls, AMO rate[d] Nomura subprime as Satisfactory overall."  AMO found that "Nomura's due diligence program is well managed," and "found no issues with Nomura['s] appraisal process, which is solid."  AMO noted that "Nomura takes the property evaluation process seriously and places a high priority on collateral valuation."

### D.    RBS

Fannie Mae issued an aggregator review of RBS Greenwich Capital in November 2006.[21]  The review notes that RBS employed Clayton, The Capital Group, and Watterson-Prime to "conduct loan level due diligence on its acquisitions."  RBS reviewed loans "pursuant to seller's guidelines," and "stated that its program to monitor seller lending matrices [in connection with their guidelines] [wa]s robust," although Fannie Mae was not provided "in-depth detail regarding this program."  RBS was found to "perform[ ] credit reviews through a process designed to determine that the loans generally comply with the lender's underwriting guidelines through a check of borrower income and asset documentation, review of credit reports and credit scores, and recalculation of debt to income ratios."  Fannie Mae understood that RBS employed the sampling methodology described above.

## V.   The GSEs Were Aware of the Risk of Defective Loans.

### A.    GSEs Had Extensive Experience With Subprime Loans Through Single Family Purchases.

The GSEs' Single Family businesses bought a large number of subprime and Alt-A mortgage loans directly from Originators.

---

[21] Although RBS has settled FHFA's claims against it in the <u>Ally</u> Action, it has not settled the claims against it in the <u>Nomura</u> Action, where RBS was an underwriter for four of the Securitizations at issue.

The GSEs purchased these loans either in bulk ("bulk purchases") or individually, through a "flow" of single loans ("flow purchases").  In some instances, the GSEs performed pre-purchase due diligence on the loans.  Defendants have identified documents showing that Fannie Mae conducted pre-purchase due diligence on bulk purchases of subprime loans since 2006.

For example, on September 11, 2006, Fannie Mae purchased 779 subprime loans with an unpaid principal balance of approximately $120 million directly from Originator First Franklin.  Later that month, Fannie Mae purchased a Certificate in Goldman Sachs's FFML 2006-FF13 Securitization; First Franklin originated "[s]ubstantially all" of the Mortgage Loans in the corresponding Supporting Loan Group.

### B.  Knowledge of the Risks of Low- and No-Documentation Loans

Because of disclosures made in documents provided to the GSEs prior to their purchase of PLS, they were informed that some of the SLGs contained low- and no-documentation mortgage loans, and thus, stated-income stated-asset ("SISA") loans and no-income no-asset ("NINA") loans.  The GSEs understood that low- and no-documentation loans posed heightened risks of borrower fraud, and considered the percentage of these loans in the Supporting Loan Groups when making PLS purchase decisions.

### C.    General Knowledge of the Subprime Marketplace

In addition to the knowledge gained through the GSEs' first-hand experience in the Alt-A and subprime loan markets, the GSEs received a number of articles in 2006 and 2007 about weakness in the subprime market.  Some of these articles reported a rise in borrower fraud and less rigorous underwriting by originators.  Fannie Mae PLS traders drafted "subprime weekly updates" that summarized news concerning the subprime market.

### D.    Risk that Originator Defects Might Reach Supporting Loan Groups

Some of the GSEs' former employees testified about the risks of defective loans being sold to the aggregators and reaching Supporting Loans Groups.  Michael Aneiro ("Aneiro"), Freddie Mac's Vice President of Non-Agency Portfolio Management, who headed Freddie Mac's PLS portfolio, agreed that, "if an originator was not following its own guidelines and was contributing loans to the collateral for a pool, [he] would expect that loans not underwritten to the originator's guidelines would then end up in the collateral for a pool."  Aneiro also agreed that it "would be [his] general expectation" that "when an originator contributed collateral to a PLS deal . . . the collateral reflected the originator's general origination practices."

Aneiro's counterpart at Fannie Mae, Norris, agreed when asked if he would "expect the loans backing PLS [he was] buying to be reflective of an originator's general underwriting practices."  Norris also testified that Fannie Mae's "process basically relied on the dealers and originators providing [it] with reps and warrant[ie]s as to the validity of how these loans were underwritten."  Norris explained that, after receiving a report prepared within the Single Family business that Originator New Century may not have been following its own guidelines, Fannie Mae's PLS division did not investigate whether New Century was following their guidelines "as to originations in PLS," because Fannie insisted on "reps and warrant[ie]s on every deal that we purchase."

The attorney in Fannie Mae's Legal Department who headed its anti-predatory lending reviews, John Ingram, testified that if the Legal Department saw "a trend . . . with a particular originator," it may have "let the trading desk know that we don't want to see any more deals with that originator."  Ingram also testified that "the issuer would have been engaged with the due diligence provider in looking at the anti-predatory lending results and removing loans presettlement directly with the due diligence provider," because "[t]hat was their responsibility."

Peter Niculescu ("Niculescu"), Fannie Mae's Vice President for Portfolio Strategy, when asked if he "expect[ed] that the

31

originator's loans would perform similarly whether they were sold as whole loans or placed in PLS," testified:  "Yes, I can see no reason why the loan performance would be different, depending on what vehicle they were subsequently placed into." Niculescu also testified that Fannie Mae "purchased [the Securities] through established underwriters who had assuredly good due diligence processes on the underlying loans," and therefore "would not have had at the time much reason to be concerned . . . about the incidence of fraud in the issues of securities that we had purchased."

Perri Henderson ("Henderson"), a Freddie Mac PLS trader, when asked if she would "expect the loans backing [a] PLS deal to generally reflect th[e] originator's practices," answered, "Unless they stated otherwise I would assume that."  Henderson was not the PLS trader responsible for any of the Certificates purchased from the Defendants.

Speaking about Freddie Mac's own use of sampling to review prospective bulk loan purchases for the Single Family business, Ronald Feigles ("Feigles"), the Freddie Mac employee responsible for due diligence on Freddie's bulk purchases of Alt-A mortgage loans, agreed that one could "reasonably assume" that at least some of the unsampled loans contained defects.  And Feigles agreed that it was "probably accurate" that Freddie Mac would "typically . . . purchase between 70 and 85 percent of the loans

that it looked at in the Alt-A bulk purchases." The percentage of loans purchased among those offered for sale is referred to as the "pull-through rate." A February 2006 memorandum concerning a Fannie Mae Single Family purchase from Originator New Century noted that Fannie Mae was told New Century's "standard pull through rate is 90%" and further noted that "[o]ther lenders in subprime expect pull through rate (e.g. First Franklin) in the mid and upper 90's."

**E.   Risk of Inaccuracies in Defendants' Representations**

There is no evidence that the GSEs ever questioned Defendants' representations about any of the Securities at issue. At a few points, however, each GSE questioned the reliability of the descriptions of certain sets of PLS loans.

First, in July 2006, a Freddie Mac credit approval analysis authored by Kevin Palmer ("Palmer") stated, concerning a security purchased from dismissed defendant UBS Americas, Inc. ("UBS"), that the "deal has about 47% of the collateral concentrated right at 80% CLTV. We believe that the dealer is not reporting true CLTV accurately and therefore we have shifted all of this collateral into the 95+ CLTV bucket for costing purposes." Palmer reported, "Even under this extreme scenario," the deal warranted approval. On August 21, 2006, Palmer wrote about another security purchased from dismissed defendant UBS that the "deal contained a high percentage of collateral right

at 80% LTV, this was an indicator to us that the reported CLTV number could have been low."  And in another July 2006 email, Palmer noted that Freddie Mac "requested loan level information (. . . ensur[ing] that this information was made available to all AAA investors who requested it)," where a Merrill Lynch SLG had "the highest CLTV's (95.99%) that we have seen in the past six months" and "a fairly high percent of NINA [no-income no-asset loans]."  Palmer noted Freddie Mac was "concerned about the accuracy" of its internal risk estimates based on aggregate pool-wide information, believing that they overestimated credit risk.

On March 26, 2007, Fannie Mae's Norris wrote regarding a pool of loans originated by New Century, "Given these are likely the last loans made by New Century, we ask that you make some liberal assumptions with regard to CLTV, income, dti, etc."  The GSEs never purchased a security backed by these loans.

### 1. The GSEs' Pre-Purchase Credit Risk Analyses

The GSEs' pre-purchase credit analysis often included modeling multiple scenarios to determine a Certificate's risk profile.  For instance, as of April 2007, Fannie Mae's pre-purchase review included a "50 scenario analysis."  As Caijiao Zhao ("Zhao"), the Director of PLS Analytics, testified, "[t]here's always the best case analysis, which is using the tape [with Defendants' representations], using the corporate

approved model, but there's another set of alternative . . .
'what if' analys[e]s," where "[w]e say, okay, what if LTV is 10
points higher than what's reported to us and things like that."
Similarly, Palmer testified that Freddie Mac conducted "scenario
analysis . . . illustrating what the performance would be if
[certain loan characteristics, like] CLTVs were different" than
as described by sellers.  As Palmer explained, "our assumption
of the LTVs [wa]s that the information provided to us was
accurate," but Freddie Mac considered "how the [Certificate]
would perform under different LTVs" as an exercise in "prudent
risk management."

### 2.  Appraisal Bias

The GSEs were generally aware of the risk of appraisal
bias, which, if uncorrected, can distort reported LTV and CLTV
ratios.  For example, Gary Kain ("Kain"), the Vice President of
Freddie Mac's Mortgage Investments and Strategy Group
responsible for overseeing both Single Family and PLS
activities, was asked if he became concerned in 2006 and 2007
about the risk of appraisal bias in PLS.  He testified that "at
some point in this process" he "became . . . aware" that "there
was potentially an issue with appraisal bias."  In an August
2005 memorandum, the Vice President of Mortgage Credit Risk
Management at Fannie Mae, Shelley Poland, listed as a "risk
factor[] and practice[] prevalent in today's mortgage credit

35

environment" the "general degrading of appraisal quality as well as the proliferation of automated appraisal valuations."

By 2005, Fannie Mae's Single Family Research & Analytics group created quarterly "Lender Valuation Bias Reports" that reported appraisal bias by region and by originator for the top twenty-five originators, based on a comparison of originator-reported values for loans purchased by Fannie Mae's Single Family business against values generated by the GSE's Retrospective Property Valuation System (RPS).  The report for the second quarter of 2007 found that the total median valuation bias for all originators was 6.2% and the total median valuation bias for Originator Countrywide, for example, was 7.5%.

The risk of appraisal bias, generally, appears not to have been separately accounted for in the GSEs' models, at least by Fannie Mae.[22]  "[S]ubprime collateral had not been analyzed for appraisal bias historically [at] Fannie Mae."  Zhao testified that Fannie Mae did "no[t] account for" the "risk of appraisal bias in the tool [it] created to assess or quantify credit risk

---

[22] Some at Fannie Mae believed, however, that the risk of appraisal bias was partially captured by its models.  For example, Mark An, who worked with Zhao on analytics, explained that Fannie Mae's model "probably" failed to capture appraisal bias risks "fully," but opined that it was "probably not far off either" because the model was built using historical data from 1988 to 2005 which included "loans originated from high bias environment[s] (the early 1990s, for example)."

of PLS," because they did not know "how much it [was]" for a
given loan pool.

## VI.  Single Family Discovery Rulings

Defendants complain in their opposition to FHFA's motion
that the limits the Court imposed on discovery in these actions,
particularly in connection with the GSEs' Single Family
businesses, have prejudiced their ability to establish actual
knowledge.  The parties litigated the proper scope of Single
Family discovery over several years, beginning with a conference
in July 2012.  After treating these issues in six subsequent
conferences over the course of the next year, the Court received
briefing and issued an opinion on June 28, 2013 (the "June 28
Opinion"), in which it set out the appropriate limits.  FHFA v.
UBS Americas Inc., 11cv5201 (DLC), 2013 WL 3284118, at *14-15
(S.D.N.Y. June 28, 2013).  The June 28 Opinion includes a
lengthy description of the history of these disputes as of that
date, which is incorporated by reference here.  The Opinion set
out a procedure for the parties to follow in the event they
needed to request further targeted discovery.  Id. at *25.
Defendants moved for reconsideration on July 12, which the Court
denied on September 25, 2013.  FHFA v. JPMorgan Chase & Co.,
11cv6188 (DLC), 2013 WL 5354212 (S.D.N.Y. Sept. 25, 2013).

These issues were raised again on several occasions.  For
instance, they were raised in the context of the Defendants'

requests for certain discovery from Clayton, a due diligence
vendor.  This past December, they were raised in the context of
expansive demands for additional discovery from the GSEs
themselves.  After a lengthy conference with the parties on
December 9, 2013, certain of the Defendants issued further
subpoenas to third parties in an effort to obtain the type of
material that the Court had already ruled was not properly
discoverable in these actions.  On December 18, the Court
ordered that "defendants cease efforts to obtain from third
parties the types of documents and information that this Court
has previously ruled they may not obtain from the GSEs or
others."  Most recently, these issues returned in January of
this year when Defendants argued that they should be permitted
to use Single Family discovery barred in these actions but
produced in connection with a related case in California.  An
Order of January 8, 2014, prohibited the use of such documents.

     As the record before the Court on the instant motion
attests, Defendants were granted extensive discovery of the
GSEs' Single Family businesses.  FHFA produced three categories
of documents from the Single Family side: (1) "documents
considered in connection with the purchases at issue," (2)
"documents held by custodians who were required to give the PLS
traders such information," and (3) "documents that went to the
GSEs' risk management committees with supervisory responsibility

                              38

over the PLS trading." 2013 WL 3284118, at *3. As detailed in

the June 28 Opinion, the general categories of documents

produced to the Defendants also encompass a broad array of

documents concerning Originators:

> FHFA has provided several categories of documents
> regarding Originators. These include documents that
> discuss risk associated with an Originator, an
> Originator's underwriting guidelines, or an
> Originator's adherence to its underwriting guidelines
> if those documents were provided to or accessible to
> PLS traders, their supervisors, or senior risk
> custodians, regardless of whether the documents
> actually pertained to PLS. FHFA has also produced
> operational reviews of Originators conducted by Single
> Family, regardless of whether they were provided to
> PLS traders, their supervisors, or senior risk
> custodians. FHFA has also produced reports or studies
> generated by Single Family that show appraisal bias on
> the part of Originators, again regardless of whether
> PLS traders, supervisors, or senior risk custodians
> received them. Finally, FHFA has produced any
> documents relating to Originators that the PLS
> businesses actually used, including Alternative Market
> Operations ("AMO") reviews and Counterparty and Credit
> Risk Management group scorecards from Freddie Mac and
> Counterparty Credit Reviews, Private Label Securities
> Counterparty Approval Reports, and daily surveillance
> reports from Fannie Mae.

Id. at *10.

The June 28 Opinion also outlined the production of

documents from GSE committees and custodians who had

responsibility for Single Family operations:

> FHFA has also provided documents from sources
> that span both the Single Family and PLS sides,
> including documents from committees and particular
> custodians. From Freddie Mac, FHFA has produced
> documents from the Enterprise Risk Management
> Committee, the Credit Risk Subcommittee, the Market

Risk Subcommittee, and Asset/Liability Management
Committee.  From Fannie Mae, FHFA has produced
documents from the Private Label Advisory Team, the
Credit Risk Committee, the Market Risk Committee, and
the Risk Policy and Capital Committee.  FHFA has also
produced documents from twenty-five custodians who had
some Single Family responsibilities, including nine
who were directly involved in counterparty reviews.

Id.

Fact discovery closed on December 6, 2013.  FHFA and the

GSEs produced more than 19 million pages of documents in

discovery; defendants in the sixteen related actions produced

more than 212 million pages, and third parties produced more

than 14 million pages.  Defendants took depositions over 46

days, questioning 29 GSE and FHFA witnesses.

**VII. FHFA's Allegations and the Instant Motion**

FHFA alleges misstatements and omissions in the Offering

Documents concerning four attributes of the Securities: (1) the

Originators' adherence to applicable underwriting guidelines in

originating the Mortgage Loans; (2) the LTV ratios and CLTV

ratios of the Mortgage Loans; (3) the owner-occupancy rates of

the properties securing the Mortgage Loans; and (4) the credit

ratings of the purchased Certificates, which correspond to

particular tranches of the Securities.  For instance, in

connection with Nomura's securitization NHELI 2007-3,[23] Nomura

---

[23] NHELI 2007-3 is one of Defendants' strongest examples, as 77%
of the Supporting Loan Group for Freddie Mac's Certification
were originated by ResMae.  As described above, Freddie Mac's

made the following representations about Supporting Loan Group
I:

    (1)   "All of the Mortgage Loans . . . were originated
           generally in accordance with the underwriting
           criteria described" in the Prospectus Supplement;

    (2)   58.49% of the loans (and 59.31% of the Group I
           pool by aggregate remaining principal balance)
           had an original LTV ratio of 80% or lower, and
           that 18.88% of the loans (and 27.05% of the pool
           by remaining balance) had an original CLTV ratio
           of 80% or lower;

    (3)   90.03% of the properties securing the Group I
           loans (corresponding to 89.21% of the loan pool
           by aggregate remaining principal balance) were
           owner-occupied; and

    (4)   the Certificate would not issue unless it was
           assigned an "AAA" credit rating by Standard &
           Poor's, a "Aaa" rating by Moody's, and an "AAA"
           rating by DBRS.

FHFA claims that these misrepresentations and omissions caused

hundreds of millions of dollars in damages to Fannie Mae and

Freddie Mac when the Mortgage Loans experienced defaults and

delinquencies at a higher rate than they would have had the

Mortgage Loans been as the Offering Documents described.

    FHFA brings its claims for these alleged misstatements and

omissions under Sections 11 and 12(a)(2) of the Securities Act

of 1933 (the "Securities Act"), as well under substantially

identical provisions of the D.C. and Virginia Blue Sky Laws.  To

---

AMO reviewed ResMae in 2004 and recommended that Freddie Mac
"Proceed With Caution," in part because its "[q]uality control
is inadequate, as it relies entirely on investor due diligence."

prevail on these claims, FHFA must prove that the Securities'
registration statements (for Section 11) or prospectuses (for
Section 12(a)(2) and the Blue Sky Laws) contained an untrue
statement of a material fact or omitted to state a material
fact.  See 15 U.S.C. § 77k(a); id. at § 77l(a)(2); D.C. Code
§ 31-5606.05(a)(1)(B); Va. Code Ann. § 13.1-522(A)(ii).
Defendants are not liable, however, if the GSEs knew of the
untruth or omission.  Under Section 11, the burden is on
Defendants to prove the GSEs' knowledge as a defense to
liability; under Section 12(a)(2) and the Blue Sky Laws, the
burden is on FHFA to prove the absence of the GSEs' knowledge as
an element of its claims.

On April 22, 2014, FHFA brought the instant motion for
partial summary judgment on the ground that no reasonable jury
could find that the GSEs knew of the scores of alleged
misstatements in the Defendants' Offering Documents.  The motion
was fully submitted on June 24.  Defendants contend that
sufficient evidence exists to permit a jury to find the GSEs
knew that conditions existed in the marketplace -- particularly
in regard to the Originators' underwriting practices -- that
created a risk of false representations appearing in the
Offering Documents.

### DISCUSSION

Defendants contend that the GSEs' knowledge of origination practices and of the subprime market -- including the rise of EPDs among 2006 loans in the GSEs' own PLS, first identified in late summer 2006 -- suffices to support a finding that the GSEs actually knew of the "very matters" that FHFA asserts made the Mortgage Loans false.  In particular Defendants identify seven categories of information that, they argue, constitute circumstantial evidence that the GSEs were "well aware of information FHFA" now claims rendered the Defendants' Offering Documents "misleading":

(1)  the GSEs' counterparty reviews of Originators;

(2)  the GSEs' direct purchases of subprime and Alt-A loans;

(3)  the GSEs' awareness of risks associated with low- and no-documentation loans;

(4)  the fact that Originators were obligated to repurchase "defective loans";

(5)  the GSEs' general knowledge of "the subprime marketplace," which saw declines in RMBS performance, lesser adherence to underwriting standards, and increasing borrower fraud;

(6)  the results of Fannie Mae's anti-predatory lending reviews; and

(7)  the performance of similar loans from the same Originators or dealers.

As described below, this evidence could not support a finding of the GSEs' actual knowledge of falsity of the alleged false

statements in the Offering Documents, and is insufficient to raise a question of fact that would prevent summary judgment.

Fatal to most of Defendants' knowledge theories is the simple fact that, whatever the GSEs' knowledge of an Originator's general practices, the Offering Documents contained specific representations about particular sets of Mortgage Loans. These were Mortgage Loans that the Defendants had purchased and chosen to populate the Supporting Loan Groups for a Certificate. The Defendants' study and selection of that set allowed them to describe the quality of these loans in detail. The level of detail included the percentage of loans in a Supporting Loan Group with an original LTV ratio of 80% or lower and the percentage with an original CLTV ratio of 80% or lower. For instance, Nomura represented in the NHELI 2007-3 Offering Documents that 58.49% of the loans (and 59.31% of the pool by aggregate remaining principal balance) had an original LTV ratio of 80% or lower, and that 18.88% of the loans (and 27.05% of the pool by remaining balance) had an original CLTV ratio of 80% or lower. Thus, whatever the GSEs' knowledge of general practices or trends, neither of them had access to the files or data that would give them knowledge that those detailed representations about the Mortgage Loans in a Supporting Loan Group were false. As described below, the Defendants have identified no evidence -- either direct or circumstantial -- of the extremely

44

improbable scenario they posit: the GSEs, when investing billions of dollars in Securities, knew of the falsity of Defendants' specific representations about the Mortgage Loans in the Supporting Loan Groups underlying the Certificates at issue.

Instead, Defendants argue in generalities about the GSEs' knowledge concerning, among other things, weaknesses in some Originators' underwriting practices and a rise in early payment defaults and foreclosures among loans in the GSEs' PLS originated in 2006 and 2007.  Such general knowledge could not support a finding that, for example, Freddie Mac actually knew that, contrary to Nomura's representations concerning Supporting Loan Group I in the NHELI 2007-3 Offering Documents, it was not the case that 58.49% of the loans (and 59.31% of the pool by aggregate remaining principal balance) had an original LTV ratio of 80% or lower.  Defendants offer no evidence suggesting that Freddie Mac actually knew that the true percentage of loans with such an LTV ratio was other than 58.49%, or that Freddie Mac knew the true percentage could not be 58.49%, as opposed to say, for instance, 50% or 70%.[24]

---

[24] This argument is most plain in the case of LTV ratios and owner-occupancy percentages, but it applies as well to Defendants' representations concerning adherence to applicable underwriting guidelines and credit ratings.  The GSEs' general knowledge did not give them actual knowledge that Defendants would place a sufficient number of defective loans in a given Supporting Loan Group to render false their representations concerning adherence to guidelines.  Nor did it give them actual

Nor do the Defendants offer any evidence concerning what the true numbers were for these Securities.  In fact, at this late stage of the litigation -- well after the close of discovery in Goldman Sachs, HSBC, and Ally, and only weeks before the parties' Joint Pretrial Orders are due in these actions on September 2 -- Defendants continue to maintain that their representations were not, in fact, false.[25]  Indeed, they "vigorously deny FHFA's allegations that the Offering Materials contained any misrepresentations or omissions."  Of course, it cannot both be the case that the representations were true and that the GSEs had actual knowledge of their falsity.

Defendants' failure to raise arguments concerning the specific representations at issue for each Certificate presents a challenge to the Court in properly construing Defendants' arguments.  Defendants' joint counterstatement of material facts is comprised of 461 paragraphs, many of them setting out specific bits of information that are never discussed in Defendants' briefs or linked to specific Certificates at issue. The Court has endeavored to adequately credit Defendants'

---

knowledge that the warranted Standard & Poor's credit rating for a given Certificate was, for example, "A" or "AA," as opposed to "AAA."

[25] Fact discovery is completed in the Nomura Action, but expert discovery is ongoing.  The Nomura Joint Pretrial Order will be filed on November 21, 2014.

general arguments while holding Defendants to the specific
evidence proffered here and applying these arguments to the
specific representations at issue.

## I.   Relevant Standards

### A.   Summary Judgment Standard

Summary judgment may not be granted unless all of the
submissions taken together "show[ ] that there is no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The
moving party bears the burden of demonstrating the absence of a
material factual question, and in making this determination, the
court must view all facts in the light most favorable to the
non-moving party.  Eastman Kodak Co. v. Image Technical Servs.,
Inc., 504 U.S. 451, 456 (1992); Holcomb v. Iona Coll., 521 F.3d
130, 132 (2d Cir. 2008).  Once the moving party has asserted
facts showing that the non-movant's claims cannot be sustained,
the opposing party must "set out specific facts showing a
genuine issue for trial," and cannot "rely merely on allegations
or denials" contained in the pleadings.  Fed. R. Civ. P. 56(e);
see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  Nor
may a party "rely on mere speculation or conjecture as to the
true nature of the facts to overcome a motion for summary
judgment," as "[m]ere conclusory allegations or denials cannot
by themselves create a genuine issue of material fact where none

would otherwise exist." <u>Hicks v. Baines</u>, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).  "A submission in opposition to (or in support of) summary judgment need be considered only to the extent that it would . . . be[] admissible at trial." <u>Doe ex rel. Doe v. Whelan</u>, 732 F.3d 151, 157 (2d Cir. 2013) (citation omitted).  Only disputes over material facts -- "facts that might affect the outcome of the suit under the governing law" -- will properly preclude the entry of summary judgment. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

**B.   Elements of Sections 11 and 12(a)(2) Claims**

This Court has previously discussed at length the structure and aims of the Securities Act, <u>see</u> <u>In re WorldCom, Inc. Securities Litigation</u>, 346 F. Supp. 2d 628, 656-64 (S.D.N.Y. 2004), and that discussion is incorporated by reference.  In brief, the private rights of action in the Securities Act were "designed to assure compliance with [its] disclosure provisions . . . by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." <u>Herman & MacLean v. Huddleston</u>, 459 U.S. 375, 381-82 (1983) (discussing Section 11).  Through Sections 11 and 12(a)(2), the Securities Act "provides the purchasers of registered securities with strict liability protection for material misstatements or omissions in registration statements filed with the SEC," <u>In re Lehman Bros. Mortgage-Backed Sec. Litig.</u>, 650 F.3d 167, 175 (2d

48

Cir. 2011), as well as "misstatements or omissions in a prospectus." NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co., 693 F.3d 145, 156 (2d Cir. 2012).

To establish a claim under Section 11, a plaintiff must prove that it:

(1)   . . . purchased a registered security, either directly from the issuer or in the aftermarket following the offering;

(2)   the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and

(3)   the registration statement "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."

In re Morgan Stanley Information Fund Sec. Litig., 592 F.3d 347, 358-59 (2d Cir. 2010) (quoting 15 U.S.C. § 77k(a)).  "Issuers are subject to virtually absolute liability under section 11." Id. at 359 (citation omitted).

In defense, a defendant may "prove[] that at the time of such acquisition [the purchaser] knew of such untruth or omission."  15 U.S.C. § 77k(a).  Non-issuers may also prove that, "after reasonable investigation, [they had] reasonable ground to believe and did believe, at the time such part of the registration statement became effective, that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make

49

the statements therein not misleading." Id. at § 77k(b)(3).
The "standard of reasonableness" is "that required of a prudent
man in the management of his own property." Id. at § 77k(c).

Similarly, to make out a prima facie case under Section
12(a)(2), a plaintiff must prove:

(1)  the defendant is a "statutory seller";

(2)  the sale was effectuated "by means of a
prospectus or oral communication"; and

(3)  the prospectus or oral communication "include[d]
an untrue statement of a material fact or
omit[ted] to state a material fact necessary in
order to make the statements, in the light of the
circumstances under which they were made, not
misleading" ["(the purchaser not knowing of such
untruth or omission)"].

In re Morgan Stanley, 592 F.3d at 359 (quoting 15 U.S.C. §
77l(a)(2)).  Where the burden is on a defendant to prove the
purchaser's knowledge as a defense to liability under Section
11, under Section 12(a)(2) and the Blue Sky Laws, the burden is
on the purchaser to prove the absence of its knowledge as an
element of its claims.  15 U.S.C. § 77l(a)(2); D.C. Code § 31-
5606.05(a)(1)(B); Va. Code Ann. § 13.1-522(A)(ii).  Plaintiffs
bringing Section 11 and 12(a)(2) claims need not establish
"scienter, reliance, or causation."  City of Pontiac Policemen's
& Firemen's Ret. Sys. v. UBS AG, 752 F.3d 173, 182-83 (2d Cir.
2014).

### C.   Actual Knowledge

The standard for actual knowledge under Sections 11 and 12(a)(2), as well as the Blue Sky Laws,[26] has already been decided in these actions.  The June 28 Opinion held that the purchaser must have "actual," "specific knowledge of the falsity of the particular statements at issue."  2013 WL 3284118, at *14-15.

The "[a]vailability elsewhere of truthful information cannot excuse untruths or misleading omissions in the prospectus."  Dale v. Rosenfeld, 229 F.2d 855, 858 (2d Cir. 1956).  The Second Circuit has rejected the idea that "merely available, as opposed to widely known, public information" could establish a plaintiff's knowledge, as Section 11's affirmative defense requires that "the defendant . . . prove actual knowledge."  New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., 709 F.3d 109, 127 n.12 (2d Cir. 2013).

The June 28 Opinion explained that "the GSEs were entitled to rely on the representations made in the offering documents and to believe that the work done by defendants and their diligence firms made the resulting Supporting Loan Group stronger than the general set of loans being sold by a particular Originator."  2013 WL 3284118, at *18.  Accordingly,

---

[26] The parties agree that Sections 11 and 12(a)(2)'s standard applies to the Blue Sky Laws.

there was "no necessary connection between an Originator's
general way of doing business and the characteristics of a
particular group of loans that have been examined and assembled
into a securitization by a defendant entity." Id. at *19.
Thus, the GSEs' "kn[owledge] of problems with an Originator will
not establish that the GSEs had actual knowledge that the
specific representations in the prospectus supplements issued by
the defendants were false." Id. at *18.

More fundamentally, knowledge about a general population --
here, the set of all loans generated by a particular Originator
-- cannot be conflated with knowledge concerning a specific
subset of that population, like loans from that Originator
selected and securitized into a particular Supporting Loan Group
by a Defendant.  For example, the Second Circuit recently held
that YouTube's internal estimates showing that 75-80% of video
streams it hosted contained copyrighted material were
"insufficient, standing alone, to create a triable issue of fact
as to whether YouTube actually knew . . . [of] the existence of
particular instances of infringement" for purposes of copyright
infringement claims against it. Viacom Int'l, Inc. v. YouTube,
Inc., 676 F.3d 19, 32-33 (2d Cir. 2012).

A plaintiff under Sections 11 and 12(a)(2) is under no duty
to investigate a seller's representations.  Accordingly,
"[c]onstructive knowledge cannot bar a purchaser's recovery"

under Sections 11 or 12(a)(2), <u>Casella v. Webb</u>, 883 F.2d 805, 809 (9th Cir. 1989) (Section 12(a)(2)); <u>see</u> <u>N.J. Carpenters Health Fund</u>, 709 F.3d at 127 n.12 (similar for Section 11). While circumstantial evidence of actual knowledge can be just as probative as direct evidence, <u>see</u> <u>Desert Palace, Inc. v. Costa</u>, 539 U.S. 90, 100 (2003), that evidence must be directed to <u>actual knowledge</u>; a case for constructive knowledge, on a record that establishes no actual knowledge, will not suffice.

Actual knowledge of falsity means just that.  Mere awareness of the ever-present risk that an issuer is mistaken, and that certain representations might be inaccurate, will not support a finding of actual knowledge of falsity.  Even suspicion of falsity, before it ripens into actual knowledge, will not suffice.  <u>Cf.</u> <u>GSC Partners CDO Fund v. Washington</u>, 368 F.3d 228, 242 (3d Cir. 2004) (noting, in the context of an issuer's forward-looking statement, that defendant's "lack of certainty or confidence" in its prediction that its statement was false is inconsistent with defendant's "<u>actual knowledge</u>" of falsity).

## II.  FHFA's Burden

FHFA bears the burden on its Section 12(a)(2) and Blue Sky Law claims to show that the GSEs possessed no actual knowledge that the specific representations of the Defendants in the Offering Documents were false.  To carry this burden it has

relied on testimony of the GSEs' former employees, who uniformly stated that they did not know of any false statements in the Offering Documents and many of whom said they relied on Defendants' representations.  FHFA has relied as well on a comprehensive written record comprised of 19 million pages produced by FHFA and the GSEs that shows the GSEs did not receive loan files for the Mortgage Loans, did not express suspicion of Defendants' representations concerning the Securities at issue, and in fact relied on these representations in making their purchasing decisions.  FHFA has presented sufficient evidence from which a jury could find that the GSEs had no actual knowledge of the falsity of the representations in the Offering Documents at issue here.  For the reasons below, Defendants have not created a genuine issue of material fact on the GSEs' knowledge.

## III. The GSEs Did Not Have Actual Knowledge of Falsity.

Defendants "vigorously deny" that the "Offering [Documents] contained any misrepresentations or omissions" and reject FHFA's claims that the Mortgage Loans were "riddled with underwriting defects, inflated appraisals and borrower fraud."  But, "[t]o the extent these conditions existed" in the Mortgage Loans, Defendants argue that "the GSEs knew of them."  That is, Defendants claim to have identified voluminous circumstantial evidence that, if it is true that the Mortgage Loans were

"riddled with underwriting defects" and the like, the GSEs knew of the conditions that created those defects.  Knowledge of conditions creating a risk of falsity, however, is not actual knowledge of falsity.  And, despite the benefit of millions of pages of discovery, Defendants have uncovered no evidence, circumstantial or otherwise, of the GSEs' actual knowledge of the falsity of Defendants' representations.  Consequently, Defendants have failed to meet their burden under Section 11 or raise a triable issue of fact with respect to the GSEs' knowledge as to Section 12(a)(2) and the Blue Sky Laws.

Instead, Defendants have amassed evidence of the GSEs' general knowledge[27] of Originator practices and the subprime market at large, including a pattern of early payment defaults in PLS purchased by the GSEs emerging in late summer 2006. Through counterparty reviews and a history of close interaction, the GSEs knew much about the major players in the RMBS market, including the Originators of the Mortgage Loans and Defendants themselves as aggregators.  The GSEs also knew and considered the fact that low- and no-documentation loans carried more risk

---

[27] The parties dispute the extent to which knowledge held by the GSEs' Single Family businesses was shared with, or is imputable to, the traders who made the GSEs' PLS purchasing decisions. FHFA also argues that several categories of evidence relied upon by Defendants are inadmissible.  Because the information identified by Defendants is insufficient to establish actual knowledge no matter who was aware of it, the Court need not reach these issues.

than full-documentation loans, and were aware of the existence of appraisal bias in loans originated by certain Originators.

In addition to this general information about the marketplace and Originators, the GSEs had certain pre-purchase information about the Mortgage Loans underlying their PLS, including the descriptions contained in the Offering Documents. In the case of one PLS not at issue here, the GSEs were given detailed loan-level information, although not loan files.[28]  But, as will be discussed below, there is no evidence that either of the GSEs ever knew any of Defendants' many representations about the Mortgage Loans that are at issue here to be false.

Because of federal securities laws, the GSEs were not permitted to conduct pre-purchase reviews of loan files for the Supporting Loan Groups underlying the Securities.  But, even if the GSEs had been permitted to investigate more fully the bona fides of the Defendants' representations in the Offering Documents, the securities laws imposed no burden on them to do so.  Instead, it fell to Defendants, who purchased the loans from the Originators and determined which loans to pool into Supporting Loan Groups, to ensure that their representations in the Offering Documents were accurate.  The GSEs understood that

---

[28] Fannie Mae received property street addresses in connection with three prospective PLS deals in July and September 2007, but none of these are at issue in these actions.

the Defendants conducted pre-securitization due diligence before making their representations about the Mortgage Loans to the market, including the GSEs.  That due diligence provided Defendants with a complete defense to strict liability claims under Section 12(a)(2) if they exercised "reasonable care," and provided non-issuer Defendants with a complete defense to Section 11 claims, if the diligence met the standards of "a prudent man in the management of his own property."  15 U.S.C. § 77k(b)(3), (c); 15 U.S.C. § 77l(a)(2).  The GSEs were entitled to rely on those representations, and all the evidence suggests that they did so.  But, as explained above, the Securities Act and the Blue Sky Laws do not require any showing of reliance.  Instead, they forbid false statements.

Defendants' arguments founder on this fact.  The GSEs' knowledge of infirmities in a particular Originator's several underwriting practices does not support an inference that the GSEs knew the Defendants were placing misrepresentations in the Offering Documents about the quality of the loans they had placed in a Supporting Loan Group.

Consider, for instance, one of the strongest examples for Defendants, Nomura's NHELI 2007-3 securitization.  Freddie Mac purchased a Certificate tied to NHELI 2007-3 on April 30, 2007.  More than three-quarters of the underlying loans (77.61%) were originated by ResMae.  After conducting due diligence (to the

best of the GSEs' knowledge), Nomura represented in the NHELI
2007-3 Offering Documents that 58.49% of the loans (and 59.31%
of the pool by aggregate remaining principal balance) had an
original LTV ratio of 80% or lower, and that 18.88% of the loans
(and 27.05% of the pool by remaining balance) had an original
CLTV ratio of 80% or lower.  Nomura also represented that 90.03%
of the properties securing the loans (corresponding to 89.21% of
the loan pool by aggregate remaining principal balance) were
owner-occupied.  Nomura has offered no evidence that Freddie Mac
actually knew any of these very specific representations about
this SLG were false.

It is true that three years earlier Freddie Mac's AMO
reviewed ResMae, rating it as "Marginal" and recommending that
Freddie Mac "Proceed With Caution."  Defendants urge that this
knowledge, together with general knowledge of weakness in the
subprime market and rising early payment defaults in similar
securities, can support a finding that Freddie Mac knew to be
false Nomura's representation that 58.49% of NHELI 2007-3's
loans had an original LTV ratio of 80% or lower.  It cannot.
Although Nomura emphasizes the limitations of its due diligence,
Freddie Mac's AMO issued an aggregator review of Nomura a little
more than a year before this purchase, finding "good due
diligence methodologies, reasonable valuation processes and
sound controls."  AMO reported that "Nomura's due diligence

program is well managed" and "found no issues with Nomura['s]
appraisal process, which is solid."  In particular, AMO noted
that Nomura conducted property and compliance due diligence on
100% of loans and credit due diligence on 20% of pools as large
as NHELI 2007-3's SLG.  AMO rated Nomura "Satisfactory" across
the board.  There is simply no evidence that Freddie Mac
actually knew -- or even believed -- that weaknesses in ResMae's
general origination practices would render false Nomura's
specific representations about the specific loans in the SLG.

Defendants offer four chief arguments in opposition to
FHFA's motion, each of which is discussed below.  First,
Defendants argue that, despite Defendants' due diligence, the
GSEs should have known -- given their reviews of Originators and
reports of Originator-specific appraisal bias, knowledge of the
marketplace, and knowledge of the early payment default rates in
2006 for 2006 PLS purchased by the GSEs and of loans purchased
by the GSEs' Single Family businesses from some of the
Originators -- that poorly originated loans would reach the
Supporting Loan Groups.  But constructive knowledge is
irrelevant, and this evidence does not raise a triable issue of
fact as to actual knowledge.

Defendants next argue that the GSEs actually believed that
defective loans would reach the SLGs.  Their evidence supports,
at most, a belief of inaccuracy concerning securities not at

issue in these actions.  Thus, as noted below, the Court need not reach the question of whether or when a showing of belief can create a triable issue as to knowledge.

Third, Defendants argue that the GSEs were aware that the SLGs "may contain" defective loans.  The GSEs were, of course, aware of the <u>risk</u> that any of Defendants' representations might prove inaccurate, and took steps to evaluate and protect against such risk, but there is no evidence they actually <u>knew</u> any particular representation was false concerning any of the Certificates at issue.  In particular, Defendants lean on the fact that the GSEs knew Defendants' diligence teams reviewed only a sample of the loans in a pool.  Yet Defendants offer no evidence that the GSEs were concerned -- let alone knew -- that Defendants' use of sampling had resulted in SLGs that did not match the Offering Documents' description of the Mortgage Loans.

Finally, Defendants complain that they have not been afforded a full opportunity to take discovery concerning the Single Family side of the GSEs' businesses.  Defendants have had that opportunity, and the record makes clear that the additional information requested about the Single Family businesses of the GSEs fails to meet Federal Rule of Procedure 56(d)'s standard.

## A.   The GSEs' General Knowledge

Defendants argue that the GSEs' general knowledge constitutes circumstantial evidence of the GSEs' actual

knowledge of the falsity of the Defendants' representations.
They point to evidence of knowledge concerning some Originators
and related phenomena, such as a growing recognition from August
2006 onward that their PLS portfolio was experiencing an unusual
or even distressing number of early payment defaults (EPDs).
The Defendants argue that courts applying the actual knowledge
standard "have relied heavily on circumstantial evidence,
including general knowledge," and "have found that actual
knowledge of a misstatement can be inferred from a party's
understanding of limited facts about the alleged misstatements."
Defendants are mistaken.

Defendants principally rely on the Second Circuit's opinion
in In re Initial Public Offerings Securities Litigation, 471
F.3d 24 (2d Cir. 2006) ("In re IPO").  As explained in the June
28 Opinion, In re IPO is inapposite.  See 2013 WL 3284118, at
*15.  The Second Circuit simply held that class certification
was inappropriate where "widespread knowledge" of aftermarket
purchase requirements among a putative class of purchasers would
necessitate "individual inquiries as to the knowledge of each
member of the class."  In re IPO, 471 F.3d at 44.  As a logical
matter, aftermarket purchase requirements inflate a security's
price.  Thus, the court went on to note that "it would surely be
at least a reasonable inference . . . that a requirement to
purchase in the aftermarket would artificially inflate

61

securities prices," and consequently knowledge of the requirement established knowledge of the artificial inflation, making an individual inquiry of each class member mandatory. Id. at 44 n.14.  Here, by contrast, there is no necessary relationship between deficiencies in an Originator's underwriting practices and the falsity of a Defendant's particular representations in the Offering Documents supporting a Securitization about a set of particular Mortgage Loans that had been reviewed, purchased, and securitized by the Defendant.

Defendants have found no evidence that the GSEs even mistrusted Defendants' representations about the Mortgage Loans,[29] let alone any evidence that the GSEs actually knew that any particular representation was false and were content nonetheless to make their purchases blind.  It is with good reason that Defendants title this prong of their argument "The GSEs' Knowledge About Originators' Practices and Loans Permitted Inferences About the Loans in the Supporting Loan Groups." (Emphasis added.)  It is not enough that certain information "permitted inferences" (however shaky) to be drawn; the question is whether the GSEs did, in fact, draw these inferences.

---

[29] As evidence of this mistrust, the Defendants have principally pointed to a statement in a July 2006 credit analysis by Freddie Mac's Palmer that "[w]e believe that the dealer is not reporting true CLTV accurately" and another statement by Palmer in August 2006 that "the reported CLTV number could have been low." Neither statement concerned the Defendants' Securities.

Defendants repeatedly emphasize that circumstantial evidence can be as probative as direct evidence.  This is true.  But, Defendants have pointed to no circumstantial evidence of <u>actual knowledge</u>.

To the contrary -- although FHFA need not establish reliance to prove its claims under Sections 11 and 12(a)(2) or the Blue Sky Laws -- it is undisputed that the GSEs used the loan characteristics reported by Defendants to evaluate the Certificates and model their risk profiles.  Based on those risk profiles, the GSEs sometimes rejected pools or insisted that a tranche be further subdivided to mitigate those risks.  Indeed, because the securities laws prevented the GSEs from conducting pre-purchase loan-level diligence, the GSEs were all the more dependent upon aggregators' representations concerning the Mortgage Loans.

Moreover, Defendants' proposed "inferences" are themselves illogical.  Defendants have offered no reason the GSEs would have believed that Defendants were incapable of identifying defective loans and either eliminating them from the Supporting Loan Groups or taking their existence into account when composing their descriptions of the SLGs for the Prospectus Supplements.  To the contrary, the GSEs conducted reviews of each of the Defendant aggregators and reported that they were quite capable in their diligence.

63

Second, Defendants' arguments bear no relation to the specific representations at issue and thus offer no reason that the GSEs' general Originator and RMBS knowledge would have caused the GSEs to doubt -- let alone recognize as false -- particular figures.  Taking as an example the lead securitization featured in Goldman Sachs's supplemental opposition memorandum, Goldman Sachs represented that 67% of the Mortgage Loans underlying FFML 2006-FF13 had an LTV ratio below 80%.  Goldman Sachs has offered no reason why 67% should have appeared improbably high to Fannie Mae in September 2006, as opposed to, say, 50% or 80%.  Even if PLS traders knew of SFCPRM's operational review of the Originator of the underlying loans, First Franklin, in May 2006, it is difficult to see why SFCPRM's finding that First Franklin had "acceptable operational practices and procedures to mitigate the risk associated with the origination of Subprime collateral" would cause Fannie Mae to infer that the percentage of Mortgage Loans in FFML 2006-FF13's Supporting Loan Group with an LTV ratio below 80% was not 67%.

Third, a contradiction lies at the heart of Defendants' current litigation position.  Because Defendants have found no evidence suggesting that the GSEs actually knew their representations were false, they effectively argue that poor origination practices and the declining performance of subprime

and Alt-A RMBS should have made it obvious that each of the
pertinent representations in the Offering Documents for the
Defendants' 65 Securitizations was false.  At the same time,
however, Defendants continue to contend that each of these
representations was true, and that their due diligence defense
will shield them, in part, from liability from any inaccuracy
that may have crept into the Offering Documents.  Although
Defendants are perfectly entitled to plead and argue in the
alternative, their positions here are inconsistent.  It bears
emphasis that at this late stage -- long after the close of fact
discovery and as the parties prepare their Pretrial Orders for
three of these four cases -- Defendants continue to argue both
that their representations were true and that underwriting
defects, inflated appraisals and borrower fraud were so endemic
as to render their representations obviously false to the GSEs.
Using the example just given, Goldman Sachs argues both that
Fannie Mae knew that the percentage of loans with an LTV ratio
below 80% was not 67%, but also that the true figure was, in
fact, 67%.

Here, the Defendants' evidence concerning the GSEs' general
knowledge does not create a triable issue of fact on the GSEs'
actual knowledge of the falsity of the specific
misrepresentations alleged in the Offering Documents.  There can
be no question that the GSEs' general knowledge of weaknesses in

some Originator practices, of the risk profiles of low- and no-documentation loans, of the rise in early payment defaults in the GSEs' PLS as of August 2006, and of similar phenomena,[30] does not support a finding that the GSEs actually knew that the Defendants' specific representations about the specific Mortgage Loans underlying the Securities were false.[31]

### B. The GSEs Actually Believed Certain Representations Were Inaccurate.

Defendants proffer evidence that, they argue, supports a finding that beginning in mid-2006, "GSE personnel believed that the data provided by issuers of PLS might not be wholly accurate." A belief that issuers' data, as a whole, "might" not

---

[30] This encompasses as well knowledge of compliance exceptions found by Fannie Mae's Legal Department in post-purchase anti-predatory reviews of PLS.

[31] Defendants also argue that the breadth of the discovery that this Court permitted the Defendants to take of the GSEs is implicit recognition that "'generalized knowledge' can demonstrate the requisite actual knowledge." But, permitting the Defendants to take extensive discovery of the GSEs does not alter the standards of proof at trial. Indeed, the June 28 Opinion makes clear that "material has been discoverable despite its limited relevance, given the particularity of the knowledge on the part of the GSEs the defendants will have to establish at trial." 2013 WL 3284118, at *18 (emphasis added).

Defendants make a similar, general argument about the Court's rulings "sustain[ing] FHFA's claims at the pleading stage." It is difficult to analyze this argument since the Defendants do not point to any specific passage in a prior Opinion in these actions. FHFA's allegations were supported by Certificate-specific information. In any case, Defendants do not explain why pleading standards should determine a party's burden of proof at trial.

be "wholly" accurate, is a far cry from actual knowledge that a specific representation made by the Defendants in a particular Offering Document is false.  Indeed, Defendants have found no evidence of suspicion concerning the Securities at issue in the above-captioned actions, much less any evidence sufficient to support a finding of actual knowledge that Defendants' specific representations were false.

Defendants' chief evidence on this front, two documents authored by Palmer, concern securities no longer at issue in these actions, as they were purchased from dismissed defendant UBS.  Palmer's July 2006 credit approval analysis explains, "[w]e believe that the dealer is not reporting true CLTV accurately" because the "deal has about 47% of the collateral concentrated right at 80% CLTV."  As a result, Palmer modeled the deal with an assumption of 95% or greater CLTV to show that "[e]ven under this extreme scenario," credit approval was appropriate.  On August 21, 2006, Palmer wrote about another UBS security that the "deal contained a high percentage of collateral right at 80% LTV, [and] this was an indicator to us that the reported CLTV number could have been low."  (Emphasis added.)

These documents suggest that Freddie Mac was wary about deals with a high concentration of loans with a reported CLTV of exactly 80% and that Freddie recognized the risk that some of

these loans contained silent second mortgages which reduced their credit quality.  Freddie modeled "extreme scenario[s]" to account for such risks.  Far from raising a question of fact concerning some general suspicion of the representations made by every bank in the RMBS industry, these documents show that, where Freddie Mac had concerns about the reported characteristics of the Mortgage Loans by a particular bank -- here, UBS -- Freddie Mac's employees discussed these concerns and expressly asked that they be incorporated into their models.  This is not to suggest that a belief of falsity is tantamount to actual knowledge of falsity; because Defendants have discovered no evidence of similar beliefs about the Securities at issue, the Court need not address when belief ripens into knowledge.

The gap between the GSEs' precautions and any actual knowledge of falsity is nicely illustrated in some of the other documents cited by Defendants.  For instance, Norris instructed that analysts in March 2007 "make some liberal assumptions with regard to CLTV, income, dti,[32] etc." when it came to "the last loans [originated] by New Century," which backed a security the GSEs never purchased.  Norris's concerns about New Century prompted caution, but do not show that he knew any particular representations by Defendants were false.

---

[32] "DTI" refers to a borrower's debt-to-income ratio.

Likewise, in April 2007, Fannie Mae's Director of PLS Surveillance, Chung, expressed concern about "'liar loans' and biased appraisals" and asked for models that could calculate "what severity increment [i.e., what magnitude of negative effects from these factors] is needed to break a bond."[33]  As Zhao, the Director of PLS Analytics, explained, "there's always wanting to know what if and the impact" and "potential risk factor[s] you want to run some analysis on."  No reasonable jury could find from the fact that the GSEs were aware that there was a <u>risk</u> that a bank's representations might turn out to be incorrect, and modeled and attempted to account for this risk, that the GSEs <u>knew</u> any particular representation by the Defendants for these Securities to be false.[34]

### C.   GSEs Believed Some Defective Loans Might Reach SLGs.

#### 1.   Mortgage Loans May Reflect Origination Practices.

Defendants point to a handful of statements from former GSE employees indicating that, in general, they expected loans

---

[33] To "break a bond" is to diminish or wipeout the flow of income due to the bondholder.  Here, because the GSEs purchased senior Certificates in Defendants' Securitizations, a number of loans in the Supporting Loan Group could default before the GSEs' Certificate payments were affected.

[34] For this reason, Defendants' contention that "the GSEs knew that the owner-occupancy percentages in the Offering [Documents] <u>may</u> have been incorrect" because "borrowers could lie about their intentions" does not raise a triable issue of fact concerning the GSEs' actual knowledge that specific representations concerning owner-occupancy percentages in specific SLGs were false.  (Emphasis added.)

backing PLS to "reflect" an Originator's general underwriting practices.  Many of these statements are ambiguous.  And no one testified that they believed a material number of defective loans would be present in particular Supporting Loan Groups, or so much as suggested that such an expectation caused them to doubt any of Defendants' representations about specific SLGs. These statements do not support a finding that the GSEs actually knew the Defendants' representations to be false.

Defendants' strongest employee testimony came from Aneiro, Freddie Mac's Vice President of Non-Agency Portfolio Management. Aneiro was asked, "[I]f an originator was not following its own guidelines and was contributing loans to the collateral for a pool, you would expect that loans not underwritten to the originator's guidelines would then end up in the collateral for a pool?"  Aneiro agreed.  Aneiro did not testify that he knew any of the Originators here were not following their own guidelines, or that he believed the Defendants here would purchase loans from such Originators and permit loans from such Originators to become "collateral for a pool."  And, even in this hypothetical, Aneiro did not testify that he believed a sufficient number of loans would fail to meet guidelines such that Defendants' specific representations regarding the Securities at issue here would be rendered false.

Aneiro was then asked, "[W]hen an originator contributed collateral to a PLS deal, was it your understanding that the collateral reflected the originator's general origination practices?"  He agreed that that "would be [his] general expectation, yes."  This testimony concerning Aneiro's "general expectation" about a hypothetical originator's "general origination practices" does not suggest that Aneiro believed this would be true of Originators with inadequate origination practices, or that the Defendants would agree to purchase and securitize loans from such Originators, let alone that Defendants would fail to identify and remove defective loans from Supporting Loan Groups or falsely describe the SLGs.[35]

### 2.   Expectation "Inherent" in GSEs' Business Practices

Defendants next argue that the mere fact that the GSEs required originator reviews before purchasing PLS, and rejected certain deals because the principal originators had loose underwriting standards, shows the GSEs' belief that an

---

[35] As noted above, Defendants elicited similar testimony from Henderson, as well as Norris.  Norris went on to testify that Fannie Mae's "process basically relied on the dealers and originators providing [it] with reps and warrant[ie]s as to the validity of how these loans were underwritten."  Norris explained that, after receiving a report prepared within the Single Family business that Originator New Century may not have been following its guidelines, Fannie Mae's PLS division did not investigate whether New Century was following their guidelines "as to originations in PLS," because Fannie insisted on "reps and warrant[ie]s on every deal that we purchase."

originator's general underwriting practices would be reflected in the SLGS.  This argument again conflates the GSEs' awareness of the <u>risk</u> that Defendants might let slip defective loans into the SLGs with the GSEs' <u>actual knowledge</u> that Defendants had slipped a material number of defective loans into any given SLG and then falsely described the SLGs in the Offering Documents. Defendants' arguments that "the GSEs knew" that certain representations in the Offering Documents "<u>may</u> have been incorrect" go to recognition of risk, not knowledge of falsity. (Emphasis added.)

There was, of course, a risk that Defendants' due diligence would fail to catch all defective loans in any given securitization.  As purchasers of Certificates backed by those Mortgage Loans, the GSEs were exposed to that risk.  Like any business, the GSEs acted to mitigate that risk, refusing to purchase securities where that risk was greatest -- i.e., where the GSEs believed the originators had become too loose with their underwriting guidelines -- and obtaining "reps and warranties" from PLS sellers.  Far from supporting the GSEs' actual knowledge of a material number of defective loans in a given SLG, these practices show that the GSEs took affirmative steps to <u>prevent</u> the purchase of securities backed by defective loans.  In any event, this evidence does not raise a question of

fact regarding the GSEs' actual knowledge of the false representations.

### 3.  Defendants' Use of Sampling

Defendants argue that the fact that they reviewed only a sample of loans, and that the GSEs knew this, proves that the GSEs knew some defective loans "might" reach the SLGs.  An examination of the GSEs' knowledge of the Defendants' due diligence practices does not suggest that the GSEs knew the Defendants' representations in the Offering Documents were false.

First, the Defendants did not report to the GSEs that they were simply taking a random sample of a certain size.  Rather, they represented to the GSEs that they employed sophisticated tools to ensure that their sampling was representative and permitted them to make representations about the loan pool with confidence.  The information that the Defendants presented to the GSEs about their due diligence programs has been described above.  The GSEs understood, for instance, that HSBC employed a "25% minimum adverse and random sample" -- 20% adverse and 5% random -- for subprime loans.  This adverse sample was comprised of the loans "posing the greatest default and loss [risk]." HSBC created its adverse sample with a "proprietary model, which w[ould] risk-rank the mortgage loans in the pool" based on a dozen indicia of credit risk.  The selection of the sample

depended as well on HSBC's evaluation of the "[o]verall risk
level of the mortgage pool," "[p]rior transaction due diligence
results," and the "[f]inancial standing of the seller."
Similarly, RBS determined the sample size for Alt-A loans with
"a statistical calculation intended to obtain a 95 percent
confidence interval."

Defendants have offered no reason, and proffered no
evidence, to suggest that they led the GSEs to understand that
their sampling protocols undermined Defendants' ability to
accurately represent the characteristics of the SLGs.  And
Defendants have offered no evidence that the GSEs believed
Defendants did not employ sampling correctly.  Instead,
Defendants collect bits of available information suggesting
that, in some cases, PLS aggregators reviewed a small percentage
of the loans.  For instance, Norris of Fannie Mae testified in
2013 that although he did not have "specific[]" knowledge about
the way aggregators employed sampling, he recalled that
aggregators' sample sizes varied and "remember[ed] a range,
possibly 10 percent to 50 percent," of loans in a Supporting
Loan Group were reviewed.  This testimony was untethered to the
practices of the Defendants and does not contradict the
contemporaneous descriptions which the Defendants gave to the
GSEs of the due diligence practices during the period 2005 to
2007.  For the reasons explained above, this does not suggest

actual knowledge that Defendants' representations in the
Offering Documents were false.

Defendants also point to testimony from Feigles, the
Freddie Mac employee responsible for due diligence on Freddie's
Alt-A bulk purchases, about Freddie Mac's own use of sampling to
review prospective bulk loan purchases for its Single Family
business.  Feigles agreed one could "reasonably assume" that at
least some of the loans contained defects.  Feigles did not
suggest, however, that a <u>material number</u> of loans would contain
defects.  Nor does he suggest that, if the rate of defects was
unusually large in a given sample, that Freddie Mac would not
enlarge its sample size so as to keep defects for the whole
loans it was purchasing within tolerance levels.  Much less does
it suggest that Freddie Mac expected that the Defendants would
fail to scrutinize their Mortgage Loans with sufficient care to
ensure that representations they were making in the Offering
Documents they filed with the SEC were accurate.

Defendants also assert that "[f]rom the GSEs'
conversations with Originators, they understood that the 'pull
through rate' during subprime due diligence typically was 70-85%
-- meaning the majority of most pools were deemed suitable for
purchase by issuers."  As an initial matter, the evidence cited
by Defendants does not support this assertion.  Defendants cite
only to testimony from Feigles that it was "probably accurate"

75

that Freddie Mac would "typically . . . purchase between 70 and 85 percent of the loans that it looked at in the Alt-A bulk purchases" for its Single Family business.  Feigles did not testify that he understood this rate to be typical for purchases by aggregators for their securitization business, or that it arose from any "conversations with Originators."

Elsewhere, Defendants cite evidence that Fannie Mae's Single Family side learned in February 2006 from New Century that "their standard pull through rate is 90%" and knew that "[o]ther lenders in subprime expect pull through rate (e.g. First Franklin) in the mid and upper 90's."  Defendants do not identify evidence of a particular pull-through rate with respect to any of the Securitizations at issue here, or the GSEs' knowledge of such a rate.

In any case, the pull-through rate should depend upon many factors, such as the parameters a purchaser chose for its buying program, the price a purchaser was willing to pay for the loans, the quality of the loans reviewed, and the purpose for which the loans were purchased -- for instance, whether they were to be held or securitized.  The Defendants have not pointed to evidence that a particular pull-through rate implies, by itself, that a material number of defective loans were "pulled through" into Supporting Loans Groups of the Securitizations.

76

Defendants have identified no evidence that the GSEs mistrusted the Defendants' representations because of their use of sampling, let alone actually knew any one of those many representations to be false.  Accordingly, the fact that the GSEs knew Defendants employed sampling in their due diligence does not support a finding of actual knowledge of the falsity of Defendants' particular representations.

### 4.   Repurchase Obligations

Similarly, the repurchase obligations included in many of the Certificates' Offering Documents, which required the Originator or sponsor to repurchase a loan if any of Defendants' representations were materially false as to that loan, could not support a finding of actual knowledge of the falsity of particular representations.  The GSEs' recognition of the risk that some defective loans might reach a Supporting Loan Group is not the same as actual knowledge that Defendants' representations concerning the loan pool as a whole were false. Defendants' arguments concerning risk disclosures in the Offering Documents fail for the same reasons.

Individuals purchase accident and travel insurance every day not because they know they will be in a car crash or that illness will prevent them from flying away for vacation, but because they recognize that risk exists and seek to protect themselves from the financial consequences of the realization of

77

that risk.  Ensuring that sellers of PLS provided "reps and warranties" for the Mortgage Loans reflects the same prudence.

Considering all of the evidence put forward by the parties, both singly and together, Defendants have not raised a genuine issue of material fact as to the GSEs' actual knowledge of the specific misrepresentations and omissions alleged by FHFA in the Offering Documents for the Securities at issue.

### D.   Limits on Discovery

On the final page of their joint thirty-five page brief, Defendants argue that "the limitations on discovery in these Actions have foreclosed defendants from obtaining discovery that would further show the GSEs' knowledge of the alleged defects."[36] In support of this conclusory assertion they refer to a declaration that summarizes additional discovery "precluded by orders of the Court"[37] that they assert "would further demonstrate the existence of disputed issues of fact."

---

[36] Fact discovery has closed in all actions, and expert discovery has closed in all actions but <u>Nomura</u>.  Nomura offers no reason to believe that the final weeks of expert discovery will produce evidence of the GSEs' actual knowledge.

[37] The declaration incorrectly characterizes the record of discovery rulings in this complex litigation, including assertions that the Court "denied discovery" altogether on particular issues.  The record of the Court's discovery rulings is available in its Opinions, endorsements on correspondence, and the transcripts from conferences.  Given the existence of that record, which includes the Court's explanations for those rulings, there is no need to try to correct or place in context the assertions in the declaration.  It is also not necessary to

Pursuant to Rule 56(d), Fed. R. Civ. P., where a party opposing summary judgment "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; [or] (2) allow time to . . . take discovery."  That declaration must detail, among other things, "what facts are sought" and "how these facts are reasonably expected to create a genuine issue of material fact."  Miller v. Wolpoff & Abramson, LLP, 321 F.3d 292, 303 (2d Cir. 2003).  A court is free to reject a non-movant's Rule 56(d) requests "if the evidence sought would be cumulative or if the request is based only on speculation as to what potentially could be discovered; and a bare assertion that the evidence supporting [non-movant]'s allegations is in the hands of the moving party is insufficient to justify the denial of summary judgment."  In re Dana Corp., 574 F.3d 129, 148-49 (2d Cir. 2009) (citation omitted).

The Defendants' effort to avoid summary judgment by reference to additional discovery fails for two related reasons. First, they rest their assertion that additional discovery would have been of aid to them upon an incomplete and even misleading description of the fulsome discovery they did take and never

---

revisit any of those rulings to address the issues presented by this motion for partial summary judgment.

confront their failure to discover evidence suggesting actual knowledge from that body of material.  Second, they fail to meet the Rule 56(d) standard.

Document discovery in these actions has been massive: FHFA and the GSEs produced more than 19 million pages of documents in discovery.  Defendants received all relevant Single Family documents.  Defendants are incorrect when they charge that they were "almost entirely precluded from obtaining information related to the GSEs' Single Family businesses."  Defendants were granted extensive discovery concerning the GSEs' Single Family businesses, including all "documents considered in connection with the purchases at issue," "documents held by custodians who were required to give the PLS traders such information," and "documents that went to the GSEs' risk management committees with supervisory responsibility over the PLS trading."  2013 WL 3284118, at *3.  They also received counterparty reviews of Originators created within the Single Family businesses. Additional documents of little relevance -- documents neither considered in connection with the purchases at issue nor possessed by the management committees that jointly supervised PLS trading and Single Family activities -- would not aid Defendants in their opposition to the instant motion.  The Defendants were never able to explain, for instance, why their requests for data of Single Family transactions concerning whole

loans that were purchased under a different set of guidelines
than used by PLS aggregators and that were not, by definition,
in the Defendants' SLGs were anything other than oppressive and
irrelevant.

The Defendants complain in their joint opposition brief
about a second, related and unsuccessful request that they made
for Single Family individual loan records.  They complain that
FHFA successfully resisted producing, "on grounds of burden,"
evaluations by the Single Family businesses of individual loans
that they rejected and which ended up instead as loans
populating the SLGs.  The Defendants are correct; the Court
upheld FHFA's objection to this production.  Like their other
request for transaction records of the loans that the GSEs
actually purchased, these documents would have been of
absolutely no assistance to the Defendants in resisting this
motion for summary judgment.  The Defendants' request for this
production was rejected not only on the ground of the enormous
burden it would impose on FHFA to attempt to locate such
records, but also because any records that might be located
would be utterly irrelevant.

The Defendants speculated that some number of loans in the
SLGs might have been previously offered to the GSEs' Single
Family businesses for purchase and rejected for failure to meet
underwriting guidelines.  There were roughly 1.1 million loans

in the SLGs in the coordinated cases pending in this district,
and it would have been a herculean (and perhaps impossible) task
to determine whether any of them had previously been offered to
and rejected by the GSEs' Single Family businesses.  Since the
GSEs had their own guidelines for their buying programs,
however, there was also no reason to believe that the reasons
for rejection would have told us anything about the issues at
stake here.  But assuming there might be some overlap in the
standards causing rejection of the loan by the GSEs and the
alleged misrepresentations by the Defendants in the Offering
Documents, there was no reason to believe that the GSEs had in
their possession any record of their reason for rejecting the
loan, much less had any requirement to record each and every
reason for rejecting a loan.  But, most significantly, from the
perspective of the GSEs' traders who decided to purchase the
PLS, they did not know which loans populated the SLGs and
therefore could not have drawn any conclusions about the
accuracy of the representations in the Offering Document, which
were in any event representations about the characteristics of
the set of loans that populated the SLGs and not representations
about a single loan.

Defendants also complain that limitations on depositions
left them with "no testimony from some individuals whose
understanding of the risks of the Securitizations could

establish knowledge." Defendants took depositions over 46 days,
questioning 29 GSE and FHFA witnesses. None of that testimony
so much as suggested actual knowledge that Defendants'
representations were false. Because an understanding "of the
risks" would not support a finding of actual knowledge of the
falsity of specific representations for the reasons explained
above, such testimony would be irrelevant as well as cumulative.
The hundreds of hours of testimony Defendants did take, and the
millions of pages of discovery Defendants received, leave no
doubt that the GSEs lacked actual knowledge of the falsity of
Defendants' representations.

Nor have the Defendants met their burden under Rule 56(d).
This attempted showing comes after the conclusion of discovery,
not in the midst of it. It comes after many lengthy conferences
and countless submissions in which the Defendants were given an
opportunity to be heard and to explain their requests for
further discovery. The June 28 Opinion provided a roadmap for
the Defendants to follow in the event they wished to renew any
discovery request and once again explained the legal standards
that underlay the Court's decisions to grant some of the
parties' requests and to deny others. Against that background,
Defendants' declaration fails to establish how the requested
discovery would be "reasonably expected to create a genuine

issue of material fact" as required by Rule 56(d).  Miller, 321
F.3d, at 303.  Two examples will suffice.

The Defendants complain that UBS, the defendant scheduled
to go to trial first, was given authority over the timing of the
FHFA depositions, and that those depositions were therefore
scheduled before FHFA had completed the production of its
documents.  The declaration, however, does not point to any
later-produced document that entitled them to reopen a
deposition, and a denial of a request to do so.

The declaration complains about missing documents.  It
explains that Fannie Mae failed to produce all of its
operational reviews of Nomura and Goldman Sachs and that Freddie
Mac had not retained all of its email for the period before
November 2007.  To the extent that the Defendants believed that
there was any sanctionable discovery abuse by FHFA, they had the
opportunity to raise that issue through the appropriate
application during the discovery period.  They did not do so
then, and they have not done so now.

The declaration argues that the operational reviews would
have shown that Fannie Mae was aware that Nomura performed 20%
credit diligence on large bulk pools and that Goldman Sachs
performed due diligence on a sample of the loans that it
securitized.  Both of those points were captured in the
operational reviews that FHFA did locate and produce in

discovery and have been described in this Opinion.  As for the missing Freddie Mac emails, the declaration speculates that the email destruction has deprived Defendants of "potentially important" evidence relating to the GSE's purchase of Certificates and its actual knowledge of false statements in the Offering Documents.  This naked speculation falls far short of the showing required by Rule 56(d).  As described above, the Defendants have failed to raise a question of fact regarding Freddie Mac's actual knowledge of false statements based on all of the voluminous discovery provided in this lawsuit.  The absence of a complete repository of Freddie Mac emails for the relevant period of time does not cast doubt on that finding, nor does it suggest that reopening the discovery period would cure the problem.

## CONCLUSION

FHFA's April 22, 2014 motion for summary judgment on the element and affirmative defense concerning the GSEs' knowledge is granted.


SO ORDERED:

Dated:     New York, New York
           July 25, 2014

_____
DENISE COTE
United States District Judge


85